Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, SECOND AMENDMENT FOUNDATION,<br><br>Plaintiffs,<br><br>v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII,<br><br>Defendant | Civil Action No. _____<br>VERIFIED COMPLAINT |

## VERIFIED COMPLAINT FOR DECLARATORY
## AND INJUNCTIVE RELIEF

COME NOW the Plaintiffs, ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, and SECOND AMENDMENT FOUNDATION, by and through their undersigned counsel, and complains of the Defendant as follows:

## I

## PARTIES

**Plaintiffs**

1.  Plaintiff ELIJAH PINALES (hereinafter "Pinales") is a natural person, an adult male, over the age of 18 and under the age of twenty-one (hereinafter a "adult(s) under 21"), age nineteen (19) years old, a resident of the State of Hawaii, residing in Honolulu County and is a citizen of the United States. But for the actions of State of Hawaii (hereinafter the "State"), challenged in this lawsuit, he intends to and would have a permit to acquire (hereinafter "PTA"), and would be able to acquire, purchase, own, and possess[1] a firearm and ammunition. Plaintiff Pinales is a member of the Second Amendment Foundation;

---

[1] In all references wherein Plaintiffs complain of Hawaii Revised Statutes herein, specifically with regard to possession, Plaintiffs complain of the prohibitions regarding possession of firearms and ammunition beyond what is allowed under Hawaii Revised Statutes §§134-4 and 134-5.

2. Plaintiff JUDA ROACHE (hereinafter "Roache") is a natural person, a male, age seventeen (17) years old, born December 15, 2006, who will be 18 on December 15, 2024, an "adult under 21", resident of the State of Hawaii, residing in Honolulu County and is a citizen of the United States.  But for the laws at issue as specified herein, he intends to and would apply for a PTA.  But for the laws at issue as specified herein, he would acquire, purchase, own and possess a firearm and ammunition.  But for the laws at issue as specified herein, Plaintiff Roache intends to and would also accept, acquire and own a firearm and ammunition given to him by his mother.  Plaintiff Roache is a member of SAF;

3. Aloha Strategics LLC DBA Danger Close Tactical, (hereinafter "DCT"), is a business authorized to operate in the state of Hawaii.  DCT is located in Honolulu County.  DCT is a federally licensed firearms dealer and is legally authorized to sell firearms and ammunition to purchasers in a retail setting in the state of Hawaii and county of Honolulu.  DCT has customers who are at least eighteen years old and under the age of twenty-one years old, "adults under 21", who are not otherwise disqualified under federal and state law to acquire, buy, own and possess firearms and ammunition and who want to acquire, buy, and possess firearms and ammunition.  DCT desires to engage in business with and sell firearms and ammunition to buyers who are at least eighteen years old and also under the age of twenty-one years old, and intends to and would do so, but for the State laws

challenged here and the criminal prosecution that would follow.  DCT is a member

of SAF;

4. JGB Arms LLC, (hereinafter "JGB"), is a business authorized to operate in the

state of Hawaii.  JGB is located in Kauai County.  JGB is a federally licensed

firearms dealer and is legally authorized to sell and or transfer firearms to

purchasers in a retail setting in the state of Hawaii and county of Kauai.  JGB has

customers who are at least eighteen years old and under the age of twenty-one

years old and who are not otherwise disqualified under federal and state law and

who want to acquire, buy, and possess firearms and ammunition.  JGB desires to

engage in business with and sell firearms and ammunition to buyers who are at

least eighteen years old and under the age of twenty-one years old, and intends to

do so and would do so, but for State's laws challenged here and the criminal

prosecution that would follow.  JGB is a member of SAF;

5. Plaintiff Second Amendment Foundation (hereinafter "SAF"), is a non-profit

educational foundation incorporated under the laws of Washington with its

principal place of business in Bellevue, Washington. SAF seeks to preserve the

effectiveness of the Second Amendment through educational and legal action

programs. SAF has over 720,000 members and supporters nationwide, including

members in Hawaii. The purpose of SAF includes education, research, publishing,

and legal action focusing on the constitutional right to privately acquire, own and

possess firearms and ammunition under the Second Amendment, and the consequences of gun control. The Court's interpretation of the Second Amendment directly impacts SAF's organizational interests, as well as SAF's members and supporters in Hawaii, who enjoy exercising their Second Amendment rights. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Many of SAF's individual Hawaii members between the ages of 18 and 20, including Plaintiffs Pinales and Roache[2] and business members DCT and JGB, have been adversely and directly harmed and injured by Defendant's enforcement of the statutory prohibition on the lawful sale of firearms and ammunition to adults between the ages of 18 and 20. Indeed, Hawaii Revised Statutes §§134-2(d)(1) and 134-7(g), and other HRS specified herein, have denied, and will continue to deny, millions of responsible, peaceable, law-abiding adults under the age of 21, "adult(s) under 21", their fundamental, individual right to keep and bear arms secured under the Second and Fourteenth Amendments of the U.S. Constitution. Defendant's actions and failures alleged herein have caused SAF to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action;

_____

[2] Effective December 15, 2024.

5

**Defendant**

6.  Defendant Anne E. Lopez is the Attorney General of the State of Hawaii and is sued in her official capacity and is responsible for enforcing the State of Hawaii's customs, policies, practices and laws related to the State of Hawaii on the acquisition, sale, purchase, ownership and possession of firearms and ammunition and criminal laws including those related to the acquisition, sale, purchase, ownership and possession of firearms and ammunition. Defendant Lopez may be served at the Office of Attorney General located at 425 Queen St, Honolulu, Hawaii 96813;

## II

## JURISDICTION AND VENUE

7.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988;

8.  Venue lies in this Court pursuant to 28 U.S.C. § 1391;

## III

## INTRODUCTION

9.  This action challenges the constitutionality of State's laws that prohibits the acquisition, purchase, sale, ownership, and possession of firearms[3] and ammunition by adult(s) under 21;

10. State's prohibition of firearm and ammunition acquisition, ownership, and possession, and the related sale and purchase of firearms and ammunition, by, adults under 21 makes it impossible for those individuals to exercise their right to "keep arms", as guaranteed by the Second Amendment's text and as recognized and reaffirmed by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 142 S. Ct. 2111 (2022);

11.  The main policies, actions, and customs that Plaintiffs target and allege are unconstitutional here are-

A. Hawaii Revised Statutes, (hereinafter "HRS"), §134-2 (a), as it applies to HRS §134-2(d)(1);

HRS §134-2(a) reads-

§134-2  Permits to acquire.  (a) No person shall acquire the ownership of a firearm, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first procured from the chief of police of the county of the person's place of business or, if there is no place

---

[3] Plaintiffs also challenge the denial of the acquisition and ownership of firearms through the prohibition of the issuance of "permits to acquire", hereinafter "PTA", referenced in HRS §134-2, for firearms to adult(s) under 21.

of business, the person's residence or, if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as prescribed in this section. When title to any firearm is acquired by inheritance or bequest, the foregoing permit shall be obtained before taking possession of the firearm; provided that upon presentation of a copy of the death certificate of the owner making the bequest, any heir or legatee may transfer the inherited or bequested firearm directly to a dealer licensed under section 134-31 or licensed by the United States Department of Justice without complying with the requirements of this section.

B. HRS §134-2(d)(1), which reads-

(d) The chief of police of the respective counties shall issue permits to acquire firearms to: (1) Citizens, nationals, or lawful permanent residents of the United States of the age of twenty-one years or more[4];

C. HRS §134-2 (h), which reads-

(h) No person shall sell, give, lend, or deliver into the possession of another any firearm except in accordance with this chapter.[5]

D. HRS §134-7(g), which reads-

§ 134-7. Ownership, possession, or control prohibited, when; penalty

(g) Except as provided in section 134-5, no person who is under the age of twenty-one shall own, possess, or control any ammunition for any firearm; provided that this subsection shall not apply to a person in an exempt category identified in section 134-11(a).

---

[4] Plaintiffs, in this lawsuit, do not challenge the "citizens, nationals or lawful permanent residents" aspect of this statute-only the age restriction.
[5] As this statute applies to Hawaii Revised Statute §134-2(d)(1).

12. Plaintiffs respectfully request that this Court: (i) declare, facially and as applied to each Plaintiff, that HRS §§134-2(a), 134-2(d)(1), 134-2(h), and 134-7(g) and Defendant's policies and practices of enforcing those laws, which prohibits adults under 21, between the ages of 18 and 20, from acquiring, purchasing, and owning and or possessing any firearm or ammunition, and which also prohibits authorized firearm dealers and others from engaging in commerce with and selling and giving, lending, renting, transferring and gifting firearms and ammunition to adults under 21 are unconstitutional infringements of Plaintiffs' constitutional rights under the Second and Fourteenth Amendments of the United States Constitution; and (ii) permanently enjoin Defendant from enforcing the aforementioned HRS, both facially and as applied to each Plaintiff, and thereby allow non-federally licensed firearm dealer Plaintiffs, and others similarly situated, to acquire, purchase, own, sell, transfer and possess firearms and ammunition to adults under 21 to defend themselves, their families, and their homes and for all other lawful purposes, and to allow federally licensed firearm dealers to sell, rent, and transfer firearms and ammunition to adults under 21;

## IV

## HAWAII FIREARM LAW BACKGROUND

13. In anticipation of bad-faith efforts to obstruct its ruling in recalcitrant jurisdictions, the *Bruen* Court expressly invited challenges such as this one,

noting that, "because any permitting scheme can be put toward abusive

ends, we do not rule out constitutional challenges to shall-issue regimes

where, for example, lengthy wait times in processing license applications

or exorbitant fees deny ordinary citizens their right to public carry." *Id.*

The policies that Plaintiffs challenge[6] have gone far beyond

"abus[ing]"constitutional rights. Defendant has flat-out denied

Plaintiffs their rights to be armed inside and outside of their homes by establishing

an onerous permitting regime replete with subjective and discretionary decisions,

poll tax-like fees, and *as applicable to this lawsuit*, an outright ban on the

acquisition, sale, purchase, ownership and possession of firearms and ammunition

by adults under 21, and it has also unconstitutionally interfered with and blocked

otherwise lawful commerce between DCT and JGB and adults under 21 who desire

to, intend to and would otherwise purchase and acquire ownership of firearms and

ammunition but for State's adults under 21 prohibitions;

---

[6] Despite Hawaii's comprehensive statutory denial and infringement of Second
Amendment rights, this lawsuit <u>only</u> attacks the aspect of adults under 21 being
statutorily prohibited from being "granted" a permit to acquire, and also from
purchasing, selling, owning and possessing firearms and ammunition and also from
authorized person from selling firearms and ammunition to adults under 21. *See*
FN 1.

14.  There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, to allow an adult under 21 to acquire or own a firearm without a PTA when the adult under 21 would acquire a firearm through inheritance;

15. There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, to allow an adult under 21 to acquire or own a firearm without a PTA when the adult under 21 would acquire or own a firearm through intra-familial transfer;

16. There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, would allow an adult under 21 to acquire or own a firearm without a PTA when the adult under 21 would acquire or own the firearm due to it being a gift;

17.  There is no exception to HRS §134-7(g), or any other Hawaii Revised Statute, to allow an adult under 21 to acquire, buy, own or possess ammunition if the ammunition would be acquired or possessed due to inheritance, intra-familial transfer, or gift;

18. HRS §134-4 Transfer, Possession of Firearms, (c), reads, in pertinent part,-

> (c)  Any lawfully acquired rifle or shotgun may be lent to an adult for use within the State for a period not to exceed fifteen days without a permit; provided that where the rifle or shotgun is to be used outside of the State, the loan may be for a period not to exceed seventy-five days;

19. HRS §134-5, reads, in relevant part- §134-5 Possession by licensed hunters and minors; target shooting; game hunting.

(a)  Any person of the age of sixteen years, or over or any person under the age of sixteen years while accompanied by an adult, may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting or while going to and from the place of hunting or target shooting; provided that the person has procured a hunting license under chapter 183D, part II.  A hunting license shall not be required for persons engaged in target shooting.

(b)  A permit shall not be required when any lawfully acquired firearm is lent to a person, including a minor, upon a target range or similar facility for purposes of target shooting; provided that the period of the loan does not exceed the time in which the person actually engages in target shooting upon the premises.

20. HRS §134-17 reads in pertinent part, Penalties…. (b) Any person who violates:

(1) Section 134-2, 134-4, 134-10, 134-13(c), or 134-15 shall be guilty of a misdemeanor;

21.  HRS §134-7(j) reads-

(j) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. Any person violating subsection (c), (d), (e), (f), (g), or (h) shall be guilty of a misdemeanor;

22.  HRS §134-11, exemptions, are not applicable to this lawsuit;

**V**

**STATEMENT OF LAW**

**A**

**SECOND AMENDMENT**

23. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.";

24. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016); *NYSRPA v Bruen,* 597 U.S. 1, 142 S. Ct. 2111 (2002);

25. The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

26. In *Bruen*, the Supreme Court held unconstitutional New York's "good cause" licensing requirement because a State may not condition the right to publicly carry handguns on a citizen's "special need for self-defense." *Bruen*, 142 S.Ct. at 2135 n.8;

27. The "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This is because the Second Amendment "presumptively protects" carrying firearms. *Id.* At 2129. To determine whether a state's restriction is constitutional, the Court in *Bruen*

explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129. If the right to carry cannot be restricted absent "exceptional circumstances" then certainly the right to acquire, own and possess similarly is presumptively protected from restriction, and an outright ban is unconstitutional.  Being an adult under 21 is not an "exceptional circumstance";

28.  It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* At 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined;

29.  The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct. at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate"

or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S. Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively declare the island of Manhattan a 'sensitive place' simply because it is crowded and protected generally by the New York City Police Department." *Id;*

30. The Fourteenth Amendment to the United States Constitution provides in pertinent part: No state shall make or enforce any law which shall abridge the privileges or immunities of citizens of the United States; nor shall any state deprive any person of life, liberty, or property, without due process of law; nor deny to any person within its jurisdiction the equal protection of the laws;

31. The Supreme Court has defined all of the Second Amendment's key terms. "The people" means, at a minimum, "all Americans"; "Arms" includes "all instruments that constitute bearable arms"; *Heller*, 554 U.S. at 580–82,;

32. "We turn to the phrases 'keep arms' and 'bear arms'. Johnson defined 'keep' as, most relevantly, '[t]o retain; not to lose,', and '[t]o have in custody.' Johnson 1095. Webster defined it as '[t]o hold; to retain in one's power or possession.' No party has apprised us of an idiomatic meaning of "keep Arms." Thus, the most natural reading of 'keep Arms' in the Second Amendment is to 'have weapons' *Heller*, 554 U.S. at 582;

33. In *Jackson*, the Ninth Circuit found that ammunition is protected by the Second Amendment, and one thus has a right to purchase it. "'[T]he right to possess firearms for protection implies a corresponding right' to obtain the bullets necessary to use them." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014) (quoting *Ezell v. City of Chi.*, 651 F.3d 684, 704 (7th Cir. 2011);

34. "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cty. of Alameda,* 873 F.3d 670, 677 (9th Cir. 2017). For this reason, the right to keep and bear arms includes the right to purchase them. And thus, laws that burden the ability to purchase arms burden Second Amendment rights. *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022);

35. "18-to-20-year-olds are, like other subsets of the American public, presumptively among "the people" to whom Second Amendment rights extend." *Lara v. Commr. Pennsylvania State Police,* 91 F.4th 122, 132 (3d Cir. 2024); "Ordinary, law-abiding 18 to 20-year-old Minnesotans are unambiguously members of the people." *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) at 692, reh'g denied, *Worth v. Jacobson*, 2024 WL 3892865, (C.A.8 (Minn.), 2024). "[T]he Court concludes that law-abiding 18-to-20-year-olds are a part of "the people" referenced in the Second Amendment." *Firearms Policy Coalition, Inc. v.*

16

*McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. 2022), appeal dismissed sub nom.

*Andrews v. McCraw*, No. 22-10898, 2022 WL 19730492 (5th Cir. Dec. 21, 2022);

"We agree with Plaintiffs: the historical record shows that the Second Amendment

protects young adults' right to keep and bear arms." *Jones v. Bonta*, 34 F.4th 704,

720 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022).

"[T]he Constitution's text, structure, and history affirmatively prove that 18-year-

olds are covered by the Second Amendment." *Hirschfeld v. Bureau of Alcohol,

Firearms, Tobacco & Explosives*, 5 F.4th 407, 440 (4th Cir. 2021), as amended

(July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021).[7];

36.   *Heller* established a "text, history, and tradition" framework for analyzing

Second Amendment questions. *See United States v Rahimi, 144 S.Ct. 1889 at

1897. See also Bruen*, 142 S. Ct. at 2127-29, citing *Heller*, 554 U.S. at 634. Under

that framework, the *Heller* Court assessed historical evidence to determine the

prevailing understanding of the Second Amendment at the time of its ratification in

1791. Based on that assessment, the Court concluded that the District of Columbia

statute which prohibited possession of the most common type of firearm in the

---

[7] Plaintiffs recognize that the *Jones* and *Hirshfeld* opinions have both been vacated.
However, they both remain persuasive authority.  The *Hirschfeld* opinion was
vacated because all of the plaintiffs turned 21 and no adults under 21 were
substituted as plaintiffs.

nation (the handgun) lacked a Revolutionary-era tradition, did not comport with the historical understanding of the scope of the right, and therefore violated the Second Amendment;

37.  Since *Bruen*, a trial court recently found that the federal law restricting the sale of handguns to adults under 21 is unconstitutional. "In summary, because Plaintiffs' conduct – the purchase of handguns – "fall[s] [within] the Second Amendment's 'unqualified command' " and the challenged statutes and regulations are not "consistent with the Nation's historic tradition of firearm regulation," the Court **FINDS** 18 U.S.C. §§ 922(b)(1) and (c)(1) facially unconstitutional and as applied to Plaintiffs. Plaintiffs having demonstrated there is no genuine dispute of material fact and that they are entitled to judgment as a matter of law, their Motion for Summary Judgment [ECF No. 28] is **GRANTED**. For the same reasons,", *Brown v. Bureau of Alcohol, Tobacco, Firearms & Explosives*, 704 F. Supp. 3d 687, 706 (N.D.W. Va. 2023), appeal pending, 4th Cir.

38.  When examining a challenged law, the court must consider the relevant time period and the court must look to relevantly similar historical analogues that also explain the how and why and keep in mind that our forefathers would have never have accepted certain legislation[8].  Some legislation would have never been

---

[8] How the British Gun Control Program Precipitated the American Revolution, *David B. Kopel,* Charleston Law Review, Volume 6 Winter 2012 Number 2, "We can discern that broad attempts to disarm the people of a town, or to render them

accepted and thus is off the table for consideration.  The Founding Fathers framed

a limited government[9], and vastly *expanded* the right to keep and bear arms in

America[10].  Laws of the time[11] did not control people nor arms, but sought to, as

today, punish criminal acts and only act in a prophylactic manner under very

limited circumstances.  So, there were laws prohibiting intoxicated carrying of

arms and the temporary disarmament of those adjudicated to be insane and thus

---

defenseless, are anathema to the Second Amendment; such disarmament is what
the British tried to impose, and what the Americans fought a war to ensure could
never again happen in America. Similarly, gun licensing laws that have the
purpose or effect of allowing only a minority of the people to keep and bear arms
would be unconstitutional." *Id* at 285-286.

[9] Some rights, like the right to keep and bear arms were so broad in nature, there
were some who felt that the Constitutional amendments were unnecessary because
they could not see any government infringing upon those rights.  *See* Federalist
Papers 84.

[10] *See Passages of Arms: The English Bill of Rights and the American Second
Amendment*, University of Nebraska-Lincoln, Nebraska law Review, Christopher
D. Carrier, September 5, 2021, a review discussing Professor Schwoerer and
Professor Malcolm, with Schwoerer arguing that despite widespread firearm
ownership in England, England sought to restrict firearm possession, "She argued
that there was no intent to create a right, and no such effect, in that the three forms
of restriction (Protestantism, socioeconomic "condition," and the crucial qualifier
"as allowed by law") vitiated any real effect in the form of widespread individual
gun ownership."  The Second Amendment contains no such qualifiers.  One
common thread did remain, and that was a focus on the "use" of a gun, not the
mere possession of it. "Indeed—and the condemnation was on the *use* of the
firearms, not the possession of them."  *Id.*

[11] That the Founders would have accepted.  Parliamentary acts, cited *infra*, that
served as the catalyst for the American Revolution and the Second Amendment are
examples of the *kinds* of laws that the Founders found unacceptable- unacceptable
enough to start a revolution.

dangerous[12]. At the time of the Founding and in 1791, ordinary adults under 21 had all the rights of any other adult otherwise.

39. The relevant time period to examine to determine if there are any relevantly similar analogues that limit Second Amendment rights in the same way is 1791. *See Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024), cert. granted, judgment vacated sub nom. *Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) (Footnotes omitted) ("the Second Amendment should be understood according to its public meaning in 1791."). *See also*, *United States v. Connelly*, --- F.4th ----, 2024 WL 3963874 at *9 (5th Cir. Aug. 28, 2024) ("Offering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin."). *See also Mark Smith*[13]*,* "No Supreme Court case has ever looked to 1868 as the principal

---

[12] A 1774 American treatise on the liberties belonging to English subjects included an example of a warrant to secure a lunatic for constables, churchwardens, and overseers of the poor that allowed two justices of the peace to detain individuals by lunacy so disordered in their senses, that he is dangerous to go abroad. *See* 1788 N.Y. Laws Ch. 12., and, a1655 Virginia law prohibiting the shoot[ing] any guns at drinkeing, a 1771 New York law banning shooting guns around New Year's to prevent the great Damages frequently done by persons intoxicated with Liquor; 1655 Va. Acts 401, Acts of March 10, 1655; 1771 Colonial Laws of New York.
[13] Smith, Mark W., *'Not All History Is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868* (October 1, 2022). Available at SSRN: https://ssrn.com/abstract=4248297 or http://dx.doi.org/10.2139/ssrn.4248297

period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."

40.  It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. *Frost & Frost Trucking Co. v. Railroad Comm'n of California*, 271 U.S. 583, 593-94 (1926).  "Constitutional rights would be of little value if they could be . . . indirectly denied" (*Smith v. Allwright*, 321 U.S. 649, 664 (1944)), or "manipulated out of existence." *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960). "Significantly, the Twenty- Fourth Amendment does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citation omitted). Thus, like the Fifteenth Amendment, the Twenty-Fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. *Lane v. Wilson*, 307 U.S. 268, 275 (1939). " 'It hits onerous procedural requirements which effectively handicap exercise of the franchise by those claiming the constitutional immunity.' " *Harman*, 380 U.S. at 540-41 (citations omitted), quoting *Lane*, at 275;

41. 10 U.S.C. §505(a) allows adults age 18 to join the United States military, and

to join at age 17 with parental consent. *See* 10 U.S.C. §505(a) which reads-

> (a)    The Secretary concerned may accept original <u>enlistments</u> in the
> Regular Army, Regular Navy, Regular Air Force, Regular Marine Corps,
> Regular Space Force, or Regular Coast Guard, as the case may be, of
> qualified, effective, and able-bodied persons who are not less than seventeen
> years of age nor more than forty-two years of age. However, no person
> under eighteen years of age may be originally enlisted without the written
> consent of his parent or guardian, if he has a parent or guardian entitled to
> his custody and control.

Thus, adults under 21 may join the military;

42. The Twenty-sixth Amendment to the United States Constitution

provides, in pertinent part-

> The right of citizens of the United States, who are eighteen years of age or
> older, to vote shall not be denied or abridged by the United States or by any
> State on account of age.

Thus, adults under 21 can vote;

43.  *Bruen* further establishes several requirements to determine whether a

historical regulation is sufficiently analogous. First, the relevant time period for the

historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at

2135-36. That is because "'[c]onstitutional rights are enshrined with the scope they

were understood to have when the people adopted them.'"  *Bruen*, 142 S.Ct. at

2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).  "20th

century and late 19th century statutes and regulations "cannot provide much insight

into the meaning of the Second Amendment when it contradicts earlier evidence."
*Bruen*, 142 S.Ct. at 2154 & n.28;

44.  Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*[14].  Legislation, history and events following the Civil war can confirm but cannot limit, reduce or infringe upon the rights as understood in 1791.  In other words, only those restrictions with roots at the time of the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961));

45.  Second, the historical analogue must be "representative." Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156.  Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so

---

[14] Note that the Reconstruction Period, generally from approximately 1865-1877, involved federal troops in the south, followed by the passage of Black Codes and then Jim Crow laws, such laws extending long into the 20th century, and the passage of Constitutional amendments trying to ensure basic constitutional rights to newly freed slaves.  That time period was not typical nor traditional and could not have lessened the rights as understood from 1791.  Constitutional acts, in the late 1800's, meant to ensure newly freed slaves the rights, understood by the founders in 1791, in the Constitution, including the right to keep and bear arms, confirm the breadth and scope of the Second Amendment.

"risk[s] endorsing outliers that our ancestors would never have accepted."

*Drummond v. Robinson,* 9 f.4th 217 (3rd. Cir 2021),- individual self-defense is the central component of the Second Amendment right;

46.  Also, the historical analogue must be "relevantly similar," which is to say that it must burden ordinary, law-abiding citizens right to carry in a similar manner and for similar reasons. *Bruen*, 142 S. Ct. at 2132.  *Bruen* thus held that the inquiry into whether a proper analogue exists is controlled by two "metrics" of "how and why" any restriction was historically imposed during the Founding era.  *Id.* at 2133. "[W]hether modern and historical regulations impose a comparable burden on the right of armed self-defense and whether that burden is comparably justified are "'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis in original). "[T]o the extent later history contradicts what the text says, the text controls." *Id.* at 2137. "Thus, 'postratification adoption or acceptance of laws that are inconsistent with the original meaning of the constitutional text obviously cannot overcome or alter that text.'" *Id*., quoting *Heller v. District of Columbia*, 670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting);

47.  Also, the historical analysis required by the Supreme Court is fundamentally a legal inquiry that examines legal history, which is appropriately presented in briefs. *See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal questions" that judges can address) (emphasis in original); *see also id.* at 2135 n.8

(rejecting the dissent's suggestion that further fact-finding was needed and holding that its ruling did not "depend on any of the factual issues raised by the dissent"). Accordingly, the required analysis does not require fact-finding by a court;

48.  Aaron Burr, an American Founding Father, was born on February 6, 1756. The battles of Lexington and Concord were fought on April 19, 1775.  Burr, who was studying law at the time, learned of the battles of Lexington and Concord and in 1775, at the age of 19, enlisted in the Continental Army, with his own arms and ammunition[15];

49. Henry Lee III, an American patriot, was born on January 29, 1756.  Lee graduated from the College of New Jersey[16] in 1773 and began a legal career. Following the battles of Lexington and Concord in April 1775, Lee joined a Dragoon detachment in the Colony of Virginia as a Captain joining the service with his own arms and ammunition[17] at the age of 19[18];

---

[15] Burr distinguished himself by, in September of 1775, being a part of Colonel Benedict's expedition to Quebec.  He also distinguished himself at the battle of Quebec in December 1775. Burr was also a United States Senator from 1791-1797 and America's third Vice President.

[16] Now known as Princeton University.

[17] The Virginia Militia act at the time required him to appear armed with his own arms and ammunition.  *See* The Statutes at Large; Being a Collection of all the Laws of Virginia, from the First Session of the Legislature, in the Year 1619 (Richmond: Franklin Press, 1819), 6:112-119.  At 6:112-113 and 6:114-115 are general provisions for organizing the militia.  On 6:116 is a statement that militiamen were obligated to provide themselves with "arms and ammunition."

[18] From 1786-1788 Lee was a Delegate to the Congress of the Confederation.  In 1788 he served in the Virginia Convention in support of ratifying the U.S.

50. James Monroe, an American Founding Father, was born April 28, 1758.  In the early phase of the American Revolution, opposition to the British government grew in the Thirteen Colonies in reaction to the "Intolerable Acts", a series of harsh laws against the Colonies in response to the Boston Tea Party. In Williamsburg, British Governor John Murray, 4th Earl of Dunmore, dissolved the Assembly after protests by the delegates, who then decided to send a delegation to the First Continental Congress in Philadelphia. Dunmore wanted to take advantage of the absence of the Burgesses, who had convened to Richmond, and had soldiers of the Royal Navy confiscate the weapons of the Virginian militia[19], which alarmed militiamen and students of the College of William & Mary, including Monroe. They marched to the Governor's Palace and demanded that Dunmore return the confiscated gunpowder. When more militiamen arrived in Williamsburg under the leadership of Patrick Henry, Dunmore agreed to pay compensation for the confiscated goods. Monroe and his fellow students were so incensed by the governor's actions that they conducted daily military drills on campus afterward[20]. On June 24, 1775, Monroe[21] and 24 militiamen stormed the Governor's Palace,

---

Constitution.  From 1791-1794 he served as Governor of Virginia.   In 1794 Washington summoned Lee to quash the Whiskey Rebellion and Lee led 12,950 militiamen, all armed with their own arms and ammunition, to a peaceful resolution with those who initiated the rebellion.

[19] They used their own personal weapons. *See* FN 17.

[20] With his own arms and ammunition.

[21] At this time, Monroe was 17 years old.

capturing several hundred muskets and swords. In 1776, at age 18, Monroe joined the Continental Army, 3rd Virginia Regiment armed with his own arms and ammunition[22];

51. Joseph Plumb Martin, was an American, born on November 21, 1760. He joined the Connecticut militia in 1775, armed with his own arms and ammunition, under General Washington's command[23];

52. The text of the Second Amendment, as authoritatively interpreted by the Supreme Court, indisputably covers possession (keep) and the wear, carry, and transport (bear) of firearms, including handguns by ordinary, law-abiding citizens. The Government bears the burden to demonstrate that there is an enduring, well-established, representative historical analogue to the restriction imposed by the

_____

[22] Monroe was in the Virginia House of Delegates in 1782, the Congress of the Confederation in 1783, the Governor of Virginia in 1799 and President of the United States from 1817-1825. There were various laws in the Virginia Colony that required civilians to own their own arms and ammunition, *See* FN 13.

[23] Plumb wrote a narrative, "Adventures, Dangers and Sufferings of a Revolutionary Soldier" which is considered a primary source of information regarding the revolution. He joined the militia, with his own arms, at age 15, and saw many battles. The laws of the Colony of Connecticut required him to have his own arms and ammunition, *See* The Public Records of the Colony of Connecticut, 1636-1776, 8:379 and 8:380 contain a statute directing "that the inhabitants...be armed" and requiring "every listed souldier and other house-holder" except calvarymen "shall always be provided with, and have in continual readines, a well-fixed firelock...." If not, he was subject to ten shillings fine for failure to have a gun and ammunition, and three shillings for defects in either.

government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, the State cannot meet its burden to justify its denial in the issuance of PTA permits for the Plaintiffs, nor of the prohibition on the ownership, purchase, sale and possession of firearms and ammunition for those who are the age of eighteen but under the age of twenty-one, nor of the blocking of otherwise lawful commerce between firearms dealers and others to and from adults under 21 regarding firearms and ammunition.  There is no historical analogue of prohibition for adults under 21[24] nor of banning otherwise lawful commerce between firearm dealers and others and adults under 21;

## STATEMENT OF LAW

### B

### H.R.S. §134  Firearms

---

[24] There is also no historical analogue allowing the government to infringe on being able to acquire, buy, sell, possess or own arms through a licensure or permitting process at all or with any delay. However, Plaintiffs do not challenge the constitutionality of the PTA in this lawsuit, nor do they concede such permits are constitutionally permissible.

53. Hawaii law, specifically Hawaii Revised Statutes Section 134 *et seq*, is a comprehensive set of laws covering all aspects of firearms in Hawaii including everything from acquisition, possession, ownership, usage and carriage of arms[25];

54.  Following *Bruen*, the state of Hawaii promulgated new laws regarding firearms, making all aspects of the exercise of Second Amendment rights much more difficult, onerous and expensive;

55.  Hawaii's ban on adults under 21 not being able to get a PTA is not long-established, having been put in place in 1994.  Hawaii's ban on adults under 21 not being able to acquire, purchase or own ammunition is also not long-established as it was enacted in 2024;

## VI

## CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMENDMENT II RIGHT TO BEAR ARMS 42 U.S.C. §1983

56.  Plaintiffs hereby re-allege and incorporate by reference the allegations in the forgoing paragraphs as if set forth fully herein;

57.  Plaintiffs do not concede that any Hawaii Revised Statute is constitutional;

---

[25] Hawaii state laws regarding all aspects of the Second Amendment and firearms are thorough, oppressive, and comprehensive.  Yet, Hawaii does not have an explicit preemption law that limits regulation to the state and in several circumstances allows or mandates that counties promulgate additional regulations, restrictions and processes.  HRS §134 et seq is attached as Exhibit 1.

58.  Plaintiffs allege that State's prohibition against the acquisition, purchase, ownership and possession of firearms and ammunition by adults under 21 and the concomitant sale, lending or rental of firearms and ammunition to adults under 21 by firearms dealers and others and the prohibition against granting of PTA to adults under 21, has violated their Second Amendment and Fourteenth Amendment U.S. Constitutional rights;

59.  Following the *Bruen* decision, Hawaii, erected onerous laws, customs, policies and practices that are designed to delay, deprive and infringe upon the exercise of Second Amendment rights for as long as possible.  Although State's firearm prohibition for adults under 21 preceded *Bruen*, State recently doubled down in 2024 by prohibiting the possession by adults under 21 of ammunition in 2024;

60.  In *Cooper v. Aaron,* 358 U.S. 1 (1958), the Supreme Court was confronted with similar bureaucratic foot dragging in implementing public school integration. Given the open defiance of the Supreme Court's opinion in *Brown I*[26] and *Brown II*,[27] the Court did not tolerate finger-pointing, simply observing that "delay in any guise in order to deny . . . constitutional rights.. . could not be countenanced, and that only a prompt start, diligently and earnestly pursued . . . could constitute good faith compliance." 358 U.S. at 7.

---

[26] *Brown v. Board of Education*, 347 U.S. 483 (1954).
[27] *Brown v. Board of Education,* 349 U.S. 294 (1955).

61.  Plaintiffs do not concede that a PTA to acquire, buy, or own a firearm is constitutional.  In fact, 41 states do not require any permit or license to acquire, own or buy a long gun, and 38 states do not require any permit or license to acquire, own or buy a pistol;

62.  Only 5 states restrict the purchase of long guns to adults at least 21 years old;

## A

## **Plaintiff Elijah Pinales**

63.  Plaintiff Pinales realleges and incorporates by reference all of the foregoing allegations of this complaint;

64.  Plaintiff Pinales challenges the provisions of the HRS that prohibits the issuance of a PTA to adults under 21;

65.  Plaintiff Pinales challenges the provisions of the HRS that prohibit him from acquiring, buying, owning and or possessing firearms and ammunition because he is under 21;

66.  Plaintiff Pinales does not own any firearms or ammunition;

67.  Plaintiff Pinales is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm and ammunition, apart from the challenged statutes that prohibit him receiving a PTA and acquiring, buying, owning, and possessing a firearm and ammunition;

68.  Plaintiff Pinales has not applied for a PTA because to do so in the face of the
challenged statute that prohibits adults under 21 from being issued a PTA would be
futile;

69.  Plaintiff Pinales desires, intends, and would apply for a PTA to acquire, buy,
own, and possess a firearm and desires, intends, and would acquire, purchase, own
and possess a firearm and ammunition but for the challenged statutes that prohibit
the issuance of a PTA to him because of his current age and also prohibit his
ownership, purchase and possession of a firearm and ammunition due to his age
and the resultant criminal prosecution that would follow if he acquired, purchased,
owned and possessed a firearm and ammunition without having first obtained a
PTA;

70. Plaintiff Pinales does not have an active, unexpired hunter's permit/license;

71. Plaintiff Pinales is not a member of law enforcement nor has he ever been;

72. Plaintiff Pinales is not a member of the armed services nor has he ever been;

73. Plaintiff Pinales desires and intends to purchase a firearm and ammunition for
lawful purposes and would do so but for the State's adult under 21 prohibitions;

74.  Plaintiff Pinales has no criminal history;

75. Plaintiff Pinales has no disqualifying mental health history;

76. Except for the challenged statutes prohibiting his right to acquire, purchase,
own, or possess any firearm and ammunition due solely to his age, and his

reasonable fear of criminal prosecution for violating that law, Plaintiff Pinales would immediately purchase, acquire, own and/or possess both a firearm and ammunition within Hawaii for self-defense and other lawful purposes and could otherwise lawfully do so, but for the challenged prohibitions.

77. Plaintiff Pinales is a member of the Second Amendment Foundation;

## B

## Plaintiff Roache

78. Plaintiff Roache realleges and incorporates by reference all of the foregoing allegations of this complaint[28]

79. Plaintiff Roache challenges the provisions of the HRS that prohibit the issuance of a PTA to adults under 21;

80. Plaintiff Roache challenges the provisions of the HRS that prohibit him from acquiring, buying, owning and or possessing firearms and ammunition because he is under 21;

81. Plaintiff Roache does not own or possess any firearms or ammunition;

82. Plaintiff Roache is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm and ammunition, apart from the challenged

---

[28] Roache will turn 18 i.e. become an adult under 21 on December 15, 2024.

statutes that prohibit him receiving a PTA and acquiring, buying, owning, and possessing a firearm and ammunition;[29]

83. Plaintiff Roache will not apply for a PTA as soon as he reaches age 18 only because to do so in the face of the challenged statute that prohibits adults under 21 from being issued a PTA would be futile;

84.  Plaintiff Roache desires, intends, and will apply for a PTA to acquire, buy, own, and possess a firearm and desires, intends, and would acquire, purchase, own and possess a firearm and ammunition, as soon as he is 18 years old, but for the challenged statutes that prohibit the issuance of a PTA[30] to him because of his age and also prohibit his ownership, purchase and possession of a firearm and ammunition and the resultant criminal prosecution that would follow if he acquired, purchased, owned and possessed a firearm and ammunition without having first obtained a PTA;

85. Plaintiff Roache does not have an active, unexpired hunter's permit/license;

86. Plaintiff Roache is not a member of law enforcement nor has he ever been;

---

[29] All of Plaintiff Roache's allegations pertain to his ability to acquire, own, possess, or purchase firearms and ammunition once he is 18 years old, in December 2024. Plaintiff Roache would also, but for the challenged laws here, accept a gift from his mother of a firearm and ammunition as soon as he is 18 years old.

[30] Soleil Roache, Plaintiff Roache's mother, intends to and will gift a firearm and ammunition to Plaintiff Roache as soon as he is 18 years old, but for the statutes challenged herein.  *See* Exhibit 2.

87. Plaintiff Roache is not a member of the armed services nor has he ever been;

88. Plaintiff Roache desires and intends to purchase a firearm and ammunition for lawful purposes and would do so but for the State's adult under 21 prohibitions, once he is 18 years old;

89. Plaintiff Roache has no criminal history;

90. Plaintiff Roache has no disqualifying mental health history;

91. Except for the challenged statutes prohibiting his right to acquire, purchase, own, or possess any firearm and ammunition due solely to his age, and his reasonable fear of criminal prosecution for violating that law, Plaintiff Roache would immediately, when he turns 18, purchase, acquire, own and/or possess both a firearm and ammunition within Hawaii for self-defense and other lawful purposes and could otherwise lawfully do so, but for the challenged prohibitions;

92. Plaintiff Roache is a member of the Second Amendment Foundation;

## <u>C</u>

## <u>PLAINTIFF DANGER CLOSE TACTICAL</u>

93. Plaintiff DCT realleges and incorporates by reference all of the foregoing allegations of this complaint;

94. Plaintiff DCT has been in business since 2021;

95. Plaintiff DCT is a LLC.;

96. Plaintiff DCT sells both firearms and ammunition;

97.  Due to Defendant's enforcement of the prohibition of selling, supplying, delivering, or giving possession or control of a firearm and ammunition to any person under 21 years of age, Plaintiff DCT has been directly and adversely harmed. For example, Plaintiff DCT has been forced to not engage in otherwise lawful sales of firearms and ammunition to adults under the age of 21. It has also been forced to not engage in firearm rentals to adults under the age of 21.  Further, it has been forced to prohibit, and has prohibited, adults between the ages of 18-to-20 from attending various firearms classes hosted by Plaintiff DCT. As a direct result, Plaintiff DCT has sustained financial harm, injury, and losses from the sale and rentals of otherwise lawful goods and services. Plaintiff DCT brings this action on behalf of itself, its customers including potential adult under 21 customers, and other similarly situated licensed firearms dealers in Hawaii;

## D

## PLAINTIFF JGB ARMS LLC

98. Plaintiff JGB realleges and incorporates by reference all of the foregoing allegations of this complaint;

99.  Plaintiff JGB has been in business since 1988;

100. Plaintiff JGB is a LLC;

101. Plaintiff JGB sells ammunition and firearms;

102.  Due to Defendant's enforcement of the prohibition of selling, supplying, delivering, or giving possession or control of a firearm and ammunition to any person under 21 years of age, Plaintiff JGB has been directly and adversely harmed. For example, JGB has been forced to not engage in otherwise lawful sales to adults under the age of 21. It has also been forced to not engage in firearm rentals to adults under the age of 21. Further, it has been forced to prohibit, and has prohibited, adults between the ages of 18-to-20 from attending various firearms classes hosted by Plaintiff JGB. As a direct result, Plaintiff JGB has sustained financial harm, injury, and losses from the sale and rentals of otherwise lawful goods and services. Plaintiff JGB brings this action on behalf of itself, its customers including adult under 21 customers who would purchase firearms and ammunition but for Hawaii law, and other similarly situated licensed firearms dealers in Hawaii;

## **E**

## **PLAINTIFF SAF**

103. SAF has over 720,000 members and supporters nationwide, including members in Hawaii. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Many of SAF's individual Hawaii members between the ages of 18 and 20 have been adversely and directly harmed and injured by

Defendant's enforcement of the statutory prohibition on the lawful sale of firearms and ammunition to adults under 21. Indeed, the challenged statutes referenced herein have denied, and will continue to deny, responsible, peaceable, law-abiding adults under 21 their fundamental, individual right to keep and bear arms secured under the Second and Fourteenth Amendments of the U.S. Constitution. Defendant's actions and failures alleged herein have caused SAF to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action;

## VII

## <u>CONTEXT RELATED TO ALL CLAIMS</u>

104.  The State of Hawaii has still not received the United States Supreme Court's clear message as to the depth and scope of the Second Amendment's protections. Prior to *Bruen*, the State had treated, for more than a century, the Second Amendment as dead, buried and forgotten.  Once *Bruen* was decided the State issued new burdensome regulations.  This includes Hawaii's ban on the possession of ammunition for adults under 21. Notwithstanding the United States Constitution, the Second Amendment and binding Supreme Court precedent, the State continues to find ways to deprive individuals of their fundamental and

constitutionally protected right to acquire and possess arms and ammunition –

merely because it views it as a disfavored right.

105. For purposes of all Counts and Claims the Defendant has acted under "color

of state law" within the meaning of Section 1983.

106.  Plaintiffs do not concede that any permit is required to acquire, own,

purchase or possess a firearm or ammunition;

107.  To the extent that a permit or license is needed to acquire, purchase, or

own a firearm, which Plaintiffs do not concede is constitutional, denial cannot

be because an adult has not year reached the age of twenty-one years old;

## VIII

## (DECLARATORY JUDGMENT)

108. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if

set forth herein;

109. The Declaratory Judgment Act provides: "In a case of actual controversy

within its jurisdiction, any court of the United States may declare the rights and

other legal relations of any interested party seeking such declaration, whether or

not further relief is or could be sought." 28 U.S.C. 2201(a);

110. Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs

will suffer irreparable injury in the future;

111. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;

112. This Court possesses an independent basis for jurisdiction over the parties;

113. Plaintiffs seek a judgment declaring that the challenged statutes, specified herein, are facially unconstitutional under the Second Amendment and Fourteenth Amendment;

114. Alternatively, a declaration that the challenged statutes, as specified herein, are unconstitutional *as-applied* to the Plaintiffs;

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.      Declare, facially, to each Plaintiff, that HRS §§134-2(a), 134-2(d)(1), 134-7(g), and 134-2(h) , and all related law, policies, enforcement practices, and customs, as well as Defendant's enforcement of the same, violate the right to keep and bear arms secured by the Second and Fourteenth Amendments to the United States Constitution;

2.      Preliminarily, and thereafter permanently, enjoin Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with her who receive actual notice of the injunction, from enforcing Defendant's Hawaii Revised Statutes, as specified herein, §§134-2(a), 134-2(d)(1), 134-7(g), and 134-

2(h), all their derivative regulations, and all related laws, policies, and procedures that would impeded or criminalize the Plaintiffs' or Plaintiffs' members and/or customers exercise of their right to keep and bear arms, facially;

3.      Alternatively, declare that HRS §§134-2(a), 134-2(d)(1), 134-7(g), and 134-2(h) , and all related law, policies, enforcement practices, and customs, as well as Defendant's enforcement of the same, *as-applied* to the Plaintiffs, violates Plaintiffs' and their members and/or customers' right to keep and bear arms secured by the Second and Fourteenth Amendments to the United States Constitution;

4.      Alternatively, preliminarily, and thereafter permanently, enjoin Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with her who receive actual notice of the injunction, from enforcing against Plaintiffs and Plaintiffs' members and/or customers, Defendant's Hawaii Revised Statutes, §§134-2(a), 134-2(d)(1), 134-7(g), and 134-2(h), as specified herein, all their derivative regulations, and all related laws, policies, and procedures that would impeded or criminalize the Plaintiffs' or Plaintiffs' members and/or customers exercise of their right to keep and bear arms, *as-applied* to them;

5.      Award Plaintiffs nominal damages, and pursuant to 42 U.S.C. §1988, costs, attorney fees and expenses to the extent permitted; and

6.    Grant any and all other equitable and/or legal remedies this Court may see

fit.

Dated: November 15, 2024.

Respectfully submitted,


/s/ *Kevin O'Grady*
Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com


/s/ *Alan Beck*
Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
Counsel for Plaintiffs

## VERIFICATION

I, Elijah Pinales, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on November 15, 2024

_____

ELIJAH PINALES

## VERIFICATION

I, Juda Roache, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on November 15, 2024

_____

JUDA ROACHE

## VERIFICATION

I, David Kikukawa, declare as follows:

1. I am the owner of Danger Close Tactical, and a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on November 15, 2024

_____

DAVID KIKUKAWA

**VERIFICATION**

I, Jason Bryant, declare as follows:

1. I am a controlling member of JGB Arms LLC and a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on November 15, 2024

_____

JASON BRYANT

## VERIFICATION

I, Adam Kraut, declare as follows:

1. I am the Executive Director of SAF, which is a Plaintiff in the present case.

2. I am a citizen of the United States of America.

3. I have personal knowledge of myself, my activities, and my intentions ,
including those set out in the forgoing *Verified Complaint for Declaratory and
Injunctive Relief,* and if called on to testify, I would competently testify as to the
matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of
America that the factual statements in this *Verified Complaint for Declaratory and
Injunctive Relief* concerning myself, my activities and my intentions are true and
correct.

Executed on November 15, 2024

_____

ADAM KRAUT

47