ANNE E. LOPEZ          7609
Attorney General of Hawaiʻi

KALIKOʻONĀLANI          9964
D. FERNANDES
Solicitor General

EWAN C. RAYNER          10222
THOMAS J. HUGHES          11059
Deputy Solicitors General
Department of the Attorney General,
   State of Hawaiʻi
425 Queen Street
Honolulu, Hawaiʻi 96813
Tel:  (808) 586-1360
E-mail:  ewan.rayner@hawaii.gov
          thomas.j.hughes@hawaii.gov


DOUGLAS N. LETTER [*Pro Hac Vice*]
ERIN C. DAVIS          9292
SHIRA LAUREN FELDMAN  [*Pro Hac Vice*]
TESS M. FARDON          [*Pro Hac Vice*]
Special Deputy Attorneys General
Brady Center to Prevent Gun Violence
840 First Street NE, Suite 400
Washington, D.C. 20002
Tel:  (202) 370-8100
E-mail:  dletter@bradyunited.org
          edavis@bradyunited.org
          sfeldman@bradyunited.org
          tfardon@bradyunited.org


MARK S. DAVIS          1442
AIMEE M. LUM          8364
Special Deputy Attorneys General
DAVIS LEVIN LIVINGSTON
851 Fort Street, Suite 400
Honolulu, Hawaii 96813
Tel.: (808) 524-7500

Fax: (808) 356-0418
Email:  mdavis@davislevin.com
          alum@davislevin.com

Attorneys for ANNE E. LOPEZ,
in her official capacity as the Attorney General
of the State of Hawai'i

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, SECOND AMENDMENT FOUNDATION,<br><br>          Plaintiffs,<br><br>     v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAI'I,<br><br>          Defendant. | Civil No. 24-00496 JAO-WRP<br><br>**DEFENDANT ANNE E. LOPEZ'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION; DECLARATION OF AIMEE M. LUM; EXHIBITS 1-4; CERTIFICATE OF SERVICE** |

# TABLE OF CONTENTS

I.    PLAINTIFFS HAVE NOT ESTABLISHED ARTICLE III STANDING .....4

    A.    PLAINTIFF PINALES ............................................................................4

    B.    PLAINTIFFS DANGER CLOSE TACTICAL ("DCT") AND  JGB    .
        ARMS LLC ("JGB") .............................................................................5

    C.    PLAINTIFF SECOND AMENDMENT FOUNDATION ("SAF") .......6

II.   PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY
     INJUNCTION........................................................................................7

    A.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR
        SECOND AMENDMENT CLAIM .......................................................8

        1.    Plaintiffs Cannot Establish that 18-to-20-Year-Olds Are Among
           "the People" Accorded Second  Amendment Rights.......................9

        2.    The Challenged Provisions Are Consistent With the  Nation's
           Historical Tradition of Firearms  Regulation..................................13

        3.    Plaintiffs' Invocation of Militia History Merely  Supports
           Defendant's Argument…………………………………………… 19

    B.    PLAINTIFFS HAVE NOT SATISFIED THE OTHER RELIMINARY
        INJUNCTION  FACTORS ..................................................................21

    C.    THE REQUESTED INJUNCTION CANNOT BE GRANTED IN
        ANY EVENT........................................................................................24

III.  PLAINTIFFS' CONSOLIDATION REQUEST SHOULD BE DENIED ...25

# TABLE OF AUTHORITIES

**Cases**

*Ariz. All. for Retired Ams. v. Mayes,*
  117 F.4th 1165 ..................................................................................6

*Baird v. Bonta,*
  81 F.4th 1036 (9th Cir. 2023) ............................................................8

*Bianchi v. Brown,*
  111 F.4th 438 (4th Cir. 2024) ..........................................................18

*Clapper v. Amnesty Int'l USA,*
  568 U.S. 398 (2013) ...........................................................................6

*Dahl v. HEM Pharm. Corp.,*
  7 F.3d 1399 (9th Cir. 1993) ................................................................8

*District of Columbia v. Heller,*
  554 U.S. 570 (2008) ................................................................... 10, 11

*Doe v. Snyder,*
  28 F.4th 103 (9th Cir. 2022) ...............................................................8

*Ezell v. City of Chicago,*
  651 F.3d 684 (7th Cir. 2011) ............................................................19

*FDA v. All. for Hippocratic Med.,*
  602 U.S. 367 (2024) ........................................................................5, 6

*Gall v. United States,*
  552 U.S. 38 (2007) ...........................................................................23

*Graham v. Florida,*
  560 U.S. 48 (2010) ...........................................................................23

*Hanson v. District of Columbia*,
    671 F. Supp. 3d 1 (D.D.C. 2023)..........................................................................15

*Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*,
    5 F.4th 407 (4th Cir.)..........................................................................13

*Hum. Rts. v. County of Los Angeles*,
    14 F.4th 947 (9th Cir. 2021)..................................................................4

*Lara v. Comm'r Penn. State Police*,
    91 F.4th 122 (3d Cir. 2024)...................................................................13

*Lydo Enters. v. Las Vegas*, 7
    45 F.2d 1211 (9th Cir. 1984)..................................................................21

*Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*,
    571 F.3d 873 (9th Cir. 2009)...................................................................8

*Maryland v. King*,
    567 U.S. 1301 (2012)..........................................................................21

*Miller v. Alabama*,
    567 U.S. 460 (2012)..........................................................................22

*Murthy v. Missouri*,
    603 U.S. 43 (2024)............................................................................4

*Nat'l Rifle Ass'n of Am., Inc. v. McCraw*,
    719 F.3d 338 (5th Cir. 2013)..................................................................13

*New York State Rifle & Pistol Ass'n, Inc. v. Bruen*,
    597 U.S. 1 (2022).......................................................................... passim

*NRA of Am. v. Bureau of Alcohol*,
    700 F.3d 185 (5th Cir. 2012)..................................................................22

*NRA v. Bondi*,
    61 F.4th 1317 (11th Cir. 2023)................................................................18

*Paris v. Lara*,
No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) ............................................13

*Rocky Mountain Gun Owners v. Polis*,
121 F.4th 96 (10th Cir. 2024) ..........................................................................9, 10

*Roper v. Simmons*,
543 U.S. 551 (2005) ..............................................................................................23

*Skaff v. Meridien N. Am. Beverly Hills, LLC*,
506 F.3d (9th Cir. 2007) .........................................................................................5

*Snope v. Brown*
(U.S. Aug. 23, 2024) (No. 24-203).......................................................................18

*Spokeo, Inc. v. Robins*,
578 U.S. 330 (2016) ...............................................................................................5

*Stavrianoudakis v. U.S. Fish & Wildlife Serv.*,
108 F.4th 1128 (9th Cir. 2024)..............................................................................7

*TransUnion LLC v. Ramirez*,
594 U.S. 413 (2021) ...............................................................................................5

*United States v. Alaniz*,
69 F.4th 1124 (9th Cir. 2023)...................................................................... 2, 9, 15

*United States v. Perez-Garcia*,
96 F.4th 1166 (9th Cir. 2024)................................................................................9

*United States v. Rahimi*,
602 U.S. 680 (2024) ........................................................................ 9, 14, 15, 18

*United States v. Rene E.*,
583 F.3d 8 (1st Cir. 2009) ...................................................................................13

*Winter v. Nat. Res. Def. Council, Inc.*,
555 U.S. 7 (2008) ..............................................................................................1, 7

iv

**Statutes**

HRS § 134-2................................................................................... 1. 3, 15, 24, 25

HRS § 134-2 (d)(1) ...............................................................................................3

HRS § 134-2 (h)......................................................................................................3

HRS § 134-5............................................................................................................3

HRS § 134-7 .................................................................................................. 1, 3, 15

HRS § 134-7.7.........................................................................................................3

**Other Authorities**

18 U.S.C. § 922(b)(1)........................................................................................5, 6

1972 Haw. Sess. Laws Act 2, § 1 at 2 ................................................................11

2024 Haw. Sess. Laws Act 248, § 1 at 758 ...........................................................3

**Treatises**

*Ballots and Bullets: The Exceptional History of the Right to Vote*, 71 U. Cin. L.
    Rev. 1345 (2003) ...........................................................................................11

Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23
    (2022) …………………………………………………………………………..   19

U.S. Dep't of Justice, *2019 Crime in the United States*, Arrests by Age, 2019,
    tbl.38 ...............................................................................................................23

William Blackstone, *Commentaries on the Laws of England I* 441 (1765-1769)...11

Witnessing Community Violence, Gun Carrying, and Associations with Substance
    Use and Suicide Risk Among High School Students – Youth Risk Behavior
    Survey, United States, 2021, 72 Ctrs. for Disease Control & Prevention
    Morbidity & Mortality Wkly. Rep. (Supplement) 22, 22 (Apr. 28, 2023)...........24

*Young Guns: An Empirical Study of Persons Who Use a Firearm in a Suicide or a
    Homicide*, 5 Injury Prevention 280, 281-82 (1999) .............................................23

## DEFENDANT ANNE E. LOPEZ'S MEMORANDUM IN OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION

Plaintiffs ask the Court to enjoin critical provisions of important Hawaiʻi public safety statutes – Hawaiʻi Revised Statutes ("HRS") §§ 134-2 and 134-7 – that restrict possession of firearms and ammunition by individuals under the age of 21, with certain exceptions.  The core provision at issue – prohibiting the possession of firearms – has been in effect for over 30 years.  Yet Plaintiffs ask the Court to act immediately to allow 18-to-20-year-olds to obtain firearms and ammunition through a preliminary injunction – "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008).

Plaintiffs' extraordinary request should be denied for several reasons.  As a threshold matter, Plaintiffs lack Article III standing – a jurisdictional prerequisite to injunctive relief – because they have not established the requisite injuries, nor that their alleged injuries would be redressed by a favorable decision.  The Court's inquiry should end here, and relief should be denied outright on this basis.

Even if Plaintiffs had standing, however, the Motion would fail because Plaintiffs cannot meet the standard for obtaining injunctive relief.  *First*, they have not established a likelihood of success on the merits.  Plaintiffs have the burden of demonstrating that "the Second Amendment's plain text covers" their proposed conduct, *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 24 (2022), but they nowhere establish that 18-to-20-year-olds are "part of 'the people' whom

1

the Second Amendment protects." *United States v. Alaniz*, 69 F.4th 1124, 1128 (9th Cir. 2023) (quoting *Bruen*, 597 U.S. at 31-32).  And even if Plaintiffs could satisfy their textual burden, they would flunk *Bruen*'s historical analysis.  Extensive evidence shows that access to firearms by those under age 21 was historically restricted, demonstrating that the statutes at issue are "consistent with the Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 24.

*Second*, Plaintiffs fail to satisfy any of the remaining preliminary injunction factors.  They have not shown, for example, that they will suffer irreparable harm absent a sudden disruption to the 30-year status quo on firearms possession.  Nor do the balance of equities and the public interest weigh at all in their favor.  Indeed, 18-to-20-year-olds are more likely to be perpetrators of violent crime:  they commit gun homicides at triple the rate of adults age 21 and older, Decl. of Robert J. Spitzer ("Spitzer Decl.") ¶ 12, and are over-represented at a rate of nearly five-fold as perpetrators of mass shootings resulting in ten or more deaths (compared to their representation in the overall population), Decl. of Louis Klarevas ("Klarevas Decl.") ¶ 12.

For these reasons, Plaintiffs are not entitled to a preliminary injunction, and their Motion should be denied.

## **BACKGROUND**

In 1994, the Hawaiʻi Legislature amended HRS § 134-2 to restrict the purchase and possession of firearms by individuals under age 21.  There are notable exceptions to these restrictions, including HRS § 134-5, which allows the possession of firearms and ammunition for target shooting and hunting for those 16 and older who meet certain conditions.

In 2024, the Legislature passed S.B. 2845 – now codified at HRS §§ 134-7(g) and 134-7.7[1] – to address the possession of ammunition by those under age 21.  The Legislature noted that the measure set "a minimum age requirement to purchase, own, or possess ammunition that conforms to the existing minimum age requirement to purchase, own, or possess a firearm in the State," and found that doing so would "help to ensure the safety of residents and reduce incidents of gun violence in the State."  2024 Haw. Sess. Laws Act 248, § 1 at 758.

In this suit, Plaintiffs – a 19-year-old individual, a 17-year-old individual,[2] two gun dealers, and an "educational foundation" – challenge HRS §§ 134-2(a), 134-2(d)(1), 134-2(h), and 134-7(g).  Compl. ¶ 11.  They seek a preliminary injunction from the Court that would enjoin the State's "prohibition on adults under 21 owning and acquiring firearms and ammunition both facially and *as applied* to Plaintiffs."  Mem. in Support of Mot. for Prelim. Inj. ("Mem.") at 25.

---

[1] Plaintiffs do not challenge HRS § 134-7.7.

[2] At the time of the filing of the Complaint.  *See* Compl. ¶ 2.

3

**ARGUMENT**

## I.    PLAINTIFFS HAVE NOT ESTABLISHED ARTICLE III STANDING

"Standing is a threshold matter of jurisdiction." *LA All. for Hum. Rts. v. County of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (citation omitted). To establish Article III standing, Plaintiffs must show that they have "suffered, or will suffer, an injury that is 'concrete, particularized, and actual or imminent; fairly traceable to the challenged action; and redressable by a favorable court ruling.'" *Murthy v. Missouri*, 603 U.S. 43, 57 (2024) (citation omitted). "At the preliminary injunction stage, the plaintiffs 'must make a clear showing of each element of standing,' . . . relying on the allegations in their complaint 'and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden.'" *LA All. for Hum. Rts.*, 14 F.4th at 956-57 (alteration and citations omitted). Standing must be demonstrated "'separately for each form of relief sought,' . . . and the 'remedy must be tailored to redress their particular injury.'" *Id.* at 957 (alteration and citations omitted). Here, Plaintiffs have not established standing, so jurisdiction is lacking and preliminary injunctive relief cannot be awarded.

### A.    PLAINTIFF PINALES

Pinales lacks standing because he has failed to establish that his alleged injury is fairly traceable to the challenged statutes and would be redressed by a favorable

4

court ruling.  Pinales indicates that he wishes to purchase a firearm and ammunition,

Compl. ¶¶ 1, 69, 73, 76, but does not specify what type of firearm he intends to

purchase.  Federal law already restricts the sale of firearms other than shotguns and

rifles, and ammunition for the same, to any individual under the age of 21.  18 U.S.C.

§ 922(b)(1).  Because federal law may otherwise bar the purchase he intends to

make, Pinales has not shown that his "injury likely was caused or likely will be

caused by the defendant's conduct." *FDA v. All. for Hippocratic Med.*, 602 U.S.

367, 382 (2024).[3]

### B.    PLAINTIFFS DANGER CLOSE TACTICAL ("DCT") AND JGB ARMS LLC ("JGB")

The gun dealer Plaintiffs DCT and JGB have failed to demonstrate traceability

and redressability.  First, they have not identified the types of firearms they wish to

sell to 18-to-20-year-old individuals.  *See* Compl. ¶¶ 3, 4, 97, 102.  If they wish to

sell certain firearm types, *i.e.*, handguns, to this age group, federal law – and not just

---

[3] Plaintiff Roache, moreover, lacks standing because he was 17 at the time the complaint was filed, Compl. ¶ 2, and Plaintiffs challenge the subject statutes to the extent they apply to 18-to-20-year-olds, Compl. ¶¶ 83, 84, 88, 91, 97, 102, 103.  "The existence of standing turns on the facts as they existed at the time the plaintiff filed the complaint." *Skaff v. Meridien N. Am. Beverly Hills, LLC*, 506 F.3d 832, 838 (9th Cir. 2007).  At the time this case began, Roache's disagreement with Hawaii's firearms laws was not yet the kind of "'concrete' – that is, 'real, and not abstract'" – injury that Article III requires. *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 340 (2016)).  When he filed the Complaint, Roache had no more than a "general legal, moral, ideological, or policy objection" to Hawaii's laws.  *All. for Hippocratic Med.*, 602 U.S. at 381.

state law – would prohibit them from doing so.  *See* 18 U.S.C. § 922(b)(1).  DCT's

and JGB's claims also rest on "guesswork as to how independent decisionmakers

will exercise their judgment."  *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413

(2013).  There is no evidence that enjoining the challenged statutes would cause

DCT's and JGB's unidentified customers to apply for permits to acquire, meet all

the requirements, decide to purchase firearms and ammunition from licensed dealers

(rather than obtain them by other means), and make their purchases from DCT or

JGB.  These businesses "may not 'rely on speculation about the unfettered choices

made by independent actors not before the courts'" to establish standing.  *Ariz. All.*

*for Retired Ams. v. Mayes*, 117 F.4th 1165, 1173 (9th Cir. 2024) (quoting *Clapper*,

568 U.S. at 414 n.5).

### C.    PLAINTIFF SECOND AMENDMENT FOUNDATION ("SAF")

SAF asserts organizational standing because Defendant's enforcement of

Hawai'i law has allegedly "caused SAF to dedicate resources that would otherwise

be available for other purposes to protect the rights and property of its members,

supporters, and the general public, including by and through this action."  Compl. ¶¶

5, 103.  "But an organization that has not suffered a concrete injury caused by a

defendant's action cannot spend its way into standing simply by expending money

to gather information and advocate against the defendant's action.  An organization

cannot manufacture its own standing in that way."  *All. for Hippocratic Med.*, 602

U.S. at 394.  In rejecting a similar standing theory, the Supreme Court cautioned that it "would mean that all the organizations in America would have standing to challenge almost every . . . policy that they dislike, provided they spend a single dollar opposing those policies."  *Id.* at 395.  Moreover, to establish associational standing to bring suit on behalf of its members, SAF "must establish that: '(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit.'"  *Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024) (citation omitted).  SAF has not addressed, let alone satisfied, these requirements.

## II.    PLAINTIFFS ARE NOT ENTITLED TO A PRELIMINARY INJUNCTION

Injunctive relief is "an extraordinary remedy that may only be awarded upon a clear showing that the plaintiff is entitled to such relief" and is "never awarded as of right."  *Winter*, 555 U.S. at 22, 24 (citations omitted).  To prevail on a motion for preliminary injunction, the plaintiff must establish that "(1) he is likely to succeed on the merits of his claim, (2) he is likely to suffer irreparable harm absent the preliminary injunction, (3) the balance of equities tips in his favor, and (4) a preliminary injunction is in the public interest."  *Baird v. Bonta*, 81 F.4th 1036, 1040

(9th Cir. 2023) (citations omitted).  Although the first factor is the most important and a threshold inquiry, district courts must ordinarily consider all factors.  *Id.* (citations omitted).   Factors three and four merge when the government is a defendant.  *Id.* (citations omitted).

Mandatory injunctions – like the one sought here – are particularly disfavored, *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009) (citation omitted), and "are not granted unless extreme or very serious damage will result and are not issued in doubtful cases." *Doe v. Snyder*, 28 F.4th 103, 111 (9th Cir. 2022) (citation omitted).[4]   They are "subject to heightened scrutiny and should not be issued unless the facts and law clearly favor the moving party." *Dahl v. HEM Pharm. Corp.*, 7 F.3d 1399, 1403 (9th Cir. 1993) (citation omitted).

## A.    PLAINTIFFS ARE UNLIKELY TO SUCCEED ON THEIR SECOND AMENDMENT CLAIM

Under *Bruen*'s text-and-history approach, Plaintiffs must first show that "the Second Amendment's plain text covers" their proposed conduct.  *Bruen*, 597 U.S. at 24.  Only then does the Constitution "presumptively protect[] that conduct," and the government have to "justify its regulation by demonstrating that it is consistent with

---

[4]  A mandatory injunction is defined "as one that goes beyond simply maintaining the status quo and orders the responsible party to take action pending the determination of the case on its merits." *Snyder*, 28 F.4th at 111.

the Nation's historical tradition of firearm regulation." *Id.*  Plaintiffs fail to satisfy

both *Bruen* steps.

> **1.** **PLAINTIFFS CANNOT ESTABLISH THAT 18-TO-20-YEAR-OLDS ARE AMONG "THE PEOPLE" ACCORDED SECOND AMENDMENT RIGHTS**

At the textual stage of the *Bruen* analysis, Plaintiffs must establish that they

are "part of 'the people' whom the Second Amendment protects." *Alaniz*, 69 F.4th

at 1128 (quoting *Bruen*, 597 U.S. at 31-32).  Plaintiffs bear the burden at this step.

*See United States v. Perez-Garcia*, 96 F.4th 1166, 1178 (9th Cir. 2024); *Rocky*

*Mountain Gun Owners v. Polis*, 121 F.4th 96, 113 (10th Cir. 2024) ("At step one, the

plaintiff has the burden of establishing that 'the Second Amendment's plain text

covers' either the conduct they engaged or intended to engage in" (quoting *Bruen*,

597 U.S. at 17)).  Plaintiffs fall well short of meeting their burden, as they have not

established that 18-to-20-year-olds are part of "the people" whom the Second

Amendment protects.

*Bruen* held that Second Amendment rights belong to "ordinary, law-abiding,

*adult* citizens." *Bruen*, 597 U.S. at 31-32 (emphasis added).  The Supreme Court

recently reaffirmed that principle, explaining that the Second Amendment does not

"prohibit[] the enactment of laws banning the possession of guns by categories of

persons thought by a legislature to present a special danger of misuse." *United States*

*v. Rahimi*, 602 U.S. 680, 698 (2024).

The question at hand is not whether the State may set an age limit on the possession of firearms and ammunition – it is beyond question that the State is empowered to do that. *See Rocky Mountain Gun Owners*, 121 F.4th at 123 ("It seems evident that the necessity of some minimum age requirement is widely accepted – after all, no one is reasonably arguing that 8-year-olds should be allowed to purchase guns."). Plaintiffs themselves challenge the subject statutes only to the extent they limit possession and purchase of firearms and ammunition by 18-to-20-year-olds. Compl. ¶¶ 69, 83, 84, 88, 91, 97, 102, 103. Thus, while Plaintiffs point to the supposed solo firearm use by a 10-year-old Thomas Jefferson, Mem. at 3, they appear to acknowledge that age limits are, in fact, permissible. Indeed, Plaintiff Roache wants a firearm only *after* he turns 18. Compl. ¶ 84.

The question then is where the threshold lies – age 18 or 21? The historical record provides a clear answer. Since the Founding of the Nation, and throughout most of U.S. history, 18-to-20-year-olds were considered neither "adults" capable of responsible decision-making, nor "members of the political community" referenced in *District of Columbia v. Heller*, 554 U.S. 570, 580 (2008).

Contrary to Plaintiffs' characterization of 18-to-20-year-olds as "young adults," "[t]here was no legal category of 'young adult' or 'adult younger than 21' in the Founding era." Decl. of Saul Cornell ("Cornell Decl.") ¶ 8. In fact, "[p]ersons aged 18-20 were considered 'infants' or 'minors' under the law in the Founding era.

This legal fact did not change until the latter half of the twentieth century." *Id*. ¶ 18.

As William Blackstone stated in his digest of the Common Law in the Founding era,

it was not until the age of 21 that individuals had independent legal capacity:

> [T]he power of a father, I say, over the persons of his children ceases at
> the age of twenty one, for they are then enfranchised by arriving at years
> of discretion, or that point which the law has established . . . when the
> empire of the father, or other guardian, gives place to the empire of
> reason.

William Blackstone, *Commentaries on the Laws of England I* 441 (1765-1769).

Accordingly, minors – those under the age of 21 – were "legally 'disabled' in

the eyes of the law" in the Founding era, *see* Cornell Decl. ¶ 21, precluding them

from truly being "members of the political community" – the touchstone of whether

someone is among "the people" protected by the Second Amendment. *Heller*, 554

U.S. at 580.

Exemplifying this fact, for most of U.S. history, minors under age 21 could

not vote. At the Founding era, universal state restrictions on the right to vote meant

that it "was limited essentially to property-owning, taxpaying white males over the

age of twenty-one." Pamela S. Karlan, *Ballots and Bullets: The Exceptional History*

*of the Right to Vote*, 71 U. Cin. L. Rev. 1345 (2003). This voting limitation existed

through the middle of the twentieth century and continued until 1971. In Hawaiʻi,

the age of majority was not lowered to 18 years old until 1972. 1972 Haw. Sess.

Laws Act 2, § 1 at 2.

The limitation on minors' voting rights was mirrored in other restrictions, too. Minors, for example, could not enter enforceable contracts other than for necessities. *See* Cornell Decl. ¶ 23. Because the economy was essentially cashless, this made it virtually impossible for a minor to acquire a weapon. *See id.* ¶¶ 60, 61; Spitzer Decl. ¶ 29. And even more important, minors would have lacked any "ability to assert a legal claim in any court of law that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision." Cornell Decl. ¶ 18. Treating such minors as "autonomous legal actors capable of having the right to keep, bear, and acquire arms" would thus "ignore[] the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries." *Id.*

In short, the historical evidence overwhelmingly points to those in the founding generation ***not*** considering the Second Amendment as granting or recognizing an individual right to keep and bear arms for minors under age 21. Any assertion to the contrary "rests on an anachronistic interpretation of early American militia statutes, ignorance of Founding-era domestic law, and disregard of the social and economic realities of life at the Founding." *Id.* ¶ 39.

Although Plaintiffs contend that a "consensus" of courts have ruled that 18-to-20-year-olds are among "the people" the Second Amendment protects, that contention is seriously flawed. For starters, several of the decisions Plaintiffs rely

12

on have been vacated, as they themselves acknowledge.[5]   And Plaintiffs plainly

ignore decisions that reached the opposite conclusion.[6]   Moreover, the cases

Plaintiffs rely on fail to deal with the extensive historical evidence that the State

offers the Court here.  This material demonstrates that, although many historical

questions are ambiguous, this one is not:  historically speaking, adult gun rights in

the United States simply did not accrue to those under age 21.  As a result, 18-to-20-

year-olds are not among "the people" for purposes of the Second Amendment.

### 2.  THE CHALLENGED PROVISIONS ARE CONSISTENT WITH THE NATION'S HISTORICAL TRADITION OF FIREARMS REGULATION

Even if Plaintiffs somehow meet their burden at step one of *Bruen* (for the

reasons above, they cannot), Plaintiffs' claim would fail at *Bruen*'s second step.  The

State has assembled – even at this early stage of the proceedings – a robust record

---

[5]  *See, e.g.*, *Lara v. Comm'r Penn. State Police*, 91 F.4th 122, 126 (3d Cir. 2024), *cert. granted, judgment vacated sub nom. Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024); *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 410 (4th Cir.), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

[6]  *See*, *e.g.*, *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009) (upholding a federal prohibition on handgun possession by juveniles after concluding that "the right to keep arms in the founding period did not extend to juveniles."); *Nat'l Rifle Ass'n of Am., Inc. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013) (recognizing that statutes prohibiting the carrying of handguns in public by 18-to-20-year-olds were consistent with the "longstanding tradition of age-and safety-based restrictions on the ability to access arms" and thus "likely outside the scope of the Second Amendment").

13

proving that the provisions at issue are "consistent with this Nation's historical tradition of firearm regulation." *Bruen*, 597 U.S. at 17.

*Bruen* explained that the historical inquiry "often involve[s] reasoning by analogy" – *i.e.*, "determining whether a historical regulation is a proper analogue for a distinctly modern firearm regulation" by asking "whether the two regulations are 'relevantly similar.'"  *Id.* at 28-29.  The Supreme Court has not provided "an exhaustive survey of the features that render regulations relevantly similar," but it has pointed to "at least two metrics:  how and why the regulations burden a law-abiding citizen's right to armed self-defense." *Id.* at 29.

*Bruen*'s historical analysis, however, is not a "regulatory straightjacket," and does not require "a modern-day regulation [to be] a dead ringer for historical precursors." *Id.* at 30.  Nor is *Bruen*'s methodology "meant to suggest a law trapped in amber . . . [T]he Second Amendment permits more than just those regulations identical to ones that could be found in 1791.  Holding otherwise would be as mistaken as applying the protections of the right only to muskets and sabers." *Rahimi*, 602 U.S. at 691-92.  Accordingly, "the government [must] identify a well-established and representative historical *analogue*, not a historical *twin*." *Bruen*, 597 U.S. at 30.

Moreover, cases – like this one – "implicating unprecedented societal concerns or dramatic technological changes" that were not present or anticipated at

14

the time of the Founding require a "more nuanced approach." *Id.* at 27.  This is because "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868." *Id.*[7]  When considering this kind of "unprecedented societal concern," courts must distill the principles underpinning the regulatory tradition. *Id.*; *see Rahimi*, 602 U.S. at 739 ("[I]mposing a test that demands overly specific analogues has serious problems . . . it forces 21st-century regulations to follow late-18th-century policy choices, giving us 'a law trapped in amber.'" (citation omitted) (Barrett, J., concurring)).

The Nation's historical tradition supports HRS §§ 134-2 and 134-7.  State and local laws restricting or regulating guns and other dangerous weapons with respect to minors emerged in the eighteenth century and were ubiquitous in the nineteenth century. *See, e.g.*, Cornell Decl. ¶ 38; Spitzer Decl. ¶ 16.  The universally recognized

---

[7] *See also Alaniz*, 69 F.4th at 1129-30  (affirming constitutionality of sentencing enhancement for possession of a handgun at the time of a felony drug offense because "[i]llegal drug trafficking is a largely modern crime . . . animated by unprecedented contemporary concerns regarding drug abuse and is not closely analogous to founding-era smuggling crimes, which primarily focused on punishing importers who evaded customs duties"); *Hanson v. District of Columbia*, 671 F. Supp. 3d 1, 18 (D.D.C. 2023) (explaining that "[large-capacity magazines] are the object of 'dramatic technological changes' and implicate 'unprecedented societal concerns,' and thus their ban requires 'nuanced' consideration") (quoting *Bruen*, 597 U.S. at 27), *aff'd*, 120 F.4th 223 (D.C. Cir. 2024) ("Because [large-capacity magazines] implicate unprecedented societal concerns and dramatic technological changes, the lack of a 'precise match' does not preclude finding at this preliminary juncture an historical tradition 'analogous enough to pass constitutional muster.'").

age of adulthood during this period was 21 – also the most common age established in legislation pertaining to firearms restrictions.  *See, e.g.*, Spitzer Decl. ¶¶ 24-25, 51 (noting that while 21 was the most common age set in historical firearm restriction legislation, some laws established lower ages for various firearms-related activities, such as hunting, or with parents' permission).

From the 1700s to the early 1900s, *at least 46 states* enacted age-based restrictions (most commonly for those between 18 and 21) on weapons ownership or use by minors.  Spitzer Decl. ¶¶ 16, 23-25, 53.  This reflects a broad societal consensus that access to dangerous weapons by minors presented concerns with safety and judgment – concerns that are no less significant today.  And those historical regulations are plainly "relevantly similar," *Bruen*, 597 U.S. at 29, in that they "went to great lengths to keep guns (mostly handguns, but sometimes any guns) and other weapons out of the hands of minors," Spitzer Decl. ¶ 18, and "generally encompassed provisions to criminalize the act of transmitting guns . . . to minors whether by private individuals or commercial dealers."  *Id.* ¶ 19.

For example, in 1763, New York City enacted a law prohibiting the firing and discharge of a weapon by minors in a wide variety of places:  "at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk."  *Id.* ¶ 20.  By 1860, Kentucky had enacted a law prohibiting anyone other

16

than a parent or guardian to "sell, give, or loan, any pistol, dirk, bowieknife, brass-knucks, slung-shot, colt, cane-gun, or other deadly weapon, which is carried concealed, to any minor, or slave, or free negro." *Id.* ¶ 21.  Many states and cities enacted similar laws between the mid and late 1800s. *Id.* ¶¶ 16, 22-25.

"The expansion of laws dealing with the problem of minors and guns in the Reconstruction era was a response to a novel problem that the Founding generation did not face." Cornell Decl. ¶ 85.  Before the mid-to-late nineteenth century "minors mostly lived with their parents in circumstances where minors did not possess the means, ability, inclination, or right to obtain firearms on their own (aside from any parents or guardians who might make weapons available to them)." Spitzer Decl. ¶ 29.  At English common law, "individuals under the legal age of majority, twenty-one, were entirely subsumed under the authority of their parents (usually their fathers) or guardians." Cornell Decl. ¶ 19.  The critical changes leading to a proliferation of age-based restrictions on gun purchase and ownership in the mid-to-late nineteenth century included profound societal shifts from overwhelmingly agrarian life (where children primarily lived and worked at home in a rural setting and therefore under direct parental control) to urban, industrialized life, where children increasingly worked, were schooled, and often spent significant time outside of the home in population centers. *See* Spitzer Decl. ¶¶ 25, 28, 52.

17

This increase in laws regulating minors' acquisition, possession, and use of firearms reflects "the arc of weapons regulation in our nation[, which] has mimicked a call and response composition," where legislatures respond to the threats of firearms in society as they become "urgent and visible." *Bianchi v. Brown*, 111 F.4th 438, 464 (4th Cir. 2024) (en banc), *petition for cert. filed*, *sub. nom. Snope v. Brown* (U.S. Aug. 23, 2024) (No. 24-203). Legislatures are not required to legislate problems that do not yet exist in order to protect their legislative power. *See Rahimi*, 602 U.S. at 739-40 (Barrett, J., concurring) (rejecting "a 'use it or lose it' view of legislative authority" that incorrectly "assumes that founding-era legislatures maximally exercised their power to regulate"). Limiting the inquiry to only those laws existing at the Founding would ignore the context in which legislatures enacted restrictions based on age, along with the *Rahimi* Court's reminder that "the Second Amendment permits more than just those regulations identical to ones that could be found in 1791."[8] *Id.* at 691-92.

---

[8] Plaintiffs claim that "[t]he relevant time period to examine to determine if there are any relevantly similar analogues that limit Second Amendment rights in the same way is 1791." Compl. ¶ 39. The Court should reject this assertion. *Bruen* explicitly left open whether the analysis should be focused on 1791 (when the Bill of Rights was adopted) or 1868 (when the Fourteenth Amendment was ratified), and reiterated that later history can aid in interpretation, provided it is not contradicted by earlier history. *Bruen*, 597 U.S. at 36, 38; *see also Rahimi*, 602 U.S. at 692 n.1. Numerous courts have appropriately looked to nineteenth century sources, and the Court should do the same here. *See, e.g.*, *NRA v. Bondi*, 61 F.4th 1317, 1322-23 (11th Cir. 2023), *vacated and reh'g en banc granted*, 72 F.4th 1346 (11th Cir. 2023); *Ezell v. City of*

### 3.    PLAINTIFFS' INVOCATION OF MILITIA HISTORY MERELY SUPPORTS DEFENDANT'S ARGUMENTS

Plaintiffs point to the requirement of militia service for some 18-to-20-year-olds in support of their claim.  Mem. at 18-19.  But that requirement reflects a legal *obligation*, not a constitutional *right*.  Cornell Decl. ¶¶ 10-11.  In other words, that society once required males under 21 years of age to serve in a local militia (often under the command of older men and under military discipline) and to arm themselves in service, does not mean that these males had a constitutional right to possess and use these weapons in their civilian lives.  *See id*. ¶¶ 10-11, 48-49, 53; Spitzer Decl. ¶¶ 30-31.

Notably, beginning in 1792, militia service was performed only by males between the ages of 18 and 45.  *See* Spitzer Decl. ¶ 30.  In the late 1700s, American society universally did not envision women bearing arms in the militia.  Any potential conclusions about constitutional rights in civilian life to be drawn from service in the militia would apply to only the male population within this age range. It is therefore problematic to conclude that militia service is in any way relevant to recognizing supposed constitutional rights in the entirely different civilian realm.

Furthermore, even in the context of militia service, militia members under age 21 could not fulfill their militia obligations without parental involvement and

---

*Chicago*, 651 F.3d 684, 702 (7th Cir. 2011); *see generally* Evan D. Bernick, *Fourteenth Amendment Confrontation*, 51 Hofstra L. Rev. 1, 23 (2022).

control, as parents maintained legal responsibility for their children and for providing them with the necessary arms for militia service. For example, "New Hampshire's 1792 militia law was explicit that parents and guardians had a legal obligation and suffered the penalties for failing to acquire the necessary weapons for militia participation." Cornell Decl. ¶ 54 (also noting generally that early American militia statutes typically required parents and guardians to acquire militia weapons for their charges under 21; even when such obligations were not expressly required by statute, it was required under common law); Spitzer Decl. ¶ 30 ("In fact, arming obligations for militia members under 21 belonged to their parents or guardians"), ¶ 34 (noting that 10 of the 13 original states placed the burden for arming militiamen below the age of 21 onto parents or other authoritative figures). "In short, virtually all state militia laws expressly treated militiamen below the age of 21 as minors, not as adults 21 and over, as these laws shifted legal burdens to parents or others exercising similar authority over militiamen under 21. None of this supported an adult civilian 'right' of 18 to 20 year olds to obtain firearms." Spitzer Decl. ¶ 40.

Finally, one of the few contexts in which young males lived outside the family dwelling in the eighteenth and nineteenth centuries was as students enrolled at colleges and universities. There, college administrations exercised *in loco parentis* authority over their students under age 21, and many of those schools banned firearms. Cornell Decl. ¶ 33; Spitzer Decl. ¶ 41. Indeed, Professor Spitzer found no

20

college or university disciplinary code without such a restriction during that period, and in a number of cases, the restriction applied to students both on and off campus. *See* Spitzer Decl. ¶¶ 41-50. This fact provides yet more proof that Hawaii's restrictions on 18-to-20-year-olds are consistent with this Nation's historical tradition.

### B.    PLAINTIFFS HAVE NOT SATISFIED THE OTHER PRELIMINARY INJUNCTION FACTORS

Plaintiffs have not demonstrated that they will suffer irreparable harm, that the balance of equities tips in their favor, or that an injunction is in the public interest. As to the provisions on firearm possession, Plaintiffs seek to preliminarily enjoin measures the Hawaiʻi Legislature passed in 1994 – 30 years before Plaintiffs filed suit, undermining the alleged irreparable harm absent an immediate injunction. *See Lydo Enters. v. Las Vegas*, 745 F.2d 1211, 1213 (9th Cir. 1984). And Plaintiffs' proposed preliminary injunction, by contrast, will irreparably harm the State: "Any time a State is enjoined by a court from effectuating statutes enacted by representatives of its people, it suffers a form of irreparable injury." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers) (alteration and citation omitted).

Nor do the balance of equities and the public interest favor Plaintiffs. Modern empirical research in neuroscience and social science demonstrates that 18-to-20-year-olds tend to be more impulsive than adults because their brains are still

developing.  *See* Decl. of Elizabeth E. Cauffman ¶¶ 11-24.  The human brain does not finish developing until the mid-to-late 20s, *see id.*, and the *last* part of the brain to mature is the prefrontal cortex, which is responsible for impulse control, judgment, and long-range planning. *Id.* ¶¶ 20-21.  This results in a period in the late teens and early twenties of reduced self-control, increased likelihood of acting on negative emotions like stress or rage, and more intense, variable reactions to these negative states.  *See, e.g.*, *id.* ¶¶ 19, 27-29.  Eighteen-to-twenty-year-olds are therefore more prone to risk-taking and "valu[ing] more immediate rewards over long-term benefits" than adults.  *See id.* ¶¶ 16, 19-20, 27-34; *see also NRA of Am. v. Bureau of Alcohol*, 700 F.3d 185, 210 n.21 (5th Cir. 2012) ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."); *Miller v. Alabama*, 567 U.S. 460, 471-72 (2012) (noting that "developments in psychology and brain science continue to show fundamental differences between juvenile and adult minds—for example, in parts of the brain involved in behavior control"—and finding that juveniles possess "transient rashness, proclivity for risk, and inability to assess consequences" (internal citations omitted)).

As the Supreme Court recognized in barring capital punishment for juvenile offenders, "[a] lack of maturity and an underdeveloped sense of responsibility are found in youth more often than in adults and are more understandable among the

young.  These qualities often result in impetuous and ill-considered actions and decisions." *Roper v. Simmons*, 543 U.S. 551, 569 (2005); *see also Graham v. Florida*, 560 U.S. 48, 68 (2010) ("[D]evelopments in psychology and brain science continue to show fundamental differences between juvenile and adult minds.  For example, parts of the brain involved in behavior control continue to mature through late adolescence."); *Gall v. United States*, 552 U.S. 38, 58 (2007) ("[Y]outh is more than a chronological fact.").

It is not surprising, then, that 18-to-20-year-olds account for a disproportionate share of violent crimes and homicides – both as victims and as perpetrators.  *See* Klarevas Decl. ¶¶ 12, 14; Spitzer Decl. ¶¶ 11-12.[9]  Although 18-to-20-year-olds make up less than four percent of the U.S. population, they account for more than 15% of homicide and manslaughter arrests.[10]  And in 2020, firearm-related injuries caused more deaths of 1-to-19-year-olds than any other cause of death.[11]

---

[9] *See also* Susan B. Sorenson & Richard A. Berk, *Young Guns: An Empirical Study of Persons Who Use a Firearm in a Suicide or a Homicide*, 5 Injury Prevention 280, 281-82 (1999), https://www.ncbi.nlm.nih.gov/pmc/articles/ PMC1730567/pdf/v005p00280.pdf (finding that "persons under the age of 21 years are substantially more likely to use a firearm in the commission of a suicide or a homicide than are persons 21 or more years old").

[10] U.S. Dep't of Justice, *2019 Crime in the United States*, Arrests by Age, 2019, tbl.38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/ tables/table-38.

[11] Christopher R. Harper, et al., Witnessing Community Violence, Gun Carrying, and Associations with Substance Use and Suicide Risk Among High School Students –

Individuals 18 to 20 years of age are also all too frequently the perpetrators of mass shootings. Klarevas Decl. ¶ 12 (finding a five-fold over-representation in the number of mass shootings perpetrated by individuals 18-20); *see also* Spitzer Decl. ¶¶ 11-12 (discussing research showing that individuals aged 18 to 20 are more likely to commit deadly shootings than other age groups). And this age group is disproportionately at risk of attempting suicide, a risk exacerbated by firearm access.[12]

In light of all of this evidence, Plaintiffs' preliminary injunction cannot possibly be in the public interest. Plaintiffs' Motion should therefore be denied.

## C.    THE REQUESTED INJUNCTION CANNOT BE GRANTED IN ANY EVENT

Plaintiffs' Motion asks the Court to "compel" Defendant to:

(a) allow Plaintiffs, or when applicable their customers or members, to apply for a permit pursuant to and consistent with all requirements set forth in HRS § 134–2;

(b) evaluate in the normal course, with no more or less scrutiny than would be applied to a typical applicant, Plaintiffs' or when applicable their customers, or members' applications and background to determine their fitness and qualifications to acquire firearms lawfully; and,

(c) insofar as Plaintiffs, or when applicable their customers or members, are determined to be fit and qualified to acquire firearms, to thereafter issue in the normal course to them the permit contemplated by HRS §

---

Youth Risk Behavior Survey, United States, 2021, 72 Ctrs. for Disease Control & Prevention Morbidity & Mortality Wkly. Rep. (Supplement) 22, 22 (Apr. 28, 2023), https://www.cdc.gov/mmwr/volumes/72/su/pdfs/su7201a3-H.pdf.
[12] *See Sorenson*, supra n.9.

24

> 134–2, vesting them with the same rights and privileges to acquire
> firearms as any other adult who obtains permit(s) pursuant to HRS §
> 134–2.

Mot. for Prelim. Inj. at 2-3.  Such relief cannot be accorded because it exceeds the

scope of relief sought in the Complaint.   Compl. ¶¶ 40-42.  Moreover, the requested

injunction cannot be ordered against Defendant.  HRS § 134-2 dictates that permits

to acquire are issued by the chiefs of police of the various counties.  Defendant does

not evaluate applications for, or issue those permits, so she cannot be ordered to take

action for which she lacks legal authority.  Consequently, even assuming Plaintiffs

could meet the preliminary injunction standard (which they cannot, as explained

above), the relief they request in their Motion cannot be granted.

## III.  PLAINTIFFS' CONSOLIDATION REQUEST SHOULD BE DENIED

Plaintiffs' request for an advancement and consolidation of the trial on the

merits with the preliminary injunction hearing pursuant to Federal Rule of Civil

Procedure 65(a)(2) should be rejected.  Defendant is entitled to conduct discovery

to further assess Plaintiffs' standing and the merits of their claims.   Proper

disposition of the merits of the claims cannot be accomplished in the limited and

compressed preliminary injunction context.

## CONCLUSION

For the reasons stated herein, Defendant requests that the Court deny

Plaintiffs' Motion.

DATED:    Honolulu, Hawai'i, December 23, 2024.

/s/ Aimee M. Lum

KALIKO'ONĀLANI D. FERNANDES
EWAN C. RAYNER
THOMAS J. HUGHES
DOUGLAS N. LETTER [*Pro Hac Vice*]
ERIN C. DAVIS
SHIRA LAUREN FELDMAN [*Pro Hac Vice*]
TESS M. FARDON [*Pro Hac Vice*]
MARK S. DAVIS
AIMEE M. LUM

Attorneys for Defendant ANNE E. LOPEZ in her official capacity as the Attorney General of the State of Hawai'i

26