# EXHIBIT 1

IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ELIJAH PINALES, et al., | : | Civil No. 24-00496 JAO-WRP |
| | : | |
| Plaintiffs, | : | |
| | : | **DECLARATION OF SAUL** |
| v. | : | **CORNELL** |
| | : | |
| ANNE E. LOPEZ, IN HER OFFICIAL | : | |
| CAPACITY AS THE ATTORNEY | : | |
| GENERAL OF THE STATE OF | : | |
| HAWAI'I, | : | |
| | : | |
| Defendant. | : | |
| | : | |
| | : | |

## DECLARATION OF SAUL CORNELL

## DECLARATION OF PROFESSOR SAUL CORNELL
### BACKGROUND AND QUALIFICATIONS

1.      I am the Paul and Diane Guenther Chair in American History at

Fordham University in New York City. I have a master's degree and a Ph.D. in

History, both from the University of Pennsylvania. In addition to teaching

constitutional history at Fordham College, I teach seminars in constitutional law at

Fordham Law School. I have been a Senior Visiting Research Scholar on the

faculty of Yale Law School, the University of Connecticut Law School, and

Benjamin Cardozo Law School. Prior to my time at Fordham University, I was a

Professor of History at The Ohio State University, the Thomas Jefferson Chair at

the University of Leiden in the Netherlands, and an Assistant Professor in the

Departments of History at The Ohio State University and the College of William &

Mary. A copy of my complete curriculum vitae (CV) is attached to this report as

Exhibit A.

2.      My scholarship on the Second Amendment and the history of firearms

regulation has been widely cited by state and federal courts, including the U.S.

Supreme Court.[1] I have published two dozen articles on this topic that have

appeared in leading law reviews and top peer-reviewed legal history journals.[2] I

---

[1] For a complete list of court citations, see my CV attached as Exhibit A.
[2] Particularly relevant publications include Saul Cornell, *History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel under Anglo-American Law, 1688–1868*, 83 LAW & CONTEMP. PROBS. 73 (2020);
(continued…)

authored the chapter on the right to bear arms in the *Oxford Handbook of the U.S. Constitution* and co-authored the chapter in *The Cambridge History of Law in America* on the Founding Era and the Marshall Court, the period that includes the adoption of the Constitution and the Second Amendment.[3] I am currently ranked 91st in the list of the top 100 hundred legal scholars on Hein-on-line's scholar index, a metric that includes both scholarly citations and  court citations.

3.      I have given numerous invited lectures, presented papers at faculty workshops, and participated in conferences on the Second Amendment and the history of firearms regulation at Yale Law School, Harvard Law School, Stanford Law School, UCLA Law School, the University of Pennsylvania Law School, Columbia Law School, Duke Law School, Pembroke College Oxford, Robinson College, Cambridge, Leiden University, and McGill University.

4.       I have also provided expert witness testimony in both state and federal courts in a number of firearms-related matters.

---

Saul Cornell & Nathan DeDino, *A Well Regulated Right: The Early American Origins of Gun Control*, 73 FORDHAM L. REV. 487 (2004). A full list of relevant publications is also included in my CV.

[3] Saul Cornell, *The Right to Bear Arms*, *in* THE OXFORD HANDBOOK OF THE U.S. CONSTITUTION 739–759 (Mark Tushnet, Sanford Levinson & Mark Graber eds., 2015); Saul Cornell & Gerald Leonard, *Chapter 15: The Consolidation of the Early Federal System*, in 1 THE CAMBRIDGE HISTORY OF LAW IN AMERICA 518–544 (Christopher Tomlins & Michael Grossberg eds., 2008).

5.      A list of my publications is also included in the CV I attach as Exhibit A to this report.

6.      I am being compensated for services performed in the above-entitled case at an hourly rate of $750 for reviewing materials, participating in meetings, and preparing reports, and $1000 for depositions and court appearances. I am also compensated for travel expenses. My compensation is not in any way dependent on the outcome of this or any related proceeding, or on the substance of my opinion.

## SUMMARY OF CONCLUSIONS

7.      The State of Hawaii has asked me to provide an expert opinion on the history of firearms regulation in the Anglo-American legal tradition, with a particular emphasis on the regulation of sales of and access to firearms of those below the age of twenty-one, including those old enough to participate in the militias. In the body of my report below, I provide evidence and reasoning for the following opinions:

8.       The term "young adult" and phrase "adults younger than 21" are legal oxymorons for the Founding era and post-Civil War period. There was no legal category of "young adult" or "adult younger than 21" in the Founding era.[4]

---

[4]   On the emergence of the category of young adult in contemporary legal theory, see Elizabeth S. Scott, Richard J. Bonnie, & Laurence Steinberg, *Young Adulthood as a Transitional Legal Category: Science, Social Change, and Justice Policy*, 85 FORDHAM L. REV. 641 (2016).

9.      Nor did The legal category of a rights bearing "young adult" at the time of the Fourteenth Amendment and has only slowly entered American law in the last century. The idea of a "young adult" is a very recent development in American society and law.  American law has always, and continues to this day to recognize, the limited capacities of minors to act with the requisite discretion of fully developed adults.[5]

10.      In their briefing, plaintiffs assert an uncontroversial fact about the history of the militia in the eighteenth century and much of the nineteenth century: governments compelled some minors to serve in the militia and participate in related community-based forms of law enforcement. But the fact that government forced individuals to participate in the militia does not demonstrate the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21. Rather, this fact shows that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense.

11.      Imposing a legal obligation on individuals does not establish that a right existed; here it demonstrates that the opposite was the case. Failure to comply with this legal obligation resulted in punishment. Militia laws gave government broad power over minors. They did not confer an individual rights claim that

---

[5] *Id.*

4

minors might make against government regulation. In the Anglo-American legal tradition, rights are the *correlatives* of duties, not *synonyms*.

12.    Across the broad arc of American history, from the Founding era and through the modern day, governments have regulated firearms. The scope of such police power regulations was greatest when the health and safety of minors was at issue. Regulations limiting firearms ownership and possession for those under the age of 21 are longstanding and firmly rooted in the American historical and legal tradition. The law has never considered minors fully independent legal actors who possessed the same rights as adults.[6]

## MATERIALS REVIEWED AND METHODOLOGIES USED

13.    My evaluation of these legal historical materials draws on the most recent scholarship on the Second Amendment and the right to bear arms, as well as the existing case law, including *New York State Rifle & Pistol Association v. Bruen* and *United States v. Rahimi.* I employ the accepted historical and legal methodologies for interpreting legal sources from the Founding era and later periods of American history, including the era of the Fourteenth Amendment's adoption and implementation. This declaration analyzes the public meaning of the Second Amendment, the Fourteenth Amendment, the various state constitutional provisions

---

[6] Saul Cornell, *"Infants" and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record*, YALE L. & POL'Y REV.: INTER ALIA, at pt. II (Oct. 26, 2021)

on the right to keep and bear arms, state statutes, local ordinances, court decisions, and popular and learned legal commentaries.[7] The goal of surveying such a wide range of sources is to ascertain the various public understandings of how these different legal and constitutional texts were interpreted when the Bill of Rights was ratified, when individual laws and ordinances were enacted, and when the Fourteenth Amendment was adopted and interpreted by courts.[8]

14.    Historical inquiries by courts must be supplemented by careful examination of the relevant historical scholarship and evidence if they are to avoid the dangers of "law office history."[9] Modern legal history—the methodology I use in this report—approaches the past with a more holistic model of meaning, recognizing that legal meanings, including those relevant to understanding the history of the Second Amendment, the various state constitutional arms-bearing provisions, and gun regulation, must be rigorously contextualized.[10] This approach requires analyzing more than statutes and cases to understand the social, cultural, and intellectual contexts that shaped the law. Any effort to understand the Second

---

[7] Zachary Schrag, THE PRINCETON GUIDE TO HISTORICAL RESEARCH (2021).

[8] J.H. HEXTER, REAPPRAISALS IN HISTORY 194–45 (1961).

[9] Alfred H. Kelly, *Clio and the Court: An Illicit Love Affair*, 1965 SUP. CT. REV. 119, 122 n.13 (1965).

[10] The best illustration of this method is the three volume *Cambridge History of Law in America*. *See* THE CAMBRIDGE HISTORY OF LAW IN AMERICA (Michael Grossberg & Christopher L. Tomlins eds., 2008).

Amendment and the history of gun regulation must canvass a variety of historical topics, including such diverse and distinctive sub-fields as legal history, social history, cultural history, economic history, and military history.[11]

15.    In *District of Columbia v. Heller*, the Supreme Court directed courts and litigants to look to history in evaluating the scope of permissible regulation under the Second Amendment.[12] At the time *Heller* was decided, there was relatively little scholarship on the history of gun regulation, but in the years since the decision was published, a burgeoning body of scholarship has uncovered a previously unknown and little studied history of arms regulation in the Anglo-American legal tradition.[13] My report draws on this important body of new scholarship and the breadth of digital sources now available to scholars in order to understand and contextualize the rights implicated—and not implicated—in this case.

16.    *Heller* did not undertake the arduous and laborious task of doing the historical research necessary to understand the full scope of the legal tradition of

---

[11] *Id.*

[12] *Dist. of Columbia v. Heller*, 554 U.S. 570 (2008); Eric M. Ruben & Darrell A. H. Miller, *Preface: The Second Generation of Second Amendment Law & Policy*, 80 LAW & CONTEMP. PROBS. 1 (2017).

[13] Cornell & DeDino, *supra* note 2; Robert J. Spitzer, *Gun Law History in the United States and Second Amendment Rights*, 80 LAW & CONTEMP. PROBS. 55 (2017). For an effort to synthesize the new scholarship  on regulation and apply it using *Heller's* framework, see JOSEPH BLOCHER & DARRELL A. H. MILLER, THE POSITIVE SECOND AMENDMENT: RIGHTS, REGULATION, AND THE FUTURE OF HELLER (2018).

arms regulation. Rather, it left this project to lower courts and future scholars. Justice

Scalia's characterization of the limits of *Heller's* foray into history in the majority

opinion is instructive in this regard:

> Although we do not undertake an exhaustive historical analysis today
> of the full scope of the Second Amendment, nothing in our opinion
> should be taken to cast doubt on longstanding prohibitions on the
> possession of firearms by felons and the mentally ill, or laws
> forbidding the carrying of firearms in sensitive places such as schools
> and government buildings, or laws imposing conditions and
> qualifications on the commercial sale of arms.[14]

Moreover, in *Heller*, Justice Scalia's majority opinion noted that

"constitutional rights are enshrined with the scope they were thought to have when

the people adopted them."[15] *Heller* also made clear that the right to keep and bear

arms was not absolute:

> Like most rights, the right secured by the Second Amendment is not
> unlimited. From Blackstone through the nineteenth-century cases,
> commentators and courts routinely explained that the right was not a
> right to keep and carry any weapon whatsoever in any manner
> whatsoever and for whatever purpose.[16]

17.    *Heller* identified an illustrative set of examples of "presumptively

lawful regulations."[17] This list was not exhaustive, but only a sketch of the many

ways guns and gunpowder have been regulated by government, a legacy that is

deeply anchored in text, history, and tradition.[18] Thus, *Heller* directed courts to look

---

[14]*Heller*, 554 U.S. at 626–27.
[15] *Id.* at 684.
[16] *Id.* at 626.
[17] *Id.* at 627 n.26.
[18] *Id.* at 626.

at the Founding era, antebellum America, and Reconstruction when examining the scope of the right.[19]

## THE LEGAL STATUS OF INFANTS UNDER
## THE COMMON LAW: THE FOUNDING ERA

18.    The first step in evaluating the status of Second Amendment rights for those aged 18–20 and other minors in the Founding era is to consider the common law treatment of the legal capacities and rights of persons under the age of legal majority at that time. Persons aged 18–20 were considered "infants" or "minors" under the law in the Founding era.[20] This legal fact did not change until the latter half of the twentieth century.[21] Across this broad swath of American legal history, minors' status has been significantly constrained under law and would not have included the ability to assert a legal claim in any court that would vindicate a Second Amendment right or a similar claim under an analogous state constitutional provision. Therefore, treating infants as autonomous legal actors capable of having

---

[19] On the notion of constitutional modalities, and the relevance of the categories of history, text, and tradition, see P. BOBBITT, CONSTITUTIONAL INTERPRETATION (1991). Of course, other scholars may have different terminology for these modes of analysis, but these jurisprudential categories largely overlap these six forms. *E.g.*, Richard H. Fallon, Jr., *A Constructivist Coherence Theory of Constitutional Interpretation*, 100 HARV. L. REV. 1189 (1987); Robert Post, *Theories of Constitutional Interpretation*, in LAW AND THE ORDER OF CULTURE 13–41 (R. Post ed., 1991).

[20] ZEPHANIAH SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT 213 (1795).

[21] Hamilton, *supra* note 5 at 57-8.

the right to keep, bear, and acquire arms is profoundly anachronistic and ignores the common law context in which the Second Amendment and similar state constitutional provisions were enacted in the eighteenth and early nineteenth centuries.[22]

19.     Under English common law, individuals under the legal age of majority, twenty-one, were entirely subsumed under the authority of their parents (usually their fathers) or guardians. The power of fathers or guardians under this system of patriarchy exceeded the power of the monarch over his subjects.[23] Parents and other legal guardians had the legal authority to correct those in their charge, including through corporal punishment. There was no recourse to legal redress for such minors against their parents or guardians (provided the punishment was deemed necessary and not excessively cruel).[24]

20.     In many respects, the situation of minors under 21 resembled that of married women under coverture. Under the doctrine of coverture, a married woman ceased to exist as a legal entity and her entire legal persona was subsumed within

---

[22] J.H.Baker, AN INTRODUCTION TO ENGLISH LEGAL HISTORY 483–84 (4th ed. 2002).

[23] *Id.*

[24] John E.B. Myers, *A Short History of Child Protection in America*, 42 FAM. L.Q. 449 (2008); ELIZABETH PLECK, DOMESTIC TYRANNY: THE MAKING OF AMERICAN SOCIAL POLICY AGAINST FAMILY VIOLENCE FROM COLONIAL TIMES TO THE PRESENT (1987).

her husband's authority.[25] Sir William Blackstone described the legal meaning of coverture as follows:

> By marriage, the husband and wife are one person in law: that is, the very being or legal existence of the woman is suspended during the marriage, or at least is incorporated and consolidated into that of the husband: under whose wing, protection, and cover, she performs every thing; and is therefore called in our law-French a feme-covert.[26]

21.    Indeed, an influential eighteenth-century English treatise on the law of domestic relations noted that the comparison between a femme covert and minors was frequently made by writers on the law: "Feme Covert in our Books is often compared to an Infant, both being persons being disabled in the Law."[27] Given that minors were legally "disabled" in the eyes of the law, the claim that they might assert a Second Amendment right against government interference is erroneous.

22.    The American Revolution set in motion a process of change that republicanized the rights of minors by giving society, acting through courts and legislatures, greater authority to intervene to protect and promote the well-being of those under the age of majority.[28] This change did not endow minors with full legal

---

[25] Allison Anna Tait, *The Beginning of the End of Coverture: A Reappraisal of the Married Woman's Separate Estate*, 26 YALE JOURNAL OF LAW AND FEMINISM 165, 167 (2014).

[26] 1 William Blackstone, COMMENTARIES *442.

[27] Anon., BARON AND FEME: A TREATISE OF LAW AND EQUITY CONCERNING HUSBANDS AND WIVES 8 (1738).

[28] Jeffrey Shulman, THE CONSTITUTIONAL PARENT: RIGHTS, RESPONSIBILITIES, AND THE ENFRANCHISEMENT OF THE CHILD (2014).

rights under the law, but it did diminish the near absolute power that fathers (or parents more generally) and guardians had over minors living under their authority.

23.    The subject of minors' legal status was explored at considerable length by Zephaniah Swift, an esteemed Connecticut jurist in the Founding era, and author of one of the first legal treatises published after the adoption of the Second Amendment: "Persons within the age of twenty-one, are, in the language of the law denominated infants, but in common speech—minors." Swift noted: "by common law an infant can bind himself by his contract for necessaries, for diet, apparel, education and lodging," but little else.[29] During the decades after the American Revolution, courts became more involved in monitoring contractual arrangements involving minors and adopted a more aggressive role in protecting the interests of minors, even if it meant voiding contracts. This new supervisory role narrowed the range of contractual freedom of minors acting without consent. Thus, minors were subject to far greater state supervision than any other legal entity involved in the marketplace during the early years of the republic.[30]

24.    It is impossible to understand the legal conception of "infant" without recognizing the patriarchal nature of English common law and its early American

---

[29] SWIFT, 1 A SYSTEM OF THE LAWS OF THE STATE OF CONNECTICUT, 213. Necessities would not have included arms, but was understood to include food, clothing, educational costs if appropriate and little else.
[30] HOLLY BREWER, BY BIRTH OR CONSENT: CHILDREN, LAW, AND THE ANGLO-AMERICAN REVOLUTION IN AUTHORITY (2012).

variants.[31] Johns Hopkins historian Toby Ditz summarizes the centrality of the legal

concept of patriarchy to family law and governance in the Founding Era:

> Historians have begun to use the concept "household patriarchy" to describe community organization in eighteenth century America. Household patriarchy refers to both internal and external aspects of domestic organization. It describes authority relations in which heads, and not others within households, have the formal right to make final decisions about internal matters. Patriarchal household heads speak for their dependents in dealings with the larger world. The civic status of household dependents is an indirect or secondary one; the community reaches them primarily through the actions and voices of the heads. [32]

25.     Individuals below the age of legal majority served in the militia and

participated in community-based efforts to keep the peace (such as the "hue and

cry"), but these public safety duties were undertaken in a supervised setting under

color of law.[33] Further, the circumstances under which an infant could participate in

community forms of keeping the peace were defined by the patriarchal structure of

---

[31] The absorption of the common law in America and the development of different variants of common law in the colonies and states has generated a rich scholarly literature, for a useful overview, see Lauren Benton & Kathryn Walker, *Law for the Empire: The Common Law in Colonial America and the Problem of Legal Diversity*, 89 CHI.-KENT L. REV. 937 (2014).

[32] Toby L. Ditz, *Ownership and Obligation: Inheritance and Patriarchal Households in Connecticut, 1750-1820*, 47 WILLIAM & MARY Q. 235, 236 (1990).

[33] The Statute of Winchester, adopted in 1284 in the Reign of Edward I, required male members of the community between 15 and 40 to join the "hue" and "cry" and participate in community law enforcement, see 1 STATUTES OF THE REALM 26 (1235-1377). Until the rise of modern police forces in the middle of the nineteenth century, community-based law enforcement, including the "hue" and "cry" were the only means to deal with most forms of ordinary crime. See LAWRENCE M. FRIEDMAN, CRIME AND PUNISHMENT IN AMERICAN HISTORY (1996).

local communities and the peacekeeping mechanism instantiated by law. As

Princeton historian Laura Edwards notes:

> The social order of the peace was profoundly patriarchal. The concept was
> based in a long-standing, highly gendered construction of government
> authority, which subordinated everyone to a sovereign body, just as all
> individual dependents were subordinated to specific male heads of
> household. [34]

Thus, participation in law keeping does not vindicate the type of right claimed by

plaintiffs. It only underscores that minors carried weapons in public only when

sanctioned by law or when under the supervision of adults.

## THE PERSISTENCE OF COMMON LAW RESTRICTIONS
## ON MINORS IN THE NINETEENTH CENTURY

26.    The common law restrictions and disabilities on minors did not erode

after the Founding era but remained a fixture in American law for the next century.

The influential early nineteenth century legal author and jurist James Kent discussed

the legal status of minors in 1836 in his influential *Commentaries on American* law:

"The necessity of guardians results from the inability of infants to take care of

themselves; and this inability continues, in contemplation of law, until the infant has

attained the age of twenty-one years."[35] When some radical Jacksonian Democrats

suggested that the age of majority for voting ought to be lowered for those who had

_____

[34] Laura F. Edwards, *The Peace: The Meaning and Production of Law in the Post-
Revolutionary United States*, 1 UC IRVINE L. REV. 565, 570 (2011).
[35] James Kent, 2 COMMENTARIES ON AMERICAN LAW 259 (3d ed., 1836).

served in the militia, leading Federalists in the New York state constitutional convention mocked them. Federalist Elisha Williams, a delegate from Columbia County, wondered if his Democratic opponents wished to enfranchise "brave infants" by giving them the right to vote.[36] Extending full rights to minors was literally treated as a joke by Federalists sitting in the state constitutional convention.

27.     John Bouvier, author of the first American law dictionary, shared Swift and Kent's views, and his 1858 explanation of the legal significance of the age of majority followed their lead: "The rule that a man attains his majority at age twenty-one years accomplished, is perhaps universal in the United States. At this period, every man is in the full enjoyment of his civil and political rights."[37] Bouvier's statement captures the widespread view of early American legal commentators that minors were not recognized as independent legal actors who enjoyed the full panoply of rights under American law. Every commentator on the law between the adoption of the Second Amendment and the Civil war echoed the belief that infants did not enjoy the full civil and political rights of citizens.[38]

28.     The adoption of the Fourteenth Amendment did not alter the legal status of minors.  The *American and English Encyclopedia of Law,* a standard reference

---

[36] CORINNE T. FIELD, THE STRUGGLE FOR EQUAL ADULTHOOD: GENDER, RACE, AGE, AND THE FIGHT FOR CITIZENSHIP IN ANTEBELLUM AMERICA (2014) at 58.
[37] JOHN BOUVIER, 1 INSTITUTES OF AMERICAN LAW 148 (1858).
[38] Field, *supra* note 36.

work consulted by lawyers and judges written at the end of the nineteenth century, included a long discussion of the legal status of minors that reiterated the views expressed by Story, Kent, and Bouvier.[39]

29.    Lewis Hochheimer, one of the leading authorities on domestic law and a respected commentator on legal matters during the era of the Fourteenth Amendment, echoed these views, expressly noting that state police power authority was at its zenith when the health and welfare of minors was at issue.[40] The police power framework that antebellum jurists had developed to address issues about weapons regulation persisted.[41] Hochheimer singled out "[s]pecific regulations and

---

[39] 16 THE AMERICAN AND ENGLISH ENCYCLOPÆDIA OF LAW 358 (2nd ed., 1900).The Supreme Court has recognized this work as an important source for reconstructing legal thought in the post-Civil War era, see Counterman v. Colorado, 600 U.S. 66, 143 S. Ct. 2106, 216 L. Ed. 2d 775 (2023) at 96 (describing the English and American Encyclopedia as a "leading treatise.")   A multi-volume reference work, this collection was considered to be an essential part of a basic library for lawyers, see American and English Encyclopedia of Law, Vol. 29, 42 Cent. L.J. 397, 400 (1896) (book review).

40.    See New Books and Editions: Hochheimer on Custody of Infants, 36 ALB. L.J. 380, 380 (1887) (celebrating Hochheimer's new book, The Law Relating to the Custody of Infants).

41.    See Lewis Hochheimer, The Police Power, 44 CENT. L.J. 158, 158, 161 (1897). Hochheimer defined the police power as "the inherent and plenary power of a State or government to prescribe regulations to preserve and promote the public safety, health and morals, and to prohibit all things hurtful to the comfort and welfare of society." Id. at 158. He noted that "[t]he constitutionality of statutes as to the care and protection of minors has been universally upheld," See id. at 161; See LEWIS HOCHHEIMER, A MANUAL OF CRIMINAL LAW AS ESTABLISHED IN THE STATE OF MARYLAND 146–47 (1889) ("The carrying or wearing of dangerous or deadly weapons concealed upon or about the person and the carrying
(continued…)

prohibitions, designed for the protection of their morals and health and the security of their persons, such as those relating to the sale of . . . dangerous weapons," i.e., firearms. [42] His comments echoed other commentators from the period who saw firearms regulation as the *locus classicus* of state police power authority.[43]

## FOUNDING ERA DISTRUST OF MINORS' UNSUPERVISED ACCESS TO GUNS

30.    Most of the exclusionary policies in place in the Founding era, including laws disarming racial and religious minorities, would not survive constitutional challenge today. The same is not true for laws governing minors. In

_____

or wearing of such weapons openly, with the intent or purpose of injuring any person, are statutory offenses. Such statutes have frequently been held not to conflict with the constitutional right of the people of the United States to keep and to bear arms." (footnotes removed)). A Reconstruction era review of Hochheimer's book on infants praised the work for its exhaustive treatment of the subject, noting that it offered a "convenient and comprehensive summary" of the rights, remedies, and procedures available to infants, parents, guardians, and courts in this area of the law. *New Books and Editions: Hochheimer on Custody of Infants*, *supra* note 40, at 380. A brief review in the *Harvard Law Review* also praised the book for its "careful exposition of a small but important topic in the law." *Reviews*, 13 HARV. L. REV. 416, 420 (1900) (giving a positive review to Lewis Hochheimer's book, *The Law Relating to the Custody of Infants*).

42.    *See* LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS 1, 3-4 (3d ed. 1899) at 2–4 (describing the scope of the government's police power over infants).

43.    For an exploration of the broad legal consensus on the scope of police power regulation of arms during the era of the Fourteenth Amendment, Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 UC DAVIS L. REV. ONLINE 65, 68–70, 78 (2021) [hereinafter Cornell, *Right to Regulate*]

marked contrast to these other laws driven by impermissible forms of animus, the view that minors lack the maturity and discretion needed to acquire and use arms without adult supervision is entirely consistent with modern science and law.[44]

31.    Indeed, the continuity between common law views of the limited ability of minors to act responsibly and modern cognitive science's understanding of brain development is striking. Consider the characterization of minors' limited capacity in this regard from a popular legal guide from the Founding era. Drawing on the revered English common law authority Bracton, an early American justice of the peace manual[45] noted:

> From the observations made on the daily actions of infants as to their arriving to discretion, the laws and customs of every country have fixed upon particular periods on which are presumed capable of acting with reason and discretion: hence in our law the full age of man or woman is twenty-one years.[46]

32.    Although some of the disabilities attaching to minors' unique status under law have been removed in the two centuries since the adoption of the Second

---

[44] Megan Walsh & Saul Cornell, *Age Restrictions and the Right to Keep and Bear Arms, 1791-1868*, 108 MINN. L. REV. 3049 (2024).

[45] On the central role that justice of the peace manuals played in Anglo-American legal culture, see Larry M. Boyer*, The Justice of the Peace in England and America from 1506 to 1776: A Bibliographic History*, 34 Q.J. LIBR. CONG. 315, 317-18 (1977), and JOHN B. NANN & MORRIS L. COHEN, THE YALE LAW SCHOOL GUIDE TO RESEARCH IN AMERICAN LEGAL HISTORY 87 (2018); Brewer, *supra* note 30 at 369-371.

[46] [A Gentleman of the Law] A NEW CONDUCTOR GENERALIS (Albany,1803) at 237.

Amendment, American law continues to treat minors differently than adults. As Justice Barrett has noted in another Second Amendment context: "History is consistent with common sense."[47] In this instance the common sense embodied in the common law and modern science are in complete accord.[48]

33.　　One of the clearest demonstrations of the diminished capacity of minors to behave responsibly with arms when not supervised may be found in the stringent rules prohibiting weapons at colleges in the Revolutionary era.[49] College was one of the very few circumstances where minors lived outside of their parents' or a guardians' direct authority. As a matter of law, minors attending college traded strict parental authority for an equally restrictive rule of *in loco parentis*.[50]

34.　　Harvard's campus rules adopted in the era of the American Revolution prohibited guns on campus:

> XVI. No Undergraduate shall keep a Gun, Pistol or any Gunpowder in the College, without Leave of the President—nor shall he go a gunning, fishing, or seating over deep Waters, without Leave from the President, or one of the Tutors or Professors, under the Penalty of one shilling for either of the Offences aforesaid—and if any Scholar shall fire a Gun, or Pistol, within the College Walls, Yard or near the College, he shall be fined not

---

[47] *Kanter v. Barr*, 919 F.3d 437, 451, 464–465 (CA7 2019) (Barrett, J., dissenting).

[48] For a discussion of the way modern cognitive science and psychology have vindicated the Founders view of minors' lack of discretion and impulse control, see *supra* note 44.

[49] Robert J. Spitzer, *Historical Weapons Restrictions on Minors*, 76 RUTGERS U. L. REV 101 (2024).

[50] Brian Jackson, *The Lingering Legacy of "In Loco Parentis": An Historical Survey and Proposal for Reform,* 44 VAND. L. REV.1135 (1991).

exceeding two shillings & six pence, or be admonished, degraded, or rusticated according to the Aggravation of the Offence.[51]

35.    Although Harvard was a private entity, its role in early Massachusetts society straddled the public and private spheres.[52] Other colleges in the Founding era adopted similar restrictions. Yale College prohibited students from possessing any guns or gun powder.[53] Two years after the adoption of the Second Amendment, Rhode Island College, the forerunner of Brown University, adopted its own stringent ban on guns on campus that not only fined students for possession of firearms, but threatened potential expulsion as well.[54]

36.    The University of Georgia, one of the nation's oldest public institutions of higher education, also forbade guns on campus. The rule was emphatic: "no student shall be allowed to keep any gun, pistol, Dagger, Dirk[,] sword cane or any

---

[51] 31 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: COLLECTIONS 338, 358 (1935).

[52] Thus, the Massachusetts Constitution of 1780 instructed the citizenry "to cherish the interests of literature and the sciences, and all seminaries of them; especially the university at Cambridge. MASS. CONST. ch. V, § 1. Laws of the Commonwealth of Massachusetts from November 28, 1780 to February 28,1807, with the Constitutions of the United States of America, and of the Commonwealth, 1780-1807) at 580. Harvard students and faculty were exempted from militia obligations but during the American Revolution Harvard College did create a militia company, *see* Conrad E. Wright, *Creating a Fellowship of Educated Men: Forming Gentleman at Pre-Revolutionary Harvard*, *in* YARDS AND GATES: GENDER IN HARVARD AND RADCLIFFE HISTORY 17–38 (Laurel Ulrich ed., 2004).

[53] THE LAWS OF YALE-COLLEGE, IN NEW-HAVEN, IN CONNECTICUT, ENACTED BY THE PRESIDENT AND FELLOWS, THE SIXTH DAY OF OCTOBER, A.D. 1795 p.26 (1800).

[54] LAWS OF RHODE ISLAND COLLEGE (1793) at 13.

other offensive weapon in College or elsewhere, neither shall they or either of them be allowed to be possessed of the same out of the college in any case whatsoever."[55] A similar law governed students at the University of North Carolina, another public university founded in the same period. The university prohibition was total: "No Student shall keep a dog, or firearms, or gunpowder. He shall not carry, keep, or own at the College, a sword, dirk, sword-cane." [56]

37.    The figure of Thomas Jefferson looms large in modern discussions about the meaning of the Second Amendment.[57] Although Jefferson was among the Founding generation's most ardent defenders of an expansive vision of the right to keep and bear arms, even he took a dim view of allowing guns at the University of Virginia, the institution he helped found. Jefferson and his good friend James Madison, the primary architect of the Second Amendment, attended the meeting in which this sweeping prohibition of firearms on campus was adopted:

> No Student shall, within the precincts of the University, introduce, keep or use any spirituous or vinous liquors, keep or use weapons or

---

[55] *The Minutes of the Senate Academicus* 1799–1842, UNIVERSITY OF GEORGIA LIBRARIES (1976), https://www.libs.uga.edu/hargrett/archives/senatus/senatus%20academicus%201799-1811.pdf.

[56] ACTS OF THE GENERAL ASSEMBLY AND ORDINANCES OF THE TRUSTEES, FOR THE ORGANIZATION AND GOVERNMENT OF THE UNIVERSITY OF NORTH-CAROLINA 15 (1838).

[57] David Thomas Konig, *Thomas Jefferson's Armed Citizenry and the Republican Militia*, 1 ALB. GOV'T L. REV. 250 (2008).

arms of any kind, or gunpowder, keep a servant, horse or dog, appear in school with a stick, or any weapon, nor, while in school."[58]

38.     The rules and regulations of American colleges in the era of the Second Amendment further support the conclusion that for individuals below the age of majority, there was no unfettered right to purchase, keep, or bear arms. Rather, access to, and the ability to keep or bear, weapons occurred in supervised situations where minors were under the direction of those who enjoyed legal authority over them: fathers, guardians, constables, justices of the peace, or militia officers. The fact that such regulations were ubiquitous in the Founding era only underscores the fact that legal and social norms governing American society in the era of the Second Amendment's ratification do not offer any support for plaintiffs' view that unsupervised minors were to be trusted with easy access to firearms. Quite the opposite was the case: there was almost universal acceptance that guns in the hands of minors required adult supervision and extensive training to be used safely.[59]

39.     Finally, the role of minors in community-based law enforcement also merits further historical scrutiny. Participation in such activities was, as Professor Edwards notes, embedded in the patriarchal structure of local communities.[60]

---

[58] UNIVERSITY OF VIRGINIA BOARD OF VISITORS MINUTES (October 4–5, 1824) 1, 6–7 (1824), https://encyclopediavirginia.org/entries/university-of-virginia-board-of-visitors-minutes-october-4-5-1824/.

[59] Walsh and Cornell, *supra* note 44 .

[60] Edwards, *The Peace supra* note 34.

Minors meeting this legal obligation, a distinct obligation from the militia, also acted in a setting that was supervised by adults. A popular South Carolina justice of the peace manual published in 1788, the year the Constitution was adopted, captured this view when it described the categories of person "who shall not be a constable" as including "infants," "madmen," and "idiots."[61] The author of this influential legal guide, John Fauchereaud Grimké, was among the state's most distinguished jurists. The fact that he included infants old enough to participate in the militia and local law enforcement in the same legal category as those the law considered to be incapable of asserting their legal will independently only highlights the absurdity of treating those under 21 as having a robust, freestanding right to keep, bear, and freely acquire arms at the time of the Founding.[62] Any assertion that infants below the age of majority could claim the right to bear arms outside of the militia or related peacekeeping activities, without the authority of parents or a guardian, rests on an anachronistic interpretation of early American militia statutes, ignorance of

---

[61] JOHN FAUCHEREAUD GRIMKÉ, THE SOUTH CAROLINA JUSTICE OF THE PEACE 117 (1788). Grimké was one of the state's most eminent lawyers and became one of its most influential jurists. For biographical background on his life, see Eli A. Poliakoff, *Grimké, John Faucheraud*, SOUTH CAROLINA ENCYCLOPEDIA (May 17, 2016), https://www.scencyclopedia.org/sce/entries/grimke-john-faucheraud/.

[62] For a more elaborate argument about the dangers of interpreting the Second Amendment with an ahistorical understanding of rights, see Jud Campbell, *Natural Rights, Positive Rights, and the Right to Keep and Bear Arms*, 83 LAW & CONTEMP. PROBS. 31 (2020).

Founding-era domestic law, and disregard of the social and economic realities of life at the Founding.[63]

## PROTECTING ORDERED LIBERTY IN AMERICA:
## EARLY AMERICAN MILITIA LAWS
## IN HISTORICAL CONTEXT

40.    Plaintiffs build their case around an uncontroversial fact: colonial militias and the militias created by the first states included white males between the ages of eighteen and twenty, and sometimes younger, in their ranks. By including some infants in the militia ranks, the statutes creating and regulating these militias and the concomitant duties they imposed implemented policy goals aimed at arming and expanding the ranks of able-bodied militiamen. But they did not embody or establish a constitutional *right* that might be claimed by minors outside of this very narrow context defined by the relevant statutes. Nor did these statutes alter the legal age of majority; they simply implemented a policy goal of the states, and later the federal government.

41.    Although many states chose to include minors for policy reasons, the composition of the militia was always dictated by strategic imperatives. States were

---

[63] During the era of the Second Amendment the  federal government and the states struggled to arm the militia with the right type of weapons, see  Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).

at liberty to expand or contract the legal definitions of the militia to further their goals of public defense. If a state felt it was important to exclude minors because of the economic burden it placed on families or because younger Americans were viewed as less effective soldiers, there was nothing to prevent a legislature from implementing such changes.

42.    Federalist Thomas Fitzsimons, a member of both the Constitutional Convention and the first Congress that drafted the Second Amendment, captured the view of many in the Founding era when he expressed concerns about imposing overly burdensome requirements of militia service on the nation. Commenting during the debate over the first militia act, Fitzsimons reminded members of Congress that "subjecting the whole body of the people to be drawn out four or five times a year was a great and unnecessary tax on the community."[64]  The ultimate decision on the composition of the militia was entirely within the purview of Congress.

43.    States had plenary authority to alter the age requirement for participation in the militia.  New Jersey changed the legal definition of the militia in 1821: "[F]rom and after the passing of this act, all persons under the age of twenty-

---

[64] ANNALS OF CONGRESS, House of Representatives, 1st Congress, 3rd Session (1790) at 1852.

one years be, and they are hereby, exempt from militia duty in time of peace."[65]

Kansas excluded minors by framing its constitutional provision on the militia as follows: "The militia shall be composed of all able-bodied white male citizens between the ages of twenty-one and forty-five years."[66]

44.    The ideal of a broadly inclusive vision of the militia, at least as far as white males were concerned, was venerated in public orations, pamphlets, and newspaper essays, but a close look at the statutes enacted by various states and the federal government in the decades after the adoption of the Second Amendment reveals a different legal reality.[67] Instead of mandating a universal and broadly inclusive militia in the text of the Constitution, the Framers wisely chose to give Congress the  power to define the composition of the militia. There was no textual mandate in the Constitution that compelled future generations to include minors if

---

[65] An Act to exempt minors from Militia Duty in time of peace, in Josiah Harrison, Ed., *A Compilation Of The Public Laws Of The State Of New-Jersey Passed Since The Revision In The Year 1820* 266 (1833). By the 1820s, the militia had fallen into disrepute in many parts of America and became a subject of satire and ridicule, see David, Tatham, *David Claypoole Johnston's Militia Muster*, 19 *AMERICAN ART JOURNAL* 4 (1987).

[66] Kan. Const. of 1859, art. 8, § 1.

[67] *See* Bernard Bailyn, THE IDEOLOGICAL ORIGINS OF THE AMERICAN REVOLUTION (1967); J. G. A. Pocock, THE MACHIAVELLIAN MOMENT: FLORENTINE POLITICAL THOUGHT AND THE ATLANTIC REPUBLICAN TRADITION (1975); Saul Cornell, A WELL REGULATED MILITIA: THE FOUNDING FATHERS AND THE ORIGINS OF GUN CONTROL IN AMERICA 69 (2008); Lawrence Delbert Cress, CITIZENS IN ARMS: THE ARMY AND MILITIA IN AMERICAN SOCIETY TO THE WAR OF 1812 (1982); Noah Shusterman, IN ARMED CITIZENS: THE ROAD FROM ANCIENT ROME TO THE SECOND AMENDMENT (2020).

such a policy was deemed to be undesirable. If a particular future Congress believed that society and public defense meant that minors' labor was needed elsewhere or if it concluded that minors were not well suited to the military tasks required for national defense, there was no legal ground for minors to claim a right to participate in the militia or acquire the weapons needed for militia service.[68] Thus, as a matter of constitutional law the composition of the militia was left to Congress to determine it as it saw fit.

45.    Nor is it surprising that those most familiar with American military matters in the era of the Second Amendment, including virtually all the Federalist Founders, believed that America's heavy dependence on the militia had been a strategic mistake in the American Revolution, one that had severely hampered the struggle for independence.[69] George Washington's private correspondences contain withering comments about the inadequacy of the militia, and the necessity of creating an effective standing army.[70] When Congress finally debated the structure

---

[68] Jack N. Rakove, *The Second Amendment: The Highest State of Originalism*, 76 CHI.-KENT L. REV. 103, 108, 120-125 (2000) (notes the significance of this tension between American political rhetoric and constitutional law in the Founding Era). On the distinction between legal meaning and ordinary public meaning in originalist theory, see William Baude & Stephen E. Sachs, *Grounding Originalism*, 113 NW.U.L.REV. 1455 (2019).

[69] On the importance of distinguishing between Federalist and Anti-Federalist views of the militia, see Cornell, A WELL REGULATED MILITIA, *supra* note 67, at 41-70.

[70] *From George Washington to Lund Washington, 30 September 1776*, NAT'L ARCHIVES, https://founders.archives.gov/documents/Washington/03-06-02-0341.

of the militia in the First Congress, there were deep divisions over the organization and structure of the militia. Many—particularly those who had served with Washington in the Continental Army—recognized that the militia, including the Revolutionary-era militia, was never, as some orators and newspaper essayists proclaimed, an effective fighting force that included the whole body of the people in arms. Those most familiar with the militia's performance during the Revolution feared placing the future security of the nation entirely in the hands of such a militia.

46.    Many in the First Congress, including the many Federalists who outnumbered their Anti-Federalist adversaries, shared Washington's concerns and doubted the wisdom of continuing to conceive of the militia in the expansive terms that republican theory demanded—a body of independent yeoman drawn from the ranks of nearly all able-bodied white men of the nation. Despite a close vote on the issue in Congress, the first federal militia act rejected calls to create an elite, select militia.[71] Instead, it carried forward the model of earlier colonial laws and defined membership in the militia broadly, but did little to guarantee that such a militia would be properly armed.[72] The debates over the future of the militia in Congress reveal a tension between the ideals espoused in popular rhetoric and the reasoned consideration of America's military leaders. More germane to contemporary Second

---

[71] Cornell, A WELL REGULATED MILITIA, *supra* note 67.
[72] *Id.*

Amendment jurisprudence, the exact nature of the militia's composition was left to the political branches to decide in accordance with the policy requirements of the nation.

47. The notion that the composition of the militia, including the participation of minors, was hard wired into our constitutional order at the Founding is simply mistaken. Rhetorical flourishes should not be confused with actual laws governing the militia, which were shaped by political and military imperatives of public policy and not determined by fixed constitutional principles or the lofty encomiums that often appeared in print, toasts, and orations.[73] The size of the militia, its composition, and the rules for its training were not constitutionally mandated at the Founding, but have varied across American history, a fact that continues to this day.[74]

48. The militia laws in the Revolutionary era not only defined who was in the militia; they also specified the types of weapons that were required to meet this civic obligation and imposed fines and other punishments on those who failed to show up to mandatory musters properly armed.[75] In the American legal tradition

[73] Cornell, WELL REGULATED MILITIA.

[74] H. R. Uviller & William G. Merkel, *The Second Amendment in Context: The Case of the Vanishing Predicate*, 76 CHI.-KENT L. REV. 403 (2000).

[75] For a good example, see Act of Dec. 20, 1791, 1791 S.C. Acts 16, (amending and putting into force an earlier act entitled "an Act for the regulation of the Militia of this state, passed the 26th day of March 1784"); *see also* Act of Jan. 18, 1815, ch. 131, 1815 Mo. Laws 360 (condensing the several Militia laws into a single act).

rights are not understood to give government almost unlimited authority over citizens, so plaintiffs' argument is based on serious constitutional error.

49.     The fact that failure to adequately arm and maintain the prescribed type of weapons required of militia men resulted in harsh penalties and possible court martial only further undermines claims that one can interpret early American militia laws as evidence of a broad and relatively unfettered right to keep and bear arms for minors.[76] A 1794 Rhode Island statute adopted a few years after the Second Amendment was framed is illustrative of the severity of these punishments:

> That every non-commissioned officer or private who shall neglect to appear at the regimental Rendezvous, shall forfeit the sum of Six Shillings and for every day he shall neglect to appear at the company parade, he shall forfeit Four Shillings and Sixpence. And if he shall not be armed and equipped according to other said Act of congress, when so appearing, without sufficient excuse, he shall, for appearing without a gun, forfeit one shilling and sixpence; without bayonet and belt six pence; without a Bayonet and Belt, Sixpence; without a Cartouch-Box and Cartridges.[77]

50.     Once they had mustered, members of the militia were subject to the full rigors of military discipline and punishment.[78] Indeed, eighteenth century military discipline was exceedingly harsh, including corporal punishment such as

---

[76] See for example, Act effective May 5th, 1794, 1794 R.I. Pub. Laws 14, 21, (organizing the militia of the state); Act of Dec. 28, 1792, 1795 N.H. Laws 525 (adding to a prior act regulating the state militia). Act of 1799, § 4, 1799 Conn. Acts 511, 512–13 (providing for fines and penalties for "[n]on-appearance and deficiencies" of equipment).

[77] Act effective May 5th, 1794, § 10, 1794 R.I. Pub. Laws 14, 21.

[78] *Houston v. Moore*, 18 U.S. 1 (1820).

whipping.[79] During this era, the goal of achieving good military discipline justified a range of discipline and punishment for failure to comply with mandatory *duties*. In the American legal tradition rights, by contrast, do not endow government with the power to punish citizens for not exercising them.[80]

51.    Government, not individual citizens, decided which weapons were necessary to meet the obligation imposed by militia laws. Failure to acquire the officially prescribed type of weaponry could result in fines and other punishments.[81] As far as the militia was concerned, all guns were not created equal in the eyes of the law: only a tiny fraction of the guns in private hands qualified for the highest level of constitutional protection. Most guns were treated as ordinary private property and could be seized in debt proceedings or sold for tax arrears.[82]

### MINORS AND MILITIA ARMS: UNDERSTANDING THE LEGAL SIGNIFICANCE OF

---

[79]Laws To authorize a detachment from the militia of the United States., Chapter 55, § 6, 12 Congress, Public Law 12-55. 2 Stat. 705 (1812) (Prohibiting whipping a common form of punishment used by the military in the eighteenth century).

[80] Kenneth, Campbell, "Legal Rights", *Stanford Encyclopedia of Philosophy* (Winter 2022 Edition), Edward N. Zalta & Uri Nodelman (eds.), URL = https://plato.stanford.edu/archives/win2022/entries/legal-rights/.

[81] For a sampling of Founding-era militia statutes, see Act of Apr. 3, 1778, ch. 33, 1778 N.Y. Laws 136 (raising a thousand men to defend the state); Act of 1786, ch. 1, 1786 N.C. Sess. Laws 407 (raising troops to protect the inhabitants of Davidson county)

[82] For additional examples of the scope of early militia regulations, see Act of Apr. 14, 1778, ch. 21, 1778 N.J. Laws 41, 2d. Gen. Assembly (regulating, training, and arraying the militia); Act of Feb. 16, 1779, 1779 Vt. Acts & Resolves 57 (forming and regulating the militia; encouraging military skill for state defense).

## AND NEED FOR EARLY AMERICAN MILITIA LAWS

52.     Rather than erect a barrier against government intrusion into the most private sphere of American life, militia statutes did the opposite: they gave government sweeping powers over the lives and property of those required to serve in the militia. Weapons purchased for militia service were subject to government inspection. Indeed, although militia weapons were typically privately owned, they were among the most heavily regulated forms of private property in early American law.[83]

53.     Interpreting early American militia laws requires reading these statutes as Founding era Americans would have understood them. These laws imposed a legal *obligation* on Americans; they did not create or assert a *right* against government regulation. Indeed, these laws were a highly intrusive form of government regulation.[84] Militia statutes gave government broad authority to compel individuals to engage in specified actions or face punishment.[85] Thus, when these laws are understood within their historical context, they demonstrate that those serving in the militia, including minors, did not have a freestanding and robust right

---

[83] Cornell & DeDino, *supra* note 2, at 508-10.

[84] There is a vast, erudite, and complex scholarly literature on the nature of legal rights in the modern Anglo-American legal tradition. See, e.g., Joseph Raz, *Legal Rights*, 4 OXFORD J. LEGAL STUD. 1, 14 (1984); Leif Wenar, *Rights*, THE STANFORD ENCYCLOPEDIA OF PHILOSOPHY (Edward N. Zalta ed., 2021).

[85] Cornell & DeDino, *supra* note 2, at 508-10.

to acquire, keep, and bear whatever arms they desired for whatever purpose. Rather, these laws compelled individuals to purchase or bring to muster the specific type of weapons the government wished them to use.

54.    The responsibility for acquiring weapons generally fell on those who were legally responsible for minors, not the minors themselves. Early American militia statutes typically did not penalize minors for failing to obtain the required arms necessary to participate in the militia. Instead, parents and guardians were responsible for acquiring militia weapons for their minor children or charges under the age of 21. For example, New Hampshire's 1792 militia law was explicit that parents and guardians had a legal obligation and suffered the penalties for failing to acquire the necessary weapons for militia participation: "That such of the infantry as are under the care of parents, masters or guardians, shall be furnished by them with such arms and accoutrements."[86] And even when such obligations were not expressly included by statute, the common law definition of infants meant that they could not purchase arms because of their inability to make contracts.  Moreover, legal proceedings to prosecute minors for failing to honor such agreements were not binding so gun smiths and merchants had strong incentives to not engage in such

---

[86] An Act for Forming and Regulating the Militia Within This State, and For Repealing All the Laws Heretofore Made for That Purpose N.H., 447 (1792);  see also, An Act for regulating, governing, and training the Militia of this Commonwealth, ch. CVII, § 28, in 1810 Mass. Laws 151, 176.

economic transactions.[87] Thus, the claim that militia laws offer strong proof of the existence of a right possessed by minors to keep and bear arms makes neither legal nor historical sense.[88]

55.    In 1793, shortly after Congress adopted the first ten Amendments during the First Congress, Pennsylvania enacted the following act modifying the nature of its militia law by exempting minors from having to purchase weapons:

> I. Be it enacted. . . That each and every free, able-bodied, white, male citizen of this or any other of the United States, residing in this commonwealth, who is or shall be of the age of eighteen years and under the age of forty-five years, except as hereinafter excepted, shall severally and respectively be enrolled in the militia.
>
> II. And be it further enacted. . . [that certain categories of persons] shall be, and are hereby, excepted from military duty, notwithstanding their being above the age of eighteen and under the age of forty-five years. And also all young men under the age of twenty-one years, and all servants purchased bona fide and for a valuable consideration, shall be exempted from furnishing the necessary arms, ammunition and accoutrements, as are required by the fifth section thereof, and shall be excepted from militia duties and fines during such minority or servitude, except in cases of rebellion, or an actual or threatened invasion of this or any of the neighboring states.[89]

---

[87] Brief of Amici Curiae Historian Holly Brewer in Support of Appellant and in Support of Reversal at 16–23, Worth v. Jacobson, No. 23-2248 (8th Cir. July 25, 2023).

[88] Jonathan Gienapp, *The Foreign Founding: Rights, Fixity, and the Original Constitution*, 97 TEX. L. REV. ONLINE 115 (2019); Jud Campbell, *Judicial Review and the Enumeration of Rights*, 15 GEO. J.L. & PUB. POL'Y 569 (2017).

[89] Act of April 11, 1793, ch. 176, §§ 1–2, 1793 Pa. Laws 394, 394–95 (regulating the militia of Pennsylvania).

56. This Pennsylvania statute illustrates that there was no fixed constitutional requirement that minors participate in the militia nor was it a constitutional requirement that they acquire weapons. Both of these legal obligations were dictated by the policy choice that individual states and the federal government made in response to the need to promote public defense, as discussed above.[90] Many states exempted students from militia service, and individual states were free to exempt any other sub-category of minors, or all minors if they wished, if such a policy furthered the goal of strengthening the militia or other state policy objectives.[91] A state could choose to exempt minors from the requirement to purchase weapons if such a policy was expedient, or exclude them from the militia entirely.

57. Militia statutes did not exist in a vacuum, and they must be read and interpreted in the relevant historical contexts in which they were enacted. The labor of sons was vital to the survival and prosperity of family farms in a pre-industrial largely agrarian economy. Outside the slave South, the value of this type of labor

---

[90] Act of Mar. 12, 1844, § 2, 1843 Ohio Laws 53, 53 (only requiring those between the ages of twenty-one and forty-five to be enrolled in the militia); Act of May 4, 1864, no. 211, § 1, 1864 Pa. Laws 221, 221–22 (same).

[91] Delaware adopted a similar provision to Pennsylvania in 1806, exempting minors enrolled in the militia from acquiring weapons, Act of Aug. 13, 1807, ch. XLIX, §§ 1–2, 4, in 4 LAWS OF THE STATE, OF DELAWARE 123, 123–24, 125–26 (M. Bradford & R. Porter eds., 1816). In 1829 New Jersey exempted all militia-eligible minors from participation during peace time, Act of Nov. 6, 1829, 1829 N.J. Laws 3.

was essential for those engaged in farming. In other sectors of the economy, apprentices were indispensable to artisan modes of production. Given the strong economic pressures on small farm owners and artisans in a pre-industrial society, market forces could easily have led families to prevent sons or apprentices from joining the militia voluntarily.[92] Thus, at the time of the Second Amendment's enactment these legal and social facts meant that it was necessary for the states to enact laws that gave government the authority to force able-bodied minors under 21 to participate even if it meant economic burdens to their families and employers. Without such laws, it is likely that few minors would have been enrolled in the militia because of the opposition of those who needed their labor, i.e., parents, guardians, and masters. And the states flexed that power by threatening punishment: Delaware's 1776 militia law, for example, expressly recognized this problem and included a provision that levied a fine on any "Masters, Guardians, and Parents" who "restrained" militia-eligible minors from enrolling.[93]

58.     Rather than provide historical proof that infants under 21 had expansive rights and strong legal claims against government interference with firearms rights, then, the various militia laws and common law requirements mandating that individuals assist in keeping the peace evidence the considerable power early

---

[92] Robert A. Gross, THE MINUTEMEN AND THEIR WORLD *(*1976).

[93] Delaware, An Act establishing a Militia in this State. Law and Statutes, 4 (1776).

American governments had to compel individuals, including minors under the age of 21, into public service when society required their labor. This coercion was in essence a form of taxation. Few in modern America would confuse taxes with rights, but this confusion is central to plaintiffs' argument.

59.    It is also important to understand the social history of the Founding Era, particularly the way economic realities shaped family formation in this period. Minors under 21 living under the authority of their fathers faced significant hurdles in establishing their own independent households. The laws governing settlement and residency for Massachusetts are revealing in this regard: they imposed an age requirement of twenty-one, as well as a variety of different wealth requirements, to establish residency in the commonwealth.[94] Moreover, acquiring the necessary economic resources to establish independence was increasingly difficult during the era of the Second Amendment. Indeed, most adult men in Concord, the town virtually synonymous with the Minuteman ideal of a well-regulated militia, were forced by economic necessity to postpone establishing their own independent households until their mid-twenties, a decision necessitated by the difficulty of

---

[94] Persons residing outside of a properly governed household, i.e., a home headed by a white male  patriarch, could be banished from early New England towns, a process known as "warning out," see  Douglas Lamar Jones, *The Transformation of the Law of Poverty in Eighteenth-Century Massachusetts*, 62 PUBLICATIONS OF THE COLONIAL SOCIETY OF MASSACHUSETTS: LAW IN COLONIA MASSACHUSETTS 1630–1800 152, 190 (1984).

acquiring enough land to establish an independent farmstead. Although these persons were no longer minors in the eyes of the law after turning 21, in virtually every other respect they remained under the patriarchal authority of their fathers as a practical matter in most respects until they could leave home.[95]

60.    Plaintiffs' ahistorical conception of the realities of life in the Founding era is marred by ignorance of other economic realities well established by historical scholarship on this period. At the time of the Second Amendment there were six banks in the United States. The economy was dominated by credit transactions because cash was scarce. On the eve of the American Revolution and the adoption of the first state arms bearing provisions over 95% of economic transactions were credit based. The numbers from Massachusetts in the table below make this point clearly.[96]

| Credit | Cash | Barter |
|--------|------|--------|
| 98.5 | 1.0 | 0.4 |

---

[95] Mary Babson Fuhrer, *The Revolutionary Worlds of Lexington and Concord Compared* 85 NEW ENGLAND Q. 78 (2012).
[96]  Flynn, David. "Credit in the Colonial American Economy". EH.Net Encyclopedia, edited by Robert Whaples. March 16, 2008.
URL https://eh.net/encyclopedia/credit-in-the-colonial-american-economy/

61.    In the decades after the adoption of the Second Amendment, the New England economy, one of the most closely studied regions of the new republic, remained primarily credit based.[97] Given these facts, acquiring firearms would have required access to credit, something infants were unable to procure because they could not make contracts.[98]

## REGULATING GUNS IN AN ERA OF LOW GUN VIOLENCE AND RELATIVE FIREARMS SCARCITY

62.    The fact that there are no modern style gun control laws from the Founding era is unremarkable. The Founding era did not have a modern style gun violence problem to address.[99] Muzzle loading black powder weapons were ill-suited to impulsive acts of violence and not well adapted to the task of personal self-defense. The weapons were not typically left loaded because black powder was corrosive and hydroscopic (readily absorbing moisture): two technological limits that militated against using these types of weapons in emergency self-defense situations.[100] Moreover, only a tiny fraction of Founding era guns were pistols that could be easily transported or carried on a person. Pistols in this period were even

---

[97] For a useful overview of the cash poor credit economy of early New England, see Tom Kelleher, *The Debit Economy of 1830s New England*, (Sturbridge, Mass.: Old Sturbridge Village) available at https://www.teachushistory.org/detocqueville-visit-united-states/articles/debit-economy-1830s-new-england.
[98]  *Supra* Brewer note 87.
[99] Randolph Roth, AMERICAN HOMICIDE 180-249 (2009).
[100] *Id.*

less reliable than long guns in most self-defense situations because they could not function as a bludgeon in case of a misfire.[101] Until the era of the revolver, roughly 1840, individuals interested in defending themselves against attack while traveling in public were far better off sporting a sword cane, knife, or dirk than a pistol.[102]

63.     Indeed, most early arms regulations included edged weapons alongside firearms for this reason. Given these basic facts about early American crime and gun technology it turns out that Founding era gun laws unsurprisingly were not primarily designed to address problems of inter-personal gun violence that modern America faces.  Moreover, the economics of gun production meant that few households apart from the wealthiest owned multiple weapons.[103] Thus, the absence of laws limiting minors from acquiring weapons in the Founding era reflects nothing more than the basic economics and practical realities of gun ownership and military policy in the era. It has nothing to do with the existence of an unfettered underlying constitutional right for those under twenty-one to acquire and use weapons.

64.     The over-arching aim of early American gun policy was driven by a policy concern entirely absent from the modern debate over firearms policy:  the

---

[101] Kevin M. Sweeney, *Firearms Ownership and Militias in Seventeenth and Eighteenth Century England and America*, *in* A RIGHT TO BEAR ARMS?: THE CONTESTED ROLE OF HISTORY IN CONTEMPORARY DEBATES ON THE SECOND AMENDMENT (Jennifer Tucker et al. eds., 2019).
[102]  Cornell*, supra* note 67.
[103] Kevin Sweeney, "Firearms, Militias, and the Second Amendment"  in The Second Amendment On Trial (Saul Cornell and Nathan Kozuskanich, eds., 2013).

relative scarcity of military style weapons. American governments faced a problem quite alien to modern America: the urgent need to arm militias with the necessary weapons for ground warfare. Given that there were generally too few muskets in the hands of militia members to arm them properly in the Founding era, there was no reason to limit access to such weapons. The goal of government policy was to arm Americans who possessed too few of the right kind of weapons, not disarm them because there were more guns than people, the situation America faces today.

### THE POLICE POWER AND REGULATION OF MINORS' ACCESS TO ARMS, 1776-1900

65.     The power to regulate firearms and gunpowder has always been central to the police power and historically was shared by both states and local municipalities.[104] The federal government enjoyed a limited police power that governed federal land, buildings and the territories.

66.     *Heller* recognized the broad scope of state authority to regulate arms inherent in the state police power.[105] This issue was central to one of the antebellum cases *Heller* cited as authoritative, *State v. Reid*.[106] The case upheld a concealed carry prohibition, noting that the right to keep and bear arms left "with the

---

[104] Harry N. Scheiber, *State Police Power*, in 4 ENCYCLOPEDIA OF THE AMERICAN CONSTITUTION 1744 (Leonard W. Levy et al. eds., 1986).
[105] *See Heller*, 554 U.S. at 629.
[106] *State v. Reid*, 1 Ala. 612 (1840).

Legislature the authority to adopt such regulations of police, as may be dictated by the safety of the people and the advancement of public morals."[107]

67.    Police power regulations also impacted minors' relationship to arms and gun powder. As was true for other applications of the police power, the enactment of specific laws aimed at minors depended on the practical and public perceptions of the need for government regulation in a particular area.

68.    Modern-style arms control measures targeting weapons better suited for crime and inter-personal violence, and not especially useful for militia service, did not emerge in American law until technological changes and economic efficiencies made pistols more accurate, more easily concealed, and more widely available in the early nineteenth century.[108]

69.    The market revolution of the Jacksonian period (1828-1854) transformed American life, making a host of consumer goods—from wooden clocks to firearms—widely available for the first time. The impact of these interconnected set of changes in production, consumption, and technology transformed gun culture by making a variety of weapons, including pistols, more common and more reliable.[109] At the time of the Second Amendment's ratification, 90% of the guns owned by Americans were long guns. By the time Andrew Jackson became president

---

[107] *Id.*, at 616.
[108] Cornell*, Well Regulated, supra* note 67.
[109] *Id.*

a variety of easily concealed weapons, including firearms and weapons such as the Bowie knife, had proliferated.[110]

70.　In response to the perception that these easily concealed weapons posed a particular danger, states began passing a variety of laws addressing interpersonal violence.[111] By the time of the Civil War many states had enacted a variety of laws to deal with the problem of gun violence, including the special dangers firearms posed to minors. In 1856, for example, Alabama adopted a provision focusing on the specific problem posed by the sale of pistols and other concealable weapons to minors and imposed a substantial financial penalty:

> "That anyone who shall sell or give or lend, to any male minor, a bowie knife, or knife or instrument of the like kind or description, by whatever name called, or air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[112]

71.　Tennessee passed a similar law: "That any one who shall sell or give or lend, to any male minor, a . . . air gun or pistol, shall, on conviction be fined not less than three hundred, nor more than one thousand dollars."[113] Kentucky also enacted a similar law, but carved out an exception if a minor was supervised by an adult:

> If any person, other than the parent or guardian, shall sell, give or loan, any pistol, dirk, bowie knife, brass knucks, slung-shot, colt, cane-gun, or other

---

[110] Sweeney, *Firearms Ownership and Militias supra* note 60.

[111] Cornell, *supra* note 2. For a good example, see Of Miscellaneous Offences, ch. 7, § 4, 1841 Ala. Acts 148, 148–49.

[112] Act of Feb. 2, 1856, no. 26, § 1, 1856 Ala. Acts 17, 17.

[113] An Act to Amend the Criminal Law, No. 26, § 1, 1856 Ala. Acts 17.

deadly weapon, which is carried concealed, to any minor, or slave, or free negro, he shall be fined fifty dollars.[114]

72.    The fact that the Kentucky statute expressly mentioned a prohibition on giving or loaning weapons to slaves or free persons of color is itself instructive.  As historian Randolph Roth's work demonstrates, the Slave South was the most violent region of the nation in the period before the Civil War. Although some laws enacted in this period and in this region were driven by racial animus, other laws, including laws targeting minors, were not. Laws prohibiting concealed carry were one type of racially neutral modern style gun control regulation. Southern States also took the lead in enacting acting gun-control-type measures, including laws aimed at preventing minors from acquiring and using dangerous weapons.[115]

73.    Police power regulations were also adopted by cities and towns to regulate arms. In 1817, Columbia, South Carolina enacted a law that allowed for the seizure of weapons used by minors within the city limits.[116] And in 1857, the city of

---

[114] *1859 Ky. Acts 245, An Act to Amend An Act Entitled "An Act to Reduce to One the Several Acts in Relation to the Town of Harrodsburg, § 23.*
[115] Eric M. Ruben & Saul Cornell, *Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context*, 125 YALE L.J.F.121 (2015). On southern homicide rates, see Randolph Roth, AMERICAN HOMICIDE180-249 (2009).
[116] An Ordinance for Prohibiting the Firing of Guns in the Town of Columbia (1817), Ordinances, of the Town of Columbia, (S. C.) Passed Since the Incorporation of Said Town: To Which are Prefixed, the Acts of the General Assembly, for Incorporating the Said Town, and Others in Relation Thereto 61-61 (1823); Ordinances of the City of New York, To Prevent the Firing of guns in the
(continued…)

Louisville, Kentucky passed an ordinance stating that "[n]o person shall retail

gunpowder to minors" but included an exception for those who had "authority from

his parent or guardian."[117]

74.    Post-Civil War America carried forward this antebellum tradition of

robust regulation of firearms. Many of the new constitutions adopted after the Civil

War in Southern states and newly admitted Western states expressly asserted that

the right to keep and bear arms did not preclude robust legislative power to regulate,

making explicit a point that the pre-Civil War case law had firmly established. [118]

The Utah constitutional convention debated a proposal to change the age at which

individuals could be compelled to participate in the militia from eighteen to twenty-

one. Although there was some disagreement over the wisdom of changing the policy,

there was little disagreement that if such a policy was desirable, the state had ample

authority to make the change. The contours of this debate make clear that there was

---

City of New York, § 1, Edward Livingston, LAWS AND ORDINANCES, ORDAINED
AND ESTABLISHED BY THE MAYOR, ALDERMEN AND COMMONALTY OF THE CITY OF
NEW-YORK, IN COMMON-COUNCIL CONVENED, FOR THE GOOD RULE AND
GOVERNMENT OF THE INHABITANTS AND RESIDENTS OF THE SAID CITY 83–84
(1803). DIGEST OF THE CHARTER AND ORDINANCES OF THE CITY OF MEMPHIS 50
(1857).
[117] No. 68. An Ordinance as to Retailing Gun Powder, in Oliver H. Strattan, A
COLLECTION OF THE STATE AND MUNICIPAL LAWS, IN FORCE, AND APPLICABLE TO
THE CITY OF LOUISVILLE, KY 175 (1857).]
[118] Cornell, *Right to Regulate,* 68–70, 78 (2021) (discussing the rising level of gun
violence in the Reconstruction Era and the bevy of new laws, including laws aimed
at limiting the access of weapons to minors, passed by legislators in response).

no constitutional necessity compelling states to either require or prohibit minors from participating in the militia. The decision remained one that was dictated by military necessity, not constitutional imperative.[119]

75.    The broad latitude to regulate arms was acknowledged by the major constitutional commentators of the Reconstruction era as well. John Norton Pomeroy, one of the era's most distinguished constitutional authorities, observed that the right to keep and bear arms posed no barrier to government authority to regulate or limit persons from "carrying dangerous or concealed weapons."[120]

76.    The Republicans who wrote the Fourteenth Amendment championed an expanded police power to effectuate their vision of a well-regulated society.[121] The robust regulation of firearms during Reconstruction, including regulations on sale or access to firearms for those under the age of majority, was not a novel application of the police power, but simply an example of the flexibility inherent in this legal concept. Exercises of the police power were seen as consistent with the

---

[119] Official Report of the Debates and Proceedings of the Convention Assembled at Salt Lake City ... (1898) at 815-819.

[120] JOHN NORTON POMEROY, AN INTRODUCTION TO THE CONSTITUTIONAL LAW OF THE UNITED STATES: ESPECIALLY DESIGNED FOR STUDENTS, GENERAL AND PROFESSIONAL 152–53 (1868); LEWIS HOCHHEIMER, THE LAW RELATING TO THE CUSTODY OF INFANTS, 3 d., (1899) at 4.

[121] For a more detailed discussion, see Laura F. Edwards *The Reconstruction of Rights: The Fourteenth Amendment and Popular Conceptions of Governance* 41 J. OF SUP. CT. HIST. 310 (2016). For a discussion of how the courts wrestled with the meaning of the Amendment, see WILLIAM E. NELSON, THE FOURTEENTH AMENDMENT: FROM POLITICAL PRINCIPLE TO JUDICIAL DOCTRINE (1998).

scope of the Second Amendment's reach as it had been understood at the Founding and as it was understood at the time.

77.    The author of Section One of the Fourteenth Amendment, John Bingham, expressly affirmed the states' ability to promote public safety and welfare during the public campaign to ratify the amendment, assuring Ohioans in Cincinnati that the states would continue to be responsible for all issues of "local administration and personal security."[122] As long as laws were racially neutral and favored no person over any other, the states were free to enact whatever reasonable measures were necessary to promote public safety and promote the common good.[123]

78.    Post-Civil War legal authorities recognized that improvements in gun technology and changes in society posed new challenges to government's efforts to preserve the peace. In particular, the proliferation of small pistols, some expressly marketed to young people, prompted a backlash as legislators responded to increasing levels of gun violence among minors.[124] The rising levels of gun violence, including accidents, in the post–Civil War era drew notice by jurists, journalists, and

---

[122] John Bingham, *Speech*, CINCINNATI DAILY GAZETTE (Sept. 2, 1867) as quoted in Saul Cornell and Justin Florence, *The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation*, 50 SANTA CLARA L. REV. 1043. 1058 (2010).

[123] Michael Les Benedict, *Preserving Federalism: Reconstruction and the Waite Court*, 1978 SUP. CT. REV. 39, 40-41, 47 (1978).

124  For good illustration of this concern in regards to minors, see J.N. Hall, *Accidents with Firearms*, 23 OUTING, Oct. 1893–Mar. 1894, at 89, 89–90.

physicians.[125] Indeed, one prominent medical expert noted that an entire class of firearms injuries were specific to boys whose behavior with guns was reckless and whose access to smaller firearms made injuries more likely.[126] The development of smaller weapons specifically targeted at minors exacerbated a problem that had emerged in the antebellum era, prompting widespread calls for more regulation.[127] Although the problems society faced were new, the legal tools used by governments to legislate were not. As had been true during the antebellum era, states and localities turned to their ample police powers to justify new laws and regulations.

79.    The general expansion of firearms regulation during Reconstruction included a spate of new laws governing minors and guns.[128] Individual states and

---

125.    For an examination of the proliferation of journalistic accounts of gun violence in the post–Civil War era, see Jennifer Carlson & Jessica Cobb, *From Play to Peril: A Historical Examination of Media Coverage of Accidental Shootings Involving Children*, 98 SOC. SCI. Q. 397, 403–04 (2017).

126.    J.N. Hall, *Accidental Gun Shot Wounds: A Medico-Legal Study,* 50 MED. REC., July 4, 1896–Dec. 26, 1896, at 408, 411 ("Perhaps the most prolific cause of accidental shootings is to be found in the habit of pointing a weapon at another in fun, under the impression that it is not loaded. . . . Children learn to shoot toy pistols and are permitted to fire them at one another with impunity. Then, obtaining a revolver in some manner, they use it in similar fashion. . . . Sheer foolhardiness is responsible for an enormous number of accidents.").

127.    *See Firearms*, IOWA STATE BD. OF HEALTH, MONTHLY BULLETIN, June 1891, at 75, 75—76 (noting that, in reference to revolvers especially, "[t]he practice of carrying concealed weapons seems on the increase, and is indulged in too often by mere boys and generally without the slightest excuse," and calling for "vigorous enforcement of the law prohibiting the carrying of firearms . . . especially the law prohibiting the sale of firearms to children").

[128] Cornell and Florence, *Supra* note 122.

localities responded to the proliferation of weapons among unsupervised minors by adopting a range of age-specific limits on the purchase and use of firearms by those under the age of legal majority (which remained twenty-one during this period).[129] The provision adopted by the city of Fresno, California just before the turn of the century is illustrative of these laws: "No junk-shop keeper or pawnbroker shall hire, loan or deliver to any minor under the age of eighteen years any gun, pistol or other firearm, dirk, bowie-knife, powder, shot, bullets or any weapon."[130] Some of these laws targeted children younger than sixteen, but others singled out anyone below the age of twenty-one. For example, Indiana's state law cast a broad net, prohibiting "The Sale, Gift or Bartering of Deadly Weapons or Ammunition to Minors":

> Be it enacted by the General Assembly of the State of Indiana, That it shall be unlawful for any person to under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol. § 2. Be it further enacted, that any person who shall violate any of the provisions of the foregoing section shall be deemed guilty of a misdemeanor, and upon conviction thereof, shall be fined in any sum not less than five dollars, nor more than fifty dollars.[131]

80.    Wisconsin adopted a statute that prohibited minors from going armed or acquiring pistols and revolvers:

---

[129]  Carlson and Cobb, *From Play to Peril, supra* note 125.

[130] Misdemeanors. Section 53., *in* L. W. MOULTRIE, CHARTER AND ORDINANCES OF THE CITY OF FRESNO 37 (1896).

[131] Act of Feb. 27, 1875, ch. 40, 1975 Ind. Acts 59.

SECTION 1: It shall be unlawful for any minor, within this state, to go armed with any pistol or revolver, and it shall be the duty of all sheriffs, constables, or other public police officers, to take from any minor, any pistol or revolver, found in his possession.

SECTION 2: It shall be unlawful for any dealer in pistols or revolvers, or any other person, to sell, loan, or give any pistol or revolver to any minor in this state.[132]

81.    An 1883 Missouri statute that banned weapons in places where young people might gather, such as schools, places of worship, and other venues in which people gathered for "education, literary, or social purposes." In addition, the law also expressly prohibited loaning, giving, or selling any "deadly weapon" to a minor.

If any person shall carry concealed, upon or about his person, any deadly or dangerous weapon, or shall go into any church or place where people have assembled for religious worship, or into any school room or place where people are assembled for education, literary or social purposes, or to any election precinct on any election day, or into any court room during the sitting of court, or into any other public assemblage of persons met for any unlawful purpose other than for militia drill or meetings called under the militia law of this state, having upon or about his person any kind of fire arms, bowie knife, dirk, dagger, slung-shot, or other deadly weapon, or shall in the presence of one or more persons exhibit any such weapon in a rude, angry or threatening manner, or shall have or carry any such weapon upon or about his person when intoxicated or under the influence of intoxicating drinks, or shall directly or indirectly sell or deliver, loan or barter to any minor any such weapon, without the consent of the parent or guardian of such minor, he shall, upon conviction, be punished by a fine of not less than twenty-five nor more than two hundred dollars, or by imprisonment in the county jail not exceeding six months, or by

---

[132] 1883 Wis. Sess. Laws 290.

both such fine and imprisonment.[133]

82.    A Kansas statute prohibited selling, trading, giving, loaning pistols or

revolvers to minors:

> Any person who shall sell, trade, give, loan or otherwise furnish any
> pistol, revolver or toy pistol, by which cartridges or caps may be
> exploded, or any dirk, bowie-knife, brass knuckles, slung shot, or
> other dangerous weapons to any minor, or to any person of
> notoriously unsound mind, shall be deemed guilty of a
> misdemeanor, and shall, upon conviction before any court of
> competent jurisdiction, be fined not less than five nor more than one
> hundred dollars.[134]

83.    The language of a Louisiana law was even more comprehensive:

> "That, hereafter, it shall be unlawful, for any person to sell, or
> lease or   give through himself or any other person, any pistol, dirk,
> bowie-knife any person under the age of twenty-one years.[135]

84.    A Nevada law focused on the danger posed by minors carrying guns in

public:

> Every person under the age of twenty-one (21) years who shall wear
> or carry any dirk, pistol, sword in case, slung shot, or other dangerous
> or deadly weapon concealed upon his person, shall be deemed guilty
> of a misdemeanor, and shall, upon conviction thereof, be fined not less
> than twenty nor more than two hundred ($200) dollars, or by
> imprisonment in the county jail not less than thirty days nor more than
> six months, or by both such fine and imprisonment.[136]

---

[133] 1883 Mo. Laws 76, An Act To Amend Section 1274, Article 2, Chapter 24 Of
The Revised Statutes Of Missouri, Entitled "Of Crimes And Criminal Procedure,"
§ 1.
[134] 1883 Kan. Sess. Laws 159, § 1.
[135] 1890 La. Acts 39, § 1; 1882 Md. Laws 656, § 2.
[136] 1885 Nev. Stat. 51, § 1 (approved March 4, 1881, THE GENERAL
STATUTES OF THE STATE OF NEVADA. IN FORCE. FROM 1861 TO 1885,
INCLUSIVE. 1077  (David E. Baily and John D. Hammond, 1885).

85.    The expansion of laws dealing with the problem of minors and guns in the Reconstruction era was a response to a novel problem that the Founding generation did not face.  The constitutional justification for these laws, state police power, was well established under antebellum law and proved to be flexible enough to accommodate a range of pragmatic solutions.

## CONCLUSIONS

86.    A review of the historical record, in context, reveals that "infants"—individuals below the legal age of majority, which has been 21 for the most of American history—have never had an unfettered constitutional right to keep, bear, and acquire arms. This was true in the era of the Second Amendment's adoption and has continued to be true in subsequent periods of American history, including the era of the Fourteenth Amendment. For most of the pre-Civil War period in American history, minors only had legal access to arms when under the patriarchal authority of a head of household, when assisting sheriffs, justices of the peace or constables to preserve the peace, or when performing militia duties and supervised by militia officers.

87.    Those under the age of 21 never enjoyed an autonomous individual right to purchase, acquire, own, or use firearms for most of American legal history. In fact, for most of American history, the law did not consider such minors as fully autonomous legal individuals in any meaningful sense. The legal status of infants

under American law in the Founding era was an inheritance from English common law. This bedrock principle of Anglo-American law was unaltered by the American Revolution, the adoption of the Constitution, or the addition of amendments, including the Second Amendment and the Fourteenth Amendment. Thus, asserting a constitutional right of those under 21 to keep, bear, and acquire arms rests on a serious misunderstanding of a core principle of Anglo-American law regarding the status of those below the age of legal majority. In fact, the concept of "young adult" is a recent development in American culture and has no grounding in earlier Anglo-American law—and thus it has no bearing on assessing the scope of the Second Amendment right as it was originally understood at the time of its ratification and in the ensuing years.

88.    The central fact asserted by Plaintiffs in this case is uncontroversial: in the Founding era and for much of American history, governments compelled some minors under 21 to serve in the militia and participate in related community-based forms of law enforcement. But the existence of such duties does not provide any concomitant evidence of the existence of a constitutional *right* to keep, bear, or acquire firearms for those under the age of 21. Rather, it demonstrates that governments have imposed a constitutional duty and obligation upon generations of Americans, including some minors, to contribute to public defense.

89.    Failure to meet this legal obligation could result in a variety of punishments. In several states, the law expressly punished parents or guardians if they failed to acquire the necessary arms required by law to allow their minor children to participate in the militia. In those states in which such a provision was not included in law, the common law would have governed, and legal proceedings against insufficiently armed minors would have targeted parents or guardians.

90.    Plaintiffs confuse rights with obligations, and conflate the specific public policy choices made by states and the federal government with non-existent fixed constitutional principle mandating the participation of minors in the American military. In fact, state and local governments were free to expand or contract the age restrictions on participation in the militia in response to the needs of public defense and safety. When it proved advantageous to include males below 21 in the militia, governments adopted regulations to achieve that policy goal. If public defense or other policy goals were better served by excluding this portion of the population from militia service, legislatures enacted laws to implement that policy objective.

91.    Plaintiffs also err by ignoring the fact that minors could not make binding legal contracts. This legal disability meant that procuring firearms without the assistance of an adult would have been nearly impossible for most of American history.

92.    The regulation of gun powder and firearms has always been understood to be a core feature of the state's considerable police powers and the scope of this power is greatest when protecting the health and safety of minors. Given these two facts, it is not surprising that there is a long history of state regulations targeting minors and guns.

93.    The expansion of laws regulating minors during Reconstruction was a direct result of changes in firearms technology and the marketing strategy used to sell guns. Changes in society also made the problem of guns and minors more serious. States and localities responded to these developments by enacting a range of new laws regulating and in some cases prohibiting minors from acquiring guns without adult supervision. Although the legal justification for these laws carried forward antebellum police power jurisprudence, the methods used to address these unprecedented problems produced by changes in gun culture and society were uncontroversial. Thus, firearms regulation, including limits on the ability of minors under 21 to access and use arms, clearly falls within long-standing American historical and legal traditions. In short, Plaintiffs' contention that individuals under the age of 21 have always enjoyed a robust Second Amendment right to purchase, receive, and transfer firearms has no foundation in history, text, or tradition.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on _____12/20/24_____, at ___Redding, CT 06896_.


_Saul Cornell_
Saul Cornell

# EXHIBIT A

# Saul Cornell

Paul and Diane Guenther Chair in American History
Department of History
Fordham University
✸ 203 826-6608 (c) ✸ scornell1@fordham.edu

| Education | | | |
|---|---|---|---|
| 1989 | University of Pennsylvania | Ph.D. | Dissertation: "The Political Thought and Culture of the Anti-Federalists" |
| 1985 | University of Pennsylvania | MA | History |
| 1982 | Amherst College | BA | History - Magna Cum Laude |
| 1980-81 | University of Sussex, Brighton, England | | |

| Teaching Experience | | |
|---|---|---|
| 2009-2024 | Guenther Chair in American History | Fordham University |
| 2011-2022 | Adjunct Professor of Law | Fordham Law School |
| 2005-2008 | Professor of History | The Ohio State University |
| 1997-2005 | Associate Professor, History | The Ohio State University |
| 1995 | Thomas Jefferson Chair | University of Leiden, The Netherlands |
| 1991-1997 | Assistant Professor, History | The Ohio State University |
| 1989-1991 | Assistant Professor, History | College of William and Mary |

## Fellowships and Grants

- (2024) Senior Visting Research Scholar, Solomon Center, Yale Law School
- 2019-2020 The Gilder Lehrman Center for the Study of Slavery, Resistance, and Abolition, Yale University
- 2018-2019 Senior Research Scholar in Residence, Floersheimer Center for Constitutional Democracy, Cardozo Law School
- 2014 Senior Research Scholar in Residence, University of Connecticut Law School
- 2011 Senior Research Scholar in Residence, Yale Law School
- 2003-2008 Joyce Foundation, Second Amendment Center Grant, $575,000
- 2003-2004 NEH Fellowship
- 2002-2005 Department of Education, Teaching American History Grant, Historyworks, $2,000,000
- 2002 Gilder-Lehrman Fellowship
- 2001-2002 Joyce Foundation Planning Grant, $40,000
- 2001 American Council of Learned Societies (ACLS)
- 1999-2000 Betha Grant, Batelle Memorial Endowment, Ohio Teaching Institute, $100,000
- 1998 Thomas Jefferson Memorial Foundation, Research Fellowship
- 1995 Thomas Jefferson Chair in American Studies, Fulbright Lecturing Award
- 1994 Ohio State University Seed Grant
- 1993 Ohio State University Special Research Assignment

- 1992 Ohio State University Grant-In-Aid
- 1989-1991 NEH Post-Doctoral Fellow, Institute of Early American History and Culture

## Prizes and Awards

- 2006 Langum Prize in Legal History 2006
  2006 Pulitzer Nomination, History
- 2006 History News Network, Book of the Month
- 2006 History News Network, Top Young Historian
- 2001 Society of the Cincinnati, History Book Prize, a Triennial Award for the Best Book on the American Revolutionary Era
- 2000 Choice Outstanding Academic Book
- 2000 Pulitzer Nomination History

## Book Publications

The Partisan Republic:  Democracy, Exclusion, and the Fall of the Founders Constitution
*New Histories of American Law*, series eds., Michael Grossberg and Christopher Tomlins (Cambridge University Press, 2019)  [With Gerald Leonard]

The Second Amendment On Trial:  Critical Essays on District of Columbia v. Heller
(University of Massachusetts Press,  2013) [with Nathan Kozuskanich]

Visions of America: A History of the United States [co-authored with  Jennifer Keene and Ed O'Donnell]
 (First edition, 2009),( second edition 2013) (third edition, 2016)

"A Well Regulated Militia": The Founding Fathers and the Origins of Gun Control (Oxford University Press, 2006) (paperback edition  2008)

Whose Right to Bear Arms Did the Second Amendment Protect?  (Bedford/St. Martins Press, 2000)
 (Paperback 2000)

The Other Founders:  Anti-Federalism and the Dissenting Tradition in America, 1788-1828  (Institute of Early American History and Culture, University of North Carolina Press, 1999)  (paperback edition 2001)

Editor, Retrieving the American Past:  Documents and Essays on American History, (Pearson, 1994-2008)

### Scholarly Articles, Book Chapters, and  Essays:

"Age Restrictions and the Right to Keep and Bear Arms, 1791–1868,"   *Minnesota Law Review* (2024) 3049-3120 (with Megan Walsh).

"Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era," 51 *Fordham Urban Law Journal.*  (2023):25-55

"Abolition, Armed Self-Defense, and Firearms Regulation in Antebellum America," *New Histories of Gun Rights and Regulation (*2023):213-232.

"History and Tradition or Fantasy and Fiction: Which Version of the Past Will the Supreme Court Choose in NYSRPA v. Bruen?," 49 *Hastings Constitutional Law Quarterly* (2022): 145-177.

"The Long Arc of Arms Regulation in Public: From Surety to Permitting,1328–1928," 55 University of California, Davis Law Review (2022): 2545-2602

"'Infants' and Arms Bearing in the Era of the Second Amendment: Making Sense of the Historical Record," 40 Yale Law & Policy Review Inter Alia 1 (2021)

"The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America" 55 University of California, Davis Law Review Online (2021): 65-90.

"President Madison's Living Constitution: Fixation, Liquidation, and Constitutional Politics in the Jeffersonian Era", 89 Fordham Law Review (2021): 1761-1781.

"History, Text, Tradition, and the Future of Second Amendment Jurisprudence: Limits on Armed Travel Under Anglo-American Law, 1688–1868," 83 Law and Contemporary Problems (2020): 73-95

"Reading the Constitution, 1787–91: History, Originalism, and Constitutional Meaning." Law and History Review 37 (2019): 821–45

"Constitutional Mythology and the Future of Second Amendment Jurisprudence after *Heller*," in Firearms and Freedom: The Second Amendment in the Twenty-First Century Controversies in American Constitutional Law Series (Routledge, 2017): 8-24

"The Right to Keep and Carry Arms in Anglo-American Law, Preserving Liberty and Keeping the Peace," 80 Law and Contemporary Problems (2017): 11-54

"Half Cocked': The Persistence of Anachronism and Presentism in the Academic Debate over the Second Amendment," 107 Northwestern Journal of Criminal Law 107 (2017): 203-218

"The 1790 Naturalization Act and the Original Meaning of the Natural Born Citizen Clause: A Short Primer on Historical Method and the Limits of Originalism," Wisconsin Law Review Forward 92 (2016)

"Constitutional Meaning and Semantic Instability: Federalists and Anti-Federalists on the Nature of Constitutional Language," in special issue on "The Future of Legal History," American Journal of Legal History 56 (2016): 21-29

"Firearm Regionalism and Public Carry: Placing Southern Antebellum Case Law in Context," Yale Law Journal Forum 125(2015-16):121-135 [with Eric Ruben]

"Originalism As Thin Description: An Interdisciplinary Critique" Fordham Law Review Res Gestae 84 (2015): 1-10

"The Right to Bear Arms," The Oxford Handbook of the US Constitution, eds., Mark Tushnet, Sanford Levinson, and Mark Graber (2015): 739-759

"Conflict, Consensus & Constitutional Meaning: The Enduring Legacy of Charles Beard" Constitutional Commentary 29 (2014): 383-409

"Meaning and Understanding in  the History of Constitutional  Ideas: the Intellectual History Alternative to Originalism" Fordham Law Review 82  (2013): 721-755

"The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities"  Fordham Urban Law Journal 39 (2012): 1695-1726

"Evidence, Explanation, and the Ghost of Charles Beard" William & Mary  Quarterly 69 (2012): 393-4

"Idiocy, Illiteracy, and the Forgotten Voices of Popular Constitutionalism: Ratification and the Ideology of Originalism" William & Mary Quarterly 69 (2012): 365-368

"The People's Constitution v. The Lawyer's Constitution: Popular Constitutionalism and the Original Debate Over Originalism," Yale Journal of Law and the Humanities 23 (2011): 295-337

"St. George Tucker's Lecture Notes, The Second Amendment, and Originalist Methodology: A Critical Comment," Northwestern University Law Review 103 (2009): 406-416

"Heller, New Originalism, and Law Office History: 'Meet the New Boss, Same as the Old Boss'" UCLA Law Journal  56  (2009): 1095 -1125

"Originalism on Trial: The Use and Abuse of History in District of Columbia v. Heller" Ohio-State Law Journal  69 (2008): 625-640

"Consolidation of the Early Federal System," Chapter 10 of the Cambridge History of  American Law (Cambridge University Press, 2008) [With Gerry Leonard]

"The Ironic Second Amendment" Albany Government Law  Review 2 (2008): 292-311.

"The Original Meaning of Original Understanding: A Neo-Blackstonian Critique," Maryland Law Review  (2008): 101-115

"Mobs, Militias, and Magistrates:  Popular Constitutionalism During the Whiskey Rebellion," Chicago-Kent Law Review  (2007): 883-903

"The Second Amendment and Early American Gun Regulation:  a Closer Look at the Evidence," Law and History Review (2007): 197-204

"St. George Tucker and the Second Amendment: Original Understandings and Modern Misunderstandings," William and Mary Law Review  47 (2006): 1123-55

"The Early American Origins of  the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, the Lessons of History,"  Stanford Law and  Policy Review (2006): 571-596

"Well Regulated: The Early American Origins of Gun Control,"  Fordham Law Review 73 (2004):  487-528 [With Nathan DeDino]

"Beyond the Myth of Consensus: The Struggle to Define the Right to Bear Arms in the Early Republic," in Beyond the Founders: New Essays on the Political History of the Early Republic (UNC Press, 2005)

"A New Paradigm for the Second Amendment," Law and History Review 22 (2004): 161-7

"Gun Laws and Policies:  A Dialogue," Focus on Law Studies: Teaching about Law in the Liberal Arts (American Bar Association, 2003)

"The Militia Movement," Oxford Companion to American Law (Oxford University Press, 2002)

"Don't Know Much About History: The Current Crisis in  Second Amendment Scholarship," <u>Northern Kentucky Law Review</u> (2003)

"A Right to Bear Quills or Kill Bears? A Critical Commentary on the Linkage between the 1st and 2nd Amendment in Recent Constitutional Theory," in <u>The Limits of Freedom</u> <u>in A Democratic Society</u> (Kent State University Press, 2001)

"The Irony of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional History," in <u>American Law Ways and Folkways</u> (Odense University Press, Denmark 2001)

"Commonplace or Anachronism: The Standard Model, The Second Amendment, and the Problem of History in Contemporary Constitutional Theory," <u>Constitutional Commentary</u> (1999): 221-246

"Mere Parchment Barriers?  Anti-Federalists, the Bill of Rights, and the Question of Rights Consciousness," in <u>Government Proscribed:  The Bill of Rights</u> (University of Virginia Press, 1998): 175-208

"Moving Beyond the Great Story: Post-Modern Prospects, Post-Modern Problems, A Forum on Robert Berkhofer, Jr. <u>Beyond the Great Story"</u> <u>American</u> <u>Quarterly</u> (1998): 349-357

"The Anti-Federalists," in  <u>The Blackwell Companion to American Thought</u>, eds.,  James Kloppenberg (London, 1995)

"The Bill of Rights," in <u>The Blackwell Companion to American Thought</u>, eds., James Kloppenberg (London, 1995)

"Splitting the Difference: Textualism, Contexualism, and Post-Modern History," <u>American Studies</u> (1995): 57-80

"Canon Wars II:  The Return of  the Founders,"  <u>Reviews in American History</u> 22 (1994): 413-417

"Moving Beyond the Canon of Traditional Constitutional History: Anti-Federalists, the Bill of Rights and the Promise of Post-Modern Historiography," <u>Law and History Review</u> (1994): 1-28

"Early American History in a Post-Modern Age," <u>William and Mary Quarterly</u> 50 (1993): 329-341

"Liberal Republicans, Republican Liberals?:   The Political Thought of the Founders Reconsidered," <u>Reviews in American History</u> 21 (1993):  26-30

"Politics of the Middling Sort:  The Bourgeois Radicalism of Abraham Yates, Melancton  Smith, and the New York Anti-Federalists," in <u> New York in the Age</u> of the Constitution (New York Historical Society, 1992): 151-175

"Aristocracy Assailed:  Back-Country Opposition to the Constitution and the Problem of Anti-Federalist Ideology," <u>Journal of American History</u> (1990): 1148-1172

"The Changing Historical Fortunes of the Anti-Federalists," <u>Northwestern University Law Review</u> (1989): 39-73

"Reflections on the `Late Remarkable Revolution in Government,' Aedanus Burke and Samuel Bryan's Unpublished History of  the Ratification of the Federal Constitution," <u>The Pennsylvania Magazine of History and Biography</u> (1988): 103-130

**<u>Book Reviews:</u>**

- <u>Journal of American History</u>

- William and Mary Quarterly
- American Studies Journal of the Early Republic
- Pennsylvania Magazine of History and Biography
- American Quarterly
- American Journal of Legal History
- Law and History Review

### Journal Manuscript Referee:

- Journal of American History
- William and Mary Quarterly
- Diplomatic History
- Pennsylvania Magazine of History and Biography
- Law and History Review
- Harvard Law Review
- Stanford Law Review
- Yale Law Journal

### Book Manuscript Reviewer:

- University Press of Virginia
- University of North Carolina Press
- Stanford University Press
- University of Massachusetts Press
- Oxford University Press
- Cambridge University Press
- University of Michigan Press
- Harvard University Press

### Invited Lectures:

"Early American Firearms Regulation: A Guide for the Perplexed," Fall 2024 Conference "Historical and Contemporary Perspectives on Guns and Society" CSGS Fall , 2024

"Historian Roundtable Discussion," Duke University School of Law, Durham, NC (Co-sponsored with the Center for the Study of Guns and Society (CSGS) at Wesleyan University)  Summer 2024

"Learning to Read like an Eighteenth-Century Lawyer: The Historical Critique of Originalism Revisited,"  W&M Bill of Rights Journal Symposium on Memory and Authority, Spring 2024

"Originalism, the Supreme Court, the Texas Rahimi Decision,"   Spring 2023 Lessons from History on Domestic Violence, Firearms, and the Law, (CSGS) Spring 2023

"Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era,"   Public Health History and the Future of Gun Regulation after Bruen,  Fall 2023 *Fordham Urban Law Journal*

"Race, Regulation, and Guns: The Battleground in the Debate Over the Second Amendment," Haber/Edelman Lecture:  University of Vermont,  Fall 2021

"Second Amendment Myths and Realities," University of Tampa, Honors College Symposium, November 30, 2018.

"The Common Law and Gun Regulation: Neglected Aspects of the Second Amendment Debate,"  Guns in Law, Amherst College, Law Justice and Society (2016)

"The New Movement to End Gun Violence." UCLA Hammer Museum (2016)

"No Person May Go Armed": A Forgotten Chapter in the History of Gun Regulation" The Elizabeth Battelle Clark Legal History Series, Boston University College of Law, 2016

Legacy Speaker Series:  "Guns in the United States," University of Connecticut (2016) "How does the Second Amendment Apply to Today?"

American Constitution Society/ Federalist Society Debate, Tulane Law School, New Orleans (2016)

"The Second Amendment and The Future of Gun Regulation: Forgotten Lessons From U.S. History," Constitution Day Lecture, Goucher College, (2015)

Keynote Lecture: "The Second Amendment and American Cultural Anxieties:  From Standing Armies to the Zombie Apocalypse" Firearms and Freedom: The Relevance of the Second Amendment in the Twenty First Century, Eccles Center, British Library (Spring 2015)

"Narratives of Fear and Narratives of Freedom:  A Short Cultural History of the Second Amendment," Comparing Civil Gun Cultures: Do Emotions Make a Difference? Max Plank Institute, Berlin (2014)

"History and Mythology in the Second Amendment Debate," Kollman Memorial Lecture, Cornell College, Iowa (Spring, 2013)

"Will the Real Founding Fathers Please Stand Up or Why are so few Historians Originalists" Constitution Day Lecture, Lehman College, Fall 2011

"Lawyers, Guns, and Historians: The Second Amendment Goes to Court," SHEAR/HSP Public Lecture, Philadelphia, July, 2008

The Robert H. and Alma J. Wade Endowment Lecture, Kentucky Wesleyan University, "The Early American Origins of Gun Control" (2006)

"Jefferson, Mason, and Beccaria:  Three Visions of the Right to Bear Arms in the Founding Era," Bill of Rights Lecture, Gunston Hall Plantation, Fairfax, VA   (2003)

"A New Paradigm for the Second Amendment," Finlay Memorial Lecture, George Mason University, (2001)

"Academic Gunsmoke:  The Use and Abuse of History in the Second Amendment Debate," Cadenhead Memorial Lecture, University of Tulsa, (2000)

"Why the Losers Won: The Rediscovery of Anti-Federalism in the Reagan Years," Thomas Jefferson Inaugural Lecture, University of Leiden, Netherlands, (1995)

## **Presentations:**

Round table" " Race and the Disparate Impact of Gun Law Enforcement, Historically and Today," Aiming for Answers: Balancing Rights, Safety, and Justice in a Post-Bruen America, Minnesota Law Review 2023 Symposium October 2023

"Rights, Regulation, and the Original Meaning of the Police Power: Constitutional Anachronisms in Contemporary Second Amendment Jurisprudence," "Landmark Judgments," Faculty of Law University of Bologna, Italy September 2023.

"Guns Everywhere: Individual Rights and Communal Harms after NYSRPA v. Bruen," UCLA Criminal Law Journal, Roundtable: "The History of the Second Amendment: How We Got to Bruen–and Where We Go from Here October" 2022

"From Ideology to Empiricism: Second Amendment Scholarship After Heller, " Hastings Constitutional Law Quarterly Symposium, Heller at Ten, January 18, 2019

"Firearms and the Common Law Tradition," Aspen Institute, Washington, DC (2016)

"The Original Debate over Original Meaning Revisited, " British Group in EarlyAmerican History, Annual Meeting, Cambridge, England (2016)

"Second Amendment Historicism and Philosophy" The Second Generation of Second Amendment Scholarship" Brennan Center, NYU 2016

"The Reception of the Statute of Northampton in Early America: Regionalism and the Evolution of Common Law Constitutionalism" OIEAHC and the USC/Huntington Library Early Modern Studies Institute May 29–30, 2015

"The Right to Travel Armed in Early America: From English Restrictions to Southern Rights," British Group in Early American History, Annual Conference Edinburgh, Scotland (2014)

"Progressives, Originalists, and Pragmatists:   The New Constitutional Historicism and the Enduring Legacy of Charles Beard," Charles Beard, Economic Interpretation and History, Rothmere Center, Oxford University (2012)

CUNY Early American Seminar, "The People's Constitution v. the Lawyer's Constitution," 2011

Roundtable : "The Work of J.R. Pole," SHEAR , Philadelphia, Pennsylvania 2011)

"The Right to Bear Arms in the Era of the Fourteenth Amendment: Gun Rights or Gun Regulation?" Bearing Arms, Policy, Policing, and Incorporation After Heller, Santa Clara Law School (2010)

"Re-envisioning Early American History," American Historical Association Annual Meeting, San Diego (2010)

"The Ironic Second Amendment" Firearms, the Militia, and Safe Cities: Merging History, Constitutional Law and Public Policy, Albany Law School ( 2007)

"*District of Columbia* v. *Heller*  and the Problem of Originalism,"  University of Pennsylvania Constitutional Law Workshop, Philadelphia ( 2007)

"Progressives and the Gun Control Debate,"  American Constitution Society, Harvard Law School, (2006)

"The Problem of Popular Constitutionalism in Early American Constitutional Theory," American Association of Law Schools, Annual Conference (2006)

"Popular Constitutionalism and the Whiskey Rebellion," Symposium on Larry Kramer's The People Themselves, Chicago-Kent Law School  (2005)

Roundtable Discussion on the Second Amendment and Gun Regulation,  NRA/ GMU Student's For the Second Amendment Symposium  (2005)

"The Early American Origins of the Modern Gun Control Debate: The Right to Bear Arms, Firearms Regulation, and the Lessons of History,"  Gun Control: Old Problems, New Problems, Joint Conference Sponsored by the John Glenn Institute and Stanford Law School (2005)

"Original Rules for Originalists?"  University of Minnesota Law School (2005)

"The Fourteenth Amendment and the Origins of the Modern Gun Debate," UCLA, Legal History Workshop (2004)

"Beyond Consensus, Beyond Embarrassment: The Use and Abuse of History in the Second Amendment Debate," American Society of Legal History, Austin, TX  (2004)

"Armed in the Holy Cause of Liberty: Guns and the American Constitution," NYU Legal History Colloquium (2004)

"Digital Searches and  Early American History,"  SHEAR  Brown University  (2004)

"Well Regulated: The Early American Origins of Gun Control," The Second Amendment and the Future of Gun Regulation," Joint Conference Sponsored by the John Glenn Institute and Fordham Law School, New York (2004)

"Minuteman, Mobs, and Murder: Forgotten Contexts of the Second Amendment," Department of History, University of California Berkeley (2003)

"History vs. Originalism in the Second Amendment Debate,"  Federalist Society/ American Constitution Society, George Washington University Law School, Washington D.C.  (2003)

"Self-defense, Public Defense, and the Politics of Honor in the Early Republic," Lake Champlain Early American Seminar, Montreal (2003)

"The Ironic Second Amendment" "Gun Control:  Controversy, Social Values, and Policy," University of Delaware Legal Studies Conference, Newark, Delaware (2003)

"Individuals, Militias, and the Right to Bear Arms:  The Antebellum Debate Over Guns," Institute for Legal Studies, University of Wisconsin School of Law (2004)

"Guns in the British Atlantic World: New Research, New Directions" Society for the Historians of the Early American Republic, Ohio State University (2003)

"Neither Individual nor Collective:  A New Paradigm for the Second Amendment," American Bar Foundation, Chicago (2003)

"The Changing Meaning of the Armed Citizen in American History," "Americanism Conference," Georgetown University (2003)

"A New Paradigm for the Second Amendment?" Supreme Court Historical Society, Washington, D.C. (2002)

"Constitutional History as Cultural History: The Case of the Second Amendment" European American Studies Association, Bordeaux, France (2002)

"Don't Know Much About History: The Current Crises in Second Amendment Scholarship," Salmon P. Chase College of Law, Symposium, "The Second Amendment Today," (2002)

"History, Public Policy, and the Cyber-Age: Gun Control Policy after the Emerson Decision," Sanford Institute of Public Policy, Duke University (2002)

"Constitutional History After the New Cultural History: The Curious Case of the Second Amendment," Society of the Historians of the Early American Republic, Baltimore (2001)

Roundtable Discussion, "The State of Second Amendment Scholarship," American Historical Association (2001)

"Armed in the Holy Cause of Liberty: Critical Reflections on the Second Amendment Debate," Vanderbilt University Law School (2001)

"Neither Individual nor Collective: A New Paradigm for the Second Amendment," Boston University Law School, (2000)

"The Current State of Second Amendment Scholarship," National Press Club Washington, D.C. American Bar Association, (2000)

"Taking the Hype out of Hyper-Text, Or What Should Textbook Companies Being Doing for us on the Web," OAH St. Louis, Missouri (1999)

"The Ironies of Progressive Historiography: The Revival of Anti-Federalism in Contemporary Constitutional Theory," European American Studies Association, Lisbon, Portugal (1998)

"Deconstructing the Canon of American Constitutional History" American Society of Legal History, Seattle, Washington (1998)

"Beyond Meta-narrative: The Promise of Hypertext," American Studies Association, Seattle, Washington (1998)

"Text, Context, Hypertext," American Historical Association, Washington D.C. (1998)

"Jefferson and Enlightenment," International Center for Jefferson Studies, Charlottesville, VA, (1998)

"Copley's Watson and the Shark: Interpreting Visual Texts with Multi-media Technology," American Studies Association, Washington, D.C. (1997)

"Multi-Media and Post-Modernism," H-Net Conference, Technology and the Future of History, East Lansing, Michigan (1997)

Comment on Jack Rakove's <u>Original Meanings</u>, Society of the Historians of the Early Republic, State College, PA (1997)

"Teaching with Multi-Media Technology," Indiana University, spring 1997 "Constitutional History from the Bottom Up:  The Second Amendment as a Test Case," McGill University, Montreal, Canada (1996)

"Just Because You Are Paranoid, Does Not Mean the Federalists Are Not Out to Get You:  Freedom of the Press in Pennsylvania," University of Pennsylvania (1995)

"Multi-Media and Post-Modernism: The Future of American Studies?" Lecture, Erasmus University, Rotterdam, Netherlands (1995)

"Post-Modern American History?  Ratification as a Test Case," St. Cross College, Oxford University, Oxford, England (1994)

"The Other Founders," NYU Legal History Seminar," NYU Law School (1994)

"Reading the Rhetoric of Ratification,"  paper presented at "Possible Pasts:  Critical Encounters in Early America," Philadelphia Center for Early American Studies, Philadelphia, PA (1994)

"American Historiography and Post-Modernism," Organization of  American Historians, Atlanta, GA (1994)

"The Anti-Federalist Origins of Jeffersonianism,"  Columbia  Seminar on Early American History (1994)

"American History in a Post-Modern Age?" American Historical Association, San Francisco, CA (1994)

"Post-Modern Constitutional History?"  Indiana University School of Law,  Bloomington, IN (1993)

Participant, Institute of Early American History and Culture, planning conference, "New Approaches to Early American History," Williamsburg, VA (1992)

"Mere Parchment Barriers?  Federalists, Anti-Federalists and the Problem of Rights Consciousness," American Studies Association, Baltimore, MD (1991)

"James Madison and the Bill of Rights:  a comment on papers by Jack Rakove, Ralph Ketcham and Max Mintz," Organization of American Historians and Center for the Study of the Presidency Conference, "America's Bill of Rights at 200 Years,"  Richmond, VA, (1991)

Symposium participant, "Algernon Sidney and John Locke:  Brothers in Liberty?" Liberty  Fund Conference, Houston, TX  (1991)

"Mere Parchment Barriers?  Antifederalists, the Bill of Rights and the Question of Rights Consciousness," Capitol Historical Society, Washington, D.C. (1991)

"Anti-Federalism and the American Political Tradition," Institute of Early American History and Culture Symposium, Williamsburg, VA  (1989)

---

**Interviews, Editorials, Essays, Podcasts:**

---

- "Clarence Thomas' Latest Guns Decision Is Ahistorical and Anti-Originalist"
  SLATE June 24, 2022
- Cherry-picked history and ideology-driven outcomes: Bruen's originalist
  distortions*,"* SCOTUSblog (Jun. 27, 2022)
- "The Right Found a New Way to Not Talk About a School Shooting," SLATE May 25, 2022
- "The Horror in New York Shows the Madness of the Supreme Court's Looming Gun Decision," *Slate* May 19, 2022
- "Guns, Guns Everywhere: Last week's subway Shooting was Horrifying. If the Supreme Court Creates a National Right to Carry, the Future will be Worse," New York Daily News Apr 17, 2022
- "The Supreme Court's Latest Gun Case Made a Mockery of Originalism" *Slate* November 10, 2021
- "'Originalism' Only Gives the Conservative Justices One Option On a Key Gun Case," *Washington Post,* November 3, 2021
- "Neither British Nor Early American History Support the Nearly Unfettered Right to Carry Arms," *Slate* November 02, 2021
- "Will the Supreme Court Create Universal Concealed Carry Based on Fantasy Originalism?" *Slate* November 1, 2021
- "Biden was Wrong About Cannons, but Right About the Second Amendment," *Slate* June 29, 2021
- "Barrett and Gorsuch Have to Choose Between Originalism and Expanding Gun Rights," *Slate* April 29, 2021 Slate
- "What Today's Second Amendment Gun Activists Forget: The Right Not to Bear Arms," *Washington Post*, January 18,  2021
- "Could America's Founders Have Imagined This?" *The New Republic*, December 20, 2019
- "Don't Embrace Originalism to Defend Trump's Impeachment" *The New Republic*, December 5, 2019
- "The Second-Amendment Case for Gun Control" *The New Republic*, August 4, 2019
- "The Lessons of a School Shooting—in 1853" *Politico*, March 24, 2018.
- "Originalism and the Second Amendment in *District of Columbia v. Heller*," *University of Chicago Law Review*, Podcast, Briefly 1.9, Wed, 04/11/2018
- "Sandy Hook and the Original Meaning of the Second Amendment," *Time* December, 2017
- "The State of the Second Amendment," National Constitution Center, Podcast October, 2017
- "Gun Anarchy and the Unfree State: The Real History of the Second Amendment," *The Baffler On-line* October 2017
- "Five Types of Gun Laws the Founding Fathers Loved*"* *Salon* October 22, 2017
- "Half Cocked," *Book Forum* April 2016
- "Let's Make an Honest Man of Ted Cruz. Here's how we Resolve his "Birther" Dilemma with Integrity" *Salon* January 23, 2016
- "Guns Have Always Been Regulated,"  *The Atlantic Online* December 17, 2015

- "The Slave-State Origins of Modern Gun Rights" *The Atlantic Online* 30, 2015 [with Eric Ruben]
- PBS, "Need to Know: 'Debating the Second Amendment: Roundtable'" April 26, 2013
- "All Guns are not Created Equal" Jan 28, 2013 *Chronicle of Higher Education* [with Kevin Sweeney]
- "What the 'Right to Bear Arms' Really Means" *Salon* January 15, 2011 "Elena Kagan and the Case for an Elitist Supreme Court," *Christian Science Monitor* May 20, 2010
- "Gun Points," *Slate*, March 8, 2010 (With Justin Florence, and Matt Shors)
- "What's Happening to Gun Control," To the Point, NPR. March 11, 2010
- "Getting History Right," *National Law Journal*, March 1, 2010
- "History and the Second Amendment," *The Kojo Nnamdi Show* , WAMU (NPR) March 17, 2008
- "The Court and the Second Amendment," *On Point* with Tom Ashbrook, WBUR (NPR) March 17, 2008
- "Aim for Sensible Improvements to Gun Regulations," *Detroit Free Press,* April 29, 2007
- "A Well Regulated Militia," *The Diane Rehm Show*, WAMU (NPR) Broadcast on Book TV ( 2006)
- "Taking a Bite out of the Second Amendment," *History News Network*, January 30, 2005
- "Gun Control," Odyssey, Chicago NPR September 8, 2004
- "Loaded Questions," *Washington Post Book World* February 2, 2003
- "The Right to Bear Arms," Interview *The Newshour,* PBS May 8, 2002
- "Real and Imagined," *New York Times*, June 24, 1999

## Other Professional Activities

- Editorial Board, <u>Constitutional Study</u>, University of Wisconsin Press (2014-present)
- Advisory Council, Society of Historians of the Early American Republic (SHEAR) (2007-2009)
- Program Committee, Annual Conference, Society of the Historians of the Early American Republic, Philadelphia, PA 2008
- Editorial Board, <u>American Quarterly</u> (2004-2007)
- Director, Second Amendment Research Center, John Glenn Institute for Public Service and Public Policy, 2002- 2007
- Fellow, Center for Law, Policy, and Social Science, Moritz College of Law, Ohio State University 2001- 2004
- Local Arrangements Committee, Annual Conference, Society of the Historians of the Early American Republic, Columbus, OH 2003
- Project Gutenberg Prize Committee, American Historical Association, 2004, 2002
- Program Committee, Annual Conference, Society of the Historians of the Early Republic, 2001
- Co-Founder Ohio Early American Studies Seminar
- NEH Fellowship Evaluator, New Media Projects, Television Projects
- Multi-media Consultant and Evaluator, National Endowment for the Humanities, Special, Projects, Division of Public Programs, Grants Review Committee (1999)

## Court Citations, Amicus Briefs and Expert Witness Reports

**US Supreme Court:**

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen</u>, 597 U.S. __, 50 2022 U.S. Lexis 3055 (2022)

<u>N.Y. State Rifle & Pistol Ass'n v. Bruen</u>, 597 U.S. __, 26, 28, 45, 47 2022 U.S. Lexis 3055 (2022) (Breyer, J. dissenting)

<u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742, 900, 901 n.44  (2010) (Stevens, J., dissenting).

<u>McDonald v. City of Chicago, Ill.</u>, 561 U.S. 742, 914, 933 (2010) (Breyer, J., dissenting).

<u>D.C. v. Heller</u>, 554 U.S. 570, 666 n.32, 671, 685 (2008) (Stevens, J., dissenting).

**Federal Courts:**

<u>United States of America,  v. Graylan Steve Johnson,</u> United States District Court, S.D. Florida. February 20, 2023 Slip Copy 2023 WL 2308792

<u>United States v. Posey</u>, United States District Court, N.D. Indiana, Hammond Division. February 09, 2023 Slip Copy 2023 WL 1869095

<u>United States v. Combs</u>, United States District Court, E.D. Kentucky, Central Division., (at Lexington). February 02, 2023 Slip Copy 2023 WL 1466614

<u>United States v. Barber,</u> United States District Court, E.D. Texas, Sherman Division. January 27, 2023 Slip Copy 2023 WL 1073667

<u>Range v. Att'y Gen. United States</u>, No. 21-2835, 2022 WL 16955670 (3d Cir. Nov. 16, 2022).

<u>Antonyuk v. Hochul</u>, No. 122CV0986GTSCFH, 2022 WL 16744700 (N.D.N.Y. Nov. 7, 2022).

<u>United States v. Bullock</u>, No. 3:18-CR-165-CWR-FKB, 2022 WL 16649175 (S.D. Miss. Oct. 27, 2022).

<u>United States of Am. v. Riley</u>, No. 1:22-CR-163 (RDA), 2022 WL 7610264 (E.D. Va. Oct. 13, 2022).

<u>United States v. Coombes</u>, No. 22-CR-00189-GKF, 2022 WL 4367056 (N.D. Okla. Sept. 21, 2022)
.

<u>United States v. Medrano</u>, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122650

<u>United States v. Coleman</u>, United States District Court, N.D. West Virginia, Martinsburg. January 06, 2023 Slip Copy 2023 WL 122401

<u>United States v. Goins</u>, United States District Court, E.D. Kentucky, Central Division., Lexington. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17836677

<u>Reese v. Bureau of Alcohol Tobacco Firearms & Explosives,</u> United States District Court, W.D.

Louisiana, Lafayette Division. December 21, 2022 --- F.Supp.3d ---- 2022 WL 17859138

South Bay Rod & Gun Club, Inc. v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811113

Miller v. Bonta, United States District Court, S.D. California. December 19, 2022 --- F.Supp.3d ---- 2022 WL 17811114

Nat'l Ass'n for Gun Rts., Inc. v. City of San Jose, No. 22-CV-00501-BLF, 2022 WL 3083715 (N.D. Cal. Aug. 3, 2022).

Jones v. Bonta, United States Court of Appeals, Ninth Circuit. May 11, 2022 --- F.4th ---- 2022 WL 1485187.

Duncan v. Bonta, United States Court of Appeals, Ninth Circuit. November 30, 2021 19 F.4th 1087 2021

Young v. Hawaii, 992 F.3d 765, 785-86 (9th Cir. 2021) (en banc).

Kanter v. Barr, 919 F.3d 437, 446 n.6, 457, 462, 464 (7th Cir. 2019) (Barrett, J., dissenting).

Medina v. Whitaker, 913 F.3d 152, 159 (D.C. Cir.), cert. denied sub nom. Medina v. Barr, 140 S. Ct. 645 (2019).

Young v. Hawaii, 896 F.3d 1044, 1066 (9th Cir. 2018), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Young v. Hawaii, 896 F.3d 1044, 1077 (9th Cir. 2018) (Clifton, J., dissenting), reh'g en banc granted, 915 F.3d 681 (9th Cir. 2019).

Teixeira v. Cty. of Alameda, 873 F.3d 670, 684–85 (9th Cir. 2017).

Kolbe v. Hogan, 813 F.3d 160, 175 (4th Cir. 2016), on reh'g en banc, 849 F.3d 114 (4th Cir. 2017).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 348 (3d Cir. 2016).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 370–71, 371 n.17, 372 n.19 (3d Cir. 2016) (Hardiman, J., concurring).

Binderup v. Attorney Gen. United States of Am., 836 F.3d 336, 389 n.85, 405 n.187 (3d Cir. 2016) (Fuentes, J., concurring).

Peruta v. Cty. of San Diego, 824 F.3d 919, 935 (9th Cir. 2016).

Peruta v. Cty. of San Diego, 742 F.3d 1144, 1185, 1188 (9th Cir. 2014) (Thomas, J., dissenting).

Nat'l Rifle Ass'n, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 714 F.3d 334, 342 n.19, 343 n.23 (5th Cir. 2013) (Jones, J., dissenting).

Kachalsky v. Cty. of Westchester, 701 F.3d 81, 95 & n.21 (2d Cir. 2012).

Moore v. Madigan, 702 F.3d 933, 935 (7th Cir. 2012).

Nat'l Rifle Ass'n of Am., Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives, 700 F.3d 185, 200, 202–03 (5th Cir. 2012).

United States v. Carpio-Leon, 701 F.3d 974, 980 (4th Cir. 2012).

United States v. Greeno, 679 F.3d 510, 519 (6th Cir. 2012).

United States v. Yancey, 621 F.3d 681, 684 (7th Cir. 2010).

United States v. Rene E., 583 F.3d 8, 12, 15–16 (1st Cir. 2009).

Miller v. Sessions, 356 F. Supp. 3d 472, 481 (E.D. Pa. 2019).

Grace v. D.C., 187 F. Supp. 3d 124, 138 n.11 (D.D.C. 2016).

Powell v. Tompkins, 926 F. Supp. 2d 367, 386 (D. Mass. 2013), aff'd, 783 F.3d 332 (1st Cir. 2015).

United States v. Tooley, 717 F. Supp. 2d 580, 589–591 (S.D.W. Va. 2010), aff'd, 468 F. App'x 357 (4th Cir. 2012).

United States v. Boffil-Rivera, No. 08-20437-CR, 2008 WL 8853354, 6 (S.D. Fla. Aug. 12, 2008), report and recommendation adopted sub nom.

United States v. Gonzales-Rodriguez, No. 08-20437-CR, 2008 WL 11409410 (S.D. Fla. Sept. 22, 2008), aff'd sub nom.

United States v. Boffil-Rivera, 607 F.3d 736 (11th Cir. 2010).

**State Courts:**

Norman v. State, 215 So. 3d 18, 30 & nn.11–12 (Fla. 2017).

Posey v. Com., 185 S.W.3d 170, 179–180 (Ky. 2006).

Posey v. Com., 185 S.W.3d 170, 185 n.3 (Ky. 2006) (Scott, J., concurring).

State v. Craig, 826 N.W.2d 789, 796 (Minn. 2013).

People v. Handsome, 846 N.Y.S.2d 852, 858 (N.Y. Crim. Ct. 2007).

Zaatari v. City of Austin, No. 03-17-00812-CV, 2019 WL 6336186, 22 (Tex. App. Nov. 27, 2019) (Kelly, J., dissenting).

State v. Roundtree, 2021 WI 1, 395 Wis. 2d 94, 952 N.W.2d 765

State v. Christen, 2021 WI 39, 958 N.W.2d 746

Amicus Briefs:

Amicus Brief, Harper v. Moore, No. 21-1271 (U.S. Supreme Court, 2022)  [ISLT and Gerrymandering]

Amicus Brief KOX V. STATE OF GEORGIA, SUPREME COURT STATE OF GEORGIA Case No. S23A0167 [Second Amendment and Campus Carry]

Amicus Brief, *NYSRPA v. Bruen*, No. 20-843 (U.S. Supreme Court, 2021) [2nd Amendment]

Amicus Brief, *Young v. State of Hawaii*  N O . 12-17808 (9th Cir. 2020) [2nd Amendment]

Amicus Brief*, Gould v. Morgan*, No. 17-2202 (1st Cir. 2018) [2nd Amendment]

Amicus Brief, *Flanagan vs. Becerra*, Central District of California Case  (2018) [2nd Amendment]

Amicus Brief, *Gill* v. *Whitford* (US Supreme Court, 2017)  [Partisan Gerrymandering]

Amicus Brief*, Woollard v Gallagher*, (4th Cir. 2013) [Second Amendment]

Amicus Brief *Heller v. District of Columbia* [Heller II] (US Court of Appeals for D.C.) (2010) [2nd Amendment]

Amicus Brief, *McDonald* v. *City of Chicago* (US Supreme Court,2010) [14th Amendment]

Amicus Brief, *District of Columbia* v. *Heller* (US Supreme Court 2008) [2nd Amendment]

Amicus Brief, *Silvera*  v. *Lockyer*, case on appeal( 9th  Circuit 2003) [2nd Amendment]

Amicus Brief, *Emerson* v. *U.S.* case on appeal (5th Circuit 1999) [2nd Amendment]

Pro-bono Historical Consultant State of Ohio, *McIntyre* v. *Ohio*, (U.S. Supreme Court, 1995) [1st Amendment]

### Expert Witness Reports

*Rocky Mountain Gun Owners, Nonprofit Corp. v. Hickenlooper*, 14-cv-02850 (D. Colo.).
*Chambers, et al., v. City of Boulder*, 2018 CV 30581 (Colo. D. Ct. City of Boulder, filed June 14, 2018).
*Zeleny v. Newsom*, 14-cv-02850 (N.D. Cal.).
*Miller, et al v. Smith, et al.*, 2018 cv 3085 (C.D. Ill.).
*Jones v. Bonta United States* Court of Appeals, --- F.4th ---- , 2022 WL 1485187 (9th Cir., May 11, 2022).
*Baird v. Bonta*, No. 2:19-cv-00617 (E.D. Cal.).
*Worth v. Harrington*, 21-cv-1348 (D. Minn.).
*Miller v. Bonta*, No. 3:19-cv-01537-BEN-JLB (S.D. Cal. 2019).
*Duncan v. Bonta*, No. 3:17-cv-01017-BEN-JLB (S.D. Cal. 2017).
*Renna v. Bonta*, No. 20-cv-2190 (S.D. Cal. 2020).

*Boland v. Bonta*, No. 8:22-cv-1421-CJC-ADS (C.D. Cal. 2022).
*Rupp v. Bonta*, No. 8:17-cv-746JLS-JDE (C.D. Cal. 2017).
*B&L Productions, Inc. v. Newsom*, No. 21-cv-1718-AJB-DDL (S.D. Cal. 2021).
*Nat'l Assoc. for Gun Rts. v. Campbell*, No.1:22-cv-11431-FDS (D. Mass. 2022).
*Nat'l Assoc. for Gun Rts. v. Lamont*, No. 3:22-cv-0118 (D. Conn. 2022).
*Nastri v. Dykes*, No. 3:23-cv-00056 (D. Conn. 2023).
*Nat'l Assoc. for Gun Rts. v. Lopez*, No. 1:22-cv-00404 (D. Haw. 2022).

## Law Review Symposia Organized

**Second Amendment:**
 "The Second Amendment and the Future of Gun Regulation: Historical, Legal, Policy, and Cultural Perspectives," 73 *Fordham L. Rev.* 487 (2004).
"Gun Control: Old Problems, New Paradigms"  17 *Stan. L. & Pol'y Rev.* 671 (2006).
"A Symposium on Firearms, the Militia and Safe Cities: Merging History, Constitutional Law and Public Policy," 1 *Alb. Gov't L. Rev.* 292 (2008).
"The 2nd Amendment at the Supreme Court: "700 Years of History" and the Modern Effects of Guns in Public," 55 *U.C. Davis L. Rev.* 2545 (2022).

**New Originalism:**

"The New Originalism" 82 *Fordham L. Rev.* 721 (2013).
"Historians and the New Originalism: Contextualism, Historicism, and Constitutional Meaning"84 *Fordham L. Rev.* 915  (2015).