```
 1              IN THE UNITED STATES DISTRICT COURT

 2                  FOR THE DISTRICT OF HAWAII

 3
    ELIJAH PINALES, JUDA        ) CIVIL NO. 24-00496JAO-WRP
 4  ROACHE, ALOHA STRATEGICS    )
    LLC DBA DANGER CLOSE        ) Honolulu, Hawaii
 5  TACTICAL, JGB ARMS LLC,     ) January 31, 2025
    SECOND AMENDMENT            )
 6  FOUNDATION,                 )
                                ) [2] PLAINTIFFS' MOTION FOR
 7            Plaintiffs,        )  PRELIMINARY INJUNCTION
                                )
 8        vs.                   )
                                )
 9  ANNE E. LOPEZ, IN HER       )
    OFFICIAL CAPACITY AS THE    )
10  ATTORNEY GENERAL OF THE     )
    STATE OF HAWAI'I,           )
11                              )
              Defendant.        )
12  _____)

13
                 TRANSCRIPT OF PROCEEDINGS
14       BEFORE THE HONORABLE JILL A. OTAKE,
              UNITED STATES DISTRICT JUDGE
15
    APPEARANCES:
16
      For the Plaintiffs:      KEVIN GERARD O'GRADY, ESQ.
17                             Law Office of Kevin O'Grady, LLC
                               1164 Bishop Street, Suite 1605
18                             Honolulu, Hawaii  96813

19
      For the Defendant:       EWAN C. RAYNER, ESQ.
20                             THOMAS J. HUGHES, ESQ.
                               Deputy Solicitors General
21                             Department of the Attorney General,
                                State of Hawai'i
22                             425 Queen Street
                               Honolulu, Hawai'i  96813
23
                               DOUGLAS N. LETTER, ESQ.
24                             Special Deputy Attorneys General
                               Brady Center to Prevent Gun Violence
25                             840 First Street NE, Suite 400
                               Washington, D.C.  20002
```

```
 1    APPEARANCES (Cont'd.):

 2    For the Defendant        MARK S. DAVIS, ESQ.
      (Cont'd.):               AIMEE M. LUM, ESQ.
 3                             Special Deputy Attorneys General
                               Davis Levin Livingston
 4                             851 Fort Street, Suite 400
                               Honolulu, Hawaii  96813
 5

 6

 7

 8

 9

10

11

12

13

14

15

16

17

18

19

20    Official Court          Cynthia Fazio, RMR, CRR, CRC
      Reporter:               United States District Court
21                             300 Ala Moana Blvd., C-270
                               Honolulu, Hawaii  96850
22

23

24
      Proceedings recorded by machine shorthand, transcript produced
25    with computer-aided transcription (CAT).
```

```
 1   FRIDAY, JANUARY 31, 2025                          9:05 A.M.

 2            THE COURTROOM MANAGER:  Civil Number 24-00496JAO-WRP,

 3   Elijah Pinales, et al., versus Anne E. Lopez in her official

 4   capacity as the Attorney General of the State of Hawaii.

 5            This case has been called for a hearing on Plaintiffs'

 6   Motion for Preliminary Injunction.

 7            Counsel, please make your appearances for the record.

 8            MR. O'GRADY:  Good morning, Your Honor.  Kevin O'Grady

 9   on behalf of Mr. Pinales and the other plaintiffs.

10            Please excuse Mr. Beck.  Because of the weather last

11   night, he was expected to argue, I only had a few hours to

12   prepare.  We discovered last night that he was diverted to

13   Maui, and despite his best efforts to be here, including up

14   until this morning, in fact today his flight has been rerouted

15   and rescheduled, and as I understand it he is unable to make

16   even Zoom because he's presently at the airport.

17            THE COURT:  Oh, okay.  I'll not expect too much then.

18            MR. O'GRADY:  Okay.  Thank you.

19            THE COURT:  I'm kidding, Mr. -- I'm kidding,

20   Mr. O'Grady.  That's not true.  I've seen you before.  You've

21   impressed me before.  So I'm not worried about it.

22            MR. O'GRADY:  Thank you.

23            THE COURT:  But thank you for explaining that.

24            MR. LETTER:  Good morning, Your Honor.  I'm Douglas

25   Letter here representing the Attorney General of Hawaii.  I'm
```

1    appearing as a Special Deputy Attorney General of Hawaii.  With

2    me today from the Hawaii Solicitor General's Office, Mr. Ewan

3    Rayner, Mr. Thomas Hughes, and then behind me, Mr. Mark Davis

4    and Ms. Aimee Lum from the Davis Levin and Livingston law firm.

5            THE COURT:  Good morning.

6            MR. LETTER:  Good morning.

7            THE COURT:  You may all be seated.

8            Before we begin, let me just share a couple of things

9    that I thought might help our argument this morning.  And that

10   is, I'm going to give you a lot of time to cover the ground

11   that you want to cover, but I would recommend that both sides

12   start with the question of which era do I look at for the

13   historical analogy here.  And I'd be curious to hear from the

14   defense in particular if they agree with me that that is

15   potentially dispositive in this case.

16           In my view at least it looks like the Founding Era

17   would favor the plaintiffs and the Reconstruction Era gives

18   more valid arguments, I think, to the defendant.  But with

19   that, Mr. O'Grady, you may approach.

20           MR. O'GRADY:  You wish me up here, Judge?

21           THE COURT:  Yes, please.

22           MR. O'GRADY:  Yes, Judge.

23           So, Judge, I'm going to rearrange my thoughts and

24   attempt to answer your questions talking about the era.  I

25   think that we have to start first with *Heller* and with *Bruen*.

1    And in *Heller* and *Bruen*, the United States Supreme Court stated

2    not all history is equal.  And constitutional rights,

3    especially -- well, constitutional rights are pegged to the

4    meaning at the founding and at ratification.

5         I note that in *Bruen* and *Heller* there were no

6    reconstruction, if I can remember correctly, no reconstruction

7    laws cited that were contrary to what was at the founding.  And

8    that is, to the extent that the United States Supreme Court has

9    looked at reconstruction statutes at all, it was merely

10   confirmatory of what was in place at the founding.

11        THE COURT:  Let's talk about *Wolford* then.

12        MR. O'GRADY:  Yes.

13        THE COURT:  Because the Ninth Circuit seems to look at

14   the Reconstruction Era under *Wolford* and compare the

15   regulations with regard to, for example, parks because at the

16   founding parks were not quite in existence as they were by the

17   time of the Reconstruction Era.  So tell me why *Wolford* doesn't

18   direct me to look at the Reconstruction Era.

19        MR. O'GRADY:  Well, I would look at this two ways.  I

20   understand that *Wolford* states that and I understand that we

21   are in the Ninth Circuit, but I think that the United States

22   Supreme Court has directed that if reconstruction statutes are

23   to be examined, which the *Wolford* court did, they must be taken

24   in light of what was at the founding.

25        Although we dispute -- obviously we are seeking a

 1   petition for a writ of certiorari and *Wolford* -- and we are

 2   aware of its precedent here upon this Court, we believe that it

 3   can be read harmoniously if you take a look at, for example,

 4   you said parks were not in existence such as we conceive of

 5   them today, and so how can we interpret that in light of 1791,

 6   vis-a-vis 1878 or what have you after reconstruction.

 7         Here, I don't think that you need to necessarily look

 8   for that avenue out, which I think is what the *Wolford* court

 9   tried to do.  They tried to say, well, there is this different

10   thing, parks, and we find this other statute in the late 1800s

11   to be a little bit more helpful than things in the 1790s

12   because in fact they weren't discussing those things in the

13   1790s.

14         Here, you don't have to address that because

15   18-year-olds, 20-year-olds and weapons all existed in the

16   1790s.

17         THE COURT:  Well, the weapons that existed in the

18   1790s though, you would concede, were different, right?  I mean

19   one of the arguments is that the weapons in the 1790s were

20   muzzle-loaded weapons that were less subject to use

21   impulsively.  Whereas in the Reconstruction Era, at least one

22   of the arguments that defendant makes, is that there were --

23   there was a greater proliferation of handguns which could be

24   used more excessively, could be concealed and things of that

25   sort.  So why isn't there actually a different arena, a

1    different context between the Reconstruction Era and the

2    founding here?

3         MR. O'GRADY:  Well, first, Hawaii's laws do not, like

4    some of the early 1900s and the early 1800 laws which were in

5    some of the exhibits of the defendant, focus on easily

6    concealable pistols or Bowie knives which were a focus of

7    several of the laws that were contained in the exhibits.  To

8    the extent that there's any evidence, and we would characterize

9    it as scant outliers, there is some restriction.  And I note

10   that some of the ages were under 18.  There was 18, 16, and 14

11   and such, not under 21.

12        Here, Hawaii's laws are an outright ban on the

13   acquisition and ownership, possession, save those few statutes

14   that we mentioned with regard to hunting or being at the target

15   range, with regard to long guns, shotguns, whether by gift or

16   inheritance.  I note that some of the statutes cited by the

17   defendants said that it was improper and illegal to provide a

18   pistol or a Bowie knife to a person, a minor, sometimes

19   undefined, frequently undefined, and sometimes ages of 16 or

20   such, without the consent of their parents.  Here it doesn't

21   matter.  And in fact we have one client that his parent has

22   indicated that were she allowed to, she would acquire and give

23   to him a firearm.

24        THE COURT:  And that is going to be one of my

25   questions for the defense.  I am curious to know what they say

1    in response to that because I did notice that myself.

2         But help me understand why you don't view it as kind

3    of an analogous situation as was in *Wolford* where times had

4    changed between the Founding and the Reconstruction Era with

5    regard to in this instance the technology and, frankly, the

6    societal change between an agrarian lifestyle and urban

7    lifestyle, and, you know, 18 to 20-year-olds living with their

8    parents primarily during the Founding Era, and 18 to

9    20-year-olds taking more independent acts once there was

10   greater urbanization.

11        MR. O'GRADY:  I think I would like to phrase the

12   Court's question in terms of the *Bruen* prong or issue of how

13   and why and the extent of the regulation at question.  And here

14   I don't think that Hawaii's laws are sufficiently relevant

15   under the how and why.  This is an across-the-board ban on all

16   sorts of weapons.  Long guns, which were present then; pistols,

17   which were present then.  Any sort of knives were covered back

18   then.  Here, this particular statute doesn't cover knives.  But

19   the point is, I don't think that the change in society is

20   something that United States Supreme Court says can result in

21   an outright across-the-board ban.

22        Again, the closest case we have in time would be

23   *Rahimi*.  *Rahimi* says that if you're going to say that a person

24   has a particular proclivity for violence or is dangerous, it

25   has to be made under specific certain conditions.  They were

1     very aware back then under monarchies that the legislature
2     could say a particular group of people might be impulsive or
3     might not be loyal or might be dangerous to the sovereign,
4     Catholics, blacks, a variety of different people could fall
5     under that.
6           Here, they're making a generalized -- the State of
7     Hawaii is making a generalized argument that 18 to
8     20-year-olds, who join the military, 20-year-olds can join the
9     police force, although because of this particular law they
10    would not necessarily be given a firearm until necessarily
11    they're 21 because they're also enforcing liquor laws or
12    something like that.  But a variety of people 18 to 20 are
13    reasonable and that the founding in fact, those 18 to
14    20-year-olds, it wasn't just, well, they might be immature and
15    they might engage in crimes or reckless behavior.  In fact,
16    those 18 to 20-year-olds, and sometimes younger, were expected
17    to help keep the peace with the weapons that they
18    self-acquired, were proficient with and carried.
19           THE COURT:  Well, let me ask you a question kind of in
20    that vein.  One of the arguments that the defense makes is the
21    militia back then did not include, for example, women.  And so
22    would you agree then that at least at the founding the argument
23    that you're making now only applied to males?
24           MR. O'GRADY:  So, I think that the defense -- the
25    defendant's argument that back then the militia only applied to

1    males, only applied to white males in many categories, I think

2    would run against several problems.

3         Recently, yesterday we submitted the supplemental

4    authority for *Reese*.  In *Reese* there's a paragraph in there

5    that talks about how it would be, I don't know the word they

6    used, but it was something like astonishing or fanciful, that

7    we should look at that because at the time women were not able

8    to vote, there were a variety of things that were restricted to

9    white property owners.  They had to have sufficient property,

10   not just property.  They had to be white.  They had to be

11   landed.  There were a variety of things that today we would say

12   that is not any reason why you should be restricted in your

13   rights.

14        And I note that the Second Amendment does not have

15   either an age particularity in it, nor does it say anything

16   else.  It does not say the Second Amendment applies to white

17   males.  It does not say the Second Amendment only applies to

18   white males in the militia.  It does not say that the Second

19   Amendment only applies to white males of a particular age.  It

20   might be that the militia rules included people of a particular

21   age who were white males.  But you have to have weapons in

22   order to be part of the militia.  You don't have to be part of

23   the militia to own weapons.

24        THE COURT:  Let me ask you a question regarding the

25   age.  If we look at the founding, was there any age restriction

1   that would be constitutional?

2           MR. O'GRADY:  At the time of the founding, and shortly

3   thereafter, especially through the Militia Act, it was not

4   viewed so much as a restriction as an obligation.  I don't see

5   anything in the history that indicates that there were

6   across-the-board age restrictions.  There were restrictions

7   based upon a person's mental capacities.  So you might find

8   statutes at the founding that indicated that lunatics and

9   feeble people were not able to -- were not given arms.  But

10  that --

11          THE COURT:  I guess this brings me back to my original

12  question about, you know, why are you endorsing looking

13  exclusively at the founding?  If there were no age restrictions

14  at the founding, that would suggest that -- I mean using your

15  logic, that would mean that any age restriction is

16  unconstitutional now.

17          MR. O'GRADY:  I appreciate the Court's point.  I think

18  that if you take a look at the *Reese* decision there's a

19  discussion in there with regard to individual rights that we

20  have.  The First Amendment and the -- and the Second Amendment

21  are ones that we will look at.

22          Are there First Amendment rights for people who are 15

23  in high school?  Yes.

24          Are they the full panoply of rights that an

25  18-year-old has?  No.

1          So, could there be some restrictions necessarily the

2    younger that a person goes.  A 12-year-old might have First

3    Amendment rights but not nearly as much as a 17-year-old

4    12th-grader.  But again, once you reach the age where you are

5    an adult, then you have all of your rights.

6          And again, the framers knew how to put limitations on

7    age.  An 18-year-old had an individual right to self-defense,

8    which is the core purpose of the Second Amendment so he can

9    keep and bear arms, but he was not able to become a United

10   States representative until he met the mandatory age as stated

11   in the Constitution, nor the president.  Those are reasons that

12   they put them in there.  They did not put them in with regard

13   to the Fourth Amendment, with regard to the First Amendment,

14   with regard to the Second Amendment.  So individuals have those

15   rights.

16          Practically, there might have been when someone is

17   standing in the parents' position that they are able to

18   exercise more authority over that person, a 12-year-old, a

19   15-year-old, a 17-year-old.  But that didn't stop the

20   17-year-old or the 18-year-old or the 19-year-old from having

21   his own arms to bring to militia, to become accustomed with and

22   to have for self-defense, which is the core of the Second

23   Amendment.

24          THE COURT:  Let me ask you kind of something related

25   to that.  Don't the militia laws also obligate parents to

1    provide their children with firearms?

2                MR. O'GRADY:  No.  And the *Reese* court --

3                THE COURT:  At least for militia service.

4                MR. O'GRADY:  No.  And the *Reese* court addressed this.

5    It said -- if I may have a moment.  I don't believe this was

6    one of the pinpoints I indicated yesterday.

7                But it said that -- it said that the statutes in

8    question, which were not all of the statutes, and frequently it

9    was that the militia member brought his own arms and it was not

10   necessarily the requirement the parents provide the arms.  But

11   it said that the -- the way the statutes, the Militia Act and

12   other statutes were read, it could be equally that a person --

13   a parent will provide the arm.  This is at the bottom of

14   Page 22:  They just as readily implied that 18 to 20-years-olds

15   were expected to keep and bear arms even if provided by

16   parents.  It's at the bottom of Page 22 of the opinion that we

17   provided yesterday.

18               So, it might be that there was a Militia Act here and

19   there that said a parent can provide and will provide if the

20   militia member himself is unable to.  But that doesn't mean

21   that the militia members themselves were prohibited from

22   acquiring, owning and possessing arms, and becoming familiar

23   and accustomed with them before they had to appear for militia

24   drill.

25               THE COURT:  One second, I just got to Page 22.

1           MR. O'GRADY:  Yes, Judge.  It's right at the bottom.

2           THE COURT:  Thank you.

3           MR. O'GRADY:  Yes, Judge.

4           THE COURT:  One of the other questions I have is

5     whether or not you would agree that legislatures don't

6     typically enact laws to address problems that do not exist.

7           MR. O'GRADY:  Well, that might be so.  However, the

8     problem of people who are not exercising proper judgment,

9     whether they be 15, 19 or 45, and get arrested, is not

10    something that is new.  That people exercise poor judgment no

11    matter what their age is something that legislators have always

12    had to deal with.  And whether the arms be knives, swords,

13    muskets, firearms, revolvers, or semiautomatic magazine-fed

14    pistols, the question is the same; whether or not the person is

15    going to commit a crime.  Whether or not the person has the

16    judgment to not commit that crime.

17          So, the reason that they didn't is because -- I'm sure

18    there were criminal acts back then -- they just did not have, I

19    don't think, the authority because all of these people age 18

20    to 20 were armed.  That was the pervasive history.

21          THE COURT:  Well, I don't know that the historical

22    record shows that all these people aged 18 to 20 were armed.  I

23    would be curious to know your answer to the question of, look,

24    during reconstruction or after the point at which there was

25    greater industrialization and urbanization in our country, then

 1   this problem of youths possessing firearms and getting into

 2   trouble suddenly arose, right?  And in response a lot of states

 3   and municipalities enacted laws to address that.  And

 4   ultimately, years and years and decades and decades went by

 5   without anybody challenging the constitutionality of those laws

 6   that restricted sale, transfer to 18 to 20-year-olds.

 7        So I'm curious to know how you respond to that, the

 8   fact that there had been no real constitutional challenges, you

 9   know, after the Fourteenth Amendment was passed, to those laws

10   restricting the sale and transfer to 18 to 20-year-olds.

11        MR. O'GRADY:  So that legislators perhaps in the early

12   part of the 20th century, perhaps in the late 1890s and such,

13   enacted a variety of laws that no one had taken the time to

14   challenge does not mean, according to the United States Supreme

15   Court, that it changed the meaning from 1791 as understood in

16   1791 and immediately thereafter.  And even the reconstruction

17   statutes of the Fourteenth Amendment don't really change that.

18   That states then began to encroach upon the Second Amendment

19   doesn't mean that -- it doesn't change those laws into

20   constitutional laws.  It means that they began to encroach upon

21   them and no one has challenged them.  So I don't think it

22   changes the meaning.

23        And the language that I used, I know you said that

24   there may not be proof of a lot of people carrying arms back

25   then.  The pervasive, germane history language is something

1    that I pulled from reading *Reese* last night which the Fifth

2    Circuit said there was pervasive and germane history in the

3    tradition of 18 to 20-year-olds possessing and having firearms.

4    And I would submit because the Second Amendment was written to

5    protect the individual right to keep and bear arms such that if

6    necessary one might be called up to a militia, that they were

7    supposed to not only keep and bear them, but they were supposed

8    to be accustomed and well trained with them.  And that was

9    their own responsibility irrespective of whether or not they

10   were actually ever called up into the militia.

11        THE COURT:  Would you agree that the militia laws

12   though were written to address a different problem than the

13   problem of interpersonal gun violence?

14        MR. O'GRADY:  No.  I think *Heller* and *Bruen* indicate

15   that the core, central component of the Second Amendment is

16   self-defense and that the militia laws were part of

17   self-defense and they were written, yes, to assist either the

18   localities or the sovereign in defending.  But the purpose of

19   the Second Amendment at its core is individual self-defense.

20        THE COURT:  I'm not saying the Second Amendment, I'm

21   talking about the militia itself, the militia laws themselves

22   that talk about, for example, parents needing to provide their

23   children with firearms.  I mean the purpose of the militia was

24   a common defense; would you agree with that?

25        MR. O'GRADY:  Yes.

1          THE COURT:  Okay.  Whereas the laws in the

2    reconstruction related to prohibiting that same behavior of

3    maybe transferring firearms to 18 to 20-year-olds, but the

4    purpose of those laws was something different, that it was to

5    prevent interpersonal gun violence.

6          MR. O'GRADY:  So the laws that were passed after

7    reconstruction were designed to -- with a focus on criminal

8    prevention, yes.  I think, though, that if you look at them,

9    and I would direct the Court, I only had an hour or so last

10   night to look, but as I was looking through the exhibits, I

11   noticed that many of the statutes that were attached by the

12   defendant, several of them only deal with acts.  That is,

13   discharge of firearms in particular places and such, and acts

14   of discharge by minors.

15         There are some of them that deal with selling or

16   giving or lending a firearm.  Typically it was pistols and

17   concealable weapons.  And frequently the ages in the 1800s were

18   quite young.  They were 16 and such.  It didn't become 18 to 20

19   until later and then there are far fewer of all the statutes

20   that they provided in there that do that.

21         So, I think that at that point, going back to your

22   original question of do we look at reconstruction or do we look

23   at 1791.  I think that you will see that as reconstruction goes

24   on, they attempted to encroach upon it slowly.  Prior to the

25   mid-1800s there didn't seem to be any restriction on giving,

1    say, a 14-year-old a rifle or a musket or a pistol, but then by

2    the time the late 1890s come around you have a couple of states

3    and municipalities that are stopping people without the consent

4    of the parents from giving a pistol, not all guns, not long

5    guns, to minors under the age of 18, and sometimes 16 and 15.

6    That's -- it slowly crept up, this concept of 21 and up, as

7    indicated by the *Reese* court, at least at the federal level,

8    was a very recent 20th century invention.

9         And again, it was geared towards, yes, criminal

10   violence as opposed to the militia, but the 18 to 20 -- the

11   21-year-old bar on pistols at the federal level is a very

12   recent design.  Hawaii's statute goes far beyond that.  You

13   cannot give a 19-year-old a hunting rifle.  You cannot give him

14   a shotgun.  He cannot go down and acquire a long gun.  Federal

15   law does not stop him from buying a shotgun for home defense or

16   for shooting quail or anything else like that.  State law,

17   which is what we're challenging, stops that 19-year-old from

18   acquiring a rifle or a shotgun.

19        THE COURT:  All right.  Thank you.  Mr. O'Grady, I

20   don't have any other questions, but if you want to make further

21   argument, you can.

22        MR. O'GRADY:  Briefly, Judge, I think that I will

23   point briefly to the supplemental authority we submitted.  I

24   think it is without question that the 18 to 20-year-olds are

25   the people and you cannot break it down into a subset.  And

1   that is, you cannot start to excise people according to their

2   age.  And so I think that the 18 to 20-year-olds at the

3   founding had the same Second Amendment rights as their

4   20-year-old compatriots.  And I think that's the same now.  The

5   fact that some governments have encroached upon it recently,

6   and Hawaii very recently, to the age of 21 and up does not make

7   it constitutional because we have to look back at 1791 and what

8   even in 1865 they were thinking 1791 meant with regard to the

9   scope and breadth of the Second Amendment.

10          THE COURT:  All right.  Thank you.  You'll obviously

11  have time for rebuttal as well.

12          MR. O'GRADY:  Yes, thank you.

13          THE COURT:  Mr. Letter?

14          MR. LETTER:  Morning, Your Honor.

15          THE COURT:  Good morning.

16          MR. LETTER:  I will -- my plan is to address your

17  various questions.  You've demonstrated you did your homework

18  and are fully up on the issues here.

19          I did want to start though with one point, with your

20  indulgence, which is, please remember that we are here on

21  merely a preliminary injunction, and not just any old

22  preliminary injunction but a request for a mandatory

23  preliminary injunction.  And that is something, as you know, is

24  very unusual and a heightened standard.  And so this is

25  something that at all times must be -- be kept in mind.  We

1    obviously can brief fully the merits --

2          THE COURT:  Right.

3          MR. LETTER:  -- et cetera, at a later stage.  Thank

4    you, Your Honor.

5          THE COURT:  Let me ask you a question, kind of leaving

6    off where Mr. O'Grady did.  And this is something I've been

7    wrestling with in looking at the Hawaii statutes.  And it's

8    kind of ironic given that *Heller* says that pistols are the

9    quintessential self-defense firearm.

10         So, the Hawaii statutes, it seems to me, cover all

11    firearms, whereas if you look at the Reconstruction Era's

12    cases -- excuse me, laws, they cover, for example, the transfer

13    of handguns to people under 21.  And I'm curious to know how

14    you think I should handle the fact that those laws banned a

15    broad range of arms, but not all firearms.  And also how I

16    should handle the fact that those laws dealt with the sale and

17    transfer and gifting in some instance of firearms as opposed to

18    possession, which Hawaii does.  And then I'll -- I wanted to

19    start there because that's where we left off with Mr. O'Grady,

20    and then I'll get back to the question, the original question

21    of which era do I look at.

22         MR. LETTER:  Certainly, Your Honor.  So, I'll start

23    the answer with reminding you what the Supreme Court most

24    recently said in *Rahimi*, which is remember, the law is not

25    frozen in amber.  The *Rahimi* decision was an eight-to-one

1    decision, Justice Thomas the lone decent, and the justices

2    there, all of the other justices made clear that this was an

3    essential part of the way the Second Amendment was to be

4    interpreted.  It's not frozen in amber.

5         What this means is we do need to look at what is the

6    problem that the legislatures are identifying --

7         THE COURT:  That's the why.  And I get that you are --

8    you have a stronger point on the why, but the how, I think, is

9    the real question here.

10        MR. LETTER:  Right.

11        THE COURT:  With regard to Hawaii statutes.  So tell

12   me why you are able to meet the how.

13        MR. LETTER:  The why and the how here, not -- might

14   not be in all cases, but here are inextricably linked because

15   Your Honor asked a key question that we have raised, which is,

16   we don't expect the legislature to legislate necessarily if

17   there isn't a problem.

18        So, throughout our history, in the early years as our

19   experts Mr. Spitzer and Mr. Klarevas and Mr. Cornell point out,

20   handguns were not a problem.  Pistols were highly inaccurate.

21   They weren't particularly owned broadly, et cetera.  You

22   couldn't -- by the way, with all these, you couldn't store

23   them, you couldn't have a loaded gun that you stored, carried

24   with you constantly and stored in your house because the powder

25   would degrade and destroy the weapon.  They were all single

1    shot, it took forever to load them, et cetera.

2            So, in those years if there was going to be any

3    legislation, and that carries through, remember revolvers don't

4    really become an issue until the 1840s, 1850s.  Repeating

5    rifles are not even in the civilian context until the 1870s or

6    so and later.

7            When this starts to become a problem with the -- and

8    worries about mass murder, it's machine guns.  And in the

9    wake -- automatic weapons in the wake of the St. Valentine's

10   Day Massacre, you know, Al Capone, et cetera, that era, that's

11   when Congress says no automatic weapons, we're not having

12   those.  And Justice Scalia, et cetera, all -- I'm sure you've

13   noticed in *Heller* and *Bruen* say, of course we're not

14   questioning that.

15           So that's why I say, I think the how and the why are

16   inextricably linked because the how, the problem changes with

17   the technology.  And that's when, you know -- and again, Chief

18   Justice Roberts makes clear in *Rahimi,* but it's in the other

19   opinions, too, that's when you as a court are responsible for

20   doing a more nuanced analysis.

21           So I hope that addresses your question, Your Honor.

22   As I say, I think it's -- that the laws respond to the problems

23   at the time as they are perceived and that's -- and that --

24           THE COURT:  Well, I guess what I need some

25   clarification on from you then is, are you saying that the

```
 1    problems that were -- that we face now are different from the
 2    problems during the Reconstruction Era?
 3             MR. LETTER:  Absolute, Your Honor.
 4             THE COURT:  Okay.  But nothing -- you haven't provided
 5    me any reason to look at more current eras than the
 6    Reconstruction Era.
 7             MR. LETTER:  Yes.  And, Your Honor, this is -- this is
 8    exactly where the Rahimi language is key.  Not frozen in amber.
 9    We have to look -- we have to provide a more nuanced analysis
10    when we're dealing with new problems and new technologies.  New
11    problems, that's where Dr. Cauffman's declaration that you have
12    is so important.  And that ties in with the Supreme Court's
13    Miller opinion, the most recent opinion where the Supreme Court
14    said you can't have life without parole sentences for people
15    under a certain age because our understanding of brain
16    development has changed immensely over the years.  And so now
17    there's a recognition that minors -- that people who are
18    mid-adolescent, 18 to 20-year-olds, it makes very good sense to
19    treat them differently.
20             And so that's what the Hawaii legislature has done
21    here.  And again, that ties in with the technology, what are
22    the weapons.  And that also, again, ties in with what we
23    provided to you by Mr. Klarevas, who said mass murders are a
24    relatively -- quite relatively new phenomenon, and those are
25    carried out overwhelmingly more percentage-wise by 18 to
```

1    20-year-olds than their -- their -- the makeup of the entire

2    population.

3          So that's why the Hawaii legislature recognized the

4    problem is not at all what it was in 1868.  It certainly wasn't

5    what it was in 1791.  It wasn't even what it was in 1920, 1950.

6    We know so much more now.

7          THE COURT:  Is there any case that you can cite to

8    that gives me the authority to look at the modern record?

9          MR. LETTER:  Yes, Your Honor.  The Supreme Court in --

10   says -- I believe it says it in *Heller*, but it definitely --

11         THE COURT:  I'm sorry, go ahead.

12         MR. LETTER:  No, I'm sorry, I'll wait.

13         THE COURT:  I assumed that you were going to talk

14   about something other than the Second Amendment.

15         MR. LETTER:  Oh, no, no, I was going to talk about the

16   Second Amendment.  I'm sorry.

17         THE COURT:  Okay.

18         MR. LETTER:  *Bruen*, the court says, of course we can

19   look at other history, as long as it doesn't contradict the

20   prior.  The Supreme Court expressly says that.  I don't have a

21   page to tell you but it's there.

22         And so the Supreme Court, and again, *Rahimi* says,

23   we're not locked in to 1791 and 1868.  Other history can be

24   relevant --

25         THE COURT:  But the other history that all courts have

 1    looked at has, it seems to me, been primarily limited to the

 2    Reconstruction Era and the passage of the Fourteenth Amendment

 3    because you look at the ratification.  And so help me

 4    understand why -- I understand what you say *Rahimi* says and I

 5    understand why you're making that argument, but can you point

 6    me to any post-*Rahimi* cases or language in *Rahimi* itself that

 7    could suggest that I would look at a more modern era, more

 8    recent than the Reconstruction Era?

 9            MR. LETTER:  I got the perfect two cases for you,

10    *Heller* and *Bruen,* because remember I said a little while ago,

11    the Supreme Court said expressly, Justice Scalia said, of

12    course we're not talking about machine -- you know, the

13    regulation of machine guns, et cetera, that's clearly fine.

14            Well, why is that?  The justices said, that is

15    obvious.  And I assume Mr. O'Grady is not going to in any way

16    attempt to argue against that.

17            Well, that law was passed in, I believe, 1938.  And

18    the Supreme Court said, well, yeah, of course that's fine.  The

19    Supreme Court didn't go into any kind of analysis about, well,

20    were there any similar things, when were Gatling guns first

21    available, et cetera.

22            So that's an example where the Supreme Court has

23    100 percent blessed a statute that is nowhere near the time

24    when the Second and the Fourteenth Amendment were passed.  And

25    I think not surprisingly, the justices are exercising a massive

1    amount of common sense there, and so that ties in completely

2    with it.  Obviously you are allowed to look at 1938.  There's

3    no reason therefore why you can't look at more recent statutes.

4            Let me emphasize again, the Supreme Court said that's

5    fine, as long as it doesn't contradict earlier laws.

6            And by the way, on that, a number of points to make in

7    response to your earlier questions.  The Supreme Court said,

8    said it in both *Heller* and *Bruen*, that the constitutional

9    rights are enshrined with the scope they were understood to

10   have when they were passed.  So, that tells us that the Supreme

11   Court justices want themselves and the other judges, federal

12   judges to be aware of the context.

13           So, that's why we spent so much time in declarations

14   by Mr. Cornell and Mr. Spitzer telling you what the history was

15   at the time that the Second and the Fourteenth Amendments.

16           THE COURT:  So looking at *Heller*, basically what it

17   looks like *Heller* was talking about was specifically that --

18   and this is not a quote -- this is from the headnotes

19   honestly -- said a limitation on the right to keep and carry

20   arms is that the sorts of weapons protected by the Second

21   Amendment are those in common use at the time.  Right?

22           The firearms that are at issue with regard to Hawaii

23   law were in common use arguably at the reconstruction.  Right?

24           MR. LETTER:  In the -- not necessarily.  For instance,

25   semiautomatic and automatic weapons were not --

1                    THE COURT:  I mean we've put --

2                    MR. LETTER:  Yeah.

3                    THE COURT:  We've talked about that.

4                    MR. LETTER:  But largely, yes.

5                    THE COURT:  So I guess my question is, why does *Heller*

6       tell me I can look at the Modern Era when *Heller* is

7       specifically talking about the types of guns in common use at

8       the time?

9                    MR. LETTER:  Right.

10                   THE COURT:  And that those same guns were in common

11      use in the Reconstruction Era.

12                   MR. LETTER:  Exactly.  And by the way, if I could,

13      because we think this is really important.  Remember, it's not

14      just, you know, were in common use, were in common use for

15      lawful self-defense.  So that's an absolutely key part of the

16      *Heller* and *Bruen* and the intervening decision involving -- out

17      of Chicago by the Supreme Court.  But it's lawful -- using

18      lawful self-defense.

19                   So I'd have to keep coming back to Justice Scalia said

20      absolutely clearly what wasn't even developed until well after

21      reconstruction, of course we can -- Congress can ban machine

22      guns.

23                   THE COURT:  Right, but isn't that a different question

24      than an age restriction?  Isn't a type restriction different

25      than an age restriction?

```
 1          MR. LETTER:  I don't think so, Your Honor, and here's
 2   why, and this gets back to the why.  And I've got two aspects
 3   to this answer, which is the how and the why.  What -- what
 4   problem is the legislature addressing?  And again, that's where
 5   what Mr. Klarevas and Dr. Cauffman -- why we submitted those
 6   declarations to you, because they tell you, we now understand
 7   there is a major problem with mass murders by people who were
 8   under 21.
 9          And I thought, you know, there was a very key
10   admission by my friend Mr. O'Grady when you asked him about,
11   okay, so any?  Any age?  That can't possibly be the law.  You
12   know, they reference Thomas Jefferson at ten years old.
13   Interesting story.  So I guess that means they're arguing that,
14   yeah, ten-year-olds, it's a constitutional right.  There is
15   nothing in the wording of the Second or Fourteenth Amendments
16   that says that the legislature can draw distinctions.
17          Well, there's a major jurisprudential problem with
18   that analysis, which is, if you look at, for example, the
19   modern decisions from the Supreme Court involving marriage
20   rights and intimate sexual relations.  And the reason I'm
21   bringing those up is the Supreme Court, explained by Justice
22   Kennedy, he said those are like the right to bear arms.  Those
23   preceded the Constitution.  They come from somewhere else.
24   They're recognized in the Fifth, the Fourteenth, and the Ninth
25   Amendments.  And so those are absolute -- those are rights to
```

```
 1    marry and for intimate relations.  Supreme Court quite clear
 2    about that.  And yet both of those are heavily regulated by
 3    age.  And surely nobody would think, nobody would argue,
 4    including --
 5            THE COURT:  Did you make that argument in your moving
 6    papers, in your materials here?
 7            MR. LETTER:  We didn't, Your Honor.  We had 25 pages
 8    to cover things and -- and so we couldn't cover everything in
 9    that small amount of pages.
10            THE COURT:  Let me get to kind of the central question
11    for you then.
12            MR. LETTER:  Yes.
13            THE COURT:  Which is, would you agree with me that if
14    I agree with Mr. O'Grady that I look only to the founding, then
15    you have a losing argument?
16            MR. LETTER:  No, Your Honor.
17            THE COURT:  Okay.  Help me understand why.
18            MR. LETTER:  Because of what I said before that in
19    both *Heller* and *Bruen* the Supreme Court said, Justices Scalia
20    and Thomas for the court said, We look at the understanding of
21    these rights when those amendments were passed.  So let's focus
22    on the Second Amendment.
23            At that time, as our declarations explain, nobody
24    would have thought that somebody under 21 had a constitutional
25    right, not responsibilities like the militia, nobody would have
```

1  thought that they had constitutional rights to bear arms.

2         THE COURT:  How do you respond to the argument of,

3  well, look, of course they did if they were allowed to carry

4  them.  And I think the modern day version of that would be why

5  would we limit the possession of firearms to people who we ask

6  to serve in defense of our country?  So, how do you respond to

7  that?

8         MR. LETTER:  Your Honor, obviously militia service or

9  if you're currently in the, you know, United States military, I

10  think you can be even 17 in the United States military with

11  parental permission, you're under military discipline.  In

12  fact, if you behave wrongly, you can even be executed under

13  military discipline.  So you are under the command of -- at all

14  times military discipline under officers who command the

15  militia, who command the regular Armed Forces.  You're not out

16  laundering the streets with your gun.

17         And, for example, as we know, the military now and the

18  militia now, the equivalent, you know, the National Guard, et

19  cetera, they're using automatic high-powered assault rifles.

20  Again, we think nobody could possibly argue that, oh, well, if

21  somebody in the -- you know, in the middle of combat at

22  Afghanistan has a high-powered assault rifle, that means that

23  person gets to have that in the civilian context.  That would

24  make no sense at all.

25         So, the militia, they had a responsibility to serve,

1    but there's no way that that means and therefore you have a

2    right, a constitutional right to behave in regular life as if

3    you were constantly in the militia.

4            In addition, so much of what we provided to Your Honor

5    shows that the militia, they still were considered infants --

6    and I know that word today, we would use that completely

7    differently, but what we provided to you says, no, no, they

8    were considered infants and their parents were responsible for

9    providing the weaponry.  And I'll say it again, they were under

10   military discipline when they were in the militia.  And they

11   were in the militia because they were needed.  When they

12   weren't needed, various states, I think you referred to this,

13   said, we only want 18, 19, 20-year-olds when we really, really,

14   need them, like, you know, we're under a major invasion,

15   attack, et cetera.  So, the fact that they served in the

16   militia doesn't tell us anything about their asserted

17   constitutional rights.

18           THE COURT:  In looking at the circuits that have ruled

19   on this without vacating their opinions or -- for en banc

20   review, and maybe I'm counting this wrong, but am I right that

21   the Tenth Circuit would have ruled in your favor but based on a

22   different theory, right, that the -- if I'm remembering

23   correctly, that the 18 to 20-year-olds were not part of the

24   people?

25           MR. LETTER:  I believe that that is correct, Your

1   Honor.

2          THE COURT:  Do you have any case law from any circuit

3   that says the militia laws are really just a sign of what an --

4   represent an obligation and not a right?

5          MR. LETTER:  I'm not aware of any opinions, Your

6   Honor.  When the argument is over let me check that and if

7   there is, we'll let you know.  I'm not aware off the top of my

8   head.

9          On that point, if I may, I did want to mention because

10  the *Reese* decision is so recent, we checked overnight in my

11  office, did some very quick work and we looked at the docket.

12  And the Fifth Circuit did not have in front of it the

13  information, the updated information that we had provided to

14  you about treatment of infants, treatment of militia, et

15  cetera.  Those four declarations are in front of you.  They

16  were not before the Fifth Circuit.  There were some references

17  to scholarly articles but not signed and sworn declarations

18  that were submitted.  So the Fifth Circuit did not have this

19  key and important information that you now do.

20         I want to, with your permission, just throw in an

21  aside.  It's not for much discussion now, but obviously in a

22  way all of this is -- seems very strange on how we apply it to,

23  you know, the State of Hawaii given its history that is so

24  different from, for example, you know, 1750, '60s, '70s, you

25  know, in Virginia and Massachusetts.  But I'm going to leave

1    that argument for a different day.

2            THE COURT:  Sorry, one moment.

3            MR. LETTER:  Yes.

4            THE COURT:  I am looking at *Rocky Mountain Gun Owners*

5    and I was incorrect.  It's not that the Tenth Circuit

6    considered them not part of the people, it's that the Tenth

7    Circuit concluded that the regulations there fell within the

8    safe harbor.

9            MR. LETTER:  Okay.  So the argument not within the

10   people -- considered within the people, that can't mean what

11   Mr. O'Grady says it does because Mr. O'Grady seems to say if

12   you have constitutional rights, you're within the people.  But

13   we know that's wrong because, for instance, people who've

14   committed felonies, people who have serious mental or emotional

15   issues, they're all still within the people in a broad sense.

16   They're protected by the U.S. Constitution.  People who -- gays

17   and want to marry or have sexual relations, they're all part of

18   the people and they have constitutionally protected rights, but

19   that doesn't mean that the legislature cannot respond to modern

20   very, very serious public safety problems and -- and issue

21   restrictions.  And so the -- it means for the purposes of

22   Second Amendment jurisprudence, the Supreme Court has told us,

23   the people can be restricted.  Mr. *Rahimi*, for example, he

24   still has constitutional rights.  He has --

25           THE COURT:  Wait, so are you saying that 18 to

1    20-year-olds are part of the people now?

2              MR. LETTER:  Not for purposes of the Second Amendment

3    jurisprudence.

4              THE COURT:  How can that be if they're part of the

5    people for the First Amendment and the Fourth Amendment?

6              MR. LETTER:  They are -- because what I'm saying is,

7    again, I think the most obvious example is Mr. *Rahimi.*

8    Mr. *Rahimi* has the right not to be -- self-incrimination.  He

9    has the right against cruel and unusual punishment.  He may

10   indeed later have the right to vote because many states are

11   restoring rights to vote for felons, et cetera.

12             But as we know, he doesn't have -- the Supreme Court

13   told us, he does not have a Second Amendment right to have a

14   gun right now because he's under a domestic abuse order.  But,

15   again, he clearly still has all sorts of --

16             THE COURT:  So he falls in and out of the people?

17             MR. O'GRADY:  Yeah, we know that.  Again, that's what

18   the Supreme Court has told us.  So, I'm saying for purposes of

19   this Second Amendment analysis, because of the status of

20   infants when the Second and Fourteenth Amendments were

21   ratified, they're not part of the people covered by that.

22             And, again, let me just emphasize about Mr. *Rahimi.*

23   When the Second Amendment was ratified, we filed an amicus

24   brief and the Supreme Court pointed this out, there were no

25   such things as domestic abuse orders.  There were none.  And

1  yet, the Supreme Court had no problem whatsoever in *Rahimi* in

2  saying, of course we can take guns away from people like

3  Mr. Rahimi who has a domestic abuse order against him, that

4  therefore the U.S. Congress was perfectly authorized to

5  issue -- to put that restriction in the Gun Control Act.

6      THE COURT:  Let me kind of get back to where we

7  originally started and ask you, Mr. Letter, if I think you're

8  wrong in terms of that I can look at the Modern Era.  And I

9  think -- you know, I think Mr. O'Grady has some good points

10  against this, but let's say I decide that I can look at the

11  Reconstruction Era.  Are you conceding that the state's ban on

12  all firearms is broader than the Reconstruction Era's bans that

13  primarily focused on pistols?

14      MR. LETTER:  I need to ask you, when you say am I

15  conceding, I'm certainly conceding the regulations are

16  different.  As I say, there was no regulation of machine guns

17  in 1868, but we know from the Supreme Court that that's okay,

18  you can still ban machine guns.

19      And so no, we still win because we know what -- how

20  infants, how 18 to 20-year-olds were regarded by society.  So

21  when the Second and Fourteenth Amendments were ratified, what

22  we're saying is everybody understood that 18 to 20-year-olds

23  were not within the group who would therefore have unrestricted

24  access to firearms because the society around them so

25  universally treated people in that age group differently, just

```
 1    like we surely didn't need a law that said nine-year-olds
 2    cannot have pistols in 1789 or -- I mean 1791 or 1869, and for
 3    the reason that, well, because everybody knew when those
 4    were -- those amendments were ratified that nine-year-old --
 5    nobody would have thought that, of course nine-year-olds have a
 6    constitutional right to a firearm.
 7              THE COURT:  All right.
 8              MR. LETTER:  So I hope that -- I hope I am responding.
 9              THE COURT:  That does answer my question.  I don't
10    have any other questions, Mr. Letter, but if you wish to make
11    more argument, you may.
12              MR. LETTER:  I will, if Your Honor will give me one
13    moment just to look at the list of notes that I jotted down
14    when you were talking to my friend, Mr. O'Grady.
15              Oh, Your Honor, could we just -- I just wanted to
16    re-emphasize the points in our declarations that we've
17    submitted to you about colleges.  And when 18 to 20-year-olds
18    were in college, they were in loco parentis, the college
19    administrators were acting as if they were the parents.  And it
20    wasn't just you can't have guns on campus, it was you can't
21    have guns.  That's fully discussed in the Spitzer and Cornell
22    declarations.
23              THE COURT:  Do any of those college rules relate to a
24    particular age range?
25              MR. LETTER:  No.  They related to students, many of
```

1  whom would have been 18 to 20.  Some of them obviously would

2  have been older.  Probably not many would have been older

3  because at that age -- at that stage most people over 21

4  wouldn't have been --

5          THE COURT:  So are you saying that the regulation

6  prohibited them from possessing firearms even off campus?

7          MR. LETTER:  Yeah.  Oh, yes, absolutely.  That is

8  addressed directly in both of those declarations.  Because we

9  knew this argument would be made.  And so they would say no,

10  you can't have them anywhere in the town.  It's definitely

11  addressed in those declarations.

12          THE COURT:  And one -- one question that came to mind

13  is with regard to the transfer limitations, the limitations on

14  transfer during the Reconstruction Era, why is the transfer a

15  good historical analog for -- why are laws banning the transfer

16  of firearms a good historical analog for the Hawaii laws that

17  basically prohibit the possession?

18          MR. LETTER:  Because I think part of that would have

19  been the fact that even during Reconstruction Era, we were

20  talking very heavily about people who were 18 to 20-year-olds

21  who were still rural.  An immense percentage of them would have

22  been working on the farm.  And so they would have been -- and,

23  and in a patriarchal society, they and their mothers all were

24  subject to the rule, basically, of at that time, you know, the

25  King, the father in the family.  And so it's not clear -- and

 1    these 18 to 20-year-olds wouldn't be able to -- they wouldn't

 2    have the cash, it was not a cash economy.

 3            THE COURT:  Sorry, I'm talking about the

 4    Reconstruction Era.

 5            MR. LETTER:  Right.

 6            THE COURT:  So -- so --

 7            MR. LETTER:  It's still -- it's still a heavily rural

 8    society.

 9            THE COURT:  I thought the big argument that your

10    experts make is that the urbanization of the United States at

11    the reconstruction caused there to be a greater influx of youth

12    onto the streets that warranted the restriction?

13            MR. LETTER:  Right.  So this had begun happening in

14    part because the slaves had been freed and so you suddenly had

15    a whole batch of -- of labor that began moving north because

16    they didn't own their own farms.  They were no longer tied to

17    plantations, they didn't own necessarily their own property, et

18    cetera.  And the nation was in the midst of changing, but it

19    still wasn't -- it still -- we still had an enormous percentage

20    of infants or children who were directly under the control of

21    their fathers.

22            THE COURT:  All right.  So, I guess the bottom line

23    question then is why is a transfer ban a historical analog for

24    a possession ban?

25            MR. LETTER:  Because I -- I believe that the

 1    assumption at the time would have been if we're banning

 2    transfer, then we're banning almost all possession because

 3    otherwise they would have to get the guns from somewhere.  So

 4    one possibility would be they inherit them.  But even

 5    inheritance is a transfer.  So, even at that time, I think they

 6    would have been considered almost identical because where would

 7    an 18-year-old at that time have -- get a weapon otherwise if

 8    they weren't purchasing them?  Somebody transferring the gun to

 9    them.  So, the number of people you would have been affecting

10    would have been very, very small.

11           You did have some militia.  You know, Reconstruction

12    Era is coming right at the end of the Civil War when an immense

13    number of young men were directly in the Army itself.  There

14    were still militias.  I think at that time the militias would

15    have been almost entirely old men because the young men were in

16    the Army.

17           THE COURT:  All right.  Anything else, Mr. Letter?

18           MR. LETTER:  I don't believe so.  Your Honor, let me

19    just look at my colleagues for one second.

20           THE COURT:  Yes, take your time.

21           MR. LETTER:  Nothing.  Thank you.

22           THE COURT:  All right.  Thank you.  Mr. O'Grady.

23           MR. O'GRADY:  Yes, Judge.

24           THE COURT:  I'm sorry.  If we could start off where we

25    left off on this transfer versus possession discussion.  How

 1    would you respond to Mr. Letter's argument of, well,

 2    transfer -- a ban on transfers is historically analogous to a

 3    possession ban because how else would somebody obtain a firearm

 4    under the age of 21.

 5            MR. O'GRADY:  So I would disagree most assuredly as

 6    not -- and if you take a look at several of the statutes --

 7            THE COURT:  Sorry, can you pull the microphone closer

 8    to you?

 9            MR. O'GRADY:  Sure.  I apologize.

10            It is most assuredly not the same.  If you take a look

11    at a lot of the statutes that were attached to some of their

12    exhibits -- and I'll just say something outside right now, it

13    is our request that you ignore the declarations.  You can look

14    at the laws and that's what the Court should be doing.

15            But if you take a look at a lot of the laws, they used

16    a lot of language that the legislatures knew how to use about

17    give, sell, deliver.  They very well covered that.  They

18    certainly knew what the word "possession" was.  Because where

19    there is a statute or two that mentions possession, that's

20    included in there, if they wanted to.  But the vast majority

21    spoke about giving or delivering.

22            With regard to how one acquires it, it's very simple.

23    I will give an example that frequently happens here in Hawaii.

24    People on the Mainland who are 18 years old and they get a

25    hunting rifle from their father because in that state it's

```
 1   legal, they come here, it's suddenly illegal.  Not because it
 2   was transferred to them or was sold to them or is delivered to
 3   them or lended to them, it's because they possess it.  That is
 4   much broader.  And the person who came here with their firearms
 5   at age 18 that they had had lawfully acquired through gift,
 6   inheritance or purchase by themselves when they were 18 on the
 7   Mainland and they come here, all of those are suddenly banned.
 8   He is a criminal for every single firearm and round of
 9   ammunition that he possesses.
10        I also understand that this is a reply or rebuttal,
11   Judge, but I would earnestly request an opportunity to cover a
12   wide variety of items that were raised by my colleague.  One of
13   them, I would like to make it clear right now that I most
14   certainly do not agree that the Hawaii -- I'm sorry, that the
15   United States Supreme Court, or Justice Scalia, or any member
16   of the court agreed that the machine gun laws that he
17   references in the 1930s are 100 percent okay and they were
18   blessed off on.
19        First, the language used in Heller was that they are
20   presumptively lawful and that they mentioned that they did not
21   go through an exhaustive analysis.
22        Secondly, it is not a ban.  You may own machine guns
23   in the United States if you pay a tax stamp on it.  And the
24   history involved with 1930's National Firearms Act which put a
25   tax on automatic weapons, which had existed in the 1800s, the
```

1    main concern at that time was whether or not it was going to

2    violate the Second Amendment even if it was only a tax.  And it

3    was not a complete ban.

4         So no, I do not agree that those things would be

5    banned and that the United States Supreme Court signed off on

6    them or blessed them.

7         You had asked about the questions regarding

8    technology -- with regard to technology and reconstruction.  I

9    think that a lot of my colleague's argument with regard to

10   brain development and some of his experts basically slides us

11   back into the argument that was dispensed with in *Heller* that

12   was addressed by I believe it was Justice Kennedy that the

13   legislators are allowed to say, well, things have changed, we

14   view people differently, and the sort of sliding scale of how

15   we can address criminal problems.  That was dispensed with in

16   *Heller*.  I don't think the Court should be looking at, well,

17   now we have people that examine 19-year-olds differently.

18        As I mentioned earlier when I was standing up here

19   originally, there are 45-year-olds who exercise poor judgment.

20   That doesn't mean that we are now allowed to do anything about

21   that and say, well, generally poor judgment, we think a lot of

22   people in this state or in this county exercise poor judgment.

23   Right now there's a big argument with regard to how many people

24   use fireworks in this state.  There are those in the

25   legislature that say it's a horrible, horrible problem.  But if

1    you look up in the sky there are a great many people that are

2    doing it.  Do they all possess poor judgment?  Perhaps.

3    Perhaps the legislature thinks so.  Those aerials are already

4    illegal.

5            The point is the legislature is not allowed to just

6    use this generalized notion.  *Rahimi*, although it said a law

7    cannot be trapped in amber, it says that you have to have

8    individualized specific identification of persons.  You cannot

9    label an entire group 18 to 20 as being immature or

10   irresponsible and then just put a ban on any possession,

11   transfer, inheritance, gift.

12           THE COURT:  Where does it say that in *Rahimi?*

13           MR. O'GRADY:  I'm sorry?

14           THE COURT:  Where does it say that in *Rahimi?*

15           MR. O'GRADY:  I'm sorry, where does it say what

16   exactly?

17           THE COURT:  What you just said.  You just said *Rahimi*

18   says that you can't put a blanket stamp on group of people and

19   can't ban --

20           MR. O'GRADY:  I'd have to look at the quote.  It says

21   you cannot say -- there is a -- several paragraphs where it

22   said, The government has argued that general irresponsibility,

23   people who are irresponsible or not, quote, generally

24   law-abiding would be the kind of people that we would be able

25   to exclude from owning, possession, owning weapons.  And the

 1    *Rahimi* case said, no, that's too vague a concept, general

 2    irresponsibility.  And that's something that they dispensed

 3    with.  I'm sorry, I don't have the page number off the top of

 4    my head.

 5          THE COURT:  Well, then wouldn't that also support no

 6    age limit at all?

 7          MR. O'GRADY:  No, I think that -- I think that

 8    blending into --

 9          THE COURT:  I mean if that's the case, why would any

10    age limit be a problem?

11          MR. O'GRADY:  I think that it is going to be tied a

12    little bit more to whether or not the person has become an

13    adult and I think the question of majority is addressed in the

14    *Reese* opinion that I cited.  Also, I would like to point out to

15    the Court we are not arguing that there is no age limit.  We

16    are not arguing for 17-year-olds and 15-years-olds or

17    five-year-olds to be able to own or possess --

18          THE COURT:  I understand that, but some of the

19    rationale begs the question, though, right?

20          MR. O'GRADY:  Yes.  I will concede that, that it does

21    sort of beg the rationale.  But I don't think that the Court

22    need necessarily go that far in this case.  We are looking at

23    specifically 18 to 20-year-olds.  18 to 20-year-olds can vote,

24    they can marry, they are full members of the society.  And

25    under *Rahimi* there would have to be a specific judicial finding

1  after process, not of sliding scale of legislators attempting

2  to address something common, like criminality, for them to just

3  wipe out a huge section of the population.

4          My colleague indicated that nobody would have thought

5  that at the time of the founding that persons 18 to 20 had

6  Second Amendment rights.  But I think that the arguments that

7  we've submitted, the *Reese* case, and the authorities indicate

8  that nobody would have thought that in fact they could restrict

9  18 to 20-year-olds from having their own weapons, acquiring

10 their own weapons, and possessing their own weapons.

11         I would also like to direct the Court to -- since

12 we're talking about -- the Court is focused on reconstruction

13 versus the founding.  In the *Reese* matter on Page 6, the Court

14 quoted *Bruen*, indicating that a law may unconstitutionally

15 infringe on the right when it goes beyond what was done at the

16 founding.  And then again on Page 27 of that opinion, it quotes

17 Justice Barrett from, I believe, *Rahimi*, since my colleague

18 referenced *Rahimi* and the amber line, Justice Barrett -- this

19 is paragraph -- I'm sorry, the first full paragraph on the

20 page, Page 27:  For an originalist, the history that matters

21 most is the history surrounding the ratification of the text.

22 That backdrop illuminates the meaning of the enacted law.

23 History or tradition that long postdates ratification does not

24 serve that function.

25         So, I know you started off this morning, Your Honor,

1    asking about, well, is the focal point reconstruction or the

2    founding?  And I think my friend conceded, provided it does not

3    contradict what happened at the founding, you can look at a

4    later time.  Our point is that you should focus solely on 1791.

5    However we recognize in *Wolford* that there were other cases

6    that were looked at from reconstruction, and we recognize that

7    in this circuit, and we say, fine, to the extent it does not

8    contradict 1791.  And I think here the broad ban which is not

9    an exceptional circumstance.  And I believe in our complaint we

10   quoted *Bruen* -- sorry, excuse me.

11           That the right to carry cannot be restricted absent

12   exceptional circumstances -- and this is on Page 14 of our

13   complaint.  And that's citing the United States Supreme

14   Court -- if the general right to carry can only be restricted

15   in exceptional circumstances, and *Rahimi* tells us that usually

16   would require judicial act based upon a hearing of some sort

17   specific to an individual person, then we don't see how

18   Hawaii's laws which are a broad restriction -- sorry, ban on

19   the possession, ownership, transfer, acquisition, inheritance

20   of arms and ammunition could possibly meet the standards under

21   *Bruen*.

22           Sorry.  If I may have a moment, Judge.  I just want to

23   make sure I address --

24           THE COURT:  Take your time.

25                   (Pause in the proceedings.)

1            MR. O'GRADY:  Briefly.  With regard to the colleges,

2    there are a couple things to bear in mind.  First, I would

3    again request that you disregard any alleged experts' opinions

4    on the law.  And just as the United States Supreme Court has

5    directed, judges analogize, they look at the laws, we can see

6    what the laws were at the time.  I don't have them all

7    memorized with regard to my colleague's assertion that they

8    covered off-campus possession as well.  However, as the Court

9    pointed out, the age was not limited.  It was students who

10   attended the university, which means several things.

11           First of all, it did not cover all people and it did

12   not cover all 18 to 20-year-olds.  It only covered those people

13   who wanted to and did attend a particular college that had that

14   particular law.  And if it was a private institution, that is

15   different from a government ban on the possession, ownership,

16   transfer and all of the other items that we have here in

17   Hawaii.

18           Also, although my friend says that there might have

19   been people that were older in college, I think back in the

20   colonial times there were many individuals, I think it's

21   referenced in the complaint as well, that one of the Founding

22   Fathers joined the militia while he was in law school at age

23   18.  So he was already on to an advanced degree.  I don't know

24   if it was straight to law school back then, but I think there

25   were many a people who were attending college and speaking

1    Latin, which I never got the opportunity to do, at age 16.

2           So it may very well be that in order to, as the *Reese*

3    court said, the *Reese* court said, These were not to generally

4    disarm 18 to 20-year-olds because of criminality, it was to

5    focus their attention because they were in school.  And if you

6    had 16-year-olds at the time that were attending school and

7    they had firearms, it is possible that that might have

8    distracted them in some way.  They go out and they shoot and

9    they hunt and what have you.  It wasn't for criminality.  So I

10   think the purpose is different.

11          I think I've covered what my colleague raised.  I

12   would wait any questions that the Court may have.

13          THE COURT:  I don't have anything further.  Thank you.

14          MR. O'GRADY:  Thank you, Judge.

15          THE COURT:  All right.  Thank you.  Thank you,

16   everyone, for your argument this morning.

17          Mr. O'Grady, please let Mr. Beck know that we

18   understand the situation he was in.  It's unfortunate for him.

19          MR. O'GRADY:  Yes, Judge.

20          THE COURT:  That's got to be frustrating.

21          MR. O'GRADY:  It was sitting on the tarmac for

22   six-plus hours.

23          THE COURT:  That's unpleasant.  But thank you,

24   everyone, for your briefing and your argument this morning.  I

25   will endeavor to issue a ruling in a reasonable time frame.

1    Because the *Reese* case came out yesterday, we need a little bit

2    more time to look at it and kind of digest it.  I did read it

3    before today, but I haven't spent quite as much time as I had

4    the other cases.

5            So, thank you, everyone.  We are in recess.

6            (The proceedings concluded at 10:25 a.m.,

7    January 31, 2025.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    COURT REPORTER'S CERTIFICATE

2

3          I, CYNTHIA FAZIO, Official Court Reporter, United

4   States District Court, District of Hawaii, do hereby certify

5   that pursuant to 28 U.S.C. §753 the foregoing pages is a

6   complete, true, and correct transcript of the stenographically

7   reported proceedings held in the above-entitled matter and that

8   the transcript page format is in conformance with the

9   regulations of the Judicial Conference of the United States.

10          DATED at Honolulu, Hawaii, February 5, 2025.

11

12

13                          */s/ Cynthia Fazio*
                            CYNTHIA FAZIO, RMR, CRR, CRC
14

15

16

17

18

19

20

21

22

23

24

25