IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIJAH PINALES, ET AL.,<br><br>                  Plaintiffs,<br><br>      vs.<br><br>ANNE E. LOPEZ,<br><br>                 Defendant. | CIV. NO. 24-00496 JAO-WRP<br><br>ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION |

**ORDER DENYING MOTION FOR PRELIMINARY INJUNCTION**

This case presents a Second Amendment challenge to Hawaiʻi statutes that require people to be 21 years or older to acquire, own, or—in effect—possess firearms.  *See* ECF No. 1.  Plaintiffs include:  (1) individuals between 18 and 20 years old who would obtain a gun but for the State's age restriction; (2) stores that would sell firearms and ammunition to people 18 and older; and (3) the Second Amendment Foundation.  They move to preliminarily enjoin enforcement of the relevant statutory provisions as they apply to 18- to 20-year-olds ("Motion for Preliminary Injunction" or "Motion").  *See* ECF No. 2.  Put simply, Plaintiffs

challenge the State's[1] decision to set the minimum age for gun possession at 21 rather than 18.  The State opposes.  ECF No. 35.

As explained further below, dozens of Reconstruction Era laws that banned the transfer of handguns to people under 21 years old demonstrate that the State's age restriction likely accords with the principles of the Nation's historical firearm regulations.  While reasonable minds may disagree, the Court concludes that Plaintiffs have not met their burden of demonstrating that they are likely to succeed on their constitutional challenge.  They've therefore failed to show that they are likely to be irreparably harmed absent the extraordinary preliminary relief they seek:  enjoining the State's age requirement, which has been in effect for more than 30 years.

In sum, the Court denies the Motion for Preliminary Injunction and maintains the status quo.  In doing so, the Court stresses the preliminary nature of the instant ruling, which does not represent a definitive conclusion on the constitutionality of the State's statutory scheme.  *See Roman v. Wolf*, 977 F.3d 935, 941 (9th Cir. 2020) (per curiam) ("Injunctions that alter the status quo 'are not granted unless extreme or very serious damage will result and are not issued in

---

[1]  Plaintiffs name only Anne E. Lopez, acting in her official capacity as the Attorney General of the State of Hawaiʻi, as Defendant. The Court refers to Defendant generally as "the State."

doubtful cases.'" (quoting *Marlyn Nutraceuticals, Inc. v. Mucos Pharma GmbH & Co.*, 571 F.3d 873, 879 (9th Cir. 2009))). Further, although it should be clear, the Court states explicitly that this order in no way affects the ability of people under 21 to use firearms in accordance with the State's law, which allows for several exceptions, including the use of firearms for hunting or target shooting. *See* Haw. Rev. Stat. ("HRS") § 134-5.

## I.    BACKGROUND

### A.    Statutory Scheme and Facts

In Hawaiʻi, "no person shall *acquire* the ownership of a firearm" be it "by purchase, gift, inheritance, bequest, or in any other manner" until the person obtains a permit from their county's chief of police. *See* HRS § 134-2(a) (emphasis added). As relevant to the instant case, "the chief of police . . . shall issue permits to acquire firearms to: (1) Citizens, nationals, or lawful permanent residents of the United States *of the age of twenty-one years or more*" who are not otherwise disqualified. *Id.* § 134-2(d)(1) (emphasis added); *id.* § 134-7 (disqualifications).[2] In addition to essentially prohibiting acquisition by those under 21, the statute also provides that "[n]o person shall sell, give, lend, or deliver

---

[2] These laws are subject to narrow exceptions. For example, people under 21 (but over 16) who are accompanied by an adult may carry and use certain guns under certain circumstances for hunting and target practice. *See id.* §134-5(a).

into the possession of another any firearm except in accordance with" the foregoing. *Id.* § 134-2(h). Similarly, the State prohibits people under 21 from owning, possessing, or controlling ammunition, except under a few narrow circumstances. *Id.* § 134-7(g); *id.* § 134-7.7 (prohibiting sale of ammunition).

As to firearms, then, the law restricts acquisition and transfer, but there is no statutory provision *explicitly* prohibiting all possession by people under 21. Although the Court has some questions about the precise effect of the law in certain situations, both sides treat the laws as banning possession by anyone under 21. By preventing any *acquisition*, that is the general effect of the scheme, so the Court will follow the parties' approach at this early stage of the litigation and consider the law as a possession ban for those aged 18 to 20.

Five plaintiffs bring this action. Two of the plaintiffs are individuals between 18 and 20 years old who want a gun. Elijah Pinales ("Pinales") is 19 years old and "intends to and would have a permit to acquire . . . and would be able to acquire, purchase, own, and possess a firearm and ammunition." ECF No. 1 ¶ 1. He alleges he is not otherwise disqualified under Hawaiʻi or federal law from owning a gun. *Id.* ¶ 67; *see also id.* ¶¶ 70–75.

Juda Roache ("Roache") was 17 at the filing of the Complaint but turned 18 on December 15, 2024. *Id.* ¶ 2. The allegations pertaining to him are essentially identical to Pinales', *see id.* ¶¶ 79–92, except that in addition to acquiring his own

gun, he would also accept a gun and ammunition gifted to him by his mother, who wants to give him both, *see id.* ¶ 84 n.30.

Plaintiffs Aloha Strategics LLC DBA Danger Close Tactical and JGB Arms LLC (collectively, the "Dealers") are federally licensed firearm dealers in Hawaiʻi that want to and would sell guns to those 18 and older if legally allowed.  *See id.* ¶¶ 3–4.

Plaintiff Second Amendment Foundation (the "Foundation") "is a non-profit educational foundation" that "seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs." *Id.* ¶ 5.  Its purposes "include[] education, research, publishing, and legal action focusing on the constitutional right to privately acquire, own and possess firearms and ammunition under the Second Amendment, and the consequences of gun control." *Id.*  Both Pinales and Roache are members of the Foundation.  *See id.* ¶¶ 1–2.

## B.    Procedural History

Plaintiffs filed the Complaint on November 20, 2024.  ECF No. 1.  They assert a single claim for declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of the Second Amendment.  *See id.* at 29.  Plaintiffs pursue facial and, alternatively, as-applied challenges to the constitutionality of "HRS §§134-2(a), 134-2(d)(1), 134- 7(g), and 134-2(h), and all related law, policies, enforcement practices, and customs, as well as Defendant's enforcement of the same." *See id.*

at 40–41.  They seek a declaration that the provisions are unconstitutional and an injunction against the State from enforcing the laws against people aged 18 and older.  *See id.*

Simultaneous with the filing of the Complaint, Plaintiffs moved for a preliminary injunction.  *See* ECF No. 2.  Specifically, Plaintiffs ask the Court to enjoin the State "from enforcing HRS §§134-2(a), 134-2(d)(1), 134-2(h), and 134-7(g) . . . to the extent they prohibit or restrict adults under the age of 21 from applying for a permit to acquire, purchasing, owning or possessing firearms and ammunition."  *See id.* at 2.  Further, they move to compel the State "to allow Plaintiffs, or when applicable their customers or members, to own and possess ammunition to the same extent an adult over the age of 21 can."  *Id.* at 3.  The State opposed the Motion and submitted expert declarations regarding the general history of the 18th and 19th centuries, historical firearm regulations, evidence about mass shootings, and developmental neuroscience and psychology.  *See* ECF No. 35.  Plaintiffs filed a reply but didn't proffer any expert evidence.  *See* ECF No. 36.

The Court held a hearing on the Motion on January 31, 2025.[3]

## II.    LEGAL STANDARD

Federal Rule of Civil Procedure 65(a) allows courts to issue preliminary injunctions.  The purpose of a preliminary injunction is to "preserve the status quo and the rights of the parties until a final judgment issues in the cause."  *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d 1091, 1094 (9th Cir. 2010).

To obtain preliminary injunctive relief, a plaintiff must establish:  (1) a likelihood of success on the merits; (2) a likelihood of irreparable harm in the absence of preliminary relief; (3) that the balance of equities tips in favor of the plaintiff; and (4) that an injunction is in the public interest.  *See Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008).  "When, like here, the nonmovant is the government, the last two *Winter* factors 'merge.'"  *Baird v. Bonta*, 81 F.4th 1036, 1040 (9th Cir. 2023) (quoting *Nken v. Holder*, 556 U.S. 418, 435 (2009)).

The Ninth Circuit employs a "sliding scale" approach to preliminary injunctions, under which "the elements of the preliminary injunction test are balanced, so that a stronger showing of one element may offset a weaker showing

---

[3]  The Court commends the performance of Plaintiffs' counsel Mr. O'Grady at the hearing.  As he related, his co-counsel, who was supposed to argue the motion, was unable to attend the hearing at the last minute because his flight was rerouted due to an unusually strong winter storm in the islands.  Despite a lack of preparation time, Mr. O'Grady presented Plaintiffs' case well.

of another." *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131 (9th Cir.

2011). The issuance of a preliminary injunction may be appropriate when there are

"'serious questions going to the merits' and a balance of hardships that tips sharply

towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood

of irreparable injury and that the injunction is in the public interest." *Id.* at 1135.

Injunctive relief is "an extraordinary remedy that may only be awarded upon

a clear showing that the plaintiff is entitled to such relief"; it is "never awarded as

of right." *Winter*, 555 U.S. at 22, 24 (citations omitted). "[C]ourts 'must balance

the competing claims of injury and must consider the effect on each party of the

granting or withholding of the requested relief,'" and should be particularly

mindful, in exercising their sound discretion, of the "public consequences in

employing the extraordinary remedy of injunction." *Id.* at 24 (citations omitted).

### III.   DISCUSSION

Before turning to the preliminary injunction factors, the Court addresses

Defendant's argument that Plaintiffs lack standing to maintain this case. The Court

concludes that Pinales and the Dealers undoubtedly have standing, and that the

Foundation has associational standing. Thus, even though there are significant

questions about Roache's standing, the Court may consider the Motion.

## A.    Standing

"To have standing, Plaintiffs must have '(1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision.'"  *LA All. for Human Rights v. Cnty. of Los Angeles*, 14 F.4th 947, 956 (9th Cir. 2021) (quoting *Spokeo, Inc. v. Robins*, 578 U.S. 330, 338 (2016)).  Standing "'must be supported in the same way as any other matter on which the plaintiff bears the burden of proof, *i.e.*, with the manner and degree of evidence required at the successive stages of the litigation.'"  *Washington v. Trump*, 847 F.3d 1151, 1159 (9th Cir. 2017) (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992)).  At the preliminary injunction stage, plaintiffs must make a "clear showing of each element of standing."  *Yazzie v. Hobbs*, 977 F.3d 964, 966 (9th Cir. 2020) (citation omitted).  They may do so by "relying on the allegations in their complaint and whatever other evidence they submitted in support of their preliminary-injunction motion to meet their burden."  *LA All. for Human Rights*, 14 F.4th at 957 (internal quotation marks, citation, and alteration omitted).

For standing purposes, the alleged injury "must be 'concrete,' meaning 'not abstract' . . . [and i]t must be particularized, meaning that it affects the plaintiff individually, not in a generalized manner."  *Ariz. All. for Retired Ams. v. Mayes*, 117 F.4th 1165, 1173 (9th Cir. 2024) (quoting *FDA v. All. for Hippocratic*

*Medicine*, 602 U.S. 367, 381 (2024)).  "And it must be either real or imminent, meaning that it has occurred or will likely occur soon." *Id.* (citation omitted).  At the preliminary injunction stage, plaintiffs "need only establish a *risk* or *threat* of injury to satisfy the actual injury requirement." *City & Cnty. of San Francisco v. U.S. Citizenship & Immigr. Servs.*, 944 F.3d 773, 787 (9th Cir. 2019) (citation omitted) (emphasis in original).

To demonstrate traceability, "plaintiffs must show that their injury 'likely was caused or likely will be caused by the defendant's conduct.'" *Ariz. All. for Retired Ams.*, 117 F.4th at 1173 (quoting *All. for Hippocratic Medicine*, 602 U.S. at 382).  "Government regulations that require or forbid some action by the plaintiff almost invariably satisfy both the injury in fact and causation requirements.  So in those cases, standing is usually easy to establish." *All. for Hippocratic Medicine*, 602 U.S. at 382.  By contrast, "[w]hen the plaintiff is an unregulated party, causation" is more difficult to establish, and "the plaintiff must show that the [regulated] third parties will likely react in predictable ways that in turn will likely injure the plaintiffs." *Id.* at 383 (internal quotation marks and citations omitted).

To establish redressability, plaintiffs "must show that a favorable ruling will cure their injury." *Ariz. All. for Retired Ams.*, 117 F.4th at 1174 (citation omitted).

### 1.    Plaintiff Pinales

Defendant argues that Pinales lacks standing because he has not specified what type of gun he wants to buy.  More specifically, the State contends that this defeats the traceability and redressability elements of standing because federal law—not the challenged Hawai'i statutes—prohibits him from buying anything other than shotguns and rifles.  *See* ECF No. 35 at 11–12 (citing 18 U.S.C. § 922(b)(1)).  Pinales contends that "[e]xcept for the challenged statutes . . . [he] would immediately purchase, acquire, own and/or possess both a firearm and ammunition within Hawaii for self-defense and other lawful purposes and could otherwise lawfully do so[.]"  ECF No. 1 ¶ 76.  Because he states that he would lawfully be able to possess a firearm but for the challenged laws, Pinales in effect alleges that he would acquire a gun that federal law, but not Hawai'i law, allows. At this stage, that is sufficient to establish standing.  *See Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 111–12 (10th Cir. 2024) (rejecting traceability concerns where plaintiff didn't specify the type of firearm he planned to buy).

### 2.    Plaintiff Roache

As to Roache, the State highlights that he was 17 years old at the time Plaintiffs filed the Complaint and thus didn't have a concrete interest in the case as Plaintiffs challenged the constitutionality for people 18 and older.  ECF No. 35 at 12 n.3.  The thing is, Roache has turned 18 since this case began.

"The existence of federal jurisdiction ordinarily depends on the facts as they exist when the complaint is filed[.]" *Newman–Green, Inc. v. Alfonzo–Larrain*, 490 U.S. 826, 830 (1989). But Plaintiffs persuasively draw an analogy to pre-enforcement challenges, *see* ECF No. 36 at 8, where "the injury is the anticipated enforcement of the challenged statute in the future." *Peace Ranch, LLC v. Bonta*, 93 F.4th 482, 487 (9th Cir. 2024). The Court is therefore hesitant to conclude that Roache lacks standing. In any event, the Court need not rule on Roache's standing at this time because Pinales and the other Plaintiffs have standing, which gives the Court the ability to rule on the pending Motion. *See, e.g.*, *Brown v. City of Los Angeles*, 521 F.3d 1238, 1240 n.1 (9th Cir. 2008) ("[T]he presence in a suit of even one party with standing suffices to make a claim justiciable." (citing *Dep't of Commerce v. U.S. House of Representatives*, 525 U.S. 316, 330 (1999))). And Roache's claims are functionally identical to Pinales', except that Roache's mother would gift him a firearm. As explained below, that fact does not affect the Court's conclusion.

### 3.    The Dealers

The State's challenge to the Dealers' standing doesn't distinguish between the two plaintiffs. For both, the State emphasizes that the Dealers don't identify the types of guns they want to sell. ECF No. 35 at 12. In addition, the State claims that the Dealers' alleged injury "rests on 'guesswork as to how independent

12

decisionmakers will exercise their judgment,'" because there is no evidence that potential customers would apply for permits, then purchase the guns from these stores. *Id.* at 13 (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 413 (2013)).

Both Dealers allege that they have "customers who are at least eighteen years old and under the age of twenty-one years old and who are not otherwise disqualified under federal and state law and who want to acquire, buy, and possess firearms and ammunition." *See* ECF No. 1 ¶¶ 3–4. Because of the age limits, the Dealers claim they have "sustained financial harm" via lost sales and rentals. *See id.* ¶¶ 97, 102. The Dealers bring this action on behalf of themselves and their potential customers. *See id.*

The Court concludes the Dealers have standing. As gun stores, the Dealers have "derivative standing to assert the subsidiary right to acquire arms on behalf of [their] potential customers." *Teixeira v. Cnty. of Alameda*, 837 F.3d 670, 678 (9th Cir. 2017). Although the State essentially argues that it is too speculative to assume that customers between 18 and 20 will shop at the Dealers, it is a reasonable assumption that the Dealers are missing out on at least some business because of the State's age restriction. If not for the statutes, more people could and likely would buy certain types of firearms and ammunition from the Dealers.

### 4.   The Foundation

The State argues the Foundation lacks standing because it hasn't alleged a concrete injury.  *See* ECF No. 35 at 13–14.  Specifically, the State contends that the Foundation's only claimed injury is that enforcement of Hawaiʻi law has allegedly "caused [the Foundation] to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action."  *See id.* (citing ECF No. 1 ¶¶ 5, 103).

Organizations may have standing based on their own injuries or their members' injuries.  *See Stavrianoudakis v. U.S. Fish & Wildlife Serv.*, 108 F.4th 1128, 1143 (9th Cir. 2024).  "An organization asserting that it has standing based on its own alleged injuries must meet the traditional Article III standing requirements."  *Ariz. All. for Retired Ams.*, 117 F.4th at 1172.  "Like an individual, an organization may not establish standing simply based on the 'intensity of the litigant's interest' or because of strong opposition to the government's conduct." *All. for Hippocratic Med.*, 602 U.S. at 394 (quoting *Valley Forge Christian Coll. v. Ams. U. for Separation of Church and State, Inc.*, 454 U.S. 464, 468 (1982)). Additionally, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action."  *Id.*

14

Conversely, to establish associational standing, i.e., standing on behalf of its members, an organization need not show its own injury but must demonstrate "that: (a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Stavrianoudakis*, 108 F.4th at 1143 (citation omitted). The third requirement may be fulfilled where plaintiffs seek only declaratory or injunctive relief, which do not require individualized proof. *See id.* (citing *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 799 (9th Cir. 2001)).

The Foundation "brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public." ECF No. 1 ¶ 103. It alleges that enforcement of the statutes directly injures its members between 18 and 20 years old by denying their Second Amendment rights. *Id.* As to its own injuries, it merely states that the State's laws have caused it to refocus resources to litigate this issue rather than spending them on other purposes. *See id.*

The Court concludes that the Foundation has associational standing on behalf of its members but lacks standing to sue on its own behalf. Its conclusory allegation that it devoted resources to opposing Defendant's actions is insufficient

to establish its own injury-in-fact.  *See All. for Hippocratic Med.*, 602 U.S. at 394–

95.  But Pinales is a member of the Foundation, which means at least some

members have standing; the interests that the Foundation seeks to protect in this

action are germane to its purpose; and Plaintiffs request only declaratory and

injunctive relief.

## B.    Likelihood of Success

The Court begins with a short overview of modern Second Amendment

jurisprudence, not only to lay out the analytical framework it will engage in, but

also to note that this area of law is rapidly developing.

In 2008, the Supreme Court held that "the Second Amendment conferred an

individual right to keep and bear arms" independent of any militia service.  *Dist. of*

*Columbia v. Heller*, 554 U.S. 570, 595 (2008).  In doing so, the Supreme Court

recognized that "[l]ike most rights, the right secured by the Second Amendment is

not unlimited."  *Id.* at 626.  For example, it highlighted that:

> [N]othing in our opinion should be taken to cast doubt on
> longstanding prohibitions on the possession of firearms by felons
> and the mentally ill, or laws forbidding the carrying of firearms
> in sensitive places such as schools and government buildings, or
> laws imposing conditions and qualifications on the commercial
> sale of arms.

*Id.* at 626–27.  This list of disqualifying examples is sometimes referred to as "safe

harbors."  *See Rocky Mtn. Gun Owners*, 121 F.4th at 119 n.5 (citing Brannon P.

Denning & Glenn H. Reynolds, *Trouble's Bruen: The Lower Courts Respond*, 108

16

Minn. L. Rev. 3187, 3191 (2024)).  And while *Heller* looked to history to elucidate the meaning of the right to keep and bear arms, it also explained that the Second Amendment would apply to modern circumstances.  *See* 554 U.S. at 584 (rejecting as borderline frivolous the notion that the Second Amendment only protected arms that existed in the 1700s).  Still, the Supreme Court declined to define the full scope of the right, *see id.*, or articulate a precise analytical framework for future challenges, *see id.* at 634–35.  Rather, no matter the outer extent of the right, the Supreme Court concluded that Washington D.C.'s "ban on handgun possession in the home . . . and prohibition against rendering any lawful firearm in the home operable for the purpose of immediate self-defense," violated the Second Amendment.  *Id.* at 635–36.

Apart from holding that the Second Amendment was also fully applicable to the States via the Fourteenth Amendment, *see McDonald v. City of Chicago*, 561 U.S. 742 (2010) (plurality opinion), the Supreme Court didn't revisit the Second Amendment until 2022 when it decided *New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1 (2022).  There, the Supreme Court established the analytical framework for Second Amendment challenges.  It held that if conduct falls within the plain text of the Second Amendment, then the government may only regulate it if doing so is consistent with traditional historical regulation:

> When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct.

17

> To justify its regulation, the government may not simply posit
> that the regulation promotes an important interest. Rather, the
> government must demonstrate that the regulation is consistent
> with this Nation's historical tradition of firearm regulation. Only
> if a firearm regulation is consistent with this Nation's historical
> tradition may a court conclude that the individual's conduct falls
> outside the Second Amendment's unqualified command.

*Bruen*, 597 U.S. at 18 (internal quotation marks and citation omitted).

Almost exactly two years later in *United States v. Rahimi*, the Supreme

Court added some gloss to—or some might say clarified or narrowed—*Bruen*'s

historical analysis test. *See* 602 U.S. 680, 690–93 (2024). The Supreme Court

noted that "some courts have misunderstood the methodology of our recent Second

Amendment cases." *Id.* at 691. To correct that misunderstanding, the Supreme

Court emphasized that *Heller* and *Bruen* "were not meant to suggest a law trapped

in amber," and did not require an identical historical analogue to pass

constitutional muster under the second part of the *Bruen* test. *See id.* at 691–92.

Instead, courts must determine "whether the challenged regulation is consistent

with the *principles* that underpin our regulatory tradition." *Id.* (citing *Bruen*, 597

U.S. at 26–31) (emphasis added). Doing so involves "ascertain[ing] whether the

new law is 'relevantly similar' to laws that our tradition is understood to permit,

'apply[ing] faithfully the balance struck by the founding generation to modern

circumstances.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 28). To

determine whether a law is relevantly similar, courts must consider "[w]hy and

18

how the regulation burdens the right." *Rahimi*, 602 U.S. at 692.  Even if a

challenged law is not a "dead ringer" or "historical twin" with a historical

regulation, it may still be sufficiently analogous to survive a constitutional

challenge. *Id.*

This is all to say the Supreme Court has defined the basic right inherent in

the Second Amendment and laid out a framework with some broad principles for

assessing challenges.  But modern Second Amendment jurisprudence is still

nascent and courts and litigants are working through the finer points now.  *See id.*

at 736 (Kavanaugh, J., concurring) ("Second Amendment jurisprudence is still in

the relatively early innings and [d]eciding constitutional cases in a still-developing

area of this Court's jurisprudence can sometimes be difficult."); *see also id.* at 741

(Jackson, J., concurring) ("I write separately because we now have two years'

worth of post-*Bruen* cases under our belts, and the experiences of courts applying

its history-and-tradition test should bear on our assessment of the workability of

that legal standard.  This case highlights the apparent difficulty faced by judges on

the ground.  Make no mistake: Today's effort to clear up 'misunderstandings,' is a

tacit admission that lower courts are struggling." (alterations and citation omitted)).

This case touches on a few of the open and hotly-contested issues in Second

Amendment challenges, including the relevance of Reconstruction Era[4] regulations and the appropriate level of generality for comparing modern laws to the historical analogues.

Further, the Court notes the quickly-shifting legal landscape in which it is operating. Since May 2022, at least the Third, Fifth, Eighth, Ninth, Tenth, and Eleventh Circuit Courts of Appeals have considered age-based firearm regulations. Both the Ninth Circuit and Eleventh Circuit opinions have been vacated. The Third Circuit also vacated a panel's decision, before that panel re-issued an opinion during the pendency of this Motion. The day before the Court's hearing on this Motion, the Fifth Circuit struck down the federal law that prohibits licensed dealers from selling handguns to people under 21.

With this background in mind, the Court turns to the substance of the Motion and stresses once again the extraordinary nature of the requested preliminary relief: the enjoining of the State's laws designed to protect the public, some portion of which have been in effect for at least 30 years.

---

[4]  The Court uses "Reconstruction Era" or "mid- and late-19th century" to refer to the period between 1850-1900, with an emphasis on laws passed around the time of the ratification of the Fourteenth Amendment in 1868.

### 1.    Plain Text of the Second Amendment – "The People"

The first part of the *Bruen* test requires the Court to determine whether the plain language of the Second Amendment covers the challenged conduct—here, firearm possession by 18- to 20-year-olds.  *Bruen*, 597 U.S. at 17.  The Court concludes that it does.

The Second Amendment provides:  "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed."  U.S. Const. amend. II.  The parties agree that the only real question at part one of the *Bruen* test is whether 18- to 20-year-olds are part of "the people."  The State argues that 18- to 20-year-olds fall outside the Amendment's understanding of "the people," because in the Founding Era—and until relatively recently—individuals lacked independent legal capacity before they turned 21.  *See* ECF No. 35 at 16–20.  Plaintiffs respond that courts have rejected the State's argument and that it would be illogical to look to the Founding Era understanding of "the people."[5]  *See* ECF No. 36 at 11–12.

---

[5]   As an aside, Plaintiffs challenge the restrictions only as they pertain to people aged 18 and older.  Plaintiffs therefore implicitly accept that either the plain text of the Second Amendment doesn't apply to those younger than 18 years old or that the government may impose limitations on that group that accord with the Second Amendment.

Before turning to that debate, the Court points out a conceptual wrinkle yet to be ironed out in Second Amendment jurisprudence. *Heller* interpreted "the people" to mean "all members of the political community," or "persons who are part of a national community," or simply "all Americans." 554 U.S. at 580–81 (internal quotation marks and citations omitted); *see also United States v. Perez-Garcia*, 96 F.4th 1166, 1179–80 (9th Cir. 2024) (adopting interpretation of "the people" to mean members of the national community). This seems simple enough, but *Heller* also commented that the right belonged to "law-abiding, responsible citizens." 554 U.S. at 635. Courts have debated whether that qualification suggests that only law-abiding and responsible citizens are part of "the people." As then-Judge Amy Comey Barrett explained the conceptual divide:

> There are competing ways of approaching the constitutionality of gun dispossession laws. Some maintain that there are certain groups of people—for example, violent felons—who fall entirely outside the Second Amendment's scope. . . . Others maintain that all people have the right to keep and bear arms but that history and tradition support Congress's power to strip certain groups of that right.

*Kanter v. Barr*, 919 F.3d 437, 451–52 (7th Cir. 2019) (Barrett, J., dissenting) (citations omitted).

Arguably, *Bruen* linked the two ideas when it remarked that it was undisputed that petitioners as "two ordinary, law-abiding, adult citizens" were "part of 'the people' whom the Second Amendment protects." *Bruen*, 597 U.S. at

22

31–32.  And some courts have connected *Heller* and *Bruen*'s focus on "ordinary,

law-abiding" citizens to the Amendment's definition of "the people."  *See, e.g.,*

*Medina v. Whitaker*, 913 F.3d 152, 159–60 (D.C. Cir. 2019) (holding that a felony

conviction removes a person from the scope of the Second Amendment); *Binderup*

*v. Att'y Gen.*, 836 F.3d 336, 357 (3d Cir. 2016) (en banc) (Hardiman, J., concurring

in part and concurring in the judgments) ("[T]he Founders understood that not

everyone possessed Second Amendment rights.  These appeals require us to decide

who count among 'the people' entitled to keep and bear arms."), *abrogated on*

*other grounds by Bruen*, 597 U.S. at 17.

But other courts have been hesitant to exclude certain groups from the

definition of "the people."  For example, the Ninth Circuit rejected the idea that

pretrial releasees accused of felonies fell outside the scope of the Second

Amendment.  *See Perez-Garcia*, 96 F.4th at 1179–80.  It explained that while the

government could limit the pretrial releasees' rights, it was "quite another matter to

say that a criminal defendant loses his or her ability to even challenge the condition

itself under the Second Amendment."  *Id.* at 1180.  Then-Judge Barrett also

advocated for the limitation of rights rather than a definitional exclusion.  *See*

*Kanter*, 919 F.3d at 452.  As discussed below, other circuits have followed this

approach in age-based restriction cases.

All of the Circuit Courts of Appeal that have considered Second Amendment challenges to age limits have concluded that 18- to 20-year-olds are included within "the people," and the Court agrees. The gist of their conclusions is that (1) "the people" means the national community, like *Heller* said; (2) the national community means the current one and not some historical community; and (3) 18- to 20-year-olds are part of the current national community.

In *Worth v. Jacobson*, the Eighth Circuit rejected the argument that 18- to 20-year-olds were excluded from the people. *See* 108 F.4th 677, 690 (8th Cir. 2024) (citation omitted). Rather than rely on the historical exclusion of individuals under 21 from the national community, the court considered whether 18- to 20-year-olds are included in it today. In doing so, the court drew an analogy to *Heller*'s discussion of modern weapons as part of the Amendment's definition of "arms." *See id*. *Heller* deemed the argument that only those arms that existed at the Founding were constitutionally protected as "bordering on the frivolous," because courts "do not interpret constitutional rights that way." 554 U.S. at 582. From this—and the fact that rights like voting have spread beyond the group of people who could vote at the Founding—the Eighth Circuit concluded that the definition of "the people" as those within the "political community" is fixed, but that the "contents," i.e., who is considered within the political community, can be and has been expanded. *See Worth*, 108 F.4th at 689–91.

24

The Third Circuit agreed. *See Lara v. Comm'r Penn. State Police*, 125 F.4th 428, 437 (3d Cir. 2025). First, it stated that considering the historical understanding of "the people" conflated the first and second steps of *Bruen*. *Id.* The court then reasoned that if it were so limited, "'the people' would consist of white, landed men, and that is obviously not the state of the law." *Id.* Further, the Third Circuit reasoned that if the court read "the people" to exclude 18- to 20-year-olds, then it would render the phrase inconsistent with other parts of the constitution like the First and Fourth Amendments. *See id.*; *see also Rocky Mtn. Gun Owners*, 121 F.4th at 116.

These authorities confirm that concluding that 18- to 20-year-olds are not part of "the people" would result in an inconsistent constitutional interpretation. And—more significantly—if the Court were to look at who was part of "the people" during the Founding Era, entire groups of non-white, non-male, non-land-owning individuals would not enjoy constitutional protections today. *See Lara*, 125 F.4th at 437; *Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, — F.4th —, 2025 WL 340799, at *7 (5th Cir. 2025).

Indeed, the State cites no case to support the premise that the historical understanding of "the people" controls. In a footnote, it cites *United States v. Rene E.*, 583 F.3d 8, 16 (1st Cir. 2009), and *N.R.A. v. McCraw*, 719 F.3d 338, 347 (5th Cir. 2013), as examples of cases where courts have upheld age restrictions. ECF

25

No. 35 at 20 n.5.  But both pre-date *Bruen* and don't explicitly address whether 18-
to 20-year-olds are part of the people.

While the State provides compelling evidence that 21-year-olds represented
the entry point into the national community for much of the Nation's history, the
Court concludes that the modern understanding of "the people" defines the
contours of the Second Amendment.  The State makes no argument that 18-year-
olds are currently excluded from the national community.  Nor does it contend that
the challenged conduct in this case—firearm and ammunition possession and
acquisition/transfers—falls outside the plain text of the Second Amendment for
any other reason.[6]  As such, the Court concludes that Plaintiffs have satisfied step
one of the *Bruen* framework.  Of course, even though 18- to 20-year-olds are part
of the people under the Second Amendment, the government may still limit their

---

[6]  In *Rocky Mountain Gun Owners*, the Tenth Circuit reversed a preliminary
injunction of a Colorado law that prohibited people under 21 from purchasing a
firearm (and restricted sales to the same).  *See* 121 F.4th at 104.  Unlike the law at
issue here, the Colorado law did not otherwise prohibit 18- to 20-year-olds from
possessing or otherwise acquiring, inheriting, or receiving firearms as gifts.  *Id.* at
105.  The court concluded that the law was one of *Heller*'s "presumptively lawful"
regulations because it "impos[ed] conditions and qualifications on the commercial
sale of arms."  *Id.* a 118–19 (quoting *Heller*, 554 U.S. at 626–27).  It reasoned that
because the law came within the *Heller* safe harbor, the regulated conduct fell
outside the plain text of the Second Amendment, and that plaintiffs' challenge
therefore failed at the first step.  *See id.* at 119–22.  Here, the State makes no
argument that at least certain portions of its statutory scheme fall within any safe
harbor.  As such, the Court will say no more on the matter.

26

right under certain circumstances and the State's evidence of who was part of the

national community at the Founding may be relevant to that inquiry.

### 2.    Historical Analogues

Before the Court engages in the historical analysis *Bruen* requires at this

stage, it first determines:  (1) what historical record it will examine and (2) which

era(s) of history it will consider.  The former is easily discerned while the latter is a

thornier question.

### a.  The Historical Record

Courts conducting a historical analysis pursuant to *Bruen* need only consider

the historical sources cited in the record or in other cases.  *See Wolford v. Lopez*,

116 F.4th 959, 976 (9th Cir. 2024) (citing *Bruen*, 597 U.S. at 25 n.6).  The Court

therefore did not conduct its own historical research into statutes, treatises, first-

hand accounts, or other sources that a historian may unearth.  Instead, it relied on

the historical record presented by the parties, that is, the States' experts'

declarations and both parties' recitation of past laws, some of which are provided

in cases they cited.

### b.  The Relevant Era(s)

A vital question is whether the Court should primarily examine laws and

regulations from the Founding Era and/or the Reconstruction Era, when the

Fourteenth Amendment, which made the Second Amendment applicable to the

states, was ratified.  Plaintiffs argue that only the Founding Era governs.  *See* ECF No. 2-1 at 21–22.  The State responds that both periods are relevant to the inquiry. *See* ECF No. 35 at 22–23.  The Court concludes that it should consider both eras.

The Supreme Court has yet to answer "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868 when defining its scope."  *Bruen*, 597 U.S. at 37; *see also Rahimi*, 602 U.S. at 692 n.1 (concluding that, like *Bruen*, it need not decide whether the ratification of the Second or Fourteenth Amendment provides the relevant timeframe); *see also id.* at 746 n.4 (Jackson, J., concurring) (explaining that "[e]xtremely pertinent inquiries relevant to consistent application of *Bruen*'s standard await resolution," including whether to look to the public understanding at the time of the Second or Fourteenth Amendments).  However, it has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791."  *Bruen*, 597 U.S. at 37–38.  And the Court also recognizes that the Supreme Court has favored Founding Era laws, especially if later history contradicts that evidence.  *See id.* at 36–37 (describing how *Heller* relied on post-founding historical evidence as confirmation).

Significantly, though, the Supreme Court did consider Reconstruction Era laws in both *Heller* and *Bruen*.  And *Bruen* also recognized, that "[t]he regulatory

28

challenges posed by firearms today are not always the same as those that
preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and
that therefore, "cases implicating unprecedented societal concerns or dramatic
technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at
27. Thus, even if the Supreme Court has suggested it favors Founding Era laws, it
has not foreclosed consideration of more recent history like the Reconstruction
Era.

Indeed, the Ninth Circuit has "look[ed] to the understanding of the right to
bear arms both at the time of the ratification of the Second Amendment in 1791
and at the time of the ratification of the Fourteenth Amendment in 1868."
*Wolford*, 116 F.4th at 980 (citation and emphases omitted).[7] And some other
courts that have reviewed and upheld age-based firearms restrictions have also
considered mid- and late-19th century laws, albeit in non-binding commentary.
*See Rocky Mtn. Gun Owners*, 121 F.4th at 142 (McHugh, J., concurring)
(discussing laws from 1850 through the twentieth century); *see also N.R.A. v.
Bondi*, 61 F.4th 1317, 1322–23 (11th Cir. 2023), *vacated and reh'g en banc
granted*, 72 F.4th 1346 (11th Cir. 2023) (concluding that public understanding

---

[7] *Wolford* considered two states' restrictions on firearm possession in certain
places. Plaintiffs have not persuasively argued why the Court should ignore
*Wolford* or why its analysis doesn't apply here.

around the time of the passage of the Fourteenth Amendment delineated the

contours of the Second Amendment right).  The Second Circuit sums up the

reasoning of those courts that consider Reconstruction Era laws:  "While we

recognize that evidence nearest to 1791 can differ from that nearest to 1868, such

discrepancy does not mean that the right to keep and bear arms was calcified in

either 1791 or 1868.  Rather, 1791 and 1868 are both fertile ground, and the

adjacent and intervening periods are likewise places in the historical record to seek

evidence of our national tradition of firearms regulation."  *Antonyuk v. James*, 120

F.4th 941, 974 (2d Cir. 2024).

Meanwhile, those courts that have struck down age-based restrictions have

focused on Founding Era laws and diminished the import of the 19th century

regulations.  *See Reese*, — F.4th —, 2025 WL 340799, at *10–13 (favoring

Founding Era laws over those from the Reconstruction Era); *Lara*, 125 F.4th at

438–41 (concluding that "that the constitutional right to keep and bear arms should

be understood according to its public meaning in 1791" because the later history is

inconsistent with the Founding Era regulations); *see also Worth*, 108 F.4th at 698

("*Bruen* strongly suggests that we should prioritize Founding-era history.").  In any

event, the Court is bound by Ninth Circuit precedent—which tells courts to look to

both eras—and that approach makes more sense anyway.

First, the historical and societal developments between the Founding and the ratification of the Fourteenth Amendment in 1868 are relevant context to determine the Nation's regulatory principles. The State persuasively argues that the Reconstruction period represents one where "unprecedented societal concerns" and "dramatic technical changes" arose that necessitated different types of firearms restrictions for the first time. *See* ECF No. 35 at 21–22 (citing *Bruen*, 597 U.S. at 27). The sweeping societal and technological evolution between the Founding Era and the Reconstruction Era is precisely the type of change that can trigger examination of the latter's regulations. *See Wolford*, 116 F.4th at 982–83 (discussing the development of modern parks in the latter half of the 19th century and how municipalities immediately imposed firearm bans, which weren't constitutionally questioned). The Court recounts the record evidence about those societal changes to provide context.

Around 1800, 90% of Americans were engaged in agriculture, with the typical person living and working on subsistence family farms where children lived at home. *See* ECF No. 35-3 ("Spitzer Decl.") ¶ 28. A century later, the Nation had transformed into a global industrial power. *See id.* What did this mean for the daily lives of many Americans? For one, it meant movement away from rural areas to urban cities and towns with greater population density. *See id.* ¶¶ 17, 28. The period also coincided with the market revolution of the Jacksonian period

31

(1828-1854) that made consumer goods—like easily-concealed firearms—widely available for the first time. *See* ECF No. 35-2 ("Cornell Decl.") ¶ 69. With the rise in industrialization and urbanization, and the concomitant decline of subsistence agriculture, children also started working outside the home in greater numbers for the first time.[8] *See* Spitzer Decl. ¶ 28. Toward the end of the 19th century this also led to "an increased number of youth on the streets," who became involved in crime. *See id.*

The technological changes in firearms following the Founding Era also warrant consideration of the Reconstruction Era's regulations, particularly when a lack of regulation during the Founding Era may well be attributed to a lack of more concealable, accessible, and sophisticated firearms. *See* Cornell Decl. ¶ 62; Spitzer Decl. ¶ 29. At the ratification of the Constitution, pistols were relatively rare and long guns represented 90% of the guns owned by Americans. *See* Cornell Decl. ¶¶ 62, 69. These muzzle-loaded arms from the Founding Era were "ill-suited to impulsive acts of violence" in part because they were often left unloaded due to the corrosive and hydroscopic (readily absorbing moisture) quality of the gunpowder." *See id.* ¶ 62. Further, there was a relative scarcity of military style weapons that

---

[8] Contrary to the record evidence, at the hearing, defense counsel confusingly contended that the Nation remained primarily agrarian even after the Civil War, but it wasn't clear to the Court what his point was.

were useful for militias, such that one goal of government policy was to arm

certain Americans.  *See id.* ¶ 64.

     States also passed dozens of new laws regulating firearms shortly after the

Fourteenth Amendment's enactment.  It would be odd if they did so knowing that

such laws would run afoul of the meaning of the Second Amendment that was just

applied to them.  *See Wolford*, 116. F.4th at 980; *Bondi*, 61 F.4th at 1322.

     Moreover, the Court does not read the Founding and Reconstruction Era

laws to contradict one another.  While it's true that the laws passed in the mid- and

late-19th century are novel when compared to the Founding, that's because there

was an *absence* of regulations in the 1790s.  New regulations are not necessarily

inconsistent with an absence of laws.  Concluding otherwise would demonstrate

the flawed assumption that "founding-era legislatures maximally exercised their

power to regulate."  *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring).  Indeed,

courts have discussed how legislatures have engaged in "call and response"

regulation, in which they articulate new laws in response to new societal problems.

*See Bianchi v. Brown*, 111 F.4th 438, 462–66 (4th Cir. 2024) (en banc), *petition for

cert. filed, sub. nom. Snope v. Brown* (U.S. Aug. 23, 2024) (No. 24-203).  As

discussed above, there is evidence in the record that explains why the absence of

regulations during the Founding is expected and doesn't necessarily demonstrate

the expansive right Plaintiffs assert.

Beyond historical developments, there are also constitutional reasons to

consider the period around the passage of the Fourteenth Amendment.

"Constitutional rights are enshrined with the scope they were understood to have

when the people adopted them." *Heller*, 554 U.S. at 634–35. And the Supreme

Court decided in *McDonald* that the Fourteenth Amendment made the Second

Amendment applicable to the states. *McDonald,* 561 U.S. at 750. In doing so, it

provided some commentary that suggests Reconstruction Era attitudes about the

scope of the Second Amendment remain relevant to understanding the rights

therein. It analyzed "whether the right to keep and bear arms is fundamental

to *our* scheme of ordered liberty," or, stated differently, "whether this right is

deeply rooted in the Nation's history and tradition." *Id.* at 767 (internal quotation

marks and citations omitted). Answering those questions in the affirmative, the

Supreme Court reviewed not only the pre- and Founding Era history, but also

historical evidence around the time of the Civil War and Reconstruction. *See id.* at

767–78. It stated that it was "clear that the Framers and *ratifiers of the Fourteenth*

*Amendment* counted the right to keep and bear arms among those fundamental

rights necessary to our system of ordered liberty." *Id.* at 778 (emphasis added).

Significantly, as other courts have observed, "[i]t would be incongruous to

deem the right to keep and bear arms fully applicable to the States by

Reconstruction standards but then define its scope and limitations exclusively by

1791 standards." *See, e.g.*, *Antonyuk*, 120 F.4th at 973.  And so the Court follows the Ninth Circuit's lead and considers the record presented as to both eras to glean whether the challenged law "is consistent with the principles that underpin [the Nation's] regulatory tradition." *Rahimi*, 602 U.S. at 692 (citation omitted).

### c.  Founding Era Laws:  College Rules and Militia Service

Apart from some passing references, the parties begin the historical analysis around the time of the Founding rather than centuries beforehand.  The State focuses on the Founding Era for the general proposition that people under 21 had limited legal rights, which likely explains an absence of laws regulating their use and/or possession of firearms.  But the State also directs the Court to Founding Era universities' bans of firearms.  ECF No. 35 at 23, 27.  Plaintiffs for their part state simply, "[t]he fact that the Founding Era did not prohibit adults under 21 from owning firearms should be the end of the matter."  ECF No. 2-1 at 26.  Plaintiffs also cite laws that mandated militia service as evidence that the government didn't restrict gun possession to individuals aged 21 and older.  *See id.* at 25–26.  The Court concludes that the State does not proffer a relevantly similar historical analogue from this period to satisfy its burden—although, as will be seen later, its reliance on statutes from the Reconstruction Era renders a different result.

As a reminder, *Rahimi* directs that courts consider "[w]hy and how" the proffered analogous regulations limited the right to bear arms.  602 U.S. at 92.  In

other words, when comparing historical regulations with modern ones, courts must examine whether both sets of regulations were implemented for similar reasons and whether the regulations curtailed the right in similar ways. Before turning to the State's proposed analogues though, the Court addresses the general legal status of people under 21 before and around the Founding.

The Founding Era history on which the State relies reflects a view of those under 21 as lacking significant independence and responsibility. *See*, *e.g.*, William Blackstone, Commentaries on the Laws of England I 441 (1765-1769) (referring to the age of 21 as the point at which "the power of a father . . . over the persons of his children ceases"). As one example of their reduced legal rights, those under 21 were not legally able to enter into contracts. *See* Spitzer Decl. ¶ 14; Cornell Decl. ¶ 23. This included an inability to enter into contracts for credit, which in a nearly cashless economy meant that minors would rarely have been able to purchase their own firearms. *See* Cornell Decl. ¶¶ 54, 60–61. In a similar vein, those under 21 would not have been able to assert a legal claim in any court at that time. *See id.* ¶ 18. They were, in effect, subsumed under the legal authority of their parents and did not possess independent legal status. *See id.* ¶ 19.

Such facts suggest that there would have been no reason to regulate firearms for people under 21. Or, as Defendant's expert explains, "relatively few weapons laws concerning minors existed in the eighteenth and early nineteenth centuries,

since minors mostly lived with their parents in circumstances where minors did not

possess the means, ability, inclination, or right to obtain firearms on their own."

Spitzer Decl. ¶ 29.  The Court thinks there is persuasive evidence that young folks'

position in society explains the absence of firearms regulations at the Founding.  In

other words, there was no reason "why" regulations were necessary.

Still, the State attempts to direct the Court to a couple of Founding Era

regulations it argues are relevant analogues.  First, the State tries to buttress its

theories by pointing to collegiate rules during the Founding Era that prohibited the

possession of firearms by students, *see* ECF No. 35 at 27–28, but those rules are

somewhat off the mark.[9]  To start, few people attended college.  *See* Spitzer Decl.

¶ 42.  And the Court would be hesitant to conclude that rules about those few who

did reflected attitudes about the broader right in society.  Perhaps most

significantly, the laws also appear to apply to all students regardless of age,

meaning that such rules might say more about historical restrictions of guns in

sensitive locations than they do about restricting firearms to minors.  In other

words, the "why" of the university rules may not match the motivation behind the

---

[9]  As an example, the University of Georgia in 1810 provided "that no student shall
be allowed to keep any gun, pistol, Dagger, Dirk sword cane or any other offensive
weapon in College or elsewhere, neither shall they or either of them be allowed to
be possessed of the same out of the college in any case whatsoever."  ECF No. 35-
3 at 155.

State's current laws. Similarly, the "how" of the college bans, which affected only a tiny portion of the population of people of the relevant age, isn't comparable to the challenged laws here which essentially ban firearms for all people under age 21.[10]

Beyond the college and university rules, the State directs the Court to one law from the 1700s that relates to minors and firearms. *See* ECF No. 35 at 23. That law, enacted in New York City in 1763, said:

> [I]f any Children, Youth, apprentices, Servants, or other persons, do fire and discharge any gun, pistol, leaden-gun, rockets, crackers, squibs, or other fire works, at any mark, or at random against any fence, pales or other place in any street, lane or alley, or within any orchard, garden or other inclosure, or in any place where persons frequent to walk, such person so offending shall forfeit for every such offense, the sum of forty shillings.

ECF No. 135-3. But a law prohibiting the firing of weapons in certain places is not relevantly similar to a ban on the acquisition and possession of firearms. If anything, laws that restrict the firing of firearms suggest that there wasn't legislative concern about possession per se. Again, using the "why and how" test demonstrates the mismatch between the historical regulation and the current challenged laws. Even if the "why" of the laws is the same (concerns about the

---

[10] Still, the Court finds it interesting that there is no evidence of any uproar about or constitutional challenges to the full possession bans for students.

safety and judgment of minors), the "how" is different (restricting a specific use vs. ban on possession).

Although not obligated to do so, Plaintiffs proffer militia service laws from the Founding Era, arguing that these laws are dispositive evidence that 18-year-olds had firearm rights at the time of the Founding. *See* ECF No. 2-1 at 25–26; ECF No. 36-1 at 16. The State attacks the conclusion, arguing that service in the militias demonstrated an *obligation* to serve and said nothing about a *right* to bear arms, *see* ECF No. 35 at 26, and that, in any event, many of the laws required young militia members' parents to provide them with the necessary arms for service. *See id.* at 26–27. The State argues that such parental provision rules suggest that minors did not have their own right. Based on the State's evidence, the Court agrees that the militia laws provide at best only ambiguous support for the premise that 18-year-olds had a right to bear arms at the Founding.

Other courts that have struck down age-based restrictions often cite the Second Militia Act of 1792 as evidence that 18-year-olds had full Second Amendment rights at the Founding. *See, e.g.*, *Lara*, 125 F.4th at 442–43. The Act provided that "every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years and under the age of forty-five years (except as herein exempted) shall severally and respectively be enrolled in the militia." Second Militia Act of 1792 § 1, 1 Stat. 271 (1792). It also

required "[t]hat every citizen so enrolled and notified, shall, within six months

thereafter, provide himself with a good musket or firelock . . . or with a good rifle."

*Id*. The Fifth Circuit interpreted the age requirement and edict that militia

members bring their own guns to mean that "[c]ertainly, eighteen-year-olds must

have been allowed to keep firearms for personal use, and were within the core

rights-holders at the founding. *Reese*, — F.4th —, 2025 WL 340799, at *9. But

the Court finds that nonbinding authority unpersuasive.

A couple passages in the Second Militia Act demonstrate the point. First

and most obviously, the Act only applies to white males. But courts are supposed

to ignore *that* part of the history when considering firearm regulations. *See, e.g.*,

*Lara*, 125 F.4th at 437. Second, the word "shall" reflects a command, duty, or

requirement. Just because states *required* young people to serve in militias and

often mandated that they bring their own firearms at a certain point in history,

doesn't mean that the Second Amendment necessarily prevents governments from

restricting possession at other times. *See Bondi*, 61 F.4th at 1331 ("The fact that

federal law obliged 18-to-20-year-olds to join the militia does not mean that 18-to-

20-year-olds had an absolute right to buy arms."). Next, if one reads the Act as

indicative of the scope of the right to keep and bear arms, the mention of an upper

age limit in the Act (i.e., 45 years) begs the question: Do older folks lose that

right? Regardless, *Heller* stands for the premise that the right to bear arms is not

connected to militia service.  *See Heller*, 554 U.S. at 580–81 ("Reading the Second

Amendment as protecting only the right to 'keep and bear Arms in an organized

militia therefore fits poorly with the operative clause's description of the holder of

that right as 'the people.'").  It would then be odd to say that militia service helps

define the right.  *See id.* at 596 ("To be sure, Congress need not conscript every

able-bodied man into the militia, because nothing in Article I suggests that in

exercising its power to organize, discipline, and arm the militia, Congress must

focus upon the entire body.  Although the militia consists of all able-bodied men,

the federally organized militia may consist of a subset of them.").  Suffice it to say,

however, that whatever the militia service laws' exact import, they certainly don't

support the State's case either.  *See Lara*, 125 F.4th at 444–45 (commenting that

militia laws are good circumstantial evidence that people under 21 could be

armed).

        In sum, while there is no evidence in the record that the government broadly

restricted 18-year-olds from possessing weapons around the time of the Founding,

there's also substantial evidence suggesting that the lack of such regulations could

be explained by lack of need and is not necessarily indicative of the scope of the

Second Amendment right.  To put it in *Bruen*'s terms, the Court concludes at this

early stage that there is evidence that public safety concerns regarding young

people's misuse of firearms is *not* "a general societal problem that has persisted

41

since the 18th century." *Bruen*, 597 U.S. at 26.  Instead, historical, technological,

demographical, and legal changes gave rise to a new societal problem.  As such,

"the lack of a distinctly similar historical regulation addressing" young people's

possession of firearms at the Founding is not "relevant evidence that the

challenged regulation is inconsistent with the Second Amendment."  *Id.*  Still, if

the Court were limited to considering only Founding Era restrictions, Plaintiffs

would likely succeed on their challenge.  *See Lara*, 125 F.4th at 438–45 (relying on

Founding Era regulations rather than 19th century laws); *Worth*, 108 F.4th at 696–

97 (expressing that Reconstruction Era laws are less significant as compared to

those from the Founding Era).  But, as explained below, the State offers

compelling analogues from the Reconstruction Era.

### d.  Mid- and Late-19th Century Regulations:  Bans on Transfers of Concealable Arms

The Court concludes that the firearms regulations from the mid- and late-

19th century that the State proffers are relevantly similar analogues to the laws

Plaintiffs challenge here.

It was against the above-outlined backdrop of massive societal change that

the states and municipalities began regulating firearms more closely.  *See* Spitzer

Decl. ¶ 29; Cornell Decl. ¶¶ 70, 85.  Most relevant to the instant case are laws that

restricted transfer of firearms to minors.[11]  One law that the State cites as

representative of those in other jurisdictions was an 1860 Kentucky statute which

provided:  "If any person, other than the parent or guardian, shall sell, give, or

loan, any pistol, dirk, bowie-knife, brass-knucks, slung-shot, colt, cane-gun, or

other deadly weapon, which is carried concealed, to any minor, or slave, or free

negro, he shall be fined fifty dollars."  *See* ECF No. 35-3 at 118.[12]  Another early

example of such a restriction is an 1856 Tennessee statute:  "[H]ereafter, it shall be

unlawful for any person to sell, loan, or give, to any minor a pistol, bowie-knife,

dirk, or Arkansas tooth-pick, or hunter's knife."  ECF No. 35-3 at 138.  The law

---

[11]  Professor Spitzer directs the Court to early regulations from Delaware (1812), South Carolina (1817), and Connecticut (1835) that prohibited children or minors from *firing* weapons.  *See* Spitzer Decl. ¶ 21.  While those laws may demonstrate that minors could be and were treated differently than other members of society, they cannot serve as a historical analogue to justify the State's bar on possession of firearms.  Again, even though the "why" of those regulations may match those of today's, the "how" diverges.  The historical laws prohibited narrow conduct whereas the current laws at issue restrict all acquisition of firearms.

[12]  This law appears to have applied to the town of Harrodsburg.  *Id.*; *see* Spitzer Decl. ¶ 21 (noting that the Kentucky laws cited applied to two cities).  According to Professor Spitzer, municipal laws "are no less significant than state laws" because:  (1) problems with weapons would first arise in populated areas; (2) municipal laws reflect allowable state public policy; and (3) they often lead to the passage of state-wide laws.  Spitzer Decl. ¶ 17; *cf. Wolford*, 116 F.4th at 983 (finding it "constitutionally insignificant" that firearms in parks were regulated by municipalities and not states).

made exceptions for "a gun for hunting" or if "said minor be travelling on a

journey." *Id.*

Other laws banning the transfer of firearms to minors proliferated during and

after the Civil War. *See* Spitzer Decl. ¶ 22. Many of these explicitly applied to

people under 21.[13] For example, an 1875 Indiana law provided:

> § 1. Be it enacted by the General Assembly of the State of
> Indiana, That it shall be unlawful for any person to sell, barter,
> or give to any other person, under the age of twenty-one years,
> any pistol, dirk, or bowie-knife, slung-shot, knucks, or other
> deadly weapon that can be worn, or carried, concealed upon or
> about the person, or to sell, barter, or give to any person, under
> the age of twenty-one years, any cartridges manufactured and
> designed for use in a pistol.

ECF No. 35-3 at 115. Georgia passed a similar law in 1876: "[I]t shall not be

lawful for any person or persons knowingly to sell, give, lend or furnish any minor

or minors any pistol, dirk, bowie knife or sword cane." ECF No. 35-3 at 113.

Maryland, in 1882, warned: "[I]t shall be unlawful for any person, be he or she

licensed dealer or not, to sell, barter or give away any firearm whatsoever or other

deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a

minor under the age of twenty-one years." ECF No. 35-3 at 120. In 1890,

Louisiana outlawed "sell[ing], or leas[ing], or giv[ing] through himself or any

---

[13] Even if the statutes did not explicitly list an age, many of the regulations
relating to "minors" applied to people under 21 based on caselaw at the time. *See*
ECF No. 35-3 at 149–52 (table listing ages from the State's compiled statutes).

other person, any pistol, dirk, bowie-knife or any other dangerous weapon which

may be carried concealed to any person under the age of twenty-one years." *Id.*

Kansas in 1883 banned the transfer to minors, but also explicitly regulated

possession: "Any minor who shall have in his possession any pistol, revolver or

toy pistol, by which cartridges may be exploded, or any dirk, bowie-knife, brass

knuckles, slung shot or other dangerous weapon, shall be deemed guilty of a

misdemeanor." *Id.* at 117. Other courts have counted these mid- to late-19th

century pistol transfer bans. For example, the concurrence in *Rocky Mountain Gun*

*Owners* calculates that:

> Before 1900, at least twenty jurisdictions made it unlawful to sell
> handguns and other deadly weapons to minors under the age of
> twenty-one. Five of these laws had exceptions—like for hunting
> or if there was parent consent—but the majority did not include
> exceptions. Moreover, eighteen of these laws went further than
> the Colorado law by prohibiting all acquisitions, not just
> purchases.

121 F.4th at 141 (footnotes omitted).

Plaintiffs minimize the import of the statutes the State proffers. They

maintain that the Founding Era is the only proper period for comparison but that

even if the Court considers the 19th century regulations, the laws fail to support the

State's ban on possession because they are not relevantly similar. *See* ECF No. 36

at 15. Parsing the Plaintiffs' somewhat confusing language on the issue, the Court

gathers that Plaintiffs challenge the relevancy of the laws because they generally

restricted:  (1) illegal discharge of firearms; (2) concealed carry of certain weapons; (3) transfer/possession of discrete categories of weapons, rather than all firearms; and (4) transfer/possession of all firearms to people younger than 18 years old, rather than 18- to 20-year-olds.  *See id.*  In other words, Plaintiffs consider most of these laws as too dissimilar because they didn't ban possession of all guns for 18- to 20-year-olds.  As to (1), the Court agrees and explained above that it does not consider such laws relevantly similar for comparison.  *See supra* at Section III.B.2.c.  As to (2), the Court does not see where the State relies on such laws, but to the extent it does, the Court finds them too far afield from the current challenged law.  But restrictions (3) and (4) require deeper analysis.

For example, the laws the Court listed in the preceding paragraphs all restricted transfer of concealable and carriable arms to people under 21.  *See Jones v. Bonta*, 34 F.4th 704, 720 (9th Cir. 2022), *vacated and reh'g en banc granted*, 47 F.4th 1124 (9th Cir. 2022) (commenting that most of the Reconstruction Era laws banned sales of pistols).  It's noteworthy that they not only banned sales, but also other types of transfer like bartering or gifting.  They did not, however, ban transfer or possession of *all* guns for people under 21.  Even the 1882 Maryland law, which purports to ban transfer of "any firearm whatsoever" to people under 21 years old, specifically excludes "shotgun[s], fowling pieces and rifles."  *See* ECF No. 35-3 at 120.  The Court's review of the State's compiled Reconstruction Era

46

statutes confirms that most of those that prohibit transfer deal with specific types of
guns rather than all firearms.  In fact, the Court could not find a single law in the
record before it that explicitly banned the transfer of all firearms to people under
21.[14]

By contrast, some of those jurisdictions that arguably banned transfer or
possession of *all* firearms had younger age limits.  The following is a non-
exhaustive list of age limits:  12 years – Vermont; 14 years – Arizona, Ohio, and
Utah; 15 years – Garrett County, Maryland, New Jersey, and Rhode Island
(without parental permission); 16 years – New Haven, Connecticut, Massachusetts,
Oregon, and Pennsylvania; 18 years – California and New York (at least in cities).
*See* ECF No. 35-3 at 106–140.  As the list makes obvious, the restrictions trend
very young.  The median age is 15 years old.

So what should the Court make of all this?  Around the time of the passage
of the Fourteenth Amendment, as many as twenty states prohibited transfer of

---

[14]  A couple of laws are somewhat ambiguous.  An 1881 Delaware law, for
example, provides "[t]hat if any person shall carry concealed a deadly weapon
upon or about his person other than an ordinary pocket knife, or shall knowingly
sell a deadly weapon to a minor other than an ordinary pocket knife, such person
shall" be punished.  ECF No. 35-3 at 108.  The law is titled "An Act Providing for
the Punishment of Persons Carrying Concealed Deadly Weapons."  Although the
language is somewhat vague, based on context, this seems to apply to only
concealable arms, but the State does not push the issue and the Court is unsure
whether a handful of examples would suffice regardless.

certain concealable firearms to people under 21 years old. Those restrictions are not "outliers" like Plaintiffs contend. Several states also had blanket bans on transfer to or possession of all firearms for people below certain ages—though most of the ages were much younger than 21. But the State provides no evidence of a blanket ban on transfer of all firearms to people under 21 years old. In short, there is no "dead ringer" or "historical twin" for the current law.

The question then becomes—What principles do the historical prohibitions on the transfer of certain guns to people below 21 or blanket bans for people younger than 18 (and sometimes much younger) reveal? The Court considers the laws banning transfer of handguns and other concealable arms to those under 21 more analogous to the current law than the full firearm bans for the very young. It's common sense that government has and may treat children differently from those who've reached the age of majority. As such, the "why" of the laws banning all guns to the very young seems a bit far afield from the current law.

But the laws that banned the transfer of pistols and other concealable weapons strike the Court as close analogues to the challenged law. The 1875 Indiana law, for instance, prevented any person from selling, bartering, or giving any pistol or other deadly weapon that could be worn or carried concealed on the person to any person under 21. *See* ECF No. 35-3 at 115. When compared with the State's current law, both obviously set 21 as the relevant age. Further, the 1875

48

Indiana law did not distinguish between types of transferors (licensed dealer, private seller, parent)[15] or types of transfer (sale, trade, gift). The current Hawai'i laws similarly apply to any type of acquisition from anyone. The fact that the historical laws like Indiana's applied to transferors and the current Hawai'i laws apply to transferors and acquirors is of little import because the laws demonstrate the same regulatory principle—preventing people under 21 from obtaining certain weapons. But where the Indiana law applies to pistols and other non-firearm arms, the current Hawai'i law applies to all firearms. In short, the laws are functionally identical but for the types of guns they regulate—more like historical siblings than twins.

But while the laws challenged here share a lot of similarities with the historical analogues, the main difference is worth examining. The Reconstruction Era laws clearly demonstrate some historical principle of firearm regulation, but what does it mean that the historical laws applied only to pistols and not *all* firearms? The Court thinks that the distinction between the modern and historical

---

[15] While some laws included exceptions for parental consent, like Missouri in 1883, *see, e.g.*, ECF No. 35-3 at 124, most did not, *see Rocky Mountain Gun Owners*, 121 F.4th at 141. For this reason, the fact that Roache would not only buy a gun, but would also accept one as a gift from his mother, doesn't change the Court's analysis.

laws could lead to a few different conclusions under the *Bruen/Rahimi* test—indeed, three possible alternatives come to mind.

### e.  Applying Reconstruction Laws as Relevantly Similar Regulations—Three Alternatives

First, the historical regulations could demonstrate a principle of gun restriction that means that governments may prohibit the possession of *certain categories of guns* by people under 21.  Under this approach, the State's ban would likely be constitutional only as applied to handguns.  One benefit of that approach is that, to a certain extent, it tracks with federal law.  Under federal law, it is illegal for any licensed seller to sell or deliver any firearm "other than a shotgun or rifle" to any person under 21—in essence, a handgun ban like the historical regulations in the record.  18 U.S.C. § 922(b)(1); *cf. Bruen*, 597 U.S. at 73 (Alito, J., concurring) ("Our decision, as noted, does not expand the categories of people who may lawfully possess a gun, and federal law generally forbids the possession of a handgun by a person who is under the age of 18, 18 U.S.C. §§ 922(x)(2)–(5), and bars the sale of a handgun to anyone under the age of 21, §§ 922(b)(1), (c)(1).").  But federal law bans only certain types of sales by certain types of sellers.  It doesn't prohibit all transfer or acquisition, so it ultimately says little about the instant dispute.  And, as of this past week, the Fifth Circuit struck that law down, so it may not be an apt principle to follow.  *See Reese*, — F.4th —, 2025 WL 340799, at *13.

50

The approach of distinguishing between type of firearm—thereby allowing for the transfer of rifles but not handguns—also runs headlong into *Heller*. *Heller* emphasized self-defense as the inherent right at the heart of the Second Amendment and that the handgun ban in that case "amount[ed] to a prohibition of an entire class of 'arms' that is overwhelmingly chosen by American society for that lawful purpose."  554 U.S. at 628.  Going one step further, the Supreme Court rejected Washington D.C.'s argument that it was "permissible to ban the possession of handguns so long as the possession of other firearms (*i.e.*, long guns) [was] allowed."  *Id.* at 629.  It was enough for the Supreme Court that "handguns are the most popular weapon chosen by Americans for self-defense in the home, and a complete prohibition of their use is invalid."  *Id.*  As such, it seems somewhat inconsistent with modern Second Amendment jurisprudence to say that the mid-19th century laws demonstrate that governments may today prohibit "the quintessential self-defense weapon."  *See id.*  And, in any event, following this approach may be hewing too close to requiring the State to show a historical twin to justify modern regulations.

A second possible approach is to say that if handguns are the "quintessential self-defense weapon," then *the historical regulations prohibiting their transfer to people under 21 years old ran afoul of the Second Amendment when they were passed*.  Plaintiffs took this position at the hearing, arguing that the Reconstruction

51

Era laws showed how states began to "encroach" on the Second Amendment rights. But to come to that conclusion the Court would have to ignore the absence of any constitutional challenges to those laws.

Despite the wave of nearly identical state regulations from the Reconstruction Era, neither party cites a single case in their briefs about constitutional challenges to the mid-19th century age-based restrictions.[16] Considering that dozens of geographically diverse states passed similar laws in the second half of the 19th century, one would expect more caselaw if the public considered the laws even borderline unconstitutional. The lack of challenge suggests that the laws were considered uncontroversial during the era. *See Wolford*, 116 F.4th at 981 ("[I]f the constitutionality of historical laws went undisputed in the courts in the Nation's early years, that evidence suggests that the laws were constitutional. Similarly, if courts unanimously confirmed laws as constitutional, that evidence, too, suggests that the laws were constitutional; the fact that a criminal defendant or two raised a Second Amendment argument that

---

[16] Other modern courts that have considered age-based restrictions have also noted the lack of such litigation. These modern cases cite a couple of semi-relevant historical cases. *See Worth*, 108 F.4th at 698; *Bondi*, 61 F.4th at 1330; *Jones*, 34 F.4th at 720. Those historical cases all upheld enforcement of the age-based restrictions, even if they only tangentially considered constitutionality.

courts quickly rejected does not create a meaningful dispute as to the

constitutionality of the law." (citation omitted)).

Contemporaneous commentators from the era also seemed to accept the

laws' constitutionality.  Those modern cases that cite the few historical court

decisions also mention "the judge and professor Thomas Cooley, who wrote a

massively popular 1868 Treatise on Constitutional Limitations."  *Heller*, 554 U.S.

at 617; *see also Jones*, 34 F.4th at 720; *Bondi*, 61 F.4th at 1330.  An 1883 edition

of Cooley's treatise "espoused the view that states could use their police power to

prohibit the sale of arms to minors."  *Bondi*, 61 F.4th at 1330 (citing Thomas M.

Cooley, Treatise on Constitutional Limitations 740 n.4 (5th ed. 1883)).  *Jones*

discounted this authority because it discussed state police power rather than the

right to keep and bear arms.  *See* 34 F.4th at 720.  But of course, state police power

doesn't extend to unconstitutional actions, and considering that Cooley recognized

an individual right to bear arms in other writings around the same time, *see Heller*

554 U.S. at 617–18, the treatise's comment is at least somewhat persuasive

evidence that laws limiting pistol transfers to those under 21 were uncontroversial.

In sum, the lack of controversy around the handgun transfer laws suggests that they

weren't considered unconstitutional at the time, and thus the approach of treating

them as such now falls flat.

Finally, a third possible conclusion is that *those laws that banned the transfer of pistols are nearly as burdensome as a ban on any firearm and could justify the State's current regulations*.  The two circuit courts that have upheld (even if only briefly in one circuit) age-based restrictions have suggested that to be the case.  For example, in the vacated *Bondi* opinion, the Eleventh Circuit panel explained the same Reconstruction Era laws discussed above were "similarly relevant" to the Florida law that banned the sale of firearms to people under 21 because "while the [challenged] Act covers all firearms and thus handguns," it did not cover the other non-firearm arms that the Reconstruction Era laws discussed like "dirks and bowie knives."  61 F.4th at 1328.  "In other words, both the [challenged] Act and its Reconstruction Era predecessors apply to the sale of handguns and some other class of arms to minors."  *Id.*  Similarly, in the *Rocky Mountain Gun Owners* concurrence, Judge McHugh found the pistol bans analogous precisely because those are the quintessential self-defense weapons.  *See Rocky Mtn. Gun Owners*, 121 F.4th at 141–42 (McHugh, J., concurring) (concluding at *Bruen* step two that historical regulations of handguns justified Colorado's ban of sales of all firearms to people under 21).

The Court considers this third approach to be the most consistent with the Supreme Court's modern Second Amendment cases.  So, even though the challenged Hawaiʻi law isn't a "dead ringer" for the historical precursors, the Court

decides at this preliminary stage that it is "analogous enough" to conclude that

Plaintiffs have not demonstrated they are likely to succeed on their constitutional

challenge. *See Bruen*, 597 U.S at 30. As noted above, the "why" of the historical

laws and current regulation are the same. Both then and now, governments

considered people under 21 to pose a greater threat to public safety than older

adults. *See* ECF No. 35 at 10 ("The Legislature noted that the measure set 'a

minimum age requirement to purchase, own, or possess ammunition that conforms

to the existing minimum age requirement to purchase, own, or possess a firearm in

the State,' and found that doing so would 'help to ensure the safety of residents and

reduce incidents of gun violence in the State.'" (quoting 2024 Haw. Sess. Laws

Act 248, § 1 at 758)). And the "how" of the historical laws are not so different

from the effect of the current challenged law. Historically, the states attempted to

address the threat of young people with arms by prohibiting the transfer to—and

thus preventing the acquisition by—people under 21 years old of a broad swath of

weapons, including handguns. That states could impose such a burden on young

people's Second Amendment rights, suggests that the State's current law "is

consistent with the principles that underpin our regulatory tradition." *See Rahimi*,

602 U.S. at 692.

The Court recognizes that the State's current law goes further than the

historical regulations but the law is not "trapped in amber." *Id.* at 691. Whatever

reason 19th century policy makers had for excluding long guns from the scope of their age-based restrictions, 21st century legislators need not necessarily make those exact same decisions. *See id.* at 739 (Barrett, J., concurring). As Justice Barrett described, courts have faced a level of generality problem when applying *Bruen*. *See id.* The Court thinks that the right level of generality in this case is to say that there is a strong historical tradition in this country of restricting the type of arms that people under 21 years old may keep and bear. Plaintiffs have not demonstrated that the State's current law likely runs afoul of that principle.

## C.    Other Preliminary Injunction Factors

When, as here, a plaintiff alleges a constitutional violation and moves for a preliminary injunction, the likelihood of success factor "is especially important." *Baird*, 81 F.4th at 1041. That is so because deprivation of a constitutional right constitutes irreparable harm. *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012). But Plaintiffs have failed to demonstrate likelihood of success so their path to a preliminary injunction is much narrower. A preliminary injunction may nevertheless be appropriate when there are "serious questions going to the merits and a balance of hardships that tips sharply towards the plaintiff . . . so long as the plaintiff also shows that there is a likelihood of irreparable injury and that the injunction is in the public interest." *Cottrell*, 632 F.3d at 1135 (internal quotation marks omitted). The Court acknowledges that Plaintiffs have raised serious

Second Amendment questions and thus assesses the other preliminary injunction

factors starting with irreparable harm.

Even if Plaintiffs have shown serious questions going to the merits, they

must still demonstrate a *likelihood* of irreparable harm. *See id.* at 1135 ("*Winter*

tells us that plaintiffs may not obtain a preliminary injunction unless they can show

that irreparable harm is likely to result in the absence of the injunction.");

*Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1127 (9th Cir. 2009) ("In *Winter,* the

Supreme Court definitively refuted our possibility of irreparable injury

standard . . . [the] standard [instead] requires plaintiffs seeking preliminary relief

to demonstrate that irreparable injury is likely in the absence of an injunction."

(internal quotation marks and citation omitted)); *see also Winter*, 555 U.S. at 22

("Issuing a preliminary injunction based only on a possibility of irreparable harm is

inconsistent with our characterization of injunctive relief as an extraordinary

remedy that may only be awarded upon a clear showing that the plaintiff is entitled

to such relief.").  Plaintiffs, however, only assert that they'll be harmed "because

they will not be able to exercise their constitutional rights unless a preliminary

injunction is granted."  ECF No. 2-1 at 29.  And because the Court has concluded

that they are not *likely* to succeed on the merits, it follows that even if they have

demonstrated a possibility of irreparable harm, they have not shown a likelihood.

*See, e.g.*, *Peridot Tree WA Inc. v. Wash. State Liquor and Cannabis Control Bd.*,

2024 WL 69733, at *10 (W.D. Wash. Jan. 5, 2024); *Pangea Legal Servs. v. McAleenan*, 2019 WL 3068362, at *3 (N.D. Cal. July 13, 2019).

Similarly, Plaintiffs also base their equities and public interest argument exclusively on the alleged unconstitutionality of the State's laws.  While it's true that "it is always in the public interest to prevent the violation of a party's constitutional rights," *Riley's American Heritage Farms v. Elsasser*, 32 F.4th 707, 731 (9th Cir. 2022) (citation omitted), Plaintiffs have not established the likelihood of a violation.  As such, the equities do not tip sharply in their favor, nor have they demonstrated that the proposed injunction would be in the public interest.

Further, the State provides the Court with evidence that an injunction would not serve the public interest.  One of the State's experts—Professor Elizabeth E. Cauffman—submitted a declaration describing how "[d]evelopmental science demonstrates that important neurobiological development is ongoing throughout the teenage years and continuing into the mid-20s."  ECF No. 35-5 (Cauffman Decl.) ¶ 10.  While age cannot provide bright-line boundaries, Cauffman concludes that people between 18 and 20 years old often exhibit decision-making and judgment more similar to those aged 14 to 17, rather than that of adults in their mid-20s.  *Id.* ¶ 11. This means they are more prone to poor decision-making and impulsive behavior.  *Id.* ¶ 14.  Such deficiencies in self-control, in Cauffman's opinion, are "likely to interfere with safe firearm usage."  *Id.* ¶ 40.  This may help

58

explain why criminal offending "peaks in the late teens or early 20s."  Spitzer

Decl. ¶ 11.  For example, people between 18 and 20 years old account for a

disproportional amount of murders and manslaughters as compared to the share of

the population they represent.  *See id.* ¶ 12 n.6 (citing FBI crime and U.S. Census

Bureau data).  In other words, the State has proffered good reasons why denial of

the preliminary injunction serves the public's interest.

    In the absence of a strong showing of unconstitutionality, the Court declines

to preliminarily enjoin a longstanding age restriction that the State has concluded

best protects the public.

///

///

///

///

///

///

///

///

59

## IV.    CONCLUSION

For the foregoing reasons, the Court denies Plaintiffs' Motion for

Preliminary Injunction.[17]

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, February 7, 2025.



Jill A. Otake
United States District Judge

CIV. NO. 24-00496 JAO-WRP, *Pinales v. Lopez*; Order Denying Motion for Preliminary
Injunction

---

[17]  The Court also denies Plaintiffs' request pursuant to Federal Rule of Civil
Procedure 65(a)(2) to advance a trial on the merits and consolidate it with the
Court's consideration of the Motion.