Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT

## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, SECOND AMENDMENT FOUNDATION,<br><br>        Plaintiffs,<br><br>    v.<br><br>ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAIʻI,<br><br>        Defendant. | Civil No. 24-00496 JAO-WRP<br><br><br>**STIPULATION TO FILE FIRST AMENDED COMPLAINT** |

## **STIPULATION TO FILE FIRST AMENDED COMPLAINT**

Plaintiffs ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, SECOND AMENDMENT FOUNDATION ("**Plaintiffs**") and Defendant ANNE E. LOPEZ, in her official capacity as the Attorney General of the State of Hawai'i ("**Defendant**" and, together with Plaintiffs, the "**Parties**"), through counsel, hereby stipulate as follows:

WHEREAS, Plaintiffs filed their Complaint on November 20, 2024 (ECF No. 1), and;

WHEREAS, Defendant was served on November 22, 2024, and;

WHEREAS, the Court entered its Order Denying Motion for Preliminary Injunction on February 7, 2025 (ECF No. 45);

WHEREAS, the deadline for Defendant's response to Plaintiffs' Complaint is currently March 20, 2025; and

NOW, THEREFORE, the Parties stipulate that Plaintiffs be granted leave to file an amended complaint, a proposed copy of which is attached to this stipulation. If the Court approves this stipulation, Plaintiffs will file the amended complaint by the next business day.

This is the first stipulation to file an amended complaint submitted in connection with this litigation.

DATED:    March 14, 2025,


/s/Alan Beck
ALAN ALEXANDER BECK
KEVIN GERARD O'GRADY


Attorneys for Plaintiffs ELIJAH
PINALES, JUDA ROACHE,
ALOHA STRATEGICS LLC DBA
DANGER CLOSE TACTICAL, JGB
ARMS LLC, SECOND
AMENDMENT FOUNDATION


/s/ Ewan C. Rayner
EWAN C. RAYNER
KALIKOʻONĀLANI D. FERNANDES
THOMAS J. HUGHES
DOUGLAS N. LETTER [*Pro Hac Vice*]
ERIN C. DAVIS
SHIRA LAUREN FELDMAN [*Pro Hac Vice*]
TESS M. FARDON [*Pro Hac Vice*]
MARK S. DAVIS
AIMEE M. LUM

Attorneys for Defendant ANNE E. LOPEZ

in her official capacity as the Attorney
General of the State of Hawaiʻi

IT IS SO APPROVED AND ORDERED:

DATED: HONOLULU, HAWAII, MARCH 18, 2025.



_____
Wes Reber Porter
United States Magistrate Judge

_Pinales v. Lopez_; Civil No. 24-00496 JAO-WRP; United States District Court for
the District of Hawaii; STIPULATION TO FILE FIRST AMENDED
COMPLAINT

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | | |
|---|---|---|
| ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, SECOND AMENDMENT FOUNDATION, | ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | Civil Action No. 1:24-cv-00496 JAO-WRP |
| v. | ) ) | VERIFIED FIRST AMENDED COMPLAINT |
| ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, | ) ) ) ) ) | |
| Defendant | ) ) | |
| | ) | |

## <u>VERIFIED <span style="color:red">FIRST AMENDED</span> COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF</u>

COME NOW the Plaintiffs, ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, and SECOND AMENDMENT FOUNDATION, by and through their undersigned counsel, and complains of the Defendant as follows:

## I

## <u>PARTIES</u>

**Plaintiffs**

1.  Plaintiff ELIJAH PINALES (hereinafter "Pinales") is a natural person, an adult male, over the age of 18 and under the age of twenty-one (hereinafter a "adult(s) under 21"), age nineteen (19) years old, a resident of the State of Hawaii, residing in Honolulu County and is a citizen of the United States. But for the actions of State of Hawaii (hereinafter the "State"), challenged in this lawsuit, he intends to and would have a permit to acquire (hereinafter "PTA"), and would be able to acquire, purchase, own, and possess[1] a firearm and ammunition <u style="color:red">consistent with federal law</u>. Plaintiff Pinales is a member of the Second Amendment Foundation;

---

[1] In all references wherein Plaintiffs complain of Hawaii Revised Statutes herein, specifically with regard to possession, Plaintiffs complain of the prohibitions regarding possession of firearms and ammunition beyond what is allowed under Hawaii Revised Statutes §§134-4 and 134-5.

2. Plaintiff JUDA ROACHE (hereinafter "Roache") is a natural person, a male, age seventeen (17) 18 years old, born December 15, 2006, who will be turned 18 on December 15, 2024, an "adult under 21", resident of the State of Hawaii, residing in Honolulu County and is a citizen of the United States.  But for the laws at issue as specified herein, he intends to and would apply for a PTA.  But for the laws at issue as specified herein, he would acquire, purchase, own and possess a firearm and ammunition consistent with federal law.  But for the laws at issue as specified herein, Plaintiff Roache intends to and would also accept, acquire and own a firearm and ammunition given to him by his mother.  Plaintiff Roache is a member of SAF;

3. Aloha Strategics LLC DBA Danger Close Tactical, (hereinafter "DCT"), is a business authorized to operate in the state of Hawaii.  DCT is located in Honolulu County.  DCT is a federally licensed firearms dealer and is legally authorized to sell firearms and ammunition to purchasers in a retail setting in the state of Hawaii and county of Honolulu.  DCT has customers who are at least eighteen years old and under the age of twenty-one years old, "adults under 21", who are not otherwise disqualified under federal and state law to acquire, buy, own and possess firearms and ammunition and who want to acquire, buy, and possess firearms and ammunition.  DCT desires to engage in business with and sell firearms and ammunition to buyers who are at least eighteen years old and also under the age of twenty-one years old, and intends to and would do so, but for the State laws

challenged here and the criminal prosecution that would follow. DCT is a member

of SAF;

4. JGB Arms LLC, (hereinafter "JGB"), is a business authorized to operate in the

state of Hawaii. JGB is located in Kauai County. JGB is a federally licensed

firearms dealer and is legally authorized to sell and or transfer firearms to

purchasers in a retail setting in the state of Hawaii and county of Kauai. JGB has

customers who are at least eighteen years old and under the age of twenty-one

years old and who are not otherwise disqualified under federal and state law and

who want to acquire, buy, and possess firearms and ammunition. JGB desires to

engage in business with and sell firearms and ammunition to buyers who are at

least eighteen years old and under the age of twenty-one years old, and intends to

do so and would do so, but for State's laws challenged here and the criminal

prosecution that would follow. JGB is a member of SAF;

5. Plaintiff Second Amendment Foundation (hereinafter "SAF"), is a non-profit

educational foundation incorporated under the laws of Washington with its

principal place of business in Bellevue, Washington. SAF seeks to preserve the

effectiveness of the Second Amendment through educational and legal action

programs. SAF has over 720,000 members and supporters nationwide, including

members in Hawaii. The purpose of SAF includes education, research, publishing,

and legal action focusing on the constitutional right to privately acquire, own and

possess firearms and ammunition under the Second Amendment, and the consequences of gun control. The Court's interpretation of the Second Amendment directly impacts SAF's organizational interests, as well as SAF's members and supporters in Hawaii, who enjoy exercising their Second Amendment rights. SAF brings this action on behalf of itself, its members, supporters who possess all the indicia of membership, and similarly situated members of the public. Many of SAF's individual Hawaii members between the ages of 18 and 20, including Plaintiffs Pinales and Roache[2] and business members DCT and JGB, have been adversely and directly harmed and injured by Defendant's enforcement of the statutory prohibition on the lawful sale of firearms and ammunition to adults between the ages of 18 and 20. Indeed, Hawaii Revised Statutes §§134-2(d)(1) and 134-7(g), and other HRS specified herein, have denied, and will continue to deny, millions of responsible, peaceable, law-abiding adults under the age of 21, "adult(s) under 21", their fundamental, individual right to keep and bear arms secured under the Second and Fourteenth Amendments of the U.S. Constitution. Defendant's actions and failures alleged herein have caused SAF to dedicate resources that would otherwise be available for other purposes to protect the rights and property of its members, supporters, and the general public, including by and through this action;

---

[2] Effective December 15, 2024.

**Defendant**

6.  Defendant Anne E. Lopez, (hereinafter referred to as "State"), is the Attorney

General of the State of Hawaii

and is sued in her official capacity and is responsible for enforcing the State of

Hawaii's customs, policies, practices and laws related to the State of Hawaii on the

acquisition, sale, purchase, ownership and possession of firearms and ammunition

and criminal laws including those related to the acquisition, sale, purchase,

ownership and possession of firearms and ammunition. Defendant Lopez may be

served at the Office of Attorney General located at 425 Queen St, Honolulu,

Hawaii 96813;

**II**

**JURISDICTION AND VENUE**

7.  This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C.

§§ 1331, 1343, 2201, 2202 and 42 U.S.C. § 1983 and § 1988;

8.  Venue lies in this Court pursuant to 28 U.S.C. § 1391;

**III**

**INTRODUCTION**

9.  This action challenges the constitutionality of State's laws that prohibits the

acquisition, purchase, sale, ownership, and possession of firearms[3] and ammunition

by adult(s) under 21;

10. State's prohibition of firearm and ammunition acquisition, ownership, and

possession, and the related sale and purchase of firearms and ammunition, by,

adults under 21 makes it impossible for those individuals to exercise their right to

"keep arms", as guaranteed by the Second Amendment's text and as recognized

and reaffirmed by the Supreme Court in *New York State Rifle & Pistol Ass'n, Inc.*

*v. Bruen*, 142 S. Ct. 2111 (2022);

11.  The main laws, policies, actions, and customs that Plaintiffs target and allege

are unconstitutional here are-

A. Hawaii Revised Statutes, (hereinafter "HRS"), §134-2 (a), as it applies to HRS

§134-2(d)(1);

> HRS §134-2(a) reads-
>
> §134-2  Permits to acquire.  (a) No person shall acquire the
> ownership of a firearm, whether usable or unusable, serviceable
> or unserviceable, modern or antique, registered under prior law
> or by a prior owner or unregistered, either by purchase, gift,
> inheritance, bequest, or in any other manner, whether procured
> in the State or imported by mail, express, freight, or otherwise,
> until the person has first procured from the chief of police of the
> county of the person's place of business or, if there is no place

---

[3] Plaintiffs also challenge the denial of the acquisition and ownership of firearms
through the prohibition of the issuance of "permits to acquire", hereinafter "PTA",
referenced in HRS §134-2, for firearms to adult(s) under 21.

of business, the person's residence or, if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as prescribed in this section. When title to any firearm is acquired by inheritance or bequest, the foregoing permit shall be obtained before taking possession of the firearm; provided that upon presentation of a copy of the death certificate of the owner making the bequest, any heir or legatee may transfer the inherited or bequested firearm directly to a dealer licensed under section 134-31 or licensed by the United States Department of Justice without complying with the requirements of this section.

B. HRS §134-2(d)(1), which reads-

(d) The chief of police of the respective counties shall issue permits to acquire firearms to: (1) Citizens, nationals, or lawful permanent residents of the United States of the age of twenty-one years or more[4];

C. HRS §134-2 (h), which reads-

(h) No person shall sell, give, lend, or deliver into the possession of another any firearm except in accordance with this chapter.[5]

D. HRS §134-7(g), which reads-

§ 134-7. Ownership, possession, or control prohibited, when; penalty

(g) Except as provided in section 134-5, no person who is under the age of twenty-one shall own, possess, or control any ammunition for any firearm; provided that this subsection shall not apply to a person in an exempt category identified in section 134-11(a).

---

[4] Plaintiffs, in this lawsuit, do not challenge the "citizens, nationals or lawful permanent residents" aspect of this statute-only the age restriction.
[5] As this statute applies to Hawaii Revised Statute §134-2(d)(1).

E. H.R.S. §134-7.7, which reads-

[§ 134-7.7]. Sale of ammunition to a person under the age of twenty-one; prohibition; penalty

(a) No person shall intentionally, knowingly, or recklessly sell, offer to sell, distribute, or otherwise transfer ammunition for any firearm to any person who is under the age of twenty-one; provided that it shall not be a violation of this section to sell, offer to sell, distribute, or otherwise transfer ammunition to a person who:
(1) Meets the criteria to possess a firearm under section 134-5; and
(2) Is actively engaged in hunting or target shooting or going to or from the place of hunting or target shooting.
(b) Any person who sells, offers for sale, distributes, or otherwise transfers ammunition for any firearm shall check the government-issued photographic identification of the buyer or recipient to establish the age of the buyer or recipient before making the transfer.
(c) It shall be an affirmative defense to subsection (a) that the seller, distributor, or transferor of the ammunition had requested, examined, and reasonably relied upon a government-issued photographic identification establishing the age of the buyer or recipient as at least twenty-one years of age before selling, offering to sell, distributing, or otherwise transferring the ammunition.
(d) Any person violating subsection (a) shall be guilty of a misdemeanor.

12. Plaintiffs respectfully request that this Court: (i) declare, facially and as applied to each Plaintiff, that HRS §§134-2(a), 134-2(d)(1), 134-2(h), and 134-7(g), and 134-7.7, and Defendant's policies and practices of enforcing those laws, which prohibits adults under 21, between the ages of 18 and 20, from acquiring, purchasing, and owning and or possessing any firearm or ammunition, and which also prohibits authorized firearm dealers and others from engaging in commerce with and selling and giving, lending, renting, transferring and gifting firearms and ammunition to adults under 21 are unconstitutional infringements of Plaintiffs'

constitutional rights under the Second and Fourteenth Amendments of the United

States Constitution; and (ii) permanently enjoin Defendant from enforcing the

aforementioned HRS, both facially and as applied to each Plaintiff, and thereby

allow non-federally licensed firearm dealer Plaintiffs, and others similarly situated,

to acquire, purchase, own, sell, transfer and possess firearms and ammunition to

adults under 21 to defend themselves, their families, and their homes and for all

other lawful purposes, and to allow federally licensed firearm dealers to sell, rent,

and transfer firearms and ammunition to adults under 21;

## IV

## HAWAII FIREARM LAW BACKGROUND

13.  In anticipation of bad-faith efforts to obstruct its ruling in recalcitrant

jurisdictions, the *Bruen* Court expressly invited challenges such as this one,

noting that, "because any permitting scheme can be put toward abusive

ends, we do not rule out constitutional challenges to shall-issue regimes

where, for example, lengthy wait times in processing license applications

or exorbitant fees deny ordinary citizens their right to public carry." *Id*.

The policies that Plaintiffs challenge[6] have gone far beyond

"abus[ing]"constitutional rights. Defendant has flat-out denied

---

[6] Despite Hawaii's comprehensive statutory denial and infringement of Second
Amendment rights, this lawsuit *only* attacks the aspect of adults under 21 being

Plaintiffs their rights to be armed inside and outside of their homes by establishing

an onerous permitting regime replete with subjective and discretionary decisions,

poll tax-like fees, and *as applicable to this lawsuit*, an outright ban on the

acquisition, sale, purchase, ownership and possession of firearms and ammunition

by adults under 21, and it has also unconstitutionally interfered with and blocked

otherwise lawful commerce between DCT and JGB and adults under 21 who desire

to, intend to and would otherwise purchase and acquire ownership of firearms and

ammunition but for State's adults under 21 prohibitions;

14.  There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised

Statute, to allow an adult under 21 to acquire or own a firearm without a PTA

when the adult under 21 would acquire a firearm through inheritance;

15. There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised

Statute, to allow an adult under 21 to acquire or own a firearm without a PTA

when the adult under 21 would acquire or own a firearm through intra-familial

transfer;

---

statutorily prohibited from being "granted" a permit to acquire, and also from
purchasing, selling, owning and possessing firearms and ammunition and also from
authorized persons from selling firearms and ammunition to adults under 21. *See*
FN 1.

16. There is no exception to HRS §134-2(d)(1), or any other Hawaii Revised Statute, would allow an adult under 21 to acquire or own a firearm without a PTA when the adult under 21 would acquire or own the firearm due to it being a gift;

17.  There is no exception to HRS §134-7(g), or any other Hawaii Revised Statute, to allow an adult under 21 to acquire, buy, own or possess ammunition if the ammunition would be acquired or possessed due to inheritance, intra-familial transfer, or gift.There is no exception under HRS §134-7.7, or any other Hawaii Revised Statute, to allow an adult under 21 to buy, acquire, possess, or have transferred to him, any ammunition from a relative, intra-familial transfer or through inheritance or gift;

18. HRS §134-4 Transfer, Possession of Firearms, (c), reads, in pertinent part,-

> (c)  Any lawfully acquired rifle or shotgun may be lent to an adult for use within the State for a period not to exceed fifteen days without a permit; provided that where the rifle or shotgun is to be used outside of the State, the loan may be for a period not to exceed seventy-five days;

19. HRS §134-5, reads, in relevant part- §134-5 Possession by licensed hunters and minors; target shooting; game hunting.

> (a)  Any person of the age of sixteen years, or over or any person under the age of sixteen years while accompanied by an adult, may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting or while going to and from the place of hunting or target shooting; provided that the person has procured a hunting license under chapter 183D, part II.  A hunting license shall not be required for persons engaged in target shooting.

(b)  A permit shall not be required when any lawfully acquired firearm is lent to a person, including a minor, upon a target range or similar facility for purposes of target shooting; provided that the period of the loan does not exceed the time in which the person actually engages in target shooting upon the premises.

20. HRS §134-17 reads in pertinent part, Penalties…. (b) Any person who violates:

(1) Section 134-2, 134-4, 134-10, 134-13(c), or 134-15 shall be guilty of a misdemeanor;

21.  HRS §134-7(j) reads-

(j) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. Any person violating subsection (c), (d), (e), (f), (g), or (h) shall be guilty of a misdemeanor;

22.  HRS §134-11, exemptions, are not applicable to this lawsuit;

<div align="center">

**V**

**STATEMENT OF LAW**

**A**

**SECOND AMENDMENT**

</div>

23. The Second Amendment to the United States Constitution provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms shall not be infringed.";

24. The Second Amendment guarantees individuals a fundamental right to keep and carry arms for self-defense and defense of others in the event of a violent

confrontation. *District of Columbia v. Heller*, 554 U.S. 570 (2008); *McDonald v. Chicago*, 561 U.S. 742 (2010); *Caetano v. Massachusetts,* 577 U.S. 1027 (2016); *NYSRPA v Bruen,* 597 U.S. 1, 142 S. Ct. 2111 (2002);

25. The Second Amendment is applicable to the States as incorporated through the Due Process Clause of Fourteenth Amendment because the right to "keep and bear Arms" is a fundamental constitutional right essential to ordered liberty. *McDonald v. City of Chicago*, 561 U.S. 742 (2010).

26. In *Bruen*, the Supreme Court held unconstitutional New York's "good cause" licensing requirement because a State may not condition the right to publicly carry handguns on a citizen's "special need for self-defense." *Bruen*, 142 S.Ct. at 2135 n.8;

27. The "general right to public carry" cannot be restricted absent "*exceptional* circumstances." *Bruen*, 142 S. Ct. at 2156 (emphasis added). This is because the Second Amendment "presumptively protects" carrying firearms. *Id.* At 2129. To determine whether a state's restriction is constitutional, the Court in *Bruen* explained that "the standard for applying the Second Amendment is as follows: When the Second Amendment's plain text covers an individual's conduct, the Constitution presumptively protects that conduct. The government must then justify its regulation by demonstrating that it is consistent with the Nation's historical tradition of firearm regulation." 142 S. Ct. at 2129. If the right to carry

cannot be restricted absent "exceptional circumstances" then certainly the right to acquire, own and possess similarly is presumptively protected from restriction, and an outright ban is unconstitutional. Being an adult under 21 is not an "exceptional circumstance";

28. It is the State's burden to "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." 142 S.Ct. at 2127; *see also id.* At 2150 ("[W]e are not obliged to sift the historical materials for evidence to sustain New York's statute. That is respondents' burden."). If the State fails to meet its burden, then the State's restrictions must be enjoined;

29. The *Bruen* Court struck down as unconstitutional New York's "proper cause" requirement for issuance of a permit to carry a handgun in public. In doing so, *Bruen* explicitly rejected New York's attempt to justify its restriction as analogous to a historical "sensitive place" regulation. 142 S.Ct. at 2133-34. The Court explained that a state may not simply ban guns wherever people may "congregate" or assemble. A rule that "expand[ed] the category of 'sensitive places' simply to all places of public congregation that are not isolated from law enforcement defines the category of 'sensitive places' far too broadly." 142 S. Ct. at 2134. As the Court explained, "[p]ut simply, there is no historical basis for New York to effectively

declare the island of Manhattan a 'sensitive place' simply because it is crowded

and protected generally by the New York City Police Department." *Id;*

30. The Fourteenth Amendment to the United States Constitution provides in

pertinent part: No state shall make or enforce any law which shall abridge the

privileges or immunities of citizens of the United States; nor shall any state deprive

any person of life, liberty, or property, without due process of law; nor deny to any

person within its jurisdiction the equal protection of the laws;

31. The Supreme Court has defined all of the Second Amendment's key terms. "The

people" means, at a minimum, "all Americans"; "Arms" includes "all instruments

that constitute bearable arms";  *Heller*, 554 U.S. at 580–82,;

32. "We turn to the phrases 'keep arms' and 'bear arms'.  Johnson defined 'keep'

as, most relevantly, '[t]o retain; not to lose,', and '[t]o have in custody.'  Johnson

1095.  Webster defined it as '[t]o hold; to retain in one's power or possession.' No

party has apprised us of an idiomatic meaning of "keep Arms."  Thus, the most

natural reading of 'keep Arms' in the Second Amendment is to 'have weapons'

*Heller*, 554 U.S. at 582;

33. In *Jackson*, the Ninth Circuit found that ammunition is protected by the Second

Amendment, and one thus has a right to purchase it. "'[T]he right to possess

firearms for protection implies a corresponding right' to obtain the bullets

necessary to use them." *Jackson v. City & Cty. of S.F.*, 746 F.3d 953, 967 (9th Cir. 2014) (quoting *Ezell v. City of Chi*., 651 F.3d 684, 704 (7th Cir. 2011);

34. "[T]he core Second Amendment right to keep and bear arms for self-defense 'wouldn't mean much' without the ability to acquire arms." *Teixeira v. Cty. of Alameda,* 873 F.3d 670, 677 (9th Cir. 2017). For this reason, the right to keep and bear arms includes the right to purchase them. And thus, laws that burden the ability to purchase arms burden Second Amendment rights. *Jones v. Bonta*, 34 F.4th 704, 716 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022);

35. "18-to-20-year-olds are, like other subsets of the American public, presumptively among "the people" to whom Second Amendment rights extend." *Lara v. Commr. Pennsylvania State Police,* 91 F.4th 122, 132 (3d Cir. 2024); "Ordinary, law-abiding 18 to 20-year-old Minnesotans are unambiguously members of the people." *Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) at 692, reh'g denied, *Worth v. Jacobson*, 2024 WL 3892865, (C.A.8 (Minn.), 2024). "[T]he Court concludes that law-abiding 18-to-20-year-olds are a part of "the people" referenced in the Second Amendment." *Firearms Policy Coalition, Inc. v. McCraw*, 623 F. Supp. 3d 740, 748 (N.D. Tex. 2022), appeal dismissed sub nom. *Andrews v. McCraw*, No. 22-10898, 2022 WL 19730492 (5th Cir. Dec. 21, 2022); "We agree with Plaintiffs: the historical record shows that the Second Amendment

protects young adults' right to keep and bear arms." *Jones v. Bonta*, 34 F.4th 704, 720 (9th Cir. 2022), opinion vacated on reh'g, 47 F.4th 1124 (9th Cir. 2022).

"[T]he Constitution's text, structure, and history affirmatively prove that 18-year-olds are covered by the Second Amendment." *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 440 (4th Cir. 2021), as amended (July 15, 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021).[7];

36. *Heller* established a "text, history, and tradition" framework for analyzing Second Amendment questions. *See United States v Rahimi,* 144 S. Ct. 1889 at 1897. *See also Bruen*, 142 S. Ct. at 2127-29, citing *Heller*, 554 U.S. at 634. Under that framework, the *Heller* Court assessed historical evidence to determine the prevailing understanding of the Second Amendment at the time of its ratification in 1791. Based on that assessment, the Court concluded that the District of Columbia statute which prohibited possession of the most common type of firearm in the nation (the handgun) lacked a Revolutionary-era tradition, did not comport with the historical understanding of the scope of the right, and therefore violated the Second Amendment;

---

[7] Plaintiffs recognize that the *Jones* and *Hirshfeld* opinions have both been vacated. However, they both remain persuasive authority.  The *Hirschfeld* opinion was vacated because all of the plaintiffs turned 21 and no adults under 21 were substituted as plaintiffs.

37.  Since *Bruen*, the Fifth Circuit ~~a trial court~~ recently found that the federal law

restricting the sale of handguns to adults under 21 is unconstitutional. *See Reese v.*

*Bureau of Alcohol, Tobacco, Firearms, & Explosives,* 127 F.4th 583 (5th Cir.

2025).  This is in accord with a trial court in the Fourth Circuit finding that the

same law is unconstitutional.  "In summary, because Plaintiffs' conduct – the

purchase of handguns – "fall[s] [within] the Second Amendment's 'unqualified

command' " and the challenged statutes and regulations are not "consistent with

the Nation's historic tradition of firearm regulation," the Court **FINDS** 18 U.S.C.

§§ 922(b)(1) and (c)(1) facially unconstitutional and as applied to Plaintiffs.

Plaintiffs having demonstrated there is no genuine dispute of material fact and that

they are entitled to judgment as a matter of law, their Motion for Summary

Judgment [ECF No. 28] is **GRANTED**. For the same reasons,", *Brown v. Bureau*

*of Alcohol, Tobacco, Firearms & Explosives*, 704 F. Supp. 3d 687, 706 (N.D.W.

Va. 2023), appeal pending, 4th Cir.:

38.  When examining a challenged law, the court must consider the relevant time

period and the court must look to relevantly similar historical analogues that also

explain the how and why and keep in mind that our forefathers would have never

have accepted certain legislation[8].  Some legislation would have never been

---

[8] How the British Gun Control Program Precipitated the American Revolution,
*David B. Kopel,* Charleston Law Review, Volume 6 Winter 2012 Number 2, "We

accepted and thus is off the table for consideration.  The Founding Fathers framed

a limited government[9], and vastly *expanded* the right to keep and bear arms in

America[10].  Laws of the time[11] did not control people nor arms, but sought to, as

today, punish criminal acts and only act in a prophylactic manner under very

limited circumstances.  So, there were laws prohibiting intoxicated carrying of

arms and the temporary disarmament of those adjudicated to be insane and thus

_____

can discern that broad attempts to disarm the people of a town, or to render them
defenseless, are anathema to the Second Amendment; such disarmament is what
the British tried to impose, and what the Americans fought a war to ensure could
never again happen in America. Similarly, gun licensing laws that have the
purpose or effect of allowing only a minority of the people to keep and bear arms
would be unconstitutional." *Id* at 285-286.

[9] Some rights, like the right to keep and bear arms were so broad in nature, there
were some who felt that the Constitutional amendments were unnecessary because
they could not see any government infringing upon those rights.  *See* Federalist
Papers 84.

[10] *See Passages of Arms: The English Bill of Rights and the American Second
Amendment*, University of Nebraska-Lincoln, Nebraska law Review, Christopher
D. Carrier, September 5, 2021, a review discussing Professor Schwoerer and
Professor Malcolm, with Schwoerer arguing that despite widespread firearm
ownership in England, England sought to restrict firearm possession, "She argued
that there was no intent to create a right, and no such effect, in that the three forms
of restriction (Protestantism, socioeconomic "condition," and the crucial qualifier
"as allowed by law") vitiated any real effect in the form of widespread individual
gun ownership."  The Second Amendment contains no such qualifiers.  One
common thread did remain, and that was a focus on the "use" of a gun, not the
mere possession of it. "Indeed—and the condemnation was on the *use* of the
firearms, not the possession of them."  *Id.*

[11] That the Founders would have accepted.  Parliamentary acts, cited *infra*, that
served as the catalyst for the American Revolution and the Second Amendment are
examples of the *kinds* of laws, and principles, that the Founders found
unacceptable- unacceptable enough to start a revolution.

dangerous[12].  At the time of the Founding and in 1791, ordinary adults under 21 had all the rights of any other adult otherwise.

39. The relevant time period to examine to determine if there are any relevantly similar analogues that limit Second Amendment rights in the same way is 1791. *See Lara v. Comm'r Pennsylvania State Police*, 91 F.4th 122, 134 (3d Cir. 2024), cert. granted, judgment vacated sub nom. *Paris v. Lara*, No. 24-93, 2024 WL 4486348 (U.S. Oct. 15, 2024) (Footnotes omitted) ("the Second Amendment should be understood according to its public meaning in 1791."). *See also*, *United States v. Connelly*, --- F.4th ----, 2024 WL 3963874 at *9 (5th Cir. Aug. 28, 2024) ("Offering three laws passed scores of years post-Ratification (and a fourth passed nearly half a century beyond that) misses the mark by a wide margin.").  *See also Mark Smith[13],  "*No Supreme Court case has ever looked to 1868 as the principal

---

[12] A 1774 American treatise on the liberties belonging to English subjects included an example of a warrant to secure a lunatic for constables, churchwardens, and overseers of the poor that allowed two justices of the peace to detain individuals by lunacy so disordered in their senses, that he is dangerous to go abroad. *See* 1788 N.Y. Laws Ch. 12., and, a 1655 Virginia law prohibiting the shoot[ing] any guns at drinkeing, a 1771 New York law banning shooting guns around New Year's to prevent the great Damages frequently done by persons  intoxicated with Liquor; 1655 Va. Acts 401, Acts of March 10, 1655; 1771 Colonial Laws of New York.
[13] Smith, Mark W., *'Not All History Is Created Equal': In the Post-Bruen World, the Critical Period for Historical Analogues Is when the Second Amendment Was Ratified in 1791, and not 1868* (October 1, 2022). Available at SSRN: https://ssrn.com/abstract=4248297 or http://dx.doi.org/10.2139/ssrn.4248297

period for determining the meaning of an individual right in the Bill of Rights. If periods after 1791 are consulted at all, it is only to confirm that subsequent authorities, generally very shortly after the Founding, remained consistent with the public understanding in 1791."

40. It has long been established that a State may not impose a penalty upon those who exercise a right guaranteed by the Constitution. *Frost & Frost Trucking Co. v. Railroad Comm'n of California*, 271 U.S. 583, 593-94 (1926). "Constitutional rights would be of little value if they could be . . . indirectly denied" (*Smith v. Allwright*, 321 U.S. 649, 664 (1944)), or "manipulated out of existence." *Gomillion v. Lightfoot*, 364 U.S. 339, 345 (1960). "Significantly, the Twenty- Fourth Amendment does not merely insure that the franchise shall not be 'denied' by reason of failure to pay the poll tax; it expressly guarantees that the right to vote shall not be 'denied or abridged' for that reason." *Harman v. Forssenius*, 380 U.S. 528, 540 (1965) (citation omitted). Thus, like the Fifteenth Amendment, the Twenty-Fourth "nullifies sophisticated as well as simple-minded modes" of impairing the right guaranteed. *Lane v. Wilson*, 307 U.S. 268, 275 (1939). " 'It hits onerous procedural requirements which effectively handicap exercise of the franchise by those claiming the constitutional immunity.' " *Harman*, 380 U.S. at 540-41 (citations omitted), quoting *Lane*, at 275;

41. 10 U.S.C. §505(a) allows adults age 18 to join the United States military, and

to join at age 17 with parental consent. *See* 10 U.S.C. §505(a) which reads-

> (a)    The Secretary concerned may accept original <u>enlistments</u> in the
> Regular Army, Regular Navy, Regular Air Force, Regular Marine Corps,
> Regular Space Force, or Regular Coast Guard, as the case may be, of
> qualified, effective, and able-bodied persons who are not less than seventeen
> years of age nor more than forty-two years of age. However, no person
> under eighteen years of age may be originally enlisted without the written
> consent of his parent or guardian, if he has a parent or guardian entitled to
> his custody and control.

Thus, adults under 21 may join the military;

42. The Twenty-sixth Amendment to the United States Constitution

provides, in pertinent part-

> The right of citizens of the United States, who are eighteen years of age or
> older, to vote shall not be denied or abridged by the United States or by any
> State on account of age.

Thus, adults under 21 can vote[14];

---

[14] At Common Law, minors could enter into enforceable contracts for necessities. The term necessity went beyond basic necessities such as food and encompassed any necessity that was "essential to him in his current position in life." Austen-Baker, Richard and Hunter, Kate (2020) Infants' Contracts: Law and Policy in the 18th and 19th Centuries. Journal of Contract Law, 36 (4). pp. 1-24  at 15 (attached as Exhibit 1) available at https://eprints.lancs.ac.uk/id/eprint/139393/1/JC_Infants_Capacity_JCL_Final_Rev_1_1_.pdf; *See also Peters v Fleming*, (1840) 6 M & W 42 (finding the same); *See also* Miller, Clayton Isaac, "Contracts of Infants" (1892) at 9 (attached as Exhibit 2) available at https://scholarship.law.cornell.edu/cgi/viewcontent.cgi?article=1275&context=historical_theses.  In colonial America, firearms were a necessity pursuant to this

43.  *Bruen* further establishes several requirements to determine whether a

historical regulation is sufficiently analogous. First, the relevant time period for the

historical analogue must be the Founding, centering on 1791. *Bruen*, 142 S.Ct. at

2135-36. That is because "'[c]onstitutional rights are enshrined with the scope they

were understood to have when the people adopted them.'"  *Bruen*, 142 S.Ct. at

2136, quoting *District of Columbia v. Heller*, 554 U.S. 570, 634-35 (2008).  "20th

century and late 19th century statutes and regulations "cannot provide much insight

---

definition because they were required for hunting, militia service, self-defense and
other necessary aspects of life. Thus, a minor could enter into an enforceable
contract to purchase a firearm. Employment was considered another form of
necessity. *See* Infants' Contracts at 31. In fact, from at least fifteen years old,
colonists routinely entered into contracts to serve on-board private merchant
vessels as apprentices, midshipmen, cabin boys and powder monkeys. This
included orphans who did not have parents or other guardians to consent to their
contract.  *See*
https://naturalhistory.si.edu/sites/default/files/media/file/wibconditionsearlycolonie
sfinal.pdf.  "("Indentured servants were mostly young men between the ages of 15
and 25 years, who signed contracts in England to work in the colonies without
wages.").  *See also*, https://seahistory.org/sea-history-for-kids/kids-as-crew/,
"Today, you have to be 14 years old before you can get a job in most states in the
US, but in the Age of Sail both merchant ships and navy vessels signed on boys as
young as seven years old as regular members of the crew. Positions open to kids
were usually that of cabin boy (also called ship's boy), midshipman, and powder
monkey. Ship's boys and powder monkeys usually came from poor families, or
were runaways or orphans. Getting a position onboard a ship at least meant they
had a place to sleep and meals to eat, plus opportunities to travel the world and
perhaps rise in the ranks and captain their own ships someday." *Id.*

into the meaning of the Second Amendment when it contradicts earlier evidence." *Bruen*, 142 S.Ct. at 2154 & n.28;

44. Thus, restrictions on the right to keep and bear arms dating after the Civil War and after the adoption of the Fourteenth Amendment in 1868 may be confirmatory of earlier legislation but cannot be used alone to provide the appropriate historical analogue required by *Bruen*[15]. Legislation, history and events following the Civil war can confirm but cannot limit, reduce or infringe upon the rights as understood in 1791. In other words, only those restrictions with roots at the time of the Founding are sufficiently "enduring" and "well-established" to comport with the Second Amendment's "unqualified command." *Id.* at 2126 (quoting *Konigsberg v. State Bar of Cal.*, 366 U.S. 36, 50 n.10 (1961));

45. Second, the historical analogue must be "representative." Historical "outlier" requirements of a few jurisdictions or of the Territories are to be disregarded. *Bruen*, 142 S.Ct. at 2133, 2153, 2147 n.22 & 2156. Courts should not "uphold every modern law that remotely resembles a historical analogue," because doing so

---

[15] Note that the Reconstruction Period, generally from approximately 1865-1877, involved federal troops in the south, followed by the passage of Black Codes and then Jim Crow laws, such laws extending long into the 20th century, and the passage of Constitutional amendments trying to ensure basic constitutional rights to newly freed slaves. That time period was not typical nor traditional and could not have lessened the rights as understood from 1791. Constitutional acts, in the late 1800's, meant to ensure newly freed slaves the rights, understood by the founders in 1791, in the Constitution, including the right to keep and bear arms, confirm the breadth and scope of the Second Amendment.

"risk[s] endorsing outliers that our ancestors would never have accepted."

*Drummond v. Robinson,* 9 f.4th 217 (3rd. Cir 2021),- individual self-defense is the

central component of the Second Amendment right;

46.  Also, the historical analogue must be "relevantly similar," which is to say that

it must burden ordinary, law-abiding citizens right to carry in a similar manner and

for similar reasons. *Bruen*, 142 S. Ct. at 2132.  *Bruen* thus held that the inquiry into

whether a proper analogue exists is controlled by two "metrics" of "how and why"

any restriction was historically imposed during the Founding era.  *Id.* at 2133.

"[W]hether modern and historical regulations impose a comparable burden on the

right of armed self-defense and whether that burden is comparably justified are

"'*central*'" considerations when engaging in an analogical inquiry." *Id.* (emphasis

in original). "[T]o the extent later history contradicts what the text says, the text

controls." *Id.* at 2137. "Thus, 'postratification adoption or acceptance of laws that

are inconsistent with the original meaning of the constitutional text obviously

cannot overcome or alter that text.'" *Id*., quoting *Heller v. District of Columbia*,

670 F.3d 1224, 1274, n.6 (Kavanaugh, J., dissenting);

47.  Also, the historical analysis required by the Supreme Court is fundamentally a

legal inquiry that examines legal history, which is appropriately presented in briefs.

*See Bruen*, 142 S. Ct. at 2130 n.6 (noting that the historical inquiry presents "legal

questions" that judges can address) (emphasis in original); *see also id.* at 2135 n.8

(rejecting the dissent's suggestion that further fact-finding was needed and holding

that its ruling did not "depend on any of the factual issues raised by the dissent").

Accordingly, the required analysis does not require fact-finding by a court;

48.  Aaron Burr, an American Founding Father, was born on February 6, 1756.

The battles of Lexington and Concord were fought on April 19, 1775.  Burr, who

was studying law at the time, learned of the battles of Lexington and Concord and

in 1775, at the age of 19, enlisted in the Continental Army, with his own arms and

ammunition[16];

49. Henry Lee III, an American patriot, was born on January 29, 1756.  Lee

graduated from the College of New Jersey[17] in 1773 and began a legal career.

Following the battles of Lexington and Concord in April 1775, Lee joined a

Dragoon detachment in the Colony of Virginia as a Captain joining the service

with his own arms and ammunition[18] at the age of 19[19];

---

[16] Burr distinguished himself by, in September of 1775, being a part of Colonel
Benedict's expedition to Quebec.  He also distinguished himself at the battle of
Quebec in December 1775. Burr was also a United States Senator from 1791-1797
and America's third Vice President.

[17] Now known as Princeton University.

[18] The Virginia Militia act at the time required him to appear armed with his own
arms and ammunition.  *See* The Statutes at Large; Being a Collection of all the
Laws of Virginia, from the First Session of the Legislature, in the Year 1619
(Richmond: Franklin Press, 1819), 6:112-119.  At 6:112-113 and 6:114-115 are
general provisions for organizing the militia.  On 6:116 is a statement that
militiamen were obligated to provide themselves with "arms and ammunition."

[19] From 1786-1788 Lee was a Delegate to the Congress of the Confederation.  In
1788 he served in the Virginia Convention in support of ratifying the U.S.

50. James Monroe, an American Founding Father, was born April 28, 1758.  In the early phase of the American Revolution, opposition to the British government grew in the Thirteen Colonies in reaction to the "Intolerable Acts", a series of harsh laws against the Colonies in response to the Boston Tea Party. In Williamsburg, British Governor John Murray, 4th Earl of Dunmore, dissolved the Assembly after protests by the delegates, who then decided to send a delegation to the First Continental Congress in Philadelphia. Dunmore wanted to take advantage of the absence of the Burgesses, who had convened to Richmond, and had soldiers of the Royal Navy confiscate the weapons of the Virginian militia[20], which alarmed militiamen and students of the College of William & Mary, including Monroe. They marched to the Governor's Palace and demanded that Dunmore return the confiscated gunpowder. When more militiamen arrived in Williamsburg under the leadership of Patrick Henry, Dunmore agreed to pay compensation for the confiscated goods. Monroe and his fellow students were so incensed by the governor's actions that they conducted daily military drills on campus afterward[21]. On June 24, 1775, Monroe[22] and 24 militiamen stormed the Governor's Palace,

---

Constitution.  From 1791-1794 he served as Governor of Virginia.   In 1794 Washington summoned Lee to quash the Whiskey Rebellion and Lee led 12,950 militiamen, all armed with their own arms and ammunition, to a peaceful resolution with those who initiated the rebellion.

[20] They used their own personal weapons. *See* FN 17.

[21] With his own arms and ammunition.

[22] At this time, Monroe was 17 years old.

capturing several hundred muskets and swords.  In 1776, at age 18, Monroe joined

the Continental Army, 3rd Virginia Regiment armed with his own arms and

ammunition[23];

51. Joseph Plumb Martin, was an American, born on November 21, 1760.  He

joined the Connecticut militia in 1775, armed with his own arms and ammunition,

under General Washington's command[24];

52.  The text of the Second Amendment, as authoritatively interpreted by the

Supreme Court, indisputably covers possession (keep) and the wear, carry, and

transport (bear) of firearms, including handguns by ordinary, law-abiding citizens.

The Government bears the burden to demonstrate that there is an enduring, well-

established, representative historical analogue to the restriction imposed by the

---

[23] Monroe was in the Virginia House of Delegates in 1782, the Congress of the
Confederation in 1783, the Governor of Virginia in 1799 and President of the
United States from 1817-1825. There were various laws in the Virginia Colony
that required civilians to own their own arms and ammunition, *See* FN 13.
[24] Plumb wrote a narrative, "Adventures, Dangers and Sufferings of a
Revolutionary Soldier" which is considered a primary source of information
regarding the revolution.  He joined the militia, with his own arms, at age 15, and
saw many battles. The laws of the Colony of Connecticut required him to have his
own arms and ammunition, *See* The Public Records of the Colony of Connecticut,
1636-1776, 8:379 and 8:380 contain a statute directing "that the inhabitants...be
armed" and requiring "every listed souldier and other house-holder" except
calvarymen "shall always be provided with, and have in continual readines, a well-
fixed firelock...."  If not, he was subject to ten shillings fine for failure to have a
gun and ammunition, and three shillings for defects in either.

government. And the historical analogue must be "relevantly similar" to the contemporary restriction imposed by the government, burdening the Second Amendment right in a similar manner and for similar reasons. Under this test established in *Bruen*, the State cannot meet its burden to justify its denial in the issuance of PTA permits for the Plaintiffs, nor of the prohibition on the ownership, purchase, sale and possession of firearms and ammunition for those who are the age of eighteen but under the age of twenty-one, nor of the blocking of otherwise lawful commerce between firearms dealers and others to and from adults under 21 regarding firearms and ammunition. There is no historical analogue of prohibition for adults under 21[25] nor of banning otherwise lawful commerce between firearm dealers and others and adults under 21;

## STATEMENT OF LAW

### B

### H.R.S. §134  Firearms

---

[25] There is also no historical analogue allowing the government to infringe on being able to acquire, buy, sell, possess or own arms through a licensure or permitting process at all or with any delay. However, Plaintiffs do not challenge the constitutionality of the PTA in this lawsuit, nor do they concede such permits are constitutionally permissible.

53. Hawaii law, specifically Hawaii Revised Statutes Section 134 *et seq*, is a comprehensive set of laws covering all aspects of firearms in Hawaii including everything from acquisition, possession, ownership, usage and carriage of arms[26];

54.  Following *Bruen*, the state of Hawaii promulgated new laws regarding firearms, making all aspects of the exercise of Second Amendment rights much more difficult, onerous and expensive;

55.  Hawaii's ban on adults under 21 not being able to get a PTA is not long-established, having been put in place in 1994.  Hawaii's ban on adults under 21 not being able to acquire, purchase or own ammunition is also not long-established as it was enacted in 2024;

56.    Hawaii's laws, specifically HRS Section 134, *et seq*, are designed to be oppressive, restrictive and subjective and to treat the Second Amendment not as a broad right but as a very limited permissively granted privilege.  Prior to *Bruen*, there was essentially no right to carry a weapon for self-defense openly or concealed. The right to acquisition and possession of arms and ammunition, is similarly treated not as a broad right but rather as a subjectively granted limited privilege.  And HRS 134 is replete with broad based bans on arms, ammunition

---

[26] Hawaii state laws regarding all aspects of the Second Amendment and firearms are thorough, oppressive, and comprehensive.  Yet, Hawaii does not have an explicit preemption law that limits regulation to the state and in several circumstances allows or mandates that counties promulgate additional regulations, restrictions and processes.  HRS §134 et seq is attached as Exhibit 13.

and across broad swaths of the people, and specifically with regard to this lawsuit, the ban is applicable to all arms and ammunition, including all weapons including weapons in common use for self-defense, for a huge subset of the people, all adults between the ages of 18 to 20;

## VI

## CLAIM FOR DECLARATORY AND INJUNCTIVE RELIEF UNITED STATES CONSTITUTION AMENDMENT II RIGHT TO BEAR ARMS 42 U.S.C. §1983

567. Plaintiffs hereby re-allege and incorporate by reference the allegations in the forgoing paragraphs as if set forth fully herein;

578. Plaintiffs do not concede that any Hawaii Revised Statute is constitutional;

589. Plaintiffs allege that State's prohibition against the acquisition, purchase, ownership and possession of firearms and ammunition by adults under 21 and the concomitant sale, lending or rental of firearms and ammunition to adults under 21 by firearms dealers and others and the prohibition against granting of PTA to adults under 21, has violated their Second Amendment and Fourteenth Amendment U.S. Constitutional rights;

5960. Following the *Bruen* decision, Hawaii, erected more onerous laws, customs, policies and practices that are designed to delay, deprive and infringe upon the exercise of Second Amendment rights for as long as possible. Although State's firearm prohibition for adults under 21 preceded *Bruen*, State recently doubled

down in 2024 by prohibiting the possession by adults under 21 of ammunition in 2024;

60~~1~~.  In *Cooper v. Aaron,* 358 U.S. 1 (1958), the Supreme Court was confronted with similar bureaucratic foot dragging in implementing public school integration. Given the open defiance of the Supreme Court's opinion in *Brown I*[27] and *Brown II*,[28] the Court did not tolerate finger-pointing, simply observing that "delay in any guise in order to deny . . . constitutional rights.. . could not be countenanced, and that only a prompt start, diligently and earnestly pursued . . . could constitute good faith compliance." 358 U.S. at 7.

61~~2~~.  Plaintiffs do not concede that a PTA to acquire, buy, or own a firearm is constitutional.  In fact, 41 states do not require any permit or license to acquire, own or buy a long gun, and 38 states do not require any permit or license to acquire, own or buy a pistol;

62~~3~~.  Only 5 states restrict the purchase of long guns to adults at least 21 years old;

64.  There is a deeply-rooted, enduring, and well-established tradition and history, based on the ancient right that was enshrined in the Second Amendment, of not limiting or restricting the acquisition, purchase, and possession of arms and ammunition by adults, and by adults ages 18-20.  That deeply-rooted, enduring and

---

[27] *Brown v. Board of Education*, 347 U.S. 483 (1954).
[28] *Brown v. Board of Education,* 349 U.S. 294 (1955).

well-established tradition and history, is to limit the possession of arms and ammunition by adults, no matter the age of the adult, only in exceptional circumstances and for limited periods of time, such as after judicial due process with specific findings that the specific person is then currently dangerous;

**A**

**<u>Plaintiff Elijah Pinales</u>**

6~~3~~5. Plaintiff Pinales realleges and incorporates by reference all of the foregoing allegations of this complaint;

6~~4~~6. Plaintiff Pinales challenges the provisions of the HRS that prohibits the issuance of a PTA to adults under 21;

6~~5~~7. Plaintiff Pinales challenges the provisions of the HRS that prohibit him from acquiring, buying, owning and or possessing firearms and ammunition because he is under 21;

6~~6~~8. Plaintiff Pinales does not own any firearms or ammunition;

6~~7~~9. Plaintiff Pinales is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm and ammunition, apart from the challenged statutes that prohibit him receiving a PTA and acquiring, buying, owning, and possessing a firearm and ammunition;

68~~70~~.  Plaintiff Pinales has not applied for a PTA because to do so in the face of the challenged statute that prohibits adults under 21 from being issued a PTA would be futile;

69~~71~~.  Plaintiff Pinales desires, intends, and would apply for a PTA to acquire, buy, own, and possess a firearm and desires, intends, and would acquire, purchase, own and possess a firearm and ammunition but for the challenged statutes that prohibit the issuance of a PTA to him because of his current age and also prohibit his ownership, purchase and possession of a firearm and ammunition due to his age and the resultant criminal prosecution that would follow if he acquired, purchased, owned and possessed a firearm and ammunition without having first obtained a PTA;

70~~2~~. Plaintiff Pinales does not have an active, unexpired hunter's permit/license;

71~~3~~. Plaintiff Pinales is not a member of law enforcement nor has he ever been;

72~~4~~. Plaintiff Pinales is not a member of the armed services nor has he ever been;

73~~5~~. Plaintiff Pinales desires and intends to acquire, own, possess, obtain, and or purchase a firearm and ammunition for lawful purposes and would do so but for the State's adult under 21 prohibitions.  Pinale's mother would give and or gift to Pinales a firearm and ammunition but for the State's laws prohibiting her from doing so[29];

---

[29] *See* Exhibit 4, declaration of Jonelle Pinales.

35

74~~6~~.  Plaintiff Pinales has no criminal history;

75~~7~~. Plaintiff Pinales has no disqualifying mental health history;

76~~8~~. Except for the challenged statutes prohibiting his right to acquire, purchase, own, or possess any firearm and ammunition due solely to his age, and his reasonable fear of criminal prosecution for violating that law, Plaintiff Pinales would immediately purchase, acquire, own and/or possess both a firearm and ammunition within Hawaii for self-defense and other lawful purposes and could otherwise lawfully do so, but for the challenged prohibitions.

77~~9~~. Plaintiff Pinales is a member of the Second Amendment Foundation;

## **B**

### **Plaintiff Roache**

78~~0~~. Plaintiff Roache realleges and incorporates by reference all of the foregoing allegations of this complaint[30]

79~~81~~. Plaintiff Roache challenges the provisions of the HRS that prohibit the issuance of a PTA to adults under 21;

80~~2~~. Plaintiff Roache challenges the provisions of the HRS that prohibit him from acquiring, buying, owning and or possessing firearms and ammunition because he is under 21;

---

[30] Roache ~~will turn 18 i.e. become~~ became an adult under 21 on December 15, 2024.

81~~1~~3. Plaintiff Roache does not own or possess any firearms or ammunition;

82~~2~~4. Plaintiff Roache is not disqualified under Hawaii or federal law from owning, possessing or carrying a firearm and ammunition, apart from the challenged statutes that prohibit him receiving a PTA and acquiring, buying, owning, and possessing a firearm and ammunition;[31]

83~~3~~5. Plaintiff Roache will not apply for a PTA ~~as soon as he reaches age 18~~ only because to do so in the face of the challenged statute that prohibits adults under 21 from being issued a PTA would be futile;

84~~4~~6. Plaintiff Roache desires, intends, and will apply for a PTA to acquire, buy, own, and possess a firearm and desires, intends, and would acquire, purchase, own and possess a firearm and ammunition, as ~~soon as~~ he is 18 years old, but for the challenged statutes that prohibit the issuance of a PTA[32] to him because of his age and also prohibit his ownership, purchase and possession of a firearm and ammunition and the resultant criminal prosecution that would follow if he

---

[31] All of Plaintiff Roache's allegations pertain to his ability to acquire, own, possess, or purchase firearms and ammunition ~~once~~ as he is 18 years old, in December 2024. Plaintiff Roache would also, but for the challenged laws here, accept a gift from his mother of a firearm and ammunition as ~~soon as~~ he is 18 years old.

[32] Soleil Roache, Plaintiff Roache's mother, intends to and will gift a firearm and ammunition to Plaintiff Roache as ~~soon as~~ he is 18 years old, but for the statutes challenged herein. *See* Exhibit ~~2~~5.

acquired, purchased, owned and possessed a firearm and ammunition without having first obtained a PTA;

85~~7~~. Plaintiff Roache does not have an active, unexpired hunter's permit/license;

86~~8~~. Plaintiff Roache is not a member of law enforcement nor has he ever been;

87~~9~~. Plaintiff Roache is not a member of the armed services nor has he ever been;

~~88.~~90  Plaintiff Roache desires and intends to purchase a firearm and ammunition for lawful purposes and would do so but for the State's adult under 21 prohibitions, ~~once~~ as he is 18 years old;

89~~1~~. Plaintiff Roache has no criminal history;

90~~2~~.  Plaintiff Roache has no disqualifying mental health history;

91~~3~~.  Except for the challenged statutes prohibiting his right to acquire, purchase, own, or possess any firearm and ammunition due solely to his age, and his reasonable fear of criminal prosecution for violating that law, Plaintiff Roache would immediately, as ~~when~~ he ~~turns~~ is 18, purchase, acquire, own and/or possess both a firearm and ammunition within Hawaii for self-defense and other lawful purposes and could otherwise lawfully do so, but for the challenged prohibitions;

92~~4~~.  Plaintiff Roache is a member of the Second Amendment Foundation;

## C

## PLAINTIFF DANGER CLOSE TACTICAL

93~~3~~5.  Plaintiff DCT realleges and incorporates by reference all of the foregoing allegations of this complaint;

94~~4~~6.   Plaintiff DCT has been in business since 2021;

95~~5~~7. Plaintiff DCT is a LLC.;

96~~6~~8. Plaintiff DCT sells both firearms and ammunition;

97~~7~~9.  Due to Defendant's enforcement of the prohibition of selling, supplying, delivering, or giving possession or control of a firearm and ammunition to any person under 21 years of age, Plaintiff DCT has been directly and adversely harmed. For example, Plaintiff DCT has been forced to not engage in otherwise lawful sales of firearms and ammunition to adults under the age of 21. It has also been forced to not engage in firearm rentals to adults under the age of 21.  Further, it has been forced to prohibit, and has prohibited, adults between the ages of 18-to-20 from attending various firearms classes hosted by Plaintiff DCT. As a direct result, Plaintiff DCT has sustained financial harm, injury, and losses from the sale and rentals of otherwise lawful goods and services. Plaintiff DCT brings this action on behalf of itself, its customers including potential adult under 21 customers, and other similarly situated licensed firearms dealers in Hawaii;

## D

## PLAINTIFF JGB ARMS LLC

98100. Plaintiff JGB realleges and incorporates by reference all of the foregoing allegations of this complaint;

99101.  Plaintiff JGB has been in business since 1988;

1002. Plaintiff JGB is a LLC;

1013. Plaintiff JGB sells ammunition and firearms;

1024.  Due to Defendant's enforcement of the prohibition of selling, supplying, delivering, or giving possession or control of a firearm and ammunition to any person under 21 years of age, Plaintiff JGB has been directly and adversely harmed. For example, JGB has been forced to not engage in otherwise lawful sales to adults under the age of 21. It has also been forced to not engage in firearm rentals to adults under the age of 21. Further, it has been forced to prohibit, and has prohibited, adults between the ages of 18-to-20 from attending various firearms classes hosted by Plaintiff JGB. As a direct result, Plaintiff JGB has sustained financial harm, injury, and losses from the sale and rentals of otherwise lawful goods and services. Plaintiff JGB brings this action on behalf of itself, its customers including adult under 21 customers who would purchase firearms and ammunition but for Hawaii law, and other similarly situated licensed firearms dealers in Hawaii;

## E

## PLAINTIFF SAF

103~~3~~5. SAF has over 720,000 members and supporters nationwide, including

members in Hawaii. SAF brings this action on behalf of itself, its members,

supporters who possess all the indicia of membership, and similarly situated

members of the public. Many of SAF's individual Hawaii members between the

ages of 18 and 20 have been adversely and directly harmed and injured by

Defendant's enforcement of the statutory prohibition on the lawful sale of firearms

and ammunition to adults under 21. Indeed, the challenged statutes referenced

herein have denied, and will continue to deny, responsible, peaceable, law-abiding

adults under 21 their fundamental, individual right to keep and bear arms secured

under the Second and Fourteenth Amendments of the U.S. Constitution.

Defendant's actions and failures alleged herein have caused SAF to dedicate

resources that would otherwise be available for other purposes to protect the rights

and property of its members, supporters, and the general public, including by and

through this action;

**VII**

**CONTEXT RELATED TO ALL CLAIMS**

104~~4~~6.  The State of Hawaii has still not received the United States Supreme Court's

clear message as to the depth and scope of the Second Amendment's protections.

Prior to *Bruen*, the State had treated, for more than a century, the Second

Amendment as dead, buried and forgotten.  Once *Bruen* was decided the State

issued new burdensome regulations.  This includes Hawaii's ban on the possession

of ammunition for adults under 21. Notwithstanding the United States

Constitution, the Second Amendment and binding Supreme Court precedent, the

State continues to find ways to deprive individuals of their fundamental and

constitutionally protected right to acquire and possess arms and ammunition –

merely because it views it as a disfavored right.

105̶7. For purposes of all Counts and Claims the Defendant has acted under "color

of state law" within the meaning of Section 1983.

106̶8.  Plaintiffs do not concede that any permit is required to acquire, own,

purchase or possess a firearm or ammunition;

107̶9.  To the extent that a permit or license is needed to acquire, purchase, or

own a firearm, which Plaintiffs do not concede is constitutional, denial cannot

be because an adult has not ~~year~~ yet reached the age of twenty-one years old;

110.  The Founding Fathers who drafted the Second Amendment did not draft

the Amendment to allow infringement based on technological or societal

changes that they knew had occurred in the past and would occur in the future.

At the time of the Founding, societal change was titanic, shifting from

monarchies, aristocracies, oligarchies and the like to the United States of

America, the first, and only true, representative republic. The Founding

Fathers were well familiar with societal changes yet did not limit the Second

Amendment.  There was and is no deeply-rooted, enduring tradition or history

of limiting the Second Amendment based upon societal change in general and

considering the unique and massive change of the birth of the United States,

certainly no history of limiting the Second Amendment based on smaller

levels of societal change;

111.  Similarly, the Founding Fathers did not limit the Second Amendment

based upon technological change and they were intimately familiar with the

fast pace of technological change.  At the time of the first colony in

Jamestown Virginia in 1607, there were many types of firearms, but primarily

there were matchlocks.  As early as 1540 there were multishot wheel lock

pistols.  In 1498 the principle of "rifling" was discovered, thus making long

guns far more accurate and capable of reaching much farther than long guns

without rifling.  While the colonies were still growing, in about 1630, the

concept of a flintlock took hold.  Flintlock firearms fired twice as fast as

matchlocks, misfired far less and were able to be produced much faster and

were less expensive than matchlocks.  Jonathan Dayton signed the U.S.

Constitution and within his lifetime, Joshua Shaw, in 1814, 23 years after the

ratification of the Second Amendment, devised percussion caps.  Percussion

caps eliminated the smoke from a Flintlock that a target might see, and, as

with other inventions, the percussion cap rifle was more accurate, faster and

easier to shoot and was less expensive to produce.  The Founding Fathers were intimately familiar with technological advances, including massive changes in weaponry from swords and arrows to crossbows to single shot matchlocks to multishot, quick loading, longer ranged weapons, and there is no deeply-rooted, enduring tradition or history of infringing on Second Amendment rights because of the advance of technology[33].

# VIII

## (DECLARATORY JUDGMENT)

10812. Plaintiffs repeat and reallege the allegations of the preceding paragraphs as if set forth herein;

10913. The Declaratory Judgment Act provides: "In a case of actual controversy within its jurisdiction, any court of the United States may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. 2201(a);

1104. Absent a declaratory judgment, there is a substantial likelihood that Plaintiffs will suffer irreparable injury in the future;

---

[33] To the contrary, *see infra* FN 10 and 11.  The British knew how to limit arms to those that the Parliament allowed the subjects to use, but the Founding Fathers used no limiting language nor was there any deeply-rooted and enduring tradition or history of limiting Second Amendment rights based on technological or societal changes or age.

111~~4~~5. There is an actual controversy between the parties of sufficient immediacy and reality to warrant issuance of a declaratory judgment;

112~~5~~6. This Court possesses an independent basis for jurisdiction over the parties;

113~~6~~7. Plaintiffs seek a judgment declaring that the challenged statutes, specified herein, are facially unconstitutional under the Second Amendment and Fourteenth Amendment;

114~~7~~8. Alternatively, a declaration that the challenged statutes, as specified herein, are unconstitutional *as-applied* to the Plaintiffs;

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs request that judgment be entered in their favor and against Defendant as follows:

1.      Declare, facially, to each Plaintiff, that HRS §§134-2(a), 134-2(d)(1), 134-7(g), 134-7.7, and 134-2(h) , and all related laws, policies, enforcement practices, and customs, as well as Defendant's enforcement of the same, violate the right to keep and bear arms secured by the Second and Fourteenth Amendments to the United States Constitution;

2.      Preliminarily, and thereafter permanently, enjoin Defendant, her officers, agents, servants, employees, and all persons in active concert or participation with her who receive actual notice of the injunction, from enforcing Defendant's Hawaii Revised Statutes, as specified herein, §§134-2(a), 134-2(d)(1), 134-7(g), 134-7.7,

and 134-2(h), all their derivative regulations, and all related laws, policies, and

procedures that would impeded or criminalize the Plaintiffs' or Plaintiffs' members

and/or customers exercise of their right to keep and bear arms, facially;

3.      Alternatively, declare that HRS §§134-2(a), 134-2(d)(1), 134-7(g), 134-7.7,

and 134-2(h) , and all related laws, policies, enforcement practices, and customs, as

well as Defendant's enforcement of the same, *as-applied* to the Plaintiffs, violates

Plaintiffs' and their members and/or customers' right to keep and bear arms

secured by the Second and Fourteenth Amendments to the United States

Constitution;

4.      Alternatively, preliminarily, and thereafter permanently, enjoin Defendant,

her officers, agents, servants, employees, and all persons in active concert or

participation with her who receive actual notice of the injunction, from enforcing

against Plaintiffs and Plaintiffs' members and/or customers, Defendant's Hawaii

Revised Statutes, §§134-2(a), 134-2(d)(1), 134-7(g), 134-7.7, and 134-2(h), as

specified herein, all their derivative regulations, and all related laws, policies, and

procedures that would impeded or criminalize the Plaintiffs' or Plaintiffs' members

and/or customers exercise of their right to keep and bear arms, *as-applied* to them;

5.      Award Plaintiffs nominal damages, and pursuant to 42 U.S.C. §1988 and/or

28 U.S. Code §1920, costs, attorney fees and expenses to the extent permitted; and

6.      Grant any and all other equitable and/or legal remedies this Court may see
fit.

Dated: ~~November 15, 2024~~ March 14, 2025.

Respectfully submitted,

/s/ *Kevin O'Grady*
Kevin Gerard O'Grady

Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

/s/ *Alan Beck*
Alan Alexander Beck

Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com
Counsel for Plaintiffs

**VERIFICATION**

I, Jason Bryant, declare as follows:

1. I am a controlling member of JGB Arms LLC and a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on <u>March 10, 2025</u>

JASON BRYANT

51

**VERIFICATION**

I, David Kikukawa, declare as follows:

1. I am the owner of Danger Close Tactical, and a Plaintiff in the present case and a citizen of the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on <u>March 10, 2025</u>

_____

DAVID KIKUKAWA

50

## VERIFICATION

I, Adam Kraut, declare as follows:

1. I am the Executive Director of SAF, which is a Plaintiff in the present case.

2. I am a citizen of the United States of America.

3. I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on <u>March 10, 2025</u>

**ADAM KRAUT**

52

## VERIFICATION

I, Adam Kraut, declare as follows:

1. I am the Executive Director of SAF, which is a Plaintiff in the present case.

2. I am a citizen of the United States of America.

3. I have personal knowledge of myself, my activities, and my intentions ,
including those set out in the forgoing *Verified Complaint for Declaratory and
Injunctive Relief,* and if called on to testify, I would competently testify as to the
matters stated herein.

4. I verify under penalty of perjury under the laws of the United States of
America that the factual statements in this *Verified Complaint for Declaratory and
Injunctive Relief* concerning myself, my activities and my intentions are true and
correct.

Executed on <u>March 10, 2025</u>

_____

ADAM KRAUT

# VERIFICATION

I, Elijah Pinales, declare as follows:

1. I am a Plaintiff in the present case and a citizen of the United States of America.

2. I have personal knowledge of myself, my activities, and my intentions, including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief,* and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on <u>March 10, 2025</u>

_____

ELIJAH PINALES

**VERIFICATION**

I, Juda Roache, declare as follows:

1. I am a Plaintiff in the present case and I reside in the United States of America.

2 . I have personal knowledge of myself, my activities, and my intentions , including those set out in the forgoing *Verified Complaint for Declaratory and Injunctive Relief*, and if called on to testify, I would competently testify as to the matters stated herein.

3. I verify under penalty of perjury under the laws of the United States of America that the factual statements in this *Verified Complaint for Declaratory and Injunctive Relief* concerning myself, my activities and my intentions are true and correct.

Executed on March 10, 2025

JUDA ROACHE

**VERIFICATION**

# Exhibit 1

# Infants' Contracts: Law and Policy in the 18th and 19th Centuries

**Richard Austen-Baker and Kate Hunter**[*]

**Abstract:**  *Under English law, prior to 1970 young people up to the age of twenty-one lacked the capacity to make binding contracts, subject to certain exceptions.  The report of the Latey Committee on the Age of Majority, which had recommended a reduction to age eighteen, was one-sided and, so far as capacity to make contracts was concerned, offered scant evidence as to the motivations of the existing law. The Committee heard evidence from the Church asserting, with no evidence, that such rules were intended to control young people and were there to protect the interests of others.  This article argues, especially from analysis of the relevant case law during the 18th and 19th centuries – the principal period of development of English jurisprudence on minors' contracts – that the law's motivation had in reality been to protect infants from themselves and from adults who sought to prey on their naivety and impulsiveness.*

## Introduction

With the coming into force on 1 January 1970 of section 1 Family Law Reform Act 1969, which lowered the age of majority from twenty-one years to eighteen years, the question of infants' contracts effectively disappeared as one of interest to the courts of England and Wales. Since mediaeval times, as Simpson concisely puts it, 'all contracts made by infants

---

[*] Senior Lecturer in Law, Lancaster University Law School and late Associate Lecturer, Lancaster University Law School, respectively.  The authors are grateful to Professor David Milman, Lancaster University Law School, for kindly commenting on this article in draft.  Any errors, inadequacies or infelicities remaining are, of course, entirely the responsibility of the authors themselves.

were voidable at the option of the infant either at once or on attaining his majority',[1] though the common law developed considerably from the 17th century onwards and Parliament began to legislate with the Infants Relief Act 1874.

It should also be noted that although the change in the contractual status of eighteen-to-twenty-one year-olds coincided with the reduction in the voting age in the United Kingdom from twenty-one to eighteen years, under the Representation of the People Act 1969, the two issues were separate and the one did not follow from the other.

The Latey Committee on the Age of Majority, set up by the Wilson government under the chairmanship of Sir John Latey, which recommended the reduction in a report which can scarcely be regarded as even-handed and critical, referred to evidence received from the Church of England's Board for Social Responsibility, which claimed that the restriction on infants' capacity derived not from any desire to protect young people from possible malign effects of entering unwisely into contracts, but rather as a mechanism of control over them. However, the Board's written evidence to the Committee, cites no evidence whatever for its assertions that '[h]istorically the concept [of an age of majority] is one of property rights in, and power over children, as much as of a duty to protect them'; or that there is a 'legal age of majority imposed for the sole purpose of furthering the interests or serving the convenience… of persons other than the child himself…'[2]  Nor was evidence cited in support of the assertion

---

[1] A W B Simpson, *A History of the Common Law of Contract,* Clarendon Press, Oxford, 1987, p 540. On the question of 'voidability' as opposed to nullity of infants' dealings, and some interesting comparative analysis, see H J  Hartwig, 'Infants' Contracts in English Law: With Commonwealth and European Comparisons' (1966) 15 *ICLQ* 780.

[2] The Board of Social Responsibility of the National Assembly of the Church of England, *Evidence to Committee on the Age of Majority*, March 1966, section 1. Typescript in File BSR/DMSW/MAJ Church of England Record Centre, Lambeth Palace Library.

by Miss P M Claisse, Assistant Secretary to the Board, in oral evidence to the Committee, that if the age of twenty-one were retained as the age of majority 'it would be for the protection of people other than the young'.[3] (It should be said that the Board actually had little to say about contracts in its submission, which was focussed mainly on the issue of the right to marry without parental or judicial consent.)

It will be the argument of this article that it was not the case that the concept of infancy was maintained as an oppressive tool of control over the young or that it was disadvantageous to the young and for the benefit only of others.  Although the law might restrict contractual capacity of different groups for reasons of social or economic control on the one hand, or else from a desire to protect members of the group on the other, it is submitted that the evidence in this instance, at least, points strongly to a policy imperative to protect infants. That it may be necessary to exercise some degree of control in order to protect is not surprising.  After all, a parent wishing to protect her toddler from the dangers of traffic is likely to achieve this result by carefully controlling the child's movements in or near the road: control is the means, but protection is the motive.  The primary motive of the law on incapacity in relation to infants was to protect minors, perhaps 'from themselves', as Duncan Kennedy put it.[4]

We have chosen the eighteenth and nineteenth centuries as the focus of our study because much of the case law on infants' capacity was made during that period and a number of Parliamentary steps in this field were also taken in this time.  We allow ourselves,

---

[3] Committee on the Age of Majority, *Oral evidence given by the Church of England Board for Social Responsibility*, Monday 4 July 1966.  Typescript in File BSR/DMSW/MAJ Church of England Record Centre, Lambeth Palace Library.

[4] Duncan Kennedy, 'Distributive and Paternalist Motives in Contract and Tort with Special Reference to Compulsory Terms and Unequal Bargaining Power' (1982) 41 *Maryland Law Review* 563.

however, some latitude in bringing in authorities falling outside our time-frame where we think it useful, but we stop at the famous case of *Nash v Inman*[5] in 1908, by which time the law may be said to have reached its apogee.

We will begin by very briefly explaining the reasons for the age of majority having been at twenty-one years at all, before examining the law as it was, chiefly under the headings of the concept of 'necessaries', for which infants could make binding arrangements, and of infant employment (actually, another category of 'necessity' so far as the law was concerned, but usefully considered separately for the sake of clarity and digestibility). We hope, thereby, to shed some light on the law's motives in restricting infants' capacity.

### The Age of Majority

Different countries, at different times, have had different ages of majority.  This suggests either some degree of arbitrariness in the setting of a particular age, or that different places and different times have different imperatives to serve.  Of course, both may well be true. What is encompassed within the notion of being 'of full age' also differs from one legal system to another.  Our concern here is, however, with contractual capacity and we will endeavour to avoid straying too far from this.

The Latey Report, already alluded to above, includes an account of how the law developed on this point, but rather than simply refer the reader to the Report, we will summarize that account here.

---

[5] [1908] 2 KB 1.

According to Latey, 'Roman historians state that the barbarians reckoned their young were old enough to carry arms and be counted as grown up at 15.'[6] Fifteen became the age of majority in Britain and across Northern Europe during the 9th to 11th centuries '…though not specifically linked with fighting ability'.[7] Changes in the techniques and equipment of warfare, however, led to some revision of views as to when a young man was able to fight. The Normans had developed an approach to mounted fighting, involving heavy armour and heavy swords and lances, which required greater physical development and,[8]

> By the time of Magna Carta the age for those holding in knight service had been raised to 21, and there is strong authority for the view that this was directly linked with the ability to hold up a heavy suit of armour and lift a lance or sword at the same time.

The Report cites Sainte Palaye: 'the profession of arms demanded an ability and strength not to be acquired until the age of 21.'[9] It goes on to cite Pollock and Maitland to the effect that burgesses and tenants in socage continued to come of age at fifteen, while tenants by knight service did not come of age until twenty-one; however, '…gradually … the knightly majority is becoming the majority of the common law…'[10]

Military tenures were abolished by the Tenures Abolition Act 1660, which also provided that fathers could appoint guardians of their heirs until the age of twenty-one, because otherwise the conversion of military tenancies into socage would have put those

---

[6] *Report of the Committee on the Age of Majority,* Cmnd 3342, 1967, para 38.

[7] Above n 6.

[8] Above n 6.

[9] Above n 6, citing Jean-Baptiste Sainte Palaye de la Curne, *Mémoires sur l'ancienne chevalerie, chevalerie considérée comme un établissement politique et militaire,* Nicolas Duchesne, Paris, 1781.

[10] Above n 6, para 40, citing Sir Frederick Pollock and Frederic William Maitland, *The History of English Law Before the Time of Edward I,* Cambridge, 1895, vol 2, p 438.

heirs into their property at the age of fifteen, with risks that were and are all too obvious. So, twenty-one years became, by degrees, the age of majority in English law.

The Report goes on to point out that however grotesque it might seem that the age of majority in the Latey Committee's world of jet aeroplanes, lava lamps and mini-skirts should be determined by the weight of armour in Norman England, this did not necessarily mean it was not as good an age as any to set the bar on contractual and other legal autonomy.[11]

### The Law on Infancy

As already indicated, we will divide our discussion on the law relating to infancy in the Long 18th century and the 19th century, into two, accepting that the division of the subject matter is somewhat artificial. We will begin by considering how the law sought to uphold its general rule in a way that did not make all contracting impossible, in such a way as to create undue inconvenience in the lives of infants and their parents, through the means of the doctrine of 'necessaries'. We will exclude from that discussion the question of what we might broadly term 'employment contracts', which we will then proceed to discuss separately. However, it seems apparent that contracts of service or apprenticeship, like contracts made for education or healthcare, were to an extent seen as 'necessary' for the wellbeing of the infant him- or herself (in order to earn a living and/or suitably to occupy their destined place in society), so the principle behind the enforceability of these contracts was not really different, even if the legal rules by which governed that enforceability were. Before concluding, we will also briefly touch on statutory intervention felt necessary from the second half of the 19th century.

---

[11] Above, n 5 at para 46.

'Necessaries'

The origins of the doctrine of necessaries can be traced to the fifteenth century, where it was held that 'when an infant within age has quid pro quo he will be bound by law… when he buys clothes for his body, he will be charged by action of debt, because these things he must of necessity have.'[12] Consequently, items which were deemed to be 'necessary' for an infant, such as clothes and food, were found to bind him at common law.  In cases where an infant was sued for goods supplied on credit, whereof some were necessaries and others not, then where there was an entire contract the infant would be bound by none of it:  *Stocks v Wilson.*[13]

The determination of what amounted to necessaries can essentially be divided into four linked questions: what sort of things could be necessary?; was the infant already provided?; who was to prove which facts?; and what were the respective roles of the judge and the jury?  Obviously, as civil juries began to fall into disuse outside specialist areas, the last question ceased to matter in the form in which we put it, though it would still be relevant on appeal, of course, as determining whether a particular question was a matter of law or one of fact.

We will discuss necessaries under three headings. The first will focus on the subject matter of contract, but it will be seen that it is by no means possible to separate out the four questions entirely as they are often thoroughly mixed together in any one case, so in this section we will discuss the cases in general terms across all four questions where they arise. The second and third headings consider, respectively, the relevance of existing provision, which discusses the position in relation to a defendant who already had ample goods of the

---

[12] (1431) YB Mich 10 Hen VI, fo14, pl 46.

[13] [1913] 2 KB 235.

type in question at the time the plaintiff supplied him or her, and questions of proof. The discussion under this last heading will consist of a summary of *who* had to prove *what* and *to whom* (judge or jury).

Subject matter of the contract

In *Mackarell v Bachelor*[14] it was held that the decision as to what constituted necessaries was one for the judge. Here, it was held that 'suits of sattin [sic] and velvet cannot be necessary for an infant, although he be a gentleman'.[15] (The infant defendant, who had had £44 worth of clothing, was a gentleman of the chamber to the Earl of Essex, so the plaintiff's case had been, in effect, that this was work-gear.) We shall see later how the attitude of the courts with regard to such items changed as the meaning of 'necessaries' underwent significant development, particularly in relation to the kind of items which could be deemed 'necessary' to those infants from a higher social class.

Further, in *Aoliffe v Archdale*[16] it was held that a penal bond executed to pay for food and drink was void. The plaintiff had paid out for these and the infant executed a bond to recompense him in the sum of £10, or £20 in default. It was held that if the bond had been for the exact amount the plaintiff had paid out for the infant's benefit then it would have been enforceable against the infant, but because of the penalty, the whole bond was bad. While this finding appears to have been based upon the rationale that a penal bond can never be in a minor's interests, it has been argued that the old cases do not bear this out as the reason for

---

[14] (1597) Cro Eliz 583; Goldsborough 168; 75 ER 1070.

[15] Above n 14.

[16] (1602) Moo KB 680; 72 ER 835.

the apparently well-established rule that infants were not bound by penal bonds.[17] Reeve, for instance, concludes that, in exploring the reasoning that a penal bond is not binding upon an infant as it causes him greater injury, it proved impossible to find 'any judicial decision which establishes such a rule'.[18] Cases in which the court has concluded that an infant cannot be bound for the execution of a penal bond merely restate the principle, as is so common in old reports, so it is really impossible to state with any confidence what the real basis for the rule was.[19]

The case of *Dale v Copping*[20] in 1610 is another relatively early instance of a ruling on the question of what amounted to necessaries and expanded the scope of authority on what the courts would allow, by finding that a contract to pay for a cure for illness ('falling sickness' or epilepsy in this case) could bind an infant: [21]

> Clearly the action well lieth against the defendant, and this nonage by him alledged by him at the time of the promise made, is not material, for that this shall be taken as a contract, and that to be for a thing in the nature of necessity to be done for him, and the same as necessary as if it had been a promise by him made for his meat, drink, or apparel, and in all such cases his promise is good, and shall bind him.'

The defendant pleaded his infancy in an attempt to avoid being bound by the contract. Williams J dismissed this point and repeated the principle, 'although he were within age at

---

[17] See, Simpson, *Common Law of Contract*, pp 540 and 542.

[18] T Reeve, *The Law of Baron and Femme, of Parent and Child, Guardian and Ward, Master and Servant, and of the Powers of the Courts of Chancery: With an Essay on the Terms Heir, Heirs, Heirs of the Body,* Albany, 1862, p 252.

[19] The question would quickly have become moot anyway, once Chancery began granting relief from penal bonds; the origin of the present-day rule against penalties.

[20] (1610) 1 Bulstr 40; 80 ER 743.

[21] (1610) 1 Bulstr 40 per Williams J at 40.

the time of his promise by him made for such necessaries, and his nonage not at all material, and so in this case here his promise shall as well bind him, as in the other cases, the reason of the law being the same, and this cure being of as great necessity for him'. It is submitted that the finding that a minor ought to be bound for medical treatment is significant in that it is one of the first instances in which the court expanded upon the definition of necessaries since the earliest known instances, in the 15th century. The court seems not to have known of a previous instance of medical treatment being held to be necessary for an infant so as to make his promise to pay for it binding, and the present authors are not able to locate one either. What subsequently became allowed as medical treatment might surprise a modern reader, however. For instance, in *Hart v Prater*[22] a horse was held to constitute a necessary on medical grounds, as the infant had been instructed by a doctor to take exercise on horseback, which must prompt speculation as to whether even the sort of medical treatment considered necessary might vary according to the patient's social and economic position.

*Ive v Chester*[23] gives a further early instance of a case regarding fancy clothing, in this case a very fashionable and expensive cloak and pair of velvet hose, which had been specially made for the minor.   The court held that they may constitute necessaries and thus be recoverable on an assumpsit, but such items must be 'necessary and convenient for him… according to his estate and degree'.[24] The court did not allow recovery in this case, but the reason given was that it had not been specially pleaded by the plaintiff that these were necessary for the defendant and this fact was required to be specially pleaded,[25] so we do not

---

[22] (1837) 1 Jur 623.

[23] (1620) Cro Jac 560; 79 ER 480.

[24] Above, n 20, at 561.

[25] Above n 24.

know whether the defendant's 'estate and degree' were such as demanded or warranted so luxurious a wardrobe.

It may be objected that in *Mackarell v Bachelor*[26] it had been held that luxurious clothes could not be necessaries even for a gentleman of the chamber of the Earl of Essex, so that there was some sense of an absolute ceiling on what was 'necessary' for an infant of any estate or degree. However, *Mackarell v Bachelor* had been decided in the 16th century, when there was still some feeling against excess of dress and display even among the upper-classes and sumptuary laws forbidding such excess had still been in force in England, not being repealed until (for most of them) 1603. In 1800, Lord Kenyon CJ, giving judgment in the case of *Hands v Slaney*,[27] held that the trial judge, Chambre B, at Warwick Assizes had correctly left to the jury the question of whether a livery for the servant of an infant army captain might be a necessary and the jury was entitled so to find:[28]

> [A]s to the other article furnished, namely, the livery, I cannot say that it was not necessary for a gentleman in the defendant's situation to have a servant; and if it were proper for him to have one, it was equally necessary that the servant should have a livery. The general rule is clear, that infants are liable for necessaries, according to their degree and station in life. This defendant was placed in a situation which required such an attendant: therefore, however inclined I am in general to protect infants against improvident contracts, I think that this case falls within the fair liability which the law imposes on infants of being bound for necessaries, which is a relative term, according to their station in life.

---

[26] (1597) Cro Eliz 583; 78 ER 826.

[27] (1800) 8 TR 578; 101 ER 1556.

[28] (1800) 8 TR 578 at 579.

This judgment was relied upon by counsel for the plaintiff in *Peters v Fleming*.[29] This 1840 case concerned a Cambridge undergraduate, the eldest son of a wealthy gentleman and Member of Parliament. The defendant ran up a bill of some £8.0.6d with the plaintiff jeweller for various rings, pins and a watch-chain.

The jeweller brought suit; the defendant pleaded first that he was not indebted and secondly his infancy; the plaintiff joined issue on the first plea and replied on the second that the items were necessaries for someone of the defendant's 'degree, estate and condition'. The case came on for trial before Vaughan J and a jury at the Summer Assizes for Cambridgeshire. Vaughan J left to the jury the question of whether the articles were necessaries and the jury having found that they were, the judge then directed them to return a verdict for the plaintiff for the full amount claimed, but gave leave to the defendant to move to enter a nonsuit. This was duly done by the defendant's counsel and the case came before Parke, Alderson, Gurney and Rolfe, BB, in the Exchequer of Pleas. It is interesting to note as an aside that the defendant in this trivial affair of £8.0.6d was represented by no less than Sir William Follett QC, MP, former and future Solicitor-General and future Attorney-General and, according to the plaque below his bust at the Devon and Exeter Institution (he was a son of Exeter, an alumnus of its grammar school and the city's Member of Parliament) 'the greatest advocate of the century'. Sir William led Mr Biggs Andrews, who had represented the defendant at assizes and Mr Frederick (or Frederic) Gunning, a Cambridge native who was the author of a treatise on the law of tolls.[30] A formidable team, but it did him little good:

---

[29] (1840) 6 M & W 42; 151 ER 314

[30] Frederic Gunning, *A Practical Treatise on the Law of Tolls,* London, 1833. It is also interesting that Gunning's brother, Francis, was Town Clerk of Cambridge from 1836 to 1840. Sir William Follett's younger brother, Brent Spencer Follett, QC, MP, became the first Chief Land Registrar from the creation of HM Land Registry in 1862 until his death in 1887.

the court held unanimously for the plaintiff, discharging the rule nisi for a nonsuit. The judge had been entitled to leave to the jury the question of whether the items were necessaries and the jury were entitled so to find, at least in respect of the watch-chain and the seal-engraved ring and possibly also the two pins. The finding on the other rings seems to have been regarded as erroneous, but it made no difference to the outcome as far as the court was concerned on this occasion, as the plaintiff could clearly not be nonsuited in the circumstances.

Alderson B commented, in an interruption of the defence argument, that when considering what is a necessary item of dress, this '…may mean those things without which the party would lose caste in society'.[31] So that breast-pins might be necessaries, though this would be conditioned as to quantity, since '…if twenty breast-pins had been supplied, they could scarcely be necessary'.[32]

In his judgment, Parke B observed that it was 'perfectly clear' that 'from the earliest time down to the present, the word necessaries was not confined, in its strict sense, to such articles as were necessary to the support of life, but extended to articles fit to maintain the particular person in the state, station, and degree in life in which he is'.[33]

Jewellers were concerned again in *Elkington & Co. Ltd* v *Amery,*[34] which involved the supply of engagement and wedding rings, which were found to be necessaries. In the case of *Jenner* v *Walker*,[35] Cockburn CJ, suggested that jewellery (not engagement or

---

[31] (1840) 6 M & W 42 at 45; 151 ER 314.

[32] Above, n 31. See further below in the discussion on existing provision.

[33] Above, n 31 at 46-47.

[34] [1936] 2 All ER 86.

[35] (1868) 19 LT Rep (NS) 398.

wedding rings) destined to be presents for a bride were 'very natural'[36] coming from

someone of some thousands a year (albeit that the infant actually only had £700-£1,000 a

year), and would be necessaries, though not the same items intended for some other female.

In the same case, he took the view that a 'blue morocco patent frame betting book with richly

gilt pins' could not be necessary (though perhaps a less opulent betting book might be).[37]

While it was clearly not the Chief Justice's intention to suggest that something being or not

being 'very natural' is the litmus of necessity, it could be urged at least that a wife or fiancée

may feel that such gifts were necessary incidents of the relationship.  There is no difficulty in

taking both the station and degree in life in which the defendant finds himself in general

terms together with some particular circumstances operative at the moment of the disputed

transaction,  for example, an anticipated marriage as in *Elkington & Co v Amery*,[38] or a state

of national emergency as in *Coates v Wilson*.[39]

Conversely, it was held in *Nash v Inman*[40] that fancy waistcoats for an undergraduate

were not necessaries in the particular case.  In reaching this conclusion the Court of Appeal

followed the principle laid down in *Peters v Fleming*, that such items may be appropriate for

the infant if they were suitable to his 'state… and degree in life'.[41] The main basis for the

decision of the court appears to be that the infant's father gave evidence, that was believable

and not contradicted, that his son was amply supplied with clothes, so it was a question,

mainly, of quantity, but  Buckley LJ, focussing on whether 'the goods were suitable to the

---

[36] (1868) 19 LT Rep (NS) 398 at 399.

[37] Above, n 36.

[38] [1936] 2 All ER 86.

[39] (1804) 5 Esp 152; 170 ER 769. This case is discussed further, below.

[40] [1908] 2 KB 1.

[41] (1840) 6 M & W 42; 151 ER 314.

condition in life of the infant',[42] said that the clothing was 'of an extravagant and ridiculous style having regard to the position of the boy'.[43]  (The defendant was the son of a successful architect with a house in Hampstead and a country pile near Havant, and had been educated at Uppingham before going up to Trinity College, Cambridge.)

A similar position was adopted in *Ryder v Wombwell*[44] where 'a pair of solitaires or ornamental studs, worn as the fastenings of the wristbands of a shirt, which…were made of crystals set in gold and ornamented with diamonds, representing a horseshoe in which the nails were rubies'[45] were not necessaries for the infant in the case. Willes J said that,[46]

> The question in such cases is not whether the expenditure is one which an infant, in the defendant's position, could not properly incur. There is no doubt that an infant may buy jewelry [sic] or plate, if he has the money to pay and pays for it. But the question is whether it is so necessary for the purpose of maintaining himself in his station that he should have these articles.

The question for the court therefore, was not whether the infant could afford the items, but rather whether such items were essential to him in his current position in life.  The court held that such extravagant pieces could not possibly be necessary for the infant.

Expensive dinners were similarly regarded as being incapable of constituting necessaries, as we can see in *Wharton v Mackenzie*.[47] Whilst the court in *Wharton* was willing to accept that the young gentleman was of suitable means and standing to host such dinners, Wightman J stated that 'the articles of which this bill is composed cannot be

---

[42] [1908] 2 KB 1 at 8.

[43] At 11.

[44] (1868) LR 4 Ex 32.

[45] At 37.

[46] At 39.

[47] (1844) 5 QB 606; 114 ER 1378.

necessaries if they cannot be supplied without giving credit.'[48] That is a problematic line of argument, since the question of necessary versus non-necessary goods generally *only* arises when the goods or services are supplied on credit.  An infant was quite competent to make cash transactions.[49]An infant's contracts were unenforceable as a general rule, rather than void, so disputes only arose where some part of the contract remained executory: invariably in sales of goods cases, this was payment by the infant, so that the seller sued to recover the price of goods supplied on credit and the purchaser pleaded infancy in defence.

It is to the credit of the judges in these cases, however, that often the application of common sense and a more realistic approach seems to prevail over a rigid application of the law. Indeed, such was the reason for disallowing the young undergraduate in *Wharton v Mackenzie* from being held liable for luxury foodstuffs, as Lord Denman CJ explained, 'with respect to the articles here supplied, it is an outrage to common sense to say that they can possibly be necessaries'.[50]

Sometimes, a very particular context might play a role.  In *Coates v Wilson*[51] Lord Ellenborough held a military uniform for a volunteer corps to be a necessary as a consequence of the number of men who had enlisted for military service around this time.[52] It was only right that in 'these perilous times' an infant ought to be able to contract for clothing which was essential for duties undertaken 'for defence of the country'.[53]

---

[48] At 614.

[49] See, eg, *Ryder v Wombwell* (1868) LR 4 Ex 32 at 39 per Willes J, quoted above, text at n 46.

[50] *Wharton v Mackenzie*, above n 47, at 612.

[51] (1804) 5 Esp. 152; 170 ER 769.

[52] Around 52,000 men, such as the infant in this case, joined volunteer units around this time: see D Chandler and I Beckett (Eds), *The Oxford History of the British Army*, OUP, Oxford, 2003, p 138.

[53] (1804) 5 Esp 152; 170 ER 769.

Existing provision

The question of *quantity* was also clearly relevant to the question of whether what was supplied under the contract fell within the category of 'necessaries'. We saw above that this question was alluded to by Alderson B in *Peters v Fleming* when he observed that a breast-pin might be a necessary, but twenty breast-pins could not be.[54]  There are numerous references in the case law to the issue of whether an infant was already sufficiently supplied and whether this was indeed relevant to whether the goods were necessary.  There seems to have been doubt about this, on occasion, with one view being that the fact of the infant being already well-supplied with goods of the same sort was only relevant if the seller knew that this was so, and that the seller was under no obligation to take steps to find out. It was suggested by counsel in various cases that it should not be necessary for the tradesman to make active enquiries.  Such was the argument of the plaintiff's counsel in *Ford v Fothergill*.[55] In this case a young man's excesses brought the disapproval of Lord Kenyon. In an assumpsit for work and labour as a tailor, the plaintiff sued the defendant for the price (not stated in the report) of a coat, waistcoat and two pairs of breeches, ordered by the defendant for delivery to him at the Grecian Coffee House.  These clothes were in addition to a great many others supplied by other tailors in an extravagant spending spree.  The defendant's father had paid various other tailors off that same year, 1793.  At Nisi Prius, the plaintiff's counsel argued against the suggestion that his client ought to have instituted enquiries:

---

[54] (1840) 6 M & W 42; 151 ER 314.

[55] (1794) Peake 301; 170 ER 164.

> Mingay, for the plaintiff, contended, that it was not incumbent on the plaintiff to traverse the town to
>
> enquire the defendant's fortune and character.  He came to him as a man of fortune and figure,
>
> introduced and recommended by a gentleman of fortune.  If the plaintiff thought them necessary for his
>
> state and degree, that would maintain the issue.  In the way he appeared to the plaintiff he could not
>
> know but that he had an estate of £500 per annum.

The argument, however, did not find favour with Lord Kenyon CJ, who directed the jury that

the plaintiff could and should have made enquiries.  The plaintiff, said Lord Kenyon, ought to

have '…gone to [the defendant's] father and enquired of him whether he was in want of these

clothes'.[56]  Indeed, the circumstance of the defendant living in a coffee house seemed to his

Lordship to be suggestive of an unwary nature (we assume he meant a tendency to

extravagance) as well as offering an opportunity of making enquiries both of people at the

coffee house and of the boy's father, so that it seemed that the plaintiff perhaps should have

been specially on his guard as well as having it more easily in his power to control his risks.

That the jury did not apparently agree with Lord Kenyon does not really affect the view we

must take of the law as it then stood, however.  What the case also tells us is, that the

question of what was necessary was a matter for the jury, which was also fundamental in

*Maddox v Miller*,[57] considered in more detail below.

   Further instances can be found over a long period of time.  In *Barnes & Co v Toye*[58]

the Divisional Court ordered a new trial on the grounds that the trial judge had erred in

directing the jury that it did not matter how many clothes the defendant already had, in

considering whether those supplied by the plaintiff tailors were necessaries.  Lopes J drew an

analogy with a watch, saying that 'a watch may be prima facie in some cases a necessary, but

---

[56] Above, n 55.

[57] (1813) 1 M & S 738; 105 ER 275.

[58] (1884) 13 QBD 410.

if it turned out that the infant was already supplied with a watch or watches, the one ordered

could not be a necessary',[59] and found that the jury were entitled to take into account the fact

that the minor may already be sufficiently supplied with the goods when determining whether

a particular item was necessary: 'Evidence as to the amount of clothes the defendant

possessed at the time when the order relied on was given was admissible, and the jury should

have been told that in arriving at a conclusion whether the goods supplied by the plaintiffs

were necessaries or not, they should consider whether the defendant was already sufficiently

supplied.'[60] This decision seemed to the Divisional Court to involve a dissent from the then

recent decision in *Ryder v Wombwell,* but it is not evident that it really did.  In *Ryder* the

defendant had been supplied with expensive items of jewellery on credit.  He had a great

many other items of the sort.  The Lord Chief Baron at trial had left it to the jury whether the

items were of such a type and quality as was necessary to the defendant, given his exalted

social position, but directed them to ignore the fact that he had a great many like items

already in his possession.  The Court of Exchequer Chamber held that the question of

necessary-or-not was one for the jury, but that the judge should withhold the question from

the jury if there was not sufficient evidence on which a jury could reasonably reach a

conclusion that the items *were* necessary.  The Lord Chief Baron had erred in holding that the

defendant's evidence that he already possessed plenty of jewellery should not be considered

by the jury, in light of evidence that the plaintiffs had not been aware of this fact.  In so far as

this conclusion is concerned, the Divisional Court in *Barnes & Co v Toye*, in finding, as it

did, that a defendant was entitled to adduce evidence that he was already well-supplied with

---

[59] At 413.

[60] At 414.

items of the sort alleged to have been necessaries, was not at odds with the Court of Exchequer Chamber in the earlier case.

This view, that the actual existing provision of the defendant was entirely relevant and the trader was on notice that he dealt with an infant on credit at his peril, for if it turned out that the infant was already adequately supplied then the trader could not recover, is amply supported by other authorities over a significant period, for instance, *Bainbridge v Pickering*,[61] *Cook v Deaton*,[62] *Story v Pery*,[63] *Steedman v Rose*[64] and, of course, the extremely well-known case, already mentioned above, of *Nash v Inman*.[65] In this latter case, the court found that the tradesman bringing the claim against the infant had to show, 'first, that the goods were suitable to the condition in life of the infant; and, secondly, that they were suitable to his actual requirements at the time or, in other words, that the infant had not at the time an adequate supply from other sources.'[66]

---

[61] (1789) 2 Black W 1325; 96 ER 776.

[62] (1827) 3 Car & P 114; 172 ER 348.

[63] (1831) 4 Car & P 526; 172 ER 810.  This case is worth reading for the enjoyable facts: the goods supplied by a Jermyn Street tailor were 'A rifle green coat, lined with silk… a pair of royal purple casimere [sic] trousers… a pair of shepherd's plaid trousers…'  The defendant was the infant son (he was supplied when seventeen and eighteen years old) of Lord Glentworth, who was at the time a prisoner for debt in the King's Bench prison. The defendant himself must have been quite a sight, so it is perhaps no wonder that tradesmen saw him coming.

[64] (1824) Car & M 422; 174 ER 572.

[65] [1908] 2 KB 1.

[66] [1908] 2 KB 1 at 9 per Fletcher Moulton LJ. It is notable that this case was decided after the passage of the Sale of Goods Act 1893, but s 2 of the Act (subsequently re-enacted as s 3 Sale of Goods Act 1979) would have had no effect on the decision in *Nash*.

*Dalton v Gib*[67] is a rare instance of the judges finding that the circumstances were

such that the trader need not have made enquiries as to the circumstances of the defendant,

including her existing sufficiency or otherwise of goods of the description supplied.  In this

case, the defendant was a woman of twenty years of age, who lived with her mother rather

extravagantly at an hotel in Hanover Square, a fashionable address in London's West End,

travelling around the city in a carriage, when in fact the pair were possessed of few funds and

the mother was living apart from her husband, who was living in Calais.  The defendant

contracted for the purchase of silks to the value of £35 and took some with her in the

carriage, which waited outside the plaintiff's shop, with the defendant's mother inside, whilst

the rest were delivered to the hotel, again with the mother available to supervise.  All the

judges, Tindal CJ, Vaughan, Bosanquet and Erskine JJ, agreed that the usual rule was that the

trader dealt with an infant at his own peril and was on notice to make enquiries as to whether

the infant was already sufficiently supplied, but that the circumstance of appearing in a

carriage, with her mother there when she took some of the goods with her, and living at the

hotel *with* her mother, rendered enquiries superfluous.  This does not seem really out of line

with the rest of the cases: the general rule is acknowledged and here the only person of whom

the tradesman could have been expected to make enquiries was the mother, and she was

present both at the shop and the hotel and can be taken to have approved the purchases,

implicitly signifying that the additional silks being bought were necessary for her daughter.


Proof

The proper pleading in cases of infant defendants to actions on their contracts, involved the

plaintiff pleading the contract and the defendant's indebtedness, the defendant meeting this

---

[67] (1839) 5 Bing (NC) 198; 132 ER 1080.

with a plea that they were not indebted and were not of age and then for the plaintiff to plead

that the subject matter of the contract was something that was necessary to the defendant.

This fact of the necessary nature of the goods or services supplied had to be specially

pleaded, therefore, as we saw in *Ive v Chester*.[68]

The position on the balance between what is a matter of fact and what a matter of law

seems to have changed over time.  As we have seen, in the sixteenth and early seventeenth

centuries, the judges appear to have regarded the whole question of what is necessary for a

particular infant as a question of law. Such was clearly the case in *Mackerell v Bachelor*,[69]

and also appears to have been the assumption in *Dale v Copping*.[70]  Equally clearly, by the

end of the eighteenth century the question of 'necessary or not?' had become in some sense

partly one for the judge and partly for the jury, as we saw in *Hands v Slaney*,[71] and again later

in *Jenner v Walker*.[72]   However, the division between judicial competence and jury

competence was that the judge had to decide as a matter of law whether there was or was not

sufficient evidence adduced upon the basis of which a reasonable jury, properly directed,

could possibly conclude that the goods or services were in fact necessary for the defendant.

This point, indeed, had puzzled Cockburn CJ in *Jenner*, because he had only an

imperfect account of what had just been decided in *Ryder v Wombwell*,[73] from which he had

the impression that the Exchequer Chamber had decided that the question of whether or not

an item was necessary was one for the judge.  The Chief Justice was somewhat scathing of

---

[68] (1620) Cro Jac. 560; 79 ER 480 at 561.

[69] (1597) Cro Eliz 583; 75 ER 1070. See above, text at n 14.

[70] (1610) 1 Bulstr 40; 80 ER 743. See above, text at n 20.

[71] (1800) 8 TR 578; 101 ER 1556. See above, text at n 27.

[72] (1868) 19 LT Rep (NS) 398. See above, text at n 35.

[73] (1868) LR 4 Ex 32.

the suggestion, arguing that Baron Bramwell, who hated smoking, would find a cigar case not a necessary, while another judge might find it to be necessary. Such matters of personal judgment were best left to a jury in Cockburn CJ's opinion, though he felt bound by what he had understood the judgment in *Ryder* to have been.[74]

The judge, therefore, had, as we might put it, 'first bite of the cherry', in determining whether something was capable of being found by a reasonable jury to be necessary. Once he had decided that goods of the character concerned were capable of being necessaries for the defendant in the case, it was properly left to the jury (as Lord Kenyon found that Chambre B had done at Warwick Assizes in *Hands v Slaney*) whether in that particular case the actual goods supplied were necessaries, which would include the question of whether the infant was sufficiently supplied already.

The case of *Maddox v Miller*,[75] already alluded to, furnishes a useful illustration of the extent to which the judge's 'first bite' was sometimes reduced to little more than a lick. The defendant was the son of a clergyman who lived in Gloucestershire, but the defendant had been living, at the time of the contracts involved, in Stourport-on-Severn, where he was employed by a substantial bargemaster at a salary that did not appear in evidence. In August 1809 he had sent for the plaintiff tailors to attend him at a coffee house (this was mentioned specifically, in relation to the fact that he had not been introduced to them by his father), and between then and September 1810 bespoke of him clothes to the value of £18 2s 6d. In September 1810 he paid £15 towards his outstanding bill and between October that year and February 1811 was allowed to order further clothes, some extra-deluxe clothes suitable to a nobleman while others were clothes of the ordinary sort supplied to a gentleman, amounting

---

[74] (1868) 19 LT Rep (NS) 398 at 399.

[75] (1813) 1 M & S 738; 105 ER 275.

to a further £16 4s 6d, giving a total amount owing after that date of £19 7s 0d. At the time of the delivery of the clothes the defendant was an infant.  He was subsequently sued and the case came on at Worcester Assizes before Bayley J and a jury.  The defendant pleaded his infancy and the tailor pleaded in replication that the goods were necessaries.  It was objected that insufficient evidence had been adduced for the plaintiff that the defendant was not already adequately supplied with clothes (or that these clothes were suitable for his state and condition, or what his income was) for the case to go to the jury.  Bayley J, in some uncertainty, nonsuited the plaintiffs (rather ironically).  A rule nisi to set aside the nonsuit having been obtained, the case came before Lord Ellenborough CJ, who made the rule absolute, holding that there was enough to go to the jury.

We saw earlier, in the case of *Ford v Fothergill*[76] that the jury might well go against a strong direction from the judge. Here, Lord Kenyon commented in very clear terms against the failure of the plaintiff tailor to make enquiries as to the position of the defendant and whether the defendant was already sufficiently supplied with clothes. It took a firm-minded jury to disregard the views of the Lord Chief Justice and find in favour of the tailor. This tells us two things. First, it shows that the question of sufficiency of supply was a matter for the jury (and perhaps also that it was difficult at times to disentangle the question of sufficiency from the issue of the plaintiff's duty to enquire, if such a duty truly existed, upon which the foregoing argument has clearly cast doubt).  Secondly, when taken in conjunction with other cases, such as *Peters v Fleming*,[77] in which the jury appears to have found against the weight of judicial opinion (and/or common sense) that luxurious goods were indeed necessary to the defendant and he should be held liable for them, we have an impression that juries, which

---

[76] (1794) Peake 301; 170 ER 164.

[77] (1840) 6 M & W 42; 151 ER 314. See above, n 29 and text thereat.

perhaps included a good many local tradesmen, were not as inclined as the judges were to indulge the weaknesses of apparently well-off youngsters and protect them from themselves. This second factor, moreover, seems to point to the stated reasons of the judges for disallowing claims on infants' contracts, namely the protection of the infants themselves, being indeed the real reason and policy of the law, as this article argues.

## Employment and Training

Contracts for the supply of goods or services on credit are one sort of contract involving an element of futurity or continuing obligation, which therefore raised questions about the capacity of a would-be infant contractor. They arose quite frequently since infancy lasted into the period in life in which a young person might be an undergraduate, or have entered upon a naval or military career, or be otherwise living separately from his or her parents or guardians. Infants, however, were also very frequently employed or apprenticed, which also involved contracting with a degree of futurity and therefore also raise the problem of capacity. In this section we will consider how the courts dealt with contracts of this character and see what light that sheds on the question of the law's policy or motivations. (Although the reports appear to contain rather fewer instances of actions brought in relation to these types of contracts.[78])

Before doing so, however, some note of caution must necessarily be sounded, regarding the risks of viewing the past through the lenses of the present. While infancy lasted until the age of twenty-one so that some of the contracts one is dealing with in relation to

---

[78] One reason might be, in relation to apprenticeships, for example, that disputes were dealt with either informally or else locally, for instance by magistrates under the Statute of Artificers 1563 (5 Eliz I c 4). See also *Gylbert v Fletcher* (1628) Cro Car 179; 79 ER 757.

infants' employment therefore deal with those who would be of employable age today, a great deal of employment and nearly all apprenticeships in the period under consideration here involve those whom we still regard as children. In the contemporary West, we tend to take it for granted that child labour is a Bad Thing. The Whig theory of history as applied to young people and work assumes that this is the case and that the unfolding of history over the 18th, 19th and 20th centuries has been, so far as this issue is concerned, the story of an inexorable improvement in the shape of the gradual abolition of child labour and the pushing back of the point (still going on even in Britain) of transition from education to working life.[79] This was not at all axiomatic to our ancestors, however. Dorothy George, in her brief but excellent chapter on 'Child Labour and Apprenticeship' in *England in Transition*, notes that Daniel Defoe had regarded high levels of child labour, from as young an age as possible, as his 'chief criterion of prosperity',[80] citing his enthusiastic statement in reference to the district around Halifax that 'hardly any thing [sic] above four years old but its hands are sufficient to itself'[81] and in respect of Norwich that 'the very children after four or five years of age, could every one earn their own bread'.[82] George likewise cites an American commentator visiting Halifax in 1777 who[83]

---

[79] This process can to some extent be traced through legislation, with the Cotton Mills and Factories Act 1819 establishing a minimum working age for employees and apprentices in cotton mills at nine, increasing to ten by the Factories & Workshops Act 1878, eleven under the Factories Act 1891 and twelve under the Factories & Workshops Act 1901, with subsequent increases since, especially through increases in the age at which a child could leave full-time education.

[80] Dorothy George, *England in Transition*: *Life and Work in the Eighteenth Century*, Routledge, London, 1931 (1953 reprint, Penguin, London), p 117.

[81] Above, n 80.

[82] Above, n 80.

[83] Above, n 80, p 118.

> …watched some fifteen children making wire cards for wool-carding 'which employment', he noted in his diary, 'not only keeps their little minds from vice but … takes a heavy burden from their poor parents.' That was the traditional and unquestioned attitude towards the labour of children.

The kindly Parson Woodforde had child servants in his house, as the following reference in his diary for 1779 shows: [84]

> Sepbr. 3, Tuesday. […] I hired, Yesterday, one Henry Daines, a Boy of 13. Years old, in the place of Barnard Woodcock, who leaves me at Michaelmas next being too old for his Place & can better himself. I liked the Boy very well, having an open, honest countenance to all appearances, his Mother who came with him, seemed to be a good kind of Woman & very Motherly. I gave the Boy, on hiring him 0.1.0. Dinner to day, rost Beef & Plumb Pudding…

The entry for 13 January 1800 shows that Daines was paid two guineas per annum.[85] That the children of the labouring classes should be themselves labouring from a young age was not, then, regarded as a matter of regret, rather as part of the ordinary course of things, not only by their employers and by commentators but also by their parents.

There is also a risk in the other direction. Much child labour was done under articles of apprenticeship. Apprenticeships tend to be seen today in an extremely positive light. Paid, on-the-job training for a (usually skilled) future career. The temptation is to assume that this was the case in the past, when apprenticeships were much more a part of the everyday experience of the vast majority of young people, often gilded by the reflected romantic light of the mediaeval guild system, with its 'mysteries' and its grades of apprentice, journeyman and master. Such a view is also highly misleading and hazardous to a proper understanding of child/youth labour in our period. Apprenticeships varied greatly between trades, with apprenticeships to substantial merchants or to professional men being very much educative in

---

[84] James Woodforde, John Beresford, ed, *The Diary of a Country Parson*, OUP, Oxford, 1931, vol 5, p 212.

[85] Above n 84, p 234.

nature, with good conditions for the apprentice and good future prospects (including the possibility in some instances of marrying his master's daughter and eventually taking over the business). Such apprenticeships, however, came with a hefty fee payable by the apprentice's parents or guardians to the master, which might be £100 for an apprenticeship to a surgeon or as much as £1000 to a great merchant. At the more usual level for the bulk of the population, a fee of perhaps £5 would be payable on indenturing to a weaver or small-time shoemaker.[86] George observes that 'with a small fee [the apprentice] would be an unpaid servant; with a large one he would expect to be a pupil.'[87]

Equally, even where the apprentice was mostly an unpaid servant, the arrangement was not necessarily all that advantageous to the master, either. George notes that,[88]

> [A]t the beginning the child was a nuisance, he spoiled material, he needed supervision, his appetite was large. The master expected to be repaid for the unprofitable early years when the boy (or girl) had learned his trade. But as soon as this happened, the apprentice seldom failed to resent having to work for his master without pay and, it should be remembered, for an unlimited number of hours a day.

This often led to apprentices behaving badly and spoiling work deliberately to induce the master to agree to cancel the indentures. A not infrequent thing, such was the burden of a young apprentice, was for the master deliberately to mistreat the boy so as to force him to abscond. This was of course of no concern to the master, who simply recruited another young apprentice – and, naturally, the fee that went with it.[89]

---

[86] George, above n 80, p 118.

[87] Above, n 86.

[88] Above, n 80, p 119.

[89] Above, n 88.

At the lowest end of the scale, there were apprenticeships to trades so undesirable that no fee was payable at all, or else the master paid the parents. Bottom of the pile was the chimney-sweep's apprentice, the pitiable 'climbing-boy', for whom families themselves were paid by the masters. Sometimes, such was the difficulty in finding a boy to do this work, large sums changed hands. Lane writes of a young boy who 'claimed to have been kidnapped by a "little hunchbacked gentleman" who offered his mother £100 for him'.[90]

It was not only boys who undertook apprenticeships. Although less common, girls were quite often apprenticed; though given the limited number of positions in which a woman could work, young girls who completed apprenticeships often did so in more menial occupations. Indeed, it has been recorded that 'of one girl bound at Norwich in 1653, it is said that she was to be educated in housewifery for seven years'.[91] Dorothy George, commenting on how thin the pretence of teaching a trade often was, also cites the case of 'a little girl [who] was bound as the drudge of a family of street hawkers living in a single room in a slum' whose indentures of apprenticeship provide that she should be 'taught the art of housewifery'.[92]

Poor children, dependent on the parish, were in a different and usually worse situation. For such children apprenticeships were compulsory, as George explains, 'under the Elizabethan Poor Law the children of poor parents were to be apprenticed by being billeted compulsorily upon the ratepayers of the parish to be farm servants or household servants, the

---

[90] See J Lane, *Apprenticeship in England, 1600-1914,* Routledge, London, 1996, p 9, quoting James Dawson Burn, *The Autobiography of a Beggar Boy*, London, 1856, reprinted, Europa Publications, London, 1978, p 59.

[91] O J Dunlop and R D Denman, *English Apprenticeship and Child Labour: A History*, T Fisher Unwin, London, 1912, p 153.

[92] George, above n 80, p 121.

boys till they were twenty-four, the girls till twenty-one or marriage'.[93] From the Poor Relief

Act 1691 onwards, serving as an apprentice for at least 40 days established a right of

settlement in the parish where it was served, meaning that parish officers were incentivized to

indenture poor children to masters in another parish, because they thereby got permanently

rid of them as possible claimants on their own parish's poor rate.  While masters in a child's

own parish were obliged to accept poor apprentices, those in other parishes were not, so

parish officers would have to pay the master in another parish, usually £5.  The payment

seems to have been considered well worth it.[94]

It is clear then, that when we speak of apprenticeships; we are referring to all manner

of different arrangements, some of which were of benefit to the infant, others distinctly and

sometimes egregiously exploitative. The contract was a regulated one, however, in the sense

that where a master complained of an unruly or peculiarly ham-fisted apprentice, or an

apprentice complained that he was not been taught a trade or was not correctly treated (which

might be brutality, or might be, for instance, failing to supply the apprentice with proper

clothing), either party might complain to Quarter Sessions and seek the cancellation of the

indentures. Dorothy George cites the example of William Adams, who was apprenticed to a

carpenter but complained to Quarter Sessions that he was not being taught that trade but

instead had been made to 'drive children about at fairs for half-pence in a little cart drawn by

---

[93] Above n 80, p 124. After 1778 apprenticeships for boys, too, finished at twenty-one.  The age of

commencement was generally around seven years old, meaning that a parish apprenticeship was typically

fourteen years in duration, compared with the normal trade apprenticeship of seven years for trades recognized

as existing at the time of the Statute of Artificers 1563 and varying but shorter periods for newer trades and

skills.

[94] See generally, George, above n 80, especially 124-5.

dogs' and that his master instead of supplying him with clothes had taken the clothes he already had from him and pawned them.[95]


The Law on Apprenticeships

The law was that an infant could be bound to a contract of apprenticeship, but that this was conditional on it being, looked at in the round, beneficial to the infant. Such a contract could not be enforced against the infant in an action for breach of the contract. Rather, as between the apprentice and the master, a status relationship was created, which was regulated by statute and common law. That said, it was still a contract and a third party inducing the apprentice to breach the terms of their indentures was open to action for inducing breach of contract. All of this can be gathered from the judgment of Fry LJ, sitting as an additional judge of the Chancery Division, in the celebrated case of *De Francesco v Barnum & Others*,[96] familiar still to law students as an authority against specific performance of contracts of personal service.

Briefly, De Francesco ran a highly reputed dance school in London. He brought an action against P T Barnum, the famous impresario, a theatrical agent named Signor Parravicini, employed by Barnum to engage ballet-dancers for him, two infants, Ada and Helen Maude Parnell, De Francesco's apprentices, and Mrs Elizabeth Parnell, mother of the two girls. He began by moving in the Chancery Division for an injunction restraining the defendants from breaches of the apprenticeship indentures. These indentures were both entered into on 6 December 1886, when Ada was twelve years old and Helen Maude was

---

[95] George, above n 80 p 122.

[96] (1890) 45 Ch D 430.

fourteen.  The two deeds were in the same terms.  They bound the girls as apprentices for

seven years in, mostly, the usual terms as to obedience to the master, and so on.  But they had

some unusual aspects.  The master was only to pay them anything if he used them for a

performance.  He was under no obligation to provide any work for them (though he was

obliged to provide instruction).  So they had no guarantee of any kind of income.  He was not

liable for maintaining them in any way.  He was free to take them anywhere in the world,

away from maternal care and out of the jurisdiction.  He could terminate the contract in each

case at any time 'after a fair trial' on grounds that the girl in question was unsuited to the

career.  There was no corresponding right of termination by the girls or their mother.  The

girls, even when not employed by De Francesco, could not take other work without his

written permission.  Neither could they marry.  Breach of any of the terms entitled De

Francesco to terminate and claim liquidated damages in the sum of £50.

Chitty J, hearing the motion for injunctions, refused them.  He held that without going

into the question of whether or not the contracts were beneficial to the infants, he had to

consider himself bound by the case of *Gylbert v Fletcher*,[97] decided by the King's Bench

(Hyde CJ, Jones, Whitlock and Croke JJ) in the reign of Charles I, which states that:[98]

> [A]lthough an infant may voluntarily bind himself an apprentice, and if he continue apprentice for
>
> seven years may have the benefit to use his trade, yet neither at the common law nor [by statute] shall
>
> the covenant or obligation of an infant for his apprenticeship bind him.  But if he misbehave himself,
>
> the master may correct him in his service, or complain to a justice of the peace to have him punished,
>
> according to the statute.  But no remedy lieth against an infant on such a covenant…

He noted that this case had been unchallenged authority ever since and was cited by the

leading textbook writers, so he was unwilling to consider on an interim application whether

---

[97] (1628) Cro Car 179; 79 ER 757.

[98] At 179-180.

the authority might be overruled.[99] After this, the Plaintiff ceased to seek any remedy against the infants and the matters to be considered at trial by Fry LJ concerned the question of whether the adult parties could be sued for inducing breach of contract. If there was a valid contract, then it was clearly possible that Mrs Parnell, insofar as she co-operated in the engagement of the girls to perform for Mr Barnum at Olympia,[100] and Mr Barnum and his agent Sgr Parravicini, insofar as, and from the time, they were aware of the relevant term of the indentures, could be liable for inducing breach. Fry LJ did not have to go so far as deciding the facts, because he decided that the indentures themselves were void. Although he noted the reputability of the plaintiff's school, that the training might well be valuable and perhaps the best to be had in dancing, that the indentures were in some ways enlightened as with their provisions in relation to education, he held that, judged all in all, they were not in the girls' interests. The provisions described above as 'unusual' were highly one-sided. Although every contract would contain some terms favourable to one party only and some to the other party, the balance here was very heavily in De Francesco's favour, to the extent that the deeds viewed in the round, and acknowledging that the arrangements would provide the girls with the means in due course of getting their living, were not to the net benefit of the infants.[101]

---

[99] (1889) 43 Ch D 165 at 171-2.

[100] This must have been for 'P T Barnum's Greatest Show on Earth', which opened at Olympia, London on Monday 11 November 1889. The infants in the case were presumably hired for the *corps de ballet* in the second half of the evening's entertainment, wholly devoted to 'Imre Kiralfy's Stupendous, New and Original Historical Romantic Spectacle of "*Nero; Or The Destruction of Rome*"', which included 'Superb Festal Dances'. (Connecticut Digital Archive, accessed on 9 June 2018.)

[101] (1890) 45 Ch D 430 at 443.

The rule that the covenants of an apprenticeship could not be enforced by action against an infant did not apply to mere contracts of employment, into which an infant might also enter. This is evident from Chitty J's discussion on the motion for injunctions in *De Francesco v Barnum* of the case *Fellows v Wood*.[102] This being urged on him by counsel for De Francesco as an instance of the granting of an injunction for breach of an infant's contract with his master. Chitty J explained that in this case it appeared that not only was the defendant not an infant when his former master had sought an injunction to restrain him from taking his customers, having left his service without notice and in breach of contract both as to notice and as to non-competition, but also that this 'was not a contract of apprenticeship; it was a mere contract of service'.[103]

Contracts of service

The position with contracts of service was also that infants were free to enter into such contracts which, unlike indentures of apprenticeship, were enforceable at law and in equity.[104] Nevertheless, such contracts were only binding on an infant if they were of net benefit to him or her, which was also true of contracts incidental to employment contracts. *Clements v London & North Western Railway Co.*[105] concerned a boy's employment with the defendant railway company. On joining the company's service, he also signed up to an

---

[102] (1888) 59 LT (NS) 513.

[103] (1889) 43 Ch D 165 at 174.

[104] Though Dorothy George observes that '[c]hild labour in those days was generally undertaken under indentures of apprenticeship': George, above, n 80, p 118 and generally, chapter VII.

[105] [1894] 2 QB 482.

insurance scheme, which would pay out in the event of an injury, whether or not the fault of the employer (only provided it was not the result of gross negligence on the part of the insured). The employee contributed to the scheme from his wages, on a scale, and the employer also made a contribution. The scheme provided that the employee, in joining the scheme, agreed to waive any claim against the employer in respect of personal injury in the course of his employment. It was held that, in deciding whether the contract was binding upon the infant, 'the answer to this proposition depends on whether, on the true construction of the contract as a whole, it was for his advantage'.[106] Lord Esher held that where a contract is of benefit to the infant, it will be binding upon him. His Lordship came to the conclusion in this case that as 'the risk of non-success owing to difficulty of proof, and the risk of obtaining but small advantage from a successful action, are both obviated by this agreement, under which, even if it is clear that there is no legal claim which could be enforced against the company, he is still entitled to compensation',[107] the infant therefore must derive some benefit from the contract and so ought to be held bound by it. The converse also follows as A.L. Smith LJ explained, stating that it would be 'unfair that he should be bound by it'[108] if it were not benefiting him in any way.


Conclusions

So, we submit it can be fairly stated that whatever the rigours of a rougher-mannered age, when child labour was not only rife but generally seen as desirable or an inevitable part of life, we nevertheless see, at least when the higher courts become involved, a high bar being

---

[106] At 489.

[107] At 490.

[108] At 495.

set by the courts for contractual validity, the yardstick of which is benefit to the infant.

Indentures of apprenticeship are struck down as void if not, on balance, beneficial to the

infant.  Contracts of service are less common for infants, as infant labour is mainly engaged

under at least the guise of apprenticeship, but these contracts, too, and contracts ancillary to

them, are subject to a test of net benefit.  The broad conclusion the authors feel entitled to

draw is that although the times were much harsher on the young than we care to contemplate

today, and society generally less protective of children, the law itself, when called upon

(which might only be possible, admittedly, for those with family, friends and financial

resources), was paternalistic in its outlook and astute to weigh contracts of this sort and see

whether they really were overall to the benefit of the infant.

Statutory Intervention

Whilst common law principles afforded protection to infants buying goods and services on

credit and in relation to training and employment, the law surrounding the repayment of a

loan and moneys owed was less than satisfactory, having undergone little development, save

that penal bonds were unenforceable against infants even before they were rendered generally

void.

It was doubtless commoner for an infant to require food, lodging, clothing, education

or employment than to need to borrow money, so it makes sense that a more developed

jurisprudence should have evolved in relation to the former transactions. However, the

changing nature of the contracting landscape of infants saw the need to increase regulation

with regard to the lending of money to an infant.  Mitchell Henry MP, who introduced the

Infants' Contracts Bill, which was to become the Infants' Relief Act 1874, referred the House

to 'the extent to which the money-lenders' conspiracy was carried on against young men and boys by the issue in extraordinary numbers of circulars and letters tempting them to borrow money'.[109] Such letters were sent to boys at boarding schools with a view of encouraging them to borrow money, with the result that young men were burdened with debts that they could not possibly repay. In an attempt to resolve this, the bill sought to protect 'a young man who had been inveigled into the money-lender's den…'[110]

Clause 1 provided that:

> All contracts, whether by specialty, or by simple contract, henceforth entered into by infants for the repayment of money lent or to be lent, or for goods supplied or to be supplied (other than contracts for necessaries), and all accounts stated with infants, shall be absolutely void.

while clause 2 prevented ratification and any retrospective enforcement of debt, once the infant became of full age:

> No action shall be brought whereby to charge any person upon any promise made after full age to pay any debt contracted during infancy, or upon any ratification made after full age of any promise or contract made during infancy.

Consequently, a lender would be unable to collect if he contracted with an infant, irrespective of any enquiries he may make as to age and any misrepresentation made by the infant in that regard. The legislation clearly benefited the improvident infant, but it was seen by some as imposing too severe a restriction on tradesmen. Sir Massey Lopes MP questioned whether money-lenders were really that greater a risk to infants than a shopkeeper who, for example, sold goods to an infant knowing that he was not of full age, 'were there not other classes

---

[109] HC Deb 25 June 1873 vol 216 cc 1374-8, 1374. This trend, no doubt, owed its origins to the institution of a (relatively) cheap, nationwide prepaid postal service in January 1840.

[110] Above, n 109.

quite as bad – the unscrupulous shopkeepers, for example, who persuaded young men to order goods they did not want and could not pay for'.[111] In spite of these objections the bill passed into law.  After much criticism, particularly of the difficulties of interpretation of the words 'absolutely void' (did this make it impossible for the infant to enforce such a contract for his own benefit?) the Act was repealed by s 1 of the Minors' Contracts Act 1987.  In any event, the Act seems not to have solved the actual problem that had led to its introduction, *viz.* unscrupulous lenders targeting boys at public schools, because the issue of sending circulars to children, either promoting betting or offering loans, resulted in further legislation less than twenty years later. The Betting and Loans (Infants) Act 1892 made it illegal knowingly to send communications to infants inciting them to gamble or to borrow money. Knowledge of the recipient's infancy was rebuttably presumed by  s 3 if the communication was sent to 'any person at any university, college, school or other place of education'. Penalties included fines and/or imprisonment, 'with or without hard labour'.

The Latey Report recommended that the Infants Relief Act be repealed, which received support from academic commentators, for example Downey, who wrote that 'the recommendations of the Committee on infants' contracts could usefully be implemented without delay, if only to get rid of the thoroughly unsatisfactory Infants Relief Act 1874'.[112] However, whilst the 1969 Act effected the reduction in the age of majority, it left the Infants Relief Act 1874 untouched. The Minors Contracts Act was enacted on 9 April 1987 and, as already noted, repealed the Infants Relief Act 1874 and also repealed the Betting and Loans (Infants) Act 1892.

---

[111] HC Deb 25 June 1873 vol 216 cc 1374-8, 1376.

[112] B Downey, 'Report of the Committee on the Age of Majority' (1968) 31 *MLR* (1968) 429 at 435.

## Conclusions

As explained in the Introduction to this article, the question of 'for whose benefit did infants lack full contractual capacity?' has been a contested one. The Latey Committee observed that the then age of full capacity, twenty-one years of age, was arbitrary, but not necessarily wrong. The committee had received and noted in its Report, however, evidence from the Church of England's Board for Social Responsibility (which it is fair to say probably enjoyed more influence in the mid-1960s than today), that limits on the capacity of young people were not for their benefit, were for the benefit of others and were motivated by the desire of others to control the lives and actions of young people.[113] The Report goes on in the following paragraph to state that this 'is strongly supported by the evidence',[114] for which the committee cites, actually, no evidence and evidence for which is completely lacking in the Board's submissions. On the other hand, as we have seen, the judges deciding cases regarding contractual capacity, spoke quite distinctly in terms of protecting those same young people, whether from tradesmen on the make, or exploitative masters in the workplace, or just generally from themselves. The legal realism of the 20th century has taught us to be sceptical of the language of judgments; to avoid assuming that a case had the outcome it did for the reasons stated by the judge. The present authors have had this 'opinion scepticism'[115] very much in mind. We nevertheless feel forced to the view that the opinion put to the Latey Committee that the laws on infants' capacity were framed and administered not in their interests but to control them in the interests of others, was not only (as already observed) unsupported by any evidence offered at the time, but ran contrary to the evidence we have

---

[113] *Report of the Committee on the Age of Majority,* Cmnd 3342, 1967, para 48.

[114] Above, n 113, para 49.

[115] For a discussion of this concept, see Karl Llewellyn, 'Some Realism about Realism: Responding to Dean Pound' (1931) 44 *Harvard Law Review* 1222 at 1236-8.

found in more than two centuries' worth of case law and, incidentally in the late-19[th] century legislation.  Not only is the judicial rhetoric one of protection of infant parties, but the outcomes in terms of directions given by judges are strongly and consistently so.

As the law on necessaries became both more developed and more nuanced by social standing and wealth, we see a lessening of the absoluteness of protection given to infants, in favour of some concession to tradesmen, but it is gradual and always seems reasonable, provided it is seen in a sufficiently richly textured social-historical context (and this is important).  And if one distinguishes between directions given by judges from verdicts given by juries, often made up as they were of local tradesmen, then the desire of the judges to protect infants from both their own youthful susceptibility and improvidence and the rapacity of tradesmen bent on profiting from those qualities in their customers, becomes all the more marked.  Some of the cases can be seen in terms of a contest between a judge protective of the infant defendant and a jury protective of the interests of the plaintiff businessmen.

We have no hesitation in concluding that, put shortly, the law's motive in limiting infants' contractual capacity was firmly rooted in a genuine desire to protect the young; to keep youthful indiscretion and improvidence or (especially in the case of apprenticeships or contracts of service) mere vulnerability, from ruining their adult lives.

Today, the question of the contractual capacity of young persons has to a large extent dropped off the lawyer's and the jurist's radars, since majority and full contractual capacity is attained at an age when the young person is almost certain still to be living under the parental roof.  Whether the world of e-commerce, 'smart phones', 'in-app purchases', social media devoted to the marketizing of young people's interactions and data, will offer a challenge to the current situation in this regard is a matter for speculation. There are those who press for the voting age to be reduced.  If it is, then should we also say, 'if they're responsible enough

to vote, they are responsible enough to be bound to other decisions, for instance to obtain

credit'?  If this is debated and there is one day a successor to the Latey Committee, then, in

the submission of the present authors, its members should be advised that the law has always

protected the young from the ill consequences of bad decisions so far as it can, in the

contractual field.  The controls that are there are not controls for the sake of control but for

the sake of welfare.  In the policy world of the 'vulnerable consumer', history shows us that

one vulnerable group, at least, has always had protection and we should be careful not to cast

that aside on the basis of mere supposition and fashionable sentiment.[116]

---

[116] The point that new technologies may be a cause for re-examining the position has not been entirely missed,

however, see V Slade, 'The Infancy Defense in the Modern Contract Age: A Useful Vestige' (2011) 34 *Seattle

University Law Review* 613, which cites other interesting work in the United States relating to this question,

which is strictly beyond the scope of the present article.

# Exhibit 2

**Cornell Law Library**
## Scholarship@Cornell Law: A Digital Repository

Historical Theses and Dissertations Collection          Historical Cornell Law School

1892

# Contracts of Infants

Clayton Isaac Miller
*Cornell Law School*

Follow this and additional works at: http://scholarship.law.cornell.edu/historical_theses

 Part of the Law Commons

### Recommended Citation
Miller, Clayton Isaac, "Contracts of Infants" (1892). *Historical Theses and Dissertations Collection.* Paper 272.

This Thesis is brought to you for free and open access by the Historical Cornell Law School at Scholarship@Cornell Law: A Digital Repository. It has been accepted for inclusion in Historical Theses and Dissertations Collection by an authorized administrator of Scholarship@Cornell Law: A Digital Repository. For more information, please contact jmp8@cornell.edu.

# CONTRACTS OF INFANTS

-----ooOoo-----

## GRADUATING THESIS.

-----OF-----

## CLAYTON ISAAC MILLER.

--- ··ooOoo-----

## CLASS OF '93.

## CORNELL UNIVERSITY

## LAW SCHOOL

CONTRACTS OF INFANTS.

All persons are infants, in legal contemplation, until they arrive at majority. The period of majority differs in different countries, but the general rule is twenty-one years. By the Civil law, which obtains in some of the old countries, emancipation does not take place until the person is twenty-five.

It is supposed that the selection of the age of twenty-one, rather than some other period, at which majority should be attained, originated in the old feudal system, as at that time the infant was first presumed to be physically capable, if a male, of doing knight's service, and, if a female, not before of a suitable age, to marry any one upon whom duties would devolve.

Bingham on Infancy, 1.

The common law of England from the earliest times has fixed twenty-one as the period of absolute majority for both sexes. The same rule applies in most of the United State though in some of the western states females have an enlarged capacity to act at the age of eighteen.

Stephenson v Westfall, 18 Ill. 209.

The day upon which the infant attains his lawful age is on the beginning of the day next preceding the twenty-first anniversary of his birth. The case of State v Clark,

3 Harr. (Del.) was one which arose over the right of a person to vote before his twenty-first birthday.  Chief J. Bayard in his opinion said:  "It is to be observed that a person becomes of age on the first instant of the last day of the twenty-first year next before the anniversary of his birth; thus, if a person were born at any hour of the first day of January, 1801, (even) a few minutes before twelve o'clock of the night of that day, he would be of full age at the first instant of the 31st of December, 1821, although nearly forty-eight hours before he had actually attained the full age of twenty-one, according to years, days, hours, and minutes, because there is not in law in this respect any fractions of a day; and it is the same whether a thing is done upon one moment of the day or another.

- - - - - - - - -

## II.

We now come to our main topic, the contracts of infants. A contract as defined by Story is a deliberate engagement between competent parties upon a legal consideration to do or to abstain from doing some act. In its widest sense it includes records and specialties, but the term is usually employed to designate only simple or parol contracts. By parol contracts is to be understood not only verbal and unwritten contracts, but all contracts of record not under seal. This is strictly the legal signification of the term contract, inasmuch as that reciprocity of consideration and mutuality of agreement, which are necessary to constitute a parol agreement, are not necessary in obligations of record and in specialties.

## III.

### VOID ACTS OF AN INFANT.

The method taken in law to protect an infant against the effects of his own weakness has been to consider his acts as not binding, and allow him to rescind all contracts entered into by him, with certain exceptions.

There are, however, two degrees in which his acts or instruments appear to be not binding: First, by being as if they never existed--wholly void; and, secondly, as being defeasible at the election of the party with whom they originat-

ed; that is, voidable only.

   Bingham on Infancy, 8.

   A void act never is and never can be binding, either on the party with whom it originated, or on others.  No person claiming through or under it can succeed, and the void act can never at any time or by any means be confirmed or rendered valid.

   Bingham on Infancy 9.

   Any person interested may take advantage of a void act of an infant, which is not the case when the act is simply voidable.

   There is much confusion in the older books on the subject of void and voidable acts and contracts.  But the courts at a later day go on the theory that infancy being a personal privilege, that he should be bound by no act which is not beneficial to him,and their contracts are divided into three classes:  (1) Void (2) Voidable (3) Binding.

   The main difficulty with the courts was to distinguish between void and voidable.

   Mr. Bingham, after an exhaustive review of the English cases, decided that the only safe rule to follow was that "acts which are capable of being legally ratified are voidable, and acts which are incapable of being legally ratified are absolutely void.

Bingham on Infancy 234.

Another rule laid down by Chief J. Parker in the case of Whitney v Dutch, 14 Mass. 457 was that "whenever the act done may be for the infant's benefit, it shall not be considered void; but he shall have his election when he comes of age to affirm or avoid it. Another rule, cited and approved by Judge Story, was that "where the court can pronounce that the contract is for the benefit of the infant, then it shall bind him, and where it is prejudicial to the infant, it shall be void; and where it is of an uncertain nature, the infant shall have his election of affirming or avoiding it.

But these old rules have been to some extent modified, and the tendency of the courts at the present time is to regard all contracts of infancy voidable only.

In support of this doctrine may be cited the case of Fetrow v Wiseman, 40 Ind. 184, where the authorities are collected and reviewed, and the rule is stated as follows: "First, that an infant's contracts for necessaries are as valid and binding upon the infant as the contracts of an adult; and that such contracts cannot be disaffirmed, and need not be ratified before they can be enforced. Second, the contract of an infant appointing an agent or attorney is absolutely void and incapable of ratification. Third, any contract that is illegal by reason of being against a statute or pub-

lic policy is absolutely void and incapable of ratification.
Fourth, all other contracts made by an infant are voidable
only, and may be affirmed or disaffirmed by the infant at his
election when he arrives at his majority."

So also an infant's bond with penalty and for the
payment of interest was formerly held to be void on the ground
that it cannot possibly be for his benefit.

Fisher v Mowbray, 8 East. 330.

So a bond executed by a minor as surety is void.

Allen v Minor, 2 Call. 70

An infant's promissory note as surety is void.

Maffles v Wightman, 4 Conn. 376.

But the old authorities at the best are not very
clear upon this point.  All of them seem to admit a distinc-
tion between void and voidable, and yet seem to disagree with
respect to the acts to be classed under either of those heads.

One result in which they all appear to agree is
stated by Lord Mansfield in the case of Zouch v Parsons, 3
Burr., that whenever the act done may be for the benefit of
the infant, it shall not be considered void, but that he shall
have his election when he comes of age to affirm or avoid it,
and this appears to be the only clear and definite proposi-
tion which can be extracted from the authorities.  The appli-
cation of this principle is, however, not free from difficulty,

for when a note or other simple contract is made by an infant himself, it may be made good by his assent without any inquiry whether it was for his benefit or to his prejudice.  For if he had made a bad bargain in a purchase of goods, and gives his promissory note for the price, and when he comes of age had agreed to pay the note, he would be bound by his agreement although he might have been ruined by the purchase.

I think the reasoning laid down in Whitney v Dutch, 14 Mass. 157, is correct, and the rule which is followed today, namely, "All simple contracts by an infant which are not founded on an illegal consideration are strictly not void but voidable, and may be made good by ratification.  They remain a legal substratium for a future assent until avoided by the infant, and if instead of avoiding he confirm them when he has a legal capacity to make a contract, they are in all respects like contracts made by an adult.

As an example of the trend of the courts in this direction may be mentioned the case of Yates v Lyon, 61 Barb. 205.  The text-books lay down the rule that an assignment made by a firm, one of whom is an infant, for the benefit of creditors will be void, and cite the above case as an authority for that proposition; but a careful reading of the case will show that the court, although they held that assignment void, yet were inclined to hold that if the infant be justly indebt-

ed to his creditors, they ought to be paid.  So also, as be-
fore stated, it was formerly held that bonds given by infants
with penalties attached were void, but according to later de-
cisions they are only voidable.

Weaver v Jones, 24 Ala. 420.

Same rule in regard to promissory notes.

Swasey v Vanderheyden, 10 Johns. 33.

Fetiow v Wiseman, 40 Ind. 140.

So also as to the assignment or indorsement of a
promissory note or bill of exchange.

Nightingale v Withington, 15 Mass. 272.

Professor Parsons lays down the rule in general
terms that    "the contract of an infant (if not for necessa-
ries) is voidable; that is, he may disavow it and so annul it,
either before his majority or within a reasonable time after
it;" and in a note appended to this declaration, while frankly
admitting that the rule, that those contracts are voidable only
which are for the infant's benefit, and those which are prej-
udicial are absolutely void, is adopted and recognized by
many authorities, advances the opinion that this distinction
is now practically obsolete, and unqualifiedly asserts that
the more recent authorities hold that all contracts of infants,
with the exception perhaps of the appointment of an attorney,
are voidable only and none absolutely void.

Parsons Mercantile Law 4.

## IV.

### ACTS BINDING UPON THE INFANT.

Contracts for necessaries are binding upon an infant.

The ground upon which the contracts of infants for necessaries are enforced has been said to be not because they are contracts, but only "since an infant must live as well as a man" the law gives a reasonable price to those who furnish him with necessaries.

This class includes by far the greatest number of cases in which an infant is liable on his contracts. The legal term "necessaries" is a relative term, not strictly limited to such things as are absolutely requisite for support and subsistence, but to be construed liberally and varying with the degree and estate, the rank, fortune, and age of the infant.

Rainsford v Fernvick, Carter R. 215.

His real and not his ostensible fortune and circumstances, however, constitute the test and criterion as to whether the articles are necessaries or not. Story v Perry, 4 Carr. & P. 526.

Another rule laid down in the case of Peters v Fleming, 6 Mees. & Wels. 42, is as follows: "The term necessaries includes such things as are useful and suitable to

the state and condition in life of the party, and not merely

such as are required for bare subsistence.  It is a question

for the jury whether the articles are such as a reasonable

person of the age and station of the infant would require for

real use."

Food, lodging, clothes, medicine, and education, to

use consise words, constitute the five leading elements in the

doctrine of the infant's necessaries.  But to apply a prac-

tical test we must construe these five words in a very liber-

al sense, and somewhat according to the social position, for-

tune, prospects, age, circumstances, and general situation of

the infant himself.

Schouler 622.

Articles of mere ornament are not necessaries.  The

true rule to be taken is that all such articles as are purely

ornamental are not necessary and are to be rejected, because

they cannot be required for any one; and for such matters,

therefore, an infant cannot be made responsible.  But if they

were not of this description, then the question arises whether

they were bought for the necessary use of the party, in order

to support himself properly in the degree, state, and station

of life in which he moves.  If they were for such articles

the infant may be made responsible.

Porters v Fleming, 6 M. & W. 42.

An infant's board bill while attending school is included among necessaries for which he may be compelled to pay.

Kilgore v Rich, 83 Me. 305.

In fact anything which is needful to the infant's wants comes under the head of necessaries.

No express promise is necessary in order to render an infant liable for necessaries.

Gray v Ballou, 4 Wend. 403.

And though an infant is liable on his implied contract for necessaries, yet it seems well settled that he is not bound by his contract to pay a sum certain therefor as an account stated, but only for what they are reasonably worth.

Beeler v Young, 1 Bibb. 519.

Oliver v Woodroffe, 4 M. & W. 650.

As a general rule it is the tradesman's duty to acquaint himself with the infant's circumstances and necessities, as well as to take notice of supplies by other tradesmen; he credits him at his peril.

Davis v Caldwell, 12 Cush. 513.

Kline v L' Armoureux, 2 Paige Ch. 419.

But under certain circumstances inquiry as to whether the articles are necessaries may be dispensed with by the party firnishing the infant. Thus in the case of Dalton

v Gib, 7 Scott 117, where an infant, living in a style of some pretension, purchased of a tradesman in the course of four months silks to the amount of thirty-five pounds, some of which **were delivered in the presence of her mother, it was held that this presence of the mother when the daughter purchased the articles,** and her omission to reject those which were delivered to the daughter rendered inquiry unnecessary. But if the wants of the infant be supplied by his parent or guardian, or by any other person, he cannot render himself liable for articles which would otherwise be necessaries.

Angell v Mc Clellan, 16 Mass. 31.

Waiting v Toll, 9 Johns. 141.

Among those articles not adjudges necessaries in ordinary cases are articles of mere luxury for the infant himself, or for the entertainment of his friends, horses and grain or harness for them, unless necessary in carrying on his business, loans of money, liquor, etc.

Brooks v Scott, 11 M. & W. 67.

Wharton v Mc Kenzie, 5 Q. B. 606.

Merriam v Cunningham, 11 Cush. 40.

I think the correct rule is laid down in Peters v Fleming, before cited, and the one generally followed by the courts, viz., "that the term necessaries includes such things as are useful and suitable to the estate and condition in

life of the party, and not merely such as are required for
bare subsistence; and it is a question for the jury whether
the articles are such as a reasonable person of the age and
station of the infant would require for real use."

<div align="center">V.</div>

<div align="center">RATIFICATION AND CONFIRMATION OF INFANTS' CONTRACTS.</div>

It is a universal rule that an infant cannot in any
way affirm his avoidable acts or contracts during his minority.

Reeves on Domestic Relations 349.

Corey v Burton, 32 Mich. 30.

Dunton v Brown, 31 Mich. 182.

But after an infant has arrived at full age he may
if he chooses ratify any such acts or contracts.  The mode in
which they may be ratified is sometimes prescribed by statute,
but in the absence of any statutory provision the court in
Kline v Beebe, 6 Conn. 494, lays down the following rules,
and claims either will be sufficient:  (1) By an express rat-
ification.  (2) By the performance of acts from which an af-
firmance may reasonably be implied.  (3) By the omission to
disaffirm within a reasonable time.  In England the question
of ratification is settled by statute providing that the rat-
ification to be binding must be in writing signed by the par-
ty.

Stat. 9 Geo. IV, c. 14.

In this country some of the states have similar

provisions.

Thurlow v Gilmore, 40 Me. 378.

The authorities seem to be considerably at variance

in states where we have no statute, which is generally the

case, as to what will constitute an affirmance.  One line of

authorities holds that a direct promise after majority is

necessary to establish a direct contract made during minority,

and that a mere acknowledgement will not have that effect.

Brocton v Sears, 4 Allen 95.

But this doctrine is repudiated in Henry v Root,

33 N. Y. 545.  Judge Davies, in his opinion in this case, cites

a large number of cases, and discusses this point at great

length, and holds that any act or declaration which recogniz-

es the existence of the promise as binding is a ratification

of it.  As in the case of agency, anything which recognizes

as binding an act done by an agent, or by a party who has

acted as agent, is an adoption of it."  But at the best what

amounts to a ratification is a very close question.  A direct

promise to pay would seem to be a complete ratification, but

then again the question arises as to what is a direct promise.

I think the rule laid down by Judge Davies in Henry

v Root, supra, correctly states the doctrine in New York:

"That a new promise, positive and certain, equivalent to a new

contract, is not essential; but a ratification or confirmation

of what was done during minority is sufficient to make the contract obligatory."

Practically the same view is held in Whitney v Dutch, 14 Mass. 457, where the court says: "The terms of the ratification need not be such as to import a direct promise to pay. **All** that is necessary is that the infant after **attaining** majority should expressly agree to ratify his contracts by words, oral or in writing, or by acts which import a recognition and a confirmation of the promise."

When there is no express promise the general rule is that acts which show ownership and enjoyment of the property with knowledge of all the circumstances, or recognition of the validity of the contract, without any act or declaration of disaffirmance, are sufficient; as retaining possession, using, selling, mortgaging, or converting the property to the infant's own use.

Chapin v Shafer, 49 N. Y. 407.

Also part payment.

Henry v Root, 33 N. Y. 526.

**A** ratification of the contract has often been inferred from the silence of the infant after his arrival at full age, coupled with his retaining possession of the consideration, or availing himself in any manner of his conveyance; such as his reception of rent under a voidable lease.

Morgan v Morgan, 1 Atk. 489.

The omission to disaffirm a contract within a reasonable time has been held sufficient ratification.

2 Kent's Com. 295.

Dallas, J., in the case of Holmes v Blogg, 8 Taunt. 35, said: "The infant is bound to give notice of the disaffirmance of a voidable contract within a reasonable time." In this case the court held that he ought to give notice within four months. But this point has been discussed in several cases in different states, and they hold what will be a reasonable time will be governed by the circumstances in each case.

Jenkins v Jenkins, 12 Ia. 195.

Stout v Merrill, 35 Ia. 56.

Wallace's Lessee v Lewis, 4 Harr. (Del.) 80.

State v Plaisted, 43 N. H. 414.

### VI.

### AVOIDANCE OF INFANTS' CONTRACTS.

A large majority of an infant's contracts may be disaffirmed by him at his election. But having once exercised that right he cannot retract. Thus it was held in the case of Edgerton v Wolf, 6 Gray 458, that if he surrenders property received under a contract of purchase, evidently intending thereby to give up all his interest in it, he cannot afterwards recall such surrender and retake the property. As for the

time of the exercise of this right, contracts respecting personal property may be disaffirmed during the infancy of the maker, or within a reasonable time after he attains his majority.

Chapin v Shafer, 49 N. Y. 407.

Stucker v Yorder, 33 Ia. 173.

But the rule is otherwise in regard to real estate. In the case of Zouch v Parsons, 3 Burr., the question arose whether the conveyance could be avoided by him during infancy, and it was held that it could not. This case has been deemed conclusive authority on this point, and has been generally followed since.

Emmons v Murray, 16 N. H. 386.

Bool v Mix, 17 Wend. 119.

The modes of disaffirmance are various according to the nature of the act or contract to be disaffirmed, and the circumstances of the particular case. The general rule is that there must be some positive and decided act of dissent adverse to the original act.

Jackson v Carpenter, 11 Johns. 539.

Thus a contract of service may be disaffirmed by simply leaving the employer and engaging in the service of another, or by an action for the value of the labor performed.

Whitmarsh v Hall, 3 Denio 375.

A conveyance of the same land after majority by a deed inconsistant with the first has been held sufficient.

Irvine v Irvine, 9 Wall. 617.

But it is held in New York before suit can be brought by an individual to recover the possession of lands conveyed during infancy, he must make an entry upon the lands and execute a record deed to a third person, or do some other act of equal notoriety in disaffirmance of the first deed, such as demanding possession or giving notice of an intention not to be bound by the first deed.

Voohries v Voohries, 24 Barb. 150.

Illinois, however, and some other states by statute make conveyances of minors binding unless disaffirmed within three years after his majority; if not within that time they will be upheld.

Blaukenship v Stout, 25 Ill. 132.

It seems to me that this is the reasonable rule, and one which ought to be adopted in all the states.  Three years is a reasonable time, and it seems to me would do away with a great deal of litigation to adopt such a rule generally.

## VII.

MUST THE INFANT RESTORE THE CONSIDERATION UPON RESCINDING?

The next point to be considered is whether or not the infant must return the consideration upon repudiating the

contract, and this is a mooted question at this time with the courts. In the case of Bartholomew v Finnemore, 17 Barb. 428, where an infant purchased a horse of the defendant and paid for him in property which he delivered to the defendant, and after he had kept the horse about two months, during which time by misuse the horse was greatly lessened in value, and then tendered him back and demanded a return of the property, it was held that he could not recover the property without returning the consideration received by him. Justice Hand in discussing this point said: "After the infant has enjoyed the benefit of the property in whole or in part, there is no equity in his avoiding his contract and reclaiming the property he delivered in exchange, without restoring the consideration, or at least an equivalent."

This same view is held in the following cases: Holmes v Blogg, 8 Taunt. 508. Taft v Pike, 14 Vt. 415. Kitchen v Lise, 11 Paige 107.

But in the case of Carpenter v Carpenter, 45 Ind. 142, Judge Worden reviewed a large number of cases, and holds that the consideration need not be returned. In his opinion he says: "The contracts of infants except those for necessaries are void or voidable; and those in relation to personal property may be rescinded during infancy. The false representations made by the plaintiff (the infant), as alleged, that

he was of full age, does not make the contract valid, and does not estop him from setting up his infancy in avoidance of the contract, although it may furnish ground of an action against him for tort. . . . . Upon looking into the case the plaintiff was not bound to make any tender of the property at all before he could maintain the action.  Upon the avoidance of the contract by the plaintiff, the case stood as if none had been made, and the plaintiff's claim to his horse became at once complete."

But it is held in the case of Green v Green, 69 N.Y. 553, if the infant has consumed, or wasted, or disposed of the consideration received, he can still disaffirm, and that without restoring the consideration, and the other party has no remedy.

Stout v Merrill, 35 Ia. 47, is frequently cited by the different authorities as holding that the infant cannot rescind without restoring the consideration; but a careful reading of the case will show that it holds precisely with the case of Green v Green, 69 N. Y. , supra, that if he has the consideration he must return it; but if he has wasted it during minority, he can recover back his property without returning the consideration.  The judge in that case cites Sec. 2540 of the Statutes of Iowa which reads as follows:  "A minor is bound not only for contracts for necessaries, but also his

other contracts, unless he disaffirms them within a reasonable time after he attains his majority, and restores to the other party all money or other property received by him by virtue of the contract, <u>and remaining within his control at any time after his attaining his majority</u>."   So construing this statute liberally it would seem to imply that if the infant had wasted the consideration before majority, he could disaffirm without restoring the consideration.  I think that the weight of authority will uphold the following rule:  If the infant has or has had the consideration since attaining his majority he must in order to affirm return the consideration; but if he has wasted the consideration before reaching majority, then he can disaffirm the contract and recover back his property without returning the consideration.

> Green v Green, 69 N. Y. 553.
>
> Stout v Merrill, 35 Ia. 47.
>
> Chandler v Simmons, 97 Mass. 508.

One principle seems to be firmly established by the courts:  That the infant cannot on attaining his majority hold to an exchange or purchase made by him during infancy and its advantages, and thus affirm that while pleading his infancy to avoid the payment of the purchase money.

> Kitchen v Lee, 11 Paige 107.
>
> Kerr v Bell, 44 Mo. 120.

Klein v Bell, 6 Conn. 494.

Thus an infant mortgagor cannot repudiate his pur-
chase money mortgage and still keep the property.

Curtis v Mc Dougal, 26 O. St. 66.

Otterman v Moak, 3 Sandf. Ch. 431.

White v Brouch, 51 Ind. 210.

The effect of the disaffirmance of a contract which
is wholly executory is to release the adult as well as the
infant, and place them both in statu quo.  If it is executory
only on the part of the adult, the infant may recover back
whatever he has advanced, or the value of services rendered
by him under it, unless he has received benefit from it before
disaffirmance, in which case he cannot recover.

Millard v Howlett, 19 Wend. 301.

The aim of the courts on this point seems to be to
do justice as nearly as possible between the parties, and if
it is possible without taking away too many of the rights of
the infant, to place them in the position in which they were
at the beginning of the transaction.

### VII.

#### LIABILITY OF INFANT FOR TORTS AND FRAUDS.

Infants are generally held responsible the same as
adults for torts committed by them, and when they are liable
at all the remedies and rules of evidence are the same against

them as against adults.

> Haile v Lillie, 3 Hill 149.
>
> Hartfield v Roper, 21 Wend. 615.
>
> Bullock v Babcock, 3 Wend. 391.

So some authorities hold that an infant who hires a horse to go to a place agreed on, but goes to some other place in a different direction, he is liable in trover or conversion for an unlawful conversion of the horse.

> Homer v Thyng, 3 Pick. 392.

Morton, J., who delivered the opinion in this case, said: "The defense in this case is infancy. It is contended, too, that this action is founded in contract, and that the defendants cannot be ousted of this defence by changing the form of the action from contract to tort. Infants are liable in actions arising ex delicto, but not those arising ex contractu. The defendant, however, contends that there is a qualification of this rule, and that infants are liable for positive wrongs only, and not for constructive tort. But we know of no such distinction. . . . . . . It is true an infant cannot become a trespasser by any prior or subsequent consent, but he may be guilty of tort as well by omission of duty as by the commission of positive wrongs. He is also liable for frauds as well as torts, and his liability is to be determined by the real nature of the transaction, and not by the form of

the action.  Although an infant shall not be charged in tro-
ver for goods sold to him with a knowledge of his infancy,
and although an action will not lie against an infant for af-
firming himself to be of full age in the execution of a con-
tract, yet detinue will lie against an infant for goods deliv-
ered upon a special contract for a specific purpose after the
contract is avoided, and assumpsit will lie against an infant
for money embezzled, for the court will look through the form
of the action into the tortious nature of the transaction."
But Pemrose v Curren, 3 Rowle (Penn.) squarely denies the
proposition, and holds in a similar case that an infant may
plead his infancy in bar of an action for damages, and the
reasoning of Judge Rogers in this case seems to me to be
sound.  He says:  "This is a transaction in which parents and
guardians have a deep interest, and particularly those who
educate their children from under their own eye, at a distance
in our seminaries of learning.  It amounts to this:  If a
keeper of a livery stable, or an innkeeper, whose business it
is  to let out horses and carriages to hire, chooses to en-
trust them to minors contrary to the assent and wishes of
their parents, and an injury is done by the young man in the
folly and heedlessness of youth, going to a different place
or farther than was intended, the father must either pay the
damages or suffer his child to be disgraced by imprisonment.

.  .  .

. . . . .  If the plaintiff should succeed, there would be no want of pretences upon which infants might be charged, and there would be an end to the protection which the law so wisely affords them. . . ."  Judge Rogers also in his opinion severely criticizes Homer v Thyng, and says that the fundamental error in that case consisted in considering the conduct of the infant as a violation of a contract, whereas there was no contract which could be enforced.  While the Pennsylvania rule seems to me to be the better one of the two, yet I think the weight of authority is in favor of the Massachusetts rule.

New York follows the Massachusetts rule, but limits it somewhat.  In the case of Moore v Eastman, 1 Hun 578, Judge Gilbert laid down the following rule:  "To render an infant liable, who has hired a horse, in an action for trespass, he must do some willful and positive act which amounts to an election on his part to disaffirm the contract; a bare neglect to protect the animal from injury, and to return it at the time agreed upon is not sufficient.  If he willfully and intentionally injure the animal, an action of trespass will lie against him for the tort; but not if the injury complained of occurred in the act of driving the animal through his unskilfullness and want of knowledge, discretion, and judgment."

I think there is no doubt but that the proposition laid down in Homer v Thyng, that an action will not lie against

an infant who obtains property by representing himself to be
of full age, has been overthrown by the weight of authority.

      Badger v Phinney, 13 Mass. 343.

      Wallace v Morse, 5 Hill 391.

      Kilgore v Jordan, 17 Tex. 349.

      Hemphill, C. J., in his opinion in the Texas case,
above cited, gives an exhaustive review of the law upon this
point, going back to the Roman Law and following it up to
date, and he declares that the authorities are sufficient to
show that the fraudulent acts and concealments or representa-
tions of infants when made with a view to deceive and defraud
others will be as binding upon them as upon adults, and their
contracts will be enforced against them.

      From this brief review of the contracts of infants
I think the following propositions, with slight exceptions,
are substantially correst, and can be maintained in New York:

      (1 )  The contracts of infants, except for neces-
saries, which are binding, are not void but voidable.

      (2)  That the infant cannot affirm his voidable
contracts until he arrives at majority.

      (3)  That he can disaffirm his contracts with re-
gard to personalty at any time, but contracts in relation to
real property cannot be disaffirmed until he reaches majority.

      (4)  That the affirmance of his contracts may be

express or implied, and what will be an implied ratification depends upon the circumstances in each case.

(5) That if the infant has the property in his possession at the time of disaffirming, or has had it since he attained his majority, he must return the consideration upon disaffirming.

(6) That the infant is liable for his willful torts and false representations the same as adults.

# Exhibit 3

 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-1

§ 134-1. Definitions

Currentness

As used in this chapter, unless the context indicates otherwise:

"Acquire" means gain ownership of.

"Antique pistol or revolver" means any pistol or revolver manufactured before 1899 and any replica thereof if it either is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition or is designed or redesigned to use rimfire or conventional centerfire fixed ammunition that is no longer manufactured in the United States and is not readily available in the ordinary channels of commercial trade.

"Assault pistol" means a semiautomatic pistol that accepts a detachable magazine and has two or more of the following characteristics:

(1) An ammunition magazine that attaches to the pistol outside of the pistol grip;

(2) A threaded barrel capable of accepting a barrel extender, flash suppressor, forward hand grip, or silencer;

(3) A shroud that is attached to or partially or completely encircles the barrel and permits the shooter to hold the firearm with the second hand without being burned;

(4) A manufactured weight of fifty ounces or more when the pistol is unloaded;

(5) A centerfire pistol with an overall length of twelve inches or more; or

(6) It is a semiautomatic version of an automatic firearm;

but does not include a firearm with a barrel sixteen or more inches in length, an antique pistol as defined in this section, or a curio or relic as those terms are used in 18 United States Code section 921(a)(13) or 27 Code of Federal Regulations section 478.11.

"Assembly" means the fabrication of a firearm or the fitting together of component parts to construct a firearm.

"Automatic firearm" means any firearm that shoots, is designed to shoot, or can be readily modified to shoot automatically more than one shot, without a manual reloading, by a single function of the trigger. This term shall also include the frame or receiver of any such firearm, any part designed and intended solely and exclusively, or any combination of parts designed and intended, for use in converting a firearm into an automatic firearm, and any combination of parts from which an automatic firearm can be assembled if the parts are in the possession or under the control of a single person.

"Chief of police" means the chief of police of the counties of Hawaii, Maui, Kauai, or the city and county of Honolulu.

"Concealed" means, in relation to a firearm, that the firearm is entirely hidden from view of the public and not discernible by ordinary observation, in a manner that a reasonable person without law enforcement training would be unable to detect the presence of the firearm.

"Crime of violence" means:

(1) Any offense under federal or state law or the law of another state, a United States territory, or the District of Columbia that has as an element of the offense the:

(A) Injury or threat of injury to the person of another; or

(B) Use, attempted use, or threatened use of physical force against the person or property of another or the creation of a substantial risk of causing bodily injury;

(2) Reckless endangering in the second degree under section 707-714;

(3) Terroristic threatening in the second degree under section 707-717;

(4) Sexual assault in the fourth degree under section 707-733;

(5) Endangering the welfare of a minor in the second degree under section 709-904;

(6) Endangering the welfare of an incompetent person under section 709-905;

(7) Harassment under section 711-1106(1)(a);

(8) Harassment by stalking under section 711-1106.5;

(9) Criminal solicitation under section 705-510; provided that the solicitation was for a crime described or listed in paragraphs (1) to (8);

(10) Criminal conspiracy under section 705-520; provided that the conspiracy was for a crime described or listed in paragraphs (1) to (8); and

(11) Offenses under federal law, or the law of another state, a United States territory, or the District of Columbia, that are comparable to the offenses described or listed in paragraphs (1) to (10).

"Criminal offense relating to firearms" means:

(1) Any criminal offense under this chapter punishable as a misdemeanor;

(2) Criminally negligent storage of a firearm under section 707-714.5; and

(3) Any other criminal offense punishable as a misdemeanor under federal or state law or the law of another state, a United States territory, or the District of Columbia that has as an element of the offense the use, attempted use, threatened use, or possession of a firearm.

"Firearm" means any weapon, for which the operating force is an explosive, including but not limited to pistols, revolvers, rifles, shotguns, automatic firearms, noxious gas projectors, mortars, bombs, and cannon.

"Firearm loaded with ammunition" and "loaded firearm" means a firearm with ammunition present within the firing chamber, revolving cylinder, or within a magazine which is inserted in a firearm.

"Firearm receiver" means the part of a firearm that provides housing for the firearm's internal components, including a hammer, bolt, breechblock, action, or firing mechanism. "Firearm receiver" includes any object or part that is not a firearm frame or receiver in finished form but that is designed or intended to be used for that purpose and may readily be made into a firearm frame or receiver through milling or other means.

"Fugitive from justice" means any person (1) who has fled from any state, territory, the District of Columbia, or possession of the United States, to avoid prosecution for a felony or to avoid giving testimony in any criminal proceeding or (2) who has fled from any country other than the United States and is avoiding lawful extradition back to that country.

"Pistol" or "revolver" means any firearm of any shape with a barrel less than sixteen inches in length and capable of discharging loaded ammunition or any noxious gas.

"Public highway" shall have the same meaning as defined in section 264-1(a).

"Semiautomatic" means the mode of operation by which a firearm uses the energy of the explosive in a fixed cartridge to extract a fired cartridge and chamber a fresh cartridge with each single pull of a trigger.

"Unconcealed" means not concealed.

**Credits**

Laws 1988, ch. 275, § 2; Laws 1988, ch. 271, § 2; Laws 1989, ch. 263, §§ 2, 3; Laws 1990, ch. 195, § 1; Laws 1992, ch. 286, § 1; Laws 1994, ch. 204, § 2; Laws 2001, ch. 252, § 2; Laws 2016, ch. 55, § 1, eff. June 6, 2016; Laws 2016, ch. 109,

§ 2, eff. June 22, 2016; Laws 2020, ch. 74, § 4, eff. Sept. 15, 2020; Laws 2021, ch. 183, § 4, eff. Jan. 1, 2022; Laws 2023, ch. 52, § 3, eff. July 1, 2023.

Notes of Decisions (15)

H R S § 134-1, HI ST § 134-1
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedPrior Version Held Unconstitutional by New York State Rifle & Pistol Association, Inc. v. Bruen, U.S., June 23, 2022

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-2

§ 134-2. Permits to acquire

Currentness

(a) No person shall acquire the ownership of a firearm, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner or unregistered, either by purchase, gift, inheritance, bequest, or in any other manner, whether procured in the State or imported by mail, express, freight, or otherwise, until the person has first procured from the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence or, if there is neither place of business nor residence, the person's place of sojourn, a permit to acquire the ownership of a firearm as prescribed in this section. When title to any firearm is acquired by inheritance or bequest, the foregoing permit shall be obtained before taking possession of the firearm; provided that upon presentation of a copy of the death certificate of the owner making the bequest, any heir or legatee may transfer the inherited or bequested firearm directly to a dealer licensed under section 134-31 or licensed by the United States Department of Justice without complying with the requirements of this section.

(b) The permit application form shall:

  (1) Include:

    (A) The applicant's name, address, gender, height, weight, date of birth, place of birth, country of citizenship, social security number, alien or admission number;

    (B) Information regarding the applicant's mental health history;

    (C) Any aliases or other names previously used by the applicant;

    (D) Information that is or may be relevant in determining whether the applicant is disqualified under section 134-7 from the ownership, possession, or control of a firearm; and

    (E) Information that is or may be relevant in determining whether the applicant lacks the essential character or temperament necessary to be entrusted with a firearm as set forth in subsection (e); and

(2) Require the fingerprinting and photographing of the applicant by the police department of the county of registration; provided that where fingerprints and a photograph are already on file with the department, these may be waived.

(c) An applicant for a permit shall:

(1) Sign a waiver at the time of application, allowing the chief of police of the county issuing the permit or a designee of the chief of police access to all records that have a bearing on the mental health of the applicant; and

(2) Identify any health care providers who possess or may possess the records described in paragraph (1).

(d) The chief of police of the respective counties shall issue permits to acquire firearms to:

(1) Citizens, nationals, or lawful permanent residents of the United States of the age of twenty-one years or more;

(2) Duly accredited official representatives of foreign nations;

(3) Duly commissioned law enforcement officers of the State who are aliens; provided that any law enforcement officer who is the owner of a firearm and who is an alien shall transfer ownership of the firearm within forty-eight hours after termination of employment from a law enforcement agency;

(4) Aliens of the age of eighteen years or more for use of rifles and shotguns for a period not exceeding sixty days, upon a showing that the alien has first procured a hunting license under chapter 183D, part II; and

(5) Aliens of the age of twenty-one years or more for use of firearms for a period not exceeding six months, upon a showing that the alien is in training for a specific organized sport-shooting contest to be held within the permit period.

The attorney general may adopt rules, pursuant to chapter 91, as to what constitutes sufficient evidence that an alien is in training for a sport-shooting contest.

Notwithstanding any law to the contrary and upon joint application, the chief of police may, upon request, issue permits to acquire firearms jointly to spouses who otherwise qualify to obtain permits under this section.

(e) The permit application form shall be signed by the applicant and issuing authority. One copy of the permit shall be retained by the issuing authority as a permanent official record. Except for sales to dealers licensed under section 134-31, dealers licensed by the United States Department of Justice, law enforcement officers, or where any firearm is registered pursuant to section 134-3(a), no permit shall be issued to an applicant earlier than fourteen calendar days after the date of the application; provided that a permit shall be issued or the application denied before the fortieth day from the date of application. Permits issued to acquire any pistol or revolver shall be void unless used within thirty days after the date of issue. Permits to acquire a pistol or revolver shall require a separate application and permit for each transaction. Permits issued to acquire any rifle or shotgun shall entitle the permittee to make subsequent purchases of rifles or shotguns for a period of one year from the date of issue without a separate application and permit for each acquisition, subject to the disqualifications under section 134-7 and revocation under

section 134-13; provided that if a permittee is arrested for committing a felony, a crime of violence, a criminal offense relating to firearms, or for the illegal sale or distribution of any drug, the permit shall be impounded and surrendered to the issuing authority. The issuing authority shall perform an inquiry on an applicant by using the International Justice and Public Safety Network, including the United States Immigration and Customs Enforcement query, National Crime Information Center, and National Instant Criminal Background Check System, pursuant to section 846-2.7 before any determination to issue a permit or to deny an application is made. The issuing authority shall not issue a permit to acquire the ownership of a firearm if an applicant is disqualified under section 134-7 from the ownership, possession, or control of a firearm, or if the issuing authority determines that issuance would not be in the interest of public health, safety, or welfare because the person lacks the essential character or temperament necessary to be entrusted with a firearm. In determining whether a person lacks the essential character or temperament necessary to be entrusted with a firearm, the issuing authority shall consider whether the person poses a danger of causing a self-inflicted bodily injury or unlawful injury to another person, as evidenced by:

(1) Information from a health care provider indicating that the person has had suicidal or homicidal thoughts or tendencies within the preceding five years;

(2) Statements or actions by the person indicating any dangerous propensity or violent animus toward one or more individuals or groups, including groups based on race, color, national origin, ancestry, sex, gender identity, gender expression, sexual orientation, age, disability, religion, or any other characteristic, and the propensity or animus is of a nature or to an extent that would objectively indicate to a reasonable observer that it would not be in the interest of the public health, safety, or welfare for the person to own, possess, or control a firearm or ammunition; or

(3) Other information that would lead a reasonable, objective observer to conclude that the person presents or would present a danger to the community as a result of acquiring or possessing a firearm or intends or is likely to use a firearm for an unlawful purpose or in an unlawful manner.

(f) In all cases where a pistol or revolver is acquired from another person within the State, the permit shall be signed in ink by the person to whom title to the pistol or revolver is transferred and shall be delivered to the person who is transferring title to the firearm, who shall verify that the person to whom the firearm is to be transferred is the person named in the permit and enter on the permit in the space provided the following information: name, address, and telephone number of the person who transferred the firearm; name, address, and telephone number of the person to whom the title to the firearm was transferred; names of the manufacturer and importer; model; type of action; caliber or gauge; and serial number, as applicable. The person who is transferring title to the firearm shall sign the permit in ink and cause the permit to be delivered or sent by registered mail to the issuing authority within forty-eight hours after transferring the firearm.

In all cases where receipt of a firearm is had by mail, express, freight, or otherwise from sources outside the State, the person to whom the permit has been issued shall make the prescribed entries on the permit, sign the permit in ink, and cause the permit to be delivered or sent by registered mail to the issuing authority within forty-eight hours after taking possession of the firearm.

In all cases where a rifle or shotgun is acquired from another person within the State, the person who is transferring title to the rifle or shotgun shall submit, within forty-eight hours after transferring the firearm, to the authority that issued the permit to acquire, the following information, in writing: name, address, and telephone number of the person who transferred the firearm; name, address, and telephone number of the person to whom the title to the firearm was transferred; names of the manufacturer and importer; model; type of action; caliber or gauge; and serial number, as applicable.

(g) No person shall be issued a permit under this section for the acquisition of a firearm unless the person, within the four years before the issuance of the permit, has completed:

(1) An approved hunter education course as authorized under section 183D-28, unless the applicant seeks to acquire a pistol or revolver, in which case the applicant shall complete a training satisfying the requirements of paragraph (2), (3), or (4);

(2) A firearms safety or training course or class available to the general public offered by a law enforcement agency of the State or of any county;

(3) A firearms safety or training course offered to law enforcement officers, security guards, investigators, deputy sheriffs, or any division or subdivision of law enforcement or security enforcement by a state or county law enforcement agency; or

(4) A firearms training or safety course or class conducted by a firearms instructor certified or verified by the chief of police of the respective county or a designee of the chief of police or certified by a nongovernmental organization approved for such purposes by the chief of police of the respective county or a designee of the chief of police, or conducted by a certified military firearms instructor; provided that the firearms training or safety course or class provides, at a minimum, a total of at least two hours of firing training at a firing range and a total of at least four hours of classroom instruction, which may include a video, that focuses on:

(A) The safe use, handling, and storage of firearms and firearm safety in the home, as well as a component on mental health, suicide prevention, and domestic violence issues associated with firearms and firearm violence; and

(B) Education on the firearm laws of the State.

An affidavit signed by the certified or verified firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor and attesting to the successful completion of the course by the applicant shall constitute evidence of certified successful completion under this paragraph; provided that an instructor shall not submit an affidavit signed by the instructor for the instructor's own permit application.

(h) No person shall sell, give, lend, or deliver into the possession of another any firearm except in accordance with this chapter.

(i) No fee shall be charged for permits, or applications for permits, under this section, except for a single fee chargeable by and payable to the issuing county in an amount equal to the fee charged by the Hawaii criminal justice data center pursuant to section 846-2.7. In the case of a joint application, the fee provided for in this section may be charged to each person. If an application under this section is denied, the chief of police or a designee of the chief of police shall notify the applicant of the denial in writing, stating the ground or grounds for the denial and informing the applicant of the right to seek review of the denial through a hearing pursuant to subsection (k).

(j) In all cases where a permit application under this section is denied because an applicant is prohibited from owning, possessing, receiving, or controlling firearms under federal or state law, the chief of police of the applicable county shall, within ten business days from the date of denial, send written notice of the denial, including the identity of the applicant and the reasons for the denial, to the:

(1) Prosecuting attorney in the county where the permit was denied;

(2) Attorney general;

(3) United States Attorney for the District of Hawaii; and

(4) Director of corrections and rehabilitation.

If the permit to acquire was denied because the applicant is subject to an order described in section 134-7(f), the chief of police shall, within three business days from the date of denial, send written notice of the denial to the court that issued the order.

When the director of corrections and rehabilitation receives notice that an applicant has been denied a permit because of a prior criminal conviction, the director of corrections and rehabilitation shall determine whether the applicant is currently serving a term of probation or parole, and if the applicant is serving such a term, send written notice of the denial to the applicant's probation or parole officer.

(k) If an application under this section is denied, a person or entity aggrieved by the denial shall be entitled to a hearing before the chief of police of the appropriate county or a designee of the chief of police. A person or entity aggrieved by the denial shall submit a request for a hearing in writing to the chief of police of the appropriate county no later than thirty days following the date of the decision or determination notice. The hearing shall constitute a contested case hearing for purposes of chapter 91. Following the hearing and final decision, an aggrieved party shall be entitled to a judicial review proceeding in state circuit court in accordance with section 91-14.

(l) The permit application form and the waiver form required under this section shall be prescribed by the issuing authority.

(m) The requirements of subsection (g) shall not apply to an applicant for a permit to acquire a rifle or shotgun who:

(1) Has been issued a hunter education certificate under section 183D-28 that is valid for the life of the person; or

(2) Has received a written exemption under section 183D-28.

## Credits

Laws 1988, ch. 275, § 2; Laws 1992, ch. 287, § 2; Laws 1994, ch. 204, § 3; Laws 1995, ch. 11, § 1; Laws 1996, ch. 200, §§ 2, 3; Laws 1997, ch. 53, § 2; Laws 1997, ch. 278, § 1; Laws 2006, ch. 27, § 1; Laws 2007, ch. 9, § 6, eff. April 9, 2007; Laws 2016, ch. 108, § 2, eff. June 22, 2016; Laws 2017, ch. 63, § 1, eff. June 29, 2017; Laws 2022, ch. 278, § 29, eff. Jan. 1, 2024; Laws 2023, ch. 52, § 4, eff. Jan. 1, 2024; Laws 2024, ch. 21, § 3, eff. May 13, 2024.

## Editors' Notes

### VALIDITY

<For validity of section, see New York State Rifle & Pistol Association, Inc. v. Bruen, 142 S.Ct. 2111, 213 L.Ed.2d 387, 22 Cal. Daily Op. Serv. 6128.>

**VALIDITY**

<For validity of subsection (e), see Yukutake v. Conners, 2021, 554 F.Supp.3d 1074.>

Notes of Decisions (19)

H R S § 134-2, HI ST § 134-2
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
 Division 1. Government
  Title 10. Public Safety and Internal Security
   Chapter 134. Firearms, Ammunition and Dangerous Weapons
    Part I. General Regulations

HRS § 134-2.5

[§ 134-2.5. Permits for motion picture films or television program production]

Currentness

(a) Upon a finding that public safety is not endangered, the chief of police of the appropriate county may issue permits, initially valid for a period of one year and renewable annually thereafter, for the possession, transportation, or use, with blank cartridges, of firearms or explosives solely as props for motion picture films or television program production upon a showing that good cause exists for the issuance of a permit to the applicant and upon sufficient proof of a federal firearms license and a state film permit required under section 201-3. No permit shall be issued to a person who is under twenty years of age or who is disqualified under section 134-7.

(b) Applications for permits shall be in writing, signed by the individual applicant or by a member or officer qualified to sign if the applicant is a firm or corporation, and shall state the name, business in which engaged, business address, and a full description of the use to which the firearms or explosives are to be put, including the names of the persons who will actually use the props. The application shall also require the fingerprinting and photographing of the applicant. Applications and permits shall be uniform throughout the State on forms prescribed by the attorney general.

(c) The attorney general shall establish rules pursuant to chapter 91 concerning security requirements for storing and transporting firearms or explosives for which permits are issued. Permits shall be issued only upon a showing of the applicant's ability to meet these security requirements.

(d) A fee of $50 should be charged for each permit issued under this section.

(e) Every applicant to whom a permit is issued shall keep it on the applicant's person or at the place where the firearms or explosives are stored. The permit, firearms and explosives, shall be available for inspection by any law enforcement officer or any other person designated by the respective chief of police.

(f) Every firearm or explosive for which a permit is issued shall bear a unique identifying number. If the firearm or explosive does not bear a unique identifying number, the chief of police of the appropriate county shall assign a number that shall be stamped or placed thereon.

(g) The chief of police of the respective county shall revoke permits issued under this section any time it appears that the holder of the permit has used the firearms or explosives for purposes other than those allowed by the permit or that the holder of the permit has not exercised great care in retaining custody of any firearms or explosive possessed under the permit.

**Credits**

Laws 1988, ch. 272, § 3.

H R S § 134-2.5, HI ST § 134-2.5

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedPrior Version Held Unconstitutional by Yukutake v. Conners, D.Hawai'i, Aug. 16, 2021

KeyCite Yellow Flag - Negative TreatmentProposed Legislation

> West's Hawai'i Revised Statutes Annotated
>> Division 1. Government
>>> Title 10. Public Safety and Internal Security
>>>> Chapter 134. Firearms, Ammunition and Dangerous Weapons
>>>>> Part I. General Regulations

HRS § 134-3

# § 134-3. Registration, mandatory, exceptions

Currentness

(a) Every resident or other person arriving in the State who brings or by any other manner causes to be brought into the State a firearm of any description, whether usable or unusable, serviceable or unserviceable, modern or antique, shall register and submit to physical inspection the firearm within five days after arrival of the person or of the firearm, whichever arrives later, with the chief of police of the county of the person's place of business or, if there is no place of business, the person's residence or, if there is neither a place of business nor residence, the person's place of sojourn. A nonresident alien may bring firearms not otherwise prohibited by law into the State for a continuous period not to exceed ninety days; provided that the person meets the registration requirement of this section and the person possesses:

(1) A valid Hawaii hunting license procured under chapter 183D, part II, or a commercial or private shooting preserve permit issued pursuant to section 183D-34;

(2) A written document indicating the person has been invited to the State to shoot on private land; or

(3) Written notification from a firing range or target shooting business indicating that the person will actually engage in target shooting.

The nonresident alien shall be limited to a nontransferable registration of no more than ten firearms for the purpose of the above activities.

Every person registering a firearm under this subsection shall be fingerprinted and photographed by the police department of the county of registration; provided that this requirement shall be waived where fingerprints and photographs are already on file with the police department. The police department shall perform an inquiry on the person by using the International Justice and Public Safety Network, including the United States Immigration and Customs Enforcement query, the National Crime Information Center, and the National Instant Criminal Background Check System, pursuant to section 846-2.7 before any determination to register a firearm is made. Any person attempting to register a firearm, a firearm receiver, or the parts used to assemble a firearm, and who is found to be disqualified from ownership, possession, or control of firearms or ammunition under section 134-7, shall surrender or dispose of all firearms and ammunition pursuant to section 134-7.3.

(b) Every person who acquires a firearm pursuant to section 134-2 shall register the firearm in the manner prescribed by this section within five days of acquisition. If the firearm is acquired from a person who is not a dealer licensed under section 134-31 or a dealer licensed by the United States Department of Justice, the firearm shall be physically inspected by the chief of police of the appropriate county or designee at the time of registration. The registration of all firearms shall be on forms prescribed by the attorney general, which shall be uniform throughout the State, and shall include the following information: name of the manufacturer and importer; model; type of action; caliber or gauge; serial number; and source from which receipt was obtained, including the name and address of the prior registrant. If the firearm has been assembled from separate parts and an unfinished firearm receiver, the entity that registered the firearm receiver shall be recorded in the space provided for the name of the manufacturer and importer, and the phrase "assembled from parts" shall be recorded in the space provided for model. If the firearm has been assembled from parts created using a three-dimensional printer, the entity that registered the firearm receiver shall be recorded in the space provided for the name of the manufacturer and importer, and the phrase "3-D printer" shall be recorded in the space provided for model. If the firearm has no serial number, the registration number shall be entered in the space provided for the serial number, and the registration number shall be engraved upon the receiver portion of the firearm before registration. On firearms assembled from parts created using a three-dimensional printer, the registration number shall be engraved on stainless steel, permanently embedded to the firearm receiver during fabrication or construction, and visible when the firearm is assembled. Firearms and firearm receivers with engraved or embedded registration numbers, even if done by a dealer licensed under section 134-31 or a dealer licensed by the United States Department of Justice, shall be physically inspected by the chief of police of the appropriate county or designee at the time of registration. All registration data that would identify the individual registering the firearm by name or address shall be confidential and shall not be disclosed to anyone, except as may be required:

   (1) For processing the registration;

   (2) For database management by the Hawaii criminal justice data center;

   (3) By a law enforcement agency for the lawful performance of its duties; or

   (4) By order of a court.

(c) Dealers licensed under section 134-31 or dealers licensed by the United States Department of Justice shall register firearms pursuant to this section on registration forms prescribed by the attorney general and shall not be required to have the firearms physically inspected by the chief of police at the time of registration, except as provided in subsection (b). An authorized dealer, as provided in section 134-31, or a dealer licensed by the United States Department of Justice, who brings, assembles, or causes to be brought into the State by any other means, separate parts and an unfinished firearm receiver that when assembled create a firearm, or parts created by a three-dimensional printer that when assembled create a firearm, shall register the unfinished firearm receiver and receive a serial number before the assembly of the firearm or the sale or transfer of unassembled firearm parts or a receiver to a third party in accordance with subsection (b). Any sale or transfer of unfinished firearm receivers by an authorized dealer to a third party shall be conducted as if they were fully assembled firearms with a serial number engraved on the firearm receiver and in accordance with the firearms permitting process in section 134-2.

(d) Registration shall not be required for:

   (1) Any device that is designed to fire loose black powder or that is a firearm manufactured before 1899;

(2) Any device not designed to fire or made incapable of being readily restored to a firing condition; or

(3) All unserviceable firearms and destructive devices registered with the Bureau of Alcohol, Tobacco, Firearms and Explosives of the United States Department of Justice pursuant to Title 27, Code of Federal Regulations.

(e) Every person who permanently moves firearms out of the State shall contact and notify the county police department in the county where the firearms are registered about the removal of the firearms within five days of the removal from the State. Any person who fails to timely notify the appropriate police department shall be subject to a civil penalty of $100 per firearm.

(f) No fee shall be charged for the registration of a firearm under this section, except for a fee chargeable by and payable to the registering county for persons registering a firearm under subsection (a), in an amount equal to the fee charged by the Hawaii criminal justice data center pursuant to section 846-2.7. In the case of a joint registration, the fee provided for in this section may be charged to each person.

(g) No person less than twenty-one years of age shall bring or cause to be brought into the State any firearm.

**Credits**

Laws 1988, ch. 275, § 2; Laws 1994, ch. 204, § 4; Laws 1999, ch. 217, § 2; Laws 2007, ch. 9, § 7, eff. April 9, 2007; Laws 2013, ch. 254, § 2, eff. July 1, 2013; Laws 2016, ch. 108, § 3, eff. June 22, 2016; Laws 2019, ch. 257, § 2, eff. July 1, 2019; Laws 2020, ch. 68, § 2, eff. Sept. 15, 2020; Laws 2020, ch. 74, § 5, eff. Sept. 15, 2020; Laws 2022, ch. 30, § 2, eff. June 3, 2022.

**Editors' Notes**

### VALIDITY

<For validity of subsection (c), see Yukutake v. Conners, 554 F.Supp.3d 1074.>

Notes of Decisions (14)

H R S § 134-3, HI ST § 134-3
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.  3

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
      Part I. General Regulations

HRS § 134-3.5

## [§ 134-3.5]. Disclosure for firearm permit and registration purposes

Currentness

A health care provider or public health authority shall disclose health information, including protected health care information, relating to an individual's mental health history, to the appropriate county chief of police in response to a request for the information from the chief of police; provided that:

    (1) The information shall be used only for the purpose of evaluating the individual's fitness to acquire or own a firearm; and

    (2) The individual has signed a waiver permitting release of the health information for that purpose.

**Credits**
Laws 2001, ch. 252, § 1.

H R S § 134-3.5, HI ST § 134-3.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑    KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-4

§ 134-4. Transfer, possession of firearms

Currentness

(a) No transfer of any rifle having a barrel length of sixteen inches or over or any shotgun having a barrel length of eighteen inches or over, whether usable or unusable, serviceable or unserviceable, modern or antique, registered under prior law or by a prior owner, or unregistered shall be made to any person under the age of eighteen years, except as provided by section 134-5.

(b) No person shall possess any firearm that is owned by another, regardless of whether the owner has consented to possession of the firearm, without a permit from the chief of police of the appropriate county, except as provided in subsection (c) and section 134-5.

(c) Any lawfully acquired rifle or shotgun may be lent to an adult for use within the State for a period not to exceed fifteen days without a permit; provided that where the rifle or shotgun is to be used outside of the State, the loan may be for a period not to exceed seventy-five days.

(d) No person shall intentionally, knowingly, or recklessly lend a firearm to any person who is prohibited from ownership, possession, or control of a firearm under section 134-7.

(e) After July 1, 1992, no person shall bring or cause to be brought into the State an assault pistol. No assault pistol may be sold or transferred on or after July 1, 1992, to anyone within the State other than to a dealer licensed under section 134-32 or the chief of police of any county except that any person who obtains title by bequest or intestate succession to an assault pistol registered within the State shall, within ninety days, render the weapon permanently inoperable, sell or transfer the weapon to a licensed dealer or the chief of police of any county, or remove the weapon from the State.

**Credits**
Laws 1988, ch. 275, § 2; Laws 1992, ch. 286, § 2; Laws 2023, ch. 52, § 5, eff. July 1, 2023.

Notes of Decisions (1)

H R S § 134-4, HI ST § 134-4
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
      Part I. General Regulations

HRS § 134-5

## § 134-5. Possession by licensed hunters and minors; target shooting; game hunting

Currentness

(a) Any person of the age of sixteen years, or over or any person under the age of sixteen years while accompanied by an adult, may carry and use any lawfully acquired rifle or shotgun and suitable ammunition while actually engaged in hunting or target shooting or while going to and from the place of hunting or target shooting; provided that the person has procured a hunting license under chapter 183D, part II. A hunting license shall not be required for persons engaged in target shooting.

(b) A permit shall not be required when any lawfully acquired firearm is lent to a person, including a minor, upon a target range or similar facility for purposes of target shooting; provided that the period of the loan does not exceed the time in which the person actually engages in target shooting upon the premises.

(c) A person may carry unconcealed and use a lawfully acquired pistol or revolver while actually engaged in hunting game mammals, if that pistol or revolver and its suitable ammunition are acceptable for hunting by rules adopted pursuant to section 183D-3 and if that person is licensed pursuant to part II of chapter 183D. The pistol or revolver may be transported in an enclosed container, as defined in section 134-25 in the course of going to and from the place of the hunt, notwithstanding section 134-26.

**Credits**
Laws 1988, ch. 275, § 2; Laws 1997, ch. 254, §§ 1, 4; Laws 2000, ch. 96, § 1; Laws 2002, ch. 79, § 1; Laws 2006, ch. 66, § 2.

Notes of Decisions (1)

H R S § 134-5, HI ST § 134-5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Red Flag - Severe Negative Treatment
KeyCite Red Flag Negative Treatment§ 134-6.    Repealed by Laws 2006, ch. 66, § 6

West's Hawai'i Revised Statutes Annotated
    Division 1. Government
        Title 10. Public Safety and Internal Security
            Chapter 134. Firearms, Ammunition and Dangerous Weapons
                Part I. General Regulations

HRS § 134-6

§ 134-6. Repealed by Laws 2006, ch. 66, § 6

Currentness

H R S § 134-6, HI ST § 134-6
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-6.5

[§ 134-6.5]. Relief from federal firearms mental health prohibitor

Currentness

(a) Any person who is prohibited from shipping, transporting, possessing, or receiving any firearm or ammunition, pursuant to title 18 United States Code section 922(d)(4) or (g)(4), having been adjudicated as a mental defective or having been committed to a mental institution under the laws of this State, may petition the circuit court in the circuit where the adjudication or commitment was made, in a civil proceeding, for relief from the federal firearm prohibitor based on the adjudication or commitment. The attorney general shall represent the State; provided that the attorney general, with the prosecuting agency's consent, may designate the prosecuting attorney for the county in which the petitioner seeks relief to represent the State.

(b) In the civil proceeding, the court shall consider:

(1) The circumstances regarding the adjudication or commitment from which relief is sought, including the court files of the adjudication or commitment;

(2) The petitioner's mental health and criminal history records, if any;

(3) The petitioner's reputation in the community, developed at a minimum through character witness statements, testimony, or other character evidence; and

(4) Changes in the petitioner's condition or circumstances since the disqualifying events relevant to the relief sought, including medical documentation that the petitioner is no longer adversely affected by the condition that resulted in the petitioner's adjudication or commitment and is not likely to act in a manner dangerous to public safety.

(c) The court shall grant the petition for relief if the petitioner proves, by clear and convincing evidence, that the petitioner will not be likely to act in a manner dangerous to public safety and that the granting of the relief would not be contrary to the public interest. The court shall make written findings of facts and conclusions of law on the issues before it and issue a final order.

(d) When a court issues an order granting or denying a petition for relief, the court shall forward this information to the Hawaii criminal justice data center, which in turn shall forward this information to the Federal Bureau of Investigation, or its successor agency, for inclusion in the National Instant Criminal Background Check System database. The information shall also be maintained by the Hawaii criminal justice data center for disclosure to and use by law enforcement officials for the purpose of firearms permitting or registration pursuant to chapter 134.

(e) A person may file a petition for relief under this section no less than two years after the adjudication or commitment from which the relief is sought, and no more frequently than once every three years thereafter.

(f) For purposes of this section, the terms "adjudicated as a mental defective", "committed to a mental institution", and "mental institution" shall be construed in accordance with title 18 United States Code section 922, title 27 Code of Federal Regulations section 478.11, and judicial interpretations of those provisions.

(g) Any relief granted pursuant to this section shall not constitute relief from any other federal prohibitors or from any state prohibition pursuant to chapter 134. The State, its officers, and its employees shall not be liable for any damages, attorneys' fees, or costs related to this relief process.

(h) The petitioner may appeal a denial of relief, and the standard of review on appeal shall be de novo.

**Credits**

Laws 2014, ch. 87, § 2, eff. July 1, 2014.

H R S § 134-6.5, HI ST § 134-6.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.                                    2

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-7

## § 134-7. Ownership, possession, or control prohibited, when; penalty

Currentness

(a) No person who is a fugitive from justice or prohibited from possessing a firearm or ammunition under title 18 United States Code section 922 or any other provision of federal law shall own, possess, or control any firearm or ammunition.

(b) No person who is being prosecuted for one or more charges for a felony, a crime of violence, a criminal offense relating to firearms, or an illegal sale or distribution of any drug in a court in this State or elsewhere, or who has been convicted in this State or elsewhere of having committed a felony, a crime of violence, a criminal offense relating to firearms, or an illegal sale or distribution of any drug shall own, possess, or control any firearm or ammunition.

(c) No person shall own, possess, or control any firearm or ammunition if the person:

(1) Is or has been under treatment or counseling for addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental drug, intoxicating compound as defined in section 712-1240, or intoxicating liquor;

(2) Has been acquitted of a crime on the grounds of mental disease, disorder, or defect pursuant to section 704-411 or any similar provision under federal law, or the law of another state, a United States territory, or the District of Columbia;

(3) Is or has been diagnosed with or treated for a medical, behavioral, psychological, emotional, or mental condition or disorder that causes or is likely to cause impairment in judgment, perception, or impulse control to an extent that presents an unreasonable risk to public health, safety, or welfare if the person were in possession or control of a firearm; or

(4) Has been adjudged to:

(A) Meet the criteria for involuntary hospitalization under section 334-60.2; or

(B) Be an "incapacitated person", as defined in section 560:5-102,

unless the person establishes, with appropriate medical documentation, that the person is no longer adversely affected by the criteria or statuses identified in this subsection.

(d) No person who is less than twenty-five years old and has been adjudicated by the family court to have committed a felony, a crime of violence, a criminal offense relating to firearms, or an illegal sale or distribution of any drug shall own, possess, or control any firearm or ammunition.

(e) No minor shall own, possess, or control any firearm or ammunition if the minor:

    (1) Is or has been under treatment for addiction to any dangerous, harmful, or detrimental drug, intoxicating compound as defined in section 712-1240, or intoxicating liquor;

    (2) Is a fugitive from justice; or

    (3) Has been determined not to have been responsible for a criminal act or has been committed to any institution on account of a mental disease, disorder, or defect,

unless the minor establishes, with appropriate medical documentation, that the minor is no longer adversely affected by the addiction, mental disease, disorder, or defect.

For the purposes of enforcing this section, and notwithstanding section 571-84 or any other law to the contrary, any agency within the State shall make its records relating to family court adjudications available to law enforcement officials.

(f) No person who has been restrained pursuant to an order of any court, including a gun violence protective order issued pursuant to part IV, from contacting, threatening, or physically abusing any person, shall possess, control, or transfer ownership of any firearm or ammunition, so long as the protective order, restraining order, or any extension is in effect. The protective order or restraining order shall specifically include a statement that possession, control, or transfer of ownership of a firearm or ammunition by the person named in the order is prohibited. The person shall relinquish possession and control of any firearm and ammunition owned by that person to the police department of the appropriate county for safekeeping for the duration of the order or extension thereof. At the time of service of a protective order or restraining order involving firearms and ammunition issued by any court, a police officer may take custody of any and all firearms and ammunition in plain sight, those discovered pursuant to a consensual search, and those firearms surrendered by the person restrained. If the person restrained is the registered owner of a firearm and knows the location of the firearm, but refuses to surrender the firearm or disclose the location of the firearm, the person restrained shall be guilty of a misdemeanor. In any case, when a police officer is unable to locate the firearms and ammunition either registered under this chapter or known to the person granted protection by the court, the police officer shall apply to the court for a search warrant pursuant to chapter 803 for the limited purpose of seizing the firearm and ammunition.

(g) Except as provided in section 134-5, no person who is under the age of twenty-one shall own, possess, or control any ammunition for any firearm; provided that this subsection shall not apply to a person in an exempt category identified in section 134-11(a).

(h) Any person disqualified from ownership, possession, control, or the right to transfer ownership of firearms and ammunition under this section shall surrender or dispose of all firearms and ammunition in compliance with section 134-7.3.

(i) Any person who otherwise would be prohibited under subsection (b) from owning, possessing, or controlling a firearm and ammunition solely as a result of a conviction for a crime that is not a felony, and who is not prohibited from owning, possessing, or controlling a firearm or ammunition for any reason under any other provision of this chapter or under title 18 United States Code section 922 or another provision of federal law, shall not be prohibited under this section from owning, possessing, or controlling a firearm and ammunition if twenty years have elapsed from the date of the conviction.

(j) Any person violating subsection (a) or (b) shall be guilty of a class C felony; provided that any felon violating subsection (b) shall be guilty of a class B felony. Any person violating subsection (c), (d), (e), (f), (g), or (h) shall be guilty of a misdemeanor.

**Credits**

Laws 1988, ch. 275, § 2; Laws 1990, ch. 191, § 1; Laws 1993, ch. 215, § 1; Laws 1994, ch. 204, §§ 6, 7; Laws 1995, ch. 189, §§ 2, 26; Laws 1998, ch. 133, § 5; Laws 1999, ch. 297, § 1; Laws 2000, ch. 127, § 2; Laws 2004, ch. 4, § 1; Laws 2006, ch. 27, § 2; Laws 2019, ch. 150, § 3, eff. Jan. 1, 2020; Laws 2023, ch. 52, § 6, eff. July 1, 2023; Laws 2024, ch. 248, § 3, eff. July 9, 2024.

Notes of Decisions (105)

H R S § 134-7, HI ST § 134-7
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                               © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
      Part I. General Regulations

HRS § 134-7.2

§ 134-7.2. Prohibition against seizure of firearms or ammunition
during emergency or disaster; suspension of permit or license

Currentness

(a) Notwithstanding any provision of chapter 127A or any other law to the contrary, no person or government entity shall seize or confiscate, under any emergency or disaster relief powers or functions conferred, or during any emergency period, as defined in section 127A-2, or during any time of national emergency or crisis, as defined in section 134-34, any firearm or ammunition from any individual who is lawfully permitted to carry or possess the firearm or ammunition under part I of this chapter and who carries, possesses, or uses the firearm or ammunition in a lawful manner and in accordance with the criminal laws of this State.

(b) Notwithstanding any provision of chapter 127A or any other law to the contrary, no person or government entity shall suspend, revoke, or limit, under any emergency or disaster relief powers or functions conferred, any lawfully acquired and maintained permit or license obtained under and in accordance with part I of this chapter.

(c) For purposes of this section, "government entity" means any unit of government in this State, including the State and any county or combination of counties, department, agency, institution, board, commission, district, council, bureau, office, governing authority, or other instrumentality of state or county government, or corporation or other establishment owned, operated, or managed by or on behalf of this State or any county.

**Credits**

Laws 2010, ch. 96, § 1, eff. July 1, 2010; Laws 2014, ch. 111, § 7, eff. July 1, 2014.

H R S § 134-7.2, HI ST § 134-7.2
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-7.3

§ 134-7.3. Seizure of firearms upon disqualification

Currentness

(a) If any applicant is denied a permit, the chiefs of police of the respective counties shall send, by certified mail, a notice setting forth the reasons for the denial and may require that the applicant voluntarily surrender all firearms and ammunition to the chief of police where the applicant resides or dispose of all firearms and ammunition. If an applicant fails to voluntarily surrender or dispose of all firearms and ammunition within thirty days from the date notice was mailed, the chief of police may seize all firearms and ammunition.

(b) Any person disqualified from ownership, possession, or control of firearms and ammunition under section 134-7 or part IV, within forty-eight hours of disqualification, shall voluntarily surrender all firearms and ammunition to the chief of police where the person resides or dispose of all firearms and ammunition. If any person fails to voluntarily surrender or dispose of all firearms and ammunition within forty-eight hours from the date of disqualification, the chief of police may seize all firearms and ammunition.

(c) For any person disqualified from ownership, possession, or control of firearms and ammunition under section 134-7(c), or because the person has been admitted to a psychiatric facility, whether for emergency or involuntary hospitalization, pursuant to part IV of chapter 334, once the chief of police is notified that the person is disqualified, the chief of police shall promptly issue a notice to the disqualified person to immediately surrender all firearms and ammunition. The notice shall be in writing, shall set forth the reasons for the disqualification, and shall state the requirement that the person immediately surrender all firearms and ammunition to the chief of police. If any person fails to voluntarily surrender all firearms and ammunition upon receiving notice, the chief of police may seize all firearms and ammunition. The firearms and ammunition shall be held in police custody until the person has been medically documented to be no longer adversely affected as provided in section 134-7 or until transferred or sold by the owner. Nothing in this subsection shall be construed to limit the duties imposed by subsection (b).

(d) For the purposes of this section, "dispose" means selling the firearms to a gun dealer licensed under section 134-31, transferring ownership of the firearms to any person who meets the requirements of section 134-2, or surrendering all firearms to the chief of police where the person resides for storage or disposal; provided that, for a person subject to section 134-7(f) or part IV, "dispose" shall not include transferring ownership of the firearms to any person who meets the requirements of section 134-2.

(e) The chief of police of the respective counties shall adopt procedures to implement and administer the provisions of this section by December 31, 2001.

Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 160 of 275
PageID.1124

**Credits**

Laws 2000, ch. 127, § 1; Laws 2004, ch. 4, § 2; Laws 2016, ch. 110, § 2, eff. June 22, 2016; Laws 2018, ch. 158, § 1, eff. July 1, 2018; Laws 2019, ch. 150, § 4, eff. Jan. 1, 2020.


H R S § 134-7.3, HI ST § 134-7.3
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

⚑ KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-7.5

[§ 134-7.5]. Seizure of firearms in domestic abuse situations; requirements; return of

Currentness

(a) Any police officer who has reasonable grounds to believe that a person has recently assaulted or threatened to assault a family or household member may seize all firearms and ammunition that the police officer has reasonable grounds to believe were used or threatened to be used in the commission of the offense. The police officer may seize any firearms or ammunition that are in plain view of the officer or were discovered pursuant to a consensual search, as necessary for the protection of the officer or any family or household member. Firearms seized under this section shall be taken to the appropriate county police department for safekeeping or as evidence.

(b) Upon taking possession of a firearm or ammunition, the officer shall give the owner or person who was in lawful possession of the firearm or ammunition a receipt identifying the firearm or ammunition and indicating where the firearm or ammunition can be recovered.

(c) The officer taking possession of the firearm or ammunition shall notify the person against whom the alleged assault or threatened assault was inflicted of remedies and services available to victims of domestic violence, including the right to apply for a domestic abuse restraining order.

(d) The firearm or ammunition shall be made available to the owner or person who was in lawful possession of the firearm or ammunition within seven working days after the seizure when:

  (1) The firearm or ammunition are not retained for use as evidence;

  (2) The firearm or ammunition are not retained because they are possessed illegally;

  (3) The owner or person who has lawful possession of the firearm or ammunition is not restrained by an order of any court from possessing a firearm or ammunition; and

  (4) No criminal charges are pending against the owner or person who has lawful possession of the firearm or ammunition when a restraining order has already issued.

Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 162 of 275
PageID.1126

**Credits**

Laws 1996, ch. 201, § 1.

Notes of Decisions (1)

H R S § 134-7.5, HI ST § 134-7.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-7.7

[§ 134-7.7]. Sale of ammunition to a person under the age of twenty-one; prohibition; penalty

Currentness

(a) No person shall intentionally, knowingly, or recklessly sell, offer to sell, distribute, or otherwise transfer ammunition for any firearm to any person who is under the age of twenty-one; provided that it shall not be a violation of this section to sell, offer to sell, distribute, or otherwise transfer ammunition to a person who:

(1) Meets the criteria to possess a firearm under section 134-5; and

(2) Is actively engaged in hunting or target shooting or going to or from the place of hunting or target shooting.

(b) Any person who sells, offers for sale, distributes, or otherwise transfers ammunition for any firearm shall check the government-issued photographic identification of the buyer or recipient to establish the age of the buyer or recipient before making the transfer.

(c) It shall be an affirmative defense to subsection (a) that the seller, distributor, or transferor of the ammunition had requested, examined, and reasonably relied upon a government-issued photographic identification establishing the age of the buyer or recipient as at least twenty-one years of age before selling, offering to sell, distributing, or otherwise transferring the ammunition.

(d) Any person violating subsection (a) shall be guilty of a misdemeanor.

**Credits**

Laws 2024, ch. 248, § 2, eff. July 9, 2024.

H R S § 134-7.7, HI ST § 134-7.7
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-8

## § 134-8. Ownership, etc., of automatic firearms, silencers, etc., prohibited; penalties

Currentness

(a) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of any of the following is prohibited: assault pistols, except as provided by section 134-4(e); automatic firearms; rifles with barrel lengths less than sixteen inches; shotguns with barrel lengths less than eighteen inches; cannons; mufflers, silencers, or devices for deadening or muffling the sound of discharged firearms; hand grenades, dynamite, blasting caps, bombs, or bombshells, or other explosives; or any type of ammunition or any projectile component thereof coated with teflon or any other similar coating designed primarily to enhance its capability to penetrate metal or pierce protective armor; and any type of ammunition or any projectile component thereof designed or intended to explode or segment upon impact with its target.

(b) Any person who installs, removes, or alters a firearm part with the intent to convert the firearm to an automatic firearm shall be deemed to have manufactured an automatic firearm in violation of subsection (a).

(c) The manufacture, possession, sale, barter, trade, gift, transfer, or acquisition of detachable ammunition magazines with a capacity in excess of ten rounds which are designed for or capable of use with a pistol is prohibited. This subsection shall not apply to magazines originally designed to accept more than ten rounds of ammunition which have been modified to accept no more than ten rounds and which are not capable of being readily restored to a capacity of more than ten rounds.

(d) Any person violating subsection (a) or (b) shall be guilty of a class C felony and shall be imprisoned for a term of five years without probation. Any person violating subsection (c) shall be guilty of a misdemeanor except when a detachable magazine prohibited under this section is possessed while inserted into a pistol in which case the person shall be guilty of a class C felony.

**Credits**
Laws 1988, ch. 275, § 2; Laws 1989, ch. 261, § 6; Laws 1989, ch. 263, § 4; Laws 1992, ch. 286, §§ 3, 4.

Notes of Decisions (13)

H R S § 134-8, HI ST § 134-8
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-8.5

[§ 134-8.5]. Bump fire stock, multiburst trigger activator, or trigger crank; prohibition

Currentness

(a) Any person in this State who manufactures or causes to be manufactured, imports into the State, keeps for sale, or offers or exposes for sale, or who gives, lends, or possesses any bump fire stock, multiburst trigger activator, or trigger crank shall be guilty of a class C felony.

(b) As used in this section:

"Bump fire stock" means a butt stock designed to be attached to a semiautomatic firearm and designed, made, or altered to increase the rate of fire achievable with such firearm by using energy from the recoil of the firearm to generate a reciprocating action that facilitates repeated activation of the trigger.

"Multiburst trigger activator" means:

(1) A device that simulates automatic gunfire by allowing standard function of a semiautomatic firearm with a static positioned trigger finger or a device that fires multiple shots with the pull and release of the trigger; or

(2) A manual or power-driven trigger activating device constructed and designed so that when attached to a semiautomatic firearm it simulates automatic gunfire.

"Trigger crank" means any device to be attached to a semiautomatic firearm that repeatedly activates the trigger of the firearm through the use of a lever or other part that is turned in a circular motion, but does not include any firearm initially designed and manufactured to fire through the use of a crank or lever.

**Credits**
Laws 2018, ch. 157, § 1, eff. July 9, 2018.

H R S § 134-8.5, HI ST § 134-8.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Reconsidered by Young v. Hawaii, 9th Cir.(Hawai'i), Mar. 24, 2021

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-9

## § 134-9. Licenses to carry

Currentness

(a) The chief of police of a county shall grant a license to an applicant to carry a pistol or revolver and ammunition concealed on the licensee's person within the State, if the applicant:

(1) Satisfies each of the criteria established by or pursuant to subsection (d);

(2) Is not prohibited under section 134-7 from the ownership, possession, or control of a firearm and ammunition;

(3) Is not found to be lacking the essential character or temperament necessary to be entrusted with a firearm as set forth in subsection (h);

(4) Is a citizen, national, or lawful permanent resident of the United States or a duly accredited official representative of a foreign nation;

(5) Is a resident of the State; and

(6) Is of the age of twenty-one years or more.

(b) The chief of police of a county may grant to an applicant a license to carry a pistol or revolver and ammunition unconcealed on the licensee's person within the county where the license is granted, if the applicant:

(1) Sufficiently establishes the urgency or need to carry a firearm unconcealed;

(2) Is engaged in the protection of life and property;

(3) Satisfies each of the criteria established by or pursuant to subsection (d);

(4) Is not prohibited under section 134-7 from the ownership, possession, or control of a firearm and ammunition;

(5) Is not found to be lacking the essential character or temperament necessary to be entrusted with a firearm as set forth in subsection (h);

(6) Is a citizen, national, or lawful permanent resident of the United States; and

(7) Is of the age of twenty-one years or more.

(c) The chief of police of the appropriate county, or a designated representative of the chief of police, shall perform an inquiry on an applicant by using the National Instant Criminal Background Check System, to include a check of the Immigration and Customs Enforcement databases if the applicant is not a citizen of the United States, before any determination to grant a concealed or unconcealed license is made.

(d) To be eligible to receive a license to carry a concealed or unconcealed pistol or revolver on the licensee's person, the applicant shall:

(1) Submit the appropriate carry license application, in person, to the chief of police of the appropriate county, with:

(A) All fields on the application form completed and all questions answered truthfully, under penalty of law;

(B) All required signatures present on the application;

(C) Any required documents attached to the application; and

(D) Payment of the nonrefundable license application fee required under this section;

(2) Be the registered owner of the firearm or firearms for which the license to carry will be issued; provided that this paragraph shall not apply to detectives, private detectives, investigators, and guards with an active license issued pursuant to chapter 463;

(3) Not be prohibited under section 134-7 from the ownership, possession, or control of a firearm;

(4) Have completed a course of training as described in subsection (e) and be certified as qualified to use the firearm or firearms for which the license to carry will be issued in a safe manner; and

(5) Sign an affidavit expressly acknowledging that:

(A) The applicant has read and is responsible for understanding and complying with the federal, state, and county laws governing the permissible use of firearms and associated requirements, including:

(i) The prohibition on carrying or possessing a firearm in certain locations and premises;

(ii) The prohibition on carrying more than one firearm on the licensee's person at one time;

(iii) The prohibition on carrying a firearm on private property of another person without the express authorization of the owner, lessee, operator, or manager of the private property;

(iv) The requirement to maintain possession of the license on the licensee's person while carrying a firearm;

(v) The requirement to disclose information regarding the carrying of a firearm when stopped by law enforcement;

(vi) The provision for absolute liability for injury or property damage proximately caused by a legally unjustified discharge of a firearm under section 663-9.5; and

(vii) Laws regarding the use of deadly force for self-defense or the defense of another;

(B) A license to carry issued under this section shall be void if a licensee becomes disqualified from the ownership, possession, or control of a firearm pursuant to section 134-7(a), (b), (d), or (f);

(C) The license shall be subject to revocation under section 134-13 if a licensee for any other reason becomes disqualified under section 134-7 from the ownership, possession, or control of a firearm; and

(D) A license that is revoked or that becomes void shall be returned to the chief of police of the appropriate county within forty-eight hours after the license is revoked or becomes void.

(e) The course of training for issuance of a license under this section may be any course acceptable to the licensing authority that meets all of the following criteria:

(1) The course shall include in-person instruction on firearm safety; firearm handling; shooting technique; safe storage; legal methods to transport firearms and secure firearms in vehicles; laws governing places in which persons are prohibited from carrying a firearm; firearm usage in low-light situations; situational awareness and conflict management; and laws governing firearms, including information regarding the circumstances in which deadly force may be used for self-defense or the defense of another;

(2) The course shall include a component on mental health and mental health resources;

(3) Except for the component on mental health and mental health resources, the course shall be conducted by one or more firearms instructors certified or verified by the chief of police of the respective county or a designee of the chief of police or certified by a nongovernmental organization approved for those purposes by the chief of police of the respective county or a designee of the chief of police, or conducted by one or more certified military firearms instructors;

(4) The course shall require participants to demonstrate their understanding of the covered topics by achieving a score of at least seventy per cent on a written examination; and

(5) The course shall include live-fire shooting exercises on a firing range and shall include a demonstration by the applicant of safe handling of, and shooting proficiency with, each firearm that the applicant is applying to be licensed to carry.

(f) Upon passing the course of training identified in subsection (e), the applicant shall obtain from the instructor, and include as part of the applicant's application package, a certification as to the following:

(1) The applicant's name, as confirmed by reviewing the applicant's government-issued photo identification;

(2) The date and location of the firearm proficiency test;

(3) The firearm or firearms that the applicant used in the firearm proficiency test;

(4) The applicant's score; provided that an indication that the applicant passed or failed, without the score itself, shall be insufficient information for the purposes of the application; and

(5) The instructor's qualifications to administer the firearm proficiency test.

The certification of the above information, signed by the firearms instructor who conducted or taught the course, providing the name, address, and phone number of the instructor, shall constitute evidence of successful completion of the course; provided that the instructor shall not submit a certification signed by the instructor for the instructor's own license application. The course of training for issuance of a license under this section shall be undertaken at the licensee's expense.

(g) An applicant for a license under this section shall:

(1) Sign a waiver at the time of application, allowing the chief of police of the county issuing the license or a designee of the chief of police access to any records that have a bearing on the mental health of the applicant; and

(2) Identify any health care providers who possess or may possess the records described in paragraph (1).

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(h) In determining whether a person lacks the essential character or temperament necessary to be entrusted with a firearm, the licensing authority shall consider whether the person poses a danger of causing a self-inflicted bodily injury or unlawful injury to another person, as evidenced by:

(1) Information from a health care provider indicating that the person has had suicidal or homicidal thoughts or tendencies within the preceding five years;

(2) Statements or actions by the person indicating any dangerous propensity or violent animus toward one or more individuals or groups, including groups based on race, color, national origin, ancestry, sex, gender identity, gender expression, sexual orientation, age, disability, religion, or any other characteristic, and the propensity or animus is of a nature or to an extent that would objectively indicate to a reasonable observer that it would not be in the interest of the public health, safety, or welfare for the person to own, possess, or control a firearm or ammunition; or

(3) Other information that would lead a reasonable, objective observer to conclude that the person presents or would present a danger to the community as a result of carrying a firearm in public or intends or is likely to use a firearm for an unlawful purpose or in an unlawful manner.

(i) A nonrefundable fee of $150 shall be charged for each license application submitted under this section. The fee shall be chargeable by and payable to the appropriate county and shall be used for expenses related to police services. The issuing authority shall waive the fee required by this subsection upon a showing of financial hardship by the applicant.

(j) If the applicant satisfies each of the requirements for a concealed carry license, an application for a concealed carry license submitted to the chief of police of the appropriate county under this section shall be approved within a reasonable time after receipt of all required application materials. If the applicant does not satisfy one or more of the requirements for a concealed carry license, the license shall be denied within a reasonable time after receipt of the application materials. If an application is denied, the chief of police or a designee of the chief of police shall notify the applicant of the denial in writing, stating the ground or grounds for the denial and informing the applicant of the right to seek review of the denial through a hearing pursuant to subsection (k). If the chief of police does not grant or deny a submitted application for a concealed carry license within one hundred twenty days following the date of the application, the application shall be deemed denied as of that date for purposes of subsection (k).

(k) If an application under this section is denied, a person or entity aggrieved by the denial shall be entitled to a hearing before the chief of police of the appropriate county or a designee of the chief of police. A person or entity aggrieved by the denial shall submit a request for a hearing in writing to the chief of police of the appropriate county no later than thirty days following the date of the decision or determination notice. The hearing shall constitute a contested case hearing for purposes of chapter 91. Following the hearing and final decision, an aggrieved party shall be entitled to a judicial review proceeding in state circuit court in accordance with section 91-14.

(l) If an application pursuant to this section is approved, the chief of police shall issue the applicant a license that contains, at minimum:

(1) The licensee's name;

(2) The licensee's address;

(3) A photograph of the licensee taken within ninety days before issuance of the license;

(4) The county of issuance;

(5) A notation as to whether the license permits concealed or unconcealed carry;

(6) The serial number of each registered firearm that the licensee may carry pursuant to the license; and

(7) The license expiration date.

The license issued under this subsection shall not constitute a government-issued photo identification document under federal or state law.

(m) Unless renewed, a concealed or unconcealed license shall expire four years from the date of issue.

(n) A license to carry issued under this section shall be void if a licensee becomes disqualified from the ownership, possession, or control of a firearm pursuant to section 134-7(a), (b), (d), or (f). If a licensee for any other reason becomes disqualified under section 134-7 from the ownership, possession, or control of a firearm, the license shall be subject to revocation under section 134-13. A license that is void or revoked shall be returned to the chief of police of the appropriate county within forty-eight hours after the license becomes void or is revoked.

(o) The chief of police of each county shall adopt procedures to implement this section.

(p) The chief of police of each county shall establish procedures and criteria for the renewal of licenses issued under this section. No license renewal shall be granted if an applicant for a renewed license does not satisfy, or no longer satisfies, the eligibility criteria for a new license set forth in subsections (a) through (d). As a precondition for the renewal of licenses issued under this section, the chief of police of each county may establish reasonable continuing education, training, and certification requirements, including requirements pertaining to the safe handling of firearms and shooting proficiency. A nonrefundable fee of $50 shall be charged for each license renewal application submitted under this section. The fee shall be chargeable by and payable to the appropriate county and shall be used for expenses related to police services. The issuing authority shall waive the fee required by this subsection upon a showing of financial hardship by the applicant.

(q) No person carrying a firearm pursuant to a license issued under this section shall intentionally, knowingly, or recklessly carry more than one firearm on the licensee's person at one time.

(r) A license issued by the chief of police of a county within the State under subsection (a) to carry a pistol or revolver and ammunition concealed on the licensee's person shall be valid for use in each county within the State.

**Credits**

Laws 1988, ch. 275, § 2; Laws 1994, ch. 204, § 8; Laws 1997, ch. 254, §§ 2, 4; Laws 2000, ch. 96, § 1; Laws 2002, ch. 79, § 1; Laws 2006, ch. 27, § 3; Laws 2006, ch. 66, § 3; Laws 2007, ch. 9, § 8, eff. April 9, 2007; Laws 2023, ch. 52, § 7, eff. Jan. 1, 2024.

**Editors' Notes**

### VALIDITY

*<For validity of this section, see Young v. Hawaii, 2018, 896 F.3d 1044, rehearing en banc granted 915 F.3d 681.>*

Notes of Decisions (45)

H R S § 134-9, HI ST § 134-9
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Unconstitutional or PreemptedValidity Called into Doubt by Wolford v. Lopez, 9th Cir.(Hawai'i), Sep. 06, 2024

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-9.1

[§ 134-9.1]. Carrying or possessing a firearm in certain locations and premises prohibited; penalty

Currentness

(a) A person with a license issued under section 134-9, or authorized to carry a firearm in accordance with title 18 United States Code section 926B or 926C, shall not intentionally, knowingly, or recklessly carry or possess a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, while in any of the following locations and premises within the State:

(1) Any building or office owned, leased, or used by the State or a county, and adjacent grounds and parking areas, including any portion of a building or office used for court proceedings, legislative business, contested case hearings, agency rulemaking, or other activities of state or county government;

(2) Any public or private hospital, mental health facility, nursing home, clinic, medical office, urgent care facility, or other place at which medical or health services are customarily provided, including adjacent parking areas;

(3) Any adult or juvenile detention or correctional facility, prison, or jail, including adjacent parking areas;

(4) Any bar or restaurant serving alcohol or intoxicating liquor as defined in section 281-1 for consumption on the premises, including adjacent parking areas;

(5) Any stadium, movie theater, or concert hall, or any place at which a professional, collegiate, high school, amateur, or student sporting event is being held, including adjacent parking areas;

(6) All public library property, including buildings, facilities, meeting rooms, spaces used for community programming, adjacent grounds, and parking areas;

(7) The campus or premises of any public or private community college, college, or university, and adjacent parking areas, including buildings, classrooms, laboratories, research facilities, artistic venues, and athletic fields or venues;

(8) The campus or premises of any public school, charter school, private school, preschool, summer camp, or child care facility as defined in section 346-151, including adjacent parking areas, but not including:

    (A) A private residence at which education is provided for children who are all related to one another by blood, marriage, or adoption; or

    (B) A dwelling when not used as a child care facility;

(9) Any beach, playground, park, or adjacent parking area, including any state park, state monument, county park, tennis court, golf course, swimming pool, or other recreation area or facility under control, maintenance, and management of the State or a county, but not including an authorized target range or shooting complex;

(10) Any shelter, residential, or programmatic facility or adjacent parking area operated by a government entity or charitable organization serving unhoused persons, victims of domestic violence, or children, including children involved in the juvenile justice system;

(11) Any voter service center as defined in section 11-1 or other polling place, including adjacent parking areas;

(12) The premises of any bank or financial institution as defined in section 211D-1, including adjacent parking areas;

(13) Any place, facility, or vehicle used for public transportation or public transit, and adjacent parking areas, including buses, paratransit vans, bus shelters and terminals (but not including bus stops located on public sidewalks), trains, rail stations, and airports;

(14) Any amusement park, aquarium, carnival, circus, fair, museum, water park, or zoo, including adjacent parking areas; or

(15) Any public gathering, public assembly, or special event conducted on property open to the public, including any demonstration, march, rally, vigil, protest, picketing, or other public assembly, for which a permit is obtained from the federal government, the State, or a county, and the sidewalk or street immediately adjacent to the public gathering, public assembly, or special event; provided that there are signs clearly and conspicuously posted at visible places along the perimeter of the public gathering, public assembly, or special event.

(b) This section shall not apply to a person in an exempt category identified in section 134-11(a). It shall be an affirmative defense to any prosecution under this section that a person is:

(1) Carrying or possessing an unloaded firearm in a police station in accordance with section 134-23(a)(6), 134-24(a)(6), or 134-25(a)(6);

(2) Carrying or possessing an unloaded firearm at an organized, scheduled firearms show or exhibit;

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

(3) Lawfully carrying or possessing a firearm for hunting in compliance with section 134-5;

(4) A private security officer expressly authorized to carry or possess a weapon in a location or premises listed in subsection (a) by the owner, lessee, operator, or manager of the location or premises; provided that the private security officer is acting within the private security officer's scope of employment;

(5) Carrying or possessing an unloaded firearm in a courthouse for evidentiary purposes with the prior express authorization of the court;

(6) Lawfully present within the person's own home, other than a college or university dormitory or shelter or residential facility serving unhoused persons or victims of domestic violence;

(7) Carrying a firearm pursuant to a license issued under section 134-9 or in accordance with title 18 United States Code section 926B or 926C in the immediate area surrounding the person's vehicle within a parking area for the limited purpose of storing or retrieving the firearm;

(8) Possessing a firearm in an airport or any place, facility, or vehicle used for public transportation or public transit; provided that the firearm is unloaded and in a locked hard-sided container for the purpose of transporting the firearm;

(9) Walking through a public gathering, public assembly, or special event if necessary to access the person's residence, place of business, or vehicle; provided that the person does not loiter or remain longer than necessary to complete their travel or business; or

(10) Carrying a concealed firearm in accordance with title 18 United States Code section 926B or 926C in a location or premises within the State that is not a State or county property, installation, building, base, or park, and not a location or premises where a private person or entity has prohibited or restricted the possession of concealed firearms on their property.

(c) The presence of a person in any location or premises listed in subsection (a) shall be prima facie evidence that the person knew it was a location or premises listed in subsection (a).

(d) Where only a portion of a building or office is owned, leased, or used by the State or a county, this section shall not apply to the portion of the building or office that is not owned, leased, or used by the State or a county, unless carrying or possessing a firearm within that portion is otherwise prohibited by this section.

(e) As used in this section, "private security officer" means any person employed and duly licensed to engage in the private detective or guard business pursuant to chapter 463.

(f) Any person who violates this section shall be guilty of a misdemeanor.

(g) If any ordinance of any county of the State establishing locations where the carrying of firearms is prohibited is inconsistent with this section or with section 134-9.5, the ordinance shall be void to the extent of the inconsistency.


**Credits**

Laws 2023, ch. 52, § 2, eff. July 1, 2023.


**Editors' Notes**

## VALIDITY

&lt;For validity of section, see Wolford v. Lopez, 2024, 2024 WL 4097462.&gt;


H R S § 134-9.1, HI ST § 134-9.1

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-9.2

[§ 134-9.2]. Duty to maintain possession of license while carrying a firearm; duty to disclose; penalty

Currentness

(a) A person carrying a firearm pursuant to a license issued under section 134-9 or in accordance with title 18 United States Code section 926B or 926C shall have in the person's immediate possession:

(1) The license issued under section 134-9 or documentation regarding the person's qualifications under title 18 United States Code section 926B or 926C;

(2) Government-issued photo identification; and

(3) Except with respect to firearms that are a part of the official equipment of any federal agency as provided under section 134-11(b), documentary evidence that the firearm being carried is registered under this chapter,

and shall, upon request from a law enforcement officer, present government-issued photo identification and the license or credentials and evidence of registration.

(b) When a person carrying a firearm, including a person carrying a firearm pursuant to a license issued under section 134-9 or in accordance with title 18 United States Code section 926B or 926C, is stopped by a law enforcement officer or is a driver or passenger in a vehicle stopped by a law enforcement officer, the person carrying a firearm shall immediately disclose to the law enforcement officer that the person is carrying a firearm, and shall, upon request:

(1) Identify the specific location of the firearm; and

(2) Present to the law enforcement officer a license to carry a firearm issued under section 134-9 or documentation regarding the person's qualifications under title 18 United States Code section 926B or 926C.

(c) Any person who violates this section shall be guilty of a petty misdemeanor.

**Credits**
Laws 2023, ch. 52, § 2, eff. July 1, 2023.

H R S § 134-9.2, HI ST § 134-9.2
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-9.3

[§ 134-9.3]. Leaving unsecured firearm in vehicle unattended; penalty

Currentness

(a) No person shall intentionally, knowingly, or recklessly store or otherwise leave a loaded or unloaded firearm out of the person's immediate possession or control inside a vehicle without first securely locking the firearm in a safe storage depository that is out of sight from outside of the vehicle.

(b) For purposes of this section, "safe storage depository" means a safe or other secure impact- and tamper-resistant container that, when locked, is incapable of being opened without a key, keypad, combination, or other unlocking mechanism and is capable of preventing an unauthorized person from obtaining access to or possession of the firearm contained therein. A vehicle's trunk or glove box alone, even if locked, is not a safe storage depository.

(c) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(d) Any person who violates subsection (a) shall be guilty of a petty misdemeanor.

**Credits**
Laws 2023, ch. 52, § 2, eff. July 1, 2023.

H R S § 134-9.3, HI ST § 134-9.3
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-9.4

[§ 134-9.4]. Unlawful conduct while carrying a firearm; penalty

Currentness

(a) A person carrying a firearm shall not:

  (1) Consume alcohol or intoxicating liquor;

  (2) Consume a controlled substance;

  (3) Be under the influence of alcohol or intoxicating liquor; or

  (4) Be under the influence of a controlled substance.

(b) As used in this section:

"Alcohol" and "intoxicating liquor" shall have the same meaning as in section 281-1.

"Controlled substance" means a drug, substance, or immediate precursor in schedules I through III of part II of chapter 329.

(c) Any person who violates this section shall be guilty of a misdemeanor; provided that any person who violates this section by consuming or being under the influence of alcohol or an intoxicating liquor shall be guilty of a petty misdemeanor.

**Credits**
Laws 2023, ch. 52, § 2, eff. July 1, 2023.

H R S § 134-9.4, HI ST § 134-9.4
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Reconsidered by Wolford v. Lopez, 9th Cir.(Hawai'i), Sep. 06, 2024

West's Hawai'i Revised Statutes Annotated
 Division 1. Government
  Title 10. Public Safety and Internal Security
   Chapter 134. Firearms, Ammunition and Dangerous Weapons
    Part I. General Regulations

HRS § 134-9.5

# [§ 134-9.5]. Carrying or possessing a firearm on private property of another person without authorization; penalty

Currentness

(a) A person carrying a firearm pursuant to a license issued under section 134-9 shall not intentionally, knowingly, or recklessly enter or remain on private property of another person while carrying a loaded or unloaded firearm, whether the firearm is operable or not, and whether the firearm is concealed or unconcealed, unless the person has been given express authorization to carry a firearm on the property by the owner, lessee, operator, or manager of the property.

(b) For purposes of this section, express authorization to carry or possess a firearm on private property shall be signified by:

  (1) Unambiguous written or verbal authorization; or

  (2) The posting of clear and conspicuous signage at the entrance of the building or on the premises,

by the owner, lessee, operator, or manager of the property, or agent thereof, indicating that carrying or possessing a firearm is authorized.

(c) For purposes of this section:

"Private entity" means any homeowners' association, community association, planned community association, condominium association, cooperative, or any other nongovernmental entity with covenants, bylaws, or administrative rules, regulations, or provisions governing the use of private property.

"Private property" does not include property that is owned or leased by any governmental entity.

"Private property of another person" means residential, commercial, industrial, agricultural, institutional, or undeveloped property that is privately owned or leased, unless the person carrying a firearm is an owner, lessee, operator, or manager of the property, including an ownership interest in a common element or limited common element of the property; provided that nothing in this chapter shall be construed to limit the enforceability of a provision in any private rental agreement restricting a tenant's possession or use of firearms, the enforceability of a restrictive covenant restricting the possession or use of firearms, or the authority of any private entity to restrict the possession or use of firearms on private property.

(d) This section shall not apply to a person in an exempt category identified in section 134-11(a).

(e) Any person who violates this section shall be guilty of a misdemeanor.

**Credits**

Laws 2023, ch. 52, § 2, eff. July 1, 2023.

**Editors' Notes**

**VALIDITY**

<For validity of section, see Wolford v. Lopez, 2024, 2024 WL 4097462.>

H R S § 134-9.5, HI ST § 134-9.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
 Division 1. Government
  Title 10. Public Safety and Internal Security
   Chapter 134. Firearms, Ammunition and Dangerous Weapons
    Part I. General Regulations

HRS § 134-9.6

## [§ 134-9.6]. Annual report on licenses to carry

Currentness

(a) No later than April 1, 2024, and April 1 of each year thereafter, the department of the attorney general shall publish a report on its publicly available website that includes, if available:

(1) The number of licenses to carry applied for, issued, revoked, and denied, further categorized by the age, gender, race, and county of residence of each applicant or licensee;

(2) The specific reasons for each revocation and denial;

(3) Analysis of denials based on applicants' failure to meet the standards of section 134-9(d), and recommendations to remedy any disparities in denial rates by age, gender, or race;

(4) The number of appeals and appeals granted; and

(5) The number of violations of section 134-9.1.

(b) No later than February 1 of each year, the chief of police of each county shall supply the department of the attorney general with the data the department requires to complete the report under subsection (a).

**Credits**

Laws 2023, ch. 52, § 2, eff. July 1, 2023.

H R S § 134-9.6, HI ST § 134-9.6
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-9.7

[§ 134-9.7]. Failure to conceal a firearm by a concealed carry licensee; penalty

Currentness

(a) A person commits the offense of failure to conceal a firearm by a concealed carry licensee if a person is carrying a firearm pursuant to a license issued under section 134-9(a) and intentionally, knowingly, or recklessly causes alarm to another person by failing to conceal the firearm, even briefly, whether the firearm was loaded or not, and whether operable or not.

(b) It shall be a defense to any prosecution under this section if the person:

   (1) Was within the person's private residence; or

   (2) Caused the firearm to be unconcealed for the purpose of self-defense in accordance with section 703-304 or defense of another person in accordance with section 703-305.

(c) Failure to conceal a firearm by a concealed carry licensee shall be a petty misdemeanor.

**Credits**
Laws 2023, ch. 52, § 2, eff. July 1, 2023.

H R S § 134-9.7, HI ST § 134-9.7
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
      Part I. General Regulations

HRS § 134-10

## § 134-10. Alteration of identification marks prohibited

Currentness

No person shall wilfully alter, remove, or obliterate the name of the make, model, manufacturer's number, or other mark of identity of any firearm or ammunition. Possession of a firearm or ammunition upon which any mark of identity has been altered, removed, or obliterated shall be presumptive evidence that the possessor has altered, removed, or obliterated the mark of identity.

**Credits**

Laws 1988, ch. 275, § 2.

H R S § 134-10, HI ST § 134-10
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-10.2

## § 134-10.2. Manufacturing, purchasing, or obtaining firearm parts to assemble a firearm having no serial number; penalty

Currentness

(a) A person who is not licensed to manufacture a firearm under section 134-31, or who is not a dealer licensed by the United States Department of Justice, shall not, for the purpose of assembling a firearm, possess, purchase, produce with a three-dimensional printer, or otherwise obtain separately, or as part of a kit:

  (1) A firearm receiver that is not imprinted with a serial number registered with a federally licensed manufacturer;

  (2) A firearm receiver that has not been provided a serial number that may be registered in accordance with section 134-3(c); or

  (3) Any combination of parts from which a firearm having no serial number may be readily assembled; provided that the parts do not have the capacity to function as a firearm unless assembled.

(b) Violation of this section is a class C felony.

**Credits**
Laws 2020, ch. 74, § 3, eff. Sept. 15, 2020; Laws 2021, ch. 149, § 2, eff. Jan. 1, 2022.

H R S § 134-10.2, HI ST § 134-10.2
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 188 of 275
PageID.1152

⚑  KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-10.5

§ 134-10.5. Storage of firearm; responsibility with respect to minors

Currentness

No person shall store or keep any firearm on any premises under the person's control if the person knows or reasonably should know that a minor is likely to gain access to the firearm without the permission of the parent or guardian of the minor, unless the person:

(1) Keeps the firearm in a securely locked box or other container or in a location that a reasonable person would believe to be secure; or

(2) Carries the firearm on the person or within such close proximity thereto that the person can readily retrieve and use it as if it were carried on the person.

For purposes of this section, "minor" means any person under the age of eighteen years.

**Credits**
Laws 1992, ch. 288, § 1; Laws 2021, ch. 148, § 2, eff. July 1, 2021.

H R S § 134-10.5, HI ST § 134-10.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-11

§ 134-11. Exemptions

Currentness

(a) Sections 134-7 to 134-9 and 134-21 to 134-27, except section 134-7(f), shall not apply:

(1) To state and county law enforcement officers; provided that such persons are not convicted of an offense involving abuse of a family or household member under section 709-906;

(2) To members of the armed forces of the State and of the United States and mail carriers while in the performance of their respective duties if those duties require them to be armed;

(3) To regularly enrolled members of any organization duly authorized to purchase or receive the weapons from the United States or from the State; provided the members are either at, or going to or from, their places of assembly or target practice;

(4) To persons employed by the State, or subdivisions thereof, or the United States while in the performance of their respective duties or while going to and from their respective places of duty if those duties require them to be armed;

(5) To aliens employed by the State, or subdivisions thereof, or the United States while in the performance of their respective duties or while going to and from their respective places of duty if those duties require them to be armed; and

(6) To police officers on official assignment in Hawaii from any state which by compact permits police officers from Hawaii while on official assignment in that state to carry firearms without registration. The governor of the State or the governor's duly authorized representative may enter into compacts with other states to carry out this paragraph.

(b) Sections 134-2 and 134-3 shall not apply to such firearms or ammunition that are a part of the official equipment of any federal agency.

(c) Sections 134-8, 134-9, and 134-21 to 134-27, shall not apply to the possession, transportation, or use, with blank cartridges, of any firearm or explosive solely as props for motion picture film or television program production when authorized by the chief of police of the appropriate county pursuant to section 134-2.5 and not in violation of federal law.

**Credits**

Laws 1988, ch. 275, § 2; Laws 1988, ch. 272, § 2; Laws 1989, ch. 211, § 10; Laws 1990, ch. 281, § 11; Laws 1996, ch. 60, §§ 1, 2; Laws 1999, ch. 202, § 1; Laws 1999, ch. 297, § 2; Laws 2006, ch. 66, § 4.

Notes of Decisions (5)

H R S § 134-11, HI ST § 134-11
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Red Flag - Severe Negative Treatment
KeyCite Red Flag Negative Treatment§ 134-12.   Repealed by Laws 1991, ch. 166, §  10

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-12

§ 134-12. Repealed by Laws 1991, ch. 166, § 10

Currentness

H R S § 134-12, HI ST § 134-12
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-12.5

## [§ 134-12.5]. Forfeiture of firearms, ammunition, deadly or dangerous weapons, and switchblade knives; when

Currentness

All firearms, ammunition, deadly or dangerous weapons, and switchblade knives possessed, used in violation of this chapter or the Hawaii Penal Code shall be forfeited to the State according to the provisions of chapter 712A and shall be destroyed or, if not destroyed, transferred to the chief of police of the county in which the violation took place for use by and under control of the police department.

**Credits**

Laws 1991, ch. 166, § 9.

H R S § 134-12.5, HI ST § 134-12.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-13

## § 134-13. Revocation of permits and licenses

Currentness

(a) All permits and licenses provided for under this part shall be revoked by the issuing authority, and may be revoked by any court, if the issuing authority or court determines that the permit or license is subject to revocation because the permit or license holder does not satisfy, or no longer satisfies, the applicable qualifications or requirements associated with the permit or license.

(b) If the issuing authority determines that a permit or license is subject to revocation, the issuing authority shall notify the permit or license holder of the determination in writing, stating the grounds for the determination and informing the permit or license holder of the right to seek a hearing before the issuing authority regarding the determination before revocation. Unless the permit or license holder submits a request for a hearing in writing to the issuing authority no later than thirty days following the date of the written notice that the permit or license is subject to revocation, the permit or license shall be immediately revoked by the issuing authority. Any hearing regarding a determination on whether a permit or license is subject to revocation shall constitute a contested case hearing for purposes of chapter 91. A person or entity aggrieved by a revocation under this section may apply for judicial review in state circuit court in accordance with section 91-14.

(c) If a permit or license is revoked pursuant to this section, the former permit or license holder shall return the permit or license to the issuing authority within forty-eight hours following receipt of the notice of revocation.

**Credits**

Laws 1988, ch. 275, § 2; Laws 2023, ch. 52, § 8, eff. July 1, 2023.

H R S § 134-13, HI ST § 134-13
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-14

§ 134-14. Report

Currentness

Within ten days after the last day of each month, each of the authorities authorized in this chapter to issue or revoke permits and licenses shall make a report to the department of the attorney general of all permits and licenses issued or revoked by the authority as of the last day of the preceding month. The report shall be in the manner and form as the attorney general may prescribe.

**Credits**

Laws 1988, ch. 275, § 2.

H R S § 134-14, HI ST § 134-14
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-15

§ 134-15. Restriction of materials for manufacture of pistols or revolvers

Currentness

(a) It shall be unlawful for any person, including a licensed manufacturer, licensed importer, or licensed dealer, to possess, sell, or deliver any pistol or revolver the frame or receiver of which is a die casting of zinc alloy which has a melting temperature of less than 800 degrees Fahrenheit.

(b) This section shall not apply to any pistol or revolver duly registered prior to July 1, 1975, pursuant to section 134-3 or to any antique pistol or revolver.

**Credits**
Laws 1988, ch. 275, § 2.

H R S § 134-15, HI ST § 134-15
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Red Flag - Severe Negative Treatment

KeyCite Red Flag Negative Treatment§ 134-16.   Repealed by Laws 2021, ch. 183, § 8, eff. Jan. 1, 2022

West's Hawai'i Revised Statutes Annotated
    Division 1. Government
        Title 10. Public Safety and Internal Security
            Chapter 134. Firearms, Ammunition and Dangerous Weapons
                Part I. General Regulations

HRS § 134-16

§ 134-16. Repealed by Laws 2021, ch. 183, § 8, eff. Jan. 1, 2022

Currentness

H R S § 134-16, HI ST § 134-16
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-17

## § 134-17. Penalties

Currentness

(a) If any person intentionally, knowingly, or recklessly makes any materially false, fictitious, or fraudulent statement or representation in connection with any of the requirements of this part, that person shall be guilty of a misdemeanor; provided that if any person intentionally, knowingly, or recklessly makes any materially false, fictitious, or fraudulent statement or representation regarding the person's psychiatric or criminal history in connection with any of the requirements of this part, that person shall be guilty of a class C felony.

(b) Any person who violates:

(1) Section 134-2, 134-4, 134-10, 134-13(c), or 134-15 shall be guilty of a misdemeanor;

(2) Section 134-3(a) or 134-9(q) shall be guilty of a petty misdemeanor; or

(3) Section 134-3(b) shall be guilty of a petty misdemeanor and the firearm shall be confiscated as contraband and disposed of, if the firearm is not registered within five days of the person receiving notice of the violation.

**Credits**

Laws 1988, ch. 275, § 2; Laws 1994, ch. 204, § 9; Laws 2021, ch. 183, § 5, eff. Jan. 1, 2022; Laws 2023, ch. 52, § 9, eff. July 1, 2023.

Notes of Decisions (2)

H R S § 134-17, HI ST § 134-17
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-18

## § 134-18. Qualified immunity for physicians, psychologists, psychiatrists, physician assistants, or advanced practice registered nurses who provide information on permit or license applicants

Currentness

There shall be no civil liability for any physician, psychologist, psychiatrist, physician assistant, or advanced practice registered nurse who provides information or renders an opinion in response to an inquiry made for purposes of issuing a firearm permit under section 134-2, issuing or renewing a license under section 134-9, or investigating the continuing mental health of the holder of a valid firearm permit or license; provided that the physician, psychologist, psychiatrist, physician assistant, or advanced practice registered nurse acted without malice.

**Credits**

Laws 1992, ch. 287, § 1; Laws 1994, ch. 204, § 10; Laws 2023, ch. 52, § 10, eff. July 1, 2023.

H R S § 134-18, HI ST § 134-18
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                            © 2025 Thomson Reuters. No claim to original U.S. Government Works.

[§ 134-21]. Carrying or use of firearm in the commission of a..., HI ST § 134-21
Case 1:24-cv-00496-JAO-WRP     Document 48     Filed 03/18/25     Page 199 of 275
PageID.1163

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-21

## [§ 134-21]. Carrying or use of firearm in the commission of a separate felony; penalty

Currentness

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use a firearm while engaged in the commission of a separate felony, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this subsection when the separate felony is:

(1) A felony offense otherwise defined by this chapter;

(2) The felony offense of reckless endangering in the first degree under section 707-713;

(3) The felony offense of terroristic threatening in the first degree under section 707-716(1)(a), 707-716(1)(b), or [707-716(1)(e)]; or

(4) The felony offenses of criminal property damage in the first degree under section 708-820 or criminal property damage in the second degree under section 708-821 and the firearm is the instrument or means by which the property damage is caused.

(b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.

(c) Any person violating this section shall be guilty of a class A felony.

**Credits**
Laws 2006, ch. 66, § 1.

Notes of Decisions (63)

H R S § 134-21, HI ST § 134-21
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.     1

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
   Division 1. Government
      Title 10. Public Safety and Internal Security
         Chapter 134. Firearms, Ammunition and Dangerous Weapons
            Part I. General Regulations

HRS § 134-21.5

[§ 134-21.5]. Carrying of a firearm in the commission of a separate misdemeanor; penalty

Currentness

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control a firearm while engaged in the commission of a separate misdemeanor offense, whether the firearm was loaded or not, and whether operable or not; provided that a person shall not be prosecuted under this section when the separate offense is an offense otherwise defined by this chapter or is the offense of criminally negligent storage of a firearm under section 707-714.5.

(b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate misdemeanor; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate misdemeanor.

(c) Any person violating this section shall be guilty of a class C felony.

(d) For the purposes of this section, "misdemeanor" does not include a petty misdemeanor.

**Credits**
Laws 2024, ch. 21, § 2, eff. May 13, 2024.

H R S § 134-21.5, HI ST § 134-21.5
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-22

## [§ 134-22]. Possession of a firearm with intent to facilitate the commission of a felony drug offense; penalty

Currentness

(a) It shall be unlawful for a person to knowingly possess a firearm with the intent to facilitate the commission of a felony offense involving the distribution of a controlled substance, whether the firearm was loaded or not, and whether operable or not.

(b) For the purposes of this section:

"Controlled substance" shall have the same meaning as defined in section 329-1.

"Distribution" means the selling, transferring, prescribing, giving or delivering to another, or the leaving, bartering, or exchanging with another, or the offering or agreeing to do the same.

(c) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.

(d) Any person violating this section shall be guilty of a class A felony.

**Credits**
Laws 2006, ch. 66, § 1.

H R S § 134-22, HI ST § 134-22
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-23

[§ 134-23]. Place to keep loaded firearms other than pistols and revolvers; penalty

Currentness

(a) Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing a loaded firearm other than a pistol or revolver shall be guilty of a class B felony.

**Credits**
Laws 2006, ch. 66, § 1.

Notes of Decisions (11)

H R S § 134-23, HI ST § 134-23
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-24

[§ 134-24]. Place to keep unloaded firearms other than pistols and revolvers; penalty

Currentness

(a) Except as provided in section 134-5, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing an unloaded firearm other than a pistol or revolver shall be guilty of a class C felony.

**Credits**
Laws 2006, ch. 66, § 1.

Notes of Decisions (1)

H R S § 134-24, HI ST § 134-24
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-25

[§ 134-25]. Place to keep pistol or revolver; penalty

Currentness

(a) Except as provided in sections 134-5 and 134-9, all firearms shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry unloaded firearms in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the firearm.

(b) Any person violating this section by carrying or possessing a loaded or unloaded pistol or revolver shall be guilty of a class B felony.

**Credits**
Laws 2006, ch. 66, § 1.

Notes of Decisions (15)

H R S § 134-25, HI ST § 134-25
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-26

[§ 134-26]. Carrying or possessing a loaded firearm on a public highway; penalty

Currentness

(a) It shall be unlawful for any person on any public highway to carry on the person, or to have in the person's possession, or to carry in a vehicle any firearm loaded with ammunition; provided that this section shall not apply to any person who has in the person's possession or carries a pistol or revolver in accordance with a license issued as provided in section 134-9.

(b) Any vehicle used in the commission of an offense under this section shall be forfeited to the State, subject to the notice and hearing requirements of chapter 712A.

(c) Any person violating this section shall be guilty of a class B felony.

**Credits**
Laws 2006, ch. 66, § 1.

Notes of Decisions (4)

H R S § 134-26, HI ST § 134-26
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
Part I. General Regulations

HRS § 134-27

## [§ 134-27]. Place to keep ammunition; penalty

Currentness

(a) Except as provided in sections 134-5 and 134-9, all ammunition shall be confined to the possessor's place of business, residence, or sojourn; provided that it shall be lawful to carry ammunition in an enclosed container from the place of purchase to the purchaser's place of business, residence, or sojourn, or between these places upon change of place of business, residence, or sojourn, or between these places and the following:

(1) A place of repair;

(2) A target range;

(3) A licensed dealer's place of business;

(4) An organized, scheduled firearms show or exhibit;

(5) A place of formal hunter or firearm use training or instruction; or

(6) A police station.

"Enclosed container" means a rigidly constructed receptacle, or a commercially manufactured gun case, or the equivalent thereof that completely encloses the ammunition.

(b) Any person violating this section shall be guilty of a misdemeanor.

**Credits**

Laws 2006, ch. 66, § 1.

Notes of Decisions (4)

H R S § 134-27, HI ST § 134-27

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                        © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-28

## [§ 134-28]. Explosive devices; prohibitions; penalty

Currentness

(a) It shall be unlawful for any person to knowingly or intentionally possess, construct, set off, ignite, discharge, or otherwise cause to explode any homemade explosive device.

(b) Any person violating this section shall be guilty of a class C felony.

(c) A violation of this section shall be construed as an offense distinct from an offense under section 134-8.

(d) For the purposes of this section, "homemade explosive device" means a non-commercially manufactured device composed of a single ingredient, or mixture of ingredients, capable of instantaneously releasing a sufficient amount of energy to inflict substantial damage to persons or property.

**Credits**

Laws 2011, ch. 222, § 1, eff. July 12, 2011.

H R S § 134-28, HI ST § 134-28
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**     © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part I. General Regulations

HRS § 134-29

## [§ 134-29]. Reporting lost, stolen, or destroyed firearms; penalties

Currentness

(a) Every person shall report the loss, theft, or destruction of a firearm that the person owns or possesses within twenty-four hours upon the discovery of such loss, theft, or destruction to:

  (1) The police department of the county within which the person resides; and

  (2) The police department of the county where the theft, loss, or destruction occurred.

If a person is unable to comply with this subsection, the person's designee shall make the report.

(b) The report of a lost, stolen, or destroyed firearm pursuant to subsection (a) shall include:

  (1) The caliber of the firearm;

  (2) The make of the firearm;

  (3) The model of the firearm;

  (4) The manufacturer of the firearm;

  (5) The serial number of the firearm;

  (6) Any other distinguishing number or identification mark on the firearm, if known by the person; and

  (7) Any additional relevant information required by the county police department taking the report.

(c) Upon receipt of a report of a lost, stolen, or destroyed firearm pursuant to subsection (a), a county police department shall enter the reported information into the National Crime Information Center database.

(d) A person who intentionally or knowingly fails to report the loss, theft, or destruction of any firearm pursuant to this section shall:

(1) For the first offense, be guilty of a petty misdemeanor;

(2) For the second and each subsequent offense, be guilty of a misdemeanor; and

(3) For the third and each subsequent offense:

(A) Surrender all firearm registrations, ammunition, and firearms to the police department for the county within which the person resides within seven days of receiving a notice of violation of this section; and

(B) Be prohibited from registering, possessing, or owning a firearm.

(e) If a person fails to surrender all firearm registrations, ammunition, and firearms as required in subsection (d), the chief of police of the county within which the person resides or within which any of the person's firearm registrations, ammunitions, or firearms are present shall seize all firearm registrations, firearm ammunition, and firearms registered to and in possession of the person.

(f) For the purposes of this section, an incident involving multiple firearms arising in the same occurrence shall constitute a single offense.

(g) No person shall report to any law enforcement agency that a firearm has been lost, stolen, or destroyed knowing the report to be false. If a person falsely reports a lost, stolen, or destroyed firearm, the person shall be in violation of this section and subject to the same penalties as provided in subsection (d).

(h) A person shall not be in violation of this section if the failure to report is the result of:

(1) An act of God or act of war;

(2) The inability of a law enforcement agency to receive the report; or

(3) The person who is required to report being hospitalized, unconscious, incapacitated, or otherwise seriously physically or mentally impaired as to prevent the person from reporting.

**Credits**

Laws 2019, ch. 23, § 2, eff. April 24, 2019.

---

H R S § 134-29, HI ST § 134-29

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 216 of 275
PageID.1180

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
   Division 1. Government
      Title 10. Public Safety and Internal Security
         Chapter 134. Firearms, Ammunition and Dangerous Weapons
            Part II. Firearms, Dealers' Licenses

HRS § 134-31

## § 134-31. License to sell and manufacture firearms; fee

### Currentness

Any person desiring to engage in the business to sell and manufacture firearms for sale in the State either at wholesale or retail, shall annually file an application for a license therefor with the director of finance of each county of the State. The annual fee for the issuance of such license shall be $10 and shall be payable to said director of finance. A license issued hereunder shall expire on June 30 next following the date of issuance of the license unless sooner terminated. Application for renewal of license shall be filed on or before June 30 of each year.

**Credits**

Laws 1921, ch. 13, § 1; R.L. 1925, § 2033; R.L. 1935, § 2554; R.L. 1945, § 7195; Laws 1953, ch. 155, § 1(a); R.L. 1955, § 157-30; H.R.S. § 134-31; Laws 1972, ch. 30, § 1.

H R S § 134-31, HI ST § 134-31
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
    Division 1. Government
        Title 10. Public Safety and Internal Security
            Chapter 134. Firearms, Ammunition and Dangerous Weapons
                Part II. Firearms, Dealers' Licenses

HRS § 134-32

§ 134-32. License to sell and manufacture firearms; conditions

Currentness

Every license issued pursuant to this part shall be issued and shall be regarded as having been accepted by the licensee subject to the following conditions:

(1) That the licensee at all times shall comply with all provisions of law relative to the sale of firearms.

(2) That the license during any time of national emergency or crisis, as defined in section 134-34, may be canceled or suspended.

(3) That all firearms in the possession and control of any licensee at any time of national emergency or crisis, as defined in section 134-34, may be seized and held in possession or purchased by or on the order of the governor until such time as the national emergency or crisis has passed, or until such time as the licensee and the government of the United States or the government of the State may agree upon some other disposition of the same.

(4) That all firearms in the possession and control of the licensee or registered pursuant to section 134-3(c) by the licensee shall be subject to physical inspection by the chief of police of each county during normal business hours at the licensee's place of business.

(5) That the license may be revoked for a violation of any of the conditions of this section.

**Credits**
Laws 1921, ch. 13, § 1; R.L. 1925, § 2034; R.L. 1935, § 2555; R.L. 1945, § 7196; Laws 1953, ch. 155, § 1(b); R.L. 1955, § 157-31; H.R.S. § 134-32; Laws 1988, ch. 275, § 3; Laws 1989, ch. 261, § 7; Laws 1994, ch. 204, § 11.

H R S § 134-32, HI ST § 134-32
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

§ 134-33. Punishment for violations of section 134-32, HI ST § 134-33
Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 218 of 275
PageID.1182

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part II. Firearms, Dealers' Licenses

HRS § 134-33

## § 134-33. Punishment for violations of section 134-32

Currentness

Any person who manufactures or sells any firearms within the State without having a valid license so to do, or who being a holder of a license violates any of the terms or conditions of the same, shall be fined not less than $100 nor more than $1,000 or imprisoned not less than three months nor more than one year.

**Credits**

Laws 1921, ch. 13, § 1; R.L. 1925, § 2036; R.L. 1935, § 2557; R.L. 1945, § 7198; Laws 1953, ch. 155, § 1(c); Laws 1955, ch. 54, § 2; R.L. 1955, § 157-33; H.R.S. § 134-33.

H R S § 134-33, HI ST § 134-33
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**
© 2025 Thomson Reuters. No claim to original U.S. Government Works.

---

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        Part II. Firearms, Dealers' Licenses

HRS § 134-34

## § 134-34. National emergency, when

Currentness

A national emergency or crisis shall be deemed to have arisen when the governor and the senior United States military commander headquartered in the State or, in the absence of the commander, a duly designated representative have, in the exercise of their discretion, so determined.

**Credits**

Laws 1921, ch. 13, § 1; R.L. 1925, § 2035; R.L. 1935, § 2556; R.L. 1945, § 7197; R.L. 1955, § 157-32; H.R.S. § 134-34; Laws 1989, ch. 215, § 2.

H R S § 134-34, HI ST § 134-34
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment
Proposed Legislation

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part III]. [Dangerous Weapons]

HRS § 134-51

## § 134-51. Deadly or dangerous weapons; prohibitions; penalty

Currentness

(a) Any person, not authorized by law, who knowingly carries concealed on the person, or in a bag or other container carried by the person, any dirk, dagger, blackjack, metal knuckles, or other deadly or dangerous weapon shall be guilty of a misdemeanor; provided that this subsection shall not apply to a billy.

(b) Any person who knowingly possesses or intentionally uses or threatens to use a dirk, dagger, blackjack, metal knuckles, or other deadly or dangerous weapon, or a billy, while engaged in the commission of a separate felony or misdemeanor shall be guilty of a class C felony.

(c) A conviction and sentence under subsection (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony or misdemeanor; provided that the sentence imposed under subsection (b) may run concurrently or consecutively with the sentence for the separate felony or misdemeanor.

(d) Upon conviction of a person for carrying or possessing a deadly or dangerous weapon pursuant to this section, the deadly or dangerous weapon shall be summarily destroyed by the chief of police or sheriff.

(e) Notwithstanding any provision to the contrary, this section shall not apply to:

(1) A firearm, whether loaded or not, and whether operable or not;

(2) A switchblade knife as defined in section 134-52;

(3) A butterfly knife as defined in section 134-53; or

(4) An electric gun as defined in section 134-81.

(f) For purposes of this section, "billy" includes a cudgel, truncheon, police baton, collapsible baton, billy club, or nightstick.

Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 221 of 275
PageID.1185

(g) It shall be a defense to a prosecution under subsection (a) that a person was lawfully present in the person's own home at the time of the offense.

**Credits**

Laws 1937, ch. 123, § 1; R.L. 1945, § 11114; R.L. 1955, § 267-25; H.R.S. § 727-25; Laws 1972, ch. 9, § 1; Laws 1977, ch. 191, § 2; Laws 1983, ch. 267, § 1; Laws 1984, ch. 90, § 1; Laws 1989, ch. 211, § 10; Laws 1990, ch. 195, § 3; Laws 1990, ch. 281, § 11; Laws 1992, ch. 87, § 4; Laws 1993, ch. 226, § 1; Laws 1999, ch. 285, § 2; Laws 2024, ch. 21, § 4, eff. May 13, 2024.

Notes of Decisions (31)

H R S § 134-51, HI ST § 134-51

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part III]. [Dangerous Weapons]

HRS § 134-52

## § 134-52. Switchblade knives; prohibitions; penalty

Currentness

(a) Whoever knowingly carries concealed on the person, or in a bag or other container carried by the person, any switchblade knife shall be guilty of a misdemeanor.

(b) Whoever knowingly possesses or intentionally uses or threatens to use a switchblade knife while engaged in the commission of a separate felony or misdemeanor shall be guilty of a class C felony; provided that a person shall not be prosecuted under this subsection when the separate felony or misdemeanor is an offense otherwise defined by this chapter.

(c) A conviction and sentence under subsection (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony or misdemeanor; provided that the sentence imposed under subsection (b) may run concurrently or consecutively with the sentence for the separate felony or misdemeanor.

(d) It shall be a defense to a prosecution under subsection (a) that the person was lawfully present in the person's own home at the time of the offense.

(e) For the purposes of this section, "switchblade knife" means any knife having a blade that opens automatically by:

(1) Hand pressure applied to a button or other device in the handle of the knife; or

(2) Operation of inertia, gravity, or both.

**Credits**
Laws 1959, ch. 225, § 1; 1965 Supp., § 264-9; H.R.S. § 769-1; Laws 1972, ch. 9, § 1; Laws 1990, ch. 195, § 4; Laws 2024, ch. 21, § 5, eff. May 13, 2024.

Notes of Decisions (2)

H R S § 134-52, HI ST § 134-52
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

🚩 KeyCite Yellow Flag - Negative Treatment

Unconstitutional or PreemptedNegative Treatment Vacated by Teter v. Lopez, 9th Cir.(Hawai'i), Jan. 22, 2025

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part III]. [Dangerous Weapons]

HRS § 134-53

§ 134-53. Butterfly knives; prohibitions; penalty

Currentness

(a) Whoever knowingly carries concealed on the person, or in a bag or other container carried by the person, any butterfly knife shall be guilty of a misdemeanor.

(b) Whoever knowingly possesses or intentionally uses or threatens to use a butterfly knife while engaged in the commission of a separate felony or misdemeanor shall be guilty of a class C felony; provided that a person shall not be prosecuted under this subsection when the separate felony or misdemeanor is an offense otherwise defined by this chapter.

(c) A conviction and sentence under subsection (b) shall be in addition to and not in lieu of any conviction and sentence for the separate felony or misdemeanor; provided that the sentence imposed under subsection (b) may run concurrently or consecutively with the sentence for the separate felony or misdemeanor.

(d) It shall be a defense to a prosecution under subsection (a) that the person was lawfully present in the person's own home at the time of the offense.

(e) For the purposes of this section, "butterfly knife" means any knife having a blade encased in a split handle that manually unfolds with hand or wrist action with the assistance of inertia, gravity, or both.

**Credits**

Laws 1999, ch. 285, § 1; Laws 2024, ch. 21, § 6, eff. May 13, 2024.

**Editors' Notes**

**VALIDITY**

<For validity of section, see Teter v. Lopez, 2023, 76 F.4th 938.>

Notes of Decisions (4)

H R S § 134-53, HI ST § 134-53

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders

HRS D. 1, T. 10, Ch. 134, Pt. IV, Refs & Annos

Currentness

H R S D. 1, T. 10, Ch. 134, Pt. IV, Refs & Annos, HI ST D. 1, T. 10, Ch. 134, Pt. IV, Refs & Annos
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                         © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-61

## [§ 134-61]. Definitions

Currentness

For the purposes of this part:

"Bodily injury" has the same meaning as in section 707-700.

"Business day" has the same meaning as in section 709-906.

"Colleague" means a person employed or working at the same place of business or employment as the respondent.

"Educator" means a person employed at an institution of learning at which the respondent may have a connection.

"Ex parte gun violence protective order" means an order issued by the family court, pursuant to section 134-64, prohibiting the respondent from owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition until the court-scheduled hearing for a one-year gun violence protective order.

"Family or household member" means any spouse or reciprocal beneficiary, former spouse or former reciprocal beneficiary, person with whom the respondent has a child in common, parent, child, person related by consanguinity, person related by adoption, person jointly residing or who formerly jointly resided with a respondent in the same dwelling unit as the respondent, person who has or has had a dating relationship, or person who is or has acted as the respondent's legal guardian. "Family or household member" includes a person who is an adult roommate or a co-habitant of a respondent.

"Medical professional" means a licensed physician, advanced practice registered nurse, psychologist, or psychiatrist who has examined the respondent.

"One-year gun violence protective order" means an order issued by the family court, pursuant to section 134-65, prohibiting the respondent from owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition for a period of one year.

"Petitioner" means a law enforcement officer, family or household member of the respondent, medical professional, educator, or colleague, who files a petition pursuant to section 134-64 or section 134-65.

"Respondent" means the person identified in the petition filed pursuant to section 134-64 or section 134-65.

**Credits**
Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-61, HI ST § 134-61

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-62

## [§ 134-62]. Court jurisdiction

Currentness

A petition for relief under this part may be filed in any family court in the circuit in which the petitioner resides. A petition under this part shall be given docket priority by the court.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-62, HI ST § 134-62
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-63

## [§ 134-63]. Commencement of action; forms

Currentness

(a) In order to seek an ex parte gun violence protective order or a one-year gun violence protective order, the petitioner shall file a written petition for relief on forms provided by the court. The court shall designate an employee or appropriate non-judicial agency to assist the petitioner in completing the petition.

(b) The petition shall allege, under penalty of perjury, the grounds for issuance of the order and shall be accompanied by an affidavit made under oath or a statement made under penalty of perjury containing detailed allegations based on personal knowledge that the respondent poses a danger of causing bodily injury to the respondent's self or another person by owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition, and specific facts and circumstances in support thereof, as well as the number, types, and locations of any firearms or ammunition presently believed by the petitioner to be possessed or controlled by the respondent. The petition shall also state, if known to the petitioner, whether there is an existing restraining order or protective order in effect governing the respondent and whether there is any pending lawsuit, complaint, petition, or other action between the parties under the laws of this State. The judiciary shall verify the terms of any existing order governing the parties. The court shall not delay granting relief because of the existence of a pending action between the parties or the necessity of verifying the terms of an existing order. A petition for an ex parte gun violence protective order or a one-year gun violence protective order may be granted regardless of whether there is a pending action between the parties.

(c) All health records and other health information provided in a petition or considered as evidence in a proceeding under this part shall be sealed by the court, except that the identities of the petitioner and respondent may be provided to law enforcement agencies as set forth in section 134-69. Aggregate statistical data about the numbers of ex parte gun violence protective orders and one-year gun violence protective orders issued, renewed, denied, dissolved, or terminated shall be made available to the public upon request.

(d) Upon receipt of the petition, the court shall set a date for hearing on the petition within fourteen days, regardless of whether the court issues an ex parte gun violence protective order pursuant to section 134-64. If the court issues an ex parte gun violence protective order pursuant to section 134-64, notice of the hearing shall be served on the respondent with the ex parte order. Notice of the hearing shall be personally served on the respondent by an officer of the appropriate county police department.

**Credits**
Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-63, HI ST § 134-63

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
 Division 1. Government
  Title 10. Public Safety and Internal Security
   Chapter 134. Firearms, Ammunition and Dangerous Weapons
    [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-64

[§ 134-64]. Ex parte gun violence protective order

Currentness

(a) A petitioner may request that an ex parte gun violence protective order be issued before a hearing for a one-year gun violence protective order, without notice to the respondent.

(b) The court shall issue or deny an ex parte gun violence protective order on the same day that the petition is submitted to the court, unless the petition is filed too late in the day to permit effective adjudication, in which case the order shall be issued or denied on the next business day.

(c) Before issuing an ex parte gun violence protective order, the court may examine under oath the petitioner and any witnesses the petitioner may produce.

(d) In determining whether sufficient grounds for an ex parte gun violence protective order exist, the court shall consider all relevant evidence presented by the petitioner, and may also consider other relevant evidence, including evidence of facts relating to the respondent's:

  (1) Unlawful, reckless, or negligent use, display, storage, possession, or brandishing of a firearm;

  (2) Act or threat of violence against the respondent's self or another person, regardless of whether the violence involves a firearm;

  (3) Violation of a protective order or restraining order issued pursuant to chapter 586 or section 604-10.5, or a similar law in another state;

  (4) Abuse of controlled substances or alcohol or commission of any criminal offense that involves controlled substances or alcohol; and

  (5) Recent acquisition of any firearms, ammunition, or other deadly weapons.

(e) The court shall also consider the time that has elapsed since the events described in subsection (d).

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

(f) If the court finds probable cause to believe that the respondent poses an imminent danger of causing bodily injury to the respondent's self or another person by owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition, the court shall issue an ex parte gun violence protective order.

(g) An ex parte gun violence protective order issued pursuant to this section shall include:

    (1) A statement that the respondent shall not own, purchase, possess, receive, transfer ownership of, or have in the respondent's custody or control, or attempt to purchase, receive, or transfer ownership of, any firearm or ammunition while the order is in effect;

    (2) A description of the requirements for relinquishment of firearms and ammunition under section 134-67;

    (3) A statement of the grounds asserted for the order;

    (4) A notice of the hearing under section 134-63(d) to determine whether to issue a one-year gun violence protective order, including the address of the court and the date and time when the hearing is scheduled;

    (5) A statement that at the hearing, the court may extend the order for one year; and

    (6) A statement that the respondent may seek the advice of an attorney as to any matter connected with the order, and that the attorney should be consulted promptly so that the attorney may assist the respondent in any matter connected with the order.

(h) An ex parte gun violence protective order issued pursuant to this section shall be personally served on the respondent by an officer of the appropriate county police department. The officer shall file the proof of service with the court within one business day of service.

(i) In accordance with section 134-63(d), the court shall schedule a hearing within fourteen days of the granting of the petition for an ex parte gun violence protective order to determine if a one-year gun violence protective order shall be issued. A respondent may seek an extension of time before the hearing. The court shall dissolve any ex parte gun violence protective order in effect against the respondent if the court subsequently holds the hearing and issues or denies a one-year gun violence protective order.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-64, HI ST § 134-64
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-65

[§ 134-65]. One-year gun violence protective order issued after notice and hearing

Currentness

(a) A petitioner requesting a one-year gun violence protective order shall include in the petition detailed allegations based on personal knowledge that the respondent poses a significant danger of causing a self-inflicted bodily injury or an injury to another person by owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition.

(b) In determining whether to issue a one-year gun violence protective order under this section, the court shall consider all relevant evidence presented by the petitioner and the respondent, and may also consider other relevant evidence, including but not limited to evidence of the facts identified in section 134-64(d).

(c) If the court finds by a preponderance of the evidence at the hearing that the respondent poses a significant danger of causing bodily injury to the respondent's self or another person by owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition, the court shall issue a one-year gun violence protective order.

(d) A one-year gun violence protective order issued pursuant to this section shall include all of the following:

(1) A statement that the respondent shall not own, purchase, possess, receive, transfer ownership of, or have in the respondent's custody or control, or attempt to purchase, receive, or transfer ownership of, any firearm or ammunition while the order is in effect;

(2) A description of the requirements for relinquishment of firearms and ammunition under section 134-67;

(3) A statement of the grounds supporting the issuance of the order;

(4) The date and time the order expires;

(5) The address of the court that issued the order;

(6) A statement that the respondent may request a hearing to terminate the order at any time during its effective period;

(7) A statement that the respondent may seek the advice of an attorney as to any matter connected to the order;

(8) A statement of whether the respondent was present in court to be advised of the contents of the order or whether the respondent failed to appear; and

(9) A statement that if the respondent was present in court, the respondent's presence shall constitute proof of service of notice of the terms of the order.

(e) If the respondent fails to appear at the hearing, a one-year gun violence protective order issued pursuant to this section shall be personally served on the respondent by an officer of the appropriate county police department. The officer shall file the proof of service with the court within one business day of service.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-65, HI ST § 134-65
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-66

## [§ 134-66]. Termination and renewal

Currentness

(a) The respondent named in a one-year gun violence protective order issued under section 134-65 may submit a written request at any time during the effective period of the order for a hearing to terminate the order. Upon receipt of the written request for termination:

(1) The court shall set a date for a hearing. Notice of the request shall be personally served on the petitioner by any person authorized by section 634-21. The hearing shall occur no sooner than fourteen days from the date of service of the request upon the petitioner; and

(2) The respondent seeking termination of the order shall have the burden of proving by a preponderance of the evidence that the respondent does not pose a significant danger of causing bodily injury to the respondent's self or another person by owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition.

If the court finds after the hearing that the respondent has met the respondent's burden, the court shall terminate the order.

(b) A petitioner may submit a written request for a renewal of a one-year gun violence protective order within three months prior to the expiration of the order. Upon receipt of the written request for renewal, the court:

(1) In determining whether to renew a one-year gun violence protective order, after notice to the respondent, shall consider all relevant evidence presented by the petitioner and the respondent and may also consider other relevant evidence, including evidence of the facts identified in section 134-64(d); and

(2) May renew a one-year gun violence protective order if the court finds by a preponderance of the evidence that the respondent continues to pose a significant danger of causing bodily injury to the respondent's self or another person by owning, purchasing, possessing, receiving, or having in the respondent's custody or control any firearm or ammunition.

A one-year gun violence protective order renewed pursuant to this section shall expire after one year, subject to termination by further order of the court at a hearing held pursuant to subsection (a) and further renewal by order of the court pursuant to this subsection.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.


H R S § 134-66, HI ST § 134-66

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
    Division 1. Government
        Title 10. Public Safety and Internal Security
            Chapter 134. Firearms, Ammunition and Dangerous Weapons
            [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-67

## [§ 134-67]. Relinquishment of firearms and ammunition

Currentness

(a) Upon issuance of an ex parte gun violence protective order, a one-year gun violence protective order, or a domestic abuse protective order, the court shall order the respondent to voluntarily surrender or dispose of all firearms and ammunition that the respondent owns or possesses, or has in the respondent's custody or control, in accordance with section 134-7.3(b).

(b) At the time of serving notice of a petition, an ex parte gun violence protective order, a one-year gun violence protective order, or a domestic abuse protective order, a police officer shall take custody of any and all firearms and ammunition in accordance with the procedure described in section 134-7(f). Alternatively, if personal service by a police officer is not possible, the respondent shall surrender the firearms and ammunition in a safe manner to the control of the chief of police where the respondent resides within forty-eight hours of being served with the order.

(c) At the time of surrender or removal, a police officer taking possession of a firearm or ammunition pursuant to an ex parte gun violence protective order, a one-year gun violence protective order, or domestic abuse protective order shall issue a receipt identifying all firearms and ammunition that have been surrendered or removed and provide a copy of the receipt to the respondent. Within seventy-two hours after being served with the order, the officer serving the order shall file the original receipt with the court that issued the ex parte gun violence protective order or one-year gun violence protective order, and shall ensure that the appropriate county police department retains a copy of the receipt.

(d) A court that has probable cause to believe a respondent to a protective order owns, possesses, or has in the respondent's custody or control any firearms or ammunition that the respondent has failed to surrender pursuant to this section, or has received or purchased a firearm or ammunition while subject to the order, shall issue a warrant describing the firearm or ammunition and authorizing a search of any location where the firearm or ammunition is reasonably believed to be and the seizure of any firearm or ammunition discovered pursuant to the search.

(e) The appropriate county police department may charge the respondent a fee not to exceed the reasonable and actual costs incurred by the department for storing a firearm or ammunition surrendered or removed pursuant to this section for the duration of the ex parte gun violence protective order, one-year gun violence protective order, or domestic abuse protective order and any additional periods necessary under section 134-68.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-67, HI ST § 134-67
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-68

[§ 134-68]. Return and disposal of firearms or ammunition

Currentness

(a) A county police department shall return any surrendered or removed firearm or ammunition requested by a respondent only after confirming, through a criminal history background check, that the respondent is currently eligible to own or possess firearms and ammunition.

(b) A respondent who has surrendered or had removed any firearm or ammunition to or by a county police department pursuant to section 134-67 and who does not wish to have the firearm or ammunition returned, or who is no longer eligible to own or possess firearms or ammunition, may sell or transfer title of the firearm or ammunition to a firearms dealer licensed under section 134-31. The department shall transfer possession of the firearm or ammunition to a firearms dealer licensed under section 134-31 only after the dealer has provided written proof of transfer of the firearm or ammunition from the respondent to the dealer and the department has verified the transfer with the respondent.

(c) If a person other than the respondent claims title to any firearm or ammunition surrendered or removed pursuant to section 134-67, and that person is determined by the appropriate county police department to be the lawful owner of the firearm or ammunition, the firearm or ammunition shall be returned to the lawful owner.

(d) A county police department holding any firearm or ammunition that was surrendered by or removed from a respondent pursuant to section 134-67 may dispose of the firearm or ammunition only after six months from the date of proper notice to the respondent of the department's intent to dispose of the firearm or ammunition, unless the firearm or ammunition has been claimed by the lawful owner. If the firearm or ammunition remain unclaimed after six months from the date of notice, then no party shall thereafter have the right to assert ownership thereof and the department may dispose of the firearm or ammunition.

(e) For the purposes of this section, "dispose" means selling the firearm or ammunition to a firearms dealer licensed under section 134-31, or destroying the firearm or ammunition.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-68, HI ST § 134-68
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-69

## [§ 134-69]. Reporting of order to Hawaii criminal justice data center

Currentness

(a) The court shall notify the Hawaii criminal justice data center no later than one business day after issuing, serving, renewing, dissolving, or terminating an ex parte gun violence protective order or a one-year gun violence protective order under this part and after receiving notice of such an order.

(b) The information required to be submitted to the Hawaii criminal justice data center pursuant to this section shall include identifying information about the petitioner and respondent and the date the order was issued, served, renewed, dissolved, or terminated. In the case of a one-year gun violence protective order, the court shall include the date the order is set to expire.

(c) The Hawaii criminal justice data center shall maintain a searchable database of the information it receives under this section and make the information available to law enforcement agencies upon request.

(d) The Hawaii criminal justice data center shall within one business day make information about an ex parte gun violence protective order or a one-year gun violence protective order issued, served, renewed, dissolved, or terminated pursuant to this part available to the National Instant Criminal Background Check System for the purposes of firearm purchaser background checks.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-69, HI ST § 134-69
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.   1

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-70

[§ 134-70]. Penalties

Currentness

A person who files a petition for an ex parte gun violence protective order or a one-year gun violence protective order under this part, knowing the information in the petition to be materially false or with an intent to harass the respondent, is guilty of a misdemeanor.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-70, HI ST § 134-70
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-71

## [§ 134-71]. Law enforcement to retain other authority

Currentness

The provisions of this part shall not affect the ability of a law enforcement officer to remove firearms or ammunition from any person pursuant to other lawful authority.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-71, HI ST § 134-71
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

[§ 134-72]. Lack of liability for failure to seek order, HI ST § 134-72
Case 1:24-cv-00496-JAO-WRP     Document 48     Filed 03/18/25     Page 245 of 275
PageID.1209

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part IV]. Gun Violence Protective Orders (Refs & Annos)

HRS § 134-72

[§ 134-72]. Lack of liability for failure to seek order

Currentness

This part shall not be construed to impose criminal or civil liability on any person who chooses not to seek an ex parte gun violence protective order or a one-year gun violence protective order pursuant to this part.

**Credits**

Laws 2019, ch. 150, § 2, eff. Jan. 1, 2020.

H R S § 134-72, HI ST § 134-72
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part V]. Electric Guns

HRS D. 1, T. 10, Ch. 134, Pt. V, Refs & Annos

Currentness

H R S D. 1, T. 10, Ch. 134, Pt. V, Refs & Annos, HI ST D. 1, T. 10, Ch. 134, Pt. V, Refs & Annos
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document** © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part V]. Electric Guns (Refs & Annos)

HRS § 134-81

§ 134-81. Definitions

Currentness

As used in this part:

"Cartridge" means any device or object that is designed to be used with an electric gun to project a missile. "Cartridge" includes but is not limited to a Taser cartridge.

"Electric gun" means any portable device that is designed to discharge electric energy, charge, voltage, or current into the body through direct contact or utilizing a projectile. "Electric gun" includes but is not limited to devices commonly referred to as stun guns and Tasers. "Electric gun" does not include any automatic external defibrillator used in emergency medical situations.

"Law enforcement agency" means any county police department, the department of law enforcement, the department of the attorney general, the division of conservation and resources enforcement of the department of land and natural resources, and any other state or county public body that employs law enforcement officers.

"Law enforcement officer" means a sheriff or deputy sheriff, a police officer, an enforcement officer within the division of conservation and resources enforcement of the department of land and natural resources, a special agent of the department of the attorney general, and any other public servant vested by law with a duty to maintain public order, make arrests for offenses, or enforce criminal laws, whether that duty extends to all offenses or is limited to a specific class of offenses.

"Licensee" means a person licensed to sell, offer to sell, distribute, or otherwise transfer electric guns and cartridges pursuant to section 134-83.

"Person" means an individual, firm, corporation, partnership, association, or any form of business or legal entity.

"Transfer" means the granting of possession or ownership to another. "Transfer" includes but is not limited to the granting of temporary possession to another.

**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022; Laws 2022, ch. 278, § 17, eff. Jan. 1, 2024.

H R S § 134-81, HI ST § 134-81
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part V]. Electric Guns (Refs & Annos)

HRS § 134-82

[§ 134-82]. Restrictions on use, sale, offer for sale,
distribution, and transfer of electric guns and cartridges

Currentness

(a) It shall be unlawful for any person to knowingly or recklessly use an electric gun for any purpose except:

(1) Self-defense;

(2) Defense of another person; or

(3) Protection of property of the person or of another person.

(b) Except as provided in section 134-85, it shall be unlawful for any person to knowingly sell, offer to sell, distribute, or otherwise transfer an electric gun or cartridge without a license obtained pursuant to section 134-83. It is an affirmative defense to prosecution pursuant to this subsection that the person is more than twenty-one years of age and is an employee of a licensee acting within the scope of the person's employment.

(c) It shall be unlawful for a licensee or employee of a licensee to knowingly sell, offer to sell, distribute, or otherwise transfer an electric gun or cartridge at a place other than the licensee's designated place of business.

(d) It shall be unlawful for any person to knowingly sell, offer to sell, distribute, or otherwise transfer an electric gun or cartridge to a person less than twenty-one years of age.

(e) It shall be unlawful for any person, other than a licensee, a law enforcement agency, or the Army or Air National Guard, to knowingly or recklessly purchase, obtain, or otherwise receive an electric gun or cartridge from a person who does not have a license issued pursuant to section 134-83.

(f) Any person violating this section shall be guilty of a misdemeanor.

**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-82, HI ST § 134-82

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                              © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part V]. Electric Guns (Refs & Annos)

HRS § 134-83

## [§ 134-83]. License to sell, offer to sell, distribute, or otherwise transfer electric guns or cartridges; fee

Currentness

(a) Any person desiring to sell, offer to sell, distribute, or otherwise transfer electric guns or cartridges to a person in the State, either at wholesale or retail, shall annually file an application for a license to do so with the county in which the person desires to conduct business or within the county to which the person intends the electric guns or cartridges to be sold, offered for sale, distributed, or otherwise transferred using forms prescribed by the county.

(b) If the applicant is an individual, the application and supporting documentation shall establish at least the following:

  (1) The legal name, date of birth, and the last four digits of the social security number of the individual;

  (2) The street address, telephone number, fax number, and electronic mail address of the individual;

  (3) The name and location of the principal place of business of the individual and, if applicable, each additional designated place of business from which the individual desires to sell, offer to sell, distribute, or otherwise transfer electric guns or cartridges;

  (4) The individual's Hawaii tax identification number;

  (5) That the individual has had no convictions for any felony offense;

  (6) Within the last three years, that the individual has completed an electric gun safety or training course offered or approved by the county that focuses on:

    (A) The safe use and handling of electric guns;

    (B) Current information about the effects, dangers, risks, and limitations of electric guns; and

(C) Education on the existing state laws on electric guns; and

(7) Any other information the county may require.

(c) If the applicant is not an individual, the application and supporting documentation shall establish at least the following:

(1) The name of the applying entity and any other name under which the applying entity does business, if applicable;

(2) The street address, telephone number, fax number, and electronic mail address of the applying entity;

(3) The legal name, date of birth, and the last four digits of the social security number of each of the principal owners or members of the applying entity;

(4) The street address, telephone number, fax number, and electronic mail address of each of the principal owners or members of the applying entity;

(5) The name and location of the principal place of business of the applying entity and, if applicable, each additional designated place of business from which the applying entity desires to sell, offer to sell, distribute, or otherwise transfer electric guns or cartridges;

(6) That the applying entity is registered to do business in the State;

(7) That the applying entity is composed of principal owners or members who have had no convictions for any felony offense;

(8) The applying entity's Hawaii tax identification number;

(9) The applying entity's federal employer identification number;

(10) Within the last three years, that at least one principal owner or member of the applying entity has completed an electric gun safety or training course, as described in subsection (b)(6); and

(11) Any other information the county may require.

(d) The applicant shall certify that the applicant will comply at all times with, and is responsible for compliance by its employees with, all provisions of law relative to the acquisition, possession, storage, sale, offer for sale, distribution, and transfer of electric guns and cartridges.

(e) Upon receipt of the completed application form and the annual licensing fee of $50 payable to the county, the county shall review the application and may issue a license to the applicant if it determines that the applicant meets all the requirements of this section. If requested by the licensee, the county shall provide certified copies of the license to the licensee.


(f) A license issued pursuant to this section shall expire on June 30 next following the date of issuance of the license unless sooner terminated. Application for renewal of license shall be filed on or before July 1 of each year.


**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.


H R S § 134-83, HI ST § 134-83

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                      © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00496-JAO-WRP    Document 48    Filed 03/18/25    Page 253 of 275
PageID.1217

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part V]. Electric Guns (Refs & Annos)

HRS § 134-84

## [§ 134-84]. Sale, offer for sale, distribution, or transfer of electric guns or cartridges

*Currentness*

(a) A licensee shall post the license to sell, offer to sell, distribute, or otherwise transfer electric guns or cartridges, or a certified copy thereof, in a location readily visible to customers at each designated place of business. For internet sales by a licensee, the license number shall be prominently displayed and an electronic copy of the license shall be readily accessible to the customer.

(b) An individual licensee shall complete at least once every three years an electric gun safety or training course offered or approved by the county that focuses on:

   (1) The safe use and handling of electric guns;

   (2) Current information about the effects, dangers, risks, and limitations of electric guns; and

   (3) Education on the existing state laws on electric guns.

A licensee shall keep copies of the certificates of completion of these training courses in the licensee's business records.

(c) A licensee shall not allow any employee to participate in the sale or transfer of electric guns or cartridges unless the employee completes at least once every three years the training courses described in subsection (b). The licensee shall keep copies of the certificates of completion of the training courses for each employee in the licensee's business records.

(d) If there is no manufacturer serial number on an electric gun or cartridge received into inventory by a licensee, then the licensee shall engrave on the electric gun or cartridge a legible unique serial number that begins with the licensee's license number, followed by a hyphen and a unique identifying number.

(e) A licensee shall keep records for all electric guns and cartridges received into inventory within the State, including:

   (1) Information identifying the seller, distributor, or transferor of the electric gun or cartridge; and

(2) The transaction record for the electric gun or cartridge, including the date of receipt, a description of the electric gun or cartridge, the manufacturer's serial number or the unique identifying serial number engraved by the licensee, and, if available, the manufacturer and the model number.

(f) Before completing a sale, distribution, or other transfer of an electric gun, the licensee or an employee of the licensee shall conduct a criminal history background check of the recipient. At minimum, the criminal history background check shall be a name-based search of the adult criminal conviction records maintained by the Hawaii criminal justice data center. The licensee or employee of the licensee shall require the recipient to review a printed copy of the results of the background check. After the review, the recipient shall sign and date a declaration. The declaration shall be in the following form: "I, (name of recipient), declare under penalty of law that the attached document accurately reflects my adult criminal conviction history in Hawaii. I further declare that I do not have any convictions or charges pending against me that disqualify me from owning an electric gun. I further declare under penalty of law that I am not disqualified from owning an electric gun." The licensee or employee of the licensee shall witness the recipient sign the declaration and sign the declaration as a witness. If the recipient is disqualified from owning an electric gun, or refuses or is unable to sign or make the declaration, the licensee shall immediately terminate the sale, distribution, or transfer.

(g) Before completing a sale, distribution, or other transfer of an electric gun, the licensee or an employee of the licensee shall provide an informational briefing to the recipient that includes but is not limited to the following:

(1) The safe use and handling of electric guns;

(2) Current information about the effects, dangers, risks, and limitations of electric guns;

(3) Education on the existing state laws on electric guns; and

(4) The proper disposal of electric guns.

(h) Upon completion of the informational briefing, the licensee shall provide a certification of informational briefing that is signed and dated by the recipient and the person who provided the informational briefing acknowledging that the briefing was completed and that the recipient understood the briefing. The certification shall include the names of the recipient and the person who provided the informational briefing and the date of the briefing. The form of the certification shall be as provided by the county office that issued the license to the licensee.

(i) A licensee shall keep a record of the information provided to recipients during the informational briefing.

(j) A licensee shall keep records of all sales, distributions, and other transactions of electric guns and cartridges sold in the State or to a recipient in the State, including:

(1) The recipient's name, date of birth, address, and telephone number;

(2) A copy of the recipient's government-issued identification card or document;

(3) The transaction record for the electric gun or cartridge, including the date of the transaction; a description of the electric gun or cartridge; if available, the name of the manufacturer and serial and model numbers; and, if necessary, the unique serial number engraved by the licensee;

(4) The criminal history background check and declaration signed by the recipient and the licensee or licensee's employee as a witness; and

(5) A copy of the certification of informational briefing signed and dated by the recipient and the person who provided the briefing.

(k) A licensee shall keep a record of the licensee's current inventory of electric guns and cartridges.

(l) During normal business hours, a licensee shall allow the chief of police of the appropriate county or designee to inspect the licensee's books and records for all records required to be kept by the licensee for electric guns and cartridges. At the discretion of the chief of police of the appropriate county or designee, the inspection of the records may be conducted via facsimile transmittal of the records.

(m) A licensee shall keep records required by this section for a minimum of ten years. If a licensee, as a result of death or dissolution, cannot maintain the records, the records shall be turned over to the chief of police of the appropriate county or designee.

(n) When displaying or storing electric guns or cartridges at a designated place of business, a licensee shall display or store the electric guns and cartridges in a locked cabinet or area not accessible to the general public.

(o) During normal business hours, a licensee shall allow the chief of police of the appropriate county or designee to physically inspect all electric guns and cartridges in the possession and control of the licensee wherever they may be located within the State.

(p) Any person, including any licensee, violating this section shall be guilty of a misdemeanor.

(q) A license may be suspended or revoked for a violation of any of the requirements of this section.

**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-84, HI ST § 134-84
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part V]. Electric Guns (Refs & Annos)

HRS § 134-85

[§ 134-85]. Disposal of electric gun or cartridge

Currentness

A person who is not a licensee may sell or otherwise transfer an electric gun or cartridge to a licensee or the chief of police of the appropriate county or designee. The chief of police may either destroy the electric gun or cartridge or utilize the electric gun or cartridge for educational purposes. The chief of police shall maintain records of all surrendered electric guns and cartridges, including their disposition.

**Credits**
Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-85, HI ST § 134-85
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part V]. Electric Guns (Refs & Annos)

HRS § 134-86

## [§ 134-86]. Ownership or possession prohibited

Currentness

(a) No person who is a fugitive from justice shall own, possess, or control an electric gun.

(b) No person who is under indictment for, has waived indictment for, has been bound over to the circuit court for, or has been convicted in this State or elsewhere of having committed a felony, any crime of violence, or any illegal sale of any drug shall own, possess, or control an electric gun.

(c) No person who:

  (1) Is or has been under treatment or counseling for addiction to, abuse of, or dependence upon any dangerous, harmful, or detrimental drug; intoxicating compound as defined in section 712-1240; or intoxicating liquor;

  (2) Has been acquitted of a crime on the grounds of mental disease, disorder, or defect pursuant to section 704-411;

  (3) Is or has been diagnosed as having a significant behavioral, emotional, or mental disorder as defined by the most current diagnostic manual of the American Psychiatric Association; or

  (4) Is under treatment for an organic brain syndrome;

shall own, possess, or control an electric gun, unless the person has been medically documented to be no longer adversely affected by the addiction, abuse, dependence, syndrome, or mental disease, disorder, or defect.

(d) No person who is less than twenty-five years of age and has been adjudicated by the family court to have committed a felony, two or more crimes of violence, or an illegal sale of any drug shall own, possess, or control an electric gun.

(e) No person who is less than twenty-one years of age shall own, possess, or control an electric gun.

(f) No person shall possess an electric gun that is owned by another, regardless of whether the owner has consented to possession of the electric gun.

(g) No person who has been restrained pursuant to an order of any court, including an ex parte order as provided in this subsection, from contacting, threatening, or physically abusing any person or from possessing or owning a firearm, shall possess, control, or transfer ownership of an electric gun, so long as the protective order, restraining order, or any extension is in effect, unless the order, for good cause shown, specifically permits the possession of an electric gun. The restraining order or order of protection shall specifically include a statement that possession, control, or transfer of an electric gun by the person named in the order is prohibited. Such person shall relinquish possession and control of any electric gun owned by that person to the police department of the appropriate county for safekeeping for the duration of the order or extension thereof.

In the case of an ex parte order that includes a restriction on the possession, control, or transfer of an electric gun, the affidavit or statement under oath that forms the basis for the order shall contain a statement of the facts that support a finding that the person to be restrained owns, intends to obtain or transfer, or possesses an electric gun, and that the electric gun may be used to threaten, injure, or abuse any person. The ex parte order shall be effective upon service pursuant to section 586-6.

At the time of service of a restraining order involving electric guns issued by any court, the police officer may take custody of any and all electric guns in plain sight, those discovered pursuant to a consensual search, and those electric guns surrendered by the person restrained.

For the purposes of this subsection, "good cause" shall not be based solely upon the consideration that the person subject to restraint pursuant to an order of any court, including an ex parte order as provided for in this subsection, is required to possess or carry an electric gun during the course of the person's employment. "Good cause" includes but is not limited to the protection and safety of the person to whom a restraining order is granted.

(h) Any person disqualified from ownership, possession, control, or the right to transfer ownership of an electric gun under this section shall surrender or dispose of all electric guns in compliance with section 134-85.

(i) For the purposes of enforcing this section, and notwithstanding section 571-84 or any other law to the contrary, any agency within the State shall make its records relating to family court adjudications available to law enforcement officials.

(j) Any person violating subsection (a) or (b) shall be guilty of a class C felony. Any person violating subsection (c), (d), (e), (f), (g), or (h) shall be guilty of a misdemeanor.

**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-86, HI ST § 134-86
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
   Division 1. Government
      Title 10. Public Safety and Internal Security
         Chapter 134. Firearms, Ammunition and Dangerous Weapons
            [Part V]. Electric Guns (Refs & Annos)

HRS § 134-87

[§ 134-87]. Exemptions

Currentness

(a) Sections 134-82 and 134-86(f) shall not apply to:

(1) Law enforcement agencies and law enforcement officers acting within the course of their employment; and

(2) The Army or Air National Guard and its members when they are assisting civil authorities in disaster relief, emergency management, or law enforcement functions, subject to the requirements of section 121-34.5;

provided that the electric guns shall be acquired by the law enforcement agencies or the Army or Air National Guard and not individual law enforcement officers or members of the Army or Air National Guard, and shall remain in the custody and control of law enforcement agencies or the Army or Air National Guard.

(b) Law enforcement agencies that authorize use of electric guns by its law enforcement officers and the Army or Air National Guard shall:

(1) Provide training from the manufacturer or from a manufacturer-approved training program conducted by manufacturer-certified or manufacturer-approved instructors in the use of electric guns before deployment of the electric guns and related equipment in public;

(2) Maintain records regarding every electric gun in its custody and control, including every instance of usage of the electric guns, in a similar manner as records are maintained for the discharge of firearms; and

(3) Report to the legislature on the information in, and maintenance of, these records no later than twenty days prior to the convening of each regular session.

(c) The licensing requirement of sections 134-82(b) and 134-83 shall not apply to the sale of electric guns and cartridges by the electric gun manufacturers distributing directly to law enforcement agencies or the Army or Air National Guard.

**Credits**
Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-87, HI ST § 134-87

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

---

**End of Document**                           © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Case 1:24-cv-00496-JAO-WRP   Document 48   Filed 03/18/25   Page 261 of 275
PageID.1225

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part V]. Electric Guns (Refs & Annos)

HRS § 134-88

## [§ 134-88]. Storage of electric gun; responsibility with respect to minors

*Currentness*

(a) No person shall store or keep any electric gun on any premises under the person's control if the person knows or reasonably should know that a minor is likely to gain access to the electric gun, unless the person:

  (1) Keeps the electric gun in a securely locked box or other container or in a location that a reasonable person would believe to be secure; or

  (2) Carries the electric gun on the person or within such close proximity thereto that the minor cannot gain access or control of the electric gun.

(b) Any person violating this section shall be guilty of a misdemeanor.

**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-88, HI ST § 134-88
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                          © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part V]. Electric Guns (Refs & Annos)

HRS § 134-89

[§ 134-89]. Carrying or use of electric gun in the commission of a separate misdemeanor

Currentness

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use an electric gun, whether operable or not, while engaged in the commission of a separate misdemeanor; provided that a person shall not be prosecuted under this subsection when the separate misdemeanor is a misdemeanor defined by this chapter.

(b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate misdemeanor; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate misdemeanor.

(c) Any person violating this section shall be guilty of a class C felony.

**Credits**

Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-89, HI ST § 134-89
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document © 2025 Thomson Reuters. No claim to original U.S. Government Works.

 © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part V]. Electric Guns (Refs & Annos)

HRS § 134-90

[§ 134-90]. Carrying or use of electric gun in the commission of a separate felony

Currentness

(a) It shall be unlawful for a person to knowingly carry on the person or have within the person's immediate control or intentionally use or threaten to use an electric gun, whether operable or not, while engaged in the commission of a separate felony; provided that a person shall not be prosecuted under this subsection when the separate felony is a felony defined by this chapter.

(b) A conviction and sentence under this section shall be in addition to and not in lieu of any conviction and sentence for the separate felony; provided that the sentence imposed under this section may run concurrently or consecutively with the sentence for the separate felony.

(c) Any person violating this section shall be guilty of a class B felony.

**Credits**
Laws 2021, ch. 183, § 2, eff. Jan. 1, 2022.

H R S § 134-90, HI ST § 134-90
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document

© 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
 Division 1. Government
  Title 10. Public Safety and Internal Security
   Chapter 134. Firearms, Ammunition and Dangerous Weapons
    [Part VI]. Firearm Industry Responsibility

HRS § 134-101

## [§ 134-101]. Definitions

Currentness

As used in this part:

"Firearm accessory" means an attachment or device designed or adapted to be inserted into, affixed onto, or used in conjunction with a firearm that is designed, intended, or functions to alter or enhance the firing capabilities of the firearm, the lethality of the firearm, or a shooter's ability to hold or use a firearm.

"Firearm industry member" means a person, firm, corporation, company, partnership, society, joint stock company, or any other entity or association engaged in the manufacture, distribution, importation, marketing, wholesale, or retail sale of firearm-related products.

"Firearm precursor part" means any forging, casting, printing, extrusion, machined body, or similar article that has reached a state in manufacture where it may readily be completed, assembled, or converted to be used as the frame or receiver of a functional firearm, or that is marketed or sold to the public to become or be used as the frame or receiver of a functional firearm once completed, assembled, or converted.

"Firearm-related product" means a firearm, ammunition, a firearm precursor part, a firearm component, or a firearm accessory that meets any of the following conditions:

   (1) The item is sold, made, or distributed in the State;

   (2) The item is intended to be sold or distributed in the State; or

   (3) The item is or was possessed in the State and it was reasonably foreseeable that the item would be possessed in the State.

"Reasonable controls" means reasonable procedures, acts, or practices that are designed, implemented, and enforced to do the following:

   (1) Prevent the sale or distribution of a firearm-related product to a straw purchaser, a firearm trafficker, a person prohibited from possessing a firearm under federal or state law, or a person who the firearm industry member has reasonable cause to believe is at substantial risk of using a firearm-related product to harm themselves or another or of possessing or using a firearm-related product unlawfully;

WESTLAW   © 2025 Thomson Reuters. No claim to original U.S. Government Works.    1

(2) Prevent the loss or theft of a firearm-related product from the firearm industry member; and

(3) Ensure that the firearm industry member complies with all provisions of federal or state law and does not otherwise promote the unlawful manufacture, sale, possession, marketing, or use of a firearm-related product.

**Credits**

Laws 2023, ch. 28, § 1, eff. July 1, 2023.

H R S § 134-101, HI ST § 134-101
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

End of Document                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

WESTLAW  © 2025 Thomson Reuters. No claim to original U.S. Government Works.                    2

West's Hawai'i Revised Statutes Annotated
Division 1. Government
Title 10. Public Safety and Internal Security
Chapter 134. Firearms, Ammunition and Dangerous Weapons
[Part VI]. Firearm Industry Responsibility

HRS § 134-102

## [§ 134-102]. Firearm industry members; standards of conduct

Currentness

(a) It shall be a violation of this part for a firearm industry member to fail to comply with any requirement of this part.

(b) A firearm industry member shall:

(1) Establish, implement, and enforce reasonable controls;

(2) Take reasonable precautions to ensure that the firearm industry member does not sell, distribute, or provide to a downstream distributor a firearm-related product that is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety in the State; and

(3) Not engage in any conduct related to the sale or marketing of firearm-related products that is in violation of this chapter.

(c) For the purposes of this part, a firearm-related product shall not be considered abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety based on a firearm's inherent capacity to cause injury or lethal harm.

(d) There shall be a presumption that a firearm-related product is abnormally dangerous and likely to create an unreasonable risk of harm to public health and safety if any of the following is true:

(1) The firearm-related product's features render the product most suitable for assaultive purposes instead of lawful self-defense, hunting, or other legitimate sport and recreational activities;

(2) The firearm-related product is designed, sold, or marketed in a manner that foreseeably promotes the conversion of legal firearm-related products into illegal firearm-related products; or

(3) The firearm-related product is designed, sold, or marketed in a manner that is targeted at minors or other individuals who are legally prohibited from accessing firearms.

**Credits**

Laws 2023, ch. 28, § 1, eff. July 1, 2023.

H R S § 134-102, HI ST § 134-102

Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                   © 2025 Thomson Reuters. No claim to original U.S. Government Works.

West's Hawai'i Revised Statutes Annotated
  Division 1. Government
    Title 10. Public Safety and Internal Security
      Chapter 134. Firearms, Ammunition and Dangerous Weapons
        [Part VI]. Firearm Industry Responsibility

HRS § 134-103

[§ 134-103]. Violations; who may sue; relief

Currentness

(a) An act or omission by a firearm industry member in violation of this part shall constitute an actionable cause of action.

(b) A person who has suffered harm in the State because of a firearm industry member's violation of this part may bring an action in a court of competent jurisdiction.

(c) In addition to any lawsuit filed against a firearm owner pursuant to section 663-9.5, the attorney general or any county attorney or public prosecutor may bring a civil action in a court of competent jurisdiction in the name of the people of the State to enforce this part and remedy harm caused by a violation of this part.

(d) If a court determines that a firearm industry member engaged in conduct in violation of this part, the court may award any or all of the following:

(1) Injunctive relief sufficient to prevent the firearm industry member and any other defendant from further violating the law;

(2) Damages;

(3) Attorney's fees and costs; and

(4) Any other appropriate relief necessary to enforce this part and remedy the harm caused by the conduct.

(e) In an action alleging that a firearm industry member failed to establish, implement, and enforce reasonable controls in violation of section 134-102(b), there shall be a rebuttable presumption that the firearm industry member failed to implement reasonable controls if the following conditions are satisfied:

(1) The firearm industry member's action or failure to act created a reasonably foreseeable risk that the harm alleged by the claimant would occur; and

(2) The firearm industry member could have established, implemented, and enforced reasonable controls to prevent or substantially mitigate the risk that the harm would occur.

(f) If a rebuttable presumption is established pursuant to subsection (e), the firearm industry member shall have the burden of showing through a preponderance of the evidence that the firearm industry member established, implemented, and enforced reasonable controls.

(g) An intervening act by a third party, including but not limited to criminal use of a firearm-related product, shall not preclude a firearm industry member from liability under this part.

**Credits**
Laws 2023, ch. 28, § 1, eff. July 1, 2023.

H R S § 134-103, HI ST § 134-103
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                    © 2025 Thomson Reuters. No claim to original U.S. Government Works.

> West's Hawai'i Revised Statutes Annotated
>> Division 1. Government
>>> Title 10. Public Safety and Internal Security
>>>> Chapter 134. Firearms, Ammunition and Dangerous Weapons
>>>>> [Part VI]. Firearm Industry Responsibility

HRS § 134-104

## [§ 134-104]. Interpretation of part

Currentness

(a) Nothing in this part shall be construed to limit or impair in any way the right of a person or entity to pursue a legal action under any other authority.

(b) Nothing in this part shall be construed to limit or impair in any way an obligation or requirement placed on a firearm industry member by any other authority.

(c) This part shall be construed and applied in a manner that is consistent with the requirements of the United States Constitution and the Hawaii State Constitution.

**Credits**

Laws 2023, ch. 28, § 1, eff. July 1, 2023.

H R S § 134-104, HI ST § 134-104
Current through the end of the 2024 Regular and First Special Session, pending text revision by the revisor of statutes.

**End of Document**                                  © 2025 Thomson Reuters. No claim to original U.S. Government Works.

Exhibit 4

Kevin Gerard O'Grady
Law Office of Kevin O'Grady, LLC
1164 Bishop Street, Suite 1605
Honolulu, Hawaii 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.Com

Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA 92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIJAH PINALES, JUDA ROACHE, ALOHA STRATEGICS LLC DBA DANGER CLOSE TACTICAL, JGB ARMS LLC, SECOND AMENDMENT FOUNDATION, <br><br> Plaintiffs, <br><br> v. <br><br> ANNE E. LOPEZ, IN HER OFFICIAL CAPACITY AS THE ATTORNEY GENERAL OF THE STATE OF HAWAII, <br><br> Defendant | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Civil Action No. 1:24-cv-00496-JAO-WRP <br><br> DECLARATION OF JONELLE P. PINALES |

## DECLARATION OF JONELLE P. PINALES

**COMES NOW**, Jonelle P. Pinales and states as follows:

1. I am a natural person, an adult female, United States of America citizen, resident of the State of Hawaii and County of Honolulu. If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. My son, Elijah Pinales, is a plaintiff in this lawsuit.

3. I legally own firearms in the State of Hawaii.

4. I am aware that under Hawaii law it is illegal to transfer firearms to my son for him to permanently own because he is under the age of 21.

5. But for Hawaii law, I would transfer to him a firearm to permanently own.

6. If Hawaii law is changed to allow for it, I will immediately transfer a firearm to Elijah Pinales, for him to permanently own.

**FURTHER, DECLARANT SAYETH NAUGHT.**

I certify under penalty of perjury that the foregoing is true and correct.

Executed on February 17, 2025.

*Jonelle P. Pinales*

Jonelle P. Pinales

2

# Exhibit 5

## DECLARATION OF SOLEIL ROACHE

**COMES NOW**, Soleil Roache and states as follows:

1. I am a natural person, an adult female, U.S. citizen, resident of the State of Hawaii and County of Honolulu.  If called as a witness in this matter, I would provide the following testimony and I make this declaration based on personal knowledge, except where otherwise stated;

2. My son, Juda Roache, is a plaintiff in this lawsuit.

3. I legally own firearms and ammunition in the State of Hawaii.

4. I am aware that under Hawaii law it is illegal to transfer firearms and ammunition to my son for him to permanently own even when he turns 18 on December 15, 2024.

5. But for Hawaii law, upon my son Juda Roache turning 18, I would immediately transfer him a firearm and ammunition to permanently own.

6. If Hawaii law is changed to allow for it, I will immediately transfer a firearm and ammunition to Juda Roache for him to permanently own.

   **FURTHER, DECLARANT SAYETH NAUGHT**.

I certify under penalty of perjury that the foregoing is true and correct.

   Executed on November _19_, 2024.

   _Soleil Roache_
   Soleil Roache

2