# Exhibit 1

# Infants' Contracts: Law and Policy in the 18th and 19th Centuries

**Richard Austen-Baker and Kate Hunter**[*]

**Abstract:** *Under English law, prior to 1970 young people up to the age of twenty-one lacked the capacity to make binding contracts, subject to certain exceptions. The report of the Latey Committee on the Age of Majority, which had recommended a reduction to age eighteen, was one-sided and, so far as capacity to make contracts was concerned, offered scant evidence as to the motivations of the existing law. The Committee heard evidence from the Church asserting, with no evidence, that such rules were intended to control young people and were there to protect the interests of others. This article argues, especially from analysis of the relevant case law during the 18th and 19th centuries – the principal period of development of English jurisprudence on minors' contracts – that the law's motivation had in reality been to protect infants from themselves and from adults who sought to prey on their naivety and impulsiveness.*

## Introduction

With the coming into force on 1 January 1970 of section 1 Family Law Reform Act 1969, which lowered the age of majority from twenty-one years to eighteen years, the question of infants' contracts effectively disappeared as one of interest to the courts of England and Wales. Since mediaeval times, as Simpson concisely puts it, 'all contracts made by infants

---

[*] Senior Lecturer in Law, Lancaster University Law School and late Associate Lecturer, Lancaster University Law School, respectively. The authors are grateful to Professor David Milman, Lancaster University Law School, for kindly commenting on this article in draft. Any errors, inadequacies or infelicities remaining are, of course, entirely the responsibility of the authors themselves.

were voidable at the option of the infant either at once or on attaining his majority',[1] though the common law developed considerably from the 17th century onwards and Parliament began to legislate with the Infants Relief Act 1874.

It should also be noted that although the change in the contractual status of eighteen-to-twenty-one year-olds coincided with the reduction in the voting age in the United Kingdom from twenty-one to eighteen years, under the Representation of the People Act 1969, the two issues were separate and the one did not follow from the other.

The Latey Committee on the Age of Majority, set up by the Wilson government under the chairmanship of Sir John Latey, which recommended the reduction in a report which can scarcely be regarded as even-handed and critical, referred to evidence received from the Church of England's Board for Social Responsibility, which claimed that the restriction on infants' capacity derived not from any desire to protect young people from possible malign effects of entering unwisely into contracts, but rather as a mechanism of control over them. However, the Board's written evidence to the Committee, cites no evidence whatever for its assertions that '[h]istorically the concept [of an age of majority] is one of property rights in, and power over children, as much as of a duty to protect them'; or that there is a 'legal age of majority imposed for the sole purpose of furthering the interests or serving the convenience… of persons other than the child himself…'[2]  Nor was evidence cited in support of the assertion

---

[1] A W B Simpson, *A History of the Common Law of Contract,* Clarendon Press, Oxford, 1987, p 540. On the question of 'voidability' as opposed to nullity of infants' dealings, and some interesting comparative analysis, see H J  Hartwig, 'Infants' Contracts in English Law: With Commonwealth and European Comparisons' (1966) 15 *ICLQ* 780.

[2] The Board of Social Responsibility of the National Assembly of the Church of England, *Evidence to Committee on the Age of Majority*, March 1966, section 1. Typescript in File BSR/DMSW/MAJ Church of England Record Centre, Lambeth Palace Library.

by Miss P M Claisse, Assistant Secretary to the Board, in oral evidence to the Committee, that if the age of twenty-one were retained as the age of majority 'it would be for the protection of people other than the young'.[3] (It should be said that the Board actually had little to say about contracts in its submission, which was focussed mainly on the issue of the right to marry without parental or judicial consent.)

It will be the argument of this article that it was not the case that the concept of infancy was maintained as an oppressive tool of control over the young or that it was disadvantageous to the young and for the benefit only of others.  Although the law might restrict contractual capacity of different groups for reasons of social or economic control on the one hand, or else from a desire to protect members of the group on the other, it is submitted that the evidence in this instance, at least, points strongly to a policy imperative to protect infants. That it may be necessary to exercise some degree of control in order to protect is not surprising.  After all, a parent wishing to protect her toddler from the dangers of traffic is likely to achieve this result by carefully controlling the child's movements in or near the road: control is the means, but protection is the motive.  The primary motive of the law on incapacity in relation to infants was to protect minors, perhaps 'from themselves', as Duncan Kennedy put it.[4]

We have chosen the eighteenth and nineteenth centuries as the focus of our study because much of the case law on infants' capacity was made during that period and a number of Parliamentary steps in this field were also taken in this time.  We allow ourselves,

---

[3] Committee on the Age of Majority, *Oral evidence given by the Church of England Board for Social Responsibility*, Monday 4 July 1966.  Typescript in File BSR/DMSW/MAJ Church of England Record Centre, Lambeth Palace Library.

[4] Duncan Kennedy, 'Distributive and Paternalist Motives in Contract and Tort with Special Reference to Compulsory Terms and Unequal Bargaining Power' (1982) 41 *Maryland Law Review* 563.

however, some latitude in bringing in authorities falling outside our time-frame where we think it useful, but we stop at the famous case of *Nash v Inman*[5] in 1908, by which time the law may be said to have reached its apogee.

We will begin by very briefly explaining the reasons for the age of majority having been at twenty-one years at all, before examining the law as it was, chiefly under the headings of the concept of 'necessaries', for which infants could make binding arrangements, and of infant employment (actually, another category of 'necessity' so far as the law was concerned, but usefully considered separately for the sake of clarity and digestibility). We hope, thereby, to shed some light on the law's motives in restricting infants' capacity.

### The Age of Majority

Different countries, at different times, have had different ages of majority.  This suggests either some degree of arbitrariness in the setting of a particular age, or that different places and different times have different imperatives to serve.  Of course, both may well be true. What is encompassed within the notion of being 'of full age' also differs from one legal system to another.  Our concern here is, however, with contractual capacity and we will endeavour to avoid straying too far from this.

The Latey Report, already alluded to above, includes an account of how the law developed on this point, but rather than simply refer the reader to the Report, we will summarize that account here.

---

[5] [1908] 2 KB 1.

According to Latey, 'Roman historians state that the barbarians reckoned their young were old enough to carry arms and be counted as grown up at 15.'[6]  Fifteen became the age of majority in Britain and across Northern Europe during the 9th to 11th centuries '…though not specifically linked with fighting ability'.[7]  Changes in the techniques and equipment of warfare, however, led to some revision of views as to when a young man was able to fight. The Normans had developed an approach to mounted fighting, involving heavy armour and heavy swords and lances, which required greater physical development and,[8]

> By the time of Magna Carta the age for those holding in knight service had been raised to 21, and there is strong authority for the view that this was directly linked with the ability to hold up a heavy suit of armour and lift a lance or sword at the same time.

The Report cites Sainte Palaye: 'the profession of arms demanded an ability and strength not to be acquired until the age of 21.'[9]  It goes on to cite Pollock and Maitland to the effect that burgesses and tenants in socage continued to come of age at fifteen, while tenants by knight service did not come of age until twenty-one; however, '…gradually … the knightly majority is becoming the majority of the common law…'[10]

Military tenures were abolished by the Tenures Abolition Act 1660, which also provided that fathers could appoint guardians of their heirs until the age of twenty-one, because otherwise the conversion of military tenancies into socage would have put those

---

[6] *Report of the Committee on the Age of Majority,* Cmnd 3342, 1967, para 38.

[7] Above n 6.

[8] Above n 6.

[9] Above n 6, citing Jean-Baptiste Sainte Palaye de la Curne, *Mémoires sur l'ancienne chevalerie, chevalerie considérée comme un établissement politique et militaire,* Nicolas Duchesne, Paris, 1781.

[10] Above n 6, para 40, citing Sir Frederick Pollock and Frederic William Maitland, *The History of English Law Before the Time of Edward I,* Cambridge, 1895, vol 2, p 438.

heirs into their property at the age of fifteen, with risks that were and are all too obvious.  So, twenty-one years became, by degrees, the age of majority in English law.

The Report goes on to point out that however grotesque it might seem that the age of majority in the Latey Committee's world of jet aeroplanes, lava lamps and mini-skirts should be determined by the weight of armour in Norman England, this did not necessarily mean it was not as good an age as any to set the bar on contractual and other legal autonomy.[11]

### The Law on Infancy

As already indicated, we will divide our discussion on the law relating to infancy in the Long 18th century and the 19th century, into two, accepting that the division of the subject matter is somewhat artificial.  We will begin by considering how the law sought to uphold its general rule in a way that did not make all contracting impossible, in such a way as to create undue inconvenience in the lives of infants and their parents, through the means of the doctrine of 'necessaries'.  We will exclude from that discussion the question of what we might broadly term 'employment contracts', which we will then proceed to discuss separately.  However, it seems apparent that contracts of service or apprenticeship, like contracts made for education or healthcare, were to an extent seen as 'necessary' for the wellbeing of the infant him- or herself (in order to earn a living and/or suitably to occupy their destined place in society), so the principle behind the enforceability of these contracts was not really different, even if the legal rules by which governed that enforceability were. Before concluding, we will also briefly touch on statutory intervention felt necessary from the second half of the 19th century.

---

[11] Above, n 5 at para 46.

'Necessaries'

The origins of the doctrine of necessaries can be traced to the fifteenth century, where it was held that 'when an infant within age has quid pro quo he will be bound by law… when he buys clothes for his body, he will be charged by action of debt, because these things he must of necessity have.'[12] Consequently, items which were deemed to be 'necessary' for an infant, such as clothes and food, were found to bind him at common law.  In cases where an infant was sued for goods supplied on credit, whereof some were necessaries and others not, then where there was an entire contract the infant would be bound by none of it:  *Stocks v Wilson.*[13]

The determination of what amounted to necessaries can essentially be divided into four linked questions: what sort of things could be necessary?; was the infant already provided?; who was to prove which facts?; and what were the respective roles of the judge and the jury?  Obviously, as civil juries began to fall into disuse outside specialist areas, the last question ceased to matter in the form in which we put it, though it would still be relevant on appeal, of course, as determining whether a particular question was a matter of law or one of fact.

We will discuss necessaries under three headings. The first will focus on the subject matter of contract, but it will be seen that it is by no means possible to separate out the four questions entirely as they are often thoroughly mixed together in any one case, so in this section we will discuss the cases in general terms across all four questions where they arise. The second and third headings consider, respectively, the relevance of existing provision, which discusses the position in relation to a defendant who already had ample goods of the

---

[12] (1431) YB Mich 10 Hen VI, fo14, pl 46.

[13] [1913] 2 KB 235.

type in question at the time the plaintiff supplied him or her, and questions of proof.  The discussion under this last heading will consist of a summary of *who* had to prove *what* and *to whom* (judge or jury).

Subject matter of the contract

In *Mackarell v Bachelor*[14] it was held that the decision as to what constituted necessaries was one for the judge. Here, it was held that 'suits of sattin [sic] and velvet cannot be necessary for an infant, although he be a gentleman'.[15] (The infant defendant, who had had £44 worth of clothing, was a gentleman of the chamber to the Earl of Essex, so the plaintiff's case had been, in effect, that this was work-gear.)  We shall see later how the attitude of the courts with regard to such items changed as the meaning of 'necessaries' underwent significant development, particularly in relation to the kind of items which could be deemed 'necessary' to those infants from a higher social class.

Further, in *Aoliffe v Archdale*[16]  it was held that a penal bond executed to pay for food and drink was void. The plaintiff had paid out for these and the infant executed a bond to recompense him in the sum of £10, or £20 in default.  It was held that if the bond had been for the exact amount the plaintiff had paid out for the infant's benefit then it would have been enforceable against the infant, but because of the penalty, the whole bond was bad.  While this finding appears to have been based upon the rationale that a penal bond can never be in a minor's interests, it has been argued that the old cases do not bear this out as the reason for

---

[14] (1597) Cro Eliz 583; Goldsborough 168; 75 ER 1070.

[15] Above n 14.

[16] (1602) Moo KB 680; 72 ER 835.

the apparently well-established rule that infants were not bound by penal bonds.[17] Reeve, for instance, concludes that, in exploring the reasoning that a penal bond is not binding upon an infant as it causes him greater injury, it proved impossible to find 'any judicial decision which establishes such a rule'.[18]  Cases in which the court has concluded that an infant cannot be bound for the execution of a penal bond merely restate the principle, as is so common in old reports, so it is really impossible to state with any confidence what the real basis for the rule was.[19]

The case of *Dale v Copping*[20] in 1610 is another relatively early instance of a ruling on the question of what amounted to necessaries and expanded the scope of authority on what the courts would allow, by finding that a contract to pay for a cure for illness ('falling sickness' or epilepsy in this case) could bind an infant: [21]

> Clearly the action well lieth against the defendant, and this nonage by him alledged by him at the time of the promise made, is not material, for that this shall be taken as a contract, and that to be for a thing in the nature of necessity to be done for him, and the same as necessary as if it had been a promise by him made for his meat, drink, or apparel, and in all such cases his promise is good, and shall bind him.'

The defendant pleaded his infancy in an attempt to avoid being bound by the contract. Williams J dismissed this point and repeated the principle, 'although he were within age at

---

[17] See, Simpson, *Common Law of Contract*, pp 540 and 542.

[18] T Reeve, *The Law of Baron and Femme, of Parent and Child, Guardian and Ward, Master and Servant, and of the Powers of the Courts of Chancery: With an Essay on the Terms Heir, Heirs, Heirs of the Body,* Albany, 1862, p 252.

[19] The question would quickly have become moot anyway, once Chancery began granting relief from penal bonds; the origin of the present-day rule against penalties.

[20] (1610) 1 Bulstr 40; 80 ER 743.

[21] (1610) 1 Bulstr 40 per Williams J at 40.

the time of his promise by him made for such necessaries, and his nonage not at all material, and so in this case here his promise shall as well bind him, as in the other cases, the reason of the law being the same, and this cure being of as great necessity for him'. It is submitted that the finding that a minor ought to be bound for medical treatment is significant in that it is one of the first instances in which the court expanded upon the definition of necessaries since the earliest known instances, in the 15th century. The court seems not to have known of a previous instance of medical treatment being held to be necessary for an infant so as to make his promise to pay for it binding, and the present authors are not able to locate one either. What subsequently became allowed as medical treatment might surprise a modern reader, however. For instance, in *Hart v Prater*[22] a horse was held to constitute a necessary on medical grounds, as the infant had been instructed by a doctor to take exercise on horseback, which must prompt speculation as to whether even the sort of medical treatment considered necessary might vary according to the patient's social and economic position.

*Ive v Chester*[23] gives a further early instance of a case regarding fancy clothing, in this case a very fashionable and expensive cloak and pair of velvet hose, which had been specially made for the minor. The court held that they may constitute necessaries and thus be recoverable on an assumpsit, but such items must be 'necessary and convenient for him… according to his estate and degree'.[24] The court did not allow recovery in this case, but the reason given was that it had not been specially pleaded by the plaintiff that these were necessary for the defendant and this fact was required to be specially pleaded,[25] so we do not

---

[22] (1837) 1 Jur 623.

[23] (1620) Cro Jac 560; 79 ER 480.

[24] Above, n 20, at 561.

[25] Above n 24.

know whether the defendant's 'estate and degree' were such as demanded or warranted so luxurious a wardrobe.

It may be objected that in *Mackarell v Bachelor*[26] it had been held that luxurious clothes could not be necessaries even for a gentleman of the chamber of the Earl of Essex, so that there was some sense of an absolute ceiling on what was 'necessary' for an infant of any estate or degree. However, *Mackarell v Bachelor* had been decided in the 16th century, when there was still some feeling against excess of dress and display even among the upper-classes and sumptuary laws forbidding such excess had still been in force in England, not being repealed until (for most of them) 1603.  In 1800, Lord Kenyon CJ, giving judgment in the case of *Hands v Slaney*,[27] held that the trial judge, Chambre B, at Warwick Assizes had correctly left to the jury the question of whether a livery for the servant of an infant army captain might be a necessary and the jury was entitled so to find:[28]

> [A]s to the other article furnished, namely, the livery, I cannot say that it was not necessary for a gentleman in the defendant's situation to have a servant; and if it were proper for him to have one, it was equally necessary that the servant should have a livery. The general rule is clear, that infants are liable for necessaries, according to their degree and station in life. This defendant was placed in a situation which required such an attendant: therefore, however inclined I am in general to protect infants against improvident contracts, I think that this case falls within the fair liability which the law imposes on infants of being bound for necessaries, which is a relative term, according to their station in life.

---

[26] (1597) Cro Eliz 583; 78 ER 826.

[27] (1800) 8 TR 578; 101 ER 1556.

[28] (1800) 8 TR 578 at 579.

This judgment was relied upon by counsel for the plaintiff in *Peters v Fleming*.[29] This 1840 case concerned a Cambridge undergraduate, the eldest son of a wealthy gentleman and Member of Parliament.  The defendant ran up a bill of some £8.0.6d with the plaintiff jeweller for various rings, pins and a watch-chain.

The jeweller brought suit; the defendant pleaded first that he was not indebted and secondly his infancy; the plaintiff joined issue on the first plea and replied on the second that the items were necessaries for someone of the defendant's 'degree, estate and condition'.  The case came on for trial before Vaughan J and a jury at the Summer Assizes for Cambridgeshire.  Vaughan J left to the jury the question of whether the articles were necessaries and the jury having found that they were, the judge then directed them to return a verdict for the plaintiff for the full amount claimed, but gave leave to the defendant to move to enter a nonsuit.  This was duly done by the defendant's counsel and the case came before Parke, Alderson, Gurney and Rolfe, BB, in the Exchequer of Pleas.  It is interesting to note as an aside that the defendant in this trivial affair of £8.0.6d was represented by no less than Sir William Follett QC, MP, former and future Solicitor-General and future Attorney-General and, according to the plaque below his bust at the Devon and Exeter Institution (he was a son of Exeter, an alumnus of its grammar school and the city's Member of Parliament) 'the greatest advocate of the century'.  Sir William led Mr Biggs Andrews, who had represented the defendant at assizes and Mr Frederick (or Frederic) Gunning, a Cambridge native who was the author of a treatise on the law of tolls.[30] A formidable team, but it did him little good:

---

[29] (1840) 6 M & W 42; 151 ER 314

[30] Frederic Gunning, *A Practical Treatise on the Law of Tolls,* London, 1833.  It is also interesting that Gunning's brother, Francis, was Town Clerk of Cambridge from 1836 to 1840.  Sir William Follett's younger brother, Brent Spencer Follett, QC, MP, became the first Chief Land Registrar from the creation of HM Land Registry in 1862 until his death in 1887.

the court held unanimously for the plaintiff, discharging the rule nisi for a nonsuit.  The judge had been entitled to leave to the jury the question of whether the items were necessaries and the jury were entitled so to find, at least in respect of the watch-chain and the seal-engraved ring and possibly also the two pins.  The finding on the other rings seems to have been regarded as erroneous, but it made no difference to the outcome as far as the court was concerned on this occasion, as the plaintiff could clearly not be nonsuited in the circumstances.

Alderson B commented, in an interruption of the defence argument, that when considering what is a necessary item of dress, this '…may mean those things without which the party would lose caste in society'.[31]  So that breast-pins might be necessaries, though this would be conditioned as to quantity, since '…if twenty breast-pins had been supplied, they could scarcely be necessary'.[32]

In his judgment, Parke B observed that it was 'perfectly clear' that 'from the earliest time down to the present, the word necessaries was not confined, in its strict sense, to such articles as were necessary to the support of life, but extended to articles fit to maintain the particular person in the state, station, and degree in life in which he is'.[33]

Jewellers were concerned again in *Elkington & Co. Ltd* v *Amery,*[34] which involved the supply of engagement and wedding rings, which were found to be necessaries.  In the case of *Jenner* v *Walker*,[35] Cockburn CJ, suggested that jewellery (not engagement or

---

[31] (1840) 6 M & W 42 at 45; 151 ER 314.

[32] Above, n 31.  See further below in the discussion on existing provision.

[33] Above, n 31 at 46-47.

[34] [1936] 2 All ER 86.

[35] (1868) 19 LT Rep (NS) 398.

wedding rings) destined to be presents for a bride were 'very natural'[36] coming from

someone of some thousands a year (albeit that the infant actually only had £700-£1,000 a

year), and would be necessaries, though not the same items intended for some other female.

In the same case, he took the view that a 'blue morocco patent frame betting book with richly

gilt pins' could not be necessary (though perhaps a less opulent betting book might be).[37]

While it was clearly not the Chief Justice's intention to suggest that something being or not

being 'very natural' is the litmus of necessity, it could be urged at least that a wife or fiancée

may feel that such gifts were necessary incidents of the relationship.  There is no difficulty in

taking both the station and degree in life in which the defendant finds himself in general

terms together with some particular circumstances operative at the moment of the disputed

transaction,  for example, an anticipated marriage as in *Elkington & Co v Amery*,[38] or a state

of national emergency as in *Coates v Wilson*.[39]

Conversely, it was held in *Nash v Inman*[40] that fancy waistcoats for an undergraduate

were not necessaries in the particular case.  In reaching this conclusion the Court of Appeal

followed the principle laid down in *Peters v Fleming*, that such items may be appropriate for

the infant if they were suitable to his 'state… and degree in life'.[41] The main basis for the

decision of the court appears to be that the infant's father gave evidence, that was believable

and not contradicted, that his son was amply supplied with clothes, so it was a question,

mainly, of quantity, but  Buckley LJ, focussing on whether 'the goods were suitable to the

---

[36] (1868) 19 LT Rep (NS) 398 at 399.

[37] Above, n 36.

[38] [1936] 2 All ER 86.

[39] (1804) 5 Esp 152; 170 ER 769. This case is discussed further, below.

[40] [1908] 2 KB 1.

[41] (1840) 6 M & W 42; 151 ER 314.

condition in life of the infant',[42] said that the clothing was 'of an extravagant and ridiculous style having regard to the position of the boy'.[43]  (The defendant was the son of a successful architect with a house in Hampstead and a country pile near Havant, and had been educated at Uppingham before going up to Trinity College, Cambridge.)

A similar position was adopted in *Ryder v Wombwell*[44] where 'a pair of solitaires or ornamental studs, worn as the fastenings of the wristbands of a shirt, which…were made of crystals set in gold and ornamented with diamonds, representing a horseshoe in which the nails were rubies'[45] were not necessaries for the infant in the case. Willes J said that,[46]

> The question in such cases is not whether the expenditure is one which an infant, in the defendant's position, could not properly incur. There is no doubt that an infant may buy jewelry [sic] or plate, if he has the money to pay and pays for it. But the question is whether it is so necessary for the purpose of maintaining himself in his station that he should have these articles.

The question for the court therefore, was not whether the infant could afford the items, but rather whether such items were essential to him in his current position in life.  The court held that such extravagant pieces could not possibly be necessary for the infant.

Expensive dinners were similarly regarded as being incapable of constituting necessaries, as we can see in *Wharton v Mackenzie*.[47] Whilst the court in *Wharton* was willing to accept that the young gentleman was of suitable means and standing to host such dinners, Wightman J stated that 'the articles of which this bill is composed cannot be

---

[42] [1908] 2 KB 1 at 8.

[43] At 11.

[44] (1868) LR 4 Ex 32.

[45] At 37.

[46] At 39.

[47] (1844) 5 QB 606; 114 ER 1378.

necessaries if they cannot be supplied without giving credit.'[48] That is a problematic line of argument, since the question of necessary versus non-necessary goods generally *only* arises when the goods or services are supplied on credit. An infant was quite competent to make cash transactions.[49]An infant's contracts were unenforceable as a general rule, rather than void, so disputes only arose where some part of the contract remained executory: invariably in sales of goods cases, this was payment by the infant, so that the seller sued to recover the price of goods supplied on credit and the purchaser pleaded infancy in defence.

It is to the credit of the judges in these cases, however, that often the application of common sense and a more realistic approach seems to prevail over a rigid application of the law. Indeed, such was the reason for disallowing the young undergraduate in *Wharton v Mackenzie* from being held liable for luxury foodstuffs, as Lord Denman CJ explained, 'with respect to the articles here supplied, it is an outrage to common sense to say that they can possibly be necessaries'.[50]

Sometimes, a very particular context might play a role. In *Coates v Wilson*[51] Lord Ellenborough held a military uniform for a volunteer corps to be a necessary as a consequence of the number of men who had enlisted for military service around this time.[52] It was only right that in 'these perilous times' an infant ought to be able to contract for clothing which was essential for duties undertaken 'for defence of the country'.[53]

---

[48] At 614.

[49] See, eg, *Ryder v Wombwell* (1868) LR 4 Ex 32 at 39 per Willes J, quoted above, text at n 46.

[50] *Wharton v Mackenzie*, above n 47, at 612.

[51] (1804) 5 Esp. 152; 170 ER 769.

[52] Around 52,000 men, such as the infant in this case, joined volunteer units around this time: see D Chandler and I Beckett (Eds), *The Oxford History of the British Army*, OUP, Oxford, 2003, p 138.

[53] (1804) 5 Esp 152; 170 ER 769.

Existing provision

The question of *quantity* was also clearly relevant to the question of whether what was
supplied under the contract fell within the category of 'necessaries'. We saw above that this
question was alluded to by Alderson B in *Peters v Fleming* when he observed that a breast-
pin might be a necessary, but twenty breast-pins could not be.[54]  There are numerous
references in the case law to the issue of whether an infant was already sufficiently supplied
and whether this was indeed relevant to whether the goods were necessary.  There seems to
have been doubt about this, on occasion, with one view being that the fact of the infant being
already well-supplied with goods of the same sort was only relevant if the seller knew that
this was so, and that the seller was under no obligation to take steps to find out. It was
suggested by counsel in various cases that it should not be necessary for the tradesman to
make active enquiries.  Such was the argument of the plaintiff's counsel in *Ford v
Fothergill*.[55] In this case a young man's excesses brought the disapproval of Lord Kenyon.
In an assumpsit for work and labour as a tailor, the plaintiff sued the defendant for the price
(not stated in the report) of a coat, waistcoat and two pairs of breeches, ordered by the
defendant for delivery to him at the Grecian Coffee House.  These clothes were in addition to
a great many others supplied by other tailors in an extravagant spending spree.  The
defendant's father had paid various other tailors off that same year, 1793.  At Nisi Prius, the
plaintiff's counsel argued against the suggestion that his client ought to have instituted
enquiries:

---

[54] (1840) 6 M & W 42; 151 ER 314.

[55] (1794) Peake 301; 170 ER 164.

> Mingay, for the plaintiff, contended, that it was not incumbent on the plaintiff to traverse the town to
>
> enquire the defendant's fortune and character.  He came to him as a man of fortune and figure,
>
> introduced and recommended by a gentleman of fortune.  If the plaintiff thought them necessary for his
>
> state and degree, that would maintain the issue.  In the way he appeared to the plaintiff he could not
>
> know but that he had an estate of £500 per annum.

The argument, however, did not find favour with Lord Kenyon CJ, who directed the jury that the plaintiff could and should have made enquiries.  The plaintiff, said Lord Kenyon, ought to have '…gone to [the defendant's] father and enquired of him whether he was in want of these clothes'.[56]  Indeed, the circumstance of the defendant living in a coffee house seemed to his Lordship to be suggestive of an unwary nature (we assume he meant a tendency to extravagance) as well as offering an opportunity of making enquiries both of people at the coffee house and of the boy's father, so that it seemed that the plaintiff perhaps should have been specially on his guard as well as having it more easily in his power to control his risks.  That the jury did not apparently agree with Lord Kenyon does not really affect the view we must take of the law as it then stood, however.  What the case also tells us is, that the question of what was necessary was a matter for the jury, which was also fundamental in *Maddox v Miller*,[57] considered in more detail below.

Further instances can be found over a long period of time.  In *Barnes & Co v Toye*[58] the Divisional Court ordered a new trial on the grounds that the trial judge had erred in directing the jury that it did not matter how many clothes the defendant already had, in considering whether those supplied by the plaintiff tailors were necessaries.  Lopes J drew an analogy with a watch, saying that 'a watch may be prima facie in some cases a necessary, but

---

[56] Above, n 55.

[57] (1813) 1 M & S 738; 105 ER 275.

[58] (1884) 13 QBD 410.

if it turned out that the infant was already supplied with a watch or watches, the one ordered could not be a necessary',[59] and found that the jury were entitled to take into account the fact that the minor may already be sufficiently supplied with the goods when determining whether a particular item was necessary: 'Evidence as to the amount of clothes the defendant possessed at the time when the order relied on was given was admissible, and the jury should have been told that in arriving at a conclusion whether the goods supplied by the plaintiffs were necessaries or not, they should consider whether the defendant was already sufficiently supplied.'[60] This decision seemed to the Divisional Court to involve a dissent from the then recent decision in *Ryder v Wombwell,* but it is not evident that it really did.  In *Ryder* the defendant had been supplied with expensive items of jewellery on credit.  He had a great many other items of the sort.  The Lord Chief Baron at trial had left it to the jury whether the items were of such a type and quality as was necessary to the defendant, given his exalted social position, but directed them to ignore the fact that he had a great many like items already in his possession.  The Court of Exchequer Chamber held that the question of necessary-or-not was one for the jury, but that the judge should withhold the question from the jury if there was not sufficient evidence on which a jury could reasonably reach a conclusion that the items *were* necessary.  The Lord Chief Baron had erred in holding that the defendant's evidence that he already possessed plenty of jewellery should not be considered by the jury, in light of evidence that the plaintiffs had not been aware of this fact.  In so far as this conclusion is concerned, the Divisional Court in *Barnes & Co v Toye*, in finding, as it did, that a defendant was entitled to adduce evidence that he was already well-supplied with

---

[59] At 413.

[60] At 414.

items of the sort alleged to have been necessaries, was not at odds with the Court of Exchequer Chamber in the earlier case.

This view, that the actual existing provision of the defendant was entirely relevant and the trader was on notice that he dealt with an infant on credit at his peril, for if it turned out that the infant was already adequately supplied then the trader could not recover, is amply supported by other authorities over a significant period, for instance, *Bainbridge v Pickering*,[61] *Cook v Deaton*,[62] *Story v Pery*,[63] *Steedman v Rose*[64] and, of course, the extremely well-known case, already mentioned above, of *Nash v Inman*.[65] In this latter case, the court found that the tradesman bringing the claim against the infant had to show, 'first, that the goods were suitable to the condition in life of the infant; and, secondly, that they were suitable to his actual requirements at the time or, in other words, that the infant had not at the time an adequate supply from other sources.'[66]

---

[61] (1789) 2 Black W 1325; 96 ER 776.

[62] (1827) 3 Car & P 114; 172 ER 348.

[63] (1831) 4 Car & P 526; 172 ER 810.  This case is worth reading for the enjoyable facts: the goods supplied by a Jermyn Street tailor were 'A rifle green coat, lined with silk… a pair of royal purple casimere [sic] trousers… a pair of shepherd's plaid trousers…'  The defendant was the infant son (he was supplied when seventeen and eighteen years old) of Lord Glentworth, who was at the time a prisoner for debt in the King's Bench prison. The defendant himself must have been quite a sight, so it is perhaps no wonder that tradesmen saw him coming.

[64] (1824) Car & M 422; 174 ER 572.

[65] [1908] 2 KB 1.

[66] [1908] 2 KB 1 at 9 per Fletcher Moulton LJ. It is notable that this case was decided after the passage of the Sale of Goods Act 1893, but s 2 of the Act (subsequently re-enacted as s 3 Sale of Goods Act 1979) would have had no effect on the decision in *Nash*.

*Dalton v Gib*[67] is a rare instance of the judges finding that the circumstances were such that the trader need not have made enquiries as to the circumstances of the defendant, including her existing sufficiency or otherwise of goods of the description supplied.  In this case, the defendant was a woman of twenty years of age, who lived with her mother rather extravagantly at an hotel in Hanover Square, a fashionable address in London's West End, travelling around the city in a carriage, when in fact the pair were possessed of few funds and the mother was living apart from her husband, who was living in Calais.  The defendant contracted for the purchase of silks to the value of £35 and took some with her in the carriage, which waited outside the plaintiff's shop, with the defendant's mother inside, whilst the rest were delivered to the hotel, again with the mother available to supervise.  All the judges, Tindal CJ, Vaughan, Bosanquet and Erskine JJ, agreed that the usual rule was that the trader dealt with an infant at his own peril and was on notice to make enquiries as to whether the infant was already sufficiently supplied, but that the circumstance of appearing in a carriage, with her mother there when she took some of the goods with her, and living at the hotel *with* her mother, rendered enquiries superfluous.  This does not seem really out of line with the rest of the cases: the general rule is acknowledged and here the only person of whom the tradesman could have been expected to make enquiries was the mother, and she was present both at the shop and the hotel and can be taken to have approved the purchases, implicitly signifying that the additional silks being bought were necessary for her daughter.


Proof

The proper pleading in cases of infant defendants to actions on their contracts, involved the plaintiff pleading the contract and the defendant's indebtedness, the defendant meeting this

---

[67] (1839) 5 Bing (NC) 198; 132 ER 1080.

with a plea that they were not indebted and were not of age and then for the plaintiff to plead that the subject matter of the contract was something that was necessary to the defendant. This fact of the necessary nature of the goods or services supplied had to be specially pleaded, therefore, as we saw in *Ive v Chester*.[68]

The position on the balance between what is a matter of fact and what a matter of law seems to have changed over time. As we have seen, in the sixteenth and early seventeenth centuries, the judges appear to have regarded the whole question of what is necessary for a particular infant as a question of law. Such was clearly the case in *Mackerell v Bachelor*,[69] and also appears to have been the assumption in *Dale v Copping*.[70] Equally clearly, by the end of the eighteenth century the question of 'necessary or not?' had become in some sense partly one for the judge and partly for the jury, as we saw in *Hands v Slaney*,[71] and again later in *Jenner v Walker*.[72] However, the division between judicial competence and jury competence was that the judge had to decide as a matter of law whether there was or was not sufficient evidence adduced upon the basis of which a reasonable jury, properly directed, could possibly conclude that the goods or services were in fact necessary for the defendant.

This point, indeed, had puzzled Cockburn CJ in *Jenner*, because he had only an imperfect account of what had just been decided in *Ryder v Wombwell*,[73] from which he had the impression that the Exchequer Chamber had decided that the question of whether or not an item was necessary was one for the judge. The Chief Justice was somewhat scathing of

---

[68] (1620) Cro Jac. 560; 79 ER 480 at 561.

[69] (1597) Cro Eliz 583; 75 ER 1070. See above, text at n 14.

[70] (1610) 1 Bulstr 40; 80 ER 743. See above, text at n 20.

[71] (1800) 8 TR 578; 101 ER 1556. See above, text at n 27.

[72] (1868) 19 LT Rep (NS) 398. See above, text at n 35.

[73] (1868) LR 4 Ex 32.

the suggestion, arguing that Baron Bramwell, who hated smoking, would find a cigar case not

a necessary, while another judge might find it to be necessary.  Such matters of personal

judgment were best left to a jury in Cockburn CJ's opinion, though he felt bound by what he

had understood the judgment in *Ryder* to have been.[74]

The judge, therefore, had, as we might put it, 'first bite of the cherry', in determining

whether something was capable of being found by a reasonable jury to be necessary. Once he

had decided that goods of the character concerned were capable of being necessaries for the

defendant in the case, it was properly left to the jury (as Lord Kenyon found that Chambre B

had done at Warwick Assizes in *Hands v Slaney*) whether in that particular case the actual

goods supplied were necessaries, which would include the question of whether the infant was

sufficiently supplied already.

The case of *Maddox v Miller*,[75] already alluded to, furnishes a useful illustration of

the extent to which the judge's 'first bite' was sometimes reduced to little more than a lick.

The defendant was the son of a clergyman who lived in Gloucestershire, but the defendant

had been living, at the time of the contracts involved, in Stourport-on-Severn, where he was

employed by a substantial bargemaster at a salary that did not appear in evidence.  In August

1809 he had sent for the plaintiff tailors to attend him at a coffee house (this was mentioned

specifically, in relation to the fact that he had not been introduced to them by his father), and

between then and September 1810 bespoke of him clothes to the value of £18 2s 6d. In

September 1810 he paid £15 towards his outstanding bill and between October that year and

February 1811 was allowed to order further clothes, some extra-deluxe clothes suitable to a

nobleman while others were clothes of the ordinary sort supplied to a gentleman, amounting

---

[74] (1868) 19 LT Rep (NS) 398 at 399.

[75] (1813) 1 M & S 738; 105 ER 275.

to a further £16 4s 6d, giving a total amount owing after that date of £19 7s 0d. At the time of the delivery of the clothes the defendant was an infant.  He was subsequently sued and the case came on at Worcester Assizes before Bayley J and a jury.  The defendant pleaded his infancy and the tailor pleaded in replication that the goods were necessaries.  It was objected that insufficient evidence had been adduced for the plaintiff that the defendant was not already adequately supplied with clothes (or that these clothes were suitable for his state and condition, or what his income was) for the case to go to the jury.  Bayley J, in some uncertainty, nonsuited the plaintiffs (rather ironically).  A rule nisi to set aside the nonsuit having been obtained, the case came before Lord Ellenborough CJ, who made the rule absolute, holding that there was enough to go to the jury.

We saw earlier, in the case of *Ford v Fothergill*[76] that the jury might well go against a strong direction from the judge. Here, Lord Kenyon commented in very clear terms against the failure of the plaintiff tailor to make enquiries as to the position of the defendant and whether the defendant was already sufficiently supplied with clothes. It took a firm-minded jury to disregard the views of the Lord Chief Justice and find in favour of the tailor. This tells us two things. First, it shows that the question of sufficiency of supply was a matter for the jury (and perhaps also that it was difficult at times to disentangle the question of sufficiency from the issue of the plaintiff's duty to enquire, if such a duty truly existed, upon which the foregoing argument has clearly cast doubt).  Secondly, when taken in conjunction with other cases, such as *Peters v Fleming*,[77] in which the jury appears to have found against the weight of judicial opinion (and/or common sense) that luxurious goods were indeed necessary to the defendant and he should be held liable for them, we have an impression that juries, which

---

[76] (1794) Peake 301; 170 ER 164.

[77] (1840) 6 M & W 42; 151 ER 314. See above, n 29 and text thereat.

perhaps included a good many local tradesmen, were not as inclined as the judges were to indulge the weaknesses of apparently well-off youngsters and protect them from themselves. This second factor, moreover, seems to point to the stated reasons of the judges for disallowing claims on infants' contracts, namely the protection of the infants themselves, being indeed the real reason and policy of the law, as this article argues.

## Employment and Training

Contracts for the supply of goods or services on credit are one sort of contract involving an element of futurity or continuing obligation, which therefore raised questions about the capacity of a would-be infant contractor.  They arose quite frequently since infancy lasted into the period in life in which a young person might be an undergraduate, or have entered upon a naval or military career, or be otherwise living separately from his or her parents or guardians.  Infants, however, were also very frequently employed or apprenticed, which also involved contracting with a degree of futurity and therefore also raise the problem of capacity. In this section we will consider how the courts dealt with contracts of this character and see what light that sheds on the question of the law's policy or motivations. (Although the reports appear to contain rather fewer instances of actions brought in relation to these types of contracts.[78])

Before doing so, however, some note of caution must necessarily be sounded, regarding the risks of viewing the past through the lenses of the present.  While infancy lasted until the age of twenty-one so that some of the contracts one is dealing with in relation to

---

[78] One reason might be, in relation to apprenticeships, for example, that disputes were dealt with either informally or else locally, for instance by magistrates under the Statute of Artificers 1563 (5 Eliz I c 4). See also *Gylbert v Fletcher* (1628) Cro Car 179; 79 ER 757.

infants' employment therefore deal with those who would be of employable age today, a great deal of employment and nearly all apprenticeships in the period under consideration here involve those whom we still regard as children.  In the contemporary West, we tend to take it for granted that child labour is a Bad Thing.  The Whig theory of history as applied to young people and work assumes that this is the case and that the unfolding of history over the 18th, 19th and 20th centuries has been, so far as this issue is concerned, the story of an inexorable improvement in the shape of the gradual abolition of child labour and the pushing back of the point (still going on even in Britain) of transition from education to working life.[79]  This was not at all axiomatic to our ancestors, however.  Dorothy George, in her brief but excellent chapter on 'Child Labour and Apprenticeship' in *England in Transition*, notes that Daniel Defoe had regarded high levels of child labour, from as young an age as possible, as his 'chief criterion of prosperity',[80] citing his enthusiastic statement in reference to the district around Halifax that 'hardly any thing [sic] above four years old but its hands are sufficient to itself'[81] and in respect of Norwich that 'the very children after four or five years of age, could every one earn their own bread'.[82]  George likewise cites an American commentator visiting Halifax in 1777 who[83]

---

[79] This process can to some extent be traced through legislation, with the Cotton Mills and Factories Act 1819 establishing a minimum working age for employees and apprentices in cotton mills at nine, increasing to ten by the Factories & Workshops Act 1878, eleven under the Factories Act 1891 and twelve under the Factories & Workshops Act 1901, with subsequent increases since, especially through increases in the age at which a child could leave full-time education.

[80] Dorothy George, *England in Transition*: *Life and Work in the Eighteenth Century,* Routledge, London, 1931 (1953 reprint, Penguin, London), p 117.

[81] Above, n 80.

[82] Above, n 80.

[83] Above, n 80, p 118.

…watched some fifteen children making wire cards for wool-carding 'which employment', he noted in his diary, 'not only keeps their little minds from vice but … takes a heavy burden from their poor parents.' That was the traditional and unquestioned attitude towards the labour of children.

The kindly Parson Woodforde had child servants in his house, as the following reference in his diary for 1779 shows: [84]

Sepbr. 3, Tuesday. […] I hired, Yesterday, one Henry Daines, a Boy of 13. Years old, in the place of Barnard Woodcock, who leaves me at Michaelmas next being too old for his Place & can better himself.  I liked the Boy very well, having an open, honest countenance to all appearances, his Mother who came with him, seemed to be a good kind of Woman & very Motherly.  I gave the Boy, on hiring him 0.1.0.  Dinner to day, rost Beef & Plumb Pudding…

The entry for 13 January 1800 shows that Daines was paid two guineas per annum.[85]  That the children of the labouring classes should be themselves labouring from a young age was not, then, regarded as a matter of regret, rather as part of the ordinary course of things, not only by their employers and by commentators but also by their parents.

There is also a risk in the other direction.  Much child labour was done under articles of apprenticeship.  Apprenticeships tend to be seen today in an extremely positive light.  Paid, on-the-job training for a (usually skilled) future career.  The temptation is to assume that this was the case in the past, when apprenticeships were much more a part of the everyday experience of the vast majority of young people, often gilded by the reflected romantic light of the mediaeval guild system, with its 'mysteries' and its grades of apprentice, journeyman and master.  Such a view is also highly misleading and hazardous to a proper understanding of child/youth labour in our period.  Apprenticeships varied greatly between trades, with apprenticeships to substantial merchants or to professional men being very much educative in

---

[84] James Woodforde, John Beresford, ed, *The Diary of a Country Parson*, OUP, Oxford, 1931, vol 5, p 212.

[85] Above n 84, p 234.

nature, with good conditions for the apprentice and good future prospects (including the possibility in some instances of marrying his master's daughter and eventually taking over the business).  Such apprenticeships, however, came with a hefty fee payable by the apprentice's parents or guardians to the master, which might be £100 for an apprenticeship to a surgeon or as much as £1000 to a great merchant.  At the more usual level for the bulk of the population, a fee of perhaps £5 would be payable on indenturing to a weaver or small-time shoemaker.[86]  George observes that 'with a small fee [the apprentice] would be an unpaid servant; with a large one he would expect to be a pupil.'[87]

Equally, even where the apprentice was mostly an unpaid servant, the arrangement was not necessarily all that advantageous to the master, either.  George notes that,[88]

> [A]t the beginning the child was a nuisance, he spoiled material, he needed supervision, his appetite was large.  The master expected to be repaid for the unprofitable early years when the boy (or girl) had learned his trade.  But as soon as this happened, the apprentice seldom failed to resent having to work for his master without pay and, it should be remembered, for an unlimited number of hours a day.

This often led to apprentices behaving badly and spoiling work deliberately to induce the master to agree to cancel the indentures.  A not infrequent thing, such was the burden of a young apprentice, was for the master deliberately to mistreat the boy so as to force him to abscond. This was of course of no concern to the master, who simply recruited another young apprentice – and, naturally, the fee that went with it.[89]

---

[86] George, above n 80, p 118.

[87] Above, n 86.

[88] Above, n 80, p 119.

[89] Above, n 88.

At the lowest end of the scale, there were apprenticeships to trades so undesirable that no fee was payable at all, or else the master paid the parents. Bottom of the pile was the chimney-sweep's apprentice, the pitiable 'climbing-boy', for whom families themselves were paid by the masters. Sometimes, such was the difficulty in finding a boy to do this work, large sums changed hands. Lane writes of a young boy who 'claimed to have been kidnapped by a "little hunchbacked gentleman" who offered his mother £100 for him'.[90]

It was not only boys who undertook apprenticeships. Although less common, girls were quite often apprenticed; though given the limited number of positions in which a woman could work, young girls who completed apprenticeships often did so in more menial occupations. Indeed, it has been recorded that 'of one girl bound at Norwich in 1653, it is said that she was to be educated in housewifery for seven years'.[91] Dorothy George, commenting on how thin the pretence of teaching a trade often was, also cites the case of 'a little girl [who] was bound as the drudge of a family of street hawkers living in a single room in a slum' whose indentures of apprenticeship provide that she should be 'taught the art of housewifery'.[92]

Poor children, dependent on the parish, were in a different and usually worse situation. For such children apprenticeships were compulsory, as George explains, 'under the Elizabethan Poor Law the children of poor parents were to be apprenticed by being billeted compulsorily upon the ratepayers of the parish to be farm servants or household servants, the

---

[90] See J Lane, *Apprenticeship in England, 1600-1914,* Routledge, London, 1996, p 9, quoting James Dawson Burn, *The Autobiography of a Beggar Boy*, London, 1856, reprinted, Europa Publications, London, 1978, p 59.

[91] O J Dunlop and R D Denman, *English Apprenticeship and Child Labour: A History*, T Fisher Unwin, London, 1912, p 153.

[92] George, above n 80, p 121.

boys till they were twenty-four, the girls till twenty-one or marriage'.[93] From the Poor Relief

Act 1691 onwards, serving as an apprentice for at least 40 days established a right of

settlement in the parish where it was served, meaning that parish officers were incentivized to

indenture poor children to masters in another parish, because they thereby got permanently

rid of them as possible claimants on their own parish's poor rate.  While masters in a child's

own parish were obliged to accept poor apprentices, those in other parishes were not, so

parish officers would have to pay the master in another parish, usually £5.  The payment

seems to have been considered well worth it.[94]

      It is clear then, that when we speak of apprenticeships; we are referring to all manner

of different arrangements, some of which were of benefit to the infant, others distinctly and

sometimes egregiously exploitative. The contract was a regulated one, however, in the sense

that where a master complained of an unruly or peculiarly ham-fisted apprentice, or an

apprentice complained that he was not been taught a trade or was not correctly treated (which

might be brutality, or might be, for instance, failing to supply the apprentice with proper

clothing), either party might complain to Quarter Sessions and seek the cancellation of the

indentures. Dorothy George cites the example of William Adams, who was apprenticed to a

carpenter but complained to Quarter Sessions that he was not being taught that trade but

instead had been made to 'drive children about at fairs for half-pence in a little cart drawn by

---

[93] Above n 80, p 124. After 1778 apprenticeships for boys, too, finished at twenty-one.  The age of
commencement was generally around seven years old, meaning that a parish apprenticeship was typically
fourteen years in duration, compared with the normal trade apprenticeship of seven years for trades recognized
as existing at the time of the Statute of Artificers 1563 and varying but shorter periods for newer trades and
skills.

[94] See generally, George, above n 80, especially 124-5.

dogs' and that his master instead of supplying him with clothes had taken the clothes he already had from him and pawned them.[95]


The Law on Apprenticeships

The law was that an infant could be bound to a contract of apprenticeship, but that this was conditional on it being, looked at in the round, beneficial to the infant. Such a contract could not be enforced against the infant in an action for breach of the contract. Rather, as between the apprentice and the master, a status relationship was created, which was regulated by statute and common law. That said, it was still a contract and a third party inducing the apprentice to breach the terms of their indentures was open to action for inducing breach of contract. All of this can be gathered from the judgment of Fry LJ, sitting as an additional judge of the Chancery Division, in the celebrated case of *De Francesco v Barnum & Others*,[96] familiar still to law students as an authority against specific performance of contracts of personal service.

Briefly, De Francesco ran a highly reputed dance school in London. He brought an action against P T Barnum, the famous impresario, a theatrical agent named Signor Parravicini, employed by Barnum to engage ballet-dancers for him, two infants, Ada and Helen Maude Parnell, De Francesco's apprentices, and Mrs Elizabeth Parnell, mother of the two girls. He began by moving in the Chancery Division for an injunction restraining the defendants from breaches of the apprenticeship indentures. These indentures were both entered into on 6 December 1886, when Ada was twelve years old and Helen Maude was

---

[95] George, above n 80 p 122.

[96] (1890) 45 Ch D 430.

fourteen. The two deeds were in the same terms. They bound the girls as apprentices for seven years in, mostly, the usual terms as to obedience to the master, and so on. But they had some unusual aspects. The master was only to pay them anything if he used them for a performance. He was under no obligation to provide any work for them (though he was obliged to provide instruction). So they had no guarantee of any kind of income. He was not liable for maintaining them in any way. He was free to take them anywhere in the world, away from maternal care and out of the jurisdiction. He could terminate the contract in each case at any time 'after a fair trial' on grounds that the girl in question was unsuited to the career. There was no corresponding right of termination by the girls or their mother. The girls, even when not employed by De Francesco, could not take other work without his written permission. Neither could they marry. Breach of any of the terms entitled De Francesco to terminate and claim liquidated damages in the sum of £50.

Chitty J, hearing the motion for injunctions, refused them. He held that without going into the question of whether or not the contracts were beneficial to the infants, he had to consider himself bound by the case of *Gylbert v Fletcher*,[97] decided by the King's Bench (Hyde CJ, Jones, Whitlock and Croke JJ) in the reign of Charles I, which states that:[98]

> [A]lthough an infant may voluntarily bind himself an apprentice, and if he continue apprentice for seven years may have the benefit to use his trade, yet neither at the common law nor [by statute] shall the covenant or obligation of an infant for his apprenticeship bind him. But if he misbehave himself, the master may correct him in his service, or complain to a justice of the peace to have him punished, according to the statute. But no remedy lieth against an infant on such a covenant…

He noted that this case had been unchallenged authority ever since and was cited by the leading textbook writers, so he was unwilling to consider on an interim application whether

---

[97] (1628) Cro Car 179; 79 ER 757.

[98] At 179-180.

the authority might be overruled.[99] After this, the Plaintiff ceased to seek any remedy against the infants and the matters to be considered at trial by Fry LJ concerned the question of whether the adult parties could be sued for inducing breach of contract.  If there was a valid contract, then it was clearly possible that Mrs Parnell, insofar as she co-operated in the engagement of the girls to perform for Mr Barnum at Olympia,[100] and Mr Barnum and his agent Sgr Parravicini, insofar as, and from the time, they were aware of the relevant term of the indentures, could be liable for inducing breach.  Fry LJ did not have to go so far as deciding the facts, because he decided that the indentures themselves were void.  Although he noted the reputability of the plaintiff's school, that the training might well be valuable and perhaps the best to be had in dancing, that the indentures were in some ways enlightened as with their provisions in relation to education, he held that, judged all in all, they were not in the girls' interests.  The provisions described above as 'unusual' were highly one-sided.  Although every contract would contain some terms favourable to one party only and some to the other party, the balance here was very heavily in De Francesco's favour, to the extent that the deeds viewed in the round, and acknowledging that the arrangements would provide the girls with the means in due course of getting their living, were not to the net benefit of the infants.[101]

---

[99] (1889) 43 Ch D 165 at 171-2.

[100] This must have been for 'P T Barnum's Greatest Show on Earth', which opened at Olympia, London on Monday 11 November 1889.  The infants in the case were presumably hired for the *corps de ballet* in the second half of the evening's entertainment, wholly devoted to 'Imre Kiralfy's Stupendous, New and Original Historical Romantic Spectacle of "*Nero; Or The Destruction of Rome*"', which included 'Superb Festal Dances'. (Connecticut Digital Archive, accessed on 9 June 2018.)

[101] (1890) 45 Ch D 430 at 443.

The rule that the covenants of an apprenticeship could not be enforced by action against an infant did not apply to mere contracts of employment, into which an infant might also enter.  This is evident from Chitty J's discussion on the motion for injunctions in *De Francesco v Barnum* of the case *Fellows v Wood*.[102] This being urged on him by counsel for De Francesco as an instance of the granting of an injunction for breach of an infant's contract with his master.  Chitty J explained that in this case it appeared that not only was the defendant not an infant when his former master had sought an injunction to restrain him from taking his customers, having left his service without notice and in breach of contract both as to notice and as to non-competition, but also that this 'was not a contract of apprenticeship; it was a mere contract of service'.[103]

Contracts of service

The position with contracts of service was also that infants were free to enter into such contracts which, unlike indentures of apprenticeship, were enforceable at law and in equity.[104]  Nevertheless, such contracts were only binding on an infant if they were of net benefit to him or her, which was also true of contracts incidental to employment contracts. *Clements v London & North Western Railway Co.*[105] concerned a boy's employment with the defendant railway company.  On joining the company's service, he also signed up to an

---

[102] (1888) 59 LT (NS) 513.

[103] (1889) 43 Ch D 165 at 174.

[104] Though Dorothy George observes that '[c]hild labour in those days was generally undertaken under indentures of apprenticeship': George, above, n 80, p 118 and generally, chapter VII.

[105] [1894] 2 QB 482.

insurance scheme, which would pay out in the event of an injury, whether or not the fault of

the employer (only provided it was not the result of gross negligence on the part of the

insured). The employee contributed to the scheme from his wages, on a scale, and the

employer also made a contribution. The scheme provided that the employee, in joining the

scheme, agreed to waive any claim against the employer in respect of personal injury in the

course of his employment. It was held that, in deciding whether the contract was binding

upon the infant, 'the answer to this proposition depends on whether, on the true construction

of the contract as a whole, it was for his advantage'.[106] Lord Esher held that where a contract

is of benefit to the infant, it will be binding upon him. His Lordship came to the conclusion in

this case that as 'the risk of non-success owing to difficulty of proof, and the risk of obtaining

but small advantage from a successful action, are both obviated by this agreement, under

which, even if it is clear that there is no legal claim which could be enforced against the

company, he is still entitled to compensation',[107] the infant therefore must derive some

benefit from the contract and so ought to be held bound by it. The converse also follows as

A.L. Smith LJ explained, stating that it would be 'unfair that he should be bound by it'[108] if it

were not benefiting him in any way.


Conclusions

So, we submit it can be fairly stated that whatever the rigours of a rougher-mannered age,

when child labour was not only rife but generally seen as desirable or an inevitable part of

life, we nevertheless see, at least when the higher courts become involved, a high bar being

---

[106] At 489.

[107] At 490.

[108] At 495.

set by the courts for contractual validity, the yardstick of which is benefit to the infant. Indentures of apprenticeship are struck down as void if not, on balance, beneficial to the infant. Contracts of service are less common for infants, as infant labour is mainly engaged under at least the guise of apprenticeship, but these contracts, too, and contracts ancillary to them, are subject to a test of net benefit. The broad conclusion the authors feel entitled to draw is that although the times were much harsher on the young than we care to contemplate today, and society generally less protective of children, the law itself, when called upon (which might only be possible, admittedly, for those with family, friends and financial resources), was paternalistic in its outlook and astute to weigh contracts of this sort and see whether they really were overall to the benefit of the infant.

### Statutory Intervention

Whilst common law principles afforded protection to infants buying goods and services on credit and in relation to training and employment, the law surrounding the repayment of a loan and moneys owed was less than satisfactory, having undergone little development, save that penal bonds were unenforceable against infants even before they were rendered generally void.

It was doubtless commoner for an infant to require food, lodging, clothing, education or employment than to need to borrow money, so it makes sense that a more developed jurisprudence should have evolved in relation to the former transactions. However, the changing nature of the contracting landscape of infants saw the need to increase regulation with regard to the lending of money to an infant. Mitchell Henry MP, who introduced the Infants' Contracts Bill, which was to become the Infants' Relief Act 1874, referred the House

to 'the extent to which the money-lenders' conspiracy was carried on against young men and boys by the issue in extraordinary numbers of circulars and letters tempting them to borrow money'.[109] Such letters were sent to boys at boarding schools with a view of encouraging them to borrow money, with the result that young men were burdened with debts that they could not possibly repay. In an attempt to resolve this, the bill sought to protect 'a young man who had been inveigled into the money-lender's den…'[110]

Clause 1 provided that:

> All contracts, whether by specialty, or by simple contract, henceforth entered into by infants for the repayment of money lent or to be lent, or for goods supplied or to be supplied (other than contracts for necessaries), and all accounts stated with infants, shall be absolutely void.

while clause 2 prevented ratification and any retrospective enforcement of debt, once the infant became of full age:

> No action shall be brought whereby to charge any person upon any promise made after full age to pay any debt contracted during infancy, or upon any ratification made after full age of any promise or contract made during infancy.

Consequently, a lender would be unable to collect if he contracted with an infant, irrespective of any enquiries he may make as to age and any misrepresentation made by the infant in that regard.  The legislation clearly benefited the improvident infant, but it was seen by some as imposing too severe a restriction on tradesmen. Sir Massey Lopes MP questioned whether money-lenders were really that greater a risk to infants than a shopkeeper who, for example, sold goods to an infant knowing that he was not of full age, 'were there not other classes

---

[109] HC Deb 25 June 1873 vol 216 cc 1374-8, 1374.  This trend, no doubt, owed its origins to the institution of a (relatively) cheap, nationwide prepaid postal service in January 1840.

[110] Above, n 109.

quite as bad – the unscrupulous shopkeepers, for example, who persuaded young men to order goods they did not want and could not pay for'.[111] In spite of these objections the bill passed into law.  After much criticism, particularly of the difficulties of interpretation of the words 'absolutely void' (did this make it impossible for the infant to enforce such a contract for his own benefit?) the Act was repealed by s 1 of the Minors' Contracts Act 1987.  In any event, the Act seems not to have solved the actual problem that had led to its introduction, *viz.* unscrupulous lenders targeting boys at public schools, because the issue of sending circulars to children, either promoting betting or offering loans, resulted in further legislation less than twenty years later. The Betting and Loans (Infants) Act 1892 made it illegal knowingly to send communications to infants inciting them to gamble or to borrow money. Knowledge of the recipient's infancy was rebuttably presumed by  s 3 if the communication was sent to 'any person at any university, college, school or other place of education'. Penalties included fines and/or imprisonment, 'with or without hard labour'.

The Latey Report recommended that the Infants Relief Act be repealed, which received support from academic commentators, for example Downey, who wrote that 'the recommendations of the Committee on infants' contracts could usefully be implemented without delay, if only to get rid of the thoroughly unsatisfactory Infants Relief Act 1874'.[112] However, whilst the 1969 Act effected the reduction in the age of majority, it left the Infants Relief Act 1874 untouched. The Minors Contracts Act was enacted on 9 April 1987 and, as already noted, repealed the Infants Relief Act 1874 and also repealed the Betting and Loans (Infants) Act 1892.

---

[111] HC Deb 25 June 1873 vol 216 cc 1374-8, 1376.

[112] B Downey, 'Report of the Committee on the Age of Majority' (1968) 31 *MLR* (1968) 429 at 435.

**Conclusions**

As explained in the Introduction to this article, the question of 'for whose benefit did infants

lack full contractual capacity?' has been a contested one. The Latey Committee observed

that the then age of full capacity, twenty-one years of age, was arbitrary, but not necessarily

wrong. The committee had received and noted in its Report, however, evidence from the

Church of England's Board for Social Responsibility (which it is fair to say probably enjoyed

more influence in the mid-1960s than today), that limits on the capacity of young people were

not for their benefit, were for the benefit of others and were motivated by the desire of others

to control the lives and actions of young people.[113] The Report goes on in the following

paragraph to state that this 'is strongly supported by the evidence',[114] for which the

committee cites, actually, no evidence and evidence for which is completely lacking in the

Board's submissions. On the other hand, as we have seen, the judges deciding cases

regarding contractual capacity, spoke quite distinctly in terms of protecting those same young

people, whether from tradesmen on the make, or exploitative masters in the workplace, or

just generally from themselves. The legal realism of the 20th century has taught us to be

sceptical of the language of judgments; to avoid assuming that a case had the outcome it did

for the reasons stated by the judge. The present authors have had this 'opinion scepticism'[115]

very much in mind. We nevertheless feel forced to the view that the opinion put to the Latey

Committee that the laws on infants' capacity were framed and administered not in their

interests but to control them in the interests of others, was not only (as already observed)

unsupported by any evidence offered at the time, but ran contrary to the evidence we have

---

[113] *Report of the Committee on the Age of Majority,* Cmnd 3342, 1967, para 48.

[114] Above, n 113, para 49.

[115] For a discussion of this concept, see Karl Llewellyn, 'Some Realism about Realism: Responding to Dean
Pound' (1931) 44 *Harvard Law Review* 1222 at 1236-8.

found in more than two centuries' worth of case law and, incidentally in the late-19[th] century legislation.  Not only is the judicial rhetoric one of protection of infant parties, but the outcomes in terms of directions given by judges are strongly and consistently so.

As the law on necessaries became both more developed and more nuanced by social standing and wealth, we see a lessening of the absoluteness of protection given to infants, in favour of some concession to tradesmen, but it is gradual and always seems reasonable, provided it is seen in a sufficiently richly textured social-historical context (and this is important).  And if one distinguishes between directions given by judges from verdicts given by juries, often made up as they were of local tradesmen, then the desire of the judges to protect infants from both their own youthful susceptibility and improvidence and the rapacity of tradesmen bent on profiting from those qualities in their customers, becomes all the more marked.  Some of the cases can be seen in terms of a contest between a judge protective of the infant defendant and a jury protective of the interests of the plaintiff businessmen.

We have no hesitation in concluding that, put shortly, the law's motive in limiting infants' contractual capacity was firmly rooted in a genuine desire to protect the young; to keep youthful indiscretion and improvidence or (especially in the case of apprenticeships or contracts of service) mere vulnerability, from ruining their adult lives.

Today, the question of the contractual capacity of young persons has to a large extent dropped off the lawyer's and the jurist's radars, since majority and full contractual capacity is attained at an age when the young person is almost certain still to be living under the parental roof.  Whether the world of e-commerce, 'smart phones', 'in-app purchases', social media devoted to the marketizing of young people's interactions and data, will offer a challenge to the current situation in this regard is a matter for speculation. There are those who press for the voting age to be reduced.  If it is, then should we also say, 'if they're responsible enough

to vote, they are responsible enough to be bound to other decisions, for instance to obtain

credit'?  If this is debated and there is one day a successor to the Latey Committee, then, in

the submission of the present authors, its members should be advised that the law has always

protected the young from the ill consequences of bad decisions so far as it can, in the

contractual field.  The controls that are there are not controls for the sake of control but for

the sake of welfare.  In the policy world of the 'vulnerable consumer', history shows us that

one vulnerable group, at least, has always had protection and we should be careful not to cast

that aside on the basis of mere supposition and fashionable sentiment.[116]

---

[116] The point that new technologies may be a cause for re-examining the position has not been entirely missed,

however, see V Slade, 'The Infancy Defense in the Modern Contract Age: A Useful Vestige' (2011) 34 *Seattle

University Law Review* 613, which cites other interesting work in the United States relating to this question,

which is strictly beyond the scope of the present article.