# Exhibit 4

 

DATE DOWNLOADED: Sun Mar 30 16:17:49 2025
SOURCE: Content Downloaded from *HeinOnline*

Citations:
Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

Bluebook 21st ed.
English Reports Full Reprint Vol. 101 - King's Bench .

ALWD 7th ed.
. English Reports Full Reprint Vol. 101 - King's Bench .

APA 7th ed.
English Reports Full Reprint Vol. 101 King's Bench. .

Chicago 17th ed.
English Reports Full Reprint Vol. 101 - King's Bench. , .

McGill Guide 10th ed.
English Reports Full Reprint Vol. 101 - King's Bench, (: , )

AGLC 4th ed.
English Reports Full Reprint Vol. 101 - King's Bench (.,

MLA 9th ed.
English Reports Full Reprint Vol. 101 - King's Bench. , . HeinOnline.

OSCOLA 4th ed.
English Reports Full Reprint Vol. 101 - King's Bench. , .            Please note: citations are provided as a general guideline. Users should consult their preferred citation format's style manual for proper citation formatting.

-- Your use of this HeinOnline PDF indicates your acceptance of HeinOnline's Terms and
  Conditions of the license agreement available at
  *https://heinonline.org/HOL/License*
-- The search text of this PDF is generated from uncorrected OCR text.

[577] Clarke and Reader in support of the rule. The two last-cited cases do not apply, because the defendants there had received the money merely as servants to the principals, and therefore were not at liberty to dispute that they had received it to their use. But this is a question between the parties themselves to the illegal contract, and therefore either of them is at liberty to dispute the consideration at any time. In *Lacaussade* v. *White* (a)[1] it was contended that however the illegal contract might be vacated and the deposit money recovered back at any time before the event happened, yet it was not competent for either party first to take the chance of success, and after the event was decided against him then to rescind the contract, and recover back what he had before deposited: but the Court held that it was more consonant to sound policy and justice to permit the money paid upon an illegal consideration to be recovered back, even after the event was determined, than by denying the remedy to give effect to the illegal contract. Where the consideration is illegal, it is no objection to the plaintiff's right to recover that the money has been paid over to the other party, as was holden in *Smith* v. *Bromley* (b): there, money had been advanced by the plaintiff to an agent to obtain the signature of a creditor to a bankrupt's certificate, which was paid over to the creditor. The Court held, that though no action would lie to recover it back from the agent of the creditor who had paid it over to his principal without notice, yet that it might be recovered back from the creditor himself.

Lord Kenyon, Ch.J.—The ground on which the action was maintained in the last-mentioned case was, that the money had been paid under a species of duress and oppression, and the parties were not in pari delicto. But there is no case to be found where, when money has been actually paid by one of two parties to the other upon an illegal contract, both being participes criminis, an action has been maintained to recover it back again. And the authorities which have been referred to of the two learned Judges in the Court of Common Pleas, are in favour of the defendant's right to retain the money so paid. Here the money was not paid on an immoral, though on an illegal, consideration; and though the law would not have enforced the payment of it, yet, having been paid, it is not against conscience for the defendant to retain it. This is very different from the case of *Lacaussade* v. *White*, where the money [578] was recovered from the stakeholder before it had been paid over.

Lawrence, J.—In the case of *Smith* v. *Bromley*, Lord Mansfield said, that, where both parties are equally criminal against the general laws of public policy, the rule is potior est conditio defendentis.

Per Curiam. Rule discharged.

HANDS *against* SLANEY. Saturday, May 17th, 1800. An infant, a captain in the Army, is liable to pay for a livery ordered for his servant, as necessaries, but not for cockades ordered for the soldiers of his company.

On the trial of this action for goods sold and delivered, before Mr. Baron Chambre at the last assizes at Warwick, it appeared that the goods in question were a livery for the defendant's servant, who was a captain in the Army, and cockades for some of the soldiers belonging to his company, which were furnished by the plaintiff at the defendant's request. The defendant, who was a minor, relied upon his infancy, insisting that the goods in question were not within the description of necessaries; for which only he was liable. But the learned Judge left it to the jury to consider whether the livery for a servant were not necessary and suitable to the defendant's degree, and the cockades a necessary expence incidental to his situation; and the jury, being of opinion that they were, found a verdict for the plaintiff.

Clarke and Reader on a former day obtained a rule, calling upon the plaintiff to shew cause why there should not be a new trial; which rule they were now required to support. They said that the only cases in which actions had been maintained against an infant, were for necessaries either for himself or his wife (a)[2]; but none had gone the length of deciding that he was liable for the maintenance or clothing of a servant; nor was it necessary that the defendant should have had a servant;—much less can he be liable for cockades under the description of necessaries for himself, which were for the use of the troops under his command.

---

(a)[1] Ante, 7 vol. 535.                                                    (b) Dougl. 696 n.
           (a)[2] Vid. *Turner* v. *Trisby*, 1 Stra. 168.

Perceval was to have shewn cause against the rule.

Lord Kenyon, Ch.J.—The cockades cannot be considered as necessaries for the defendant, and ought not to have been included in the damages; though it cannot be worth the de-[579]-fendant's while to be at the expence of another trial to apportion the damages. But as to the other article furnished, namely, the livery, I cannot say that it was not necessary for a gentleman in the defendant's situation to have a servant; and if it were proper for him to have one, it was equally necessary that the servant should have a livery. The general rule is clear, that infants are liable for necessaries, according to their degree and station in life. This defendant was placed in a situation which required such an attendant: therefore, however inclined I am in general to protect infants against improvident contracts, I think that this case falls within the fair liability which the law imposes on infants of being bound for necessaries, which is a relative term, according to their station in life.

Per Curiam. Rule discharged;

The plaintiff's counsel agreeing to strike out the amount of the cockades.

Doe, on the demise of Ryall, *against* Bell and Others. Tuesday, May 20th, 1800. By a devise of "all my copyhold estates situate in A. and which I became entitled to on the decease of my father," copyhold estates do not pass which the devisor's father had surrendered to him in his lifetime, though the father retained the possession of them to the time of his death, which happened prior to the will made by the son; there being other copyhold of the son answering the description in the will.

On the trial of this ejectment, which was brought to recover certain copyhold premisses called Reads and Greens, in the parish of Gillingham, before Mr. J. Lawrence at the last Dorchester Assizes, a special case was reserved for the opinion of this Court.

E. Read being seised of the two copyholds called Reads and Greens, surrendered the former on the 22d of April 1774, and the latter in June 1777, to his son W. Read in fee, who was accordingly admitted. W. Read being seised of these two copyholds, and also of two other copyholds in Gillingham, called Maddocks and Langham, which two last were devised to him by his late father E. Read, all of which he had previously surrendered to the use of his will; and being also seised of a freehold and possessed of a leasehold estate in Gillingham, both of which last were also devised to him by his late father by will, dated March 9th, 1798, devised thus: "As to, for, and concerning all my freehold, copyhold, and leasehold estates situate in the parish of 'Gillingham, and which I became entitled to on the decease of my father;' and also my estate at Motcombe which I purchased of Oliver; and also my freehold estate in Buckhouse Weston which I purchased of Mrs. Masters, having [580] previously surrendered all my said copyhold messuages, lands, &c. to the use of my will, I give and devise the same to (the defendants) W. Bell, E. H. and W. W. their heirs, executors, &c. to the uses and upon the several trusts therein expressed;" which uses were to secure an annuity of 100l. to W. Ham, with a power of distress. The will then proceeded thus: "And I do further give and devise to the said W. Ham all that my mansion-house, &c. together with the home-field and the field called way ground, at Langham, for the term of his life; and subject to the payment of the said annuity of 100l. to the said W. Ham, and also to the life-estate of the said W. Ham of and in the said mansion-house, lands, and premisses, before mentioned to the use of the said W. Bell, E. H. and W. W. and to the survivor, &c. and the heirs, executors, &c. of such survivors in trust for all and every the child and children of the said W. Bell," &c. &c. The mansion-house, and the home-field, and way-ground are part of the copyhold called Reads. The premisses charged by W. Read's will, with the annuity to W. Ham, are of sufficient annual value to pay the said annuity, even if the two copyholds called Reads and Greens be not comprized in the devise to the defendants. Edward Read, who was a farmer, continued to occupy so much of the copyhold premisses, so by him surrendered to his son Wm. Read, as were not let off after the said surrenders, in the same manner as he had done before until his death, which happened in 1799; and his son W. Read lived with and assisted him in his business. Ann Read, who for some years after the said surrenders rented a house, part of Read's copyhold, paid rent to E. Read the father whilst