# EXHIBIT 7

# Blackstone's Commentaries with Notes of Reference (1803)

ST. GEORGE TUCKER

VOLUME 2, CHAPTER 16

**Of Parent And Child**

THE next, and the most universal relation in nature, is immediately derived from the preceding, being that between parent and child.

CHILDREN are of two sorts; legitimate, and spurious, or bastards: each of which we shall consider in their order; and first of legitimate children.

I. A LEGITIMATE child is he that is born in lawful wedlock, or within a competent time afterwards. "*Pater est quem nuptiae demonstrant*", is the rule of the civil law;[1] and this holds with the civilians, whether the nuptials happen before, or after, the birth of the child. With us in England the rule is narrowed, for the nuptials must be precedent to the birth; of which more will be said when we come to consider the case of bastardy. At present let us inquire into, 1. The legal duties of parents to their legitimate children. 2. Their power over them. 3. The duties of such children to their parents.

1. AND, first, the duties of parents to legitimate children: which principally consist in three particulars; their maintenance, their protection, and their education.

THE duty of parents to provide for the maintenance of their children is a principle of natural law; an obligation, says Pufendorf,[2] laid on them not only by nature herself, but by their own proper act, in bringing them into the world: for they would be in the highest manner injurious to their issue, if they only gave the children life, that they might afterwards see them perish. By begetting them therefore they have entered into a voluntary obligation, to endeavor, as far as in them lies, that the life which they have bestowed shall be supported and preserved. And thus the children will have a perfect right of receiving maintenance from their parents. And the president Montesquieu[3] has a very just observation upon this head: that the establishment of marriage in all civilized states is built on this natural obligation of the father to provide for his children; for that ascertains and makes known the person who is bound to fulfil this obligation: whereas, in promiscuous and illicit conjunctions, the father is unknown; and the mother finds a thousand obstacles in her way;    shame, remorse, the constraint of her sex, and the rigor of laws;    that stifle her inclinations to perform this duty: and besides, she generally wants ability.

THE municipal laws of all well-regulated states have taken care to enforce this duty: though providence has done it more effectually than any laws, by implanting in the breast of every parent that natural ςοργη, or insuperable degree of affection, which not even the deformity of person or mind, not even the wickedness, ingratitude, and rebellion of children, can totally suppress or extinguish.

THE civil law[4] obliges the parent to provide maintenance for his child; and, if he refuses, "*judex de ea re cognoscet*". Nay, it carries this matter so far, that it will not suffer a parent at his death totally to disinherit his child, without expressly giving his reason for so doing; and there are fourteen such reasons reckoned up,[5] which may justify such disinherison. If the parent alleged no reason, or a bad, or false one, the child might set the will aside, *tanquam testamentum inofficiosum*, a testament contrary to the natural duty of the parent. And it is remarkable under what color the children were to move for relief in such a case: by suggesting that the parent had lost the use of his reason, when he made the inofficious testament. And this, as Pufendorf observes,[6] was not to bring into dispute the testator's power of disinheriting his own offspring; but to examine the motives upon which he did it: and, if they were found defective in reason, then to set them aside. But perhaps this is going rather too far: every man has, or ought to have, by the laws of society, a power over his own property: and, as Grotius very well distinguishes,[7] natural right obliges to give a necessary maintenance to children; but what is more than that, they have no other right to, than as it is given them by the favor of their parents, or the positive constitutions of the municipal law.

LET us next see what provision our own laws have made for this natural duty. It is a principle of law,[8] that there is an obligation on every man to provide for those descended from his loins: and the manner, in which this obligation shall be performed, is thus pointed out.[9] The father, and mother, grandfather, and grandmother of poor impotent persons shall maintain them at their own charges, if of sufficient ability, according as the quarter sessions shall direct: and[10] if a parent runs away, and leaves his children, the churchwardens and overseers of the parish shall seize his rents, goods, and chattels, and dispose of them towards their relief. By the interpretations which the courts of law have made upon these statutes, if a mother or grandmother marries again, and was before such second marriage of sufficient ability to keep the child, the husband shall be charged to maintain it:[11] for this being a debt of hers, when single, shall like others extend to charge the husband. But at her death, the relation being dissolved, the husband is under no farther obligation.

No person is bound to provide a maintenance for his issue, unless where the children are impotent and unable to work, either through infancy, disease, or accident; and then is only obliged to find them with necessaries, the penalty on refusal being no more than 20 s. a month. For the policy of our laws, which are ever watchful to promote industry, did not mean to compel a father to maintain his idle and lazy children in ease and indolence: but thought it unjust to oblige the parent, against his will, to provide them with

superfluities, and other indulgences of fortune, imagining they might trust to the impulse of nature, if the children were deserving of such favors. Yet, as nothing is so apt to stifle the calls of nature as religious bigotry, it is enacted,[12] that if any popish parent shall refuse to allow his protestant child a fitting maintenance, with a view to compel him to change his religion, the lord chancellor shall by order of court constrain him to do what is just and reasonable. But this did not extend to persons of another religion, of no less bitterness and bigotry than the popish: and therefore in the very next year we find an instance of a Jew of immense riches, whose only daughter having embraced Christianity, he turned her out of doors; and on her application for relief, it was held she was entitled to none.[13] But this gave occasion[14] to another statute,[15] which ordains, that if Jewish parents refuse to allow their protestant children a fitting maintenance, suitable to the fortune of the parent, the lord chancellor on complaint may make such order therein as he shall see proper.

OUR law has made no provision to prevent the disinheriting of children by will; leaving every man's property in his own disposal, upon a principle of liberty in this, as well as every other, action: though perhaps it had not been amiss, if the parent had been bound to leave them at the least a necessary subsistence. By the custom of London indeed, (which was formerly universal throughout the kingdom) the children of freemen are entitled to one third of their father's effects, to be equally divided among them; of which he cannot deprive them. And, among persons of any rank or fortune, a competence is generally provided for younger children, and the bulk of the estate settled upon the eldest, by the marriage-articles. Heirs also, and children, are favorites of our courts of justice, and cannot be disinherited by any dubious or ambiguous words; there being required the utmost certainty of the testator's intentions to take away the right of an heir.[16]

FROM the duty of maintenance we may easily pass to that of protection; which is also a natural duty, but rather permitted than enjoined by any municipal laws: nature, in this respect, working so strongly as to need rather a check than a spur. A parent may, by our laws, maintain and uphold his children in their lawsuits, without being guilty of the legal crime of maintaining quarrels.[17] A parent may also justify an assault and battery in defense of the persons of his children:[18] nay, where a man's son was beaten by another boy, and the father went near a mile to find him, and there revenged his son's quarrel by beating the other boy, of which beating the afterwards, died; it was not held to be murder, but manslaughter merely.[19] Such indulgence does the law show to the frailty of human nature, and the workings of parental affection.

THE last duty of parents to their children is that of giving them an education suitable to their station in life: a duty pointed out by reason, and of far the greatest importance of any. For, as Pufendorf very well observes,[20] it is not easy to imagine or allow, that a parent has conferred any considerable benefit upon his child, by bringing him into the world; if he afterwards entirely neglects his culture and education, and suffers him to grow up like a mere beast, to lead a life useless to others, and shameful to himself. Yet the municipal laws of most countries seem to be defective in this point, by not constraining the parent to bestow a proper education upon his children. Perhaps they thought it punishment enough to leave the parent, who neglects the instruction of his family, to labor under those griefs and inconveniences, which his family, so uninstructed, will be sure to bring upon him. Our laws, though their defects in this particular cannot be denied, have in one instance made a wise provision for breeding up the rising generation; since the poor and laborious part of the community, when past the age of nurture, are taken out of the hands of their parents, by the statutes for apprenticing poor children;[21] and are placed out by the public in such a manner, as may render their abilities, in their several stations, of the greatest advantage to the commonwealth. The rich indeed are left at their own option, whether they will breed up their children to be ornaments or disgraces to their family. Yet in one case, that of religion, they are under peculiar restrictions: for[22] it is provided, that if any person sends any child under his government beyond the seas, either to prevent its good education in England, or in order to enter into or reside in any popish college, or to be instructed, persuaded, or strengthened in the popish religion; in such case, besides the disabilities incurred by the child so sent, the parent or person sending shall

forfeit 100£ which[23] shall go to the sole use and benefit of him that shall discover the offense.

And[24] if any parent, or other, shall send or convey any person beyond sea, to enter into, or be resident in, or trained up in, any priory, abbey, nunnery, popish university, college, or school, or house of jesuits, or priests, or in any private popish family, in order to be instructed, persuaded, or confirmed in the popish religion; or shall contribute any thing towards their maintenance when abroad by any pretext whatever, the person both sending and sent shall be disabled to sue in law or equity, or to be executor or administrator to any person, or to enjoy any legacy or deed of gift, or to bear any office in the realm, and shall forfeit all his goods and chattels, and likewise all his real estate for life.

2. THE power of parents over their children is derived from the former consideration, their duty; this authority being given them, partly to enable the parent more effectually to

perform his duty, and partly as a recompense for his care and trouble in the faithful discharge of it. And upon this score the municipal laws of some nations have given a much larger authority to the parents, than others. The ancient Roman laws gave the father a power of life and death over his children; upon this principle, that he who gave had also the power of taking away.[25] But the rigor of these laws was softened by subsequent constitutions; so that[26] we find a father banished by the emperor Hadrian for killing his son, though he had committed a very heinous crime, upon this maxim, that "*patria potestas in pietate debet, non in atrocitate, consistere.*" But still they maintained to the last a very large and absolute authority: for a son could not acquire any property of his own during the life of his father; but all his acquisitions belonged to the father, or at least the profits of them for his life.[27]

THE power of a parent by our English laws is much more moderate; but still sufficient to keep the child in order and obedience. He may lawfully correct his child, being under age, in a reasonable manner;[28] for this is for the benefit of his education. The consent or concurrence of the parent to the marriage of his child under age, was also directed by our ancient law to be obtained: but now it is absolutely necessary; for without it the contract is void.[29] And this also is another means, which the law has put into the parent's hands, in order the better to discharge his duty; first, of protecting his children from the snares of artful and designing persons; and, next, of settling them properly in life, by preventing the ill consequences of too early and precipitate marriages. A father has no other power over his sons estate, than as his trustee or guardian; for, though he may receive the profits during the child's minority, yet he must account for them when he comes of age. He may indeed have the benefit of his children's labor while they live with him, and are maintained by him: but this is no more than he is entitled to from his apprentices or servants. The legal power of a father (for a mother, as such, is entitled to no power, but only to reverence and respect) the power of a father, I say, over the persons of his children ceases at the age of twenty one: for they are then enfranchised by arriving at years of discretion, or that point which the law has established (as some must necessarily be established) when the empire of the father, or other guardian, gives place to the empire of reason. Yet, till that age arrives, this empire of the father continues even after his death; for he may by his will appoint a guardian to his children. He may also delegate part of his parental authority. during his life, to the tutor or schoolmaster of his child; who is then *in loco parentis*, and has such a portion of the power of the parent committed to his charge, viz. that of restraint and correction, as may be necessary to answer the purposes for which he is employed.

3. THE duties of children to their parents arise from a principle of natural justice and retribution. For to those, who gave us existence, we naturally owe subjection and obedience during our minority, and honor and reverence ever after; they, who protected the weakness of our infancy, are entitled to our protection in the infirmity of their age; they who by sustenance and education have enabled their offspring to prosper, ought in return to be supported by that offspring, in case they stand in need of assistance. Upon this principle proceed all the duties of children to their parents, which are enjoined by positive laws. And the Athenian laws[30] carried this principle into practice with a scrupulous kind of nicety: obliging all children to provide for their father, when fallen into poverty; with an exception to spurious children, to those whose chastity had been prostituted by consent of the father, and to those whom he had not put in any way of gaining a livelihood. The legislature, says baron Montesquieu,[31] considered, that in the first case the father, being uncertain, had rendered the natural obligation precarious; that, in the second case, he had sullied the life he had given, and done his children the greatest of injuries, in depriving them of their reputation; and that, in the third case, he had rendered their life (so far as in him lay) an insupportable burden, by furnishing them with no means of subsistence.

OUR laws agree with those of Athens with regard to the first only of these particulars, the case of spurious issue. In the other cases the law does not hold the tie of nature to be dissolved by any misbehavior of the parent; and therefore a child is equally justifiable in defending the person, or maintaining the cause or suit, of a bad parent, as a good one; and is equally compellable,[32] if of sufficient ability, to maintain and provide for a wicked and unnatural progenitor, as for one who has shown the greatest tenderness and parental piety.

II. WE are next to consider the case of illegitimate children, or bastards; with regard to whom let us inquire, 1. Who are bastards. 2. The legal duties of the parents towards a bastard child. 3. The rights and incapacities attending such bastard children.

1. WHO are bastards. A bastard, by our English laws, is one that is not only begotten, but born, out of lawful matrimony. The civil and canon laws do not allow a child to remain a bastard, if the parents afterwards intermarry:[33] and herein they differ most materially from our law; which, though not so strict as to require that the child shall be begotten, yet makes it an indispensable condition that it shall be born, after lawful wedlock. And the reason of our English law is surely much superior to that of the Roman, if we consider the principal end and design of establishing the contract of marriage, taken in a civil light;

abstractedly from any religious view, which has nothing to do with the legitimacy or illegitimacy of the children. The main end and design of marriage therefore being to ascertain and fix upon some certain person, to whom the care, the protection, the maintenance, and the education of the children should belong; this end is undoubtedly better answered by legitimating all issue born after wedlock, than by legitimating all issue of the same parties, even born before wedlock, so as wedlock afterwards ensues: 1. Because of the very great uncertainty there will generally be, in the proof that the issue was really begotten by the same man; whereas, by confining the proof to the birth, and not to the begetting, our law has rendered it perfectly certain, what child is legitimate, and who is to take care of the child. 2. Because by the Roman laws a child may be continued a bastard, or made legitimate, at the option of the father and mother, by a marriage ex post facto; thereby opening a door to many frauds and partialities, which by our law are prevented. 3. Because by those laws a man may remain a bastard till forty years of age, and then become legitimate, by the subsequent marriage of his parents; whereby the main end of marriage, the protection of infants, is totally frustrated. 4. Because this rule of the Roman laws admits of no limitations as to the time, or number, of bastards so to be legitimated; but a dozen of them may, twenty

years after their birth, by the subsequent marriage of their parents, be admitted to all the privileges of legitimate children. This is plainly a great discouragement to the

matrimonial state; to which one main inducement is usually not only the desire of having children, but also the desire of procreating lawful heirs. Whereas our constitutions guard against this indecency, and at the same time give sufficient allowance to the frailties of human nature. For, if a child be begotten while the parents are single, and they will endeavor to make an early reparation for the offense, by marrying within a few months after, our law is so indulgent as not to bastardize the child, if it be born, though not begotten, in lawful wedlock: for this is an incident that can happen but once; since all future children will be begotten, as well as born, within the rules of honor and civil society. Upon reasons like these we may suppose the peers to have acted at the parliament of Merton, when they refused to enact that children born before marriage should be esteemed legitimate.[34]

FROM what has been said it appears, that all children born before matrimony are bastards by our laws; and so it is of all children born so long after the death of the husband, that, by the usual course of gestation, they could not be begotten by him. But, this being a matter of some uncertainty, the law is not exact as to a few days.[35] And this gives occasion to a proceeding at common law, where a widow is suspected to feign herself with child, in order to produce a supposititious heir to the estate: an attempt

which the rigor of the Gothic constitutions esteemed equivalent to the most atrocious theft, and therefore punished with death.[36] In this case with us the heir presumptive may have a writ *de ventre inspiciendo*, to examine whether she be with child, or not;[37] which is entirely conformable to the practice of the civil law:[38] and, if the widow be upon due examination found not pregnant, the presumptive heir shall be admitted to the inheritance; though liable to lose it again, on the birth of a child within forty weeks from the death of the husband.[39] But if a man dies, and his widow soon after marries again, and a child is born within such a time, as that by the course of nature it might have been the child of either husband; in this case he is said to be more than ordinarily legitimate; for he may, when he arrives to years of discretion, choose which of the fathers he pleases.[40] To prevent this, among other inconveniences, the civil law ordained that no widow should marry *infra annum luctus*;[41] a rule which obtained so early as the reign of Augustus,[42] if not of Romulus: and the same constitution was probably

handed down to our early ancestors from the Romans, during their stay in this island; for we find it established under the Saxon and Danish governments.[43]

As bastards may be born before the coverture, or marriage state, is begun, or after it is determined, so also children born during wedlock may in some circumstances be bastards. As if the husband be out of the kingdom of England (or, as the law somewhat loosely phrases it, *extra quatuor maria*) for above nine months, so that no access to his wife can be presumed, her issue during that period shall be bastard.[44] But, generally, during the coverture access of the husband shall be presumed, unless the contrary can be shown;[45] which is such a negative as can only be proved by showing him to be elsewhere: for the general rule is, *praesumitur pro legitimatione*.[46] In a divorce *a mensa et thoro*, if the wife breeds children, they are bastards; for the law will presume the husband and wife conformable to the sentence of separation, unless access be proved: but, in a voluntary separation by agreement, the law will suppose access, unless the negative be shown.[47] So also if there is an apparent impossibility of procreation on the part of the husband, as if he be only eight years old, or the like, there the issue of the wife shall be bastard.[48] Likewise, in case of divorce in the spiritual court *a vinculo matrimonii*, all the issue born during the coverture are bastards;[49] because such divorce is always upon some cause, that rendered the marriage unlawful and null from the beginning.

2. LET us next see the duty of parents to their bastard children, by our law; which is principally that of maintenance. For, though bastards are not looked upon as children to any civil purposes, yet the ties of nature, of which maintenance is one, are not so easily dissolved: and they hold indeed as to many other intentions; as, particularly, that a man

shall not marry his bastard sister or daughter.[50] The civil law therefore, when it denied maintenance to bastards begotten under certain atrocious circumstances,[51] was neither consonant to nature, nor reason, however profligate and wicked the parents might justly be esteemed.

THE method in which the English law provides maintenance for them is as follows.[52] When a woman is delivered, or declares herself with child, of a bastard, and will by oath before a justice of peace charge any person having got her with child, the justice shall cause such person to be apprehended, and commit him till he gives security, either to maintain the child, or appear at the next quarter sessions to dispute and try the fact. But if the woman dies, or is married before delivery, or miscarries, or proves not to have been with child, the person shall be discharged: otherwise the sessions, or two justices out of sessions, upon original application to them, may take order for the keeping of the bastard, by charging the mother, or the reputed father with the payment of money or other sustentation for that purpose. And if such putative father, or lewd mother, run away from the parish, the oversees by direction of two justices may seize their rents, goods, and chattels, in order to bring up the said bastard child. Yet such is the humanity of our laws, that no woman can be compulsively questioned concerning the father of her child, till one month after her delivery: which indulgence is however very frequently a hardship upon parishes, by suffering the parents to escape.

3. I PROCEED next to the rights and incapacities which appertain to a bastard. The rights are very few, being only such as he can acquire; for he can inherit nothing, being looked upon as the son of nobody, and sometimes called *filius nullius*, sometimes *filius populi*.[53] Yet he may gain a surname by reputation,[54] though he has none by inheritance. All other children have a settlement in their father's parish; but a bastard in the parish where born, for he has no father.[55] However, in case of fraud, as if a woman be sent either by order of justices, or comes to beg as a vagrant, to a parish which she does not belong to, and drops her bastard there; the bastard shall, in the first case, be settled in the parish from whence she was illegally removed;[56] or, in the latter case, in the mother's own parish, if the mother be apprehended for her vagrancy.[57] The incapacity of a bastard consists principally in this, that he cannot be heir to any one, neither can he have heirs, but of his own body; for, being *nullius filius*, he is therefore of kin to nobody, and has no ancestor from whom any inheritable blood can be derived. A bastard was also, in strictness, incapable of holy orders; and, though that were dispensed with, yet he was utterly disqualified from holding any dignity in the church:[58] but this doctrine seems now obsolete; and in all other respects, there is no distinction between a bastard and another

man. And really any other distinction but that of inheriting, which civil policy renders necessary, would, with regard to the innocent offspring of his parents crimes, be odious, unjust, and cruel to the last degree: and yet the civil law, so boasted of for it's equitable decisions, made bastards in some cases incapable even of a gift from their parents.[59] A bastard may, lastly, be made legitimate, and capable of inheriting, by the transcendent power of an act of parliament, and not otherwise:[60] as was done in the case of John of Gant's bastard children, by a statute of Richard the second.

---

### Blackstone's Footnotes (Tucker's notes not yet added)

1. Ff. 2. 4. 5.
2. L. of N. l. 4. c. 11.
3. Sp. l. l. 23. c. 2.
4. Ff. 25. 3. 5.
5. Nov. 115.
6. l. 4. c. 11. §. 7.
7. De j. b. & p. l. 2. c. 7. n. 3.
8. Raym. 500.
9. Stat. 43 Eliz. c. 2.
10. Stat. 5 Geo. l. c. 8.
11. Styles. 283. 2 Bulstr. 346.
12. Stat. 11 & 12 W. III. c. 4.
13. Lord Raym. 699.
14. Com. Journ. 18 Feb. 12 Mar. 1701.
15. 1 Ann. St. 1. c 30.
16. 1 Lev. 130.
17. 2 Inst. 564.
18. 1 Hawk. P. C. 131.
19. Cro. Jac. 296. 1 Hawk. P. C. 83.
20. L. of N. b. 6. c. 2. §. 12.
21. See page 414.
22. Stat. 1 Jac. I. c. 4. & 3 Jac. I. c. 5.
23. Stat. 11 & 12 W. III. c. 4.
24. Stat. 3 Car. I. c. 2.

25. Ff. 28. 2. 11. Cod. 8. 47. 10.
26. Ff. 48. 9. 5.
27. Inst. 2. 9. 1.
28. 1 Hawk. P. C. 130.
29. Stat. 26 Geo. II. c. 33.
30. Potter's Antiq. b. 4. c. 15.
31. Sp. L. l. 26. c. 5.
32. Stat. 43 Eliz. c. 2.
33. Inst. 1. 10. 13. Decretal. l. 4. t. 17. c. 1.
34. *Rogaverunt omnes episcopi magnates, ut consentirent quod nati ante matrimonium essent legitimi, sicut ills qui nati sunt post matrimonium, quia ecclesia tales habet pro legitimis. Et omnes comites et barones una voce responderunt quod nolunt leges Angliae mutare, quae hucusque usitatae sunt et approbatae.* Stat. 20 Hen. III. c. 9. See the introduction to the great charter, edit. Oxon. 1759. sub anno 1253.
35. Cro. Jac. 541.
36. Stiernhook de jure Gothor. l. 3. c. 5.
37. Co. Litt. 8.
38. Ff. 25. tit. 4. per tot.
39. Britton. C. 66. page 166.
40. Co. Litt. 8.
41. Cod. 5. 9. 2.
42. But the year was then only ten months. Ovid. Fast. l. 27.
43. *Sit omnis vidua sine marito duodecim menses.* LL. Ethelr. A. D. 1008. LL. Canut. c. 71.
44. Co. Litt. 244.
45. Salk. 123. 3 P. W. 276. Stra. 925.
46. 5 Rep. 98.
47. Salk. 123.
48. Co. Litt. 244.
49. Ibid. 235.
50. Lord Raym. 68. Comb. 356.
51. Nov. 89. c. 15.
52. Stat. 18 Eliz. c. 3. 7 Jac. I. c. 4. 3. Car. I. c. 4. 13 & 14 Car. II. c. 12. 6. Geo. II. c. 31.
53. Fort. de. LL. c. 40.
54. Co. Litt. 3.
55. Salk. 427.
56. Salk. 121.

57. Stat. 17 Geo. II. c. 5.

58. Fortesc. c. 40. 5. Rep. 58.

59. Cod. 6. 57. 5.

60. 4 Inst. 36.