Alan Alexander Beck
Law Office of Alan Beck
2692 Harcourt Drive
San Diego, CA  92123
(619) 905-9105
Hawaii Bar No. 9145
Alan.alexander.beck@gmail.com

Kevin Gerard O'Grady
The Law Office of Kevin O'Grady
1164 Bishop Street, Suite 1605
Honolulu, HI 96813
(808) 521-3367
Hawaii Bar No. 8817
Kevin@KevinOGradyLaw.com

Attorneys for Plaintiffs

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| ELIJAH PINALES et. al. | ) Civil Action No. 24-00496 JAO-WRP |
| | ) PLAINTIFFS' REPLY AND |
| Plaintiffs, | ) OPPOSITION TO DEFENDANT'S |
| | ) CROSS-MOTION FOR SUMMARY |
| v. | ) JUDGMENT; MEMORANDUM IN |
| | ) OPPOSITION TO DEFENDANT'S |
| ANNE E. LOPEZ, in her Official | ) CROSS-MOTION FOR SUMMARY |
| Capacity as the Attorney General | ) JUDGMENT; CERTIFICATE OF |
| of the State of Hawaii | ) SERVICE |
| | ) TRIAL: July 20, 2026 |
| Defendant. | ) JUDGE: Hon. J. Jill A. Otake |
| | ) HEARING DATE: February 13, 2026 |
| | ) |

## PLAINTIFFS' REPLY AND OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT;MEMORANDUM IN OPPOSITION TO DEFENDANT'S CROSS-MOTION FOR SUMMARY JUDGMENT

Table of Contents

I.   Introduction ...................................................................................................1

II.  Argument......................................................................................................2

   A.  Hawaii Has Failed to Satisfy *Bruen*'s Requirements .....................................2
   1.Historically, 18 to 20 Years Old Were Not Only Able to Acquire and Possess
   Arms, But Were Required to Do So ......................................................................2

   2.Founding Era Militia Laws Demonstrate 18-20-Year-Olds Have a Second
   Amendment Right to Possess Firearms.................................................................3

   3.The State Have Not Produced a Single Historical Law Which Completely
   Banned 18-20-Year-Olds from Owning Firearms...................................................6

   B.   Because the Societal Concerns Allegedly Addressed by the Challenged Law
   Existed at the Founding, a More Nuanced Approach is Improper .........................8

   1.The Neurology of 18-20-Year-Olds Has Not Changed Since the Colonial Era ...
   ......... ..................................................................................................................9

   2.Concealable Firearms Existed During the Founding Era..................................10

   C.   The State's Purported Historical Support Does Not Illustrate Shared
   Analogous Principles with the Challenged Regulations ......................................11

   1.18-20-Year-Olds Are Now Responsible for Their Own Safety .........................11

   2.Entire Subsets of "The People" Cannot Be Disarmed Because of the Criminal
   Conduct of a Statistically Miniscule Portion of its Population ............................11

   3.Restrictions on Gambling and Similar Activities are Not Relevant..................13

   4.Restrictions on Students in Schools Do Not Support Hawaii's Position ..........13

5. The Cited Reconstruction Era Firearms Restrictions Fail the "how" and "why" Principles Set Forth in *Bruen* ................................................................15

6. The Voidability Doctrine Provides no Safe Harbor for the Challenged Law ...18

7. Arms Were Expressly Listed as Necessities in Bankruptcy Proceedings .........20

D.   Hawaii's Call for Interest Balancing Should be Rejected ...........................22

E.   The State Has Failed to Show Plaintiffs Have Not Met the Requirements for Injunctive Relief ......................................................................................23

III.   Conclusion ................................................................................................25

## TABLE OF AUTHORITIES

**Cases**

*Ariz. Dream Act Coalition v. Brewer,* 757 F.3d 1053, 2014 WL 3029759 (9th Cir. 2014) ....................................................................................................................24

*Aymette v. State*, 21 Tenn. 154 (1840) ....................................................................17

*Baird v. Bonta*, 81 F.4th 1036 (9th CIR. 2023) .........................................................24

*Brown v. Ent. Merch. Ass'n,* 564 U.S. 786 (2011) ...................................................15

*Crocker v. Spencer*, 1824 WL 1335 (Vt. Feb. 1824) ...............................................20

*District of Columbia v. Heller*, 554 U.S. 570 (2008) .................................... 3, 17, 23

*Epperson v. Nugent*, 57 Miss. 45 (1879) ..................................................................19

*Fotoudis v. City & Cty. of Honolulu*, 54 F. Supp. 3d 1136 (D. Haw. 2014) ...........25

*Fry v. Canfield*, 4 Vt. 9 (1831) .................................................................................21

*Hirschfeld v. ATF*, 5 F.4th 407 (4th Cir. 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021) ...................................................................................................................6

*Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024 (9th Cir. 2013) .......................................................................................24

*Jones v. Bonta,* 34 F.4th 704 (9th Cir. 2022) ................................................ 5, 12, 18

*Jordan v. Coffield*, 70 N.C. 110 (1874) ...................................................................19

*Koons v. Att'y Gen. New Jersey,* 156 F.4th 210 (3d Cir. 2025), as amended (Sept. 17, 2025) ................................................................................................................13

*Koons v. Platkin,* 673 F. Supp. 3d 515 (D.N.J. 2023) ..............................................22

*McCoy v. ATF*, 140 F.4th 568 (4th Cir. 2025) .......................................................6, 7

*McDonald v. City of Chi.*, 561 U.S. 742 (2010) .......................................................13

*Middlebury Coll. v. Chandler*, 16 Vt. 683 (1844)...................................................19

*Morse v. Frederick*, 551 U.S. 393 (2007) ...............................................................15

*New Hampshire Mut. Fire Ins. Co. v. Noyes,* 32 N.H. 345(1855) ..........................19

*New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 26 (2022)
.................................................................................................................... passim

*Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) ..................................................1, 9

*NRA v. Bondi*, 133 F.4th 1108 (11th Cir. 2025) ....................................................7, 8

*Peters v. Fleming*, 6 M. & W. 42 (Ex. 1839) ..........................................................20

*Reese v. Bureau of Alcohol*, 127 F.4th 583 (5th Cir. 2025)......................................5

*Rodriguez v. Robbins*, 715 F.3d 1127 (9th Cir. 2013)............................................25

*Smith v. Young*, 19 N.C. 26 (N.C. 1836) .................................................................19

*Staples v. United States*, 511 U.S. 600 (1994) ........................................................16

*State v. Callicutt*, 69 Tenn. 714 (1878) ............................................................ 16, 17

*State v. Walkes,* 2025 Fla. Cir. LEXIS 974; 2025 LX 474699.................................12

*United States v. Allam,* 140 F.4th 289 (5th Cir. 2025) ...........................................14

*United States v. Allam*, 677 F.Supp.3d 545 (E.D. Tex. 2023)..................................14

*United States v. Rahimi,* 602 U.S. 680 (2024) ................................................... 15, 16

*Valle del Sol Inc. v. Whiting,* 732 F.3d 1006 (9th Cir. 2013) ..................................24

*Worth v. Jacobson*, 108 F.4th 677 (8th Cir. 2024) ............................................ 12, 15

*Yukutake v. Connors*, No. CV 19-00578 JMS-RT, 2021 WL 4342320 (D. Haw. Sept. 23, 2021)...........................................................................25

*Zepeda v. INS*, 753 F.2d 719 (9th Cir. 1983)..................................................25

**Statutes**

18 U.S.C. § 922(b)(1)....................................................................................7

1856 Ala. Acts. 17.......................................................................................17

1859 Ky. Acts 245, § 23......................................................................... 17, 18

1860 Ky. Acts 245, § 23...............................................................................17

33 Hen. 8, c. 6, § 1, An Act Concerning Crossbows and Handguns (1541)............11

Fla. Stat. § 790.065(13)................................................................................7

H.R.S. § 134-2(d).......................................................................................25

Militia Act of 1792 1 Stat. 271, §1 (1792)................................................ 2, 3, 5, 21

Tenn. Code § 4864 (1858)............................................................................15

**Other Authorities**

"Breaking Down the Key Parts of the Revolutionary War Flags", https://shorturl.at/HjW32 ................................................................5

An Act Against Wearing Swords, ch. 9, N.J. STAT. (W. Bradford 1881) (Law Passed 1686)..........................................................................10

Aurora General Advertiser (Philadelphia), May 30, 1800 ....................................10

Dorsey, Clement. *The General Public Statutory Law and Public Local Law of the State of Maryland: From the Year 1692 to 1839 Inclusive, with Annotations Thereto, and a Copious Index*. Baltimore: J. D. Toy, 1840..................................22

Ross Pomeroy, *Why do women commit far less crime than men?* Big Think (Feb. 27, 2024), https://bigthink.com/the-present/why-women-commit-much-less-crime/ (last visited Nov. 14, 2025) ......................................................................12

The Evening Post (New York), December 1, 1806, https://www.newspapers.com/image/33514851/....................................................3

The Minutes of the Senate Academicus, 1799-1842 at 38, UNIV. OF GA. LIBRS. (1976)....................................................................................................................14

The Pennsylvania Journal and Weekly Advertiser (Philadelphia), June 14, 1775, https://www.newspapers.com/image/1033733308...............................................10

The Pittsfield Sun (Pittsfield), Sep. 27, 1806, https://www.newspapers.com/image/531981202/....................................................3

THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665 (J. Hammond Trumbull ed.,1850) .................................................................................................21

The South-Carolina Gazette, Jun. 1, 1745, https://www.newspapers.com/image/605132111/....................................................2

The South-Carolina Gazette; and Country Journal (Charleston), June 9, 1767, https://www.newspapers.com/image/605380187................................................10

The Vergennes Gazette and Vermont and New-York Advertiser (Vergennes, Vt.), September 12, 1799, https://www.newspapers.com/image/488954725 ..............10

Traveling Trunk Additional Activities: Make a Regimental Flag - Gettysburg National Military Park" (U.S. National Park Service). (n.d.), https://tinyurl.com/3dbmtczu.................................................................................5

*University Church in Yale*, Yale University, https://church.yale.edu/history ..........15

Virginia. Acts of Assembly, Passed In the Colony of Virginia: From 1662, to 1715. Volume I. London: Printed by John Baskett, printer to the King's most excellent majesty, 1727 ..........................................................................................21

Yamane, David. "Pocket Pistols: 17th and 18th Century Flintlock Editions." *Gun Culture 2.0*, 16 Oct. 2017, gunculture2point0.com/2017/10/16/pocket-pistols-17th-and-18th-century-flintlock-editions/. ...........................................................10

**Treatises**

D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 203, 205 (2018) ...............................14

David B. Kopel & Joseph G.S. Greenlee, The Second Amendment Rights of Young Adults, 43 S. ILL. UNIV. L.J. 495 (2019)...............................................................6

McDonald, Sharon, The Bedford Flag Unfurled (Revised ed.). Bedford Free Public Library (1996)..........................................................................................................5

Robert K. Wright, The Continental Army (Washington, D.C.: Center of Military History, 2006) ........................................................................................................5

## I.  Introduction

The arguments made in the State's summary judgment motion are either foreclosed by precedent or wilt in the face of overwhelming persuasive authority. The State begins its brief by arguing that this Court should renew its decision from the preliminary injunction that a more nuanced approach should apply. However, since this Court's determination of the preliminary injunction, the Ninth Circuit's decision in *Nguyen v. Bonta*, 140 F.4th 1237 (9th Cir. 2025) changed circuit precedent.  And that precedent compels a determination that a more nuanced approach is not appropriate. The State goes on to present a historical narrative that makes virtually no effort to engage with the history Plaintiffs have presented and does nothing to justify Hawaii's complete ban on the possession of firearms and ammunition.  Notably, every case Hawaii favorably cites to expressly distinguishes itself from a ban on acquisition and possession like Hawaii's.

Perhaps realizing this, Hawaii proceeds to produce social science data as part of a call for interest balancing.  However, "judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here." *New York State Rifle & Pistol Association, Inc. v. Bruen*, 597 U.S. 1, 26 (2022). Rather, pursuant to *Bruen*, this Court must solely look at the scope of the historical Second Amendment right to decide this matter. Contemporary 18-20-year-olds are adults and historically adults

of all ages have had full Second Amendment rights. Even when 18-20-year-olds were minors, no early society completely banned them from acquiring or possessing firearms. Pursuant to *Bruen*, the challenged laws are unconstitutional.

## II. Argument

### A. Hawaii Has Failed to Satisfy *Bruen*'s Requirements

Under *Bruen*, Hawaii must "affirmatively prove that its firearms regulation is part of the historical tradition that delimits the outer bounds of the right to keep and bear arms." *Id.* at 19. That it has failed to do.

#### 1. Historically, 18 to 20 Years Old Were Not Only Able to Acquire and Possess Arms, But Were Required to Do So

The State claims that during the colonial era firearms were "unavailable in significant quantities." Defendant's ("Def.") Memorandum in Support of Their Motion for Summary Judgement ("MSJ") at 5. That belies common sense. Virtually every adult man had to own a firearm pursuant to the various militia acts. *See e.g.* Militia Act of 1792 1 Stat. 271, §1 (1792)[1] ("That every citizen, so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock…"). It is unclear how the State can contend firearms were unavailable despite acknowledging the existence of the militia acts.[2]

---

[1] Available at https://shorturl.at/QXEiV and attached as Exhibit 1.
[2] Newspaper advertising from the era confirms the availability of firearms in large quantities. *See* The South-Carolina Gazette, Jun. 1, 1745, at 2, https://www.newspapers.com/image/605132111/ attached as Exhibit 2; The

2

2. Founding Era Militia Laws Demonstrate 18-20-Year-Olds Have a Second Amendment Right to Possess Firearms

Hawaii claims that colonial militia laws support the constitutionality of the challenged laws. This is due to a misunderstanding of how the militia system operated. The State argues that "militia service "occur[red] through a rigorous, closely supervised, and coordinated system of hierarchical rank, order, and discipline." Def. MSJ at 13. "So when 18-to-20-year-olds had access to firearms, they were subject to military supervision and discipline." *Id*. However, militia members were required to keep their firearms at home and bring them to muster. "Ordinarily when called for militia service able-bodied men were expected to appear bearing arms supplied by themselves and of the kind in common use at the time." *District of Columbia v. Heller*, 554 U.S. 570, 573 (2008).

Therefore, militia members including 18-20-years-old always had access to their firearms even when not at militia duty.[3] The militia acts do not support the

---

Evening Post (New York), December 1, 1806, at 1, https://www.newspapers.com/image/33514851/ attached as Exhibit 3; *See also* The Pittsfield Sun (Pittsfield), Sep. 27, 1806, at 4, https://www.newspapers.com/image/531981202/ attached as Exhibit 4.

[3] Hawaii's argument that "even if firearms were considered "necessities" for minors who were subject to mandatory militia service, the challenged laws are consistent with such a scheme" because firearms can be purchased for military duty misconstrues the legal inquiry. Def. MSJ at 11 n.6. The question is not whether firearms are necessities now. It is whether firearms were or could have been, necessities during the Colonial Era. It also completely ignores Plaintiffs' argument that firearms would have also been necessities for 18-20-year-olds living

State merely because parents were sometimes charged with ensuring their children had guns. "[R]equirements that parents furnish firearms for their sons' militia service do not mean that the military-age young men lacked the right to keep and bear (or obtain) such arms themselves. They just as readily imply that eighteen-to-

---

in rural areas because they would have needed firearms to hunt and dispose of varmints. Moreover, firearms and ammunition were also considered necessities for "subsistence." *See* Exhibit 5 (Maryland Bankruptcy laws.)

twenty-year-olds were expected to keep and bear arms, even if provided by

parents." *Reese v. Bureau of Alcohol*, 127 F.4th 583, 597 (5th Cir. 2025).[45]

---

[4] Hawaii also claims that "where states mustered minors into militias, the minors were not guaranteed a weapon" because they might be assigned to be drummer or fife (flutist) or carry a flag (standard bearer). Def. MSJ at 12 n. 7. However, all militia members were required to bring a weapon to militia muster. *See* Militia Act of 1792 1 Stat. 271, §1 (1792). Whether they carried that weapon into battle is not relevant to the Second Amendment analysis. Furthermore, it is untrue that musicians did not carry weapons. "As early as 1777 these musicians began to carry arms, and their combat functions became more important than their musical skills as the war progressed." *See* Robert K. Wright, The Continental Army (Washington, D.C.: Center of Military History, 2006) at pg. 38. Available at https://history.army.mil/portals/143/Images/Publications/catalog/60-4-1.pdf and attached as Exhibit 6. Moreover, musicians and standard bearers were in the extreme minority. *See Id* at 46. (General George Washington intended "[e]ach company was to have a captain, 2 lieutenants. an ensign. 4 sergeants, 4 corporals. a fifer, a drummer, and 76 privates."). Flag bearers were even rarer. Flags were used primarily by regiments. A regiment's flag bearer had the rank of "cornet, which is the militia officer just below lieutenant." *See* McDonald, Sharon, The Bedford Flag Unfurled (Revised ed.). Bedford Free Public Library(1996) at pg. 16 available at https://shorturl.at/WJGwx and attached as Exhibit 7. As an officer, they would have rarely been younger than 21. A regiment in the Continental Army consisted of 728 soldiers. *See Id* at 46. "The Continental Army's regiments carried one or two [flags] depending on the time and place", "Breaking Down the Key Parts of the Revolutionary War Flags", https://shorturl.at/HjW32 and attached as Exhibit 8. This practice carried through to the Civil War "[e]ach Union regiment (full strength of 1000 men, or 10 companies) might carry two flags: the flag of the United States, and a flag representing the regiment called the regimental colors." *See* "Traveling Trunk Additional Activities: Make a Regimental Flag - Gettysburg National Military Park" (U.S. National Park Service). (n.d.), https://tinyurl.com/3dbmtczu and attached as Exhibit 9. Hawaii does not dispute that the typical militia member was armed with a firearm so it's unclear how Hawaii's point is relevant.

[5] Further, 18-to-20-year-olds were expected to bear arms as part of the posse comitatus, which "allowed sheriffs and others to compel citizens to serve in the name of the state to execute arrests, level public nuisances, and keep the peace." *Jones v. Bonta,* 34 F.4th 704, 722 (9th Cir. 2022) (Lee, J., concurring), vacated on

### 3. The State Have Not Produced a Single Historical Law Which Completely Banned 18-20-Year-Olds from Owning Firearms

Neither the State nor its experts have produced a single example of historical America completely banning the *ownership* of firearms for 18-20-year-olds.[6] Even assuming the State's historical analysis is true, throughout American history 18-20-year-olds have been able to obtain firearms through intrafamilial transfers.   The State itself argues that interfamilial transfers is the manner in which 18-20-year-olds obtained firearms for militia service.  Defendant's MSJ at page 11.  Since early American societies always provided 18-20-year-olds some mechanism to obtain firearms and Hawaii law does not, historical laws' "burden on the right of armed self-defense" is not "comparable" to the challenged laws. *Bruen*, 597 U.S. at 29. The case law which Hawaii relies upon does not dispute this point.[7] *McCoy v. ATF*, 140 F.4th 568, 577 (4th Cir. 2025) upheld the constitutionality of 18 U.S.C. §

---

reh'g en banc in light of *Bruen*, 47 F.4th 1124 (9th Cir. 2022) (Mem.) (cleaned up). At common law, by age 18, all able-bodied men "were obliged to join in the 'hue and cry' (hutesium et clamor) to pursue fleeing criminals." David B. Kopel & Joseph G.S. Greenlee, The Second Amendment Rights of Young Adults, 43 S. ILL. UNIV. L.J. 495, 534 (2019) attached as Exhibit 10.

[6] More fundamentally, no part of the challenged laws falls within *Heller's* language about commercial sales.  "A condition or qualification on the sale of arms is a hoop someone must jump through to sell a gun, such as obtaining a license, establishing a lawful premise, or maintaining transfer records." *Hirschfeld v. ATF*, 5 F.4th 407, 416 (4th Cir. 2021), vacated as moot, 14 F.4th 322 (4th Cir. 2021) (emphasis the court's). The presumption does not apply to restrictions "on buying a gun." *Id*. Hawaii's restrictions restrict the buyer, not the seller.

[7] Plaintiffs maintain that these cases were wrongly decided.

922(b)(1) which prohibits the commercial sale of *handguns* to individuals under the age of 21. "Section 922(b)(1) is narrow in several respects. First, the law regulates only transactions involving firearms. It does not prohibit anyone from owning, possessing, or using firearms. Second, the provision regulates only the commercial sale of firearms." *McCoy, 140 F.4th at 572*. Third, when it comes to 18-to-20-year-olds, § 922(b)(1) applies only to firearms "other than a shotgun or rifle." *Id* at 573. "The law does not, for example, prohibit the sale of hunting rifles and other long guns." *Id.* The Fourth Circuit solely found that there is a historical tradition of restricting the "commercial sale of firearms." *Id* at 577. The Fourth Circuit's case law does not support the constitutionality of Hawaii law.

Similarly, *NRA v. Bondi*, 133 F.4th 1108, 1113 (11th Cir. 2025) actually supports the unconstitutionality of the challenged laws. The *Bondi* opinion upheld the constitutionality of Fla. Stat. § 790.065(13) which states a "person younger than 21 years of age may not purchase a firearm." In doing so the Eleventh Circuit found "[c]onsistent with these Founding-era limitations, states in the nineteenth century expressly prohibited the sale of arms to minors with some exceptions for parents to provide firearms to their children. Florida law burdens the right no more than these historical restrictions because it prohibits purchase but preserves access

to firearms with parental consent." *NRA*, 133 F.4th at 1123.[8] Thus, the Eleventh

Circuit made an express finding that there is a historical tradition of allowing

intrafamilial transfers of firearms which Hawaii law prohibits. While Plaintiffs

dispute the holdings of the aforementioned cases, even under their reasoning,

Hawaii's complete ban on possession and acquisition is unconstitutional because it

does not even allow for intrafamilial transfers.

### B. Because the Societal Concerns Allegedly Addressed by the Challenged Law Existed at the Founding, a More Nuanced Approach is Improper

The State argues that this Court should apply a more nuanced approach to

evaluating the challenged laws—and in practical effect—allow the State to use less

relevant historical laws to defend them.  Hawaii has not identified any novel issue

it faces compared to the Colonial Era. Thus, circuit precedent dictates that a more

nuanced approach should not be taken. Most if not all the problems Hawaii

identified fully existed in the colonial era to the same degree as now. To the extent

Hawaii is correct that any of those problems exist to a greater degree, precedent

dictates that is not a sufficient justification to apply a more nuanced approach.

---

[8] "By 1826, at least 21 of the 24 states admitted to the Union—representing roughly 89 percent of the population—had enacted laws that placed the onus on parents or guardians to provide minors with firearms for militia service". *NRA*, 133 F.4th at 1120 (citation omitted). Thus, demonstrating that there is a historical tradition of permitting parents to transfer firearms to their children.

"The modern problems that" Hawaii "identifies as justification for" the challenged laws "are not different in kind" from past problems. *Nguyen*, 140 F.4th at 1245 "Therefore, a nuanced approach is not warranted.". *Id.* As shown below, the public safety concerns identified by the State existed during the Colonial Era to the same degree as in the modern era. And unlike the Colonial Era, contemporary 18-20-year-olds are full-fledged adults who are entirely responsible for their own safety.

   1. <u>The Neurology of 18-20-Year-Olds Has Not Changed Since the Colonial Era</u>

The State relies on the expert report of Elizabeth Cauffman to claim "developmental and social factors specific to the 18-to-20 age group are catalysts for gun violence" in support of its argument that a more nuanced approach should be used. Def. MSJ at 7. Nothing in Cauffman's report claims that the brain development of 18-20-year-olds has changed since the Colonial era. While Colonial America certainly didn't understand neurology, it obviously did understand that young people could be more immature, reckless, etc. Yet they did not completely bar 18-20-year-olds from owning firearms. The State has not cited direct historical support for their ban, because there is none. The State's discussion of neurology is a red herring. There is no reason to apply a more nuanced approach due to brain development in the relevant cohort, when the State has made no attempt to argue has changed since the time of the Founding.

## 2. Concealable Firearms Existed During the Founding Era

Hawaii argues that a more nuanced approach should be taken because firearms today are concealable unlike colonial firearms. However, Hawaii is incorrect in asserting that small concealable firearms did not exist during the Colonial Era. Concealable pistols, also known as pocket pistols, existed in colonial America.[9] Of course, some people also used concealable firearms for crimes, causing some earlier governments to seek to restrict them. In 1686, New Jersey banned the *carry* of pocket pistols. *See* An Act Against Wearing Swords, ch. 9, N.J. STAT. (W. Bradford 1881) (Law Passed 1686).[10] ("And be it further enacted by the authority aforesaid, that no person or persons after publication hereof, shall presume privately to wear any pocket pistol…"). Similarly, in 1541 England

---

[9] This link shows an example of a colonial pocket pistol. *See* Yamane, David. "Pocket Pistols: 17th and 18th Century Flintlock Editions." *Gun Culture 2.0*, 16 Oct. 2017, gunculture2point0.com/2017/10/16/pocket-pistols-17th-and-18th-century-flintlock-editions/. Accessed 2 Dec. 2025. The following Colonial Era advertisements show that they were for sale. *See* The Pennsylvania Journal and Weekly Advertiser (Philadelphia), June 14, 1775, at 4, https://www.newspapers.com/image/1033733308 attached as Exhibit 11. (advertising "POCKET PISTOLS" for sale); *see also* The South-Carolina Gazette; and Country Journal (Charleston), June 9, 1767, at 2, (same) https://www.newspapers.com/image/605380187  Attached as Exhibit 12. They were also used for self-defense. *See* The Vergennes Gazette and Vermont and New-York Advertiser (Vergennes, Vt.), September 12, 1799, at 3, https://www.newspapers.com/image/488954725 attached as Exhibit 13; *see also* Aurora General Advertiser (Philadelphia), May 30, 1800, at 2, https://www.newspapers.com/image/586597158 attached as Exhibit 14.
[10] Available at https://bit.ly/3LuDwaS and attached as Exhibit 15.

banned the ownership of small handguns and crossbows. *See* 33 Hen. 8, c. 6, § 1,
An Act Concerning Crossbows and Handguns (1541).[11] (noting that crime was
committed with "little short handguns").  Firearms have always been concealable,
thus the concealability of firearms is not a modern problem. A more nuanced
approach should not apply.

C.  <u>The State's Purported Historical Support Does Not Illustrate Shared
Analogous Principles with the Challenged Regulations</u>

1.  <u>18-20-Year-Olds Are Now Responsible for Their Own Safety</u>

During the Colonial Era, 18-20-year-olds were under the care and protection
of their parents. Whereas now they are fully responsible for their own safety. If we
are not to have a "law trapped in amber" that means that historical laws impacting
minors should not have any relevance to them. The relevant historical principle is
that adult citizens beyond the age of majority were afforded their full constitutional
rights. Today, that age of majority is 18.

2.  <u>Entire Subsets of "The People" Cannot Be Disarmed Because of the
Criminal Conduct of a Statistically Miniscule Portion of its Population</u>

Even assuming violent crime among 18-20-year-olds has increased since the
Colonial era, 18-20-year-olds as a whole are not widely associated with violent
crime. "Only 0.25% of [18-to-20-year-olds] commit violent crimes," so if this

---

[11] Available at https://bit.ly/4hUDXHF attached as Exhibit 16.

Court accepts the State's argument, it would be permitting a restriction on "the rights of 99.75% of [18-to-20-year-olds] based on the bad acts of an incredibly small sliver of the [18-to-20-year-old] population." *Jones,* 34 F.4th at 748 (Lee, J., concurring). As *Worth* explained "[a] legislature's ability to deem a category of people dangerous based only on belief [that they posed such a danger] would subjugate the right to bear arms 'in public for self-defense' to 'a second-class right, subject to an entirely different body of rules than the other Bill of Rights guarantees.' " *Worth v. Jacobson*, 108 F.4th 677, 694 (8th Cir. 2024) (quoting *Bruen*, 597 U.S. at 70).[12] Moreover, even to the extent young people commit more violent crime, that is overwhelmingly only limited to young *men*. Not that disarming young men is constitutional because a few of them commit crime, but even if it somehow were, the State's stated "problem" does not extend to young women, as women overall commit only 10% of homicides in the United States. *See* Ross Pomeroy, *Why do women commit far less crime than men?* Big Think (Feb. 27, 2024), https://bigthink.com/the-present/why-women-commit-much-less-crime/ (last visited Nov. 14, 2025). That a miniscule portion of the 18-20-year-old population commits crime does nothing to justify the challenged laws.

_____

[12] Despite similar concerns regarding the concealed carry of firearms, a Florida Court recently enjoined Florida's ban on concealed carry by 18-20-year-olds. *See State v. Walkes,* 2025 Fla. Cir. LEXIS 974; 2025 LX 474699 (not available in Westlaw).

3.    <u>Restrictions on Gambling and Similar Activities are Not Relevant</u>

This Court should not allow the State to analogize to activity that is not constitutionally protected to justify the challenged laws. The State argues that restrictions on "alcohol and tobacco purchases, and select types of gambling" for 18-20-year-olds disapproves Plaintiffs' argument that 18-20-year-olds as full adults are entitled to full Second Amendment rights. The State's position is deeply flawed because the State's examples deal with activities which are not constitutionally protected. Notably, the State has not pointed to a single constitutionally protected right which can be restricted, much less banned, as to 18-20-year-olds. They are entitled to the same rights as other adults as to the rest of the Bill of Rights. The Second Amendment is not a "second-class right, subject to an entirely different body of rules than the other Bill of Rights." *McDonald v. City of Chi*., 561 U.S. 742, 780 (2010). This Court should reject Hawaii's request to treat it as such.

4.    <u>Restrictions on Students in Schools Do Not Support Hawaii's Position</u>

The State argues that restrictions on students support the constitutionality of the challenged laws. This is untrue. Unlike statutory restrictions on firearm rights, restrictions in schools have a different and more limited history. Such historical restrictions were based on notions of *in loco parentis* and applied only to students, not to faculty or other adults. *See Koons v. Att'y Gen. New Jersey,* 156 F.4th 210, 309 (3d Cir. 2025), <u>as amended</u> (Sept. 17, 2025) (Porter, J., *concurring in part, dissenting*

13

*in part*) ("These codes of conduct prohibited students from carrying guns; the majority identifies no such regulation affecting staff, teachers, or anyone other than students."); D. Kopel & J. Greenlee, The "Sensitive Places" Doctrine: Locational Limits on the Right to Bear Arms, 13 Charleston L. Rev. 203, 205, 247-54 (2018)[13] (detailing history of firearms restrictions in schools). *United States v. Allam*, 677 F.Supp.3d 545, 569-72 (E.D. Tex. 2023), *aff'd United States v. Allam,* 140 F.4th 289 (5th Cir. 2025) (canvassing historical rationales for restrictions on arms at schools, noting "the prohibitions applied to students only"). Furthermore, they were not age based restrictions because they "applied to all students regardless of age." *Id.* And typically "they applied only to possession within a school or in an area where school functions were taking place." *Id* at 575.

Such restrictions were frequently accompanied by other requirements and restrictions on students' freedoms that, applied to the general population, would have been certainly unconstitutional. *See* The Minutes of the Senate Academicus, 1799-1842 at 38, UNIV. OF GA. LIBRS. (1976);[14] *See also University Church in*

---

[13] Available at https://papers.ssrn.com/sol3/papers.cfm?abstract_id=3361371 and attached as Exhibit 17.

[14] Available at https://perma.cc/J3ZV-XMEC and attached as Exhibit 18 ("Every Student, whether a Graduate or Undergraduate, shall be subject to the laws and government of the College and show in speech and behavior, all proper respect and obedience to the President, Professors and Tutors of the College.") (1803 restriction); *Id.* at 85–86 ("If any scholar shall be guilty of profane swearing … [or] [i]f he shall disturb others by noise[,] loud talking[,] or singing during the time of study[ ] … he shall for either of those offences be punished.").

*Yale*, Yale University, https://church.yale.edu/history (explaining that until 1927, chapel attendance was mandatory) (last accessed November 7, 2025). Attached as Exhibit 19 *See also Worth v. Jacobson*, 108 F.4th 677, 695-96 (8th Cir. 2024), *cert. denied*, 145 S.Ct. 1924 (2025); *Morse v. Frederick*, 551 U.S. 393, 416 (2007) (Thomas, J. concurring).[15] ("The doctrine of in loco parentis limited the ability of schools to set rules and control their classrooms in almost no way."). "[F]ounding-era college rules are not persuasive sources to discern the constitutional rights of its students." *Worth,* 108 F.4th at 696. These rules are different in their "how" and "why." *See United States v. Rahimi,* 602 U.S. 680, 692 (2024)*,* ("Why and how the regulation burdens the right are central to this [historical] inquiry"), citing *Bruen*, 597 U.S. at 29. Historical restrictions on students cannot support modern restrictions on *non*-students.

5.  The Cited Reconstruction Era Firearms Restrictions Fail the "how" and "why" Principles Set Forth in *Bruen*

None of the Reconstruction Era laws relied upon by the State are analogous to the challenged laws. The Tennessee law prohibited "selling, loaning, giving, or delivering 'to any minor a pistol, bowie-knife, dirk, Arkansas tooth-pick, hunter's knife, or like dangerous weapon, except for a gun for hunting or weapon for defense in traveling." Tenn. Code § 4864 (1858). *See also State v. Callicutt*, 69 Tenn. 714,

---

[15] *Cf. Brown v. Ent. Merch. Ass'n,* 564 U.S. 786, 795 n.3 (2011).

714 (1878) ("This section makes it a misdemeanor to sell, give, or loan a minor a pistol, or other dangerous weapon, except a gun for hunting, or weapon for defense in traveling."). Hawaii's reliance on *State v. Callicutt* is misguided. This opinion was evaluating a law which gave exemptions for hunting and self-defense unlike the challenged laws. As the law itself declares, it was targeted only at specific "dangerous weapon[s]" and notably does not include in its list, alongside things like an "Arkansas tooth-pick," the standard rifles and long guns that were the preferred self-defense firearms of the time, and so it is unlike the State's ban on all ordinary firearms that "traditionally have been widely accepted as lawful possession." *Staples v. United States*, 511 U.S. 600, 612 (1994).

And of course, the law explicitly targeted "minors" not legal adults like 18-to-20-year-old Hawaiians today. *Rahimi* holds that, when analyzing a law that regulates arms-bearing conduct, "the appropriate analysis turns on whether the challenged regulation is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692. Thus, "[e]ven when a law regulates arms-bearing for a permissible reason ... it may not be compatible with the right if it does so to an extent beyond what was done at the founding." *Id*. The shared "principle that underpin[s] our regulatory tradition" is that legal adults have full Second Amendment rights. *See Rahimi*, 602 U.S. at 692. The State's relied upon laws also should be disregarded because they targeted minors rather than full-fledged adults.

Furthermore, *State v. Callicutt* endorsed the legal reasoning of the Tennessee Supreme Court's earlier opinion in *Aymette v. State*, 21 Tenn. 154 (1840). "The cases of *Aymette v. State*, 2 Hum. 155, opinion by Judge Greene, and of *Page v. State*, 3 Heis. 198, opinion by Chief Justice Nicholson, sufficiently indicate the difference between the right and the wrong construction of the "right to keep and bear arms,"…". *State v. Callicutt*, 69 Tenn. 714, 716 (1878). The *Aymette* Court's interpretation of the right to bear arms was expressly disavowed by the Supreme Court. "The [*Aymette*] court then adopted a sort of middle position, whereby citizens were permitted to carry arms openly, unconnected with any service in a formal militia, but were given the right to use them only for the military purpose of banding together to oppose tyranny. This odd reading of the right is, to be sure, not the one we adopt." *Heller*, 554 U.S. at 613.  As *State v. Callicutt* was premised on a legal interpretation expressly disavowed by *Heller,* this Court should not rely on it.

The Alabama law is much the same—it too applied only to "male minors," not adults, and only to a subset of weapons ("bowie knife, or knife or instrument of the like kind or description … or air gun or pistol") that excluded common self-defense firearms of the time. *See* 1856 Ala. Acts. 17. The story with the Kentucky law,[16] is also the same. It likewise applied only to "minors," explicitly carved out an

---

[16] The State cites the Kentucky law as 1859 Ky. Acts 245, § 23, however Plaintiffs believe the correct citation is 1860 Ky. Acts 245, § 23

option for their parents to supply them with arms, and also only barred the sale of certain enumerated "deadly weapon[s], which [are] carried concealed."[17]; *see also Jones*, 34 F.4th at 720 (discounting laws that only banned the sale of pistols or which had exceptions for parental consent). The Kentucky law also should be rejected because it "restricted firearm access by African Americans". *Jones*, 34 F.4th at 720.

6. <u>The Voidability Doctrine Provides no Safe Harbor for the Challenged Law</u>

The premise of the voidability doctrine was that minors could not enter into binding credit contracts. It existed to protect *minors* from predatory creditor practices by allowing *minors* to void a contract with a commercial seller.  As established in Plaintiffs' MSJ, that doctrine is irrelevant to the challenged law because 1) 18-20s are adults not minors; 2) the challenged law goes beyond a sales prohibition and completely bans possession; and 3) the "why" behind the doctrine was to protect the minors from predatory lending/business practices of adults, not about protecting society from minors. However, even if this Court were to entertain the argument, Hawaii has made no effort to rebut the wealth of case law presented in Plaintiffs' MSJ. Hawaii and its experts make conclusory statements that necessities "had to be immediately related to food, clothes, education, or medical care", *see* Expert Declaration of Holly Brewer at *18, but that argument is unsupported by evidence and directly contradicted by case law from the historical

---

[17] *See Id.*

period.  "[T]he law has never limited its definition of the term *necessaries* to those things which are strictly essential to the support of life, such as food, clothing, and medicine. The practical meaning of the term has always been in some measure relative, having reference as well to what may be called the conventional necessities of others in the same walks of life with the infant, as to his own pecuniary condition and other circumstances." *Middlebury Coll. v. Chandler*, 16 Vt. 683, 686 (1844) (emphasis in original). *See also Jordan v. Coffield*, 70 N.C. 110, 110 (1874).[18] "What are 'necessaries' cannot be determined by any arbitrary and inflexible rule." *Epperson v. Nugent*, 57 Miss. 45, 47 (1879).

The State's expert Saul Cornell cites to Blackstone (without providing a quote) and American jurist Nathan Dane who relies on Blackstone. Both list food, water and clothing as *examples* of necessities. The State claims that this should be construed as an all-exclusive list of necessities. *See* Saul Cornell Expert Report at *10-11. That argument rings hollow when Blackstone expressly notes that there are other necessities.  "Lastly, it is generally true, that an infant can make no other contract that will bind him: yet he may bind himself to pay for his necessary meat,

---

[18] *See also Smith v. Young*, 19 N.C. 26, (N.C. 1836) ("The question, whether necessaries or not, is a mixed question of law and fact."); *See also New Hampshire Mut. Fire Ins. Co. v. Noyes,* 32 N.H. 345, 347 (1855) ("("Necessaries are such things as are useful and suitable to the party's state and condition in life, and not merely such as are requisite for bare subsistence[…]So horses and necessary work in regard to such horses may be necessaries.")").

drink, apparel, physic, and ***such other necessaries***." 1 WILLIAM BLACKSTONE,

COMMENTARIES Ch. 17 (emphasis added).[19] Blackstone's caveat drains the

persuasive value from Cornell's argument. Blackstone's and Dane's lists simply

were a recognition that a few things that were per se necessaries—e.g. food,

lodging, and educational expenses. These appear to always be necessaries for

which a minor could contract. Outside of those items, whether an item was a

necessary was a "question of circumstance—not only of age but also of station in

life." *Peters v. Fleming*, 6 M. & W. 42 (Ex. 1839). Even under Cornell's theory that

Blackstone's list should be presumed to be an all-exclusive list, "hard textual

evidence to the contrary" (Cornell Report at *11) is sufficient to overcome this

presumption.  And Plaintiffs have provided numerous cases where items other than

the aforementioned were considered necessities. Plaintiffs' MSJ at *22 n.7.

     7.  <u>Arms Were Expressly Listed as Necessities in Bankruptcy Proceedings</u>

    During the colonial period, firearms were considered necessities and thus

exempt from seizure during bankruptcy proceedings. "Without such construction,

no tools, ***arms***, or articles of household furniture would be exempted; for none of

these can be said to be absolutely "necessary for upholding life," as people may

subsist without them. *See Crocker v. Spencer*, 1824 WL 1335, at *2 (Vt. Feb.

1824). (emphasis added) (also holding that a cooking stove was a necessity). *See*

---

[19] Attached as Exhibit 20.

*also Fry v. Canfield*, 4 Vt. 9, 10 (1831) finding that military equipment is "exempt from attachment and execution by the 32nd section of the militia act." Connecticut's 1650 law allowed officers, upon "execution of Civill Actions.…to breake open the dore of any howse, chest or place" where goods liable to execution were, except that "it shall not bee lawfull for [an] officer to [levy] any mans…armes" or any other implements "which are for the necessary upholding of his life."[20]And the federal Uniform Militia Act in 1792 exempted militia arms "from all suits, distresses, executions or sales, for debt or for the payment of taxes." 1 Stat. 271, §1 (1792).  Throughout Colonial America arms and ammunition were deemed necessities.[21] And not just for militia service but for hunting as well. Maryland law expressly exempted firearms and ammunition from seizure that were needed for subsistence. "That no sheriff, in any county within this province shall, by any attachment, or any other execution had upon such attachment, or any other execution whatsoever, levy seize or take the goods and

---

[20] THE PUBLIC RECORDS OF THE COLONY OF CONNECTICUT, PRIOR TO THE UNION WITH NEW HAVEN COLONY, MAY 1665, at 537 (J. Hammond Trumbull ed.,1850) Attached as Exhibit 21 and available at
https://shorturl.at/ywvvJ
[21] *See also* Virginia. Acts of Assembly, Passed In the Colony of Virginia: From 1662, to 1715. Volume I. London: Printed by John Baskett, printer to the King's most excellent majesty, 1727 at 147. (Prohibited impressing or taking from any person arms "that are already provided, or shall so provide or furnish himself; neither shall the same be liable to be taken by any Distress, Seizure, Attachment, or Execution…") available at https://bit.ly/3LoltTQ and attached as Exhibit 22.

chattels of any the inhabitants of this province as far as to deprive them of all livelihood for the future, but that corn for necessary maintenance, bedding, gun, axe pot, and labourers' necessary tools, and such like household implements and ammunition for subsistence, shall be protected from all attachments and executions whatsoever."[22][23] Thus, firearms and ammunition needed for subsistence i.e. hunting were considered necessities as well.   These readily available sources detract from the persuasive value of Professor Holly Brewer's expert report which says she conducted a deep search of the term, including in the context of bankruptcy and was unable to report any examples of firearms being deemed necessities. *See* Expert Report of Holly Brewer at 16.

> D. <u>Hawaii's Call for Interest Balancing Should be Rejected</u>

Hawaii makes a number of public policy arguments that amount to interest balancing. However, none of these arguments are permissible under *Bruen* which requires a history-based inquiry and specifically dispensed with interest balancing.

---

[22] *See also* Dorsey, Clement. *The General Public Statutory Law and Public Local Law of the State of Maryland: From the Year 1692 to 1839 Inclusive, with Annotations Thereto, and a Copious Index*. Baltimore: J. D. Toy, 1840. at pg. 763 available at https://bit.ly/4p6LgOV and attached as Exhibit 5.
[23] Note the term gun only applied to long guns and not pistols. *See Koons v. Platkin,* 673 F. Supp. 3d 515, 621 n.42 (D.N.J. 2023) (quoting Noah Webster's American Dictionary of the English Language (1828)

"Historical analysis can sometimes be difficult and nuanced, but reliance on history to inform the meaning of constitutional text is more legitimate, and more administrable, than asking judges to "make difficult empirical judgments" about "the costs and benefits of firearms restrictions," especially given their "lack [of] expertise" in the field." *Bruen*, 597 U.S. at 2. "While judicial deference to legislative interest balancing is understandable—and, elsewhere, appropriate—it is not deference that the Constitution demands here. *Id*. "The test that the Court set forth in *Heller* and applies today requires courts to assess whether modern firearms regulations are consistent with the Second Amendment's text and historical understanding." *Id* at 3. The State's arguments regarding crime and other societal ills simply have no place in Second Amendment analysis, which requires a history-focused approach. Arguments about brain development are especially impermissible since there is no evidence that brain development has changed since the Colonial Era. Hawaii's interest balancing arguments must be rejected.

### E.  The State Has Failed to Show Plaintiffs Have Not Met the Requirements for Injunctive Relief

The State has not met its burden to show Plaintiff's are not entitled to a permanent injunction. "To be entitled to a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies available at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be

disserved by a permanent injunction." *Indep. Training & Apprenticeship Program v. Cal. Dep't of Indus. Relations*, 730 F.3d 1024, 1032 (9th Cir. 2013). Plaintiffs have demonstrated actual success on the merits. Plaintiffs have also suffered "an irreparable injury" — because they have been deprived of a constitutionally-protected right. *See, e.g., Valle del Sol Inc. v. Whiting,* 732 F.3d 1006, 1029 (9th Cir. 2013) (reiterating that "an alleged constitutional infringement will often alone constitute irreparable harm") (citation omitted); *Ariz. Dream Act Coalition v. Brewer,* 757 F.3d 1053, 2014 WL 3029759, at *11 (9th Cir. 2014) (stating that "[i]rreparable harm is traditionally defined as harm for which there is no adequate legal remedy, such as an award of damages") (citation omitted).  The State's arguments to the contrary are foreclosed by this binding case law.

The State's other arguments also are foreclosed by precedent. "[I]t is clear that it would not be equitable or in the public's interest to allow the state . . . to violate the requirements of federal law, especially when there are no adequate remedies available." *Ariz. Dream Act Coalition,* 757 F.3d 1053, 2014 WL 3029759, at *12 (quoting *Valle del Sol,* 732 F.3d at 1029). Here, Plaintiffs allege ongoing constitutional violation so monetary damages are insufficient and Hawaii's arguments that it is against the public interest to do so are foreclosed. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Baird v. Bonta*, 81 F.4th 1036, 1042(9th CIR. 2023). The State's other

argument is that it will suffer irreparable harm if the law is enjoined. However, the State "cannot reasonably assert that it is harmed in any legally cognizable sense by being enjoined from constitutional violations." *Zepeda v. INS*, 753 F.2d 719, 727 (9th Cir. 1983); *see also Rodriguez v. Robbins*, 715 F.3d 1127, 1145 (9th Cir. 2013) (holding that the government "cannot suffer harm from an injunction that merely ends an unlawful practice" implicating "constitutional concerns"). Judge Seabright rejected similar arguments within the context of a motion to stay. "[T]he Defendant continues to assert that a "state suffers irreparable injury whenever an enactment of its people or representative is enjoined."[…]the court declines to treat that harm as sufficient, by itself, to satisfy the showing required for the irreparable-injury factor. *Yukutake v. Connors*, No. CV 19-00578 JMS-RT, 2021 WL 4342320, at *8-12 (D. Haw. Sept. 23, 2021).[24] Plaintiffs are entitled to a permanent injunction.

### III. Conclusion

The State's MSJ should be denied and Plaintiffs' MSJ should be granted.

---

[24] *See also Fotoudis v. City & Cty. of Honolulu*, 54 F. Supp. 3d 1136, 1145 (D. Haw. 2014) (granting a permanent injunction against H.R.S. § 134-2(d)).

Respectfully submitted,

Dated: December 1, 2025

                                        */s/ Kevin Gerard O'Grady*
                                        Kevin Gerard O'Grady

                                        */s/ Alan Alexander Beck*
                                        Alan Alexander Beck
                                        Attorneys for Plaintiffs