IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF HAWAII

| | |
|---|---|
| JUDA ROACHE, ET AL.,<br><br>Plaintiffs,<br><br>vs.<br><br>ANNE E. LOPEZ, in her official capacity as Attorney General of the State of Hawai‘i,<br><br>Defendant. | CIV. NO. 24-00496 JAO-WRP<br><br>ORDER DENYING PLAINTIFFS' FIRST MOTION FOR SUMMARY JUDGMENT (ECF NO. 65) AND GRANTING DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT (ECF NO. 71) |

**ORDER DENYING PLAINTIFFS' FIRST MOTION FOR SUMMARY JUDGMENT (ECF NO. 65) AND GRANTING DEFENDANT'S COUNTER MOTION FOR SUMMARY JUDGMENT (ECF NO. 71)**

Hawai‘i law establishes 21 as the minimum age for firearm acquisition and ownership. Plaintiffs[1] contend that the age restriction violates the Second Amendment rights of 18- to 20-year-olds who would otherwise be eligible to obtain guns. Defendant Anne Lopez, in her official capacity as the Attorney General of the State of Hawai‘i,[2] defends the law as constitutional.

---

[1] There are four Plaintiffs remaining in this litigation: Juda Roache, Aloha Strategics LLC, JGB Arms LLC, and the Second Amendment Foundation (collectively, "Plaintiffs"). *See generally* ECF No. 49 ("FAC"); ECF No. 98 (Stipulation to Dismiss Plaintiff Elijah Pinales).

[2] Hereinafter referred to as "the State."

Before the Court are the parties' cross-motions for summary judgment. *See* ECF No. 65-1 ("Plaintiffs' MSJ"); ECF No. 71 ("Defendant's Counter MSJ"). For the following reasons, the Court concludes that Hawaii's age restriction conforms with the country's historical tradition of firearm regulation and thus DENIES Plaintiffs' MSJ and GRANTS Defendant's Counter MSJ.

# I. BACKGROUND

## A. Statutory Scheme and Facts

In Hawai'i, "no person shall acquire the ownership of a firearm" be it "by purchase, gift, inheritance, bequest, or in any other manner" until the person obtains a permit from their county's chief of police. *See* HRS § 134-2(a). As relevant to the instant case, "the chief of police . . . shall issue permits to acquire firearms to: (1) Citizens, nationals, or lawful permanent residents of the United States *of the age of twenty-one years or more*" who are not otherwise disqualified. *Id.* § 134-2(d)(1) (emphasis added); *id.* § 134-7 (disqualifications). In addition to essentially prohibiting acquisition by those under 21, the statute also provides that "[n]o person shall sell, give, lend, or deliver into the possession of another any firearm except in accordance with" the foregoing. *Id.* § 134-2(h). These laws are subject to certain exceptions that allow people under 21 to carry and use some firearms for hunting and target shooting, or to borrow a rifle or shotgun for 15 days. *See id.* §§ 134-4(c), 134-5(a) & (b). Further, the State also generally

prohibits people under 21 from owning, possessing, or controlling ammunition, except under a few narrow circumstances. *Id.* § 134-7(g); *id.* § 134-7.7 (prohibiting sale of ammunition).

Plaintiff Juda Roache is an individual over 18-years-old but under 21-years-old who lives in Honolulu and would apply for a permit to acquire firearms and ammunition and would purchase his own firearms if allowed. *See* ECF No. 83 ¶¶ 12–13, 16; *see also* ECF No. 49 ¶ 2. He would also accept a firearm and ammunition as gifts from his mother. *See* ECF No. 83 ¶ 14. Besides his age, he is not disqualified under Hawaiʻi law from acquiring a firearm. *See id.* ¶¶ 18–19, 21 (e.g., no criminal or mental health history that would preclude him from acquiring a gun or ammunition). Aloha Strategics LLC d/b/a Danger Close Tactical and JGB Arms LLC are federally licensed firearms dealers in Hawaiʻi that cannot sell guns or ammunition to their 18- to 20-year-old customers. *See id.* ¶¶ 22–31. The Second Amendment Foundation "is a non-profit educational foundation . . . [that] seeks to preserve the effectiveness of the Second Amendment through educational and legal action programs." ECF No. 49 ¶ 5. It has over 720,000 members, including some in Hawaiʻi between the ages of 18 and 20. *See* ECF No. 83 ¶¶ 32, 34

## B. Procedural History

Plaintiffs initially filed suit on November 20, 2024, asserting a single claim for declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of the Second Amendment. *See generally* ECF No. 1. At the same time, Plaintiffs moved for a preliminary injunction to prevent the State from enforcing its firearms restrictions against people over 18-years-old but under 21-years-old. *See* ECF No. 2. The Court denied the motion for preliminary injunction on February 7, 2025, concluding that Plaintiffs had not established that they were likely to succeed on the merits, and that they thus had not shown likely irreparable harm. ECF No. 45 ("PI Order").

Plaintiffs declined to appeal the PI Order and instead filed the FAC in March 2025, again asserting a single claim for declaratory and injunctive relief under 42 U.S.C. § 1983 for violation of the Second Amendment. *See* ECF No. 49 ¶¶ 57–64. Specifically, they challenged the constitutionality of the State's laws that prohibit the acquisition, purchase, sale, ownership, and possession of firearms and ammunition by adults under 21, i.e., otherwise qualified people between the ages of 18- and 20-years-old. *See id.* ¶¶ 1, 2, 9. The State answered the FAC and the case proceeded. *See* ECF No. 50.

In May 2025, the State moved to stay this action pending an appeal to the Ninth Circuit of a Second Amendment challenge to a California age restriction.

*See* ECF No. 58. Plaintiffs opposed, ECF No. 60, and the Court denied the motion, concluding a stay would be inefficient. ECF No. 63. That appeal remains pending. *See Pwgg, LP v. Bonta*, 179 F.4th 1232 (9th Cir. July 6, 2026) (vacating submission of appeal and reassigning to prior panel).

The parties thereafter stipulated to a summary judgment briefing schedule that would allow both sides to file two briefs. ECF No. 64. Based on the stipulation, Plaintiffs filed their MSJ on October 1, 2025. ECF No. 65. The State then timely filed its combined opposition and Counter MSJ, ECF No. 71, followed by the parties' staggered replies, ECF Nos. 82, 87, which ultimately culminated the briefing on January 16, 2026. The Court initially set a hearing on the cross-motions for February 13, 2026, ECF No. 67, but continued the hearing in light of the Supreme Court's consideration of (and potential consideration of) several Second Amendment cases during the then-current term, *see* ECF Nos. 89, 93. After the Supreme Court released two Second Amendment opinions, the Court ordered supplemental briefing, ECF No. 97, which the parties submitted on July 9, 2026, ECF Nos. 99, 100. The parties have also filed Notices of Supplemental Authority as other courts have issued orders relating to age restrictions on firearms. *See* ECF Nos. 96, 103, 106.

The Court held a hearing on the cross-motions on July 31, 2026.

## II. LEGAL STANDARD

A party is entitled to summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). Here the parties generally agree that there are no material issues of fact and that the questions are pure questions of law, meaning that the Court's order regarding the cross-motions will resolve the case. *See* ECF No. 65-1 at 12; ECF No. 71 at 9; ECF No. 94.

## III. DISCUSSION

The Second Amendment provides: "A well regulated Militia, being necessary to the security of a free State, the right of the people to keep and bear Arms, shall not be infringed." U.S. Const. amend. II. In 2008, the Supreme Court held that the amendment codified a pre-existing "individual right to keep and bear arms" independent of any militia service. *Dist. of Columbia v. Heller*, 554 U.S. 570, 593–95 (2008). Yet, in doing so, it recognized that "[l]ike most rights, the right secured by the Second Amendment is not unlimited." *Id.* at 626.

To determine whether a modern firearm regulation is constitutional, the Supreme Court developed a two-step framework in which courts first ask whether the Second Amendment's plain text covers the challenged conduct. *See New York State Rifle & Pistol Ass'n, Inc. v. Bruen*, 597 U.S. 1, 17 (2022). If it does, then "the Constitution presumptively protects that conduct" and it falls to the

government to "demonstrate that the regulation is consistent with this Nation's historical tradition of firearm regulation." *Id.*

More recently, responding to some courts' misunderstandings of the Second Amendment methodology, the Supreme Court clarified *Bruen*'s historical tradition test in *United States v. Rahimi*, 602 U.S. 680, 690–93 (2024). There, the Supreme Court emphasized that *Heller* and *Bruen* "were not meant to suggest a law trapped in amber," and did not require an identical historical analogue to pass constitutional muster under the second part of the *Bruen* test. *See id.* at 691–92. Instead, courts must determine "whether the challenged regulation is consistent with the *principles* that underpin our regulatory tradition." *Id.* (citing *Bruen*, 597 U.S. at 26–31) (emphasis added). Doing so involves "ascertain[ing] whether the new law is 'relevantly similar' to laws that our tradition is understood to permit, 'apply[ing] faithfully the balance struck by the founding generation to modern circumstances.'" *Rahimi*, 602 U.S. at 692 (quoting *Bruen*, 597 U.S. at 28). To determine whether a law is relevantly similar, courts must consider "[w]hy and how the regulation burdens the right." *Rahimi*, 602 U.S. at 692. Even if a challenged law is not a "dead ringer" or "historical twin" with a historical regulation, it may still be sufficiently analogous to survive a constitutional challenge. *Id.*

Here, there is little dispute that the State's age-limit restrictions on firearm acquisition for 18- to 20-year-olds falls within the plain text of the Second Amendment. The Court nonetheless addresses that question briefly before turning to the weightier issues at *Bruen*'s second step. Ultimately, the Court concludes that the State's restriction is largely consistent with the principles that underlie the country's regulatory tradition, as evidenced by Founding era common law and 19th century statutory prohibitions that were enacted in response to societal changes and technological advances in firearms.

## A. ***Bruen's*** **First Step**

Plaintiffs first argue that 18- to 20-year-olds are part of "the people" to whom the Second Amendment applies. *See* ECF No. 65-1 at 14–15. While the State preserves for appeal its argument that such a group is excluded from the text of the amendment, it does not press the matter here except to comment that in the Founding era, the public would not have considered anyone under 21-years-old to be part of "the people." *See* ECF No. 71 at 9–10 n.4 (citing *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 447–51 (3d Cir. 2025) (Restrepo, J., dissenting)). As the Court will discuss below, the fact that people under age 21 enjoyed limited rights in the Founding era is relevant to the Court's analysis, but at *Bruen*'s second step, not its first. *See Wolford v. Lopez*, 609 U.S. ---, 146 S. Ct. 2032, 2049 (2026) ("We will discuss all these [historical] authorities, but they are out of place at

*Bruen*'s first step. At that stage, as we have explained, the question is simply whether a challenged law falls within the Second Amendment's 'plain text.'" (citation omitted)); *but see id.* at 26–29 (Jackson, J., dissenting) (criticizing practice of considering plain text without reference to historical understanding of that text). In any event, the Court is satisfied that 18- to 20-year-olds are part of "the people."

The Circuit Courts of Appeal that have considered Second Amendment challenges to age limits have either concluded or assumed that 18- to 20-year-olds are included within "the people." *See Reese v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 127 F.4th 538, 590–95 (5th Cir. 2025); *Lara*, 125 F.4th at 437; *Worth v. Jacobsen*, 108 F.4th 677, 690 (8th Cir. 2024); *Rocky Mtn. Gun Owners v. Polis*, 121 F.4th 96, 111–12 (10th Cir. 2024); *see also McCoy v. Bureau of Alcohol, Tobacco, Firearms, and Explosives*, 140 F.4th 568, 575 (4th Cir. 2025) (assuming without deciding that 18- to 20-year olds are part of the people); *NRA v. Bondi*, 133 F.4th 1108, 1129–30 (11th Cir. 2025) (en banc) (same). As the Court previously explained in its PI Order: "The gist of their conclusions is that (1) 'the people' means the national community, like *Heller* said; (2) the national community means the current one and not some historical community; and (3) 18- to 20-year-olds are part of the current national community." ECF No. 45 at 24.

Additionally, there's no doubt that Hawaii's ban on acquisition of guns and ammunition affects the right to "keep" arms. *See Heller*, 554 U.S. at 583 (noting that to "keep arms" means to "have weapons"); *see also Teixeira v. Cnty. of Alameda*, 873 F.3d 670, 677 (9th Cir. 2017) ("As with purchasing ammunition and maintaining proficiency in firearms use, the core Second Amendment right to keep and bear arms for self-defense wouldn't mean much without the ability to acquire arms." (internal quotation marks and citation omitted)), *abrogated in part by Bruen*, 597 U.S. at 17. As such, Hawaii's law implicates the plain text of the Second Amendment and the State must demonstrate that it accords with the Nation's historical tradition of regulation.

**B. *Bruen*'s Second Step**

The Court addresses some preliminary matters before turning to the arguments regarding the State's proffered historical analogues.

**1. Preliminary Matters**

***a. Relevant Era***

In determining the scope of the Second Amendment, the Supreme Court has yet to answer whether courts should look primarily to the public understanding of individual rights in the Founding era (when the Bill of Rights was ratified in 1791), or "whether courts should primarily rely on the prevailing understanding of an individual right when the Fourteenth Amendment was ratified in 1868." *Bruen*,

597 U.S. at 37; *see also Rahimi*, 602 U.S. at 692 n.1 (concluding that, like *Bruen*, it need not decide whether the ratification of the Second or Fourteenth Amendment provides the relevant timeframe); *see also United States v. Hemani*, 608 U.S. ---, 146 S. Ct. 1677, 1687 (2026) (declining to decide the matter). However, the Supreme Court has "generally assumed that the scope of the protection applicable to the Federal Government and States is pegged to the public understanding of the right when the Bill of Rights was adopted in 1791," and has generally favored Founding era analogues. *See Bruen*, 597 U.S. at 36–38; *NRA*, 133 F.4th at 1116 ("The Supreme Court has warned against the overuse of history from Reconstruction."). Nevertheless, when later history is consistent with the Founding era, it can serve as confirmation. *See Bruen*, 597 U.S. at 36–38; *McCoy*, 140 F.4th at 578.[3] And, in fact, the Ninth Circuit has "look[ed] to the understanding of the right to bear arms both at the time of the ratification of the Second Amendment in 1791 and at the time of the ratification of the Fourteenth Amendment in 1868," especially when—as discussed below—the case implicates social or technological changes. *Wolford*, 116 F.4th at 980, *overruled on other*

---

[3] The Ninth Circuit considered both the Founding and Reconstruction eras in *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024). When the Supreme Court granted certiorari in *Wolford*, it declined to grant certiorari as to the question of which era(s) to consider. *See* Pet. for Writ of Cert., *Wolford v. Lopez*, No. 24-1046 (U.S. Apr. 1, 2025), ECF No. 1 at i-ii.

*grounds*, 146 S. Ct. 2032; *see also Wolford v. Lopez*, --- F.4th ---, 2026 WL 2291925, at *2 (9th Cir. Aug. 10, 2026) (stressing on remand that the Ninth Circuit's "analysis as to all other aspects of Hawaii's law is unaffected" by the Supreme Court's reversal of the state's law regarding carry of firearms on private property).

***b. Nuanced Approach***

Next, the parties debate whether the Court should apply "a more nuanced approach" to the case. *See* ECF No. 65-1 at 19–20; ECF No. 71 at 10–13. The phrase comes from *Bruen*, where the Supreme Court commented that "cases implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." *Bruen*, 597 U.S. at 21. Plaintiffs contend—without citing any evidence[4]—that "the social challenges of youthful behavior" have not changed since the Founding, nor has the principle of "affording legal adults their full rights under the law," even if the age of majority is different. *See* ECF No. 65-1 at 20. They also say that concealable arms existed at the Founding, without responding to evidence that the technology and availability of

[4] In Second Amendment cases, courts rely on the historical record compiled by the parties. *See Bruen*, 597 U.S. at 25 n.6; *Wolford*, 116 F.4th at 976, *overruled on other grounds*, 146 S. Ct. 2032. The State submitted several expert affidavits and reports along with its Counter MSJ, *see generally* ECF No. 72, whereas Plaintiff filed a handful of excerpts of secondary sources, *see generally* ECF No. 65.

such arms drastically changed in the 19th century. ECF No. 82 at 12–13. So, they argue that a more nuanced approach isn't warranted.

By contrast, the State presents significant evidence that both society and technology changed dramatically from the Founding to a century later. Technological advancements in firearms in the 19th century rendered them more portable, lethal, and available. *See* ECF No. 71 at 11–12 (citing various expert reports that the Court discusses in more detail below). At the same time, social changes such as "urbanization and industrialization disrupted family structures and led to more youth in the streets, higher crime, and more crime committed by youth, including with guns." *Id.* at 12 (citations omitted). Further, society also shifted from a credit-based economy where cash was scarce and people acquired goods based on agreements to provide commodities as payment later, to one where youths could earn their own wages and purchase goods, such as firearms. *Id.* (citations omitted).

Before addressing whether the so-called "nuanced approach" applies here, the Court notes that the contours—and even existence—of a distinct "nuanced approach" is one of the many Second Amendment issues still being ironed out by courts. The Ninth Circuit sitting en banc has concluded that *Bruen* indeed set forth a distinct nuanced standard, "even more flexible" than the approach in *Rahimi*. *See Duncan v. Bonta*, 133 F.4th 852, 872–73 (9th Cir. 2025) (en banc). Addressing

California's ban on possession of large-capacity magazines, the court concluded that the more nuanced approach was "appropriate" because mass shootings were a new societal concern that only arose in the 20th century and that "[l]arge-capacity magazines, when attached to a semi-automatic firearm, also represent[ed] a dramatic technological change from the weapons at the Founding." *Id.* at 873. Nonetheless, the court didn't actually apply the nuanced approach, instead engaging in "*Rahimi*'s straightforward approach" because it led to the same result in the case, even if that result was also "buttressed by the Supreme Court's reservation of a more flexible analogical approach for 'unprecedented societal concerns or dramatic technological changes.'" *Id.* at 874 (quoting *Bruen*, 597 U.S. at 27). The Ninth Circuit therefore determined when the nuanced approach might apply but did not define the contours of the approach.

Just a few months after *Duncan*, another panel of the Ninth Circuit declined to address *Duncan*'s discussion of the nuanced approach and instead remarked that "[i]t is unclear whether this passage [from *Bruen* about the nuanced approach] created a different standard from the otherwise applicable 'relevantly similar' standard, or whether it was a recognition that analogical reasoning may be more challenging in some cases where modern regulation addresses issues that could not have been contemplated historically." *Nguyen v. Bonta*, 140 F.4th 1237, 1244 (9th Cir. 2025) (citing *Rahimi*, 602 U.S. at 692). However, the court once again did not

define the approach, this time concluding it didn't apply since the proffered societal and technological developments of "large-scale firearms trafficking and straw purchasing" were in fact present at the Founding. *Nguyen*, 140 F.4th at 1244–45.

Still, from *Duncan*, the Court gleans that a nuanced approach exists and can apply in cases implicating dramatic societal or technological change. But *Duncan* gives no guidance on what the approach entails except that it's more flexible than *Rahimi*. *See* 133 F.4th at 874 ("[B]ecause the Court did not flesh out how the 'more nuanced approach' operates—for instance, whether more recent analogies should be consulted—we have taken the most conservative path in our analysis by declining to apply the more nuanced approach." (Emphasis omitted)).

Confronting the lack of explanation as to what the nuanced approach actually is, the State suggests that it may allow courts to focus on other post-Founding historical periods as particularly relevant. *See* ECF No. 87 at 8–9. In this case, the State posits that the 19th century period when legislatures enacted laws to address the new problem of young people's access to more lethal firearms provides the most direct analogues to the current Hawai'i law. *See id.* at 9.

One of the concurrences in *NRA* seems to endorse that view by advocating for special consideration of 19th century age restriction laws passed in the wake of the vast technological and societal shifts in the 19th century that rendered gun

violence by young people a concern for the first time. *See NRA*, 133 F.4th at 1134–40 (Rosenbaum, J., concurring). Judge Rosenbaum explains that certain factors can help courts assess when post-Founding era laws may serve as relevant analogues under *Bruen*. Specifically, Judge Rosenbaum posits that (1) a proliferation of new laws coinciding with new social or technological changes, and/or (2) "reasonably consistent and longstanding" laws can also reveal the Nation's principles regarding firearm restrictions, even if those laws come after the Founding. *See id.* at 1133. These examples may be especially relevant when Founding era principles are ambiguous. For instance, "if Founding Era practice plausibly supports two interpretations of the Second Amendment's scope—one that suggests a modern law's constitutionality and one that does not—a well-established, post-Founding practice may confirm which of the two controls," especially when there is a proliferation of consistent laws that "coincide[] with the new changes or technological developments" and go largely unchallenged. *Id.* at 1133–35.

Here, the Court is convinced that the societal and technological changes between the Founding and the middle of the 19th century warrant the so-called nuanced approach, as demonstrated by *Duncan* and articulated by Judge Rosenbaum's *NRA* concurrence. However, because Founding era common law and 19th century laws are aligned with regard to minors' *purchases* of firearms, the

application of the nuanced approach would not change the result when it comes to the purchase restrictions. *See Duncan*, 133 F.4th at 874 (finding the nuanced approach was triggered due to societal changes, but concluding it was unnecessary to apply because *Rahimi*'s straightforward approach reached the same result). By contrast, with regard to minors acquiring firearms as *gifts* from family, the Founding era rules are more ambiguous, whereas the 19th century laws—passed in response to the vast societal and technological developments that occurred after the Founding that rendered society much more similar to present times—are particularly relevant to the instant analysis. *See NRA*, 133 F.4th at 1133 (Rosenbaum, J., concurring). The Court thus applies the nuanced approach and relies more heavily on the 19th century laws when considering the gift restriction in Hawaii's current law.

The Court thus begins its analysis with an examination of the Founding era, before turning to the 19th century.

**2. Founding Era Analogues**

The State contends that three categories of Founding era laws (or rules) demonstrate that the current age restriction is consistent with the principles of the country's historical tradition of firearm regulation: (1) the common law infancy doctrine, which rendered people under age 21 unable to enter into contracts; (2) state militia laws that relieved people under 21 from providing their own weapons;

and (3) college and university rules banning firearms for students. *See* ECF No. 71 at 14–19. Plaintiffs respond that the infancy doctrine does not justify the State's current regulation, and that the militia laws actually support the idea that people under 21 had the right to keep and bear arms. *See* ECF No. 65-1 at 18–19, 24–32. They argue that the historical university rules are irrelevant because they applied to students regardless of age and mostly regulated where students could possess arms. *See* ECF No. 82 at 15.

The Court will address each in turn, but starts by noting that while it considered the common law's treatment of people under 21 in its PI order, it may have discounted the doctrine's importance to the analysis. The Court viewed the common law as *context*, *see* ECF No. 45 at 36–37, rather than fertile ground for assessing the principle of the regulatory tradition at the Founding. Since then though, various courts have considered the infancy doctrine as one historical analogue for modern age restrictions. *See NRA*, 133 F.4th at 1117–18; *McCoy*, 140 F.4th at 575–77. Perhaps the Court was guilty of requiring a Founding era "historical twin" in its PI Order. Now, though, the Court finds that the Founding era common law reveals a historical principle of preventing people under 21-years-old from purchasing goods, including firearms, and that the State militia acts reflect the reality that people under age 21 were generally unable to acquire their own weapons.

### *a. Common Law Infancy Doctrine*

Under English common law, through the colonial and Founding eras, and indeed for most of American history, people under age 21 were considered minors or infants. *See* ECF No. 88 ¶ 18 ("DCSF"); *McCoy*, 140 F.4th at 575. During the Founding era, the age of majority was set at 21 based on the understanding that people below that age lacked mental maturity, judgment, and responsibility. *See NRA*, 133 F.4th at 1117 (citations omitted); ECF No. 72-12 at 10[5] ("Brewer Report"). Because of this perceived deficit of judgment, minors lacked certain legal rights.

For example, an individual under 21-years-old could "neither alien his lands, nor do any legal act, nor make a deed, nor indeed any manner of contract, that will bind him." ECF No. 72-4 at 10 ("Cornell Report") (quoting 1 WILLIAM BLACKSTONE, COMMENTARIES Ch. 17)). As such, contracts entered into with minors were generally unenforceable or voidable unless the contract was for "necessities." DCSF ¶ 21; Brewer Report at 16; *see also NRA*, 133 F.4th at 1118. This meant that "since infants could 'not be held liable for failing to uphold their side of a contract over goods,' extending credit to minors was a 'considerable risk.'" *McCoy*, 140 F.4th at 576 (quoting Holly Brewer, By Birth or Consent:

---

[5] When citing the expert reports, the Court cites the page number in the footer at the bottom of each page.

Children, Law, and the Anglo-American Revolution in Authority 265 (2005)). Considering that the Founding era economy was largely credit-based, the inability to enter into binding contracts severely limited minors' ability to acquire any goods on their own. *See* DCSF ¶ 20; Cornell Report at 9–10; *McCoy*, 140 F.4th at 576.

Similarly, minors lacked the ability to purchase goods with cash—and cash and coin were scarce in the agrarian economy. *See* DCSF ¶ 24; Cornell Report at 10; *McCoy*, 140 F.4th at 576. Further, minors typically worked on family subsistence farms and had no access to "disposable income." *See* ECF No. 72-6 at 18–19 ("Spitzer Report"). Even if minors worked out of the home, they generally wouldn't generate excess income, and when they did, it legally belonged to their fathers. *See* Brewer Report at 19, 33; *NRA*, 133 F.4th at 1136 (Rosenbaum, J., concurring).

The practical effect of this inability to contract and lack of cash was that Founding era common law functionally precluded people under age 21 from purchasing or otherwise acquiring firearms. Two United States Courts of Appeals decisions from 2025 that considered challenges to laws setting an age limit for firearms relied on this fact to conclude that the Nation has traditionally restricted people under 21-years-old from purchasing weapons. *See McCoy*, 140 F.4th at 577; *NRA*, 133 F.4th at 1122.

In *NRA*, the en banc Eleventh Circuit rejected a Second Amendment challenge to a Florida law stating that a "person younger than 21 years of age may not purchase a firearm." *NRA*, 133 F.4th at 1113 (quoting FLA. STAT. § 790.065(13)). The court explained the common law backdrop in the Founding era and drew two lessons: "First, minors generally could not purchase firearms because they lacked the judgment and discretion to enter contracts and to receive the wages of their labor. Second, minors were subject to the power of their parents and depended on their parents' consent to exercise rights and deal with others in society." *Id.* at 1118. Based on those observations, and its assessment that 19th century statutes were in accord, the Court concluded that "the Florida law is consistent with our regulatory tradition in why and how it burdens the right of minors to keep and bear arms." *Id.* at 1122; *see also Rahimi*, 602 U.S. at 692 (clarifying that the "[w]hy and how the regulation burdens the right are central" to determining whether the challenged law is relevantly similar to a historical analogue).

Examining the "why" of the modern law and Founding era analogue, the court explained that both were animated by the understanding that "individuals under the age of 21 have not reached the age of reason and lack the judgment and discretion to purchase firearms responsibly." *NRA*, 133 F.4th at 1122–23. As to the "how," both the modern Florida law and the Founding era

common law precluded individuals under the age of 21 from purchasing arms. *See id.* at 1123. Notably, however, the Florida law did not explicitly prohibit familial gifts, and the court remarked that Founding era "[a]ccess to arms was a matter of parental consent." *Id.*

In *McCoy*, the Fourth Circuit concluded that 18 U.S.C. § 922(b)(1), which prohibits the commercial sale of handguns to individuals under age 21, was constitutional. *McCoy*, 140 F.4th at 572. As in *NRA*, the court examined the effect of the infancy doctrine in the Founding era and concluded that it "demonstrate[d] that there was an early American tradition of burdening the ability of 18- to 20-year-olds to purchase goods, including firearms." *Id.* at 577. Regarding the "how," the court explained that the common law at the Founding and § 922(b)(1) both made "it exceedingly difficult for a minor to purchase a handgun from a commercial seller," and did so by subjecting the seller to risk—financial risk under the infancy doctrine and criminal risk now. *See id.* As to why, both laws "were motivated by a recognition that individuals under the age of 21 lack good judgment and reason." *Id*. Thus, § 922(b)(1) was "relevantly similar" to the Founding era restrictions and passed muster under Second Amendment.

The Court agrees with *McCoy* and *NRA* that the Founding era infancy doctrine is "analogous enough" to the State's current age restriction, at least to the extent the State's law prohibits *purchase* of firearms. The Court will address

intrafamilial gifts below, but at least as to purchase of firearms, the infancy doctrine and the current Hawai‘i law are extremely similar. To start, the "why" of the two laws are the same: concern that people under 21 lack sufficient judgment and reason to buy firearms. *See NRA*, 133 F.4th at 1122–23; *McCoy*, 140 F.4th at 577. Plaintiffs, citing one of the dissents in *NRA*, argue that the infancy doctrine did not share the same "why" as the modern law because the infancy doctrine protected the minor "against the wiles and machinations of designing men," ECF No. 65-1 at 19 n.3. However, that limited view of the common law ignores that the infancy doctrine was more generally "motivated by a recognition that individuals under the age of 21 lack good judgment and reason," *McCoy*, 140 F.4th at 577, and animated by concerns about the group's "immaturity and impulsivity," *NRA*, 133 F.4th at 1123; *see also* Brewer Report at 20 (discussing Founding era recognition that youthful immaturity represented a threat to the public). As to the "how," there is no real dispute that the infancy doctrine functionally restricted people under 21-years-old from purchasing firearms just as the State's current law prohibits the same.

The question of whether the Founding era's infancy doctrine reveals a principle that supports Hawaii's ban on intrafamilial transfers is a closer call. On one hand, the infancy doctrine precludes *commercial* transactions and would not necessarily cover, say, a 1790s father gifting his son a firearm. In fact, as

described below, parents were often required to provide their sons with a firearm for militia service (although whether a father could gift a son a firearm for use in militia service may say little about a broader *right* of the son to own firearms).

On the other hand, "infants" at the Founding "were entirely subsumed within the patriarchal authority of male heads of households." Cornell Report at 9. This extended to entitlement to property such that even the wages of those few people under 21 who worked outside their homes legally belonged to their father if he was alive, or otherwise to their mother. *See* Brewer Report at 33. Further, as minors were "legally disabled," the son in the gift example would likely have no legal recourse if the father decided to take the gun back. *See* Cornell Report at 14. All this suggests that people under 21-years-old were not really entitled to *own* anything independent from their father.

Yet, there is no specific evidence in the record that speaks directly to whether parents at the Founding were precluded from gifting firearms to their children, and the state militia laws offer circumstantial evidence that such gifts would not have been considered problematic. Thus, while the Court thinks that the general treatment and legal rights of minors reveal a regulatory tradition that supports the State's current gun laws, the requirement that parents provide their sons guns for militia service suggests the opposite. The historical record is therefore ambiguous as to the ability of minors in the Founding era to obtain

ownership of firearms via forms of acquisition other than purchase, e.g., intrafamilial transfer. The Court therefore cannot draw strong conclusions solely from the Founding era. It will thus utilize the nuanced approach—as described above—and put more stock in the 19th century laws regarding the viability of such transfers.

Plaintiffs separately argue that the infancy doctrine does not support the State's position—and that the Fourth and Eleventh Circuits erred—because (1) the doctrine did not apply to firearms because they were "necessities," and (2) it restricted *minors* whereas today people 18-years-old and older are *adults*. *See* ECF No. 65-1 at 25–32.

While Plaintiffs are correct that what could be considered a necessity in the Founding era was flexible, *see id.* at 29–30; Brewer Report at 15–16, the weight of authority demonstrates that firearms were not generally considered necessities. *McCoy* and *NRA* both cited early-American treatises suggesting that goods representing "necessities" were limited and included things like food, clothing, education, and medicine. *See McCoy*, 140 F.4th at 576; *NRA*, 133 F.4th at 1118; *see also* Brewer Report at 16 ("An infant can make no other contract that will bind him: Yet he may bind himself to pay for his necessary meat, drink, apparel, physick [(medical costs)], and such other necessaries: and likewise for his good

teaching and instruction, whereby he may profit himself afterwards") (quoting Commentaries on the Laws of England (Boston: Isaiah Thomas, 1790), 1:466).

Plaintiffs don't dispute the content of the treatises, and instead point out that the lists were not exhaustive. *See* ECF No. 65-1 at 30. Although that's true, it doesn't support the argument that guns were included in the category. Plaintiffs also direct the Court to a case from 1804 where a military uniform was deemed to be a necessity, *see id.* (citing *Coates v Wilson*, 5 Esp. 152, 152 (1804)), but of course a uniform represents "clothing," *see* Brewer Report at 18 n.18 (discussing case). In their reply, Plaintiffs cite another case suggesting that military equipment was "exempt from attachment" in bankruptcy proceedings to argue that arms were necessities. *See* ECF No. 82 at 19–20 (citing *Fry v. Canfield*, 4 Vt. 9, 10 (1831)). Neither historical case specifically addresses a minor claiming a gun as a necessity, and—as discussed more thoroughly below—the fact that many states required parents to provide weapons to minors for militia service suggests that minors could not readily contract for arms, meaning they weren't widely considered necessities.

By contrast, the State (and *McCoy* and *NRA*) cite *Saunders Glover & Co. v. Ott's Adm'r*, 12 S.C.L. 572 (1822), which explained that "lodging, clothing, food, medicine and education, are necessaries to every infant," while exempting from the classification, " liquor, *pistols*, powder, saddles, bridles, whips, fiddles, fiddle-strings." *Id.* (emphasis added). In sum, the Court agrees with *McCoy* and *NRA*

and concludes that firearms were not categorically considered necessities, meaning that the infancy doctrine generally restricted minors from obtaining and owning them.

Next, Plaintiffs argue that the infancy doctrine applied to *minors*, which may have included 18- to 20-year-olds at the Founding, but wouldn't now as those folks are considered "full-fledged adults." ECF No. 65-1 at 24. The Court is not persuaded the infancy doctrine was—or that the Second Amendment is—tied to some shifting abstract age of "majority." To start, Plaintiffs cite no evidence that "[t]he contemporary age of majority is 18" or that 18-year-olds are "full-fledged adults." *Id.* at 18, 24. Indeed, while 18-year-olds now have more rights or freedom than they did at the Founding in some contexts, states may still restrict them from purchasing goods like alcohol and tobacco. *See* DCSF ¶ 51; *see also NRA*, 133 F.4th at 1125–26 (citing some states' laws that maintain an older age of majority, at least for certain activities). Plaintiffs claim that age restrictions on alcohol, tobacco, and certain forms of gambling are irrelevant because those activities are not constitutionally protected, but that misses the point that states have historically restricted different behavior for different ages.

In fact, it has always been the case that "[t]he definition of an 'infant' at common law varied with the nature of the activity. For example, the age of consent to marry ranged from twelve to fourteen and the age of criminal

responsibility was fourteen." *McCoy*, 140 F.4th at 577 (citations omitted). By contrast, "'infancy' in contract law was not tied to a dynamic, generally applicable age of majority"; instead, it ended when someone turned 21, which Plaintiffs admit. *See id.* (citation omitted); DCSF ¶ 52. This suggests to the Court that at the Founding it was universally accepted that people under age 21 lacked judgment and should not enjoy the full panoply of rights. *See McCoy*, 140 F.4th at 577. It would be anomalous to say that a state could not make that same determination now and regulate accordingly. As the Eleventh Circuit succinctly explained, "[t]hat Florida has lowered the age of majority for some rights does not mean that it has less power to restrict the rights of minors than it did at the Founding." *NRA*, 133 F.4th at 1125.

In sum, the Court concludes that the Founding era common law reveals "an early American tradition of burdening the ability of 18- to 20-year-olds to purchase goods, including firearms." *McCoy*, 140 F.4th at 577.

***b. Militia Laws***

Notwithstanding the infancy doctrine, Plaintiffs argue that mandatory militia service in the Founding era and the requirement that militia members provide their own guns meant that 18- to 20-year-olds were *required* to own arms, and that this is evidence of their Constitutional right to possess firearms. *See* ECF No. 65-1 at 18–19; ECF No. 82 at 8–9. The State responds that the state militia acts all

included "some kind of special consideration for militia members under the age of 21 that was consistent with their status as minors" and otherwise reveal an *obligation* rather than a right. *See* ECF No. 71 at 17–18 (quoting DCSF ¶ 25; Spitzer Report at 24).

The federal Militia Act of 1792 provided in part:

> That each and every free able-bodied white male citizen of the respective states, resident therein, who is or shall be of the age of eighteen years, and under the age of forty-five years (except as is herein excepted) shall severally and respectively be enrolled in the militia . . . That every citizen so enrolled and notified, shall, within six months thereafter, provide himself with a good musket or firelock.

Militia Act of May 8, 1792, § 1, 1 Stat. 271, 271 (1792). But the act also allowed states to exempt people from service "notwithstanding their being above the age of eighteen and under the age of forty-five years." *Id.* § 2 (available at ECF No. 83-2 at 6); *see McCoy*, 140 F.4th at 578. And the state militia acts enacted in conformity with the Militia Act of 1792 mostly exempted people under 21 from supplying their own arms; instead, the laws placed the burden on the minors' parents or guardians. *See* DCSF ¶ 26; Spitzer Report at 25 (noting that ten of the original thirteen states passed such laws); *see also NRA*, 133 F.4th at 1119–20 (citing state militia acts). These state exemption laws thereby reflected the reality that people under 21—even though required to bring them—were unable to acquire their own arms based on the infancy doctrine. *See NRA*, 133 F.4th at 1119–20.

The federal mandatory militia service and requirement to bring a musket to muster therefore reveal little about the scope of any right to firearms for people under 21-years-old. As the Third Circuit explained, the obligation to have a gun to bring to militia service "is distinguishable from a right to bear arms unconnected to such service." *See Lara*, 125 F.4th at 444. Further, as *McCoy* commented, "even if the Militia Act is evidence of some constitutional right to purchase firearms, it cannot stand for the proposition that such a right vested firmly at 18." *McCoy*, 140 F.4th at 578.

Nevertheless, in striking down age restriction laws, both the Fifth Circuit and Third Circuit cited the Militia Act as evidence of a right for 18-year-olds to acquire arms. The Court finds these cases less persuasive than *NRA* and *McCoy*. In *Reese*, the Fifth Circuit reasoned that the Militia Act of 1792 required 18-year-olds to enroll in the militia and provide their own weapons, meaning they "must have been allowed to 'keep' firearms for personal use." *Reese*, 127 F.4th at 596. But *Reese* "ignored how the common-law regime restricted minors' access to firearms," *NRA*, 133 F.3d at 1128–29, and did not address the implications of the state militia acts that relieved minors from the obligation to supply their own weapons. *Reese* thus failed to contextualize the Militia Act of 1792 or grapple with other conflicting legal regimes.

In *Lara*, the Third Circuit didn't go quite as far as the court in *Reese.* It acknowledged that the Militia Act of 1792 could not itself establish a right for 18-year-olds to bear arms independent of militia service, but the court still considered the act "good circumstantial evidence of the public understanding at the Second Amendment's ratification as to whether 18-to-20-year-olds could be armed, especially considering that the [government] cannot point to a single founding-era *statute* imposing restrictions on the freedom of 18-to-20-year-olds to carry guns." *Lara*, 125 F.4th at 444 (emphasis added). But, as in *Reese*, *Lara* did not assess how the Founding era common law viewed 18- to 20-year-olds. Notably, the court referenced "founding-era militia laws that required parents or guardians to supply arms to their minor sons," but rejected their significance because "nothing in those statutes says that 18-to-20-year-olds could not purchase or otherwise acquire their own guns." *Id*. at 445. Of course, as the State has established here, the infancy doctrine explains why those 18-to-20-year-olds could not acquire their own guns and why there were no statutes restricting them from doing so. *See Rahimi*, 602 U.S. at 739–40 (explaining that requiring "overly specific analogues" wrongfully "assumes that founding-era legislatures maximally exercised their power to regulate") (Barrett, J., concurring).

Ultimately, as the Court explained in its PI Order, it does not find the Militia Act of 1792 to be persuasive evidence of any right for 18-year-olds to acquire

firearms. *See* ECF No. 45 at 39–40. When viewed in context with the infancy doctrine and the state militia acts' apparent acknowledgment of the common law, the Court concludes that mandatory militia service and the general requirement to bring a gun to it says little about the historical understanding of the Second Amendment.

### *c. College and University Rules*

The State argues that Founding era college and university rules further demonstrate a historical tradition of restricting firearm access for people under 21. *See* ECF No. 71 at 19–20. While there's no doubt that Founding era universities restricted firearm possession, *see* DCFS ¶ 34, the Court does not consider those rules relevantly similar enough to the challenged law to justify the current age restrictions. As the Court explained in the PI Order, these laws would have applied to very few people, meaning the "how" of their restrictions diverge. *See* ECF No. 45 at 40; *see also* Spitzer Report at 34. Mostly, too, the rules applied on-campus, further demonstrating their limited reach. *See* Spitzer Report at 34; *NRA* 133 F.4th at 1120–21.

### **3. Nineteenth Century Analogues**

Again, courts may consider post-Founding era history if such records serve as confirmation of the Founding era history. *See Bruen*, 597 U.S. at 36–38. Further, under the nuanced approach, and because of the ambiguity of Founding

era law on the matter, the Court concludes the 19th century laws take on special relevance with regards to intrafamilial transfers.

During the second half of the 19th century, at least nineteen states and Washington D.C. enacted statutes restricting access to weapons to people under age 21. *See* DCSF ¶ 41; *NRA*, 133 F.4th at 1122. The State argues that these new laws were consistent with the Founding era common law restrictions on firearm acquisition and represent relevantly similar analogues to the current challenged prohibition. *See* ECF No. 71 at 20–24. Plaintiffs dispute the 19th century laws' consistency with the Founding era and argue they were enacted too late for the *Bruen* test. *See* ECF No. 65-1 at 23. They also claim that Hawaii's current law is more burdensome than 19th century analogues because it bans "intrafamilial transfers" and applies to a broader range of arms. *See id.* The Court finds the 19th century laws are generally consistent with the practical effect of the infancy doctrine: they precluded young people from acquiring arms. Further, as the Court will explain, it considers the 19th century laws to be close analogues to Hawaii's current law, if not quite "historical twins." The Court thus concludes that they support Hawaii's age restriction.

***a. Societal Changes***

To provide context, the Court begins with a brief overview of the technological and societal changes that occurred between the Founding era and the

latter part of the 19th century. The Court then analyzes samples of the 19th century laws and concludes that they are analogous enough to the State's instant law.

As the Court noted in its PI order, the country changed drastically between 1800 and 1900. *See* ECF No. 45 at 31–33. In 1800, about 90% of the population engaged in agriculture, mostly in the form of small subsistence family farms. *See* Spitzer Report at 18–19. A century later, the Nation had transformed into a global industrial power. *See id*. at 19. What did this mean for the daily lives of many Americans? For one, it meant movement away from rural areas to urban-industrialized cities and towns with greater population density. *See id.* This also resulted in children leaving home for work in industrial and manufacturing sectors. *See id.* The rise in urbanization additionally led to "an increased number of youth on the streets," who became involved in crime. *See id.*; *see also* Cornell Report at 25. Industrialization and the increase in wage labor also enabled mass production and consumption for the first time. *See* Spitzer Report at 19–20; Cornell Report at 24.

At the same time, firearm technology made smaller, cheaper, and more deadly handguns widely available. *See* Cornell Report at 24–25; ECF No. 72-2 ("Roth Report") at 20–25 (describing technological advances); DCSF ¶ 4. These factors combined to cause rising levels of gun violence and accidents in the Post-

Civil War era, including those caused by younger people. *See* Cornell Report at 25; *see also* DCSF ¶¶ 5–6. Legislatures responded to the problem by passing a raft of restrictions. As the Fourth Circuit in *McCoy* commented:

> Because handgun ownership was not prevalent until the mid-nineteenth century, it is not surprising that the government cannot point us to a 'historical twin' from the founding era. But as soon as handguns came on the scene, legislatures quickly prohibited their sale to minors, consistent with our Nation's regulatory tradition of restricting firearm sales to infants.

*McCoy*, 140 F.4th at 579.

***b. 19th Century Laws***

In the 19th century, "Alabama, Tennessee, Kentucky, Indiana, Missouri, Illinois, Maryland, West Virginia, Wisconsin, Iowa, Louisiana, Wyoming, the District of Columbia, North Carolina, and Texas prohibited selling, loaning, or giving dangerous weapons, including pistols, to individuals under the age of 21."

*NRA*, 133 F.4th at 1121.[6] One representative example is an 1875 Indiana law that provided:

> [I]t shall be unlawful for any person to sell, barter, or give to any other person, under the age of twenty-one years, any pistol, dirk, or bowie-knife, slung-shot, knucks, or other deadly weapon that can be worn, or carried, concealed upon or about the person, or to sell, barter, or give to any person, under the age of twenty-one years, any cartridges manufactured and designed for use in a pistol.

1875 Ind. Acts 59. Similarly, Maryland made it illegal for anyone "to sell, barter or give away any firearm whatsoever or other deadly weapons, except shotgun, fowling pieces and rifles, to any person who is a minor under the age of twenty-one years." 1882 Md. Laws 656.

Notably, many of those laws prohibited more than just the commercial purchase or sale of weapons and instead also restricted gifts and loans. And only four of those jurisdictions exempted parental gifts from their prohibitions. *See*

[6] Citing 855–56 Ala. Laws 17; Tenn. Code § 4864 (1858), reprinted in The Code of Tennessee Enacted By the General Assembly of 1857–'8, at 871 (Nashville, E. G. Eastman & Co. 1858); 1860 Ky. Acts 245; 1875 Ind. Acts 59; Mo. Rev. Stat. § 1274 (1879), reprinted in 1 The Revised Statutes of the State of Missouri 1879, at 224 (Jefferson, Carter & Regan 1879); 1881 Ill. Laws 73; 1882 Md. Laws 656; 1882 W. Va. Acts 421; 1883 Wis. Sess. Laws 290 (vol. 1); 1884 Iowa Acts 86; 1890 La. Acts 39; 1890 Wyo. Terr. Sess. Laws 140; J. A. Van Orsdel & Fenimore Chatterton, Revised Statutes of Wyoming in Force December 1, 1899, at 1253 (Laramie, Chaplin, Spafford & Mathison 1899) (codifying the territorial law); 27 Stat. 116–17 (1892); 1893 N.C. Sess. Laws 468–69; 1897 Tex. Gen. Laws 221–22.

*NRA*, 133 F.4th at 1121 (citing 1860 Ky. Acts 245; Mo. Rev. Stat. § 1274 (1879); 1897 Tex. Gen. Laws 221–22; 1881 Ill. Laws 73).

Further, these 19th century laws faced few if any constitutional challenges when they were passed, suggesting they were seen as uncontroversial. From this absence of litigation, the State argues that people in the 19th century would not have regarded the age restrictions as violating the Second Amendment. *See* ECF No. 71 at 22. The other courts that have upheld age restrictions have noted the same. *See McCoy*, 140 F.4th at 579 ("These nineteenth-century laws were celebrated by the public and went largely unchallenged."); *NRA*, 133 F.4th at 1140–42 (Rosenbaum, J., concurring) (describing how the 19th century litigation history supports the conclusion that banning sales of firearms to people under 21 was constitutional).

***c. How and Why Analysis***

Turning to the "how" and "why" analysis of these 19th century analogues, the Court first notes that the Plaintiffs don't explicitly address the latter with regard to the 19th century laws. As such, there is no dispute that the 19th century laws and the current Hawai'i law share the same motivation: a recognition that people under age 21 lack maturity, and a concern about weapons in immature hands. *See* Roth Report at 30–31; Spitzer Report 11–12, 20–21; DCSF ¶¶ 47–48; *NRA*, 133 F.4th at 1145 (Rosenbaum, J., concurring) ("[B]oth nineteenth-century legislatures

and Florida tried to curb a rise in deadly firearm violence that Under-21s were inflicting."). Even *Reese*, which struck down an age restriction, acknowledged that the 19th century laws were relevantly similar.[7] *Reese*, 127 F.4th at 599.

The "how" between the laws also share significant overlap despite Plaintiffs' arguments to the contrary. First, Plaintiffs argue that Hawaii's law is more burdensome than the historical analogues because it does not allow for intrafamilial transfers. *See* ECF No. 65-1 at 23; ECF No. 82 at 10–11. To Plaintiffs' credit, they are correct that Hawai'i law restricts even intrafamilial transfer, and *NRA* does stress that the Florida statute at issue in that case "preserve[d] access to firearms with parental consent." *NRA*, 133 F.4th at 1123. But, as discussed above, as many as twenty states' laws prevented all transfer—i.e., not just sales—of weapons to people under 21-years-old, and only a handful of those exempted parental gifts from their reach. The Court further emphasizes that the 19th century prohibitions on intrafamilial gifts were not necessarily inconsistent with the Founding era common law that prevented minors from

---

[7] The Fifth Circuit instead discounted the 19th century laws because it concluded the Founding era revealed a right to firearm ownership for 18- to 20-year-olds and that "the [19th century] laws were passed too late in time to outweigh the tradition of pervasively acceptable firearm ownership." *Id.* But as the Court explained, it disagrees with *Reese*'s conclusion regarding the Militia Act of 1792 and finds the 19th century laws broadly consistent with Founding era common law. Thus, the Court finds the 19th century laws relevant to the *Bruen* analysis.

acquiring their own guns via purchase and more generally prevented minors from being entitled to ownership of anything separate from their fathers. Still, as discussed above, to the extent that Founding era law was ambiguous about how intrafamilial gifts would have been viewed, the 19th century proliferation of laws banning such transfers suggest that they were in accord with the Nation's tradition of firearm regulation. The Court ultimately finds the extent of the unchallenged 19th century legislation banning such gifts to be persuasive support for Hawaii's modern age restriction.

Next, Plaintiffs emphasize that Hawaii's law is broader than the commercial sale prohibitions at issue in *McCoy* and *NRA*. *See* ECF No. 82 at 10. That's true, but those cases simply decided the matters before them; the Court is doing the same here and again reiterates that the 19th century laws banned all forms of transfers, including familial transfer in many cases. The Court concludes that Hawaii's current ban on transfer and acquisition thus finds support in the 19th century analogues.

The Court also acknowledges—as it did in the PI order—that Hawaii's law is more burdensome than the 19th century analogues in that it generally bans ownership of all types of guns—including long guns—for people under the age of 21, whereas the 19th century laws restricted pistols and other concealable handheld arms. *See* ECF No. 45 at 50–56; *see also* ECF No. 65-1 at 20 ("Even during the

Reconstruction Era, the state was only able to produce a handful of laws which restricted pistol possession rather than firearms in general.”). Nevertheless, the Court still finds the 19th century laws relevantly similar to the instant age restriction.

First, the Court finds *Bondi* instructive. There, the Eleventh Circuit concluded that the fact that the Florida law banned purchases of all firearms did not render it impermissible because “[a]t the Founding, the law precluded the purchase of any kind of firearm by a minor,” meaning the Florida law tracked the law of the Founding. The same is true here: the Hawai‘i law bans acquisition of all firearms, much like the infancy doctrine prevented acquisition at the Founding.

Additionally, because *Heller* commented that handguns were the “quintessential self-defense weapon,” the laws banning handguns reveal a principle of broad gun restriction. *Heller*, 554 U.S. at 629. A history of states’ restrictions on the most fundamental self-defense firearms suggests they may restrict other forms of firearms as well. *See Rocky Mountain Gun Owners*, 121 F.4th at 141–142 (McHugh, J., concurring). Further, the record suggests that 19th century legislatures targeted pistols because they were more dangerous and prone to be used for violence than the long guns of the times, which were still muzzle loaded and could not be used impulsively. *See* Roth Report at 25–29. Unlike those long guns of the past, today’s rifles are more efficient for violence. *See id.* at 39–40.

So, even though the challenged Hawai‘i law isn't a "dead ringer" for the historical precursors, the Court finds those "analogous enough" to justify the current restrictions. Even if 19th century lawmakers decided not to restrict minors' possession and acquisition of long guns because those firearms didn't present a societal issue, 21st century legislators need not necessarily make those exact same decisions. *See Rahimi*, 602 U.S. at 739 (Barrett, J., concurring). As Justice Barrett described, courts have faced a level of generality problem when applying *Bruen*, but "'[a]nalogical reasoning' under *Bruen* demands a wider lens: Historical regulations reveal a principle, not a mold." *See id*. at 739–40. The Court thinks that the right level of generality in this case is to say that there is a strong historical tradition in this country of restricting acquisition of firearms by people under age 21.[8]

**C. Summing Up**

Based on the record before it, the Court finds solid evidence in Founding era common law that society restricted the practical ability of people under 21 from acquiring goods, including firearms, because of concerns about their judgment and maturity. While the Militia Act of 1792 and state militia laws reveal that minors

---

[8] The Court also notes that Hawai‘i law allows people under age 21 to temporarily use and possess long guns in certain contexts. *See* HRS §§ 134-4(c), 134-5(a) & (b).

would have been allowed to have arms in certain contexts, the militia laws' onus on parents' provision of weapons for their sons also reflects the reality that minors were practically prohibited from obtaining guns. Further, the common law restrictions reduced the necessity of direct statutory regulation, meaning that the absence of direct Founding era regulation does not necessarily suggest a right for people under age 21 to acquire arms. To require direct regulation would wrongfully "assume[] that founding-era legislatures maximally exercised their power to regulate," *Rahimi*, 602 U.S. at 739–40 (Barrett, J., concurring), and require a "dead ringer" or "historical twin," *id.* at 692. The Court thus discerns a Founding era tradition of limiting minors' access to firearms.

After the Founding, as society became more industrial, urban, and commodified in the 19th century, people under 21 began working for wages outside the home in large numbers and were able to keep their earnings for the first time. These societal trends also coincided with technological advances that made firearms more efficient and lethal for violent purposes. As soon as this occurred, states began restricting acquisition of arms, including pistols, by people under 21 because of their lack of maturity and involvement in crime. These laws went largely unchallenged. While these 19th century laws were not dead ringers for the modern Hawai‘i age restriction, they shared the same why and mostly the same how, such that the Court considers them analogous enough to the challenged law.

The Court thus concludes that the Founding era's practical prohibition on acquisition, coupled with the 19th century's explicit prohibitions, reveal a principle of restricting firearm acquisition for people under 21. Hawaii's current age restriction falls within that tradition.

## IV. CONCLUSION

For the foregoing reasons, the Court DENIES Plaintiffs' MSJ and GRANTS Defendant's Counter MSJ. The Court directs the clerk to enter judgment in favor of Defendant and close the case.

IT IS SO ORDERED.

DATED: Honolulu, Hawai'i, August 31, 2026.

Jill A. Otake
United States District Judge

CIV. NO. 24-00496 JAO-WRP, *Roache, et al. v. Lopez*, Order Denying Plaintiffs' First Motion for Summary Judgment (ECF No. 65) and Granting Defendant's Counter Motion for Summary Judgment (ECF No. 71)